Page 276

UNITED STATES SECURITIES AND EXCHANGE COMMISSION


In the Matter of:          )

                           )   File No. FL-03815-A

JAY PEAK, INC.             )


WITNESS:   William Stenger

PAGES:     276 through 563

PLACE:     Securities and Exchange Commission

           801 Brickell Avenue, Suite 1800

           Miami, Florida 33131

DATE:      Thursday, September 17, 2015


     The above-entitled matter came on for hearing,

pursuant to notice, at 9:24 a.m.



PLAINTIFF'S
EXHIBIT
20

Diversified Reporting Services, Inc.

(202) 467-9200

Page 277

```
 1   APPEARANCES:
 2
 3   On behalf of the Securities and Exchange Commission:
 4       BRIAN JAMES, ESQ.
 5       TRISHA SINDLER FUCHS, ESQ.
 6       CHRISTOPHER MARTIN, ESQ.
 7       ROBERT K. LEVENSON, ESQ.
 8       MARK DEE, ACCOUNTANT
 9       Division of Enforcement
10       Securities and Exchange Commission
11       801 Brickell Avenue
12       Suite 1800
13       Miami, Florida 33131
14       (305) 982-6300
15
16   On behalf of the Witness:
17       DAVID B. GORDON, ESQ.
18       Mitchell, Silberberg & Knupp, LLP
19       12 East 49th Street, 30th Floor
20       New York, NY  10017
21       (212) 509-3900
22
23
24
25
```

Page 278

```
 1           CONTENTS
 2
 3   WITNESS:              EXAMINATION
 4   William Stenger           280
 5
 6   EXHIBITS:  DESCRIPTION        IDENTIFIED
 7     165    Pictures        352
 8     166    Stateside PPM      380
 9     167    Payment Register,
10            dated 3/7/12 - 8/31/15    356
11     168    AnC Bio Amended PPM    412
12     169    Q Burke PPM        459
13     170    Q Burke Amended PPM    459
14     171    Pictures        423
15     172    Letter, dated 5/18/11   427
16     173    Pictures        433
17     174    Jay Peak Penthouse Suites PPM  472
18     175    Jay Peak Hotel Suites PPM  474
19     176    Phase I PPM        475
20     177    Jay Peak Lodge & Townhouses
21            PPM        475
22     178    Jay Peak Golf & Mountain
23            Suites PPM        477
24     179    Payment Register,
25            dated 12/31/12 - 9/11/15    488
```

Page 279

```
 1            PROCEEDINGS
 2        MR. JAMES:  We are on the record at
 3   9:24 a.m.  Today is Thursday, September 17th,
 4   2015.  My name is Brian James, and with me are
 5   Trisha Sindler, Christopher Martin, Bob Levenson,
 6   and Mark Dee, and we are officers of the
 7   Commission for purposes of today's proceedings.
 8        We are here today to resume the
 9   examination of William Stenger, which was
10   adjourned back in May of 2014.
11        Mr. Stenger, are you represented by
12   counsel for purposes of today's proceedings?
13        MR. STENGER:  I am.
14        MR. JAMES:  Would Counsel please
15   identify himself once again for the record.
16        MR. GORDON:  Sure.  David Gordon,
17   Mitchell, Silberberg & Knupp.
18        MR. JAMES:  Mr. Gordon, have you
19   changed law firms since you last appeared?
20        MR. GORDON:  There was a merger between
21   my prior law firm, Richardson & Patel.
22        MR. JAMES:  Okay.
23        Mr. Stenger, do you understand that you
24   remain under oath for today's proceedings?
25        MR. STENGER:  I do.
```

Page 280

```
 1        MR. JAMES:  And also let the record
 2   reflect that a copy of the Formal Order of
 3   Investigation in this matter will be available to
 4   the witness and his Counsel for examination
 5   during the course of this proceeding.
 6        Whereupon,
 7            WILLIAM STENGER
 8   was recalled as a witness and, having been
 9   previously duly sworn, was examined and testified
10   further as follows:
11            EXAMINATION
12        BY MR. JAMES:
13        Q   And we'll jump right in.  If you could
14   for me -- like I said before, the last time you
15   appeared before us was back in May 2014.  If you
16   could now just update us on the current status of
17   each of the Jay Peak limited partnerships, and
18   just starting by the full name of the partnership
19   and just tell us what's the current status.
20        A   Okay.  The Phase I project has been
21   fully completed, and we operate that hotel and it
22   is a very successful operation.  The investors in
23   Phase I are in the process of being repaid their
24   investment.  We have made a guaranteed commitment
25   to repay all of their investment by January of
```

Page 281

```
 1   2018.
 2         By that time, they will not only have
 3   received their five hundred thousand dollar
 4   investment back, but based on the payment
 5   schedule we have, they will actually receive five
 6   hundred and fifty thousand, which we're very
 7   proud to be able to say that they'll be getting
 8   more back than they put into the project.
 9   Q   Okay.
10   A   Phase II --
11   Q   Before you go on now, can you just give
12   me the full name of Phase I.
13   A   It was known as the Lodge and Town --
14   excuse me, Tram Haus Lodge project. That's how I
15   know it as. Phase I it's --
16   Q   Is that the Jay Peak Hotel Suites --
17   A   Phase I.
18   Q   -- Phase I?
19   A   Correct. Yes.
20   Q   And then when you said there's a
21   guaranteed commitment, is that in the form of
22   some type of written agreement between the
23   limited partnership and the Phase I investors?
24   A   It is now, yes.
25   Q   Okay. And what document is that?
```

Page 282

```
 1   A   Well, I don't have it with me, but I'd
 2   be pleased to send it to you.
 3   Q   Okay.
 4         And then is that an agreement that's
 5   signed by anyone of the Phase I investors, or is
 6   it an agreement that was put in place by like the
 7   limited partnership?
 8   A   It's an agreement that was put in place
 9   by the general partner pursuant to the agreement
10   we had with our limited partners to exit them at
11   the time that we felt it was appropriate.
12         MR. JAMES: And if we could on the
13   record request a copy of that document from
14   Counsel.
15         MR. GORDON: I believe you have it. I
16   believe that would be the second amendment to the
17   partnership agreement for Jay Peak Hotel Suites,
18   LP. I think that is the document.
19         MR. JAMES: Okay. All right. So we'll
20   take a look at that. In the event that it's
21   not --
22         MR. MARTIN: Is it like a payment
23   schedule?
24         MR. GORDON: I believe that's right. I
25   mean -- if someone pulls it out, I mean, I'll
```

Page 283

```
 1   confirm. If that's not the document and I'm
 2   incorrect, then, obviously, we'll get it for you.
 3         THE WITNESS: But there is a payment
 4   schedule associated with that.
 5         MR. MARTIN: Okay. I think I've seen
 6   it.
 7         THE WITNESS: And because all of the
 8   limited partners have now had their conditions
 9   removed, we're in a position to guarantee that,
10   which is a very positive outcome for the
11   partners.
12         MR. MARTIN: And who is the guarantor?
13         THE WITNESS: Jay Peak. The resort,
14   the entire resort facility and property is the
15   guarantee.
16         Would you like me to continue?
17         BY MR. JAMES:
18   Q   Just one more question. On Phase I,
19   for the accounts that are at People's Bank, are
20   you the only signatory on those accounts?
21   A   On the Phase I?
22   Q   Yes.
23   A   You know, I honestly don't know if I'm
24   the only one. I know that I was the signatory
25   for Phase I. Phase I is now concluded.
```

Page 284

```
 1   Q   And when was that concluded?
 2   A   Well, when we initiated the exit
 3   strategy for those partners, the partnership
 4   ceased to exist, and they now are on a payment
 5   regimen for the payback of their investment.
 6   Q   Okay.
 7         MR. MARTIN: And are all limited
 8   partners being purchased out of -- are there
 9   different share classes?
10         THE WITNESS: No. They're all the
11   same. They're all the same.
12         MR. MARTIN: So is class -- are the
13   Class B shares with the first phase?
14         THE WITNESS: You know, I'm not sure of
15   the technical position, but they're all --
16   they're all equal. They're all the same.
17         MR. MARTIN: Did the general partner,
18   due to some cost overruns, obtain any ownership
19   interest in the Phase I?
20         THE WITNESS: Well, right now, we
21   control Phase I.
22         MR. MARTIN: But as far as equity?
23         THE WITNESS: We have the equity in
24   that hotel now, and we've taken the
25   responsibility of guaranteeing the repayment to
```

Page 285

1   each of the partners.
2          MR. MARTIN:  And when it's repurchased,
3   who will be the ultimate owner of the property?
4          THE WITNESS:  The company will.
5          MR. MARTIN:  Jay Peak --
6          THE WITNESS:  Yes.
7          MR. MARTIN:  -- Resort?
8          THE WITNESS:  Yes.
9          MR. MARTIN:  Okay.
10   BY MR. JAMES:
11       Q    Okay.  If you want to go on to Phase
12   II.
13       A    Phase II is an operating entity, hotel,
14   conference center, water park, ice arena, golf
15   course, clubhouse, continues to operate
16   successfully, growing in sales each year,
17   performing very, very well.
18       Q    Are there returns being paid to --
19       A    There are.  There are.
20       Q    Okay.
21          And could you give me a sense of, are
22   there quarterly --
23       A    Yes.  We issue quarterly reports.
24   There are usually payments at least two of those
25   four quarters.  In our industry, our business,

Page 286

1   the peak quarters are the winter, and the softer
2   quarters are the summer.
3          In the summer, we generally pay our
4   bills, keep abreast of our financial commitments.
5   In the winter, we do better because our occupancy
6   is higher and our average daily rates are higher.
7   And so as a result, the -- we are paying all the
8   bills in the spring and fall, and we're producing
9   profitable results that are shared with the
10   partners.
11          It averages out to about two and a half
12   to three percent a year, and there may be a
13   quarter where there will be no payment, but there
14   will be a report that shows income, expenses.
15   And if there's a deficit, we hold that deficit.
16   And -- but in the wintertime, especially the
17   months of December through April, those five
18   months of the highest income, we go above water,
19   so to speak, and from those proceeds, the
20   investors will see a return.  And it's proven to
21   be about as predicted.
22       Q    Okay.
23          And when was that construction
24   completed?
25       A    November of 2011, I believe.

Page 287

1       Q    Okay.
2          And it's been in operation since?
3       A    It's been in operation since then.
4       Q    Okay.
5          And have all of those investors
6   received their conditional green card and have
7   their conditions removed?
8       A    I believe that all but one or two have,
9   and the last couple are very close to that point.
10       Q    Were there any cost overruns associated
11   with Phase II?
12       A    Phase II was over budget, yeah.
13       Q    Okay.
14          And do you know by how much?
15       A    Oh, I think it was over by somewhere in
16   the neighborhood of fifteen or twenty million.
17   And those were -- I'm sorry.
18       Q    My question will be:  What was the
19   source of those overruns?
20       A    The two particular things in that
21   project that ran over were the water park,
22   principally, and the ice arena and the golf
23   clubhouse.
24       Q    Okay.
25          And did the investors bore the cost of

Page 288

1   those --
2       A    No, they did not.
3       Q    Who did?
4       A    Our company.
5       Q    By your company, you mean Jay Peak,
6   Inc.?
7       A    Right.
8          MR. DEE:  And when you say Jay Peak,
9   Inc. bore the responsibility, are you talking
10   about the promissory notes that you signed?
11          THE WITNESS:  I would have to see what
12   you're referring to.  I know that the cost
13   overruns were borne by the company and not passed
14   on to the investors.
15          MR. DEE:  Correct.  I understand that.
16          But from an accounting perspective,
17   there are promissory notes that would bear your
18   signature both for the cost overruns of Phase I
19   and Phase II.  Phase I cost overruns were seven
20   and a half, eight million.  Phase II overruns
21   were close to twenty-eight million.
22          From an accounting perspective, were
23   the promissory notes, even though they're borne
24   by Jay Peak, the company, do you use that as an
25   accounting treatment to offset that liability?

Page 289

1          THE WITNESS: I have to tell you, I'm
2  not an accountant, and I'm not prepared to answer
3  that because I don't know the precise technical
4  answer of it. I stated a minute ago that
5  company, we were over budget.
6          MR. DEE: Right.
7          THE WITNESS: We understood what -- why
8  it was over budget.
9          MR. DEE: Understood.
10         THE WITNESS: And we knew that we had
11 to bear the responsibility of taking care of
12 that.
13         MR. DEE: Okay.
14         MR. LEVENSON: Let me ask it this way.
15 What -- that money had to come from some account
16 somewhere. I mean, what was the source of the
17 money that you used to pay for the cost overruns?
18         THE WITNESS: Well, we had our
19 operation. We had our -- the proceeds that we
20 benefitted from doing the projects. In Phase II,
21 there was land sales. There are developer
22 proceeds. And when you say that we were over
23 budget, some of that expense was rightly ours,
24 and we applied the proceeds that would've come to
25 us back into the project.

Page 290

1          MR. LEVENSON: So are you saying you
2  took it out of management fees or other --
3          THE WITNESS: Correct.
4          MR. LEVENSON: -- money --
5          THE WITNESS: Correct. Correct.
6  Proceeds that were appropriately due us.
7          Now, that was back in 2009 and '10 that
8  this construction was occurring, and we addressed
9  it, took time. We did -- we stood behind that
10 project, and the results are very significant.
11         MR. DEE: Is it safe to say your
12 position then is, for the cost overruns, we'll
13 say -- let's use your figure, fifteen to twenty
14 million. Are you saying that you used management
15 fees to cover that, that --
16         THE WITNESS: I'm saying that we used
17 operational proceeds. We used management fees.
18 We used income that was due us for a variety of
19 things. And they were applied to the deficit
20 that we encountered.
21         MR. DEE: Okay.
22         When you say operational proceeds, are
23 you talking about revenue generated by that
24 particular project?
25         THE WITNESS: By all the things that we

Page 291

1  were doing at the resort; running the resort,
2  running the golf course, running the hotels,
3  running the ski operation, building things,
4  developmental proceeds.
5          MR. LEVENSON: Did any of the -- to the
6  extent you can break it down, did any of the
7  funds used to pay for the cost overruns come from
8  any of the investor funds from any of the
9  subsequent projects, Phase III and beyond?
10         THE WITNESS: We had subsequent
11 projects.
12         MR. LEVENSON: Right.
13         THE WITNESS: We had six projects.
14         MR. LEVENSON: Right.
15         THE WITNESS: And they are proceeds
16 from each project that are rightly due the
17 developer. And we used those proceeds for a
18 variety of things, some of which, no doubt, was
19 to address the cost overruns in Phase II. But
20 from things that were appropriately due us.
21         MR. LEVENSON: Okay. So let me -- I
22 just -- so we're operating under the same
23 understanding. When you say the proceeds
24 appropriately are rightly due us, can you be more
25 specific on what --

Page 292

1          THE WITNESS: Well, in each project,
2  there's land sales. In each project, there's
3  developer fees. In each project, there are costs
4  that revert back to the developer. Those fees
5  are ours to do with as we wish.
6          MR. LEVENSON: And are those funds,
7  those proceeds, derived in part or in whole from
8  the investments coming from investors?
9          THE WITNESS: In part. But remember,
10 we have a growing going concern of a ski area and
11 a golf course and ice arena operation, two hotels
12 that are performing very well. And forthcoming
13 projects that are taking place. So there are
14 three to five different potential sources of
15 proceeds that we use to deal with whatever
16 obligations we have.
17         MR. LEVENSON: And is there any kind
18 of -- did anyone do any kind of a breakdown that
19 would show, you know, with regard to the specific
20 overruns that we're talking about now, for
21 example, Phase II, where that -- what specific
22 proceeds or pots that money came from?
23         THE WITNESS: I'm sure that we analyzed
24 where the funds could come from over -- but, you
25 know, some of that is not predictable, because

Page 293

1 you don't always know what kind of ski season
2 you're going to have.
3 　　　　MR. LEVENSON: No. I understand. But
4 when you actually pay the checks, do you know
5 where it would come from?
6 　　　　THE WITNESS: I don't recall exactly.
7 I know that the retirement of any overage took a
8 period of time, and we took responsibility for
9 that.
10 　　　　MR. LEVENSON: But some part of the
11 overrun proceeds came from investor proceeds in
12 the subsequent project? Did I understand you?
13 　　　　THE WITNESS: That's correct.
14 　　　　MR. LEVENSON: Okay.
15 　　　　And is it possible for you to say what
16 percentage or how much?
17 　　　　THE WITNESS: I can't tell you at this
18 point, but I could identify that.
19 　　　　MR. LEVENSON: If you have something
20 that would identify it, we would definitely like
21 to see it.
22 　　　　THE WITNESS: Yeah.
23 　　　　MR. LEVENSON: And I don't know if it
24 would go so specific as to say which subsequent
25 projects, which money came from. If it exists,

Page 294

1 we'd like to see it, or if you can say that.
2 　　　　THE WITNESS: I can say that the
3 overage on Phase II was addressed by multiple
4 sources of funds that came from a variety of
5 places, all of which we were either our operating
6 company, because we were growing by six, eight,
7 ten million dollars a year. We were doing well,
8 and are doing well, by the way. We're now almost
9 a sixty million dollar company, and that's a
10 significant growth pattern, and we're showing
11 significant results.
12 　　　　MR. LEVENSON: Okay. Thank you.
13 　　　　THE WITNESS: And that's part of where
14 we have addressed our responsibilities.
15 　　　　MR. LEVENSON: Thank you.
16 　　　　BY MR. JAMES:
17 　　Q　Do the limited partners have an equity
18 ownership of the water park?
19 　　A　Yes.
20 　　Q　So that was never either assigned or a
21 portion or all of it transferred to Mr. Quiros --
22 　　A　Well, I think -- I think since the
23 inception of the project, I have to check this, I
24 think that the current status of the water park
25 is that we own that now.

Page 295

1 　　Q　When you say we?
2 　　A　Under a -- well, our company owns it
3 under a lease arrangement with the partners. I
4 think it's a ten-year lease. But I would need to
5 get the specific document for you on that.
6 　　Q　Okay.
7 　　A　I don't know if that's been provided or
8 not.
9 　　　　MR. GORDON: I'm sure it has.
10 　　　　BY MR. JAMES:
11 　　Q　Just to be clear, so Jay Peak, Inc.
12 owns the water park and leases it back to the
13 limited partnership, Phase II?
14 　　A　I'd like to defer to my Counsel on the
15 technicality of that. I run the resort
16 operation. I run the Hotel Jay. The water park
17 is part of that. The conference center is part
18 of that. The ice arena is part of that.
19 　　　　There is a lease arrangement, and I
20 think, David, you're familiar with exactly what
21 the technical documentation is. But I'm happy to
22 give you that precise answer if you don't have it
23 already.
24 　　Q　Okay.
25 　　　　And just to go back. You talked a

Page 296

1 little bit with Mr. Levenson about the proceeds
2 that you were entitled to under the project, and
3 you said the developer. Are you talking about
4 the cost supervision fees that are noted in the
5 Use of Proceeds section of the PPM?
6 　　A　Some of that, yes. Some of that's part
7 of it.
8 　　Q　And what else were you referring to?
9 　　A　Well, you have -- you know, I'd have to
10 look at the entire budget. And there are areas
11 of developer proceeds and just land sales and
12 things of that sort that are significant.
13 　　Q　Okay.
14 　　　　But as far as proceeds that Jay Peak
15 would be entitled to, what else as far as the
16 offering documents are concerned for Phase I,
17 other than that construction supervision fee?
18 　　A　Construction supervision, developer
19 fees, land costs. Those are -- those add up.
20 Those are significant.
21 　　Q　Okay.
22 　　　　But all of those are identified in
23 the --
24 　　A　Pretty much yes.
25 　　Q　Okay.

Page 297

1     But anything not identified in the
2  offering documents?
3     A   I don't believe so.
4     Q   And that would be the same thing for
5  Phase I also, the parameters of what Jay Peak is
6  entitled to --
7     A   Correct.
8     Q   -- as the developer is limited to
9  what's inside the offering documents for Phase I?
10    A   They're pretty well identified.
11    Q   And, actually, that would be for all
12 the projects?
13    A   Right.
14        So when you mention an overage of a
15 certain amount, that includes those things that
16 you were just referencing.  And if we took those
17 things that you just referenced and deducted it
18 from the overage, the overage becomes less.
19    Q   So if you take --
20    A   Everything that we might've been
21 entitled to and apply it against the obligation,
22 it, obviously, reduces it.
23    Q   Okay.
24        So, for example, if the overage for
25 Phase II was twenty million, and then under the

Page 298

1  Phase II offering documents --
2     A   There might've been ten or twelve
3  million dollars of developer proceeds that they
4  were entitled to, and that gets reduced from it.
5     Q   Okay.
6         So the net would be the difference?
7     A   Correct.  Correct.
8     Q   That then Jay Peak would --
9     A   And there's no doubt that in Phase II,
10 we -- there are three things that we built better
11 than what the offering document stated.  A couple
12 of them we did with our eyes wide open because
13 our marketing consultants advised us to look.
14 You can build an also-ran facility, or you can do
15 a couple of strategic things and make it
16 incredibly effective.
17        And I look back on it, and I'm sorry we
18 didn't expand the offering, but I am very glad we
19 built what we did, because I've seen since the
20 time we built it to now that the impact of that
21 strategic decision with our eyes wide open has
22 meant millions of dollars more of revenue to that
23 partnership and to subsequent partnerships.
24        Because the water park is not just an
25 ordinary water park.  It's extraordinary.  It's

Page 299

1  exceptional.  It brings people from hundreds of
2  miles away, and fills the property.  And I've
3  been this close to it from inception to today.
4         I regret that we went over budget, but
5  I know that we've compensated for that.  And I
6  know that the result on our business and the
7  partnership's income is substantial, both not
8  only in the hotel of the Phase II partnership,
9  but every other partnership has benefitted
10 because that water park fills rooms and units.
11        And if there was a strategic error that
12 I might've made in the building of it, a better
13 mouse trap than what we had designed, I'll tell
14 you, it's paid off for everyone, especially the
15 partners.
16        MR. DEE:  Just to give you a bigger
17 picture why we're asking is, you were entitled
18 between Phase I and Phase II in management fees,
19 approximately, eleven million dollars.  From your
20 land sales net, you're entitled to six.  That
21 gives you seventeen million.
22        You're running between the two phases
23 thirty-six million.  So you're nineteen million
24 that we're trying to find out how you covered.
25 You're saying you covered it with revenues, you

Page 300

1  covered with operations.  That's why we're
2  asking, so --
3         THE WITNESS:  Well, we have other --
4  other projects that came afterwards.
5         MR. DEE:  Okay.  So the subsequent
6  projects you borrowed from to cover the nineteen
7  million.  Is that what you're saying?
8         THE WITNESS:  No.  We had thought we
9  had -- these projects --
10        MR. DEE:  No.  No.  I understand.  Let
11 me get you focused.
12        THE WITNESS:  Okay.
13        MR. DEE:  You're going to tell me you
14 took the management fees from the other projects
15 to cover that nineteen million and the other land
16 deals, correct?
17        THE WITNESS:  Uh-huh.
18        MR. DEE:  How far down did you go to
19 cover that nineteen million, how many phases?
20        THE WITNESS:  Well, I'll tell you the
21 answer to that, but I want to you understand that
22 the speed with which we were going, we had three
23 projects going at one time.
24        MR. DEE:  Understood.  You don't have
25 to get into that.  Just tell me how you got the

Page 301

1  money.
2      THE WITNESS:  Well, I am.
3      MR. DEE:  All right.
4      THE WITNESS:  I'm telling you that the
5  subsequent projects that were happening two at a
6  time, and -- and our growing operational success,
7  provided us with the opportunity and the ability
8  to continue to retire our obligation.
9      MR. MARTIN:  Was any portion of
10  investor funds that the general partner wasn't
11  entitled to through a construction fee or
12  supervision fee or any other type of fee, and was
13  any of that used to cover the shortfall?
14     THE WITNESS:  I believe that every --
15  every fund or money that we accessed wasn't -- we
16  were contractually entitled to.  And the fact
17  that we made the decision to use those funds for
18  the retirement of an obligation, that's what we
19  did.
20     (Mr. Levenson and Mr. Dee left the
21  room.)
22     MR. MARTIN:  So no -- for example, no
23  Phase III funds were used that -- you know,
24  investor funds that weren't encumbered by the
25  management fee in any way, none of those investor

Page 302

1  funds were used to cover any cost overruns?
2      THE WITNESS:  No.  No.  We were
3  entitled to fees in each of those projects, and
4  we took those proceeds and met our obligations.
5      MR. MARTIN:  And how do you know that
6  no investor proceeds were used --
7      THE WITNESS:  Well, because that's what
8  we committed ourselves to.  Do I know that -- no.
9  I believe that the math is very clear.
10     MR. MARTIN:  Is there an exit strategy
11  in place for Phase II?
12     THE WITNESS:  Not yet.  Not yet.  We
13  are going to -- we have communicated with the
14  Phase II partners, that once the last partner
15  receives their 829 approval, that we would
16  evaluate market conditions, and we would
17  communicate with them what options there might be
18  to exit.
19     MR. GORDON:  Can I just maybe help for
20  a second.  He said the math is very clear.  Did
21  you all understand what he meant by that?  And if
22  you didn't, I'm wondering if it would make sense
23  for him to expand on that.
24     MR. MARTIN:  Sure.  If you want to
25  expand on that.

Page 303

1      (Mr. Levenson and Mr. Dee enter the
2  room.)
3      THE WITNESS:  Well, each project has
4  land value, developer fees, and those are the
5  principal sources of what we use to meet any
6  obligation we have.  And I think it's pretty
7  clear on each one.
8      Now, the gentleman asked the question
9  about -- there was a lot of compression going on.
10  These projects were happening very fast.  I think
11  we had three projects within about a twenty-four
12  month period.  And it may have taken thirty-six
13  months to build, but we -- it was a very active
14  and aggressive period of time.
15     MR. MARTIN:  And you understood, as the
16  general partner of those projects, that you
17  couldn't co-mingle funds between those projects;
18  is that correct?
19     THE WITNESS:  Every project stands on
20  its on.  Every project has its own budget.  Every
21  project has its own obligations.  We have rights
22  to the things that are produced from those
23  projects that we are entitled to by the offering,
24  and we use those proceeds to meet obligations
25  that we had.

Page 304

1      MR. MARTIN:  But could Phase -- in your
2  understanding of it as a general partner, could
3  Phase I and like Phase II, could those funds be
4  put into a single account?
5      THE WITNESS:  I believe the last time I
6  testified I acknowledged that at the very
7  beginning of Phase I the company was bought, the
8  two projects were underway, and there was a
9  period of maybe a few months where the accounting
10  was tangled up.  No slight of hand in any way.
11  Just kind of the chaos of a new company, two new
12  projects, where -- was there any commingling of
13  funds?  I think there was a period of time
14  where -- I mean, by that, I mean a couple of
15  months where there might've been a -- there
16  might've been a deposit made in Phase I that
17  should have been in Phase II and vice versa, but
18  that was straightened out.  That was straightened
19  out.
20     And I can tell you that, looking back
21  on it, I know how, frankly, chaotic it was the
22  first three or four months of the new ownership,
23  getting everything set up, a new Accounting
24  Department, getting the project one completed,
25  project two started.

Page 305

```
 1        So -- but very -- going back to 2009,
 2   very soon afterwards, each of these projects has
 3   its own budgets, its own accounts, its own payout
 4   approach, and it was very much adhered to.
 5        MR. MARTIN: So you're saying besides
 6   those three or four months there's not been any
 7   commingling of any funds of any projects?
 8        THE WITNESS: I don't believe so.
 9        MR. LEVENSON: Going back to -- and I
10   apologize if I missed the answer when we stepped
11   out a second. But Mark had asked you about going
12   down the line in terms of management fees or
13   other fees which you're entitled for the
14   subsequent projects to cover Phase II. Did you
15   go beyond those fees in any way from the
16   subsequent projects, using any investor funds
17   from the subsequent projects to cover the
18   overages?
19        THE WITNESS: I don't believe so, no.
20   Now, remember, the operating company is growing
21   every year. We're doing better every year. And
22   our -- you know, our ability to do more and take
23   on more responsibility, that was why we were
24   embarked in this, to create a bigger going
25   concern that would employ more people and also,
```

Page 306

```
 1   obviously, produce more revenue.
 2        MS. FUCHS: The operating company being
 3   Jay Peak --
 4        THE WITNESS: Yeah. I mentioned to
 5   you, in 2008, if you look at the sales of Jay
 6   Peak in 2008, I think it was around seven or
 7   eight million dollars. This year it will be
 8   approaching sixty million. Our profit this year
 9   should be twelve million dollars. That's a -- I
10   mean, that's a remarkable story coming out of a
11   collapsing financial market eight years ago,
12   seven years ago.
13        So we've -- you know, we've had growth.
14   We've had profitability. We've addressed every
15   obligation we had. And I've been very
16   transparent with you. The overage that we
17   incurred in Phase II I regret, but I also know
18   that we've taken the responsibility to
19   systematically and appropriately address it.
20        And we've addressed it with every
21   financial resource that we're entitled to, and
22   every cent of profitability that we have had has
23   gone into that. And we -- the facilities are
24   something to be proud of.
25        MR. MARTIN: Just two last follow-up
```

Page 307

```
 1   questions. On commingling, you understand as a
 2   general partner, though, that the partnership
 3   agreements prohibited commingling of funds? You
 4   have an understanding of that?
 5        THE WITNESS: I do.
 6        MR. MARTIN: And what steps did you
 7   take as a general partner to make sure there
 8   weren't commingling of funds?
 9        THE WITNESS: I didn't take any steps,
10   because that wasn't my -- I mean, I didn't have a
11   concern about that.
12        MR. MARTIN: Who would've taken steps
13   on behalf of the general partner to make sure the
14   funds of the limited partners weren't co-mingled?
15        THE WITNESS: Well, we have my partner
16   is aware of the funding structure, and our CFO's
17   aware of the funding structure and the payment of
18   bills and the meeting of obligations.
19        MR. MARTIN: And who are those
20   individuals?
21        THE WITNESS: Ariel Quiros is my
22   partner, and George Gulisano is the CFO.
23        MR. MARTIN: When you say he was a
24   partner, you give -- do you share an equity stake
25   together?
```

Page 308

```
 1        THE WITNESS: We do.
 2        MR. MARTIN: What is the breakdown of
 3   that equity stake?
 4        THE WITNESS: He's an eighty percent
 5   owner, and I'm a twenty percent owner of Jay
 6   Peak.
 7        MR. MARTIN: How long has that been the
 8   case?
 9        THE WITNESS: Since the inception of
10   our partnership.
11        MR. MARTIN: Which would've been the
12   purchase --
13        THE WITNESS: Back in 2008.
14        MR. MARTIN: Okay.
15        BY MR. JAMES:
16     Q   And he's the eighty percent owner
17   through Q Resorts?
18     A   Well, I think he's a hundred percent
19   owner of Q Resorts. I have a --
20     Q   Okay.
21        And who owns the eighty percent equity
22   stake in Jay Peak?
23     A   I believe -- I believe Ariel does.
24     Q   As an individual?
25     A   Yeah, I believe so.
```

Page 309

```
 1        You know, I'm not an attorney, and when
 2   you say ownership and individual versus -- you
 3   can trip me up.  The ownership -- the
 4   documentation of the corporation ownership papers
 5   would -- you probably have that.
 6        THE WITNESS:  Do they have that
 7   information?
 8        MR. GORDON:  I'm not sure if they have
 9   the shareholder document for Jay Peak, Inc.
10   BY MR. JAMES:
11     Q   Well, for example, you reference the
12   acquisition of Jay Peak back in 2008.  According
13   to the purchase agreement between Q Resorts and
14   MSSI, Q Resorts is the buyer?
15     A   That's correct.
16     Q   Okay.
17        So my question is:  At what point did
18   the ownership interest change?  Because as of
19   acquisition, Q Resorts acquired all the shares in
20   Jay Peak.
21     A   And that's -- and that is correct.
22     Q   Okay.
23     A   That's correct.
24     Q   So when did it switch to eighty/twenty
25   percent --
```

Page 310

```
 1     A   Well, I've always been told by my
 2   partner that I would benefit from twenty percent
 3   of the ownership of Jay Peak.
 4     Q   Okay.
 5     A   And I haven't ever doubted that.
 6     Q   Okay.
 7        Have you seen like any shares --
 8     A   No.
 9     Q   Or certificates?
10     A   -- no, I haven't.
11     Q   Have you received any distributions
12   that suggest that you have a --
13     A   No, I have not seen received any
14   distributions.
15     Q   So what, if anything, have you seen to
16   support the twenty percent interest you have
17   in --
18     A   Just my partner's handshake.
19        MR. MARTIN:  There's no documents
20   memorializing that transaction?
21        THE WITNESS:  No.
22        MR. MARTIN:  And you receive
23   compensation?
24        THE WITNESS:  I'm an employee of Jay
25   Peak, Inc.
```

Page 311

```
 1        MR. MARTIN:  Since inception -- since
 2   the acquisition, could you go through what your
 3   annual salary was.
 4        THE WITNESS:  It's a hundred and
 5   seventy-seven thousand.  And that's what I was
 6   paid when I joined the company.  And that's what
 7   I'm paid today.
 8        MR. MARTIN:  Are there any bonuses or
 9   anything like that?
10        THE WITNESS:  I've accepted no bonuses.
11        MR. MARTIN:  So since the acquisition,
12   you've received a hundred and seventy-seven
13   thousand a year just period?
14        THE WITNESS:  That's correct.
15        MR. MARTIN:  Okay.
16        BY MR. JAMES:
17     Q   Do you receive any other benefits, not
18   monetary, as compensation?
19     A   I have a car that I use.
20     Q   Okay.
21        Any homes or property?
22     A   No.
23        MS. FUCHS:  No portion of any
24   management fees --
25        THE WITNESS:  No.
```

Page 312

```
 1        MS. FUCHS:  -- or construction
 2   supervision fees?
 3        THE WITNESS:  No.
 4        Surprising?  I'm pretty committed to
 5   the operation and making sure that it's
 6   profitable, their obligations are met.  Some day
 7   down the road I hope that there will be benefit,
 8   but right now, I know that our obligation is to
 9   take care of the resort, make it grow and be
10   profitable, and take care of our obligations.
11        MR. MARTIN:  Did you put any money in
12   to obtain the twenty percent interest?
13        THE WITNESS:  Just a lot of hard work.
14        MR. MARTIN:  So sweat equity?
15        THE WITNESS:  I've been at Jay Peak for
16   thirty years.
17        MR. MARTIN:  And why didn't you have
18   that transaction memorialized?
19        THE WITNESS:  Shame on me.  I just --
20   you know, I'm not planning to retire tomorrow.  I
21   haven't done it.  My wife's not happy about that.
22        MR. MARTIN:  And when did that -- was
23   it a conversation?  You've mentioned a handshake.
24        THE WITNESS:  Well, we -- you know,
25   when we bought the company, I'd been there
```

## Page 313

1    twenty-two years. I was immersed in the project
2    development, fully committed to the projects, the
3    community, doing what we have been doing with the
4    State.
5            And Ari knew that -- and I convinced
6    him that this was something that he should get
7    involved in and be part of, and we've both been
8    totally committed to doing that.
9            And I'm there every day to make sure
10   that we run the place as well as possible, grow
11   our business as well as possible, construct what
12   we are hoping to construct, deliver it, run it,
13   make it successful.
14           MR. MARTIN: So the timing of that
15   handshake was the time of acquisition; is that
16   correct?
17           THE WITNESS: Yeah. When we were
18   putting the thing together. And it was --
19   frankly, it was the last thing I was worried
20   about, because I've known him for twenty-some
21   years, and I know that that'll come to pass.
22           MR. MARTIN: And has that ever been
23   reaffirmed to you that you own a twenty
24   percent --
25           THE WITNESS: It's been reaffirmed. We

## Page 314

1    don't talk about it.
2            MR. MARTIN: But you have on occasion?
3            THE WITNESS: On rare occasion, rare
4    occasion.
5            Our day-to-day, week-to-week
6    interaction is about, how's occupancy, how's
7    business, how's construction coming? Those are
8    the things that we focus on.
9            BY MR. JAMES:
10       Q   How about investors, any conversations
11   about investors?
12       A   Well, sure. We've talked -- I don't
13   think it's any secret to you that we've had some
14   bumps in the road with our Phase I investors.
15   Our communications with those Phase I investors,
16   I regret was bumpy.
17           So we've had some interaction with
18   that, and, you know, we've done the best we could
19   to correct that. And that's why subsequent
20   phases we're approaching in a very deliberate,
21   proactive way.
22       Q   Phase III?
23       A   Phase III is called Penthouse Suites,
24   and that project opened in part when Hotel II
25   opened, but there were some other components to

## Page 315

1    it that opened the following year.
2            Those elements are performing well.
3    And, again, those investors are receiving
4    quarterly reports and quarterly earnings based on
5    performance, and we're pleased with that, too.
6        Q   What's the returns on average?
7        A   It's in the same range of, you know,
8    two to three percent. You know, it varies. You
9    know, the first year of any -- imagine you've got
10   a five-year window of something. You construct,
11   and then you operate. And the first year you
12   open is not usually as good as the second, and
13   the second is usually not as good as the third.
14           So you might -- your first year, you
15   might have one percent. The second year, two or
16   three. And the fourth -- third year, you could
17   have more. Every project has its own income and
18   expense, and the profits are shared as they
19   occur.
20       Q   Do you recall what percentage was
21   either referenced in the offering documents or
22   communicated to the investors even if it was an
23   estimate as to return --
24       A   We always told investors that there was
25   no guarantee of what they would earn, that we

## Page 316

1    hoped to have somewhere between a two and four
2    percent. But I always told every investor that
3    while construction was underway, there would be
4    no income because we're building a project.
5            And I always made sure that every
6    investor understood that the purpose of this
7    project is job creation, and that the first two
8    years, on average, when we're constructing, is
9    when the developmental jobs are being created,
10   direct, indirect, and induced jobs.
11           And in year three, or about year three,
12   is when the business would open, and that the
13   first year would be what it was. The second
14   year, hopefully more. The third year, hopefully
15   more. That's pretty much the way it works.
16           MR. MARTIN: How would you communicate
17   that each and every investor?
18           THE WITNESS: When they -- before --
19   before they subscribe.
20           MR. MARTIN: Orally, you would tell
21   them?
22           THE WITNESS: I met and continue to
23   meet about ninety-five percent of our investors
24   in person. I urge them, urge them to come and
25   meet me, see the facilities, meet the staff, go

Page 317

1  to the site, ask questions. And I try to give
2  them a very clear picture of what I expect is
3  going to happen. I am very, very clear about no
4  guaranteed return.
5      I'm also very clear that the reason
6  that they're getting their visa is because
7  they're helping to create economic development
8  and job creation. And if they're here because
9  they want a big return on their investment, they
10  need to rethink it, because the reason they're
11  really here is because they want a green card.
12      Now, we're going to benefit from the
13  capital to create the project, to create the
14  jobs. And I try to make sure they understand that
15  they're making an enormous contribution to our
16  community, and that they're helping create jobs,
17  and they should take great pride in the fact that
18  they're getting their visa in exchange for
19  capital that's creating jobs in the highest
20  unemployment county in the state.
21      And I don't know if I shared with you
22  the results of our unemployment the last time.
23  Did I do that? Did I give you anything about the
24  job creation acknowledgment that the State of
25  Vermont put to us?

Page 318

1      Q   I can't recall.
2      A   I'll see that you get it.
3          But it was back in, I think, May of
4  2014 where we were acknowledged for creating a
5  change, a substantial change in the unemployment
6  rate of our community.
7          So I'm getting back to your question,
8  do I talk about the income? I referenced that
9  there probably will be some. It will be modest.
10  They'll be nothing in the first couple of years
11  of development, and then hopefully more. And I
12  make sure they understand that the job creation
13  that they're making happen is a very important
14  part of what they're doing.
15     Q   Do you also tell them that the money
16  they invest in will only be used for that
17  project?
18     A   Well, that goes without saying. No, I
19  don't tell them that. Because why would I tell
20  them that their money is going to be used for
21  anything else?
22     Q   No. But do you tell them that it will
23  be used for that project that they're invested
24  in?
25     A   Of course.

Page 319

1      Q   Okay.
2          Do you make that clear to them?
3      A   Do I re-enforce that? I tell them that
4  they're -- I show them what they're going to
5  build. They know what -- the offering document
6  spells out what their funds are going to be used
7  for and what they're going to be participating
8  in, what their contribution creates, and what the
9  job creation will be as a result of that.
10     Q   But the ninety-five percent that you
11  said you meet in person and you talk to, my
12  question is:  Do you tell that ninety-five
13  percent that their money will be used for that
14  project, whatever project you're telling about
15  investing in?
16     A   Of course.
17     Q   And at any point, do you recall an
18  instance where an investor was confused or unsure
19  as to how their money would be used?
20     A   No.
21     Q   And that's the requirement of the whole
22  USCIS process for getting a green card is that
23  those funds have to create jobs for that project?
24     A   That's correct.
25     Q   And if it doesn't, then that would

Page 320

1  impact the investor's ability to get that green
2  card?
3      A   Job creation is incredibly important.
4      Q   Okay.
5          And as you mentioned, you tell them
6  that if you are investing for any other reason
7  than to get your green card, you should
8  reconsider?
9      A   I make it clear to them that the
10  gaining of the green card is a compelling reason
11  for them to be in the project.
12          I have investors from seventy-four
13  countries in our program. Certain countries have
14  stock markets that are producing at ridiculous
15  rates, and I'll mention the Indian market. When
16  I sit down with some Indian investors, they'll
17  reference the fact that they can make twenty
18  percent a year on their -- their stocks -- their
19  stock portfolio.
20          And when I tell them they might, they
21  might see two percent, they kind of snicker. And
22  then I bring them back to realizing, look, you're
23  not here to compete with your mutual fund in
24  India. You're here to create jobs in a rural
25  community. You're going to benefit from a green

Page 321

```
1    card.  And I tell them that if the green card is
2    not important to you, then you shouldn't be in
3    our project.
4         If the green card is important to you,
5    and improving the lives and welfare of a rural
6    community in Vermont is important to you, then
7    consider this project.  And, you know, most all
8    of them are very, very pleased to be part of it.
9         Q   When was Phase III, the Penthouse
10   Suite, when was that construction completed?
11        A   I want to say 2012-ish, you know.
12        Q   In its entirety?
13        A   Well, it had different components, so
14   some of it might've been done in 2012, some of it
15   might've been done in 2013, but there's a record
16   of that.
17        Q   What are the other components beyond
18   the actual suites?
19        A   We had the Sky Haus.  We had the
20   Mountain Learning Center.  But I have to --
21   there's a number of things we've built.  I know
22   if you look at -- you have the offering document
23   with you?
24        Q   We do.
25        A   All right.  It's listed there.
```

Page 322

```
1         Q   Let me ask you a second question.  So
2    were there any cost overruns associated with the
3    Penthouse Suites project?
4         A   I don't believe so.
5         MS. FUCHS:  And were any of the
6    management fees or construction supervision fees
7    from the Penthouse project used to help pay cost
8    overruns?
9         THE WITNESS:  I think that the
10   management fees and proceeds that we were due
11   from that project were used to meet our
12   obligations.  One of them being that, yes.
13        MR. DEE:  And there are records and the
14   transfers for those credits, your accounting
15   records that reflect that you took the management
16   fees from subsequent projects to pay the
17   obligations for the earlier project?
18        THE WITNESS:  I think those were some
19   of the things that we might've done with those
20   proceeds.
21        MR. DEE:  But there's records of it?
22        THE WITNESS:  I'm sure there is.
23        MR. DEE:  I just have a follow-up on
24   the distribution for Penthouse this year.  Was
25   there a distribution?
```

Page 323

```
1         THE WITNESS:  I would have to check
2    with my Accounting Department.  Now, the only
3    reason I'm not going further is I believe there
4    has been.  Which quarter it was, how much it was,
5    I could find out in a phone call; although, my
6    accountant right now is an educational course
7    this morning for accountants, so she's not there.
8         MR. DEE:  Not a problem.
9         THE WITNESS:  I can get that.
10        MR. DEE:  Could you conceptually tell
11   me where the funds would come from?
12        THE WITNESS:  The profits of running
13   the elements of that partnership.  There are
14   fifty-six suites in Penthouse, and every one of
15   them you hope are occupied at a high rate.  You
16   had costs to run it and income and profits from
17   that, as well as the other things would go into
18   that partnership, and we would share the profits
19   with the partners, according to the agreement.
20        MR. DEE:  Okay.
21        Are they paid quarterly?
22        THE WITNESS:  If there are proceeds.  I
23   don't know if you were out of the room when I
24   mentioned that we're a twelve-month business, but
25   we are a bit cyclical.  And the five months of
```

Page 324

```
1    the winter are the most income-high months.  It
2    doesn't mean we're not occupied during the other
3    months, but we've got to pay our bills.
4         MR. DEE:  Understood.
5         So, theoretically, let's say you're
6    profitable in January, February, and March.
7         THE WITNESS:  And April.
8         MR. DEE:  And April.  You pay in April.
9    Thank you.
10        THE WITNESS:  December, January,
11   February, March, and April are the five most
12   significant income months for a ski resort.
13        Now, our goal has been for the last
14   eight years, how do we take a winter-only
15   business and turn it into a more year-round
16   business?  And I mentioned growth from about
17   eight million to what will approach sixty million
18   this year, in an eight-year -- seven-year period.
19        There's been -- we have had sales this
20   fiscal year of almost nine million dollars during
21   the first few months of the year.  We will see
22   significant sales the last five months.  And we
23   will -- we will approach sixty million in sales
24   this year.
25        BY MR. JAMES:
```

Page 325

```
 1        Q   Do you recall how much management fees
 2   were taken from the Penthouse Suites project?
 3        A   I don't.
 4        Q   Do you recall when in the process of
 5   construction it was taken?
 6        A   I don't.
 7        Q   Okay.
 8            What about how?
 9        A   I'm sure that that data exists and
10   could be identified, but I don't know exactly
11   when.
12        Q   Okay.
13            So do you know whether there's, I
14   guess, an accepted agreed upon way of collecting
15   the management fees from the various projects,
16   whether it's something that Mr. Quiros
17   formulated, you, or the accountant?  Do you know
18   if there's a routine way of taking the management
19   fees as far as when, how --
20        A   I am sure that there's record of that
21   for the Penthouse project and Golf and Mountain
22   Suites and Lodge and Townhouses, because they
23   were all happening in a very -- a very direct and
24   deliberate way -- deliberately is what I wanted
25   to say.
```

Page 326

```
 1            We had a master plan.  I think I shared
 2   that master plan with you last year, where I
 3   showed you where Phase I was going to be, Phase
 4   II was going to be, Golf and Mountain Suites,
 5   Lodge and Townhouse Stateside.  Each one flowed
 6   into the other in terms of their physical
 7   relationship on the property.
 8            And the compression of development of
 9   Hotel Jay, which was Phase II, and Penthouse and
10   Golf and Mountain and Lodge and Townhouse, it was
11   all one large construction physical area.  One
12   led into the other.
13        Q   But as far as -- and maybe this may
14   help.  So you have Phase III.  The Penthouse
15   Suites is in construction.  You're raising money.
16   At the same time, there's an expense associated
17   with Phase II.
18            Do you, as the individual that's
19   operating, overseeing these projects, do you say,
20   okay, well, you authorize a transfer from the
21   Phase III bank account to pay for the Phase II
22   expenses because you know you will be entitled to
23   fees, or do you say, well, we have collected
24   X-amount of fees, take X from that and pay --
25        A   I don't know the exact mechanics of
```

Page 327

```
 1   when it was done and what -- and what month it
 2   was done.  I know that at some point along the
 3   timeline of construction and completion, that
 4   whatever we were entitled to we may have used for
 5   payroll, we may have used for other financial
 6   obligations that we might've had.
 7            One of the things that we had the
 8   benefit of was that the contractors that we were
 9   working with were largely the same team project
10   to project.  So we were able to benefit from some
11   patience while these things were going on.
12            MR. MARTIN:  Did anything have to be
13   constructed for you guys to earn your management
14   or construction supervision fee?
15            THE WITNESS:  I think that we were -- I
16   think we were clearly paying attention to what
17   was actually constructed.
18            MR. MARTIN:  No.  Like, for example, if
19   there's a five hundred thousand dollar
20   investment, could you just take the management
21   fee day one, or there would actually have to be
22   something built out of that?
23            THE WITNESS:  I'm not sure what the
24   offering documents state in that.  And, you know,
25   I'm not dodging your question.  I just don't
```

Page 328

```
 1   know.  I was involved every day in the
 2   construction and the fulfillment of the
 3   obligation, or the project.
 4            MR. MARTIN:  Do you know who would
 5   know?
 6            THE WITNESS:  Well, I think our -- our
 7   CFO and Ari might know that.  But everything
 8   that -- I know that everything that we were
 9   entitled to was appropriate based on that
10   project.
11            Now, for instance, land value, where it
12   would apply, I don't know at what point the land
13   might -- the land value would've been -- that
14   benefit would've come to us.  And if you were to
15   say, well, it came at the beginning of the
16   project, you might be right.  And it might've
17   been in the middle of the project or at the end
18   of the project.  I honestly don't know the dates
19   of that kind of thing.
20            But I know that at some point, it was
21   something that would've come to us, because it
22   was our land.  We committed it to the project.
23            BY MR. JAMES:
24        Q   Who would know?
25        A   I mentioned that Ariel probably would
```

Page 329

```
 1    know or our CFO would know.
 2         MR. MARTIN:  And is there an exit
 3    strategy in place for Phase III?
 4         THE WITNESS:  There will be.  They have
 5    not -- all of those partners have not gotten
 6    their 829 removal of conditions yet.
 7         MR. MARTIN:  Do you know how many
 8    remain?
 9         THE WITNESS:  I don't think many.  I
10    think there's a handful that are still left.
11         MS. FUCHS:  Have all the Phase II
12    investors gotten their 829?
13         THE WITNESS:  No.  I mentioned a few
14    minutes ago that there are a couple that have
15    not.  And when they do get their, we will -- we
16    will evaluate market conditions and communicate
17    what we believe we can do.
18         MS. FUCHS:  So is Phase I the only
19    phase where all investors have gotten their 829?
20         THE WITNESS:  Correct.  But we're very
21    close to the end on Phase II.  And Penthouse is
22    soon to follow.
23         BY MR. JAMES:
24    Q    Phase IV?
25    A    Lodge -- or excuse me.  Golf and
```

Page 330

```
 1    Mountain Suites, the project is completed, being
 2    occupied, and there are other elements to that.
 3    Again, your offering document that you have for
 4    that will show that.
 5    Q    When was it completed?
 6    A    I want to say -- it was completed over
 7    a two-year period.  I want to say 2013, 2014.
 8    Q    Any cost overruns?
 9    A    No.
10    Q    Any monies from that phase being used
11    for expenses in the earlier --
12    A    Again -- I'm sorry.
13    Q    Let me just finish the question for the
14    benefit of the Court Reporter.
15    A    I'm sorry.  I apologize.
16    Q    Any monies from that phase used to pay
17    for any expenses associated with the earlier
18    projects?
19    A    The developer fees, land costs, values
20    were used to help us meet our obligation.
21    Q    So that's a yes?
22    A    That's a -- well, I'm telling you that
23    we had proceeds that we used for -- was a hundred
24    percent of that benefitted -- the developer fees
25    and land costs, was a hundred percent of it used
```

Page 331

```
 1    for a particular thing?  I -- I don't know.  I --
 2    there might -- there might've been some other use
 3    for it.
 4         But I'm not dodging your question.  I'm
 5    just saying, you're asking me if all of it went
 6    for such and such a thing, and I don't know the
 7    answer to that.
 8    Q    But your --
 9    A    I know that we realized that the
10    obligations that we had to pay for the overruns of
11    Phase II needed to be addressed, and that we
12    would address it from our operations.  We would
13    address it from the benefit and proceeds from the
14    projects that we were entitled to.  And that we
15    would be diligent in trying to do that.
16         MS. FUCHS:  So to follow-up on Brian's
17    questions.  Who would know more about the amount
18    of developer fees that were used from Phase IV
19    to --
20         THE WITNESS:  Our CFO would know that.
21         MS. FUCHS:  And Mr. Quiros?
22         THE WITNESS:  And Mr. Quiros.
23         MS. FUCHS:  And when you say developer
24    fees, are you using that term interchangeably
25    with construction supervision fees?
```

Page 332

```
 1         THE WITNESS:  Yes.  There's different
 2    levels of that, but --
 3         MS. FUCHS:  Okay.
 4         BY MR. JAMES:
 5    Q    And then on that one, I think you've
 6    already said that there's still investors waiting
 7    to have their conditions removed?
 8    A    That's correct.
 9    Q    Do you know how many?
10    A    I could get you a very specific chart
11    that shows every project with every investor and
12    where they are in their removal of conditions
13    status.  If we haven't provided that, we'd be
14    happy to.
15         MR. MARTIN:  Have there been any
16    returns paid related to Phase IV?
17         THE WITNESS:  They have benefitted from
18    proceeds from the profitability of that project,
19    yes.
20         MR. MARTIN:  What's the magnitude of
21    those returns?
22         THE WITNESS:  In the same range.  You
23    know, the one, two, three percent range.
24         MR. MARTIN:  So one percent of five
25    hundred thousand, you're talking about like a
```

Page 333

```
 1   five thousand return annual?  Is that what
 2   you're --
 3         THE WITNESS:  Yeah.  In the first year,
 4   again, when you're opening a new facility that no
 5   one's ever heard of or seen, first year is
 6   usually modest.  Second year gets better.  Third
 7   year gets better.
 8         MR. MARTIN:  I understand.  But when
 9   you say one percent of the investment --
10         THE WITNESS:  It might've been -- it
11   might've been point five percent.  I don't know
12   exactly what it was.  But I have -- we have a
13   record of when the project opened, what the
14   income was every day from when that project
15   opened, what the expenses were, what the -- what
16   was left quarter by quarter, and when those funds
17   were sent to the investors.
18         MR. MARTIN:  For any of the returns
19   that have been paid at anytime, were investor
20   funds used to pay any of those returns from other
21   projects?
22         THE WITNESS:  The -- the profits?  No.
23   The profits that an investor would get came from
24   the -- remember, there's the development cost of
25   a project, and then you're -- then there's your
```

Page 334

```
 1   operating results.  Golf and Mountain Suites has
 2   ninety suites in it, I think.  And -- or a
 3   hundred, a hundred.  Excuse me.
 4         You hope that a hundred nights -- every
 5   one of those suites is full three hundred and
 6   sixty-five days a year.  That doesn't happen,
 7   even in Miami.  But they are occupied, and
 8   there's a certain rate.
 9         And at the end of each quarter, we've
10   paid the staff, we've paid the lights, we've paid
11   the insurance, we've done the maintenance, we've
12   done whatever's necessary.  There's a result at
13   the end of a quarter, and whatever that is is
14   divided up equally among the partners, and a
15   check is sent to them with the statement.
16         MR. MARTIN:  So it's coming from
17   operations?
18         THE WITNESS:  Operations, yes.
19         MR. MARTIN:  Okay.
20         And how do you know that?
21         THE WITNESS:  Because my Accounting
22   Department does it.  I sign every one of those
23   checks.  I see that every single quarter, and I
24   sign every single check.
25         MR. MARTIN:  And Phase IV, is there an
```

Page 335

```
 1   exit strategy there?
 2         THE WITNESS:  No, not yet.
 3         BY MR. JAMES:
 4      Q   And any sense when those fees were
 5   taken from Phase IV?  Was it at the end of the
 6   project, or was it --
 7      A   I don't know.  I don't know when they
 8   would've been.
 9      Q   That's something Ariel Quiros would
10   know?
11      A   I would suspect that they could be more
12   precise on that.  I can tell you that we were
13   certainly going to be accessing the fees that we
14   were entitled to.  And when that exactly
15   occurred, I'm sure is a matter of record.
16      Q   And the Phase IV investors would be
17   included in that ninety-five percent of investors
18   that you talked to personally?
19      A   Well, you know, yeah, I talked to
20   most -- most of the investors.
21      Q   For Phase IV, also?
22      A   Well, you know, I'm trying to remember
23   2013 and who the investors were.  And I just know
24   that the pattern of what I try to do with every
25   investor is to get them to come and see and feel
```

Page 336

```
 1   and touch and ask questions.
 2         MR. MARTIN:  When they make those
 3   visits, who else do they see besides you?
 4         THE WITNESS:  They might see one of our
 5   team members.  We have three or four people that
 6   interact with the project.  But I personally try
 7   to meet every one of them.
 8         MR. MARTIN:  And who are those three or
 9   four people?
10         THE WITNESS:  Oh, Charles Leamy works
11   for me.  Candace Campbell works for me.  Heather
12   Whipkey.  But if it's not me, it might be Chuck
13   Leamy or Candace Campbell that will show them
14   around, because they know them the facilities and
15   the project.
16         But I make time for every investor that
17   I can.  And it's rare, rare that an investor
18   would ever come and I not meet them.  Most of the
19   time they're coming because they want to meet me.
20   They want to know who the general partner is.
21   And I want them to know who I am.
22         MR. MARTIN:  Are you aware of Mr.
23   Quiros ever meeting with investors in that way?
24         THE WITNESS:  I think he's met with a
25   few investors, but not -- it's been because,
```

Page 337

1  perhaps, he was at the resort at the time that I
2  was showing someone around.
3        MR. MARTIN: Do you know any of the
4  identity of any of those investors?
5        THE WITNESS: I don't recall
6  specifically, because he's not there very much.
7        MR. DEE: And, again, the distributions
8  that were paid this year were from operations?
9        THE WITNESS: Always. Always from
10  operations. Always from operations.
11        MR. MARTIN: Now go to Phase V?
12        MR. JAMES: Yes.
13        THE WITNESS: Phase V is Lodge and
14  Townhouse. And, again, that is part of the
15  master plan, and it is across the road, so to
16  speak, from the Golf and Mountain Suites. And it
17  consists of accommodations and some other things
18  that the offering document that you have on that
19  is, I'm sure, outlines.
20        And, again, the same concept. There's
21  income from accommodation stays. There are
22  expenses. And at the end of each quarter, there
23  are proceeds that are available to the partners.
24  Golf and Mountain Suites and Lodge and Townhouse
25  operate almost in identically the same way.

Page 338

1  BY MR. JAMES:
2     Q  And when was that completed?
3     A  Well, I'm thinking 2014.
4     Q  Okay.
5        And you mentioned --
6     A  But the precise finishing of each
7  element is a matter of record. And if I'm saying
8  2014, it's in that neighborhood. I mean, each
9  project followed one after the other.
10     Q  And, again, some of the similar
11  questions. The supervision fees from that
12  project, were those used, or any fees from that
13  project used to pay expenses associated with any
14  earlier projects?
15     A  Well, you're now into the fifth
16  project. And I know that the land costs, land
17  value, management fees, developer fees,
18  construction supervision fees were used for some
19  aspects of our operation.
20        I'm not dodging your question. You
21  know, at this point, I'm not sure exactly what
22  those benefits to our company would've been used
23  for. But I'm sure that at some point in the
24  completion of that project that those fees
25  were -- we were entitled to, and we used them for

Page 339

1  whatever the needs might have been.
2     Q  Okay.
3        It sounds like during that construction
4  phase where the investors invest their money,
5  that's the point where it's complete and
6  operating, the return is being generated from
7  profit. It sounds like during that phase, all
8  the monies that Jay Peak was entitled to, the
9  developer fees, land fees, it sounds like all of
10  that went back into, I guess, Jay Peak and the
11  project under Jay Peak?
12     A  Went back into our company to be used
13  to meet the obligations that we might've had.
14     Q  Okay.
15        So do you know whether any payouts were
16  being made to either yourself or the other owner
17  in the form of cash or --
18     A  I know of no personal payouts to
19  anyone.
20     Q  Okay.
21        So, for example, for Phase V, say --
22  I'm just pulling a number -- say, all those
23  numbers, the supervision fees, the land sales,
24  came up to ten million. You're saying is that
25  your understanding is that that entire ten mil

Page 340

1  would've gone back into some operating aspect of
2  Jay Peak or the LPs or --
3     A  Yes.
4     Q  Okay.
5        So nothing goes out the door to Mr.
6  Quiros, yourself, or some other individual?
7     A  To my knowledge, nothing.
8     Q  So if we're --
9     A  And I can't speak for Ariel. But I can
10  tell you, and you're entitled to look at my bank
11  statements, you'll see there's nothing.
12     Q  Okay.
13        But as far as you know, nothing also
14  went to Mr. Quiros --
15     A  Nothing, absolutely -- well, I don't
16  know.
17     Q  As far as you know?
18     A  As far as I know, no.
19     Q  And that's for every project that
20  you're aware of?
21     A  That's correct.
22     Q  At least the ones we've talked about so
23  far?
24     A  Yeah. Yeah.
25        MS. FUCHS: And did he ever discuss

Page 341

1    that with you?
2          THE WITNESS:  No.  No.
3    BY MR. JAMES:
4      Q    Okay.  And, again, similar rate of
5    returns like the earlier projects?
6      A    Yeah.
7      Q    Okay.
8          About one to two percent?
9      A    Yeah.
10     Q    And, again, on a quarterly basis?
11     A    Quarterly.
12     Q    Depending on --
13     A    Same principal.  We're -- we're seeing
14   growth in general.  The biggest months of growth
15   are December through April.  So the first quarter
16   and second quarter are usually the ones that we
17   have the best results for.
18     Q    Okay.
19         And then any distributions comes
20   entirely from --
21     A    Operations.
22     Q    -- operations?
23         And exit strategy at this point in
24   time?
25     A    Haven't gotten to a point of concluding

Page 342

1    that.
2      Q    Okay.
3          And there are still investors who are
4    waiting to have their conditions removed --
5      A    Yes, there are.  There are.
6          MR. MARTIN:  Just a quick question.
7    For any of these phases that we discussed, Phase
8    I through V, have there ever been any audited
9    financial statements done on any of those by an
10   independent accounting firm?
11         THE WITNESS:  We don't do audited
12   statements from independent.  We have three CPAs.
13   I think we have very elaborate and detailed
14   accounting.  I'm very proud of the Accounting
15   Department we have right now.
16         MR. MARTIN:  But the answer to my
17   question is, no, there aren't any --
18         THE WITNESS:  We do not hire a
19   third-party auditing firm to do the day-to-day
20   auditing of the funding of the projects.
21         We could, and the partnership would pay
22   for it.  And it's an expense that's unnecessary.
23         MR. MARTIN:  So for none of the
24   projects at anytime has there been an independent
25   accounting firm audit the books and records of

Page 343

1    any of these phases, correct?
2          THE WITNESS:  I don't believe so.
3          MR. MARTIN:  Okay.
4    BY MR. JAMES:
5      Q    Phase VI?
6      A    Stateside is underway right now.  We
7    have the hotel, Stateside Hotel, complete and
8    operating.  We are under construction with the
9    second phase of that.  These are actually some
10   photographs from last week.  And we will -- you
11   want this?
12         MR. MARTIN:  Yeah, if you --
13         THE WITNESS:  Sure.
14         There are eighty-four cottages under
15   construction.  We will continue to complete them
16   during this quarter and into the first quarter of
17   2016.
18         We have a recreation center that we
19   have started site work on.  And we are meeting
20   next week with the contractor to complete the
21   construction contract and delivery schedule for
22   that.  And we'll complete Stateside in early
23   2016.
24         MR. DEE:  Is there a medical center
25   component?

Page 344

1          THE WITNESS:  There's a clinic.  And --
2    there's a medical clinic, and I've heard the
3    reference made of medical center.  Kind of sounds
4    like a three hundred room hospital.
5          We're in a very rural community.  And
6    one of the things that I wanted to bring into the
7    program was a clinic, a small clinic that would
8    serve the community, our employees, our guests.
9    It's going to be a twenty-five hundred to three
10   thousand square foot clinic.
11         If you Google Vermont healthcare,
12   you'll see that the State of Vermont is in
13   healthcare turmoil.  And I've been working with
14   our local hospital and our regional rural
15   healthcare providers to come up with the right
16   operating strategy for how to run this clinic and
17   not be underwater.
18         So I purposely left it to the end,
19   because we're still trying to figure out the
20   business plan that would've seemed pretty clear a
21   few years ago.  We're getting there.  And our
22   local hospital is pretty close, I believe, to
23   acknowledging that they're going to be willing to
24   absorb any operating losses, but we haven't -- we
25   haven't crossed that bridge yet.  So that's the

Page 345

```
 1   last component, and I'm working hard on that.
 2        MR. DEE: Just a follow-up question.
 3   Just for the remaining construction, do you have
 4   an estimate of what your construction costs are
 5   going to be to finish out the cottages, the rec
 6   center, and the medical center -- or medical
 7   clinic?
 8        THE WITNESS: The cottages, rec center,
 9   and medical center, probably in the neighborhood
10   of I'm guessing around fifteen to twenty million,
11   maybe more. We haven't finished our negotiation
12   with the contractor next week for the rec center.
13        MR. DEE: And those funds are from
14   the --
15        THE WITNESS: Phase VI, Stateside
16   project.
17        MR. DEE: Thank you.
18        MR. MARTIN: Is that offering still
19   ongoing?
20        THE WITNESS: No. No. That's fully
21   subscribed.
22        MR. MARTIN: Do you know how much
23   remains?
24        THE WITNESS: In?
25        MR. MARTIN: Relating to Phase VI, like
```

Page 346

```
 1   what funds are available?
 2        THE WITNESS: I know that there are
 3   funds available, and I know that our Jay
 4   Construction Management division is involved and
 5   obligated to build that. And we're underway with
 6   it, and it's -- we're building it right now and
 7   nearing completion.
 8        MR. LEVENSON: Are there fifteen to
 9   twenty million in funds in Phase VI available to
10   finish out construction, or will that money have
11   to come from somewhere else?
12        THE WITNESS: That money is coming from
13   the responsibilities of Jay Construction
14   Management right now.
15        MR. LEVENSON: But the underlying
16   source of those funds, is that Phase VI investor
17   funds, or is that coming from somewhere else?
18        THE WITNESS: It's investor funds. We
19   have -- we have an obligation to complete this
20   project, and we're underway with it.
21        MR. LEVENSON: Right. I understand.
22   But do you have the fifteen to twenty million
23   available from Phase VI funds, or is it going to,
24   as with Phase II --
25        THE WITNESS: Well --
```

Page 347

```
 1        MR. LEVENSON: Let me just finish the
 2   question.
 3        THE WITNESS: Sorry.
 4        MR. LEVENSON: -- as with Phase II,
 5   will it come from other sources that the company
 6   has available?
 7        THE WITNESS: The entity that's
 8   responsible to build the balance of what we're
 9   doing is Jay Construction Management, and they're
10   contractually obligated to complete the cottages
11   and the rec center and the clinic.
12        So that obligation is clearly theirs,
13   and the responsibility is clear. And we're --
14   we're building the facilities right now. We're
15   paying our bills, and we're going to finish it
16   very soon.
17        MR. LEVENSON: I understand. But my
18   question is: What are you paying your bills
19   with? What will that fifteen to twenty million
20   dollars be paid with?
21        THE WITNESS: It's being paid by Jay
22   Construction Management with funds that it has
23   responsibility for.
24        MR. LEVENSON: And where is Jay
25   Construction Management getting that money?
```

Page 348

```
 1        THE WITNESS: From -- from the project
 2   and from the company.
 3        MR. LEVENSON: And so my question is:
 4   What's coming from the company, is that coming
 5   out of Phase VI or from some other source?
 6        THE WITNESS: It's coming from the
 7   proceeds of the project and the investor funds
 8   that went into the project and the obligated --
 9   it's coming from Jay Construction Management.
10        MR. MARTIN: Are they owed anything
11   further by Phase --
12        THE WITNESS: Who?
13        MR. MARTIN: Jay Construction
14   Management. I mean, if you're saying they're
15   obligate buy it -- I mean, to build it --
16        THE WITNESS: They have been -- they
17   have been compensated to build this project.
18   They are responsible.
19        MR. MARTIN: So the phase doesn't owe
20   anymore money to Jay --
21        THE WITNESS: No. The phase -- the
22   partnership owns nothing more. We are obligated
23   to complete this project, and we are in the
24   process of doing that.
25        MR. LEVENSON: And is all of that money
```

```
                                    Page 349
 1    that was paid to Jay Construction Management come
 2    from Phase VI or --
 3          THE WITNESS:  Phase VI.
 4          MR. LEVENSON: -- were there management
 5    fees or other fees from some other phase that
 6    were used to --
 7          THE WITNESS:  No.  No.  It comes from
 8    that project.
 9          MR. DEE:  Who are the officers of Jay
10    Construction Management?
11          THE WITNESS:  The current ownership of
12    Jay Construction Management is Ariel Quiros.
13          MR. DEE:  So if Jay Construction
14    Management doesn't fulfill its obligation, your
15    partner takes down that construction site,
16    defaults?
17          THE WITNESS:  It's the obligation of
18    Jay Construction Management to complete this
19    project.
20          MR. DEE:  I know.
21          Theoretically, if Jay Construction
22    Management cannot fulfill its obligation and
23    defaults, that it's your partner that defaulted
24    on the project?
25          THE WITNESS:  Well, he's the owner of
```

```
                                    Page 350
 1    Jay Construction Management, so I guess
 2    theoretically that would be the case.  But we're
 3    finishing the project.  We see the end zone
 4    right -- we're headed towards it.  We're
 5    completing the project.
 6          MR. MARTIN:  Was there negotiations
 7    between Phase VI as the general partner of Jay
 8    Construction Management?
 9          THE WITNESS:  Could you repeat that?
10          MR. MARTIN:  Were there any
11    negotiations, you know, that Jay Construction
12    Management would build the project for Phase VI?
13          THE WITNESS:  Jay Construction -- well,
14    there was a commitment made by Jay Construction
15    Management to complete the project.
16          MR. MARTIN:  How was that commitment
17    made?  Was it in writing?
18          THE WITNESS:  I think there is an
19    agreement between Jay Construction Management to
20    complete the project.
21          MR. MARTIN:  Do you have an
22    understanding who the signators are on that
23    agreement?
24          THE WITNESS:  No, I don't.
25          MR. MARTIN:  Are you on it?
```

```
                                    Page 351
 1          THE WITNESS:  I don't know -- well,
 2    you're asking me if there's a document.  I think
 3    there is, but I'm not sure.
 4          MR. MARTIN:  Do you recall ever -- did
 5    you ever sign a document?
 6          THE WITNESS:  I sign a lot of
 7    documents. I'm not dodging your question.  I'm
 8    just -- you know, you're asking me something that
 9    I wasn't -- that I wasn't expecting, and I don't
10    know.
11          I know -- I know that we're building
12    the cottages right now, that we're going to sign
13    an agreement next week for the completion of the
14    recreation center.  And the only thing that's
15    remaining is the clinic.  And the only reason
16    that we haven't started that yet is because I'm
17    still trying to finalize the operational
18    relationship afterwards, and nearing completion
19    on that.
20          MR. MARTIN:  But no ground's been
21    broken on the rec center?
22          THE WITNESS:  Yes.  We've done site
23    preparation.  We have broken ground.
24          MR. MARTIN:  Let's mark this.
25          THE WITNESS:  This is the rec center.
```

```
                                    Page 352
 1    This is what we're building.
 2          MR. MARTIN:  One second.
 3          THE WITNESS:  I'm sorry.
 4              (SEC Exhibit No. 165 was
 5              marked for identification.)
 6          MR. MARTIN:  This is a document that
 7    you brought in that we've marked it as Exhibit
 8    165. And it's a series of nine pictures.  Could
 9    you explain which of these relate to the
10    recreational center, which of those?
11          THE WITNESS:  None of them.
12          MR. MARTIN:  None of them.
13          THE WITNESS:  None of them.  This was a
14    collage that I sent to our Department of Comps.
15          MR. MARTIN:  So all of those would
16    relate to the cottages?
17          THE WITNESS:  Those are cottages.
18          MR. MARTIN:  Okay.  Thank you.
19          MS. FUCHS:  Is Peak CM doing the
20    construction on Stateside?
21          THE WITNESS:  No.  No.  DEW.
22          MS. FUCHS:  DEW.
23          Which projects has DEW done the work
24    on?
25          THE WITNESS:  They've done the work on
```



Page 353

1  Phase I, Phase II, Phase III.
2        Peak CM did the provisions and the
3  Austria Haus renovation, and Peak CM did the
4  Mountain Learning Center build out. DEW was
5  responsible for everything else.
6        MS. FUCHS: And Austria Haus was for
7  which phase?
8        THE WITNESS: You'll need to look at
9  the offering documents. I'm sorry.
10       MS. FUCHS: Do you know which phase --
11       THE WITNESS: It was either -- I think
12  it was either Penthouse or Phase -- the Golf and
13  Mountain Suites.
14       MS. FUCHS: Do you know which phase
15  Mountain Learning Center was from?
16       THE WITNESS: Again, I could -- it's
17  either -- it's either Penthouse or Golf and
18  Mountain, I believe.
19       MS. FUCHS: Have any permits been
20  pulled for the clinic, or the medical center, for
21  Stateside?
22       THE WITNESS: We've identified where
23  it's going to be, and where we've acquired the land
24  that it's going to be built on. I've got a
25  design of the footprint that we've been sharing

Page 354

1  with our operational partners, and we have a
2  floor plan, and we have an estimate. We have not
3  concluded the operational side of that, which I
4  feel is important to have a sense of that before
5  we finish it.
6        MS. FUCHS: So no permits pulled yet?
7        THE WITNESS: We have a master plan
8  permit that allows us to do commercial,
9  residential in our entire area. We know that the
10  site has no wetlands. We know that it has no
11  stream impacts. We know it's zoned residential,
12  commercial.
13       There is a master plan approval for the
14  project, and that is one of the projects -- or
15  one of the components of the projects. So I
16  don't anticipate any permit issues whatsoever.
17       We are waiting for a construction
18  general permit for the rec center, which should
19  be issued within the next couple of weeks, and
20  that has mostly to do with storm water retention
21  and so forth. We've done the storm water
22  retention facility for the rec center. That's
23  been under -- that's been done.
24       MS. FUCHS: Have any supervision fees
25  been taken for the Stateside project?

Page 355

1        THE WITNESS: I would -- I would
2  suspect so.
3        MS. FUCHS: Do you know?
4        THE WITNESS: I'm sure some have,
5  because some of the project is fully completed,
6  and we're underway with the last portion of it.
7        MS. FUCHS: Do you know how much in
8  supervision fees?
9        THE WITNESS: I don't. I don't.
10  Whatever the document, you know, states.
11       BY MR. JAMES:
12   Q   You just said that you would assume
13  some of the project has been completed. Are you
14  saying that that's when the fees are taken,
15  that's the trigger?
16   A   No. No. I don't know exactly at what
17  point in the project we -- you know, we have the
18  land, and we have developer fees, and we have
19  construction management fees. And at some point
20  along the process of the construction of the
21  project itself, those fees are appropriately due.
22  And I would just have to defer to what the --
23  what the understanding would be. And, again, I
24  defer to my partner and our CFO for when -- they
25  may not have been taken yet, but I suspect they

Page 356

1  might've.
2        MR. MARTIN: When you met with these
3  investors, you know, the ninety-five percent or
4  so, did any of them ever ask you any questions
5  regarding management fees or construction fees?
6        THE WITNESS: No. No.
7            (SEC Exhibit No. 167 was
8            marked for identification.)
9        BY MR. JAMES:
10   Q   Let me show you what's been marked as
11  Exhibit No. 167. And tell me if you've seen that
12  document before.
13   A   Okay. I've looked at it.
14   Q   Have you seen that document before?
15   A   Very recently.
16   Q   Okay. What is it?
17   A   It is the payment register for the
18  project from March 7th, 2012 to August 31st,
19  2015.
20   Q   Okay.
21       And which project?
22   A   It says, Hotel Suites Stateside, LP.
23   Q   Okay.
24       Does this document capture all of the
25  project cost associated with Stateside that has

Page 357

1   been paid as of August 31st, 2015?
2      A   I believe it does.
3      Q   Okay.
4          And then what's the total project cost
5   for Stateside?
6      A   The total is sixty-eight million
7   dollars. Total checks and wires, it says.
8      Q   Okay.
9          And where are you pulling that figure
10  from?
11     A   The last page.
12     Q   Okay. And that's JPI-11775. Okay.
13         Do you recall how much money was raised
14  from investors in Stateside?
15     A   I believe it was sixty-seven million.
16     Q   Okay.
17         So according to Exhibit 167, the entire
18  amount raised from the investors has been spent
19  already for the Stateside project?
20     A   I guess. I believe so.
21     Q   Okay.
22         So when you talked about the
23  construction still remaining, you know, the rec
24  center, the medical center, where is that money
25  coming from?

Page 358

1      A   Well, as I look at this register, there
2   are a number of line items that state JCM has
3   received payment. And JCM is obligated to
4   complete the project, and the funds to pay for
5   the completion of the project are going to come
6   from JCM.
7      Q   So is it your testimony that JCM is
8   holding all of the funds that were paid to it
9   that are listed in Exhibit 167?
10     A   I'm saying that JCM has been paid -- I
11  haven't added up all the -- I'm looking at the
12  various items here, the funds that they have been
13  paid. They are obligated to complete the
14  project.
15     Q   Okay.
16         And when you said they're obligated,
17  they're obligated financially?
18     A   Yes. Yes. They've been paid this
19  money, and they have a contractual obligation to
20  complete the project, and that obligation is
21  being met right now.
22     Q   And, for example, starting on the first
23  page, on March 7th, 2012, there's a payment to
24  JCM for one point one million, and that appears
25  to be only the second entry for this project. Do

Page 359

1   you know what that payment was for to JCM? What
2   were they supposed to do with that money?
3      A   Which date?
4      Q   March 7th, 2012. It's on page one,
5   which is JPI-117769, one point one plus million.
6      A   Uh-huh.
7      Q   Do see that entry?
8      A   I do.
9      Q   That's the second entry on this payment
10  register?
11     A   Right.
12     Q   Do you know what that amount was for
13  that went to JCM that early in the project?
14     A   The first portion of the Stateside
15  project is the Stateside Hotel.
16     Q   Okay.
17     A   And that portion of the project was
18  constructed in that time frame.
19     Q   Okay.
20         When was that portion completed?
21     A   I think we opened it on December 20th,
22  2013, I believe.
23     Q   Okay.
24         So, in theory, any entries or payments
25  to JCM from Stateside listed on 167 prior to that

Page 360

1   date, 2013, those went to completing the first
2   stage of Stateside?
3      A   I'm -- I'm -- I'm sure. I'm sure.
4      Q   Okay.
5          And what was that exact date again?
6   I'm sorry.
7      A   The exact date of opening?
8      Q   Of -- well, completion.
9      A   I can verify this, but I think it was
10  December 20th, 2013. I know it was December
11  20th. I'm quite sure it was 2013.
12     Q   Okay.
13         So then --
14     A   But I should -- I can and should verify
15  that. This upcoming winter will be our third
16  operating winter, which would be 2015, '16. I go
17  back 2014, '15, 2013, '14. Yes, I believe it was
18  December 20th, 2013, we opened it. So if you go
19  back twelve, fourteen months, you would've had
20  ground breaking.
21     Q   And those payments that are going to
22  JCM prior to December 2013, they're using that
23  money to pay the construction company to actually
24  construct Phase I?
25     A   Well, I believe that's correct. And,

Page 361

```
 1    you know, I know the rough cost of the hotel.
 2    And I would have to take this register, and I'd
 3    have to look at what were the expenses paid to
 4    JCM from December, or even January of '14, back,
 5    and that would probably be a close approximation
 6    to the cost of the hotel. But I haven't done
 7    that exercise, but I believe that that's what you
 8    would see.
 9        Q   Okay.
10            So then -- so, basically, you're saying
11    everything, all the transfers or payments to JCM
12    after December 2013, what are those amounts going
13    to be used for by JCM?
14        A   After that date?
15        Q   Yes.
16        A   Well, we've got -- you know, with the
17    construction of a hotel, the payment of that does
18    not necessarily stop with the opening of it. So
19    going into the first quarter of 2014, there may
20    have been expenditures.
21            And we have -- we've started
22    construction on the cottages. We're about to
23    finish that. And that will be the ninetieth
24    percentile of the project, and the rec center
25    will be the last component of it.
```

Page 362

```
 1        Q   Okay.
 2            And how does it work? It that the
 3    construction company completes, for example,
 4    looking forward the rec center, do they send JCM
 5    a payment request and then JCM invoices
 6    Stateside?
 7        A   The construction company will send an
 8    invoice to JCM, and JCM will pay the bill.
 9        Q   Okay.
10            And then those records are kept?
11        A   They are.
12        Q   Okay.
13            And then so there's bank records that
14    show the monies then being --
15        A   There are records that show that
16    invoices are submitted to JCM and payments made
17    to the subcontractors, the general contractors.
18    We have the checks, or the wires, that show that.
19        Q   Okay.
20            So is there any instance where JCM
21    would bill the project prior to getting a bill
22    from the construction company?
23        A   I don't know the sequencing of the
24    payments.
25        Q   But as far as you know as far as how
```

Page 363

```
 1    the practice would work, is there any instance
 2    where JCM is getting monies prior to having a
 3    financial obligation to the construction company?
 4        A   I don't know. I know that JCM has
 5    taken on the obligation to complete the project,
 6    that -- that construction is underway now. The
 7    bills are being paid. The project is nearing
 8    completion.
 9            And JCM is -- has the contractual
10    obligation to complete the project. So DEW will
11    bill JCM. JCM is obligated to pay the bill. And
12    we are paying the bill -- they are. They are
13    paying the bills.
14            MR. LEVENSON: All of this money --
15    what exhibit number is this?
16            MR. JAMES: 167.
17            MR. LEVENSON: Okay. Everything in
18    Exhibit 167 has been spent, correct? This
19    reflects the money that is out the door?
20            THE WITNESS: It's into either actual
21    bricks and mortar or to JCM. And JCM is
22    obligated contractually to complete the project.
23            MR. LEVENSON: This says total cash
24    expended for Jay Peak HS Stateside, LP project
25    sixty-six million, nine hundred and fifty-three
```

Page 364

```
 1    thousand, two hundred and fifty-three dollars,
 2    sixty-one cents. That money's spent, correct?
 3    It's been paid?
 4            THE WITNESS: Yeah. And this is the
 5    list of the parties that have been paid.
 6            MR. LEVENSON: So JCM doesn't have any
 7    of this money anymore? They've spent it,
 8    correct?
 9            THE WITNESS: JCM has the money.
10    They're obligated to complete the project. I
11    don't know. I know that they're obligated to pay
12    the bills.
13            MR. LEVENSON: We understand --
14            THE WITNESS: Okay.
15            MR. LEVENSON: -- the statement that
16    JCM is contractually obligated to complete the
17    project. It's not going to answer the question
18    that I just asked, though.
19            Okay. Does JCM have any of this money,
20    the sixty-six million dollars, in its bank
21    account anywhere, or has it spent it all?
22            THE WITNESS: I don't know the answer
23    to that.
24            MR. LEVENSON: Okay.
25            Because you said there were fifteen --
```

Page 365

1  according to this, all but forty-six thousand
2  dollars of the Stateside investor funds have been
3  spent?
4      THE WITNESS: Right.
5      MR. LEVENSON: So if JCM has an
6  additional fifteen to twenty million dollars of
7  construction work to do, it's not coming from --
8      THE WITNESS: If --
9      MR. LEVENSON: Let me finish the
10  question -- Stateside investor funds. It's
11  coming from somewhere else. And my question is,
12  where?
13      THE WITNESS: Can you repeat what you
14  just said. You said this was fifteen million to
15  twenty million dollars of construction yet to be
16  completed?
17      MR. LEVENSON: That's what you said.
18      THE WITNESS: You asked me a question,
19  how much was the value of the construction yet to
20  be completed, and I told you it's about fifteen
21  to twenty million.
22      MR. LEVENSON: Right. So where is JCM
23  getting that fifteen to twenty million -- hold
24  on -- because it's not coming from Stateside
25  investor funds?

Page 366

1      THE WITNESS: JCM has been paid funds,
2  and those funds are obligated to pay the balance
3  of this project. Now, you're asking me a
4  question of what do I think the cost will be to
5  complete the project, and I told you a number.
6      I can also look here and see that JCM
7  has been paid a substantial amount of money. And
8  for that payment of that substantial amount of
9  money, they have contractually taken on the
10  obligation to complete the work that you asked me
11  how much was it. And I said it's, approximately,
12  fifteen-some million dollars.
13      MR. LEVENSON: But according to this,
14  all of these funds -- are you saying that JCM has
15  fifteen to twenty million dollars --
16      THE WITNESS: I'm telling you they've
17  been paid the money, and they are obligated to
18  complete the project.
19      MR. LEVENSON: So if they don't have
20  the money, where are they going to get it?
21      THE WITNESS: I don't know where
22  they're going to get it if they don't have the
23  money, but they're obligated to complete the
24  project. And the project is being completed.
25  That I know, because I'm there. And I know the

Page 367

1  bills are being paid.
2      MR. MARTIN: Have you ever asked how
3  much money JCM has?
4      THE WITNESS: I have not.
5      MR. MARTIN: And your partners never
6  shared that information with you?
7      THE WITNESS: No.
8      MR. DEE: Who does the accounting for
9  these projects? Are there all different
10  accountants, or do you have one accounting firm
11  that does it all for all the --
12      THE WITNESS: We have an accounting
13  firm -- or we have accountants on our staff. Mr.
14  Quiros has accountants in Miami. And those are
15  the two accounting entities that we -- that we
16  work with. I work on a day-to-day basis with my
17  accounting team at Jay Peak, and Ari has a team
18  here.
19      MR. DEE: Okay.
20      If you work with your accounting firm
21  on a day-to-day basis --
22      THE WITNESS: My accounting team.
23      MR. DEE: Your accounting team. Sorry.
24  Can you tell us what the balance is that you're
25  owed from JCM?

Page 368

1      THE WITNESS: Can I tell you what the
2  balance is that I am owed from JCM?
3      MR. DEE: Correct.
4      THE WITNESS: No.
5      MR. DEE: For the Stateside project.
6  No.
7      Would your accounting team would be
8  able to tell you that?
9      THE WITNESS: I'm sure we have a record
10  of what -- this is where this list of payouts
11  came from.
12      MR. DEE: Okay.
13      But JCM, obviously, owes you,
14  Stateside, money, because they haven't built the
15  rec center, they haven't finished the cottages,
16  and you haven't gone on to the medical clinic
17  yet. So they have money, theoretically, held for
18  you to build the rest of the project.
19      THE WITNESS: JCM has an obligation.
20      MR. DEE: Okay.
21      Your accounting team must know -- that
22  you work with daily, as you said -- must know
23  what the balance is that they owe you, so that
24  you can continue to monitor the project.
25      THE WITNESS: Our accounting team at



Page 369

1   Jay Peak knows what funds have been paid to JCM,
2   and JCM has its account -- accounting.
3          MR. GORDON: Can I help with the
4   identity of the account?
5          MR. DEE: Go ahead.
6          MR. GORDON: I believe that JCM has its
7   own accountant. I believe that's Ida Ovies – I
8   think you've probably seen her name or heard her
9   name before. At least that's who has
10  historically done JCM.
11         MR. DEE: Okay. But Mr. Stenger talks
12  like these are two separate entities, which they
13  are, and they should be communicating. And,
14  obviously, JCM owes you money to build the rest
15  of those projects.
16         So at the end of the year, or at the
17  end of the quarter when you balance your books,
18  your accounting team should know what's owed to
19  finish those projects. They actually technically
20  have to have that money held for you. Do they
21  hold it in escrow for you? Is there an escrow
22  account at JCM that holds the Stateside money?
23         THE WITNESS: Is there an escrow
24  account that holds the money? We have paid JCM,
25  according to this register, funds for the

Page 370

1   completion of the Stateside project.
2          MR. DEE: I understand that, and I've
3   heard that. Do they hold an escrow account for
4   you over there in the Stateside project?
5          THE WITNESS: I don't know if they have
6   an escrow account.
7          MR. DEE: Okay.
8          Do you --
9          THE WITNESS: I know that they have
10  their own account, and I know that they've
11  received the funds. And in exchange for
12  receiving the funds, they have contractually
13  obligated themselves to complete the project, and
14  that project is being completed right now, right
15  now.
16         MR. DEE: All right. Thank you.
17         And you had stated earlier there was no
18  commingling. The reason I asked about the escrow
19  funds is because if JCM is taking care of all
20  these projects, they should be separating the
21  money in escrow funds -- in an escrow accounts,
22  so they can be accountable for each project.
23         So to continue, you're sure there's no
24  commingling of any funds at all?
25         THE WITNESS: I can't speak to that,

Page 371

1   because I don't know the answer to that.
2          MR. DEE: Okay.
3          THE WITNESS: I can only repeat what I
4   said earlier. This register shows the payment of
5   funds to JCM. JCM has taken on a contractual
6   obligation to complete the project.
7          MR. DEE: Okay.
8          THE WITNESS: We have -- we are at
9   about eighty-five percent complete. The balance
10  is in sight. We are breaking ground for the rec
11  center very shortly. And the only element that
12  is a question mark at this point is the precise
13  time for the clinic to be completed, but that is
14  a minor, small part of this project.
15         MR. DEE: All right. Let me just ask
16  this one follow-up question. You don't know if
17  JCM has any money for those projects -- the rest
18  of your projects at all, do you?
19         THE WITNESS: I don't. But I don't
20  know that they don't.
21         MR. DEE: But you don't know that they
22  do.
23         THE WITNESS: I know they're obligated
24  to complete it.
25         MR. DEE: The question was: Do you

Page 372

1   know if they have any funds available for your
2   project? And you told me you don't know. That's
3   good enough.
4          THE WITNESS: Okay.
5          BY MR. JAMES:
6      Q   Other than Mr. Quiros, who is JCM?
7      A   JCM has a team of construction
8   supervision people that are involved in the
9   day-to-day bricks and mortar and running of
10  coordinating the construction.
11     Q   And these are employees, full-time
12  employees?
13     A   They are employees of Jay Peak.
14     Q   Okay. No. I'm talking about JCM.
15     A   JCM is owned by Mr. Quiros.
16     Q   Yes.
17     A   And the Construction Development team
18  of Jay Peak, Inc. is contracted to work for JCM
19  in projects like this --
20     Q   Okay.
21         So --
22     A   -- and coordinate the subs, the
23  generals, and the completion responsibilities for
24  the project.
25     Q   Okay.



Page 373

```
 1        So JCM uses Jay Peak employees to, like
 2   you said, manage the obligation to construct
 3   Stateside?
 4        A   Correct.  Correct.
 5        Q   So JCM doesn't have any of its own
 6   employees?
 7        A   Mr. Quiros is the owner of JCM.
 8        Q   So is Mr. Quiros in there running
 9   invoices, doing ledgers, contracting with
10   construction companies?
11        A   I am -- I am not sure -- Mr. Gordon
12   mentioned an accounting firm that does work for
13   JCM.
14        The principal function of JCM in this
15   particular project is to complete the projects
16   and to coordinate the completion of the project.
17        Q   And I understand that.  But my question
18   is:  Who is doing that?  Who is the individual or
19   individuals that's doing that?
20        A   We have a contractor called DEW that is
21   involved with construction.
22        Q   And that's the construction company?
23   That's not part of JCM?
24        A   No.  They're a vendor that produces
25   results.
```

Page 374

```
 1        Q   Okay.
 2        So who at JCM?
 3        A   There are about five or six employees
 4   that work at Jay Peak in our Construction
 5   Development division who are assigned to assist
 6   with this project and other projects.
 7        Q   Okay.
 8        So who do they work -- who do they
 9   report to at JCM?
10        A   At JCM, the owner of that -- of JCM is
11   Mr. Quiros.  On a day-to-day basis, they interact
12   with me.
13        Q   Okay.
14        So the Jay Peak employees that,
15   basically, are assigned to JCM report to you?
16        A   Yeah, they do.
17        Q   Okay.
18        And who are these employees?
19        A   They work with me.  They work with me
20   on the project.
21        Q   Okay.
22        So JCM itself doesn't have any actual
23   live bodies operating JCM on a day-to-day basis?
24        A   Well, JCM contracts with my development
25   team to implement the project creation.
```

Page 375

```
 1        Q   Okay.
 2        So who on the JCM side is signing these
 3   contractions with your development team to run
 4   Stateside?
 5        A   I believe Mr. Quiros.
 6        Q   So there's agreements between JCM --
 7        A   I believe there is, yes.
 8        Q   Let me finish.  There's agreements
 9   between JCM and these individuals at Jay Peak
10   that, basically, memorializes this agreement that
11   they're going to assist JCM in running the
12   project?
13        A   I believe so.
14        Q   And they're assigned by Mr. Quiros?
15        A   Yes.
16        Q   And those individuals report to you?
17        A   On a day-to-day basis, because I'm
18   there.
19        Q   Okay.
20        Mr. Gordon mentioned an accountant.
21   Does the accountant report to you?
22        A   I've not worked with day-to-day with
23   that accountant, no.
24        Q   Okay.
25        So you're supervising the employees who
```

Page 376

```
 1   are operating for JCM, but you're unaware of the
 2   accounting functions, how much cash is being
 3   held?
 4        A   That's correct.
 5        Q   So who is aware of that?
 6        A   I would think Mr. Quiros is aware of
 7   that.
 8        Q   Okay.
 9        And have you spoken to Mr. Quiros about
10   those subject areas?
11        A   I have not.
12        Q   And what's your basis to believe that
13   he would know that?
14        A   Because he's the owner of JCM.
15        Q   And there's no one else at JCM?
16        A   No.
17        Q   Okay.
18        And do the investors know that this
19   function has been, basically, contracted out to
20   JCM, which is Mr. Quiros's company?
21        A   I don't know -- I don't know that they
22   do.
23        Q   Did you ever communicate that to the
24   investors?
25        A   No.  No.
```

Page 377

```
 1    Q   So would investors, do you think, want
 2  to know -- that you've met at least ninety-five
 3  percent of them.  Do you think they would want to
 4  know that Mr. Quiros owns Jay Peak and has also
 5  contracted out that function to another company
 6  that he owns?
 7    A   I think the investor is interested in
 8  the project being completed as described in the
 9  offering document, and done in a timely way, so
10  that they can get their proceeds and their green
11  cards.
12    Q   Okay.
13    A   That's what they're concerned about.
14  They want to make sure that the project gets done
15  and who the contractors are, what the obligations
16  are.  Their interest is in building what the
17  offering said we would build.
18    Q   But wouldn't that interest also include
19  wanting to know that Jay Peak has outsourced that
20  entire function?
21    A   No.  I don't think that they care.
22    Q   Have they told you they haven't
23  cared --
24    A   No.
25    Q   -- or have you disclosed that?
```

Page 378

```
 1    A   No.
 2    Q   Okay.
 3    A   I know that they care about getting the
 4  things that were built or promised to be built,
 5  they would want to know that they're being built.
 6    Q   By whom?
 7    A   I don't think they care.
 8    Q   Okay.
 9    A   As you mentioned a few minutes ago, you
10  asked me about Peak CM as contractor and DEW as a
11  contractor.  Both -- I never, ever have told an
12  investor, well, we're going to be using DEW
13  contract or Gosselin Concrete versus Harrison
14  Concrete.  They don't care about that.
15        They care about, is the hotel being
16  built as we were told and described, are the
17  cottages being built, is the rec center being
18  built, is the medical clinic being built, and is
19  it being done in the time frame that is
20  appropriate for my needs as a current investor?
21    Q   Okay.
22        And would they care that the investors'
23  sixty-seven million and all of that has already
24  been spent and there's still three components to
25  be constructed?
```

Page 379

```
 1    A   The money has been paid to people who
 2  are obligated to complete the project.
 3    Q   It's been paid to JCM?
 4    A   That's correct.
 5    Q   And we've established that JCM is Mr.
 6  Quiros --
 7    A   Is obligated -- JCM is obligated to
 8  complete this project in a timely way, and it's
 9  being done right now.
10    Q   Okay.
11        So Mr. Quiros is obligated to complete
12  the project?
13    A   JCM.  JCM is obligated to complete this
14  project.
15    Q   And we just established that that's Mr.
16  Quiros?
17    A   That's correct.
18    Q   Okay.
19        So he's obligated to complete the
20  project?
21    A   Those are your words, and I don't
22  disagree with that, but I've made myself very
23  clear that JCM, which is owned by Mr. Quiros, is
24  obligated to complete the project, and we're
25  doing it right now.
```

Page 380

```
 1    Q   Okay.
 2        And there's no one else that JCM --
 3    A   I don't know of anyone else.
 4    Q   Okay.
 5        (SEC Exhibit No. 166 was
 6        marked for identification.)
 7        BY MR. JAMES:
 8    Q   Can I show you what's been marked as
 9  Exhibit 166?
10    A   Sure.
11    Q   Have you seen that before?  This is the
12  Stateside offering documents, the PPM, business
13  plan.
14    A   I'm familiar with it.
15    Q   If you could turn to Bates number
16  JPI-004606.  At the bottom of each page, there is
17  a stamp number that begins with the prefix JPI.
18    A   Which page again?
19    Q   4606.
20    A   460 --
21    Q   6.
22    A   Okay.
23    Q   Are you there?
24    A   I am.
25    Q   Okay.  Have you seen this page before?
```

Page 381

```
 1      A  I have.
 2      Q  Okay.
 3         Can you describe to me exactly what
 4  this page captures?
 5      A  It says a summary.  It's the Hotel
 6  Suites Stateside summary of data applied.  It
 7  shows the capital expenditure of the project.
 8  And it outlines the contractor supervision cost,
 9  structural engineering utilities, cottages,
10  supervision costs and expenses, structural
11  engineering.  Discusses the recreation center, or
12  lists the recreation center and the medical
13  clinic.  And it's a summary of various stages and
14  costs.
15      Q  Okay.
16         And as far as the sixty-seven million
17  we saw in Exhibit -- the earlier exhibit, I think
18  it was No. 167, you see that sixty-seven million
19  as far as the capital expenditures into the
20  project?  Where it says, Grand Total, if you go
21  across.
22      A  Grand total.  Yes, I do see.  I see --
23  I see the grand total.
24      Q  Okay.
25         Let me focus your attention on the cost
```

Page 382

```
 1  supervision fees.  And those are the amounts that
 2  we talked about earlier that is taken by the JPI
 3  for its construction supervision of the Stateside
 4  project.  Do see those numbers?
 5      A  I do see the supervision fees and
 6  expenses.
 7      Q  Okay.
 8         Do you see how it's broken down by
 9  stages, stage one, stage two, stage three, stage
10  four?
11      A  I do.
12      Q  Okay.  And you see how the construction
13  cost to the Hotel Suites is broken down into four
14  payments, I guess, and then the cost supervision
15  also is broken down based on those amounts?
16      A  I see it.
17      Q  Okay.
18         So do you interpret that to read that
19  the cost supervision is earned, or at least it's
20  taken in conjunction when those amounts are spent
21  on that particular portion of the project?
22      A  I think it shows the allocation
23  mathematically.
24      Q  So you do not believe that's a timing
25  indicator, also?
```

Page 383

```
 1      A  Well, I mean it's divided equally in
 2  three parts.  And, you know, every project is not
 3  one-third, one-third, one-third.  It's for the
 4  simplicity of the math, it's divided
 5  proportionally.
 6         Stage one, it says here, Stateside
 7  Hotel Suites, stage one, four million, five
 8  hundred and eighty-seven thousand, five hundred
 9  dollars.  I can guarantee you, that number in
10  practical reality was not that number.
11         And in stage two and stage three, these
12  are mathematically divided into thirds.  It's one
13  project.
14      Q  But why?  Why would it be broken down
15  into four stages?
16      A  I think for the simplicity of saying
17  it.
18      Q  Okay.
19         Did you prepare or have any involvement
20  in preparing this offering document?
21      A  I was involved in the general
22  discussions of the project, and did not do this
23  particular document.  I was aware of it, aware of
24  what we were building, aware of when we were
25  going to start the project and aware of when we
```

Page 384

```
 1  were going to try to finish it.
 2      Q  Okay.
 3      A  So I'm aware.  I did not create this
 4  document.
 5      Q  And this was communicated to the
 6  investors prior to investing?
 7      A  The investors saw that their investment
 8  was going to build a hotel, cottages, a
 9  recreational center, and a medical clinic.  And
10  they knew that they were putting their funds in,
11  that the project was going to start on or about a
12  certain date and end on or about a certain date.
13  And when the money was spent, how it was spent,
14  what time of year, they were not concerned about
15  that or appraised of that, because we couldn't
16  have told them.
17      Q  But they were given this exhibit,
18  Exhibit 167?
19      A  Given as a conceptual -- conceptual in
20  the sense of the phasing, not the bottom line
21  number.
22      Q  Well, where does it delineate that, as
23  to this page, it's conceptual, not literal?
24      A  Well, because I said a minute ago, when
25  you've got stage one, stage two, stage three, and
```

Page 385

```
 1    they're divisible identically by a third, a
 2    third, a third, I can tell you in practical
 3    reality when you're building something, it
 4    doesn't always fall that way.
 5          We might've spent less than four
 6    million, five hundred and sixty-seven thousand in
 7    Phase I, and maybe more in stage two, or more in
 8    stage one and less in stage two and more in stage
 9    three.
10       Q   And you're saying that this is an equal
11    amount --
12       A   I'm just saying that this is a
13    mathematical presentation.  The total numbers may
14    be correct, and are correct -- I don't mean any
15    correct.  They are correct.  But, you know,
16    whether they occurred exactly this way -- this is
17    a projection.
18       Q   Where does it say projection on here?
19       A   Well, it's an offering document.  This
20    was given to people before anything was built.
21       Q   Well, it's their representation.
22       A   That's right.  That's right.
23       Q   So keeping with your thought, go back
24    to that same page.  If you go down to guest
25    services, recreation center, and medical center,
```

Page 386

```
 1    If you go across to that same development, four
 2    stage breakdown, do you see where the numbers do
 3    vary from phase to phase, and, in fact, for the
 4    rec center and the medical center, some of those
 5    expenses are not incurred until stage three and
 6    stage four?
 7       A   Well, those are also estimates of
 8    income.
 9       Q   What about timing?
10       A   They're -- in terms of the estimated
11    time of creation?
12       Q   Uh-huh.
13       A   It says here one.
14       Q   So, for example, for the medical center
15    there's nothing -- there's no expense under stage
16    one, stage two.  When you get to stage three is
17    where you see expenses associated with the
18    construction of the medical center.
19       A   Correct.
20       Q   So my question is:  Based on this page,
21    wouldn't you agree that this, basically,
22    represents to an investor that when you get to
23    stage three, that's when the project is going to
24    expend funds towards the medical center, not in
25    stage one, not in stage two?
```

Page 387

```
 1       A   I think that's an estimate of when we
 2    expected those general amounts to be expended.
 3       Q   And that would be in stage three and
 4    four, not stage one and two?
 5       A   That's what's depicted here.
 6       Q   Okay.
 7          So it does speak to timing?
 8       A   It's an estimate.
 9       Q   Okay.  But it speaks to its timing?
10       A   It does.  But it's also an estimate of
11    what we project could happen.  And in reality, it
12    might occur that way, and it might vary from
13    that.
14          MR. LEVENSON:  Where does it say in
15    here estimate or projection?
16          MR. GORDON:  Do you mean in the whole
17    document?
18          MR. LEVENSON:  I mean on this page.
19          MR. GORDON:  On that page.
20          THE WITNESS:  Well, it doesn't, but if
21    you look at --
22          MR. LEVENSON:  Okay.  That's --
23          THE WITNESS:  I understand.  If you
24    look at the stage three and stage four of the
25    medical center, it's mathematically divided in
```

Page 388

```
 1    half.  And I'm telling you as a guy who's been
 2    around construction and development, it's never
 3    that way.
 4          MR. LEVENSON:  Did you tell any
 5    investor that, what you just told me?
 6          THE WITNESS:  No.  And the reason is
 7    that any investor who I would talk to and if I
 8    would say, we're going -- I would tell them,
 9    we're going to build a clinic in stage three and
10    four.  We're estimating that it's going to be
11    three sixty-two eight -- or three sixty-two five
12    per stage, but that'll be the gross amount.  It
13    might be nine hundred in stage one and seven
14    hundred in stage -- or, excuse me, in stage --
15    you understand what I mean.  You have to.
16          MR. DEE:  Let me ask you this.  Since
17    you're an experienced man in construction and you
18    work with an accounting team, have you ever heard
19    the percentage of completion method used in
20    accounting?
21          THE WITNESS:  Yes.
22          MR. DEE:  Okay.
23          And in here, it wasn't applied, was it?
24          THE WITNESS:  We have contractual --
25          MR. DEE:  It was a yes or no question.
```



Page 389

1    THE WITNESS: Could you repeat it?
2    MR. DEE: You didn't use the percentage
3  of completion method when you designed this form,
4  correct?
5    THE WITNESS: I don't believe we did.
6    MR. DEE: Okay. Thank you.
7    THE WITNESS: I'd like to just restate
8  that I'm not taking issue with the gross amount
9  of the expenditure. I'm just saying that when
10  you put together a projection, you hope the
11  projection bears out close to what you estimated.
12  And you have an estimated expenditure for
13  creation and development, and then you have an
14  estimate for what you hope your income's going to
15  be.
16      I believe we adhere very closely to the
17  developmental cost. The income side is what we
18  hope will occur based on our knowledge of the
19  market and our operating experience of these
20  kinds of facilities.
21    BY MR. JAMES:
22    Q   Who are the supervision fees paid to?
23  And we can see them listed on that page. But who
24  are they paid to -- or who were they paid to?
25    A   I'd have to check the statistical

Page 390

1  reality of that. I'm not sure who exactly, which
2  entity it went to.
3    Q   But who invoices the partnership for
4  the supervision fees?
5    A   In this particular case, I'm not
6  sure -- I'm not sure who did that. I could find
7  the answer to that. My CFO would know.
8    Q   Okay.
9      So do you know whether the construction
10  supervision fees have been taken for the
11  Stateside project as you sit here today?
12    A   I believe that -- I know that this
13  register shows payments made, and I'm not sure
14  exactly where that would be listed.
15    Q   Okay.
16      So is it your testimony that if the
17  fees were taken as of August 31st, 2015, that it
18  would be listed on this payment register, which
19  is Exhibit 167?
20    A   I would think so.
21    Q   And who would be the entity? Would it
22  Jay Peak, Inc.? Would it be Q Resorts? Who
23  would be the entity that would --
24    A   I apologize for not knowing the
25  technical answer to that. I can find out that

Page 391

1  answer. I can ask my -- our CFO, who actually --
2  which entity did the invoice for this.
3    Q   Okay.
4    A   I apologize for not knowing that kind
5  of granular detail. I should know it, I guess,
6  but I know who does know. And I know that I can
7  ask my CFO, and he will have the answer to that.
8    Q   Okay.
9      Would Mr. Quiros know?
10    A   Probably.
11    Q   Okay.
12      And as of August 31st, 2015, were there
13  cost overruns associated with Stateside?
14    A   Not to my knowledge.
15    Q   Going forward, do you anticipate cost
16  overruns?
17    A   I do not.
18    Q   So we know that the entire sixty-seven
19  million has been spent by Stateside as of this
20  date?
21    A   It's been -- it's been paid to the
22  entities that are listed on this ledger, yes.
23    Q   So as of this date, the investors
24  already have put forth their sixty-seven million?
25    A   Correct.

Page 392

1    Q   So any expenses beyond that, it's not
2  their --
3    A   Obligation. They are not obligated to
4  pay anything.
5    Q   Okay.
6    A   They are going to delivered everything
7  that they have invested in.
8    Q   Okay.
9      And, let's say, for our purposes, you
10  mentioned the twenty million as far as --
11    A   I was asked the question, how much do I
12  think it will take to complete? Now, we're --
13  we're building today. There's lots of people
14  working, lots of things being done. We will
15  finish this project, the vast majority of it in
16  2015, first quarter of 2016.
17      So how much is the -- as of today, how
18  much is left? I could give you a -- it's about
19  fifteen million, but I don't know the exact
20  precise as of the 17th of September.
21    MR. MARTIN: What's the basis of your
22  estimate of fifteen or twenty? Is there a
23  document or anything that you're relying upon?
24    THE WITNESS: We're probably eighty
25  percent, plus done with these cottages, and we

Page 393

1   have the rec center to do.
2       MR. DEE: If you're eighty percent done
3   on these cottages and there's eighty-four
4   cottages, then you would have sixty-four cottages
5   complete. In those pictures that you were shown
6   in that exhibit that's in front of you, was there
7   sixty-four cottages there that --
8       THE WITNESS: Underway.
9       MR. DEE: No. No. That are complete?
10      THE WITNESS: No. No, of course, not.
11      MR. DEE: Okay.
12      How many cottages are underway in that
13  exhibit that's in front of you?
14      THE WITNESS: I believe there are -- I
15  believe seventy-two.
16      MR. DEE: Seventy-two right there?
17      THE WITNESS: We're underway with the
18  foundations for the others now.
19      MR. DEE: Okay. You have seventy-two
20  with foundation. How many are --
21      THE WITNESS: No. No, that's not what
22  I said. I said seventy-two underway. There's --
23  we're under roof with several.
24      MR. DEE: How many under roof then?
25      THE WITNESS: About five buildings.

Page 394

1       MR. DEE: Five buildings in that
2   picture, five buildings out of eighty-four,
3   seventy-nine more to go. And you're saying
4   you're eighty percent --
5       THE WITNESS: You're not listening to
6   me.
7       MR. DEE: I am listening. That's why
8   I'm asking --
9       THE WITNESS: No, you're not. How many
10  units are in a building? How many units are in a
11  building?
12      MR. DEE: Let me ask you this. Let me
13  rephrase it. There's eighty-four cottages. How
14  many are complete?
15      THE WITNESS: None are complete.
16      MR. DEE: Okay. That's all I wanted to
17  know.
18      THE WITNESS: But I want to make
19  something very clear. There are a certain number
20  of buildings that have twelve units per building,
21  and a certain number of buildings that have three
22  and four per building. So if I say that there
23  are five buildings, five units started, five
24  buildings, and you subtract that from eighty-four
25  and come up with seventy-nine, that's incorrect.

Page 395

1       MR. DEE: You're correct. I'm using
2   your Use of Funds offering document, and it
3   doesn't describe it in buildings. It says
4   cottages. So that's what I'm referring to.
5       THE WITNESS: Okay. I'm telling you
6   that were are --
7       MR. DEE: That's why I asked you in
8   cottages.
9       THE WITNESS: Okay. Well, I'm telling
10  you --
11      MR. DEE: I'm good.
12      MR. MARTIN: All right. Why don't we
13  take two actually follow-up questions, and then
14  maybe when we get done, we can we take a break.
15      MR. GORDON: And when we take a break,
16  when he steps out, I want to show you guys a
17  couple of things.
18      MR. LEVENSON: We need to take a break
19  and talk amongst ourselves first. Okay?
20      MR. GORDON: Well, of course. I don't
21  want to do this in front of the witness. When he
22  walks out on that --
23      MR. MARTIN: Okay.
24      MR. GORDON: I want to help, actually.
25      MR. MARTIN: Are you aware of any

Page 396

1   issues of any of the workers that have worked on
2   Stateside or any of the projects getting paid?
3       THE WITNESS: I'm aware of some of
4   that.
5       MR. MARTIN: When -- tell me the first
6   time you're aware of that.
7       THE WITNESS: We had a situation where
8   we were negotiating with our general contractor
9   for materials, and we had not completed the
10  negotiation. And the subcontractors that were
11  working for them had not been paid by them, and
12  there was a delay of, I believe it was five
13  business days. And they got paid.
14      It was a contractual arrangement
15  between us and the subcontractor, and that
16  subcontractor was holding back on paying. There
17  was a -- there was a -- there was a contractual
18  negotiation going on. It was completed, and they
19  were paid.
20      MR. MARTIN: And this involved the
21  Stateside project?
22      THE WITNESS: Yeah.
23      MR. MARTIN: And when did this occur?
24      THE WITNESS: Sometime in the summer.
25      MR. MARTIN: And are there any other

Page 397

```
1    occurrences?
2         THE WITNESS: No.
3         A very small community as you, I guess,
4    probably have come to realize. And our program
5    and our projects are watched like a hawk. And
6    we've got -- and I know you're familiar with all
7    the blogs that are in Vermont. They've been --
8    you know, you've seen them all, I'm sure.
9         So, you know, there is -- there is a
10   lot of attention being paid, an organization
11   a company that's making this kind of impact and
12   developmental activity. And everything -- any
13   stumble along the way gets noticed and amplified.
14        MR. MARTIN: And this incident that you
15   described, did it in any way relate to a shortage
16   of funds?
17        THE WITNESS: No. I believe it related
18   to a negotiation between us and the general
19   contractor on payment terms and timing. And it
20   was resolved.
21        But imagine you're running a company,
22   and you've got newspapers that are getting calls
23   at night for anything from potty -- temporary
24   toilets that aren't being emptied on time, and
25   whether or not a sub, who was maybe told, look,
```

Page 398

```
1    if we don't get this resolved, you don't report
2    to work Monday, and that driver of the truck
3    calls the newspapers and says, I'm getting laid
4    off because I'm not getting paid. Well, it's not
5    the project. It might've been the negotiations
6    between the company and the sub.
7         MR. MARTIN: Why don't we take a break.
8         MR. JAMES: We're off the record.
9         (A brief recess was taken.)
10        MR. JAMES: We are back on the record
11   at 11:58 a.m.
12        BY MR. JAMES:
13        Q   When we took a break, we were
14   discussing the Stateside project, and I think
15   we're talking about an issue where some of the
16   workers were not -- I guess what you stated was
17   that there was a contract negotiation that caused
18   some issues with some of the work being performed
19   at Stateside. Just one last question. Was that
20   negotiated between JCM and the general contractor
21   that caused that five-day delay?
22        A   No. It was between the general
23   contractor and the subcontractors.
24        Q   Okay.
25        So they were having a discussion?
```

Page 399

```
1         A   Yes.
2         Q   So the next project? The next project
3    after Stateside is?
4         A   We're working on AnC Bio.
5         Q   Okay. So tell us about that project.
6         A   We've begun construction. We have
7    the -- do you want this back?
8         Q   Actually, you can just put it to the
9    side for now.
10        MR. MARTIN: That one we'll have to
11   keep.
12        THE WITNESS: Oh, I'm sorry. I
13   apologize.
14        AnC Bio is a biotechnical facility and
15   project that we are underway with. We've been
16   working on it for a few years in the sense of
17   designing and developing. We broke ground.
18   Actually, we started site development last year,
19   but we actually broke ground formally in May of
20   this past year.
21        The site is in Newport, Vermont, and it
22   is about a seventy-five thousand square foot
23   facility on a five and a half, six acre site. It
24   is a building that will house between four
25   hundred and fifty and five hundred employees.
```

Page 400

```
1         It will have three distinct businesses
2    associated with it; a medical device development,
3    manufacturing, and distribution, stem cell and
4    genetic product development and distribution, and
5    clean room operations. And those are the three
6    distinct business elements that will be in the
7    AnC Bio facility.
8         We are expecting to complete the
9    construction in the fourth quarter or first
10   quarter of 2016, '17. Hopefully, we'll have a
11   good winter construction cycle and be able to hit
12   the earlier goal, but it'll be one or the other.
13        BY MR. JAMES:
14        Q   Okay.
15        How much money has been raised to date?
16        A   I believe in the mid-seventies million,
17   in the seventy some million range. It's changing
18   because we're welcoming investors still at this
19   present time.
20        MR. LEVENSON: You are continuing to
21   solicit investors?
22        THE WITNESS: Yes. Yes.
23        MR. LEVENSON: And how much is left
24   before its subscribed?
25        THE WITNESS: I -- I'd have to get you
```

Page 401

1  the specific, but I think we're about eighty
2  percent raised.
3      MR. LEVENSON: Okay.
4      So, approximately, another fifteen
5  million or so?
6      THE WITNESS: I can verify that, but I
7  think so.
8      MR. LEVENSON: Okay.
9      And is there a timeline by which you're
10  attempting to -- or just as soon as you can in
11  terms --
12      THE WITNESS: Well, we're hoping to do
13  it within the next sixty days. And as you might
14  know, the EB-5 legislation is set to Sunset at
15  the end of September. We anticipate that it will
16  be extended. And we think that, although there
17  may be changes to a the law, we think that a
18  rural Vermont project like ours will be protected
19  and successful. There are changes we anticipate,
20  but we don't think they're going to negatively
21  impact us at all.
22      MR. LEVENSON: Could you tell us what
23  you're doing at this point in time in terms of
24  seeking additional investors for that project.
25      THE WITNESS: Well, we have a number of

Page 402

1  attorneys that we have worked with in the past
2  that are immigration attorneys. They know our
3  projects to be dependable and successful. And I
4  would say about seventy-five percent of our
5  investors come to us from attorneys that know us.
6      Those attorneys generally will
7  recommend to their clients a handful of projects
8  to consider. We're never, to my knowledge, the
9  exclusive project that any attorney recommends,
10  but we just hope to be on the short list to be
11  considered.
12      And when an investor reaches out and
13  seeks information from us, we give them the
14  materials that describe the project. And if they
15  want to pursue it further, we ask them to fill
16  out a questionnaire and establish, you know, that
17  they want information from us, and we --
18      MR. LEVENSON: So is one of the things
19  you're doing contacting those attorneys and
20  letting them know you're seeking additional
21  investors?
22      THE WITNESS: We attend functions that
23  the American Immigration Lawyers Association puts
24  on, where you can present your materials, and
25  it's our way of letting them know that, yep, we

Page 403

1  have some projects, that if you have an EB-5
2  client, we would appreciate you looking at our
3  projects and deciding whether you would like to
4  recommend that we be one of the projects that are
5  considered.
6      MR. LEVENSON: And when was the last
7  couple of those that you --
8      THE WITNESS: There was a conference in
9  Las Vegas about three weeks, a month ago. There
10  were four hundred and some attorneys present.
11      MR. LEVENSON: Are you scheduled to
12  appear at any others right now?
13      THE WITNESS: There's an event in
14  Dallas. And then there's --
15      MR. LEVENSON: When's that?
16      THE WITNESS: October.
17      And then -- that's the only other event
18  in the United States.
19      MR. LEVENSON: Are you doing things
20  overseas?
21      THE WITNESS: We travel. We'll go to
22  other countries and work with attorneys that have
23  immigration practices elsewhere.
24      MR. LEVENSON: Just specifically in the
25  August, September, and going forward time frame,

Page 404

1  what have you been doing as far as overseas?
2      THE WITNESS: I was in Vietnam in
3  August.
4      MR. LEVENSON: Did you have other
5  people from Jay Peak --
6      THE WITNESS: Yes. I had -- well, one
7  of my associates was with me.
8      MR. LEVENSON: What specifically were
9  you doing there?
10      THE WITNESS: We met investors in that
11  part of the world that were interested in the
12  EB-5 investment, and we explained the projects
13  that we had done in the past and that we were
14  offering going forward.
15      MR. LEVENSON: When was that that you
16  were there?
17      THE WITNESS: I said it was in August.
18      MR. LEVENSON: I'm sorry. I didn't
19  hear you.
20      THE WITNESS: I can give you the
21  specific dates if you'd like.
22      MR. LEVENSON: Sure. That's fine. I
23  mean, if you can look it up at a break.
24      THE WITNESS: Yeah. Okay.
25      MR. LEVENSON: I appreciate it.

Page 405

```
1      THE WITNESS: I was there about a week.
2      MR. LEVENSON: Okay.
3      And was it like -- how were you, were
4  you like in a specific place? How did you
5  attract people to talk to you?
6      THE WITNESS: We in Hanoi, and then Ho
7  Chi Minh City, and then one day in Da Nang.
8      MR. LEVENSON: And were you just -- did
9  you have a conference room or something
10 somewhere?
11     THE WITNESS: We have a firm in Vietnam
12 that is in the -- I guess you call it the
13 migration referral business, both for educational
14 institutions and well as EB-5 projects.
15     MR. LEVENSON: About how many people,
16 potential investors did you --
17     THE WITNESS: We probably met fifty.
18     MR. LEVENSON: Okay.
19     I do want to ask you, and it's a
20 natural thing and I understand, but just make
21 sure you let me finish the question before you
22 start answering. I know the Court Reporter is
23 really struggling to keep up with both of us at
24 the same time.
25     THE WITNESS: Okay. Sorry.
```

Page 406

```
1      MR. LEVENSON: Any other trips that
2  you've got planned in the next couple of months?
3      THE WITNESS: I'm planning a trip at
4  the end of September.
5      MR. LEVENSON: Where to?
6      THE WITNESS: To Dubai and Delhi and
7  Istanbul.
8      MR. LEVENSON: Okay.
9      And are all of those just related to
10 the Jay Peak bio -- the biomedical, or --
11     THE WITNESS: And Q Burke Hotel.
12     MR. LEVENSON: Okay.
13     So you're looking for investors for
14 both?
15     THE WITNESS: Correct. I'm sorry.
16     MR. LEVENSON: Okay.
17     Any other things that you decide to --
18 the conferences here and the travel that you've
19 told us about, what else are you doing right now
20 as far as investor outreach or soliciting
21 investors, potential investors?
22     THE WITNESS: We answer emails, because
23 we've been in the existence for a long time.
24 People will -- they know of us. We've been to
25 AILA, American Immigration Lawyers Association,
```

Page 407

```
1  conferences quarterly, annually for years. We've
2  met hundreds and hundreds of attorneys. We have
3  eight hundred investors already, and some of
4  those investors, many of those investors are
5  extremely happy with their relationship. And
6  they have friends, family, others that might be
7  interested in an EB-5 program, and they will
8  reach out to us by email, and we'll answer and
9  follow up with that.
10     (Mr. Dee leaves the room.)
11     MR. LEVENSON: I apologize if I'm
12 jumping the gun, and if you guys want me to hold
13 off, let me know. But since you mentioned Q
14 Burke, how much -- I know Brian's going to ask
15 you some more questions about that, but what's
16 the -- how much of that is subscribed, I guess?
17     THE WITNESS: I believe we've raised
18 about between forty-five and fifty million
19 dollars.
20     MR. LEVENSON: And how much is left
21 before that's considered fully subscribed?
22     THE WITNESS: I think we've got another
23 forty or fifty to go.
24     MR. LEVENSON: Okay.
25     So you're actively looking for --
```

Page 408

```
1      THE WITNESS: Yes. I'm sorry.
2      MR. LEVENSON: Let me finish.
3      THE WITNESS: I'm sorry.
4      MR. LEVENSON: You're actively looking
5  for investors in both the biomedical and Q Burke,
6  right?
7      THE WITNESS: Yes, we are.
8      MR. LEVENSON: Okay.
9      MR. MARTIN: A couple of follow-up
10 questions on the AnC Bio. What offering document
11 are you giving to investors presently?
12     THE WITNESS: We have an offering
13 document that has been revised and recently
14 approved for release by our state. I have a copy
15 of it with me if you'd like to see it.
16     MR. MARTIN: So the amended or amended
17 or revised is what's being used right now?
18     THE WITNESS: It's an amended document,
19 yes.
20     MR. GORDON: Well, I believe it was
21 emailed to Brian and Trisha two days ago as far
22 as documents. You guys don't have that or --
23     MR. JAMES: This one?
24     MR. GORDON: The amended.
25     MR. JAMES: Yes.
```

Page 409

```
 1        MR. GORDON:  You don't have to pull it
 2   out.  I'm just saying he's pulling it out.
 3        THE WITNESS:  Well, this is a copy of
 4   it.
 5        MR. GORDON:  I don't know if this is
 6   messing up your order is kind of what I really
 7   meant.
 8        MR. MARTIN:  And previously you were
 9   using kind of the original sort of PPM to raise
10   money from AnC Bio investors; is that correct?
11        THE WITNESS:  We were using the
12   original offering document.  It expired.  Because
13   it expired, we were asked by the State to redo
14   and update the offering, and we complied with
15   that and are using the new offering.
16        MR. MARTIN:  So how much money was
17   raised, approximately, off the original PPM?
18        THE WITNESS:  I think probably about
19   sixty million, but I can get you the precise
20   amount, because it's very factual.  I'm just
21   doing the math on what I think we've raised
22   since.  I think it's about sixty.
23        MR. MARTIN:  And how much ballpark have
24   you raised with the new PPM?
25        THE WITNESS:  I think about -- I think
```

Page 410

```
 1   about seven and a half million.
 2        MR. LEVENSON:  And when did you start
 3   using that, the new one?
 4        THE WITNESS:  Back in the early part of
 5   2015, February or March.
 6        MR. LEVENSON:  Okay.
 7        MR. MARTIN:  And the general partners
 8   of the first six phases, the individual that
 9   represented the general partner, that was you; is
10   that correct?  The first six phases we talked
11   about.
12        THE WITNESS:  Yes.  Yes.
13        MR. MARTIN:  And then for the Phase VII
14   or AnC Bio, that's yourself and Mr. Quiros?
15        THE WITNESS:  Correct.
16        MR. MARTIN:  And that's also true for Q
17   Burke, yourself --
18        THE WITNESS:  Correct.
19        MR. MARTIN:  I got to finish.
20        THE WITNESS:  Sorry.
21        MR. MARTIN:  -- yourself and Mr. Quiros
22   are the individuals that embody the general
23   partner for that project; is that correct?
24        THE WITNESS:  That's correct.
25        MR. MARTIN:  Just like in general, what
```

Page 411

```
 1   is a general partner?  How do you see your duties
 2   or functions?
 3        THE WITNESS:  I am involved in the
 4   formulation and creation and concept of the
 5   project.  I am involved in the developmental side
 6   of the project and the facilitation of the
 7   operational side of the project.  So there are
 8   two distinct functions, and we are responsible
 9   for making the business happen, operate, and
10   perform on behalf of the limited partners.
11        (Mr. Dee enters the room.)
12        MR. MARTIN:  So are you their
13   representative?
14        THE WITNESS:  In certain senses, yes.
15   I look at my job is to make the results that the
16   offering states for the limited partners.  It's
17   my job to make that happen, among other things.
18        MR. MARTIN:  And that statement would
19   be true now for Phase VII, or AnC Bio and Q
20   Burke, for yourself that's and Mr. Quiros, so
21   that's your understanding of your functions?
22        THE WITNESS:  Yes.
23        MR. MARTIN:  Okay.
24        BY MR. JAMES:
25        Q   Let me show you, Mr. Stenger, what was
```

Page 412

```
 1   previously marked and introduced as Exhibit 104.
 2   And tell me is that the offering documents, the
 3   PPM for AnC Bio, the original?
 4        A   It appears to be, yes.
 5            (SEC Exhibit No. 168 was
 6                Marked for identification.)
 7        BY MR. JAMES:
 8        Q   And at the same time, let me hand you
 9   what has been marked as Exhibit 168, and tell me
10   if that's the Amended and Restated PPM for AnC
11   Bio?
12        A   Yup, I believe it is.
13        Q   And so I understand, the original AnC
14   Bio PPM, at some point, that was no longer being
15   used to solicit investors?
16        A   This offering expired.
17        Q   Okay.
18            And when did it expire?
19        A   And I believe it has a date in here.  I
20   don't know the exact date, but I believe it was
21   December of '14, but I'm not exactly sure.  I
22   know that the offering expired, and we were asked
23   to update it by our state officials, and we did
24   so.
25        Q   Okay.
```

Page 413

1    So are you saying that the reason you
2    stopped using the original PPM is because of the
3    expiration?
4    A   Correct.
5    Q   Okay.
6        Had you stopped using it prior to the
7    expiration in the end of 2014?
8    A   Prior to the expiration, did we stop?
9    Q   Yes.
10   A   No, we didn't.
11   Q   At any point, did the regional center
12   prohibit Jay Peak from using that particular PPM
13   for any reason?
14   A   We were asked by the Department of
15   Commerce to not promote the project until the new
16   offering document was renewed and approved, and
17   we -- we did that.
18   Q   Okay.
19       And when was that?
20   A   I want to say July of 2014.
21   Q   Okay.
22   A   There was a period of months where we
23   did not promote the project until the new
24   document was updated and reauthorized by the
25   State.

Page 415

1    So the time frame that we put on this
2    initial offering document for its completion
3    was -- we were not -- we were not finished with
4    it. And in large part we weren't finished
5    because the entire EB-5 world was bogging down.
6        All of our prior projects we were able
7    to compress into about a twelve-month period for
8    subscription. And we thought that this would
9    probably be the same, but it was taking longer
10   because approvals were slower at the federal
11   level.
12   Q   Why would that extend the length of the
13   project? Are you saying the 529s approval were
14   taking longer --
15   A   526.
16   Q   526, sorry, were taking longer than --
17   A   Were taking much longer nationally.
18   Q   Okay.
19       And so were you waiting for those
20   approvals before you would release the funds into
21   the project?
22   A   One of the things that every investor
23   looks for is to know whether or not a project has
24   been approved. And if a project has not been
25   approved, they may still go forward with you, but

Page 414

1    Q   Okay.
2        And were there specific sections of the
3    original offering documents that Vermont asked
4    you to update?
5    A   They asked us to update the offering as
6    it related to dates, certain regulation
7    enhancements or technicalities that they wanted
8    to see us do. They also asked us to do a market
9    analysis to determine if the suppositions we were
10   making in the business plan were still current.
11       And when they asked us to expand and
12   update the offering document, we turned that duty
13   over to our securities counsel in Burlington.
14   They worked directly with the State's attorneys.
15   And over the course of a few months, this
16   document evolved, and it is the one that was
17   approved for usage. And it is -- there's a lot
18   of commonality, lots of commonality between the
19   two. The dates are different, obviously.
20       And the reason that this expired was
21   because USCIS's timeline for approvals became so
22   elongated, that the project was slowed down.
23   What used to take three months or four months to
24   get approval was taking eighteen, twenty,
25   twenty-four months.

Page 416

1    they feel better knowing that a project has had
2    an approval.
3        And the first approval for AnC Bio,
4    because of the backlog at USCIS, took much longer
5    than we had thought it might for reasons that we
6    fully understand. The movement of the
7    Adjudication Division from California back to
8    Washington. The hiring of many new people. Once
9    we got our first approval for AnC Bio, dozens and
10   dozens of other approvals followed relatively
11   soon.
12       But it's kind of like the pig and the
13   python. There was a period of time where
14   USCIS -- and you can check with any number of
15   other EB-5 projects -- was 2014, 2013, periods of
16   time where project approval was taking a long,
17   long time. And it was in our case, and that's
18   principally the reason that the offering expired.
19       MR. MARTIN: Was there any negative
20   reaction? Was it more difficult to sell the AnC
21   Bio than your previous offerings?
22       THE WITNESS: More complicated. It's a
23   different thing. We're known for being in the
24   resort business. This is a technology project.
25   So it's more complicated and different.

Page 417

```
 1        Now, we've had lots of interest and
 2   lots of success once USCIS got through its review
 3   and got approval. We've had dozen and dozens of
 4   approvals.
 5        MR. MARTIN: Speaking of approvals,
 6   there's different components here. Where do the
 7   approvals on like the medical devices as
 8   far as getting regulatory approval?
 9        THE WITNESS: We have a firm that we've
10   hired to help us with the FDA interaction, both
11   on the development of the building and the
12   approval of medical devices. We have not gotten
13   FDA approval of any of the devices yet. There is
14   KFDA approval for some of them, which is Korean
15   FDA.
16        But we have identified and
17   contractually entered into an agreement with
18   Biologics of Alexandria, Virginia to do the
19   certification of the building, and also assist us
20   with the first products through the FDA-approval
21   cycle.
22        MR. LEVENSON: Have you actually
23   submitted any applications yet for any of the
24   approvals, the FDA approvals?
25        THE WITNESS: Not for the devices yet,
```

Page 419

```
 1        MR. MARTIN: I believe so, but I'm more
 2   focused because of the asking a general
 3   description of the medical devices. So just in
 4   sum, though, for the medical devices, nothing at
 5   this point in time has been submitted to the FDA?
 6        THE WITNESS: Not yet.
 7        MR. MARTIN: And that was true when the
 8   amended PPM was issued as well?
 9        THE WITNESS: Correct.
10        MR. LEVENSON: And it was true in 2012,
11   I assume, when the initial PPM for this project?
12        THE WITNESS: I believe so, yes.
13        MR. LEVENSON: When did you hire
14   Biologics?
15        THE WITNESS: November of 2014.
16        MR. MARTIN: I'm sorry. I'm just going
17   to go through each. The stem cell, where does
18   that stand on the regulatory approval process?
19        THE WITNESS: Well, the stem cell and
20   gene therapy product is one that is
21   individualized and created in a facility. It's a
22   dynamic fast moving and changing and evolving
23   part of the bio industry. It's changing
24   exponentially each year.
25        Within the facility will be fifty clean
```

Page 418

```
 1   no.
 2        MR. MARTIN: To a lay person, when you
 3   say medical devices, what are you talking about?
 4        THE WITNESS: Earlier, I mentioned that
 5   there are three businesses that this company will
 6   be involved in. One of them is the medical
 7   device business. And of the medical devices that
 8   we are the owners of distribution rights for, one
 9   of them is called a T-PLS pump. Another is
10   called a C-PAK or a C-Liver. These are
11   artificial organs.
12        The one that is the most advanced and
13   is involved in and has had successful human
14   trials is the T-PLS mission. One of the things
15   that we did between the time of the issuance
16   of -- or the expiration of the offering document
17   and the reissuance of the other is, at the
18   request of the State and our own interest, we did
19   a third-party market analysis of those products
20   to determine, are they still relevant, is there
21   market demand for the product, will we see these
22   products being successful?
23        And I suspect you've got a copy of
24   that. Do you? Do you have a copy of that report,
25   the Frost & Sullivan study?
```

Page 420

```
 1   rooms. Twenty of which, or thereabouts, will be
 2   used by AnC Vermont for the creation and
 3   development of stem cell therapies on a broad and
 4   individualized basis. Those products and
 5   services must be created in an FDA-certified
 6   facility. So it's not like, here's my stem cell
 7   product, I'm going to manufacture it. It is a
 8   personalized medical development feature.
 9        It might be my blood being altered and
10   improved in a stem cell related way in an
11   individual clean room for me or a patient. And
12   that kind of therapy and product is
13   individualized and must be produced in an
14   FDA-certified facility. And that's why the
15   building and the facility will have an FDA
16   certification as part of its outcome.
17        MR. MARTIN: And where do you stand in
18   getting, obtaining FDA certification?
19        THE WITNESS: As we build the building,
20   it must meet the FDA certification standards.
21   And as part of the protocol of construction with
22   the various architects and a firm like Biologics,
23   there will be an independent certification of the
24   building, and that's required.
25        MR. MARTIN: And do they do a
```

Page 421

1  preliminary, like as you build out, do they give
2  you preliminary certification just yet?
3  THE WITNESS: We have a design that is
4  being created and is near completion. We're at
5  the ninety-fifth percentile of completion. And
6  that is the building design that will meet FDA
7  standards -- is meeting FDA standards, but it
8  must go from the drawing board to reality.
9  So between the NNE Pharmaplan
10  designers, AnC Bio Vermont scientists, and a
11  third party, like Biologics, and the FDA, as the
12  building is constructed, it will adhere to FDA
13  certification standards. It probably won't be
14  until the end of construction that the FDA will
15  finalize their authorization, but every step of
16  the way, we are adhering to the FDA-required
17  specifications.
18  MR. MARTIN: And that answer would
19  also -- that would also apply to obtaining
20  regulatory approval as to the clean rooms?
21  That's a similar concept as to what you've
22  described with the stem cells?
23  THE WITNESS: What I was -- what I was
24  describing was the entire facility. And within
25  the clean rooms, I mentioned that there were

Page 422

1  fifty. Thirty of which would be rented out to
2  third parties, and that would form an income
3  stream of that.
4  MR. MARTIN: That component, the clean
5  room component?
6  THE WITNESS: The clean room component,
7  there are fifty in total. Twenty will be used by
8  AnC Bio Vermont, its own stem cell and gene
9  therapy products. The other thirty clean rooms
10  will be made available to other bioscience
11  companies, colleges, whatever, for their
12  particular interest, knowing that it is an
13  FDA-certified facility.
14  MR. MARTIN: I think you mentioned
15  ground was broke in May of 2015. What's the
16  status? I mean, is there anything actually built
17  on the site at this point in time? Do you have
18  pictures you can show us?
19  THE WITNESS: Yeah, I do. I have some
20  photos.
21  MR. MARTIN: I'd like the photos.
22  MR. GORDON: We thought you might.
23  THE WITNESS: These are just -- this is
24  the excavator. And this is the -- this is a
25  cover sheet of the design, but that's the same

Page 423

1  picture as you see on the offering document.
2  MR. MARTIN: Can we mark -- I believe
3  it's just -- just mark that one, please.
4  (SEC Exhibit No. 171 was
5  marked for identification.)
6  MR. MARTIN: Could you explain -- I'm
7  sorry. What we've marked as Exhibit 171, could
8  you just explain to that what that represents.
9  THE WITNESS: That shows storm water
10  retention system creation. It shows electrical,
11  sewer, water utilities going in. It shows site
12  preparation for concrete. And that was taken
13  about a week ago.
14  MR. MARTIN: And how much is
15  projected -- what's the projected cost to
16  complete the facility from what you've already
17  spent?
18  THE WITNESS: I'd have to look at the
19  construction budget, but, you know, it's -- it's
20  a forty million dollar building, and then you've
21  got equipment.
22  MR. MARTIN: Have there been
23  prepayments for that construction to JCM or other
24  entities?
25  THE WITNESS: There's been -- there's

Page 424

1  been some prepayment for that, yeah, in order to
2  do the design. The design is an overwhelming
3  task because of the complexity of the building.
4  And we've been working with NNE Pharmaplan for a
5  couple of years now on that. There's been --
6  MR. MARTIN: So you prepaid JCM, is
7  that correct, for some AnC Bio work?
8  THE WITNESS: Yes.
9  MR. MARTIN: How much? I mean, do they
10  sort of owe, need to complete --
11  THE WITNESS: We've made -- we've made
12  deposits on the equipment that is required to go
13  into the construction.
14  MR. MARTIN: How much have you,
15  approximately, paid JCM?
16  THE WITNESS: I think we've paid them
17  close to twenty million dollars.
18  MR. MARTIN: And how much have they
19  delivered of that at this point in time?
20  THE WITNESS: The design and the
21  creation of what the facilities will consist of
22  is underway. And a lot of its intellectual
23  property. A lot of it is the technical design.
24  And the work required to do the job is required
25  to have fifty percent of it up-front by contract,

Page 425

1  and we're underway with that.
2       MR. MARTIN: And do you know how much,
3  approximately, remains in the AnC Bio limited
4  partnership account?
5       THE WITNESS: I'm not sure at the
6  moment.
7       MR. MARTIN: Do you have any
8  approximation?
9       THE WITNESS: I know I can get it.
10 It's many millions of dollars, I know that, but I
11 don't know the precise amount today.
12      But we're starting concrete and steel
13 within the next two weeks. I hope that we're
14 under -- we're fully erected by the first
15 quarter, and we will complete the facility. I
16 want it done by the end of 2016.
17      MS. FUCHS: Where's the development of
18 the medical devices going to be?
19      THE WITNESS: The manufacturing and
20 development?
21      MS. FUCHS: Yes.
22      THE WITNESS: They will be produced and
23 distributed from the facility in Newport.
24      MS. FUCHS: From anywhere else?
25      THE WITNESS: The current technology

Page 426

1  that we're involved in has its roots in Korea,
2  some of it. But those devices that we will get
3  patented, and in some cases are patented, will be
4  produced and distributed from the United States.
5       MS. FUCHS: In Vermont?
6       THE WITNESS: Correct.
7       MS. FUCHS: Solely in Vermont?
8       THE WITNESS: Yes, I believe. I
9  mean -- yes.
10      MS. FUCHS: Is there any kind of
11 development to the medical devices that's going
12 to take place or going on currently in Korea?
13      THE WITNESS: The T-PLS device
14 currently exists and is used in Korea. That
15 product will be further refined and produced in
16 the United States. And once it has its FDA
17 approval, will be widely marketed in North and
18 South America and other places.
19      MS. FUCHS: Is T-PLS, is it
20 commercially available? Is it being used
21 commercially in Korea?
22      THE WITNESS: I don't -- I don't know
23 if it's being commercially used in Korea right
24 now.
25      MS. FUCHS: Has it ever been?

Page 427

1       THE WITNESS: I've been to a hospital
2  facility in Korea, seen the device, seen it in
3  use, so I know it exists. I know it's being
4  used. I know its benefits. I don't know how
5  widely it's being used in Korea at the moment.
6       MS. FUCHS: Or anywhere outside of
7  Korea?
8       THE WITNESS: I'm not sure if it's
9  being used in China or not.
10      But I know we've done important
11 research on the product, market potential, market
12 demand, and done so very recently, to give us a
13 great deal of confidence that the products that
14 we are in possession of the distribution rights
15 have very significant market value, and will be
16 successful.
17           (SEC Exhibit No. 172 was
18            marked for identification.)
19      MS. FUCHS: Let me show you what's been
20 marked as Exhibit No. 172. It's a one-page
21 document. It appears to be a copy of a letter,
22 dated May 18th, 2011 from you to Catherine Wentz.
23      Do you recognize this document?
24      THE WITNESS: Let me read it, if I may.
25      Okay.

Page 428

1       MS. FUCHS: Do you recognize this
2  document?
3       THE WITNESS: I do.
4       MS. FUCHS: And, briefly, what is it?
5       THE WITNESS: It is a letter from me to
6  Catherine Wentz. Do you want me to read it?
7       MS. FUCHS: No. Just what was the
8  purpose of the letter? Why did you write it to
9  her?
10      THE WITNESS: To determine a direction
11 of approval protocol for the T-PLS pump.
12      MS. FUCHS: Had you spoken by phone
13 with Ms. Wentz?
14      THE WITNESS: You know, I don't recall.
15 I don't recall.
16      MS. FUCHS: On the last paragraph where
17 you said you're "Actively pursuing this project.
18 We'll reach to you shortly to apprise you of our
19 progress and next steps." Did you ever reach out
20 to her to apprise her of your progress and next
21 steps?
22      THE WITNESS: I don't believe we have
23 since.
24      MS. FUCHS: Okay.
25      BY MR. JAMES:

Page 429

```
1      Q  So the next one is Q Burke. I know you
2   spoke a little bit about it. Can you give us of
3   a sense of where that is, percentage completed.
4      A  Would you like photographs?
5      MR. MARTIN: Sure.
6      THE WITNESS: I like photographs, too.
7   They help me.
8      While I'm getting these out, I
9   mentioned to you earlier -- and I don't know if
10   you've seen it or not. Maybe you have -- but it
11   was about a year ago that the job creation
12   statistics for the state came out, and the
13   significant recognition took place about the job
14   creation that all of these projects collectively
15   have made on our community. I'll leave that with
16   you.
17      MR. MARTIN: Okay. Thank you.
18      THE WITNESS: Q Burke on September
19   3rd -- and I'll leave this with you. You see
20   three photos there. One is of the uphill
21   depiction of the facility. And the two below,
22   the one on your left, is the south-facing side.
23   And the other is the portico. And that is a
24   snapshot of what amounts to be about two hundred
25   construction workers that are on site. It's
```

Page 431

```
1   of this project, and I --
2      MR. LEVENSON: This meaning Q Burke?
3      THE WITNESS: Yes. I'm sorry. I'm the
4   general partner of the Q Burke Mountain Hotel and
5   Conference Center, and I act as an advisor to the
6   operation.
7      MR. MARTIN: And do you receive any
8   separate compensation or salary, bonus for that?
9      THE WITNESS: None.
10      MR. MARTIN: You haven't?
11      THE WITNESS: No.
12      MR. MARTIN: Do you expect to?
13      THE WITNESS: Do I expect to? Maybe
14   some day. I'm not hesitating because I'm hiding
15   anything. I'm involved in the development and
16   the operations. I'm one of the general partners.
17   And there are going to be in the future proceeds
18   from that project. Some day, I hope it
19   materializes. But I've received no compensation
20   in any way from this project.
21      MR. MARTIN: You might've covered this
22   with Mr. Levenson. But how much has been raised
23   to date for Q Burke, approximately?
24      THE WITNESS: I think we're in the
25   forty-five to fifty million range.
```

Page 430

```
1   about half of the workforce for that project. We
2   are opening the facility on December 11th of this
3   year. We're very close to the end.
4      MR. MARTIN: So Q Burke is a separate
5   resort from Jay Peak; is that correct?
6      THE WITNESS: Burke Mountain was
7   acquired a couple of years ago by Mr. Quiros.
8   And this project was started a little over a year
9   ago, the construction of it. And it's a sister
10   resort, we call it. It's about forty-five
11   minutes from Jay Peak. And it is a beautiful
12   facility and in desperate need of accommodations.
13   And this is the only hotel within about a
14   twenty-minute radius of the resort. It's located
15   physically right in the middle of the mountain,
16   and will be highly successful.
17      MR. MARTIN: And do you have any
18   ownership interest in Burke Mountain?
19      THE WITNESS: Myself?
20      MR. MARTIN: Yes.
21      THE WITNESS: No.
22      MR. MARTIN: Do you have any -- do you
23   have an executive position or a management
24   position with Burke Mountain?
25      THE WITNESS: I am the general partner
```

Page 432

```
1      MR. MARTIN: And it remains another
2   forty-some million to raise?
3      THE WITNESS: There's another portion
4   of this project, but it is an aquatic center,
5   tennis facility, mountain bike facility that we
6   expect to build next -- next spring, next spring,
7   summer.
8      MR. LEVENSON: And that's what
9   you're --
10      THE WITNESS: That's what we're raising
11   funds for now.
12      MR. LEVENSON: Okay.
13      MS. FUCHS: What's the relationship
14   between Jay Peak, Inc. and Q Burke, this latest
15   project?
16      THE WITNESS: There is no relationship
17   between Jay Peak, Inc. and this project. I'm a
18   partner at Jay Peak. Ari Quiros bought this area
19   a couple of years ago, asked me to help develop
20   it. That's my background. I know Vermont. I
21   know the ski industry. I know what Burke
22   Mountain needs. And we've coalesced around this
23   project as a very important element to make that
24   ski area successful.
25      And we're building -- we're building
```

Page 433

1  the hotel. We're creating jobs. We're going to
2  save that resort, because it was floundering
3  badly over the last twenty or thirty years,
4  mostly because it didn't have a bed base. And
5  this is going to make a difference.
6  　　　MR. JAMES: So we're off the record for
7  lunch.
8  　　　(Whereupon, at 12:46 p.m., a luncheon
9  recess was taken.)
10  　　AFTERNOON SESSION
11  　　　(Mr. Levenson and Mr. Martin are not
12  present in the room.)
13  　　　MR. JAMES: So we're back on the
14  record.
15  　　　(SEC Exhibit No. 173 was
16  　　　marked for identification.)
17  　　BY MR. JAMES:
18  　Q  Mr. Stenger, I just wanted to just
19  circle back. You had brought a number of
20  photographs with you, but the one that you talked
21  about most recently of Q Burke, I just marked
22  that as Exhibit 173, just for reference. I just
23  wanted to confirm that that's the same document
24  you were discussed in earlier that had the three
25  photographs in it that you described?

Page 435

1  　A  Yes.
2  　Q  Okay.
3  　　　So starting with Exhibit 104, I just
4  wanted to ask you about the creation of this PPM.
5  Were you involved at all with the creation of
6  Exhibit 104, the original Jay Peak Biomedical
7  PPM?
8  　A  I was.
9  　Q  Okay. Tell me exactly what was your
10  role in the creation of this document.
11  　A  I participated in the discussions about
12  the benefit of the creation of the project, the
13  feasibility of whether we could successfully
14  develop the facility and the products, how we
15  would go about promoting the program, how we
16  would get permits and the authorization to do it,
17  what kind of recruitment capacities would our
18  community have to fulfill the employment, were
19  there market demands for the products and
20  services? I participated in those kinds of
21  discussions, and those were the key areas that I
22  participated in.
23  　Q  Okay. And then who else were a part of
24  those discussions that you listed? To the extent
25  it varied from subject area, let me know that,

Page 434

1  　A  Yes.
2  　Q  Okay. Perfect. We'll put that with
3  the same stack.
4  　　　And let me also hand to you what has
5  been marked as Exhibit No. — Exhibit No. — sir,
6  you have in front of you Exhibit No. 168, which
7  is the Amended and Restated PPM for the Jay Peak
8  Biomedical Research Park, LP project, correct?
9  　A  Yes.
10  　　　(Mr. Martin enters the room.)
11  　　BY MR. JAMES:
12  　Q  I think I had previously handed you the
13  original PPM for that project, which was marked
14  as Exhibit 104. Do you see that anywhere?
15  　　　MS. FUCHS: Here.
16  　　　MR. JAMES: Okay. Okay. Perfect.
17  　　BY MR. JAMES:
18  　Q  So in front of you, Mr. Stenger, you
19  have Exhibit 104, which is the original Jay Peak
20  Biomedical Research Park, LP offering documents,
21  the PPM, the business plan, so forth and so on.
22  And then you have next to that Exhibit 168, which
23  is the amended version of Exhibit 104, correct?
24  　A  Uh-huh.
25  　Q  Sorry?

Page 436

1  also.
2  　A  Ariel Quiros participated in various
3  discussions. Ike Lee, who is the CEO of AnC Bio
4  Vermont, participated in those discussions. Bill
5  Kelly, who is legal counsel for some of our
6  projects and involved in some of the
7  developmental aspects of the projects,
8  participated in some of the formula discussions.
9  　　　We had interaction with AnC Korea
10  during the formulative (sic) discussions about
11  the products and the medical devices that we
12  could look to bring to the United States and
13  create here and distribute here.
14  　Q  And who were those individuals at AnC
15  Bio Korea?
16  　A  Principally, a gentleman by the name of
17  Alex Choi.
18  　Q  Okay.
19  　　　Anyone else?
20  　A  There were three or four other
21  scientists that worked there that -- a gentleman
22  by the name of Dr. Jang, another gentleman by the
23  name Dr. Jake Lee, not related to Dr. Ike Lee.
24  　Q  Okay.
25  　A  Those were some of the principals.

Page 437

```
 1     Q   Okay.
 2         And anyone else, not just in South
 3   Korea but locally, who were involved in the
 4   discussions that you just described to us?
 5     A   Those are the principal people.
 6     Q   So now you have those discussions, and
 7   you get to the point where now you're putting pen
 8   to paper, if you will.  Tell me what was your
 9   role in connection with the actual drafting of
10   this document, including any review and
11   finalization.
12     A   The legal counsel for the project put
13   together the document and the legalese that was
14   there.  The budget, the job creation analysis,
15   the market demand materials, business plan I was
16   familiar with.  I wouldn't say any one person had
17   unique authority on any one of those things.  It
18   was a collaborative effort.
19     Q   Okay.  Between whom?  Sorry to cut you
20   off.
21     A   The parties that I mentioned.  I'm not
22   a scientist.  I am a developer, and I know the
23   community, and I know the economic brand of my
24   community.  And I felt that this project would
25   make an enormous contribution to the economic
```

Page 438

```
 1   well-being of Northern Vermont, a remarkable
 2   contribution.  And there's a lot of things
 3   relative to that that I can, and did, contribute
 4   significantly to.
 5     Q   Okay.
 6     A   The budget for what it would take to do
 7   it, the history of the products, the science
 8   involved with why would the stem cell product
 9   line work, why would T-PLS work, I benefitted
10   from the knowledge of others to come up with a
11   contribution, which was the end result here.
12         I've learned a lot about this effort,
13   and -- but there are others who are extremely
14   knowledgeable and sophisticated when it comes to
15   the science of these products and these programs.
16     Q   Okay.
17         So as far as the actual language that
18   was, you know, put in the final version, were you
19   the person that had the final say-so as to this
20   being the final language, or was that someone
21   else?  And if it varied based on section, tell me
22   that, also.
23     A   I believe it would -- I would say it
24   varied based on sections.
25     Q   Okay.
```

Page 439

```
 1     A   And I relied heavily on our legal
 2   counsel to make sure that the offering was
 3   succinct and in keeping with the rules and
 4   regulations of an offering of that sort.
 5     Q   Okay.
 6     A   The business plan was a collaborative
 7   effort between scientists and ourselves, and
 8   using our best judgment as to what products would
 9   be most successful at what time and how would we
10   evolve.
11     Q   Okay.
12         So when, for example, you have the Use
13   of Funds section that states how much is going to
14   be raised to investors and then, basically,
15   allocates what each dollar of investors funds are
16   going to go towards, were you responsible for the
17   final approval of that section?
18     A   I don't know that I was -- I was not
19   solely responsible for that area.
20     Q   Okay.
21         Who else in addition to you?
22     A   I would say it would be probably a
23   combination of myself and Ariel.
24     Q   Okay.  Okay.
25         Are you able to look at that page and
```

Page 440

```
 1   say, well, these areas is what I, ultimately, was
 2   responsible for, these are the areas that Mr.
 3   Quiros was, ultimately, responsible for?
 4     A   Without looking at it, I can't answer
 5   that, but I'm happy to try.
 6     Q   Okay.  Let's do that.
 7     A   One of the things I'd like to share
 8   with you is that, as this project has evolved, I
 9   mentioned earlier that the bio science industry
10   is changing at an almost exponential rate.
11   Fortunately, it's expanding and changing, from a
12   business standpoint, in very positive ways.
13         So that the market demand potential for
14   the medical devices has stayed steady or grown,
15   but the product development of the stem cell
16   product line has grown exponentially, beyond what
17   we would've thought it was going to be.
18         And there is now the advent of another
19   element of that, the gene therapy side of stem
20   cell development.  And so one of the very
21   positive things is that the market potential, we
22   are even more confident of the outcomes that we
23   believe will occur.
24         (Mr. Levenson enters the room.)
25         BY MR. JAMES:
```

Page 441

```
1        Q   Okay.
2             So at your request, I'm turning your
3    attention to the Use of Funds section of the Jay
4    Peak Biomedical Research Park, LP PPM, the
5    original PPM.  And if you turn to Bates page
6    number ANCBIO-00068, that should be what we're
7    referring to, correct?
8        A   Yes.
9        Q   Okay.
10            So take a minute and take a look at
11   that, and then if you're able to, can you tell me
12   what parts of this you have ultimate approval
13   over and what parts Mr. Quiros had ultimate
14   approval over, and to the extent, as you
15   mentioned earlier, it was combined, if you could
16   let me know that, also.
17       A   Okay.  I've looked at it.
18       Q   Okay.  To ask you a question, could you
19   identify for me what parts you had ultimate
20   approval over?
21       A   Well, what I see here is a summary of
22   the construction estimates, the distribution
23   right category, and then there are other costs
24   related to the project.  I wouldn't say that I
25   had sole responsibility or control over any one
```

Page 442

```
1    of these, and I would say that Mr. Quiros didn't
2    have sole responsibility over any one of these.
3             This is the -- this is the end product
4    of a collaboration between ourselves, the design
5    team, the people that we're procuring the product
6    rights from.  And this is a summary of sort of
7    the facts and figures of what we believe the
8    project will take to implement.
9             The distribution rights are an example
10   of a financial commitment to obtain and control
11   and own those rights.  It was an agreed upon
12   amount based on what the market demand reflection
13   was at the time.  And -- so that isn't -- did I
14   have sole discretion over determining that?  No.
15   Was I aware that was the amount of money
16   necessary to obtain those rights?  Yes.  Did I
17   have any problem with that?  No, not given what
18   I've learned and know about the market demand for
19   those products.
20       Q   And to clarify, I understand that some
21   of the source information may have come from
22   other professionals or in conjunction with other
23   professionals, but the ultimate decision to
24   accept that information and include it in the PPM
25   that is to be distributed to potential investors,
```

Page 443

```
1    that's my question.  Were you the one, whether
2    solely or in conjunction with Mr. Quiros, that
3    accepted this information and approved it being
4    in the PPM?
5        A   I would say that in conjunction with
6    others, I participated in most of the areas that
7    are listed on this page.
8             MR. LEVENSON:  Mr. Stenger, I'm going
9    to ask you, with this it will go much faster, if
10   you answer the questions that are asked to you.
11   And that question was simply:  Who approved
12   putting that in the PPM?  It's a very simple
13   question.  Who approved putting that information
14   in the PPM, you?
15            THE WITNESS:  Well, he asked me if I
16   solely did that, and I'm telling you that I'm not
17   solely responsible for any of that.  I worked in
18   collaboration with others.
19            MR. LEVENSON:  Who approved putting it
20   into the PPM?
21            THE WITNESS:  I'm not sure I know the
22   answer to that specific question of -- I
23   certainly, as general partner, am responsible for
24   what's in here.
25            MR. LEVENSON:  Okay.
```

Page 444

```
1            THE WITNESS:  Okay.  I'm not trying to
2    dodge your question, and I'm not playing cutsie
3    here.  I'm just trying to answer --
4            MR. LEVENSON:  No one's saying --
5            THE WITNESS:  But when you said solely
6    responsible, I'm trying to listen to every word
7    that I'm being asked.
8            MR. LEVENSON:  Okay.  Well, I'll ask
9    the question this way.  We'll do it faster.  But
10   if you --
11           THE WITNESS:  I'm not trying to do
12   anything --
13           MR. MARTIN:  Would your understanding
14   be the same as it would not, this document, the
15   original PPM would not have gone out without the
16   approval of the other general partners and Mr.
17   Quiros?  Is that your understanding?
18           THE WITNESS:  Yes.  Yes.  And I will
19   tell you that as general partner, I'm responsible
20   for this PPM.  I do not step away from that
21   responsibility.  But when you ask -- I'm trying
22   to -- I'm not a lawyer.  I'm trying to listen to
23   every word you're asking.  And when you say, are
24   you solely responsible, that means me only, and
25   that's not the case.  I'm part of a team of
```

Page 445

```
1    people that worked on this project that put this
2    budget together. That's all. That's all I'm
3    saying.
4         BY MR. JAMES:
5         Q   So you and Mr. Quiros approved the
6    information --
7         A   Yes.
8         Q   -- on this page, being the PPM?
9         A   Yes.
10        Q   Okay.
11            Let me ask you some other sections, and
12       this is the same question, whether you and Mr.
13       Quiros, whether jointly together or however,
14       approved these sections being in the PPM. Okay?
15            If you turn to Bates page number, I
16       guess, 00021. And it's also Use of Proceeds
17       section.
18            MR. LEVENSON: Do you mind if I give it
19       a quick try?
20            MR. JAMES: Oh, yeah. Yeah. Go for
21       it.
22            MR. LEVENSON: Just for that one
23       section.
24            MR. JAMES: Go for it.
25            MR. LEVENSON: What's the page?
```

Page 446

```
1         MR. JAMES: 21. ANCBIO-21.
2         MR. LEVENSON: Do you need a minute to
3    look at it?
4         THE WITNESS: What am I supposed to
5    look at?
6         MR. LEVENSON: The Use of Proceeds
7    paragraph. Correct?
8         MR. JAMES: Yes.
9         MR. GORDON: On the top of page 21,
10   0021, right there.
11        THE WITNESS: Yes. I'm sorry. You'd
12   like me to read that?
13        MR. LEVENSON: Do you need to?
14        THE WITNESS: I do.
15        MR. LEVENSON: Okay.
16        THE WITNESS: Okay.
17        MR. LEVENSON: Okay. You had a chance
18   to review it?
19        THE WITNESS: Yes.
20        MR. LEVENSON: Who drafted that
21   language?
22        THE WITNESS: I suspect it was drafted
23   in collaboration with our counsel and our team.
24        MR. LEVENSON: Do you know who provided
25   the language to counsel for drafting?
```

Page 447

```
1         THE WITNESS: I don't.
2         MR. LEVENSON: Did you -- who approved
3    putting it in the PPM?
4         THE WITNESS: I don't know the specific
5    answer, that anyone uniquely approved it. The
6    overall PPM was a collaborative effort. And I'm
7    signing -- I've signed the PPM.
8         MR. LEVENSON: Okay.
9             Would you say that you are responsible
10   for it being in the PPM? Is that a fair
11   statement?
12        THE WITNESS: I can tell you I have to
13   take responsibility for everything that's in the
14   PPM.
15        MR. LEVENSON: Okay.
16            Would that be true of Mr. Quiros with
17   regard to this language, too?
18        THE WITNESS: I can't answer for him,
19   but I'm a general partner and so is he.
20        MR. LEVENSON: Did you review this
21   language -- let me ask you a general question.
22   It might save some time. Did you read the PPM
23   before it was, you know, approved and sent to
24   investors?
25        THE WITNESS: I've read it.
```

Page 448

```
1         MR. LEVENSON: Okay.
2             Did you review this language?
3         THE WITNESS: I'd like to read it one
4    more time if I can.
5         MR. LEVENSON: Yeah. Sure.
6         THE WITNESS: Okay. I've read it
7    again.
8         MR. LEVENSON: All right. Did you
9    review this language before the PPM went out?
10        THE WITNESS: I'm sure I did.
11        MR. LEVENSON: Okay.
12        BY MR. JAMES:
13        Q   All right. If you could -- sticking
14   with that, if you could turn to Bates number
15   000101, and it's Section 5.02, Limitations on the
16   Authority of the General Partner.
17        A   101?
18        Q   Yes. And that section --
19        A   502 at the bottom?
20        Q   Yes. And that section, as you can see,
21   spills over to page number ANCBIO-102. Do you
22   see that, also?
23        A   Yes.
24        Q   Okay. So my question is as to this
25   section, do you have ultimate authority over this
```

Page 449

1　section being in the PPM?
2　　A　I'd like to read it.
3　　Q　Please do.
4　　A　I read it.
5　　Q　So my question is:  Are you responsible
6　for -- did you review and approve this section
7　being in the offering documents for this project?
8　　A　I am, ultimately, responsible for
9　everything that's in this document.  And I do not
10　recall reviewing in detail this specific area,
11　but I am the general partner, and I'm responsible
12　for what's printed here.
13　　Q　Okay.
14　　　And likewise, Mr. Quiros, as also the
15　general partner, he also would be responsible
16　what's in the PPM, including Section 5.02?
17　　A　As I said earlier, I can't speak for
18　him, but as a general partner, I feel that he's
19　also responsible for knowing what's in this
20　document and authorizing it.
21　　Q　Okay.
22　　　MR. LEVENSON:  Is this language also --
23　who drafted this language?  Let me ask it that
24　way.
25　　　THE WITNESS:  I believe it was drafted

Page 451

1　of the ski area, and we've been collaborating on
2　each of these EB-5 programs.
3　　　MR. MARTIN:  But he's also the owner of
4　Jay Peak?  He's an eighty percent owner, but he's
5　not the general partner in any of those projects,
6　correct?
7　　　THE WITNESS:  I'd have to check the
8　technicalities of each offering document.  I
9　believe I'm the general partner in most of them.
10　　　MR. MARTIN:  And then are you involved
11　in any other EB-5 offerings that we haven't
12　discussed here today?
13　　　THE WITNESS:  No.  We have other
14　projects that we're looking at, but we haven't
15　formulated anything with them yet.
16　　　MR. MARTIN:  There haven't been any
17　PPMs distributed to anyone in connection with
18　those projects?
19　　　THE WITNESS:  No, there have not.
20　　　MR. MARTIN:  Okay.
21　　　BY MR. JAMES:
22　　Q　Sticking with this, this exhibit, and
23　you're familiar with this, so I'll ask you what
24　I'd actually referenced in this section.  The PPM
25　also talks about the projections as far as

Page 450

1　by our counsel in collaboration with our team.
2　　　MR. LEVENSON:  Do you know who provided
3　the information that's in here to counsel for
4　drafting?
5　　　THE WITNESS:  Specifically, I don't.
6　　　MR. LEVENSON:  Okay.  Thank you.
7　　　MR. MARTIN:  Do you know why -- what's
8　your understanding why Mr. Quiros became the
9　general partner with this project, starting with
10　this project, when he hadn't been previously?
11　　　THE WITNESS:  Mr. Quiros has been
12　involved in this project from its inception.  As
13　a matter of fact, it was Mr. Quiros's
14　relationships with businesses in Korea that
15　caused the project to happen.  So he has been
16　involved as an important entity in this project
17　from its inception.
18　　　MR. MARTIN:  Did you request him that
19　he become a general partner along with you on
20　this project?
21　　　THE WITNESS:  I didn't request that.
22　It was just how the project transpired.
23　　　MR. MARTIN:  And why is he the general
24　partner of the Q Burke project?
25　　　THE WITNESS:  Because he is the owner

Page 452

1　revenue streams and income that's going to be
2　derived from each of the devices and the clean
3　room over identified here.  Do you recall that?
4　　A　I do.
5　　Q　Okay.
6　　　Are you responsible or did you draft
7　that section that's included in the PPM?
8　　A　I didn't draft it, but I'm familiar
9　with it.
10　　Q　Okay.
11　　　And did you review it and approve it
12　being in the offering documents?
13　　A　I take responsibility for it, yes.
14　　Q　Okay.
15　　　And similarly as to Mr. Quiros, as
16　co-general partner, he also would have reviewed
17　and been responsible for it?
18　　A　I believe he would be.
19　　Q　And what about the language that
20　discusses the whole FDA approval process, was
21　that also information that you reviewed before it
22　was included with the PPM?
23　　A　I'm familiar with it, yes.
24　　Q　Okay.
25　　　So did you review and approve it being

Page 453

1  in there?
2      A  I have to take responsibility for
3  whatever is in this document, yes.
4      Q  Okay.
5          And like I said, any sections in here
6  that you do not take responsibility for approving
7  and including in the offering documents?
8      A  I'm generally familiar with everything
9  that's in here, and I'm the general partner and
10 responsible for what's presented.
11     Q  Okay.
12         And then as you testified earlier, at
13 some point in time, that Exhibit No. 104 was
14 amended, and what was created was Exhibit 186
15 (sic)?
16     A  Yes.
17     Q  And this, as you stated earlier, the
18 new amended version, basically, captures the
19 majority of what's in the original version, and
20 it adds to the sections that you talked about
21 earlier?
22     A  That's correct.
23     Q  Okay.
24         So similar question as to this, are you
25 responsible for the content of Exhibit 168?

Page 455

1      THE WITNESS:  I would think -- I would
2  believe so, yes.
3      MS. FUCHS:  Other than yourself and Mr.
4  Quiros, was there anybody else who had
5  responsibility for reviewing or approving these
6  offering documents?
7      THE WITNESS:  Well, our legal counsel
8  played a role.  Our economist played a role.  Our
9  business plan developers played a role.  And if
10 you look at what goes into one of these, it's a
11 combination of legal documentation, economic
12 development documentation, job creation
13 documentation, and business plan.  And it's a
14 combination of various parties that create those
15 things, and the offering is the sum of all those
16 work -- all that work.
17     BY MR. JAMES:
18     Q  And just one last question.  So I think
19 you testified earlier that the reason for the
20 amended PPM was that the original one expired, so
21 you needed to -- and it expired prior to the
22 offering being fully subscribed.
23     A  Correct.
24     Q  So you created a new one, so you could
25 continue marketing the project and raising funds?

Page 454

1      A  Yes.
2      Q  Okay.
3          So you reviewed and approved everything
4  that's in 168?
5      A  I reviewed everything that's in it, and
6  I'm responsible for everything that's in it, yes.
7      Q  And did Mr. Quiros also review what's
8  contained in the amended PPM for the biomedical
9  project?
10     A  I don't know specifically, but I
11 believe he did.  And as co-general partner, he's
12 responsible for what's in here as well.
13     Q  Okay.
14         So like the Use of Funds section we
15 talked about earlier, the FDA approval, the
16 projections, all that you take responsibility for
17 reviewing and approving its inclusion in the PPM?
18     A  Yes.
19     MR. MARTIN:  There's a background
20 information given on yourself that's contained in
21 this document.  Did you provide that information?
22     THE WITNESS:  I believe I did.
23     MR. MARTIN:  Would it be your
24 understanding Mr. Quiros would have provided the
25 background information for his section?

Page 456

1      A  That's correct.
2      Q  And I think you said the original one
3  expired on, I think it says December 1st, 2013?
4      A  If that's what it says in the document,
5  that's the expiration date.
6      Q  Okay.
7          And you stated earlier that the
8  Department of Commerce for Vermont asked you guys
9  to stop marketing the project.  I think you said
10 it was in the summer of 2014?
11     A  Correct.
12     Q  Okay.
13         So what did you do between the
14 expiration of the original PPM at the end of
15 2013, and then in the summer of 2014, when the
16 Department froze, I guess, the project, were you
17 raising money during that time frame?
18     A  I believe that we were.
19     Q  Okay.
20         And what document were you using?
21     A  We were using the first.
22     Q  The expired one?
23     A  The first document, yes.
24     Q  Okay.
25         So from January to June, when you

Page 457

1    ceased marketing, you used the expired PPM?
2        A   That's correct.
3        Q   Okay.
4            And then when did you resume marketing
5    with the new PPM?
6        A   I believe it was the first part of
7    2015. It took us about six or so months to get it
8    reconstituted.
9        Q   Okay. So for the entire calendar year
10   of 2014, you were without a PPM for the AnC Bio
11   project?
12       A   That's correct.
13       Q   Okay.
14           And what were the conditions for the
15   project resuming that were provided by the
16   Department of Commerce? What were you required
17   to do in order to continue marketing the project?
18       A   They asked us to update the offering
19   document, and we did that. And once that
20   document was updated both from a legal standpoint
21   and any other changes that we felt were
22   appropriate, we submitted it to the Department.
23   They reviewed it and, ultimately, authorized it.
24       Q   Okay.
25           Were there any --

Page 458

1        A   I would like to say that I had -- I had
2    no knowledge that the offering had expired.
3    Shame on me. I just didn't realize that it had
4    expired on December 31st. There was nothing in
5    the offering that I thought was inappropriate to
6    share at all, other than the date had expired.
7    And when I realized that that had happened, I was
8    disappointed with myself.
9            But there was nothing in here that --
10   of any -- the new offering is better than the
11   other one. It's more complete. It has more
12   information. But I was -- I guess I was
13   surprised that, gosh, the thing had expired.
14       Q   Were there any escrow requirements
15   for any funds that were raised using the new
16   PPM?
17       A   We agreed with the Department of
18   Financial Regulation at Jay Peak -- or excuse
19   me, in the State of Vermont, to put the funds
20   in escrow, new funds in escrow until the 526
21   is approved, and we've agreed to do that.
22       Q   Okay.
23           And have you complied with that
24   requirement?
25       A   We have.

Page 459

1            (SEC Exhibit Nos. 169 and 170
2            were marked for
3            identification.)
4        BY MR. JAMES:
5        Q   Let me show you what has been marked as
6    Exhibits 169 and 170. I believe 169 is the
7    original Q Burke offering documents, and 170
8    would be the amended Q Burke offering documents.
9            Can you just look those over and
10   confirm that to be the case.
11           (Mr. Martin leaves the room.)
12           BY MR. JAMES:
13       Q   Have you had a chance to confirm that?
14       A   I'm trusting you they are what you say
15   they are. They look like the offering documents.
16       Q   Okay.
17           So let's start with 169, which appears
18   to be the original Q Burke offering documents.
19   Tell us about who's responsible for the contents
20   of this Exhibit No. 169.
21       A   Myself, Mr. Quiros, our marketing hotel
22   consultant, our economist that helped us with job
23   creation determination, legal counsel. Those are
24   the key players.
25       Q   Okay.

Page 460

1            And like we asked for the AnC Bio
2    documents, so the decision to, ultimately,
3    approve what has been included in there, was that
4    your decision?
5        A   I participated in the decisions to
6    finalize and approve this document.
7        Q   Okay.
8            Is there a particular section you were
9    not involved in, or you were involved in the
10   entire document's approval?
11       A   I'm most familiar with the economic
12   analysis, the marketing plan, and the
13   construction budget.
14       Q   Okay. Okay.
15           What are you most familiar with by far
16   as what you approved?
17       A   I approved all of it.
18       Q   Okay.
19       A   But the major legal documentation is
20   something I relied on our legal counsel for
21   guidance.
22       Q   Did you draft any of it?
23       A   Did I draft any of this?
24       Q   Yes.
25       A   I drafted some of the marketing

Page 461

1    analysis of the hotel benefit.
2        Q    Okay.
3            And I know it'll take a little bit of
4    time, but do you think you have the ability to, I
5    guess, turn us to the section you actually
6    drafted?  I understand you approved it.
7        A    I don't think I drafted -- if I go to
8    the marketing plan and point out the market
9    demand for this hotel.  I paid most attention to
10   what is starting at 00053 through the conclusion
11   of the business plan.
12       Q    Okay.
13           And that's the portion that you
14   drafted?
15       A    It's the portion that I reviewed the
16   closest, and I would not say that I drafted it,
17   but I'm very familiar with it, and I proofread
18   it, and I might've -- I'm sure I made some
19   additions, you know, or amendments to it or
20   clarification.
21       Q    Finalized?
22       A    Finalized it, yes.
23       Q    And then similar questions as to the
24   amended version, Exhibit 170, did you draft the
25   business plan section, also?

Page 462

1        A    I believe the business plan section of
2    both documents are very much identical.  And the
3    only thing that I know of that changed from
4    version A to version B are the same legal updates
5    that our counsel put in for AnC Bio.
6            We were updating both offerings at the
7    request of the State.  And the modifications and
8    enhancements or improvements, call them what you
9    will, that were done in AnC Bio were also
10   incorporated into Q Burke.
11       Q    Okay.
12           And as far as the rest of the document,
13   either you reviewed it as part of Exhibit 170, or
14   you had already had reviewed and approved it as
15   part of Exhibit 169?
16       A    That's right.  That's right.
17       Q    Okay.
18           Any sections you did not have any
19   authority, ultimate authority over?
20       A    I have ultimate authority and
21   responsibility for all of it.  I relied on my
22   legal counsel to do the updates, and I have great
23   faith that they did a good job and a complete
24   job.
25       Q    What was Mr. Quiros's involvement in

Page 463

1    the drafting, revising, finalizing of Exhibit 169
2    and Exhibit 170?
3        A    I would suspect that he did a cursory
4    review on it, but as I was saying, I relied on
5    our legal counsel to cross the Ts and dot the Is
6    and make sure it was in full compliance with the
7    law.  We relied on them.  And if they said, look,
8    we've done the job right, this is correct, here
9    are the things that are different from one to the
10   other, then we went from there.
11       Q    Okay.
12           Did Mr. Kelly draft any sections in
13   either one of these exhibits?
14       A    I wouldn't be surprised if he had a
15   hand in some of it.
16       Q    But do you know one way or another?
17       A    I -- I don't know.  I know that he
18   reviewed it in collaboration with a gentleman by
19   the name of Mark Scribner, who is our securities
20   counsel in Burlington, Vermont.
21       Q    And like the AnC Bio project, the Q
22   Burke project PPM was amended, and that created
23   Exhibit 170.  What was the reason -- and you may
24   have said this already.  What was the reason for
25   the new PPM?

Page 464

1        A    We were simply responding to the
2    request of the Department of Commerce to -- since
3    we're at it, let's update both.
4        Q    Okay.
5            To include those sections that you
6    talked about earlier?
7        A    To update it.  To update --
8        Q    The entire --
9        A    To do the same update conceptually that
10   we did in AnC to apply whatever new things that
11   were felt to be appropriate to be put into one;
12   where it would apply, put it in the other, and
13   make the offering as robust and as full as
14   possible.
15       Q    Did Exhibit 169, did that PPM expire
16   also during the offering period, do you know?
17       A    I'd have to check.  I don't think so.
18       Q    What was the -- so at some point in
19   time, did the Department of Commerce, which is
20   the regional center for all intents and purposes,
21   at some point, did they preclude Jay Peak from --
22   yourself, Mr. Quiros, or anyone else from
23   marketing the Q Burke project using the original
24   PPM?
25       A    They asked us to not market Burke until

Page 465

```
 1   the new offering document was completed.
 2       Q   Okay.
 3       A   And there was a period of time where
 4   they asked us to stop marketing AnC, and when
 5   that happened, we focused on Burke until much
 6   time as AnC was allowed to be marketed.
 7           When that happened, we were still
 8   working on the Q Burke update, and we, basically,
 9   reversed. Once the AnC Bio document was
10   authorized for reuse, we then focused on AnC
11   until the Q Burke offering document was
12   completed.
13       Q   Okay. I think I got that.
14       A   Well, it's confusing. I mean,
15   fortunately, from my perspective, we had two
16   projects, and we were working -- we were working
17   collaboratively with the Department to try to
18   provide what they wanted.
19       Q   Okay.
20           So how much time -- what was the time
21   lapse between when you were told to not market
22   the project anymore and when you were able to
23   resume marketing the project using the amended
24   PPM for Q Burke?
25       A   I can get the answer to that question,
```

Page 466

```
 1   but I'd have to look at the dates of the
 2   correspondence back and forth between -- and the
 3   meetings we had with ACCD.
 4       Q   Like, for example, we were able to
 5   discern it was twelve months at least for AnC
 6   Bio. Do you know if it was the same period of
 7   time, half that time?
 8       A   It was not twelve months. It was much
 9   less than that.
10       Q   Okay.
11           And did Q Burke comply? Was there any
12   funds -- was the project marketed or any funds
13   raised during that freeze period?
14       A   We did not -- I'm sorry. We did not --
15   when they asked us to stop marketing the program,
16   we did, until such time as they authorized us to
17   resume.
18       Q   Okay.
19           So no new investors subscribed during
20   this freeze period, if you will?
21       A   There was no marketing done at their
22   request.
23           We start -- the pipeline of investor
24   recruitment can take a year. And when someone
25   finally decides to participate, it might be after
```

Page 467

```
 1   a month, six months, nine months of interaction.
 2   When they asked us to stop marketing the program,
 3   we stopped until the new offering document was
 4   released. And there were people in the pipeline
 5   already, but we did not market the program from
 6   the time they asked us to not, until the offering
 7   document was authorized. And I believe that was
 8   July 15th or 16th of this past year.
 9           (Mr. Levenson leaves the room.)
10       BY MR. JAMES:
11       Q   So if an investor had subscribed --
12   tell me if this is your testimony. So if an
13   investor had subscribed to Q Burke during that
14   period where you were not marketing your project,
15   is your testimony that they would have been an
16   investor that was solicited previously and just
17   happened to subscribe during that freeze period?
18       A   They finished their subscription.
19       Q   Okay.
20       A   But we're absolutely true to our
21   word. When they asked us to not market it, we
22   didn't.
23       Q   And so in that instance, it sounds like
24   you're saying there might be investors who fall
25   into this, this category who subscribed during
```

Page 468

```
 1   the freeze period?
 2       A   Subscribing during the period when they
 3   asked us not to market does not constitute, in my
 4   judgment, a violation of what their request.
 5       Q   Okay. That's my question.
 6       A   Okay. Yes.
 7       Q   Okay.
 8           So to the extent someone subscribed,
 9   you're saying, they would have been solicited
10   prior to that period of time when you could not
11   market?
12       A   Yeah.
13       Q   So there's a difference between
14   marketing and accepting new investors?
15       A   Correct.
16       Q   Any instances where an investor may
17   have not been solicited, but just during that
18   time period contacted Q Burke about investing,
19   and then were able to subscribe?
20       A   I'm very familiar with that. We told
21   any inquiring investor that until the offering
22   document was completed, we were not able to
23   provide them information on the project, and we
24   adhered to that.
25       Q   Okay.
```

Page 469

1    MS. FUCHS: Were there any limitations
2  imposed upon Q Burke or asked of Q Burke by the
3  regional center in connection with new investor
4  funds that were raised?
5       THE WITNESS: On the escrow agreement
6  that is currently being used by the Q Burke
7  project has the funds in escrow, and the funds
8  are available for utilization for construction,
9  FF&E, architecture, and permitting. And that is
10  the current -- that is what the current escrow
11  agreement requires until such time as a review of
12  the project is completed by our Department of
13  Financial Regulation, which is a new participant
14  in the Vermont Regional Center operation.
15       MS. FUCHS: So the money that's held in
16  escrow, you said it can be used?
17       THE WITNESS: Yes. For construction,
18  architecture, FF&E, fixtures and equipment, and
19  permitting.
20       MS. FUCHS: So there are no
21  restrictions?
22       THE WITNESS: A developer proceeds for
23  Q Burke are not able to be withdrawn until the
24  financial review is complete.
25       MS. FUCHS: And when you say developer

Page 470

1  proceeds, you're talking about the construction
2  management fees?
3       THE WITNESS: Yes.
4       MS. FUCHS: So that's the only
5  restriction?
6       THE WITNESS: That is the only
7  restriction.
8       MS. FUCHS: And for all those other
9  uses that you mentioned that are permissible,
10  does Q Burke first have to notify the State or
11  get any kind after approval?
12       THE WITNESS: What we do is on a
13  monthly basis we submit the pay applications for
14  the project. The Department of Financial
15  Regulation has a protocol to review those pay
16  applications and authorize the payment of
17  those -- those functions.
18       MS. FUCHS: And what you've just
19  explained to me for Q Burke, is that the way it
20  also works for the Jay Peak Biomedical Research
21  Park offering with the escrow account?
22       THE WITNESS: No. The escrow agreement
23  is somewhat different. Upon the approval of a
24  526, the funds are -- since the new protocol, the
25  funds are available to the project upon the

Page 471

1  approval of a 526.
2       MS. FUCHS: So there can be no use
3  before that?
4       THE WITNESS: Of the funds since the
5  reauthorization of the PPM, yes. That's the new
6  offering document. There's also a financial
7  review that the State is doing on that project,
8  and once that's completed, then the other -- the
9  other 526 restriction, I guess you'd call it, it
10  could be released.
11       BY MR. JAMES:
12   Q   What I'm going to do now, Mr. Stenger,
13  I'm going to show you the offering documents from
14  the earlier project that we've discussed today.
15  And just to clarify, when I say offering
16  documents, and this is in reference to when we
17  talked about AnC Bio and Q Burke and Stateside,
18  it includes the PPM. It includes the limited
19  partnership agreement, includes the business plan
20  and some other. All of those collectively makes
21  up the offering documents. The subscription
22  documents, the escrow agreements you referenced.
23  Is that your understanding?
24   A   Yes.
25   Q   Okay.

Page 472

1       (SEC Exhibit No. 174 was
2        marked for identification.)
3       BY MR. JAMES:
4   Q   So let me show you what has been marked
5  as Exhibit 174, and that is the offering
6  documents for Jay Peak Penthouse Suites.
7   A   Okay.
8   Q   And I'll kind of do a compound
9  question, if you will. Like we asked about AnC
10  Bio and Q Burke, are you responsible for the
11  contents of the Jay Peak Penthouse Suites, LP
12  offering documents, which has been marked as
13  Exhibit 174?
14   A   I am.
15   Q   So when we talk about, for example, the
16  Use of Funds section, the limited partnership
17  agreement, the business plan, you have ultimate
18  responsibility over those sections and those
19  languages being included in this PPM, or this
20  offering document?
21   A   Yes. But I'd like to make a general
22  statement.
23   Q   Go ahead.
24   A   As general partner, I accept
25  responsibility for the offering document. It's

Page 473

```
1     my job to know what's in here and to stand behind
2     the commitments that we make in the offering
3     document. It's true for this one. It's true for
4     all of them.
5        Q   And then as part of that job, you
6     review and approve the offering documents before
7     they're finalized?
8        A   That's correct. And I will say that I
9     focused most on the business side of it.
10       Q   Okay.
11       A   I'm aware of the legal side that is
12    being done and is part of the documents. I am
13    not an attorney. I rely on what I believe are
14    good legal counsel to give me counsel. And
15    that's why if there's any hesitation here,
16    there's a lot of legalese here. I don't know all
17    the details about all of it.
18           I believe my counsel has advised me
19    correctly, and I believe that everything in here
20    is correct. And as general partner, I take
21    responsibility for what's in here.
22       Q   Perfect.
23           Any recollection as to whether or not
24    you actually drafted any of this section,
25    particularly the business plan?
```

Page 474

```
1        A   I'm probably quite familiar with the
2     business plan verbiage in each of these
3     offerings.
4            (SEC Exhibit No. 175 was
5             marked for identification.)
6          BY MR. JAMES:
7        Q   Okay. So let's just go through them.
8     And it's the same question, so we can probably be
9     a little bit more efficient.
10           So I'm going to hand you what has been
11    marked as Exhibit 175. This appears to be the
12    Jay Peak Hotel Suites Phase II limited
13    partnership offering documents, again, it
14    includes the PPM, the business plan, the limited
15    partnership agreement, subscription document, so
16    forth and so on.
17           Did you finalize and approve this
18    document?
19       A   I'm sure I did.
20           (Mr. Levenson enters the room.)
21          BY MR. JAMES:
22       Q   Are there any sections in there you're
23    not -- that you don't recall reviewing or
24    finalizing or approving?
25       A   This is a document that was produced
```

Page 475

```
1     five or six years ago. I say what I said
2     earlier. I'm responsible for what's in here. I'm
3     sure I reviewed it. I paid closest attention to
4     the business plan, and stand behind it.
5            (SEC Exhibit No. 176 was
6             marked for identification.)
7          BY MR. JAMES:
8        Q   And same series of questions as to
9     Exhibit 176, which is the offering documents for
10    Phase I project.
11       A   Yes, I'm familiar with this, and I
12    reviewed it and approved it.
13       Q   Okay. So the Use of Funds section, the
14    section that talks about, you know,
15    representations as far as what's going to be done
16    with the money, all that stuff you reviewed and
17    finalized and approved?
18       A   Yes.
19       Q   Okay.
20           (SEC Exhibit No. 177 was
21             marked for identification.)
22          BY MR. JAMES:
23       Q   Same question, Exhibit 177, Jay Peak
24    Lodge and Townhouses, LP, did you review and
25    finalize and approve that document?
```

Page 476

```
1        A   I'm sure I did.
2        Q   Any sections that you recall not having
3     ultimate approval over?
4        A   No.
5        Q   Any sections you recall actually
6     drafting yourself versus reviewing and revising
7     and approving?
8        A   The description of the facilities and
9     the description of the project itself, I'm sure I
10    participated in the --
11       Q   When you say participate, does it mean
12    you actually drafted yourself or --
13       A   Did I draft all of it myself? No. I
14    probably didn't draft all of it myself, but I'm
15    sure I approved it and I reviewed it. And I
16    reviewed it for what I would consider errors in
17    description.
18       Q   Okay.
19           Before it was finalized and you
20    approved?
21       A   Yes. Yeah.
22       Q   What about Mr. Quiros, do you remember
23    him going through it and reviewing the sections
24    also and also making edits or also making some
25    type of final approval?
```

Page 477

```
 1      A   You'd have to ask him, but I doubt very
 2   much if he spent a great deal of time on the
 3   specifics of the business plan for the hotel and
 4   the Jay Peak related construction.
 5      Q   Okay.
 6      A   He's got a general understanding of
 7   everything, but, you know, the specifics, we rely
 8   on our legal counsel, our economists, our
 9   business plan developers, and that's the team.
10           (SEC Exhibit No. 178 was
11           marked for identification.)
12   BY MR. JAMES:
13      Q   No. 178 is the Jay Peak Golf and
14   Mountain Suites, LP offering documents, which is
15   the PPM, business plan, limited partnership
16   agreement, subscription documents.  Same
17   question, do you recall reviewing, revising,
18   finalizing, approving that document in its
19   entirety?
20      A   I would say I did.
21      Q   Any sections - go ahead.
22      A   I'm sure I reviewed in detail the
23   business plan and the way the business plan was
24   presented, and I approved the balance that was
25   provided by our collective team.
```

Page 478

```
 1      Q   Okay.
 2          Any sections you did not have ultimate
 3   approval over?
 4      A   I would say no.
 5      Q   Okay.
 6          Any sections you recall actually
 7   drafting yourself?
 8      A   I am sure that I reviewed and proofread
 9   the business plan portion of that document, and I
10   relied on our legal counsel to complete the legal
11   portion of the offering document.
12      Q   But you reviewed, you edited, you
13   finalized, approved?
14      A   I relied on our legal counsel.  I
15   approved it.
16      Q   The Stateside, and I think we saw that
17   one earlier.  I want to ask you those same
18   questions as to Stateside offering documents,
19   which again includes the PPM, the business plan,
20   the limited partnership agreement.  Do you recall
21   drafting any sections of Exhibit 166, the
22   Stateside offering documents?
23      A   I, again, participated in the drafting
24   of the business plan, and the other elements of
25   it I approved, ultimately, appreciating the work
```

Page 479

```
 1   of others that were contributed to it.
 2          MR. LEVENSON:  Actually, let me ask one
 3   question, and it applies to really all of the
 4   offering documents and the PPMs that we looked
 5   at.  For example, with the Use of Funds section,
 6   do you know if, for example, counsel actually
 7   drafted that, or someone from, you know, Jay
 8   Peak, such as yourself, or someone else would
 9   have to have given him that information and say,
10   this is our Use of Funds section that counsel
11   drafted?  Do you know the genesis of that
12   particular section in all of the documents?
13          THE WITNESS:  I don't.
14          MR. LEVENSON:  Okay.  That's all.
15          THE WITNESS:  I would say that there's
16   a commonality through all of the documents, and
17   there's certain sections that are very similar to
18   these.  And I believe I'm correct in saying that
19   sort of the template for the offering document
20   that we felt was correct and appropriate we used
21   as a framework throughout each offering, trying
22   to be compliant with the state and federal
23   regulations, as well as the immigration
24   regulations.
25          MR. LEVENSON:  Okay.  Thanks.
```

Page 480

```
 1          BY MR. JAMES:
 2      Q   Going back to the AnC Bio project.  So
 3   you have this freeze put in place by Department
 4   of Commerce for Vermont.  You create the new
 5   offering documents, the new PPM for the AnC Bio
 6   project.  And then now you have the green light,
 7   if you will, to now continue marketing or raising
 8   money for the project.
 9      A   Correct.
10      Q   Is there a requirement that the
11   existing investors also get the new PPM?
12      A   Yes.
13      Q   Okay.  Tell me about that.
14      A   And we sent the revised documents and a
15   subscription agreement and a notification to all
16   of them that there was a new offering, and the
17   reason that there's a new offering is because the
18   other one expired, and that the State has asked
19   us to create a new offering.  And we reached out
20   to every investor and let them know that they
21   have the choice to continue or not continue.  And
22   that has been done.
23      Q   And that was sent via email, regular
24   mail, how was that communicated?
25      A   That was sent by -- by email, and I
```

Page 481

```
 1   believe -- I know it was sent by email to the
 2   investor and their counsels.
 3       Q   Okay.
 4       And, basically, the options were to
 5   resubscribe or rescind?
 6       A   That's correct. Resubscribe, or if
 7   they wanted to exit or rescind, as you put it,
 8   they could.
 9       Q   Okay. And did any of the investors
10   resubscribe, like the investors --
11       A   The vast majority have continued with
12   the program. There have been a handful,
13   literally four or five, that have chosen to
14   withdraw.
15       Q   Okay.
16       And those four or five, did you speak
17   with those four or five investors personally?
18       A   No. Their counsel communicated with
19   us, asking that they exit the program. Most of
20   them chose to exit the program because of certain
21   circumstances.
22       For instance, in the interim between
23   the time one person invested and they got
24   would want to exit, they got married, and they
25   married an American, and they no longer needed a
```

Page 482

```
 1   green card. So they took this opportunity to ask
 2   for a refund.
 3       We had a couple of others that asked to
 4   withdraw because their 526 had not been approved,
 5   and it was almost eighteen months, and they were,
 6   frankly, disenchanted with the USCIS protocol.
 7   And, of course, we authorized the repayment of
 8   those people.
 9       Q   So how many investors total? I think
10   you said four or five?
11       A   I think it's four or five.
12       Q   Okay.
13       And have all of them been paid their
14   five hundred thousand investment principal?
15       A   They're in the process right now,
16   because this is relatively fresh. I mean,
17   they're -- they have -- they have indicated that
18   they wanted to withdraw. They have signed the
19   proper documentation. We are in the process,
20   actually this week and next week, of refunding
21   them their money.
22       Q   Okay.
23       So none of them have been -- no money
24   has been refunded to any of them as you sit here
25   today?
```

Page 483

```
 1       A   No.
 2       Q   Okay.
 3       And the money that will be refunded,
 4   where is that money coming from?
 5       A   It's coming from the project funds.
 6       Q   The AnC Bio project funds?
 7       A   Yes. Yes.
 8       Q   Okay.
 9       And the funds are being held where?
10       A   I'm not sure which account they're in,
11   but we have resources to refund these people
12   their money, obviously. We have substantial
13   amount of funds in our control.
14       Q   And when you said in your control, you
15   mean --
16       A   Well, it's in the bank. It's in our --
17   in the accounts.
18       Q   Okay.
19       So you're saying in the AnC Bio bank
20   account there's sufficient funds to repay these
21   four or five investors?
22       A   That's right.
23       Q   Okay.
24       And what about the monies needed to
25   continue the project?
```

Page 484

```
 1       A   Those funds also exist in the project
 2   accounts. And we were beginning concrete and
 3   steel erection during the end of this month and
 4   into October.
 5       I don't -- I don't anticipate many
 6   other refund requests because we mostly gotten
 7   approval. The people who have requested refunds
 8   are once -- they haven't been approved yet. And
 9   there's, like I said, changes in their situation
10   that resulted in them requesting a refund.
11       Q   So your belief is that AnC Bio has
12   available monies right now to repay all of these
13   investors and then still complete the project?
14       A   I do.
15       Q   And that's based on you actually seeing
16   bank account records, or that's just your --
17       A   I'm familiar with the fact that we've
18   got how many millions of dollars are in the
19   account and are available for the development and
20   building of the project.
21       Q   And what's that number that you --
22       A   I don't know the precise balance in the
23   accounts today. I can get them for you.
24       MS. FUCHS: Which accounts are you
25   referring to?
```



Page 485

1    THE WITNESS: Well, the AnC Bio
2  account.
3       MS. FUCHS: But where, located where?
4       THE WITNESS: I believe that account
5  is -- we have two -- we have the escrow account
6  in People's United Bank, where I know there's
7  probably eight or ten million dollars in
8  Burlington.
9       MS. FUCHS: And that's the money from
10  the investors who've invested pursuant to the
11  amended PPM?
12      THE WITNESS: Correct.
13      And then there's another account we
14  have here in Florida that is the account for a
15  lot of the other funds.
16      MS. FUCHS: Which account in Florida
17  are you referring to?
18      THE WITNESS: I'm not sure the exact
19  title of the account, but there's an account here
20  that houses the funds for the construction of the
21  project.
22      MR. DEE: I'm sorry. Just a follow-up
23  on yours. Do you know which financial
24  institution?
25      THE WITNESS: My partner knows exactly

Page 487

1  available to you, what do you mean?
2       THE WITNESS: Well, the statements are
3  produced every month by the institution, and
4  there's an account balance. And if I want to see
5  them and review them, I can.
6       MS. FUCHS: But do you have to ask Mr.
7  Quiros to see them?
8       THE WITNESS: I don't have to ask. You
9  know, he makes them -- he lets me know every --
10  the first of every month, the statement comes
11  out, and the statement is available to our
12  accounting team. And the accounts are
13  headquartered here.
14      MS. FUCHS: How often do you see those
15  statements?
16      THE WITNESS: They're issued every
17  month.
18      MS. FUCHS: And how often do you see
19  them?
20      THE WITNESS: I haven't seen -- I
21  haven't looked at them recently. I'm mostly --
22  I'm mostly focus on how much incoming investor
23  funds are there. Are we getting close to our
24  goal? And our goal is to fully fund the project.
25      MR. DEE: I have a follow-up question.

Page 486

1  which institution the account is in. I think
2  it's Merrill Lynch, but I'd have to get you the
3  precise account.
4       BY MR. JAMES:
5    Q   So do you --
6    A   I guess I should -- I think it's
7  Merrill Lynch.
8    Q   Do you have some type of signing
9  authority over this account that you're speaking
10  about, the Merrill Lynch account?
11   A   I authorize pay applications from the
12  work that's being done. I don't control the
13  account.
14   Q   Okay.
15      So you don't get like the account
16  records? You don't have the ability to --
17   A   They're monthly statements that are
18  produced that I have access to.
19   Q   From Merrill Lynch?
20   A   Yes, from them. Ariel Quiros gets the
21  statements. He makes them available to me.
22   Q   Okay.
23      So you're not a signor on that account?
24   A   I don't think I am.
25      MS. FUCHS: When you said makes them

Page 488

1  Your accounting team and you, are you familiar
2  with the term "reconciliation of an account"?
3       THE WITNESS: Yes.
4       MR. DEE: Okay.
5       When money's transferred from the
6  escrow to the AnC Bio account, do you get monthly
7  reports from your accounting team as to the
8  reconciliation of funds going in, funds going out
9  for either account, or both?
10      THE WITNESS: I don't see those every
11  month.
12      MR. DEE: But you --
13      THE WITNESS: I could have access to
14  them.
15      MR. DEE: Okay.
16      Let me just clarify, because I know
17  they've got to move on. You don't see them every
18  month, but you do see them sometimes?
19      THE WITNESS: Yes.
20      MR. DEE: Okay. That's good. I'm
21  good.
22      (SEC Exhibit No. 179 was
23      marked for identification.)
24      BY MR. JAMES:
25   Q   Let me hand you what's been marked as

Page 489

```
 1   Exhibit 179.  And tell me if you've seen that
 2   before.
 3       A   I'm familiar with it.
 4       Q   Okay.  What is it?
 5       A   It is the payment register from
 6   December 31st, 2012 to September 11th, 2015.
 7       Q   Okay.
 8           So this lists all of the payments made
 9   by the Jay Peak Biomedical Research Park, LP as
10   of September 11th, 2015?
11       A   Yes.
12       Q   Let me ask you.  And so, for example,
13   if you look at the third wire from the top to
14   Northeast Contract Services for over five hundred
15   thousand.  What's that?
16       A   That represents management fees paid to
17   Northeast Contract Services for the construction
18   management of the project.
19       Q   Okay.
20           So that -- the fifteen percent we saw
21   in the AnC Bio offering documents, is that that
22   amount?
23       A   I'm not sure if that's that amount.  It
24   represents some of that.
25       Q   Okay.
```

Page 490

```
 1           And when you say some of, you mean --
 2       A   I -- sorry.
 3       Q   Go ahead.
 4       A   I believe in the AnC Bio offering there
 5   is a construction management fee, and I think the
 6   total of the two areas comes to twenty percent.
 7   And I believe --
 8       Q   Okay.  And five percent cost --
 9       A   That's correct.  I believe that's what
10   that represents.
11       Q   Okay.
12           So and Northeast Contract Services, is
13   that Mr. Quiros's entity, also?
14       A   No.  That's an entity that's owned by
15   Bill Kelly.
16       Q   Okay.
17           Mr. Kelly, we talked about earlier that
18   he assists Mr. Quiros with a lot of these
19   projects?
20       A   He plays a role in a couple of the
21   projects, yes.
22       Q   Okay.
23           So in this instance, the developer fee,
24   their construction supervision fee was taken,
25   basically, up front?
```

Page 491

```
 1       A   There is a substantial amount of work
 2   that's being done and has been done in the design
 3   area, site development that is appropriately
 4   billed for.
 5       Q   So as of March 2013, which is the date
 6   of that transfer of that wire to Northeast
 7   Contract Services for developer fees, you're
 8   saying at that point in time, there had been
 9   substantial work already done on the project?
10       A   If you were to look at the design work
11   that represents hundreds, if not thousands, of
12   hours of work, and Mr. Kelly's intimately
13   involved with all of that.
14       Q   And so does Mr. Kelly retain the --
15   and, say, for example, this is the twenty
16   percent, Mr. Kelly retains the entire twenty
17   percent for supervising the design and
18   architectural --
19       A   No.  I believe it's five percent.
20       Q   Five percent.
21           Who gets the balance?
22       A   The developers.
23       Q   And who's that for this project?
24       A   The general partners.
25       Q   So it would be yourself and --
```

Page 492

```
 1       A   Ultimately, at some point.
 2       Q   So you're saying that has not been
 3   taken by the developers as yet?
 4       A   No, I'm not saying that.  You asked me
 5   who gets that, and I told you that it comes to
 6   the partnership.
 7       Q   Okay.
 8           But you said, at some point.  So my
 9   question has it been received by the partnership?
10       A   I'm looking at the register here and
11   the dates and the amounts of money, and I see
12   that Jay Construction Management, which is a
13   procurement company for this particular project,
14   has received a substantial amount of money for
15   the work that they've done thus far.
16       Q   Okay.  I'm not sure how that answers my
17   question.  Sorry.
18       A   No.  You asked me if the partners have
19   received funds in advance, and I'm telling you
20   that Jay Construction Management, which acts as a
21   procurement company, has been paid a substantial
22   amount of money for work that they're responsible
23   for doing.
24       Q   Okay.
25       A   And I'm looking to see if there's any
```

Page 493

```
 1    other Northeast Contract Services or general
 2    partner benefit.  There is another wire on 12/4
 3    to Northeast Contract Services, and those I
 4    believe -- no.  There's another one on 7/1 of a
 5    million, forty thousand.
 6        Q    So those, again, are developer fees,
 7    construction supervision fees?
 8        A    Part of that five percent construction
 9    supervision.
10        Q    Okay.
11             So, for example, let's look at -- and
12    this is on the front page, there's two wires
13    dated June 20th, 2013.  The first one is to
14    Northeast Contract Services for two million,
15    eighty thousand.  And then the second one on the
16    same date is to Jay Construction Management, Inc.
17    for ten point four million.  Do you see those
18    two?
19        A    Which line item?
20        Q    6/20/2013, on the front page.  It's
21    probably seven to eight entries down from the
22    top, maybe a little bit more.
23        A    Yes, I see it.  I'm sorry.
24        Q    So, again, so there's two that occurred
25    on 6/20/2013; one to Northeast Contract Services
```

Page 494

```
 1    for two million, eighty thousand, and then one to
 2    Jay Construction Management, Inc. for ten point
 3    four million.
 4        A    Okay.
 5        Q    And by the way, the order of this
 6    doesn't mean one occurred before the other?  It
 7    just happens to be listed this way?
 8        A    Yes.
 9        Q    Okay.
10             So we talked about the twenty percent
11    developer fees, according to the AnC Bio project.
12    Is two million, eighty thousand twenty percent of
13    ten point four million, or no?
14        A    I don't know the correlation between
15    those two.  It might be.
16        Q    Okay.
17             Any knowledge as to whether or not
18    Northeast Contract Services would take its twenty
19    percent each time a wire was sent to JCM?  Do you
20    know whether or not that was the practice for
21    this particular project?
22        A    I don't know.
23        Q    Okay.
24             Were you at any point in the process
25    receiving the invoices that Northeast Contract
```

Page 495

```
 1    Services was issuing to the project?
 2        A    I'm sure I authorized the payment of
 3    them.
 4        Q    Okay.  But you don't recall --
 5        A    I don't.
 6        Q    -- seeing on there an entry -- in
 7    addition to the entry for JCM, there's also an
 8    entry for Northeast Contract Services that
 9    appeared to be twenty percent of the amount being
10    invoiced for JCM?
11        A    I don't recall.
12        Q    Okay.
13             MS. FUCHS:  So how much additional
14    money is Jay Peak Biomedical looking to raise
15    from investors?
16             THE WITNESS:  I think I said earlier
17    that we're at about eighty percent funded.
18             MS. FUCHS:  So would that be about,
19    approximately, twenty-two million?
20             THE WITNESS:  I estimated that.  Yeah,
21    I think that's close.  I can be very precise for
22    you, but I would have to get you that.
23             MS. FUCHS:  And do you know,
24    approximately, how much more it's going to cost
25    to build the facility at Jay Peak Biomedical
```

Page 496

```
 1    Research Park?
 2             THE WITNESS:  I'm going to be making an
 3    estimate, but I think the actual bricks and
 4    mortar of the building is somewhere in the forty
 5    some million dollar range.  But I can look at --
 6    I can look that up and give you a more precise
 7    number.  But there's the building and then there's
 8    the equipment, some of which is a combination of
 9    both.
10             Would you like me to look it up?
11             MR. DEE:  I'm going through it, and
12    I'll just quote a number here.  If you want to
13    move on, go ahead.
14             Per the PPM, would sixty-three point
15    two million sound about right, and that includes
16    the biomedical building construction and the
17    machinery, per the PPM?  So I guess your number
18    would be correct if we took the machinery out,
19    because that's about seventeen.  About
20    forty-five, forty-six million dollars just for
21    the brick and mortar?
22             THE WITNESS:  I think that's what I
23    said.
24             MR. DEE:  Okay.
25             THE WITNESS:  And I'm pleased that I
```

Page 497

1    was close.
2         MS. FUCHS: So if you look at the last
3    exhibit Brian showed you, the Exhibit 179. If
4    you turn the page, does that look about,
5    approximately, sixty-four point one million has
6    already been paid out?
7         THE WITNESS: According to this
8    register, yes.
9         MR. LEVENSON: I want to be clear in
10   saying that the money's been paid out. Is that
11   different than saying it's been spent?
12        THE WITNESS: Correct. Yes, it's been
13   paid out, and some of it has been spent. A lot
14   of it's been spent. Commitments have been made,
15   things have been ordered. So, yes.
16        MR. LEVENSON: Okay.
17        Do you know how much -- I'm assuming
18   that Peak Construction Management here is the
19   equivalent of -- oh, no. There's Jay
20   Construction. I see Jay Construction and Peak
21   Construction Management. Are those two different
22   things?
23        THE WITNESS: Peak CM, Peak CM
24   Management is the actual contractor that's doing
25   the building of the building.

Page 498

1         MR. LEVENSON: All right.
2         So Jay Construction Management is the
3    entity getting the funds. Do you know how much
4    they exactly have of the money that they've been
5    paid?
6         THE WITNESS: I believe it's listed
7    here.
8         MR. LEVENSON: No, I know. They've
9    been paid, as opposed to how much they still have
10   left versus it hasn't been spent.
11        THE WITNESS: I know that we have spent
12   money on the following areas: Ten million
13   dollars for distribution rights. We have given a
14   deposit of, I believe, close to twenty million
15   dollars for equipment. Those are two specific
16   items. We have also purchased the property,
17   developed the property so far.
18        Those are the principal functions that
19   the funds have been used for thus far, and that
20   comes to forty some million dollars, I believe,
21   in that neighborhood.
22        MR. LEVENSON: So do you understand or
23   believe that Jay Construction Management has
24   roughly twenty million dollars of the money that
25   it has been paid still left?

Page 499

1         THE WITNESS: I believe we have that
2    range of funds available, yes.
3         MR. LEVENSON: Okay.
4         And Mr. Quiros would know?
5         THE WITNESS: He would.
6         BY MR. JAMES:
7    Q    And that's separate from the --
8         MR. DEE: Escrow funds.
9         BY MR. JAMES:
10   Q    -- escrow funds and the fifty --
11   A    Well, the escrow funds are part of the
12   raise.
13   Q    Part of the what?
14   A    Part of the raise, the seventy some
15   million that we said we had.
16   Q    That you've raised already?
17   A    Yeah. We've got a combination of funds
18   that are pre-new offering and post-new offering.
19   Q    And that's my question. So the twenty
20   million that you just testified to is with JCM,
21   that does not include the money that's still in
22   escrow that you got from the new subscribers?
23   A    I believe your statement's correct. I
24   believe there's about seven and a half or eight
25   million in the bank in Burlington that's in that

Page 500

1    escrow account, but it changes every day,
2    hopefully, in an upward motion.
3    Q    And that twenty million that JCM, that
4    you testified to, is holding for AnC Bio, that's
5    different than the fifteen to twenty million that
6    it's holding for Stateside?
7    A    Correct.
8    Q    Okay.
9         So between those two, JCM should have,
10   approximately, forty million on account for those
11   two projects?
12   A    You're asking me about AnC Bio. I
13   believe that there's funds in that neighborhood.
14   We spoke earlier about --
15   Q    Stateside?
16   A    -- Stateside, and the obligation of JCM
17   is to complete that project. And you're talking
18   two different projects. There's two different
19   situations.
20   Q    But one entity holding both?
21   A    There's one entity.
22   Q    Okay.
23        So to ask my question. So the twenty
24   million for AnC Bio is not the twenty million for
25   Stateside?

Page 501

```
 1    A  No, it's not.
 2    Q  So those are two separate?
 3    A  No. No. No. They're different.
 4    Q  So in theory, JCM should have at least
 5  forty million on account for those two projects?
 6    A  It should have had forty million on
 7  account if it has -- it has the funds on account
 8  for AnC Bio, and it has funds to complete the
 9  project at Stateside. I haven't seen the
10  account, so I don't know the exact amount of
11  money that's in the account today.
12        MR. DEE: I just have a follow-up. I'm
13  just curious. For AnC Bio, you use the word
14  "fund." For Stateside, you use the word
15  "obligation." And, obviously, they're both
16  different. An obligation doesn't mean the funds
17  are there. It doesn't mean the funds aren't
18  there.
19        Could you clarify that, the word
20  "obligation" for Stateside, is it -- are there
21  funds there, or it's just an obligation for JCM
22  to complete the construction for Stateside?
23        THE WITNESS: The Stateside project is
24  under construction. We're finishing it, paying
25  the bills, getting the job done. I have not seen
```

Page 502

```
 1  the account recently, but I know we're paying our
 2  bills, and I know we're getting the job done.
 3  And that will be finished in this quarter and
 4  early part of the next quarter, with the
 5  exception of the recreation center, which we're
 6  starting in earnest next week.
 7        MR. DEE: Okay.
 8        It's very basic, and I understand
 9  you're not used to testimony. But the question
10  was just: Are there funds there separate for
11  Stateside, or is it just an obligation that JCM
12  has to complete the Stateside project?
13        THE WITNESS: I believe there are funds
14  there to do it.
15        MR. DEE: Thank you.
16        MS. FUCHS: And when you say you
17  believe there are funds, have you --
18        THE WITNESS: I haven't seen the
19  account recently.
20        MS. FUCHS: When's the most recent time
21  you've seen it?
22        THE WITNESS: Probably a couple of
23  months ago.
24        BY MR. JAMES:
25    Q  And this is an account that Quiros
```

Page 503

```
 1  controls?
 2    A  Yeah.
 3        MS. FUCHS: For JCM?
 4        THE WITNESS: Yes.
 5        MR. DEE: Do you remember what the
 6  account balance was back then?
 7        THE WITNESS: I don't. I don't. And
 8  I -- you know, my role is to build and develop
 9  and keep the programs moving. And the funds come
10  in. They get paid out. Projects get built. I
11  know that every time I need to pay a contractor
12  or meet an obligation, we've been able to do it,
13  and continue to.
14        MS. FUCHS: When you say you're aware
15  of the balance a few months ago, was it a
16  document you saw, or was it someone told you
17  something?
18        THE WITNESS: I think I was just
19  appraised by our Accounting Department how much
20  money was there.
21        MS. FUCHS: Who appraised you?
22        THE WITNESS: It was either our CFO or
23  one of the accountants. And I don't remember
24  specifically. I don't -- I pay attention to the
25  payouts every single month that come in that have
```

Page 504

```
 1  to be paid to keep the contractors moving and to
 2  keep the projects going forward. That's what I
 3  pay the most attention to. And every time I
 4  would have a payout request, those bills are
 5  paid.
 6        BY MR. JAMES:
 7    Q  But do you know what funds are being
 8  used to pay those bills?
 9    A  I'm not sure exactly in every instance,
10  no. But I know that they get paid, and we meet
11  our obligations.
12        And I'm aware of how much money we've
13  raised and brought in. I pay a lot of attention
14  to that, and I pay a lot of attention to, is the
15  building and the project getting built and is it
16  getting built on time, and are we living up to
17  our obligations for the investors?
18    Q  Okay.
19        And speaking about getting built on
20  time, so, obviously in Q Burke and AnC Bio, for
21  AnC Bio we had at least a twelve-month delay of
22  the project. How does that impact the investors
23  who are in the EB-5 project when you have a delay
24  of that nature, or even when you have a change in
25  the cost of a project?
```

Page 505

1    A  It's a big concern to me that there's a
2  delay, because every investor, when they invest,
3  within nineteen months of their approval, they
4  want to remove their conditions. And if we have
5  a delay in the ability to fulfill or subscribe
6  the project, it makes the implementation more
7  challenging.
8         But, fortunately we've -- fortunately,
9  USCIS has improved their approval cycle. It's
10  now back to what it was a few years ago of four
11  to six months, and we're moving forward with the
12  subscription and raising the funds and building
13  the buildings.
14    Q  But what has been the impact on any
15  investor, if any?
16    A  We're not scheduled for removal of
17  conditions for our first investors until 2016.
18  We will have more than met the obligation for
19  them. And by the time we finish the construction,
20  we will have met our obligations for all the
21  investors.
22    Q  So how are you going to handle what,
23  obviously, will be a discrepancy between what's
24  been submitted with their 526 versus what they
25  will be submitting with their 829?

Page 506

1    A  We'll be able to demonstrate the
2  expenditure for those investors. I'm very
3  confident that we will be able to meet our
4  obligation there.
5    Q  Was USCIS notified of the delay or any
6  other material changes to the AnC Bio project?
7    A  USCIS was the reason for the delay.
8    Q  But have they been notified of the
9  delay?
10    A  I think they're -- yes, they are
11  aware -- they're not aware of the delay. They're
12  aware of the new offering document having been
13  issued.
14    Q  USCIS or Vermont?
15    A  Both.
16    Q  And who communicated that to --
17    A  A cover -- every submission of a 526
18  has a cover letter, and that cover letter
19  describes the package that's being delivered to
20  the USCIS. And in that cover letter would be the
21  description of the offering.
22    Q  But that would be for the new
23  subscribers?
24    A  Correct.
25    Q  Okay.

Page 507

1         So -- and none of those have been
2  approved -- none of those 526s have been approved
3  yet?
4    A  They have not been approved yet, but
5  we're very close to what we would believe to be
6  the first wave of those approvals.
7    Q  But at this point, USCIS hasn't
8  accepted that new offering based on those new
9  subscribers?
10    A  No. But I fully expect they will,
11  because the offering is better than the first
12  one.
13    Q  What -- how so?
14    A  Well, it's more complete. The numbers
15  are -- you know, we've updated the marketing
16  analysis. We've given them more detail about the
17  value of the products and services. It's a
18  better -- it's a better offering.
19    Q  We had talked about the twenty million
20  deposit for equipment. We were talking about the
21  expenses of the AnC Bio project. So that twenty
22  million is not reflected on this Exhibit 179 that
23  has all of the payments by the AnC Bio project?
24    A  It is. It is --
25    Q  Tell me where it is.

Page 508

1    A  Well, it's part of the JCM commitments.
2    Q  And is there a lump sum going to JCM
3  for that twenty million, or are you saying --
4    A  If you were to take the funds that have
5  been committed to Jay Construction Management,
6  the distribution payments, the rights for the
7  distribution, fifty percent deposit on all the
8  equipment, the -- distribution, equipment, and
9  those are the -- those are the principal major
10  things.
11    Q  And so the twenty million for the
12  equipment, that's a deposit that JCM then paid to
13  who?
14    A  We paid to -- the funds for the
15  equipment were paid to AnC Biopharm.
16    Q  And that's the Korean?
17    A  I'm a little tired right now, so I
18  apologize. I'm spinning a little bit here.
19         AnC Biopharm is the entity that we
20  procured the distribution rights for, and also
21  who is collaborating on the design and the
22  creation of the facility.
23    Q  Okay.
24         And what's the current status of that
25  equipment that AnC Biopharm is procuring for this

Page 509

```
 1   project?
 2       A  It's been ordered.  And by contract, we
 3   were required to pay fifty percent in advance for
 4   that equipment.
 5       Q  Okay.
 6          It's been ordered by AnC Bio?
 7       A  It's been ordered by JCM.
 8       Q  So JCM has ordered the equipment
 9   from --
10       A  From AnC Biopharm.
11       Q  And that's the equipment in which JCM
12   made the deposit for?
13       A  Correct.
14       Q  And those monies came from the AnC Bio
15   investors?
16       A  Correct.
17       Q  And so the equipment, tell me
18   exactly -- so AnC Biopharm receives the deposit.
19   What information do you have as far as what
20   equipment has actually been manufactured, is in
21   the process of being manufactured?
22       A  There is an enormous amount of
23   documentation available to show you the equipment
24   and the -- the equipment that's going -- that
25   represents that.
```

Page 510

```
 1       Q  But the design of the equipment, or the
 2   actual equipment itself?
 3       A  I think it's a combination of both.
 4       Q  Okay.  Because I've seen through your
 5   counsel design of equipment, but I've yet -- and
 6   we've asked many times.  I have yet to receive
 7   any documentation or the information that
 8   actually supports the thought that is actually
 9   equipment being manufactured by AnC Biopharm.
10       A  There's equipment that's being designed
11   that is project unique to this building that
12   requires a fifty percent deposit in advance of
13   the work being done.  That's the contractual
14   agreement.  And there's a wealth of information
15   available to demonstrate that.
16       Q  And, again, I understand.  I've seen
17   information as to the design of this equipment.
18   My question is:  Has any equipment actually been
19   manufactured by AnC Biopharm?
20       A  I don't know if there's been any actual
21   equipment manufactured yet, but I know that the
22   design has been done, the commitments have been
23   made to fulfill that, and both are contractually
24   there and the work has been -- is underway.
25          (Mr. Dee leaves the room.)
```

Page 511

```
 1          BY MR. JAMES:
 2       Q  Okay.
 3          So you're unaware of any equipment
 4   actually being manufactured by AnC Biopharm for
 5   this project, as you sit here today?
 6       A  I'm unaware of that aspect of it, but I
 7   know that the requirement for the equipment
 8   requires fifty percent deposit.
 9       Q  Which has been paid already?
10       A  That's correct.
11       Q  So if they decide not to deliver the
12   equipment, what happens then?
13       A  Well, I think we would take action to
14   get the products that we expect.
15       Q  Okay.
16          So when was the deposit made, do you
17   recall?
18       A  I don't know specifically when it was,
19   but I know that -- I don't know.  I don't know.
20       Q  Okay.
21          So other than -- other than your
22   understanding that money was sent to AnC
23   Biopharm, and other than the designs of the
24   equipment you've seen, you have no other
25   information or knowledge of anything actually
```

Page 512

```
 1   being procured, manufactured, delivered,
 2   constructed?
 3       A  I haven't been to a facility, per se,
 4   no.  I know that it's been ordered.  I know that
 5   it's part of the design.  I know that there's a
 6   ton of people collaborating on it from
 7   Pharmaplan, AnC Bio Pharmaplan.  Commitments have
 8   been made, and product's been ordered.
 9          (Mr. Martin enters the room.)
10          BY MR. JAMES:
11       Q  And then what's the delivery date?
12   When is it supposed to be delivered?
13       A  It will be part -- some of it will be
14   part of the construction.
15       Q  And parts that are not?
16       A  Will be before it opens.  The second
17   half will.
18       Q  Has any information been communicated
19   to you as a general partner as to this equipment
20   will be ready for delivery by X date?
21       A  That's a given for me, that we're going
22   to have it on time.
23       Q  Why's that?
24       A  Well, because that's what we're --
25   that's the construction timeline that we're
```

Page 513

1  working on.
2      Q  Well, that's a timeline.  It's an
3  estimate.  It doesn't mean that it's going to be
4  adhered to.
5      A  It is an estimate.  That's right.
6      Q  My question is:  Has anyone told you,
7  whether from AnC Biopharm, Mr. Quiros, anyone
8  else, that this equipment actually has been
9  manufactured or will be manufactured, will be
10  delivered by X date?
11      A  I -- no.  But I know that the product
12  has been ordered.  I've seen the designs.  I've
13  seen the timeline.  And I believe that it will be
14  fulfilled in accordance with the construction of
15  the building.
16      Q  But that's not based on anything else,
17  other than just your belief?
18      A  That's right.
19      Q  Okay.
20          Have you ever communicated --
21      A  I might add that I believe I can get
22  that information and provide it to you.
23      Q  What information?
24      A  The information about the timeline of
25  procurement and delivery.

Page 514

1      Q  And where would you get that from?
2      A  I would ask AnC Biopharm to give that
3  to me.
4      Q  So you're in communications with AnC
5  Biopharm?
6      A  Yes.
7      Q  Okay.
8          When was the last time you
9  communicated?
10      A  The parties -- they're in this -- in
11  this country all the time helping with the
12  design.
13      Q  Okay.
14      A  They're here -- they were here a month
15  ago.
16      Q  And so you met with the principals of
17  AnC Biopharm a month ago?
18      A  Absolutely.
19      Q  In the US?
20      A  Yes.
21      Q  Where?
22      A  At Jay Peak.
23      Q  Okay.
24          And did you --
25      A  In Burlington, Vermont.

Page 515

1      Q  Okay.
2          And did you talk at all about the
3  equipment and when it'll be delivered, has it
4  been manufactured, when it'll be ready?  Did you
5  have any of those types of conversations?
6      A  No, I didn't.  But what I was focusing
7  on was getting the ninety-fifth percentile of
8  design work done to the point where we could
9  break ground, and that's what I've been pushing
10  for hard with the AnC Biopharm and NNE Pharmaplan
11  to finish the last five percent, so we could get
12  in the ground.  Fortunately, we're at that point,
13  and that's why we're not only site prepping, but
14  we're about to pour concrete and get steel in the
15  ground.
16      (Mr. Dee enters the room.)
17          BY MR. JAMES:
18      Q  Who are the individuals from AnC
19  Biopharm you met with last month?
20      A  Dr. Jang, Kevin Choi, Ike Lee.  Jake
21  Lee was also there, but those three are the
22  principal contacts on the design team with NNE
23  Pharmaplan, which is the North Carolina-based
24  design team.
25      Q  Okay.

Page 516

1          But they didn't volunteer to you any
2  updates on the equipment?
3      A  No.  The purpose of the meeting was to
4  focus on the final few percentages, so that we
5  could release the contractors to begin work.
6  Because you don't want to design twice.
7      Q  Are you aware of any other payments to
8  AnC Biopharm, other than that twenty million
9  deposit or that ten million distribution?
10      A  I don't.
11      Q  Are you aware of any credits extended
12  by AnC Biopharm to the AnC Bio project for
13  amounts that were due for equipment that they
14  have instead decided to credit the project for?
15      A  I'm not sure I understand that.
16      Q  Are you aware of any instance where AnC
17  Biopharm was owed additional monies for equipment
18  and decided instead to not receive that money
19  and, basically, continue working without that
20  payment being received?
21      A  I know that there have been various
22  interactions between AnC Biopharm and JCM.  I'm
23  not sure about what you're referencing.
24      Q  Are you aware of any declarations
25  issued by any of the principals that AnC Biopharm



Page 517

1  addressing monies that would've been owed to them
2  that they're foregoing because of their
3  relationship with Jay Peak folks?
4     A   I did -- I did see a declaration that
5  you just described.  Yes, I did see that.
6     Q   When did you see that?
7     A   Oh, it was recently.
8     Q   How recently, the past month?
9     A   In the past month.
10    Q   Okay.  But not in around the time the
11  declaration was dated or created?
12    A   I'd have to see it.  Do you have a copy
13  of it?
14    Q   And you just saw one declaration, or
15  you saw more than one?
16    A   I would have to see it.  Do you have a
17  copy?
18        MS. FUCHS:  How did you come to see the
19  declaration you're talking about?
20        THE WITNESS:  I was shown it by legal
21  counsel.
22        MR. GORDON:  You can't get into our
23  communications.  You want to stop with that.
24        THE WITNESS:  Okay.
25        BY MR. JAMES:

Page 518

1     Q   I'm going to hand you what has been
2  marked already as Exhibit 131 and 132.  Take a
3  look at it.  I'll leave it in the envelope for
4  now.
5     A   Okay.  I've read them.
6     Q   Have you seen them before?
7     A   I've seen them, yes.
8     Q   Both of them?
9     A   Yes.
10    Q   When?
11    A   Recently, within the last week.
12    Q   Under what context?
13        MR. GORDON:  And you can't talk about
14  your communications with me.  I'm just warning
15  you of that.
16        THE WITNESS:  Then I --
17        MR. GORDON:  And if you have to divulge
18  of your communications with me, then you can't
19  answer the question.
20        THE WITNESS:  Okay.
21        I can't answer the question.
22        BY MR. JAMES:
23    Q   All right.  Well, my question is -- I'm
24  not asking you what was said.  I'm asking you
25  what context did you review the declarations?

Page 519

1        MR. GORDON:  Well, I mean,
2  hypothetically, if a lawyer chose to show
3  documents to his client, that's both attorney
4  work product and attorney/client privileged.  If
5  you want to ask him if he's seen these documents
6  outside of any meeting or communications with his
7  lawyer, I'll certainly allow that.
8        MR. JAMES:  Well, I'm asking what
9  context.  So if you're telling me there's a
10  context that's not protected by attorney
11  communications, that would be an answer to the
12  question.
13        Under what context did you see these
14  declarations?
15        MR. GORDON:  If you can answer that
16  without divulging communications with your
17  lawyer.
18        THE WITNESS:  I can't.
19        BY MR. JAMES:
20    Q   You can't what?
21        MR. GORDON:  He's saying he can't
22  answer the question without --
23        THE WITNESS:  I can't answer the
24  question.
25        MR. GORDON:  There's a way around it,

Page 520

1  though.  If you just ask him whether he had
2  any -- if in any context, other than in
3  connection with a meeting with his lawyers, did
4  he see the document.
5        THE WITNESS:  The answer's no.
6        BY MR. JAMES:
7     Q   To what question?  I'm not sure where
8  we are.
9     A   I did not see the documents.
10    Q   Outside of --
11    A   Outside of the context which was just
12  described.
13    Q   Okay.
14        And other than that, you have no
15  knowledge about these declarations?
16    A   That's correct.
17    Q   Okay.
18        Do you have any knowledge about the
19  information discussed in the declaration?
20    A   No.
21    Q   Particularly paragraph six?
22        MR. MARTIN:  Of which one?
23        MR. JAMES:  I think they're the same.
24        MS. FUCHS:  Both?
25        THE WITNESS:  No.

Page 521

```
 1        BY MR. JAMES:
 2        Q  Okay.
 3           And you are the general partner --
 4        A  Partner.
 5        Q  -- for this project?
 6        A  Yes.
 7        Q  Okay.
 8           And you have no knowledge about
 9     twenty-one million, basically, being credited by
10     AnC Biopharm and instead being paid to Jay Peak?
11        A  I'm not familiar with this document and
12     that particular description that you just made.
13        Q  So you have no knowledge?
14        A  No.
15           MS. FUCHS:  So that was all new to you
16     when you read this?
17           THE WITNESS:  Yes.
18           MS. FUCHS:  Were you surprised?
19           THE WITNESS:  I wasn't -- I was
20     informed.  Was I surprised?  I didn't have a
21     particular sense one way or another.
22           MS. FUCHS:  So it's something you
23     learned for the first time?
24           THE WITNESS:  It was the first time I
25     saw that document and the first time that I noted
```

Page 522

```
 1     the content of it.
 2           MS. FUCHS:  Okay.
 3           Specifically paragraph six, Brian was
 4     just asking, this the first time you heard
 5     anything like this, about this twenty-one
 6     million?
 7           THE WITNESS:  Right.
 8           MS. FUCHS:  And no one had spoke with
 9     you about this before?
10           THE WITNESS:  No.
11           MS. FUCHS:  Even though you're a member
12     of the general partner?
13           THE WITNESS:  I know.  Yes.
14           MR. MARTIN:  What did you do in
15     response?
16           THE WITNESS:  Well, I -- I haven't done
17     anything.
18           BY MR. JAMES:
19        Q  So you haven't spoken with Mr. Quiros
20     about it?
21        A  I have not.
22           MS. FUCHS:  Why haven't you?
23           THE WITNESS:  Why haven't I spoken to
24     him about it?  I haven't had the opportunity to.
25           MR. MARTIN:  Does this concern you as
```

Page 523

```
 1     the general partner?
 2           THE WITNESS:  I would like to know the
 3     background of it.  And I know a lot about the
 4     project.  And my principal interest is in making
 5     sure that the projects are built and developed
 6     and created, and I read that.  There's certain
 7     explanations for it.
 8           MR. MARTIN:  But there shouldn't even
 9     have to be an explanation, right?  I mean, if the
10     subscription's fully subscribed, investors put in
11     money to buy this equipment by paying for it,
12     correct?
13           THE WITNESS:  Uh-huh.
14           MR. MARTIN:  And now they have to go
15     under, not a payment, but sort of a promise,
16     because they will provide it, right?
17           THE WITNESS:  I believe it's the -- may
18     I see it again -- oh, it's right here.  I'm
19     sorry.
20           "From the perspective of AnC Biopharm,
21     it made significant economic sense for JCM to pay
22     JPI rather than AnC Biopharm.  JCM owed these
23     funds to JPI.  And as stated above, JCM and AnC
24     Biopharm were related entities.
25           "Moreover, it made no economic sense
```

Page 524

```
 1     for JCM to transfer funds to Korea if they were
 2     needed in the United States for reasons relating
 3     to currency exchange and taxes.  Further, the
 4     owners of AnC Biopharm and JPI have long-standing
 5     extensive business relations, and AnC Biopharm
 6     believes it will profit substantially from the
 7     economic success of the Jay Peak Bio Research
 8     project and other EB-5 projects.  AnC Biopharm is
 9     wholly committed to ensuring the economic success
10     of these projects."
11           That's what I -- I believe, and as I
12     read this.
13           MR. MARTIN:  But you would agree with
14     me, though, the money was raised, or if it was
15     fully subscribed it would be raised to pay for
16     this as a normal commercial transaction, correct?
17           THE WITNESS:  That the money was raised
18     to develop the AnC Bio project, yes.  To build
19     the building, order the equipment, create the
20     company, and create the facility.
21           MR. MARTIN:  Now, if it's not being
22     paid any longer, where'd the money go?
23           THE WITNESS:  I believe this document
24     says that the funds have been credited, but that
25     the work is being done.
```

## Page 525

1  (Mr. Levenson leaves the room.)
2  MR. MARTIN:  So JCM just keeps the
3  twenty-one million?
4  THE WITNESS:  I -- I don't think so.
5  MR. MARTIN:  Who does?
6  THE WITNESS:  Well, I'm reacting to
7  the -- what I'm reading here.
8  MR. MARTIN:  Yeah.  But we agreed that
9  there's money set aside in the offering to pay
10  for this.  It's no longer being paid for, or JCM
11  is retaining the funds.  Does JCM get to keep
12  twenty-one million dollars?
13  THE WITNESS:  No.  I see this as a
14  document that explains the obligations that are
15  made by AnC Biopharm and JCM, and it's correct.
16  MR. MARTIN:  Do you know where the
17  twenty-one million dollars went, who has it?
18  THE WITNESS:  I'm not sure.  I'm not
19  sure.
20  MS. FUCHS:  Well, do you have any
21  understanding?
22  THE WITNESS:  I have some understanding
23  of this having read it and knowing the principals
24  that are involved in -- as I said, I read item
25  seven, which is an explanation of what the

## Page 526

1  understanding is, and that's what it says.
2  MR. MARTIN:  Do you have any
3  understanding that some or all of that twenty-one
4  million dollars is used to pay off a margin loan?
5  THE WITNESS:  No.  I know nothing of
6  that.
7  MR. MARTIN:  Do you know, is this an
8  accurate statement, "Until February 28th, 2014,
9  JCM and AnC Bio were related corporate entities
10  because they had common ownership"?  Do you know
11  if that's a true statement?
12  THE WITNESS:  I believe it is a true
13  statement.
14  MR. MARTIN:  Do you know what happened
15  in February 28th, 2014 to end that common
16  ownership?
17  THE WITNESS:  I don't.
18  MR. MARTIN:  Do you know why the common
19  ownership was ended?
20  THE WITNESS:  I believe that JCM became
21  an entity owned by Mr. Quiros.  And prior to
22  that, it was an entity owned by Mr. Choi.
23  MR. MARTIN:  So prior to that, Mr. Choi
24  owned both JCM and AnC Biopharm?
25  THE WITNESS:  No.  AnC Bio Korea, he

## Page 527

1  was involved in.  AnC Biopharm has knowledge of
2  and some relationship with, but after that date,
3  Mr. Quiros owned it, owned JCM.
4  MR. MARTIN:  So just so I'm clear, JCM
5  and AnC Biopharm, up until February 28th, 2014,
6  who were the common owners?
7  THE WITNESS:  Up until that date, I
8  believe that Mr. Choi was involved in both.  And
9  after that date, Mr. Quiros is the JCM principal.
10  MR. MARTIN:  And Mr. Choi's just
11  with -- he's no longer with JCM after that date?
12  THE WITNESS:  Correct.
13  MR. MARTIN:  Okay.
14  THE WITNESS:  That's what I believe to
15  be correct.
16  MR. MARTIN:  And why do you have that
17  belief?
18  THE WITNESS:  Because I've just been
19  appraised that Alex Choi was no longer involved
20  with JCM.
21  MR. MARTIN:  Who appraised you?
22  THE WITNESS:  Mr. Quiros.
23  MR. MARTIN:  And what context did that
24  come up?
25  THE WITNESS:  I think it was just a

## Page 528

1  conversation.  We talked four or five times a
2  week.
3  MR. MARTIN:  But not about this here?
4  THE WITNESS:  I have not talked to him
5  about this particular document.
6  MS. FUCHS:  Any reason you haven't
7  talked to him yet?
8  THE WITNESS:  He asked me if I
9  haven't -- if I had talked to him about this
10  document.  I have not.
11  MS. FUCHS:  But any reason you haven't?
12  THE WITNESS:  I just not have had the
13  time to.
14  MS. FUCHS:  The paragraph seven that
15  you were reading from where it says -- second
16  line, JCM owed these funds to JPI.  Do you know
17  why JCM owed these funds to JPI?
18  THE WITNESS:  I'm not particularly
19  sure, no.
20  MS. FUCHS:  Do you have any idea?
21  THE WITNESS:  No.
22  MS. FUCHS:  Are you -- you're President
23  of JPI; is that correct?
24  THE WITNESS:  I am.
25  MS. FUCHS:  And do you have another

Page 529

```
 1    title as well?  You're CEO?
 2         THE WITNESS:  I am.
 3         MS. FUCHS:  But you don't know why JCM
 4    owed these funds to JPI?
 5         THE WITNESS:  I'm not familiar with the
 6    detail behind this document.
 7         MS. FUCHS:  Did you have any notion
 8    that JCM owed these funds to JPI?
 9         THE WITNESS:  I'm not -- I'm not
10    precisely sure, no.
11         MS. FUCHS:  Generally sure?
12         THE WITNESS:  No, I'm not.
13         MS. FUCHS:  So up until you read this,
14    you had no notion that JCM owed JPI anything; is
15    that correct?
16         THE WITNESS:  I am not as familiar with
17    the detail of this as I might be.
18         MS. FUCHS:  Not looking at this, did
19    you have any notion that JCM would've owed any
20    funds to JPI?
21         THE WITNESS:  Can you repeat that?
22         MS. FUCHS:  Why would JCM owe any
23    monies to JPI?
24         THE WITNESS:  I'd have to -- I'd have
25    to look in background of the detail to that.
```

Page 530

```
 1         MS. FUCHS:  Can you think of any reason
 2    why?
 3         THE WITNESS:  Well, we've got a number
 4    of different things that we're doing.  I don't --
 5    I don't know the particular background of that.
 6         MS. FUCHS:  But no one's ever informed
 7    you of that?
 8         THE WITNESS:  No.
 9         MR. DEE:  Is twenty-one million dollars
10    material?
11         THE WITNESS:  Of course.
12         MR. DEE:  Okay.
13         Now that you're aware, or you were
14    aware, that there was such a material liability,
15    wouldn't that peak your interest to know if your
16    other project funds are still there; say, like
17    for, in case and point, Stateside and AnC Bio?
18         THE WITNESS:  I have certain curiosity,
19    yes.
20         MR. DEE:  Okay.
21         You've been in business a long time.
22    I've listened to you articulate your responses to
23    questions.  You're a very intelligent guy.
24    Twenty-one million is something I think you would
25    pay attention to coming from a rural area.  It's
```

Page 531

```
 1    something substantial.  That's why we're amazed,
 2    or at least I am, you haven't followed up yet.
 3         THE WITNESS:  Well, I don't believe
 4    that there's any funds missing anywhere.
 5         MR. DEE:  I didn't say funds missing.
 6         THE WITNESS:  Yeah.  Well, you're
 7    saying that --
 8         MR. DEE:  Would it peak your interest
 9    to take a look to check?
10         THE WITNESS:  Yes, it does.
11         MR. DEE:  Okay.
12         THE WITNESS:  Yes, it does.
13         MS. FUCHS:  This is dated -- these
14    declarations are dated May 25th, 2014.  But
15    you've never even seen them until about a week
16    ago, right?
17         THE WITNESS:  I did not see them until
18    recently.
19         MS. FUCHS:  Does that concern you?
20         THE WITNESS:  Not really.  I believe my
21    partner and our operation of this initiative is
22    very straightforward, and there's reasons for why
23    we've structured it the way we have.
24         MR. MARTIN:  But you didn't structure
25    it?
```

Page 532

```
 1         THE WITNESS:  I did not.
 2         MR. MARTIN:  And in the four or five
 3    conversations you have with Mr. Quiros a week, he
 4    never brought this up in the year, over a year
 5    since this declaration --
 6         THE WITNESS:  I have not discussed this
 7    with him.
 8         MR. DEE:  He has not broached the
 9    topic?
10         THE WITNESS:  He's never broached it
11    with me.
12    BY MR. JAMES:
13         Q   And you met with the AnC Biopharm folks
14    as recent as a month ago, right?
15         A   I've met with the AnC Bio folks
16    frequently.
17         Q   And no one mentioned to you --
18         A   No.  No.
19         Q   Any sense of whether -- you mentioned
20    that your belief is that there's twenty million
21    sitting in JCM that belongs to the AnC investors.
22    Any sense of whether, basically, that twenty
23    million you thought was in JCM, but now is with
24    Jay Peak?
25         A   I believe the funds are where they are
```

Page 533

```
 1    and where they're supposed to be, and the funds
 2    for the AnC Bio project are in the account.
 3        Q   Okay.
 4            So you earlier testified that you think
 5    there should be twenty million in the JCM account
 6    for AnC Bio, and then a separate twenty million
 7    for Stateside.
 8            My question is:  Having seen this
 9    declaration recently and again now, what's your
10    belief as to whether or not those funds are
11    actually in the account or whether they were
12    actually given to Jay Peak, Inc.?
13        A   I'd have to look at this more -- in
14    more detail.
15        Q   But based on what you've seen thus far,
16    no ability to venture whether or not those funds
17    are still there?
18        A   No, I don't have an opinion on that
19    yet.
20        Q   Okay.
21            So it will be forty million then, the
22    twenty million you believe that's there, and then
23    the twenty-one million that they gave to Jay
24    Peak.  So based on your belief and this debt,
25    there should have been forty million in there for
```

Page 534

```
 1    AnC Bio.  And you've only raised sixty -- what,
 2    seventy million?
 3        A   We've raised about seventy some
 4    million.
 5        Q   Okay.
 6            So forty million should be sitting in
 7    JCM, based on your belief and based on this debt?
 8        A   I believe that there's funds -- I'm
 9    tired.  There's funds available in AnC Bio to
10    build a building.  This particular document and
11    what it says, I need to -- I need to digest more.
12    I need to look at the background of it.
13            MR. MARTIN:  Doesn't it make the
14    amended PPM that came out after this declaration
15    was executed, before you saw this, regarding the
16    use of proceeds inaccurate?
17            THE WITNESS:  I don't know.
18            MR. MARTIN:  Because there's no
19    description on the use of proceeds in that
20    amended PPM that you had final approval over
21    regarding this transaction, is there?
22            THE WITNESS:  I don't know.
23            MR. MARTIN:  You don't know if it's in
24    there?
25            THE WITNESS:  I don't know if this
```

Page 535

```
 1    document constitutes a change to the PPM.
 2            MR. MARTIN:  Well, the PPM says the
 3    twenty-one million dollars is going to go to buy
 4    the equipment, right?
 5            THE WITNESS:  That's correct.  And I
 6    believe that's the case.
 7            BY MR. JAMES:
 8        Q   So you're saying this document is
 9    false, you're saying, what it says in it?
10        A   I believe that -- I believe that the
11    AnC Biopharm commitment to produce the equipment
12    is sound, and this particular document indicating
13    that we are credited it doesn't mean it's not
14    going to be delivered.
15            MR. MARTIN:  But the proceeds is not
16    being used -- the twenty-one million is not going
17    to AnC Biopharm under this declaration, right?
18    It's going to Jay Peak, right?
19            THE WITNESS:  According to this
20    document, it says that.
21            MR. MARTIN:  And there's nothing in the
22    Use of Proceeds in the amended PPM regarding
23    that, is there, that use of proceeds?
24            THE WITNESS:  I don't know.  I don't
25    believe so.
```

Page 536

```
 1            MR. MARTIN:  Would you wish that you'd
 2    been told this before you approved the amended
 3    PPM going out?
 4            THE WITNESS:  I might've wanted to see
 5    that, yeah.
 6            MR. MARTIN:  Why?
 7            THE WITNESS:  Just so I would have the
 8    full -- the full understanding.
 9            MR. MARTIN:  You could make the Use of
10    Proceeds accurate, right?
11            THE WITNESS:  That would be one of the
12    things, yes.
13            BY MR. JAMES:
14        Q   You also mentioned, I think to one the
15    questions Mr. Martin asked you about the monies
16    being used to pay a margin loan, you said you've
17    never heard of that.  Do you recall that?
18        A   Yeah, I do remember saying that.
19        Q   Okay.
20            Do you also recall that when you here
21    last time in May of 2014 we also asked you about
22    margin loan, you also said you had no knowledge
23    of any margin loans?  Do you recall that?
24        A   I don't recall the conversation
25    specifically a year -- what was it, a year ago?
```

Page 537

```
 1      Q   Yeah, over a year ago.
 2      A   I'd have to look at the -- I did read
 3  my testimony.  I don't -- it might've been in
 4  there.
 5      Q   Okay.
 6          My question is, and accepting my
 7  assumption that it is in your testimony and you
 8  did testify that you had not heard anything about
 9  a margin loan at that point in time:  Since then,
10  which this is May 2014, have you done anything as
11  general partner to find out about the possibility
12  of a margin loan being used in connection with
13  investor funds?
14      A   No.
15      Q   So as general partner, you haven't
16  asked Mr. Quiros any questions about that?
17      A   No.
18      Q   You haven't asked any financial
19  institutions where the investor funds are about
20  any margin loans?
21      A   I have not.
22      Q   Your Accounting Department?  Your CFO?
23      A   No.
24      Q   Okay.
25          So as general partner, you've made zero
```

Page 538

```
 1  effort to find out about a margin loan that could
 2  be tied to how the investors funds are being
 3  used?
 4      A   The financial structure of what we are
 5  doing is something that my partner coordinates.
 6  I have great faith in him.  And I don't get
 7  involved with the banking arrangements that he
 8  has here.
 9          I'm aware of the funds that come in,
10  the construction that's being produced, and the
11  payment for that.  And I don't get into the
12  details of the account functions, and I trust his
13  judgment, and he takes care of that.
14      Q   But you do understand as general
15  partner you have a responsibility to ensure that
16  if I'm an investor and I put my five hundred
17  thousand dollars into AnC Bio, that that actually
18  is used for AnC Bio, so I could get my job
19  creation requirements and then get my conditions
20  removed?  So don't you think that's an important
21  component of your responsibility to the
22  investors?
23      A   It's absolutely important for the funds
24  to be spent on the project and the project to be
25  created as we say it is within the time frame
```

Page 539

```
 1  that it's being done and the job creation be done
 2  and the business be opened and operated in
 3  compliance with the offering.
 4          MR. MARTIN:  Would you agree that
 5  material changes in what was told to the USCIS
 6  could cause the residency requirements not to be
 7  met?  Is that your understanding?
 8          THE WITNESS:  Could you repeat that?
 9          MR. MARTIN:  Sure.
10          If there was a material change in the
11  business plan that was submitted to USCIS, is it
12  your understanding that that could cause the
13  green cards not to be issued?
14          THE WITNESS:  If the jobs are not
15  created, the green cards won't be obtainable.
16  But the creation of the project in accordance
17  with the offering document as it's designed is
18  what triggers the job creation and, ultimately,
19  the removal of conditions for the investor.  And
20  we have successfully done that in every single
21  project, and we are successfully doing it in Q
22  Burke, and we're successful doing it in AnC Bio.
23          MR. MARTIN:  Well, you don't know yet.
24          THE WITNESS:  We will.  I absolutely
25  know we will.
```

Page 540

```
 1          MR. DEE:  That's an assumption,
 2  correct?
 3          THE WITNESS:  It's an assumption, and
 4  it's based on my knowledge and my faith in what
 5  we're doing and our ability to execute.
 6          MR. DEE:  Let me ask you this.  You've
 7  got projects that are invested, and you don't
 8  have to borrow any money, you don't have to go to
 9  the bank.  They're funded by the investors.
10  Don't you find it puzzling that your partner is
11  taking out a margin loan and collateralize or
12  pledging another investor account or accounts?
13  Didn't that set off any alarms?
14          THE WITNESS:  I'm not familiar with any
15  kind of margin loan account.  I'm not familiar
16  with that.
17          MR. MARTIN:  Do you think it was ever
18  disclosed in the first six offerings that you
19  abdicated your general partner a financial
20  obligations to Mr. Quiros?
21          THE WITNESS:  That I abdicated my --
22          MR. MARTIN:  All financial
23  responsibility.  Are you saying he handles the
24  finances, you send the money off to him?
25          THE WITNESS:  Well, we separate the
```

Page 541

1   duties. He doesn't build things. He doesn't
2   know how to run a hotel.
3        MR. MARTIN: Was that disclosed in any
4   of the first six offerings that an unnamed
5   person, Mr. Quiros, was going to take over the
6   financial responsibility for the first six
7   offerings?
8        THE WITNESS: I don't know that it was.
9   I don't know that it needed to be. I know that
10  our obligation is to build projects and to create
11  the outcomes that the investors expect, and we've
12  faithfully done that throughout every project,
13  and we're continuing to do it.
14       MS. FUCHS: When Brian asked you about
15  the margin loan, you said you didn't know about
16  any margin loan. So if Mr. Quiros were to tell
17  us you did know about the margin loan, would that
18  be accurate?
19       THE WITNESS: If Mr. Quiros told you
20  that I knew about the margin loan?
21       MS. FUCHS: Yeah. Would that be
22  accurate?
23       THE WITNESS: Whether or not Mr. Quiros
24  has margin loans on his own banking accounting,
25  his personal accounting, that's his business. I

Page 542

1   don't know of any margin loans related to our
2   project.
3        MS. FUCHS: I'm talking about for Jay
4   Peak. If he were to tell us that you knew about
5   a margin loan for Jay Peak, would that be
6   accurate?
7        THE WITNESS: A margin loan for Jay
8   Peak, Inc.?
9        MS. FUCHS: Yes.
10       THE WITNESS: He might have -- he
11  might -- there might be such a thing, but not
12  related to any of the EB-5 programs.
13       MS. FUCHS: But you just told us you
14  didn't know about any margin loan.
15       THE WITNESS: I thought you were
16  referencing margin loans in association with the
17  projects. I don't honestly know if he's got a
18  margin loan on Jay Peak -- for Jay Peak.
19       MS. FUCHS: But you don't know?
20       THE WITNESS: I don't know. You asked
21  me if he told me that there was. You're asking
22  me some hypothetical questions, and I'm trying to
23  answer them the best I can. And you specifically
24  said Jay Peak, Inc., which is the ski resort
25  operation. And we have -- we have our own

Page 543

1   accounts for Jay Peak, Inc., and those are --
2   those are different than the projects.
3        MR. DEE: Your accounting team's never
4   reported that there was -- the investor accounts
5   were collateralized?
6        THE WITNESS: No.
7        MR. DEE: Okay.
8        MS. FUCHS: Well, can investor accounts
9   be collateralized?
10       THE WITNESS: He asked me a question,
11  and I said no. And you're asking me a
12  hypothetical question, and I don't know the
13  answer to that.
14       MS. FUCHS: Is it permissible for
15  investor accounts to be collateralized?
16       THE WITNESS: I doubt it.
17       MS. FUCHS: Right. Because it's not
18  disclosed to investors, right?
19       THE WITNESS: That's right. I would
20  think that's correct.
21       MS. FUCHS: And so this money we've
22  been discussing with JCM, I mean, is it
23  permissible for JCM to pledge any investor assets
24  as collateral? Would that be permissible?
25       THE WITNESS: Is it permissible for JCM

Page 544

1   to pledge an asset --
2        MS. FUCHS: To pledge it to use --
3   would it be permissible for JCM to use any assets
4   held in this account, which came from investors,
5   as collateral?
6        THE WITNESS: Is it permissible for Jay
7   Construction Management --
8        MS. FUCHS: Is it permissible for --
9   would it be permissible for anyone one to use JCM
10  funds, which came from investors, as collateral?
11       THE WITNESS: I'm not sure if there's a
12  context under which that would be appropriate. I
13  don't know. I don't know.
14       MS. FUCHS: Because investor funds are
15  not --
16       THE WITNESS: Investor funds are
17  supposed to be used to create the project that
18  they invested in and to create the facilities and
19  the products and programs that they're committed
20  to.
21       MS. FUCHS: And that's what investors
22  were told; is that correct?
23       THE WITNESS: That's what they're told,
24  and that's what we do.
25       MS. FUCHS: And investor funds aren't

Page 545

1  permitted to be used as collateral for any other
2  purpose; is that correct?
3      THE WITNESS: I don't believe that they
4  should be used for anything, other than the
5  purpose that they're invested in, and that is to
6  create a project and create the outcome that is
7  described in the offering.
8      MS. FUCHS: It can be only be used for
9  the specific project; is that correct?
10     THE WITNESS: That's correct. It's
11 what it should be used for, yes.
12     MR. MARTIN: It shouldn't be used for
13 personal loans, right?
14     THE WITNESS: It should be used for the
15 project.
16     MR. MARTIN: So it shouldn't be used
17 like for personal loans, for example, to
18 collateralize a personal loan?
19     THE WITNESS: I would not think so, no.
20     BY MR. JAMES:
21     Q   What's the financial condition of AnC
22 Biopharm?  Are they still an operating company in
23 Korea?
24     A   Yes.  Yes, they are.
25     Q   What's their status?

Page 546

1      A   They are producing product. They're
2  designing product. They have a staff of, I
3  believe, twenty-five to twenty-eight people.
4  They operate out of the same facility they've
5  been operating out of for the last several years;
6  although, they're a lessee of the facility and
7  not the owner of the facility.
8      Q   Have you visited that facility in
9  person?
10     A   I've been there twice.
11     Q   When was the last time?
12     A   The last time, probably five years ago.
13     Q   Okay. So you haven't visited in five
14 years?
15     A   No.
16     Q   Okay.
17         And when did the AnC Bio project
18 commence?
19     A   I think we initially started before
20 that. When we were launching the project, around
21 that time. If you look at the offering document,
22 the first offering document, it probably states
23 when we initiated it.
24     Q   It was 2012?
25     A   I think so. Around then. Maybe

Page 547

1  earlier.
2      Q   So your belief and everything you just
3  mentioned, is that information you learned
4  personally, or that's information you got
5  secondhand?
6      A   That the people are who they are?
7      Q   Who they are, what they're doing now,
8  that they're still fully operating.
9      A   Yes, I've been told that. And I've met
10 with the AnC Biopharm people when they've been in
11 the United States --
12     Q   In the US?
13     A   In the US.
14     -- and shared with me what they're
15 doing, who's employed. We've looked at how many
16 of them will be actively involved in the startup.
17 And I believe there's between, as I said, between
18 twenty-five and twenty-eight employees.
19     (Mr. Levenson enters the room.)
20     BY MR. JAMES:
21     Q   Do you know if they are procuring any
22 equipment for anyone else besides AnC Bio?
23     A   Do I have --
24     Q   Do you think AnC Biopharm is procuring
25 equipment for any other clients outside of the --

Page 548

1      A   I think we're principally the project
2  that they're focused on right now.
3      Q   Are you aware of any other clients?
4      A   I'm not aware.
5      Q   And you're not aware of their
6  financials, you're not aware of how many
7  employees they have, you're not aware of their
8  abilities to credit JCM twenty-one million?
9      A   I mentioned to you that I believe
10 there's twenty-five to twenty-eight employees in
11 the operation.
12     Q   But that's based on what someone told
13 you?
14     A   That's correct. That's correct.
15     Q   Okay. Okay. Do you believe they have
16 the financial ability currently, understanding
17 the issues they've had in the last couple of
18 years, to be able to credit twenty-one million to
19 JCM and bore that cost themselves for the
20 equipment that's owed?
21     A   I believe they do.
22     Q   And then why do you believe that?
23     A   I just know the technology, and I know
24 the people, and I believe that they will be able
25 to fulfill their obligations.

Page 549

```
 1      Q   I'm saying, is that based on seeing
 2   their financial?  Is that based on seeing an
 3   audit of their books?
 4      A   No.
 5      Q   Is that based on knowing that they have
 6   a vast client pool that they generate revenues
 7   from?  Do you have any information to suggest
 8   that they have the ability to credit twenty-one
 9   million to this project?
10      A   I don't have -- I have not had access
11   to those documents that you're referencing.  I
12   could probably get them.
13      Q   So you have no basis to believe that
14   they could credit twenty-one million and then
15   find somewhere else to, basically, manufacture
16   and deliver this equipment?
17      A   I believe that they will -- no, I don't
18   have any documentation.  I have the knowledge and
19   belief that they will be able to fulfill their
20   obligation.
21          MS. FUCHS:  Where is AnC Biopharm going
22   to be manufacturing this equipment, what
23   location?
24          THE WITNESS:  A large percentage of the
25   equipment is built into the facility and is based
```

Page 550

```
 1   on the technology and the design of the products.
 2   And some will be independent materials, but a lot
 3   of it is part of the -- it's created at the time
 4   of construction, and it's part of the design.
 5   Some of it is not.  Some of it is uniquely
 6   designed for the facility.
 7          MS. FUCHS:  And where will that be
 8   manufactured?
 9          THE WITNESS:  Some of that will be
10   manufactured on site, and some of that will be
11   supplied from elsewhere.
12          MS. FUCHS:  Where?
13          THE WITNESS:  Well, some of it will be
14   from Korea.  Some of it will be from Germany.
15   Some of it will be from other places.  It's a
16   pretty -- it's a very, very detailed list of
17   equipment and materials.
18          MS. FUCHS:  What is your title with all
19   the different general partners?  Is it President?
20          THE WITNESS:  It depends on the
21   project.  I'm general partner for all the projects
22   and everything at Jay Peak.  I'm President and
23   CEO of the facilities there.
24          I'm a general partner at Q Burke.  I'm
25   not the general manager or principal running the
```

Page 551

```
 1   day-to-day operations at Burke; although, I'm an
 2   advisor to them.  I don't have really a title
 3   there.
 4          And I'm President of Jay Peak Resort
 5   and general manager there of all the facilities.
 6   And then AnC Bio, I'm general partner,
 7   facilitating the creation of the capital and the
 8   implementation of the development.  And we will
 9   have a team of people that will operate it and
10   fulfill the income side of that project.
11          MR. DEE:  What's Kevin Choi's
12   relationship Alex Choi?
13          THE WITNESS:  No relationship that I
14   know of.  As you may know, in Korea, there are
15   about ten names that the whole country is, Choi,
16   Chung, Park.  That's cultural.
17          MR. DEE:  Like Smith, Johnson?
18          THE WITNESS:  Yes.  And Dr. Lee and Dr.
19   Lee, they're not related.
20   BY MR. JAMES:
21      Q   You mentioned that Mr. Quiros purchased
22   Q Burke.  Do you know where that money came from
23   that he used to acquire Q Burke?
24      A   I don't.
25      Q   Do you provide updates to investors for
```

Page 552

```
 1   each of the projects?
 2      A   Each quarter we appraise them of the
 3   status of construction and the progress of the
 4   project.
 5      Q   And that's per project, the ones that
 6   are ongoing?
 7      A   Correct.  Correct.
 8      Q   The projects that are completed, do you
 9   also provide weekly or quarterly --
10      A   Quarterly.
11      Q   -- updates to those investors, also?
12      A   Quarterly reports.
13      Q   To those investors?
14      A   To those investors.
15      Q   And what's included in it, just what --
16   how the project's performing or --
17      A   It's a financial statement, a letter
18   describing the activity of the previous quarter.
19   And if there are proceeds that are available for
20   payment, a check would be included in the
21   quarterly statement.
22          MS. FUCHS:  Do you also provide copies
23   of those updates to Mr. Quiros?
24          THE WITNESS:  I think he gets a copy of
25   the quarterly reports we give the partners.  I'm
```

Page 553

```
 1    not -- I'm not a hundred percent sure of that. I
 2    think he's copied on the list. I think -- I
 3    think he sees them.
 4              MR. JAMES: We'll take a five-minute
 5    break.
 6              (A brief recess was taken at 3:47 p.m.)
 7              MR. JAMES: Go back on the record.
 8              BY MR. JAMES:
 9        Q  Mr. Stenger, we just have, I guess, one
10    more question.  Then we'll let your Counsel ask
11    his questions.  Do you recall any discussions
12    whether with Mr. Hulme, or about discussions
13    where Mr. Hulme was involved where it was
14    discussed that the AnC Bio project proceeds from
15    investors would be used to plug the shortfalls
16    created, or the holes that were existing in the
17    first project and the second project?
18        A  No.
19        Q  So you've never heard any suggestion
20    that that was the --
21        A  Not from Mr. Hulme.
22        Q  From anyone else?
23        A  No.
24        Q  So this is the first you've ever heard
25    of the concept that this AnC Bio project is going
```

Page 554

```
 1    to be used as a fill-all for earlier projects
 2    that had deficiencies in the amounts of money
 3    that are raised from investors?
 4        A  No.  We've talked about the proceeds
 5    from the AnC Bio project helping us with
 6    potentially going forward projects.  Because, as
 7    I shared with you a year ago, we have -- in the
 8    Newport community, we have the AnC project.  We
 9    have a downtown re-development project.  We have
10    an airport project that we're thinking about.  We
11    had a conference center hotel in downtown
12    Newport. And we intend to continue to invest in
13    the community.  And AnC Bio has its proceeds from
14    the developer that can be used going forward, or
15    for whatever purpose we might have.
16              But we have specific projects in that
17    community that we want to do.  We have an airport
18    project we want to do.  We have a Main Street
19    development project that we want to do.  The
20    proceeds that would come from this project could
21    be used for the facilitation of those other
22    things.
23              We announced on September 27th, 2012 a
24    multi-phased set of projects; some at Jay Peak,
25    some in Newport, some in Burke.  And the AnC Bio
```

Page 555

```
 1    project is underway.  The Burke project is
 2    underway.  Stateside project is near completion.
 3    We have two or three other projects that would
 4    benefit the community in a meaningful way, and
 5    the proceeds from AnC could be used to help with
 6    that. That would be a choice that would come at
 7    some point in the future.
 8              MR. MARTIN: Where did you announce
 9    that?
10              THE WITNESS: At Jay Peak.
11              MR. MARTIN: In what form was the
12    announcement?
13              THE WITNESS: We announced that to
14    about five hundred people.  We had our two US
15    senators there, our Governor there, all of our
16    local community.  And it was a community launch
17    to try to facilitate job creation and economic
18    development for the entire region.
19              MR. MARTIN: And when, approximately,
20    was that meeting?
21              THE WITNESS: December -- or excuse me,
22    September 27th, 2012.  It was a -- you've seen
23    the press clippings from it, I'm sure.  It was a
24    big day and a big announcement about that we're
25    going to try to do some really, really
```

Page 556

```
 1    significant things in the community.  And we've
 2    been pretty damn true to our word.
 3              Bumps along the way?  Absolutely.  What
 4    business doesn't have them?  But we're getting it
 5    done.  Some of the bumps are USCIS bumps, some of
 6    them are our own internal bumps, but we're
 7    getting it done.
 8              And I'm sorry I didn't have quite as
 9    much clarity on the technical in the weeds stuff,
10    but I have great faith that we are accomplishing
11    everything that we said to our investors that we
12    are going to.
13              We do have a small community.  I've got
14    Jay Construction Management that uses about nine
15    or ten of my people, and with those people have
16    been working on these projects for sometime.  And
17    there's a lot of -- a lot of internal activity
18    with our own people, because we do the work.  We
19    raise the funds.  We build the projects.  We
20    interact with the contractors.  We interact with
21    state officials.  And it's a pretty brisk-moving
22    situation.
23              But every single investor is going to
24    get everything that they wanted to get, and in
25    some cases more.
```

Page 557

```
 1        MR. JAMES: I think that's all we have,
 2   but before we conclude, I wanted to give your
 3   Counsel a chance to ask any questions.
 4        THE WITNESS: Okay.
 5        MR. GORDON: Thank you. I just want to
 6   ask a few questions.
 7        So Jay Construction Management, they
 8   did work with Phase III; is that right?
 9        THE WITNESS: Phase III, IV, V,
10   probably VI.
11        MR. GORDON: Okay.
12        And I think you testified that, does
13   Jay Construction Management have any employees of
14   its own, to your knowledge?
15        THE WITNESS: No, other than the, you
16   know, principal.
17        MR. GORDON: Okay.
18        But Jay Peak, Inc., it has a
19   construction and development group; is that
20   right?
21        THE WITNESS: Correct.
22        MR. GORDON: And I think you just said
23   about a moment ago that there are about nine to
24   ten employees of that group. Is that about
25   right?
```

Page 558

```
 1        THE WITNESS: Correct.
 2        MR. GORDON: Okay.
 3        And can you describe what role, if any,
 4   those nine to ten employees of Jay Peak, Inc.
 5   have played with respect to Jay Construction
 6   Management.
 7        THE WITNESS: They have provided the
 8   vast majority of our property services throughout
 9   the project. All nine of those people have been
10   involved in the day-to-day construction
11   relationships and some of the management
12   interaction with subcontractors, and they play an
13   active role in the creation of the projects.
14        MR. GORDON: And who pays the salaries
15   of those nine to ten people?
16        THE WITNESS: Jay Peak, Inc. does.
17        MR. GORDON: And has Jay Construction
18   Management ever paid for -- paid Jay Peak, Inc.
19   cash for the use of these employees of Jay Peak,
20   Inc.?
21        THE WITNESS: At some point, Jay
22   Construction Management is going -- is obligated
23   to pay Jay Peak, Inc. for the people that have
24   been performing those services.
25        MR. GORDON: Okay.
```

Page 559

```
 1        But are you aware of any cash paid from
 2   Jay Construction Management to Jay Peak, Inc. to
 3   pay for the use of those employees specifically?
 4   Do they pay the salary of those employees?
 5        THE WITNESS: Jay Peak, Inc. would bill
 6   Jay Construction Management for -- at some point,
 7   for the services that they get.
 8        MR. GORDON: Are you aware of the
 9   existence of a written agreement between Jay
10   Peak, Inc. and Jay Construction Management signed
11   by Mr. Quiros?
12        THE WITNESS: Am I am aware of such a
13   thing? I'm not familiar with it.
14        MR. GORDON: Is it within Mr. Quiros's
15   authority to execute such an agreement on behalf
16   of Jay Peak, Inc. if he so thinks appropriate?
17        THE WITNESS: Yes, it would be.
18        MR. GORDON: Are you aware of any
19   agreement executed by Jay Construction Management
20   that restricts its right to pay -- its right to
21   use any funds to pay debt?
22        THE WITNESS: Could you repeat that?
23        MR. GORDON: Are you aware of the
24   existence of any agreement executed by Jay
25   Construction Management that restricts its right
```

Page 560

```
 1   to use funds paid to it in any respect?
 2        THE WITNESS: No.
 3        MR. GORDON: I think shortly after
 4   lunch I heard you say you were tired. Is that
 5   about right?
 6        THE WITNESS: Yeah.
 7        MR. GORDON: Am I remembering that
 8   right? I think you said the same thing about
 9   maybe an hour ago. Is that about right?
10        THE WITNESS: Uh-huh.
11        MR. GORDON: I mean, do you think
12   having been tired has affected your testimony
13   this afternoon?
14        THE WITNESS: A lot of the questions
15   are very complicated, and I'm struggling to
16   follow some of them in making sure that I'm
17   answering correctly.
18        MR. GORDON: To what do you attribute
19   that, though? Is it just the complicated nature,
20   or is it anything else?
21        THE WITNESS: It's a combination of the
22   complicated nature and the fact that it's a hot
23   room and that I'm tired.
24        MR. GORDON: At what point did you
25   become tired?
```

Page 561

```
 1          THE WITNESS:  Probably two o'clock,
 2    soon after lunch.
 3          MR. GORDON:  I don't have any other
 4    questions.
 5          MR. LEVENSON:  I do.
 6          Did you ask -- did you understand all
 7    the questions that you were asked this afternoon?
 8          THE WITNESS:  Did I understand all the
 9    questions?  I understood them to the best of my
10    ability.
11          MR. LEVENSON:  And you answered them
12    truthfully to the best of your ability?
13          THE WITNESS:  I answered them
14    truthfully to the best of my ability, but I --
15    some of the stuff's very confusing.  And I -- I
16    acknowledge I'm struggling with this right now.
17    I'm tired.
18          MR. LEVENSON:  Okay.  Well, did you ask
19    for a break and were refused at anytime?
20          THE WITNESS:  No, not at all.  I'm here
21    at your disposal.  I wouldn't impose that.
22          MR. LEVENSON:  That's all I have.
23          MR. JAMES:  We're off the record.
24          (Whereupon, at 4:00 p.m., the
25    examination was concluded.)
```

Page 562

```
 1          PROOFREADER'S CERTIFICATE
 2
 3    In the Matter of:  JAY PEAK, INC.
 4    Witness:        William Stenger
 5    File Number:    FL-03815-A
 6    Date:           Thursday, September 17, 2015
 7    Location:       Miami, Florida 33131
 8
 9          This is to certify that I, Donna S. Raya,
10    (the undersigned), do hereby swear and affirm that the
11    attached proceedings before the U.S. Securities and
12    Exchange Commission were held according to the record
13    and that this is the original, complete, true and
14    accurate transcript that has been compared to the
15    reporting or recording accomplished at the hearing.
16
17    _____   _____
18    (Proofreader's Name)        (Date)
19
20
21
22
23
24
25
```

Page 562

1                    PROOFREADER'S CERTIFICATE

2

3   In the Matter of:   JAY PEAK, INC.

4   Witness:            William Stenger

5   File Number:        FL-03815-A

6   Date:               Thursday, September 17, 2015

7   Location:           Miami, Florida 33131

8

9          This is to certify that I, Donna S. Raya,

10  (the undersigned), do hereby swear and affirm that the

11  attached proceedings before the U.S. Securities and

12  Exchange Commission were held according to the record

13  and that this is the original, complete, true and

14  accurate transcript that has been compared to the

15  reporting or recording accomplished at the hearing.

16

17  _____           ___9/23/15___

18  (Proofreader's Name)          (Date)

19

20

21

22

23

24

25

1      UNITED STATES SECURITIES AND EXCHANGE

2           REPORTER'S CERTIFICATE

3

4      I, BRIGITTE ROTHSTEIN, Court Reporter, hereby
    certify that the foregoing transcript of 286 pages
5    (September 17th, 2015) is a complete, true and
    accurate transcript of the testimony indicated
6    held on September 17th, 2015 at 9:24 a.m. in the
    matter of: JAY PEAK, INC.

7

8      I further certify that this proceeding was
    recorded by me, and that the foregoing transcript
9    was prepared under my direction.

10

11   Date: September 18th, 2015
    Official Reporter: Brigitte Rothstein
12   Diversified Reporting Services, Inc.

13

14

15

16

17   _____
    BRIGITTE ROTHSTEIN, Court Reporter
18   Notary Public - State of Florida
    Commission No.: EE 175314
19   Expires: March 17th, 2016
    Transmittal Number: M000023

20

21

22

23

24

25