Page 1

UNITED STATES SECURITIES AND EXCHANGE COMMISSION

In the Matter of:            )
                             ) File No.:  FL-03815-A
JAY PEAK, INC.               )

WITNESS:  William Kelly

PAGES:    1 through 303

PLACE:    801 Brickell Avenue

          Suite 1800

          Miami, Florida 33131

DATE:     Thursday, July 24th, 2014

    The above-entitled matter came on for hearing,
pursuant notice, at 10:22 a.m.



PLAINTIFF'S EXHIBIT 37

Diversified Reporting Services, Inc.

(202) 467-9200

## Page 2

```
1    APPEARANCES:
2
3    On behalf of the Securities and Exchange Commission:
4        TRISHA FUCHS-SINDLER, ESQ.
5        BRIAN JAMES, ESQ.
6        MICHELLE LAMA, ACCOUNTANT
7        Division of Enforcement
8        Securities and Exchange Commission
9        801 Brickell Avenue
10       Suite 1800
11       Miami, Florida 33131
12       (305) 982-6300
13
14   On behalf of the Witness:
15       DAVID B. GORDON, ESQ.
16       Richardson Patel, LLP
17       405 Lexington Avenue
18       49th Floor
19       New York, New York 10174
20       (646) 755-7315
21
22   Also Present:
23       Kerry Boehm, SEC Intern
24
25
```

## Page 3

```
1              CONTENTS
2
3    WITNESS:              EXAMINATION
4    William Kelly            10
5
6    EXHIBITS:    DESCRIPTION         IDENTIFIED
7    133    Subpoena, dated 3/19/14      10
8    134    Subpoena, dated 6/3/14       13
9    135    Background Questionnaire      17
10   136    Technical License Agreement    154
11   137    Master Distribution Agreement    158
12   138    Memorandum of Understanding    161
13   139    Contract, dated 11/30/13      185
14   140    ANCBIO-004304             208
15   141    Memo, dated 2/26/13          218
16   142    Statement of Account          225
17   143    JCM Raymond James Statements    245
18   144    ANCBIO-004381             251
19   145    RJQUIROS-009948            258
20   146    Raymond James Statements      259
21   147    People's Bank Statement        261
22
23
24
25
```

## Page 4

```
1              PROCEEDINGS
2         MS. FUCHS-SINDLER: We are on the
3    record at 10:22 a.m. on July 24th, 2014. We are
4    here to take the testimony of William Kelly at
5    the SEC offices in Miami, Florida.
6         Mr. Kelly, would please raise your
7    right hand.
8         Do you swear to tell the truth, the
9    whole truth, and nothing but the truth?
10        MR. KELLY: I do.
11   Whereupon,
12            WILLIAM KELLY
13   was called as a witness and, having been first
14   duly sworn, was examined and testified as
15   follows:
16        MS. FUCHS-SINDLER: Please state and
17   spell your full name for the record.
18        THE WITNESS: William Kelly,
19   W-I-L-L-I-A-M, K-E-L-L-Y.
20        MS. FUCHS-SINDLER: Have you ever been
21   known by any other name?
22        THE WITNESS: No.
23        MS. FUCHS-SINDLER: Okay.
24        My name is Trisha Sindler. I'm a
25   senior counsel with the Division of Enforcement
```

## Page 5

```
1    of the United States Securities and Exchange
2    Commission. With me are Brian James, also senior
3    counsel, and Michelle Lama, an accountant in the
4    Division of Enforcement. We may be joined later
5    by Chedly Durmonay, Assistant Regional Director
6    with the Division of Enforcement. We are all
7    Officers of the Commission for the purposes of
8    this proceeding. We'd also like to thank you for
9    agreeing to allow one of our law students, Kerry
10   Boehm to sit in today.
11        This is an investigation by the
12   Commission in the matter of Jay Peak, Inc., file
13   No. FL-3815, to determine whether there have been
14   any violations of certain provisions of the
15   federal securities laws; however, the facts
16   developed in this investigation might constitute
17   violations of other federal or state, civil or
18   criminal laws.
19        Let me briefly explain the procedure we
20   will follow today. We will be asking you a
21   series of questions. At any time if you want to
22   take a short break, please free to tell us, and
23   we'll be happy to accommodate you. All we ask is
24   that if there's a question pending, if you answer
25   that before we take a break.
```

Page 6

1      The Court Reporter transcribes these
2   proceedings and will create a transcript of your
3   testimony at the end.  Please make sure to answer
4   verbally, because the Court Reporter cannot pick
5   up any nodding or any other gestures.
6      Do you understand that?
7      THE WITNESS: Yes.
8      MS. FUCHS-SINDLER: Also, it's very
9   frequent for a witness to anticipate what the
10  full question will be, so we just ask if you wait
11  for the whole question, wait for whoever's asking
12  it to finish before you answer, and that will
13  make it easier for the Court Reporter.
14     Also, if we have a conversation about
15  the case off the record, when we return, we're
16  going to have to summarize that on the record or
17  confirm with that you didn't have any substantive
18  conversations.
19     Do you understand that?
20     THE WITNESS: Yes.
21     MS. FUCHS-SINDLER: Okay.
22     Are you on any medication that would
23  affect your memory today or your ability to
24  testify completely and accurately?
25     THE WITNESS: No.

Page 7

1      MS. FUCHS-SINDLER: Okay.
2      During the course of your testimony
3   today, I'm going to ask you questions about
4   things that happened or may have happened in the
5   past. Obviously, time has gone by since those
6   events, and you're likely to have a better and
7   more complete memory of some events than others.
8      In answering a question about these
9   events, however, you should tell me about all
10  your memories or recollections that are
11  responsive to the question, not just those that
12  are specific or perfectly clear, or those of
13  which you're a hundred percent sure.
14     I'm asking you also for vague memories,
15  general memories, cloudy memories and/or memories
16  of which you are less than a hundred percent
17  certain.  In other words, I'm asking for any
18  responsive recollection whatsoever you may have
19  however incomplete or uncertain or vague or
20  nonspecific it may be.  We can then sort out
21  which memories are clear and certain and which
22  are less clear and less certain.
23     Do you understand this?
24     THE WITNESS: Yes.
25     MS. FUCHS-SINDLER: And do you agree to

Page 8

1   answer my questions with this understanding in
2   mind?
3      THE WITNESS: Yes.
4      MS. FUCHS-SINDLER: Therefore, if you
5   answer, I don't recall or I don't remember or I
6   forget, I will assume that you have no memory or
7   recollection whatsoever that is responsive to the
8   questions asked, not even fuzzy or less than
9   crystal clear memories.
10     Do you understand that?
11     THE WITNESS: Yes.
12     MS. FUCHS-SINDLER: It may be that
13  reviewing certain documents refreshes your
14  recollection as to events you're questioned
15  about. In such a case, I'm asking for your
16  testimony on everything that is responsive to the
17  question, not just clear or specific
18  recollections.
19     Do you understand that?
20     THE WITNESS: Yes.
21     MS. FUCHS-SINDLER: Prior to the
22  opening of the record, you were provided with a
23  copy of the Formal Order of Investigation in this
24  matter. It will be available to you for your
25  examination during the course of this proceeding.

Page 9

1      Mr. Kelly, have you had an opportunity
2   to review the Formal Order?
3      THE WITNESS: Yes.
4      MS. FUCHS-SINDLER: Okay.
5      Prior to the opening of the record, you
6   were provided with a copy of the Commission's
7   Supplemental Information Form 1662, a copy of
8   which was previously marked as Exhibit No. 1.
9      Have you had an opportunity to review
10  this document?
11     THE WITNESS: Yes.
12     MS. FUCHS-SINDLER: Okay. Do you have
13  any questions concerning this exhibit?
14     THE WITNESS: No.
15     MS. FUCHS-SINDLER: Are you represented
16  by counsel?
17     THE WITNESS: I am.
18     MS. FUCHS-SINDLER: Would Counsel
19  please identify himself for the record by stating
20  your name, the name of your firm, you business
21  address, and telephone number.
22     MR. GORDON: David Gordon, Richardson &
23  Patel, 405 Lexington Avenue, 49th Floor, New
24  York, New York 10174. Phone number, (646)
25  755-7315.

Page 10

```
 1        MS. FUCHS-SINDLER: Mr. Gordon, are you
 2   representing Mr. Kelly as his counsel today?
 3        MR. GORDON: I am.
 4        MS. FUCHS-SINDLER: Okay.
 5        EXAMINATION
 6        (SEC Exhibit No. 133 was
 7        marked for identification.)
 8   BY MS. FUCHS-SINDLER:
 9        Q    Mr. Kelly, prior to going on the
10   record, we marked as Exhibit No. 133 a March
11   19th, 2014 subpoena sent to you, care of Mr.
12   Gordon.
13        Is this a copy of the subpoena you're
14   appearing pursuant to today?
15        A    I believe it is.
16        Q    And have you seen this document
17   before?
18        A    I believe I have.
19        Q    Now, this document calls for the
20   production of documents and for your subpoena to
21   appear for testimony.  Have you produced all
22   documents called for in the subpoena?
23        A    Yes.
24        Q    Okay.
25        Please describe the search that was
```

Page 11

```
 1   conducted for the requested documents, and state
 2   who conduct that had search.
 3        A    I conducted that search.  The search
 4   included my Emails and any hard copy files that I
 5   would have had.
 6        Q    When you said Emails, was that a
 7   personal computer, a work computer?  Can you
 8   describe for us?
 9        A    A personal computer.  And it is -- they
10   were Emails that were transmitted from an Email
11   address of wjkelly mindspring.com.
12        Q    Any other computers that you used to
13   search for Emails?
14        A    I checked with the Jay Peak -- with the
15   IT manager of Jay Peak to find out whether or not
16   there were any potential Emails that were
17   directed to me that would be on a Jay Peak
18   server, and there were not.
19        Q    Okay.
20        And who was that individual?
21        A    That individual was Craig Russell.
22        Q    Okay.
23        And when you mentioned that you
24   searched for hard copies, where did you search
25   for those documents?
```

Page 12

```
 1        A    In my office.
 2        Q    And where is that?
 3        A    At ████████████, Weston, Florida.
 4        Q    Is that a business?
 5        A    It's a home.
 6        Q    It's a home?
 7        A    Home office.
 8        Q    Is that your residence?
 9        A    Yes, it is.
10        Q    Anywhere else that you searched for
11   hard copies?
12        A    I looked at ███████████t,
13   where there is an office that I operate out of
14   infrequently -- 4th Floor, Miami, Florida.  I'm
15   sorry.
16        Q    And what is the business at that
17   office?
18        A    The business at that office, those are
19   the offices of Ariel Quiros.
20        Q    And Q Resorts?
21        A    Yes.
22        Q    And did you locate documents there?
23        A    No, none of the documents that were
24   subpoenaed.
25        Q    Did you locate documents at your home
```

Page 13

```
 1   office?
 2        A    No.  There were no hard copies at my
 3   home office.
 4        Q    Okay.
 5        Did anyone assist you in your search?
 6        A    No -- my wife.
 7        Q    Okay.
 8        (SEC Exhibit No. 134 was
 9        marked for identification.)
10        BY MS. FUCHS-SINDLER:
11        Q    Let me also show you what has been
12   marked as Exhibit No. 134.  And it's another
13   subpoena, dated June 3rd, 2014, also requiring
14   the production of certain documents.
15        Do you recognize this document, Exhibit
16   134?
17        A    Yes, I do.
18        Q    And have you seen a copy of this
19   before?
20        A    Yes, I have.
21        Q    Exhibit No. 134 also calls for the
22   production of certain documents.  Have you
23   produced documents called for by that subpoena?
24        A    They're -- yes, I have.
25        Q    134?
```

Page 14

1    A   Under this document, I have searched
2  for documents under this -- under this subpoena.
3    Q   Okay.
4        And have you produced any documents
5  pursuant to the subpoena?
6    A   No, I don't believe that there -- no, I
7  don't believe I have.
8    Q   Okay.
9        And can you please describe the search
10  that was conducted for the documents requested in
11  Exhibit 134.
12    A   Same search. I searched both my home
13  office and the offices at 111 Northeast 1st
14  Street.
15    Q   Did anyone assist you in that search?
16    A   No. Again, only my wife.
17    Q   For both Exhibits 133 and 134, have
18  you withheld any documents we requested based on
19  any claim of privilege?
20    A   No -- excuse me.
21        MR. GORDON: Well, no. I mean --
22        THE WITNESS: If there were documents
23  that I -- if there were Emails, only Emails, if
24  there were Emails that were the product of a
25  request by Mr. Gordon or by the SEC through Mr.

Page 15

1  Gordon, those I believe were privileged. Those
2  would be the only -- those would be the only
3  documents that may have been withheld.
4        BY MS. FUCHS-SINDLER:
5    Q   So were there some documents withheld
6  based on privilege?
7    A   I had -- I had produced documents for
8  Mr. Gordon in response to this -- these subpoenas
9  that were in two records. One set of records
10  were those that I clearly believed there were no
11  privilege.
12        And those that I asked him to review
13  for privilege, I don't know what was submitted of
14  those, but I submitted them all to Mr. Gordon.
15  Mr. Gordon would have only not submitted those he
16  believed were under privilege.
17    Q   Okay.
18        MS. FUCHS-SINDLER: And, David, I
19  believe we've asked this before, but if we could
20  also get a privileged log produced.
21        MR. GORDON: Okay.
22        MS. FUCHS-SINDLER: Okay.
23        BY MS. FUCHS-SINDLER:
24    Q   Were any documents not produced that
25  were requested in both of these subpoenas,

Page 16

1  Exhibits 133 and 134 --
2    A   Not that I'm aware of.
3    Q   -- for any reason --
4    A   I'm sorry.
5    Q   It's okay -- for any reason, other
6  than privilege?
7    A   Not that I'm aware of.
8    Q   Okay.
9        Do you know of any documents that were
10  not provided pursuant both of these subpoenas
11  that were in your possession at a prior time or
12  that were lost, destroyed, or otherwise disposed
13  of?
14    A   No. Through the normal course of
15  business, documents are disposed of, but not
16  certainly anything that I would have referenced
17  to for these subpoenas.
18    Q   And you had mentioned that you
19  searched on your personal computer. Do you have
20  any other computers?
21    A   No.
22    Q   Okay.
23        And is that computer located in the
24  Weston address that you gave us?
25    A   Yes.

Page 17

1        (SEC Exhibit No. 135 was
2        marked for identification.)
3        BY MS. FUCHS-SINDLER:
4    Q   Mr. Kelly, I'm handing to you what has
5  been marked now as Exhibit No. 135, a copy of a
6  background questionnaire that you provided to the
7  staff, and we appreciate that. And on the top,
8  it's dated July 18th, 2014.
9        Can you look at that document, please.
10        And did you complete this
11  questionnaire?
12    A   I did.
13    Q   Okay.
14        Did anyone else assist you?
15    A   No.
16    Q   Okay.
17        And is all the information contained in
18  this background questionnaire complete and
19  accurate?
20    A   Yes.
21    Q   Okay.
22        Just a few questions. If you could
23  look at on page four, number sixteen where it
24  asks, have you ever been a manager or member of
25  any privately-held company?

Page 18

1    A   Yes.
2    Q    The first company that's listed is
3    Northeast Contract Services.  Can you tell us
4    what that company is?
5    A   Northeast Contract Service is a Vermont
6    domiciled company that is -- was formed for the
7    purposes of managing construction supervision of
8    EB-5 projects in Vermont.
9    Q    Do you own that company?
10   A   I do.
11   Q    Okay.
12       Are there any other owners?
13   A   No.
14   Q    How did it come about that Northeast
15   -- if you don't mind if I call it Northeast --
16   was formed?
17   A   In 2011, Ariel Quiros asked me if I
18   would be willing to form a company and staff a
19   company that would assist in construction
20   supervision for the sponsor of EB-5 projects, and
21   I said yes.
22   Q    And when was it actually formed?
23   A   I believe the end of 2012, the
24   beginning of 2013.
25   Q    Why was there that period of a gap

Page 19

1    between when he asked you in 2011 to form the
2    company for this purpose?
3    A   There was not -- there was not a need
4    for the company yet.  The work that the company
5    would do would not begin until 2012.
6    Q    What is your role with Northeast?
7    A   I'm the President and the managing
8    member.
9    Q    And can you just describe for us what
10   Northeast does?
11   A   In every EB-5 project, under the
12   regional center programs in the United States,
13   there's a requirement, because of the diversity
14   of the investors, the limited partnerships, the
15   limited partners, there is a requirement that the
16   construction be supervised by the sponsor company
17   or a delegate of the sponsor company on behalf of
18   the limited partners.  And the role of Northeast
19   Contract Services is to participate in that
20   supervision of the construction process.
21   Q    And how does Northeast participate in
22   that construction process?
23   A   At the beginning of every project,
24   there is a preconstruction period where much work
25   is done related to the site.  Northeast

Page 20

1    supervises that work.
2        At the beginning -- or shortly into
3    every project, there is a design and engineering
4    phase conducted on behalf of the limited
5    partners.  Northeast Contract supervises that
6    process.  That means attendance at all of the
7    meetings of all the engineers and architects.
8    That means participation to the degree necessary
9    on behalf of the limited partners in those
10   meetings.
11       Ultimately, there is a construction and
12   fit-out phase of these projects.  And where there
13   is, Northeast Contract participates in the
14   supervision of that construction and fit-out
15   providing oversight and data back to the sponsor,
16   who is, ultimately, responsible to the limited
17   partners for that function.  That function is
18   defined in the offering memorandums that are put
19   out to the limited partners.
20   Q    Does Northeast have any employees?
21   A   No.  No, Northeast has no employees,
22   only myself as President and manager.
23   Q    Any contractors?
24   A   Yes.  Northeast does have contracts.
25   Northeast contracts with Inner Circle

Page 21

1    Professional Services Company.
2    Q    And what is Inner Circle?
3    A   Inner Circle is my personal company
4    here in Florida where I conduct all of my
5    business advising and consulting services for
6    whomever.
7        Northeast Contract Services does
8    contract with -- Northeast Contract Services and
9    Inner Circle Special (sic) Services both contract
10   with consultants who provide specialty services
11   -- specialty services to Northeast Contract
12   Services or to Inner Circle Professional Services
13   for that function of providing construction
14   supervision.
15       Those are either individuals or
16   companies that Northeast Contract Services or
17   Inner Circle Professional Services retains to
18   provide specialty services in the construction
19   supervision business.
20   Q    And has Northeast and Inner Circle
21   contracted with any of these specialties?
22   A   Yes.  Yes, they have.
23   Q    Who are they?
24   A   One is a construction person by the
25   name of Andrew Stenger.

Page 22

1    Q    Is he related to William Stenger?
2    A    Yes, he is, son. A long history of
3  construction supervision expertise.
4         Timothy McGuire, Engineer.
5    Q    Does Andrew Stenger work for Jay Peak?
6    A    Andrew Stenger does work for Jay Peak,
7  yes.
8    Q    And does Timothy McGuire work for Jay
9  Peak?
10   A    No, he does not.
11   Q    Do you know who he works for?
12   A    He works for an engineering firm in
13 Vermont.
14   Q    What's the name?
15   A    I don't know that.
16   Q    Okay.
17        Anyone else besides Mr. Stenger and Mr.
18 McGuire?
19   A    Deshazor Designs.
20   Q    Can you spell that?
21   A    D-E-S-H-A-Z-O-R Designs. Deshazor
22 Designs is a design company.
23   Q    Located where?
24   A    In Florida and in South Carolina.
25   Q    Do you have any ownership interest in

Page 23

1  Deshazor Designs?
2    A    No. No, I do not. No.
3    Q    Are you an officer or director or have
4  you ever been at Deshazor Designs?
5    A    No, I have not.
6    Q    Who's your contact there?
7    A    Tom Deshazor or Kelly Kelly.
8    Q    How do you know Tom Deshazor?
9    A    Tom Deshazor is related to Kelly Kelly.
10 That is a family business, and so I know them
11 personally.
12   Q    And Kelly Kelly?
13   A    Is my wife.
14   Q    Mr. McGuire, is he family friend or
15 relative?
16   A    No.
17   Q    How did you meet him?
18   A    I met him because he was employed at a
19 resort in Vermont, and I met him through that
20 resort.
21        MR. JAMES: What's the name of the
22 resort?
23        THE WITNESS: It is Burke Mountain --
24 Burke Mountain Operating Company. Burke, yes,
25 B-U-R-K-E.

Page 24

1         Also, SJ Services I believe is the name
2  of the company, a company that does website
3  design for NECS, SJ Services.
4    Q    Where are they located?
5    A    Vermont.
6    Q    Who's your contact there?
7    A    Steve Wright.
8    Q    Who does he work for?
9    A    He works for Jay Peak. Well, he works
10 for SJ Services, but he also works for Jay Peak.
11        There is -- through SJ Service, there
12 is also a website company design company, IM,
13 Inc. I believe is the name of the company that we
14 retained to do website work.
15   Q    IME?
16   A    IM, Inc. is the name of the company.
17        And I don't know the contacts there,
18 because that's done through SJ Services. They
19 provide those services.
20   Q    Anyone else?
21   A    Not that I can think of.
22   Q    Okay.
23        So for all these individuals you
24 mentioned and the entities, Mr. Stenger, Mr.
25 McGuire, Deshazor Designs, SJ Services, and IM,

Page 25

1  Inc., are there contracts?
2    A    There are.
3    Q    Who are the contracts with?
4    A    The contracts are with those
5  individuals. They're either with Mr. McGuire,
6  Mr. -- Mr. McGuire, there's not a contract. I'm
7  sorry. Mr. McGuire's not a contract. He was
8  just paid, did some ad hoc services for us.
9         Mr. Stenger has a contract. Deshazor
10 Designs has a contract. IM Services (sic),
11 there's a contract through SJ Services. And I
12 don't have a contract with IM, but SJ does, or I
13 presume they do.
14   Q    And are the contracts between these
15 individuals, entities and Northeast?
16   A    In some cases, we do Northeast, and
17 some cases between Inner Circle.
18   Q    Why is it that way?
19   A    Simply because of relationships.
20 Whether I contract with them directly for
21 Northeast Contract Services or on behalf of Inner
22 Circle Professional Services, the result is the
23 same. They're working for me for the purposes of
24 that construction supervision.
25   Q    And pursuant to this contract, has Mr.

Page 26

1 Stenger been paid anything?
2    A  Yes, he has.
3    Q  How much?
4    A  I believe at this point, eight thousand
5 dollars, maybe nine thousand dollars, eight or
6 nine thousand dollars.
7    Q  And during what period of time was he
8 paid this?
9    A  During this summer, June, June of 2014.
10    Q  For what services?
11    A  Providing supervision services on site
12 for construction.
13    Q  Which site?
14    A  AnC Bio, and also at another site that
15 he's doing some work for me.
16    Q  What was that? What site is that?
17    A  At Burke Mountain.
18    Q  Do you know what percentage of this
19 eight or nine thousand was for AnC Bio and what
20 was for Burke Mountain?
21    A  About 50/50.
22    Q  And what was he supervising?
23    A  There are -- in both cases, there is
24 site work going on where there is excavation
25 going on. There is borings for -- there are

Page 27

1 borings being made for ledge and for unsuitable
2 soils. There are excavation going on.
3        And in every case, there is a very
4 strict law in Vermont about erosion control and
5 waste water, water management, if you will. And
6 so it's required by statute, frankly, in Vermont
7 to retain individuals to monitor on a daily basis
8 erosion control and other environmental -- other
9 environmental issues all prescribed by the Agency
10 of Natural Resources in -- Natural Resources in
11 Vermont. And so those are -- that is the kind of
12 work that he's doing.
13    Q  Has any money been paid to Mr.
14 McGuire?
15    A  Yes.
16    Q  How much?
17    A  Twenty thousand dollars, I believe.
18    Q  And when was that paid to him?
19    A  That was a year ago.
20    Q  For what work?
21    A  For work on -- again, on site work, and
22 for writing plans, snow management plans, stream
23 remediation plans, and providing services for
24 permitting for the projects.
25    Q  For which projects?

Page 28

1    A  AnC and Burke.
2    Q  And, again, same question, how much of
3 that twenty thousand was for AnC, and how much
4 was for Burke?
5    A  I would say more was on Burke Mountain.
6    Q  Do you know about how much?
7    A  If I had to make a guess, I would say
8 70/30.
9    Q  And how about Deshazor?
10    A  Deshazor Design is a company that's
11 been in the design business for a number of
12 years, and they provide services to me in terms
13 of, for all intents and purposes, the lobby and
14 customer acceptance area design.
15    Q  Have they been paid anything?
16    A  They have been.
17    Q  How much?
18    A  They have been paid I believe a hundred
19 thousand dollars last year and fifty thousand
20 dollars this year so far.
21    Q  And for which project?
22    A  For both.
23    Q  Burke Mountain and AnC?
24    A  Burke Mountain and AnC, yes.
25    Q  And about what percentage for each?

Page 29

1    A  I would say, again, 50/50.
2    Q  Okay.
3        And SJ Services?
4    A  SJ Services has not been paid. I have
5 payables due to them for website design. I can't
6 tell you how much the payables are at this point.
7 I think the payables are probably about five
8 thousand dollars.
9    Q  Okay.
10        And IM?
11    A  IM, I don't know. I mean, again,
12 that's all under SJ Services.
13    Q  Have payments been made by Northeast
14 to anyone else, other than these individuals or
15 entities?
16    A  Have you included Inner Circle
17 Professional Services? Then no.
18    Q  Oh.
19    A  Inner Circle Professional Services is
20 also paid by Northeast Contract Services.
21    Q  Has Inner Circle been paid by
22 Northeast?
23    A  Yes, they have.
24    Q  How much?
25    A  About one million -- it's about one

Page 30

1   million, eight. I'm not exactly sure. I would
2   have to do some calculations, but I believe the
3   number is about one million, eight since the
4   beginning of its contract services.
5   **Q   When was that?**
6   A   In February of 2013, I believe, January
7   or February of 2013.
8   **Q   Through when?**
9   A   Through today.  It has an ongoing
10  contract.
11  **Q   And what was that one point eight**
12  **million for?**
13  A   That was for the construction
14  supervision services to be provided to the
15  limited partnership for AnC Bio.  And that is a
16  hundred percent AnC Bio.
17  **Q   And what has Inner Circle done, what**
18  **services?**
19  A   Provided all of the services that I
20  described previously.  They are the
21  preconstruction supervision services, architect
22  and engineering supervision services.
23      And to this point, at AnC Bio, we
24  produced some -- there has been some abatement
25  and demolition of buildings services.  So we were

Page 31

1   actually in construction phase, if you will.
2       So preconstruction, architectural
3   engineering, and now construction phases of work.
4   That entails a great deal of time and effort and
5   meetings and travel.
6   **Q   And who are the owners of Inner**
7   **Circle?**
8   A   I am.
9   **Q   Anyone else?**
10  A   No.
11      Those fees are prescribed by the
12  offering memorandum to the sponsor company.  And
13  then the sponsor company delegates those
14  responsibilities and those prescribed fees to the
15  entities that they have do the work, both to
16  themselves and any contract entities.
17  **Q   Are you the sole officer, director of**
18  **Inner Circle?**
19  A   I am.
20  **Q   Does Inner Circle have any employees?**
21  A   Only me.  I am an employee of Inner
22  Circle.
23  **Q   And when you said these fees are**
24  **prescribed by the offering materials, which**
25  **offering materials are you talking about?**

Page 32

1   A   The AnC Bio -- Jay Peak Biomedical
2   Research Park limited partnership offering
3   memorandum provides for -- in the disclosures,
4   for the use of proceeds that there will be -- and
5   each EB-5 project does this, prescribes for
6   fifteen percent of construction -- construction
7   costs -- construction federal costs to be paid to
8   the sponsor company or their delegate for
9   construction supervision, and an additional five
10  percent for construction supervision expenses.
11      And NECS operates under a contract with
12  the sponsor company to provide certain
13  construction supervision services for a
14  percentage of that offering memorandum prescribed
15  fees.
16  **Q   And who is the sponsor that you're**
17  **referring to?**
18  A   AnC Bio Vermont, LLC.
19  **Q   And who are the officers and directors**
20  **of that entity?**
21  A   William Stenger, Ariel Quiros, and Ary
22  Quiros.
23  **Q   Spelled A-R-Y?**
24  A   Yes.
25  **Q   Is that Mr. Quiros's son?**

Page 33

1   A   It is.
2       Those are the members.  I don't know
3   that those are officers and directors.  Those are
4   the members.
5   **Q   So those fees, the fifteen percent**
6   **fee, that is paid as the construction progresses?**
7   A   Correct.
8   **Q   Has -- and to date how much has**
9   **Northeast, or NECS, received in connection with**
10  **the contract that you were talking about?**
11  A   It would be the amount that I told you
12  of one point eight million, so it would be three
13  times that, because that represents a thirty-two
14  percent share.  The remainder of the funds are
15  returned to or paid to or deposited with the
16  sponsor company.
17      So sixty-eight percent of the funds are
18  there.  I can't tell you an exact number, but I
19  recall -- I can tell you an exact, if I can do a
20  calculation.
21  **Q   When you said sixty-eight percent of**
22  **the funds are returned, can you tell us what**
23  **you're referring to?**
24  A   Yes.  There are --
25      MR. GORDON:  You don't have to do.

Page 34

1    Don't worry about it. It's just math.
2         THE WITNESS: So there are -- there are
3    -- there are twenty percent of the -- twenty
4    percent of the cost of construction in fit-out is
5    the prescribed payment to the sponsor company or
6    their delegate for providing construction
7    supervision services. Those fees are disclosed
8    in the offering memorandum in the Use of Proceeds
9    page.
10        Of that twenty percent, NECS provides
11   certain services to the sponsor company, and the
12   sponsor company provides the rest of those
13   services. The part that NECS provides to the
14   sponsor company are thirty-two percent of the
15   twenty percent.
16        BY MS. FUCHS-SINDLER:
17   Q    And the other amounts that you
18   mentioned that were paid to Mr. Stenger, Mr.
19   McGuire, Deshazor, SJ Services, is that part of
20   that --
21   A    Yes, part of that thirty-two percent.
22   Q    So that's part of the -- about five
23   point four million that's been received so far --
24   sorry, the one point eight times three?
25   A    Yeah. It's part of the NECS portion of

Page 35

1    that.
2    Q    Okay.
3         Have any other individuals or entities
4    received any part of the monies that NECS or
5    Inner Circle has received?
6    A    Not of NECS. Of Inner Circle, there
7    are other entities that have received funds from
8    Inner Circle. Those are the federal government
9    for taxes. Those are retirement plans. Those
10   are key man life insurance policies.
11        Those are operating expenses,
12   obviously, being paid to a number of vendors for
13   operating expenses of Inner Circle Professional
14   Services. Those are travel business expenses.
15        There's a number of people that have
16   been paid. NECS has not paid anyone else, other
17   than the individuals or the entities that I've
18   told you.
19        MR. JAMES: Did you draw a salary from
20   Inner Circle?
21        THE WITNESS: I do.
22        MR. JAMES: Okay.
23        What's that amount?
24        THE WITNESS: In 2013, it was eighty
25   thousand dollars. And in 2014, it is one hundred

Page 36

1    thousand dollars.
2         MR. JAMES: And do you have some type
3    of compensation agreement, or this is just based
4    on payout --
5         THE WITNESS: With Inner Circle -- with
6    Inner Circle, it's paid out. I'm very specific
7    about payouts being to me under payroll rather
8    than other purposes, and that payroll was
9    documented with quarterly 941s. And so the
10   payroll too is documented through tax returns
11   paid quarterly.
12        BY MS. FUCHS-SINDLER:
13   Q    Does anyone else receive a salary from
14   Inner Circle?
15   A    No, not at this time.
16   Q    Are there any plans for anyone else to
17   receiving a salary?
18   A    Yes. There are -- excuse me, not as
19   salary. There are plans for additional
20   consultants that will be hired, and they may be
21   hired by NECS or they may be hired by Inner
22   Circle, but they are definitive plans with
23   definitive individuals that will be hired, yes.
24   Q    Can you tell us about that?
25   A    Sure. In EB-5 projects, such as this,

Page 37

1    we need consulting services that are for customer
2    interface. So there is a company out of
3    Pennsylvania that we will retain, American -- ARM
4    is the name of the company. We will retain that
5    company -- provided they agree to it, we will
6    retain that company to provide customer interface
7    services. NECS will do that as part of the
8    construction supervision and fit-out. They
9    provide recommendations for certain kinds of
10   fit-out, if you will.
11        We will retain an FF&E individual.
12   Q    What's that?
13   A    A furniture, fixtures, and equipment
14   individual that NECS or ICPS will retain an
15   individual. Discussions are underway currently
16   for the retention of that individual for that
17   services -- those services.
18        We will at some -- we have -- we will
19   -- we will retain additional people for site
20   control, beyond what McGuire has done and beyond
21   what Andrew Stenger is doing. There are
22   additional people that will be hired for site
23   control to watch over certain things that are
24   being performed on behalf the limited
25   partnerships -- the limited partners, excuse me.

Page 38

1    We will retain -- I believe we will
2  retain additional people for qualification and
3  verification of equipment. Those will be 2014
4  hires -- or contracts, not hires, contracts.
5      Q   And this is for the AnC Bio --
6      A   Yes.
7      Q   -- project?
8      A   Yes.
9      Q   Do you have any business or personal
10 relationship with anyone in that Pennsylvania
11 company?
12     A   No.
13     Q   How about the FF&E?
14     A   No -- I'm sorry. No. I take that
15 back. The FF&E person is a Jay Peak employee.
16 That is a Jay Peak FF&E employee who we will
17 hopefully attract away from Jay Peak and put to
18 work on AnC Bio projects.
19     Q   We're going to take a quick break.
20     A   You asked that we finish questions
21 before we take breaks. There's one more. There
22 will be probably be an IT person hired for -- to
23 work for me, to review and supervise IT
24 operations under AnC.
25     Q   I appreciate it. Thank you so much.

Page 39

1      MS. FUCHS-SINDLER:  Okay. We'll go off
2  the record for a quick break.
3      (Whereupon, at 11:06 a.m., a short
4  recess was taken.)
5      MS. FUCHS-SINDLER:  We're back on the
6  record after a short break.
7      BY MS. FUCHS-SINDLER:
8      Q   During that time, we had no
9  substantive conversations; is that correct, Mr.
10 Kelly?
11     A   Correct.
12     Q   Okay.
13     So we were talking about companies that
14 Inner Circle or NE -- Northeast was planning to
15 retain. And, again, I wasn't sure, why is it in
16 some instances that it's Inner Circle doing the
17 contracts and why in some instances Northeast?
18     A   Because Northeast Contract Services
19 engages Inner Circle, me, and for the purposes --
20 really for the purposes of tax reporting, and
21 it's easier if I do it all under one company.
22     Q   Does Inner Circle do any work, other
23 than for Northeast Contract Services?
24     A   Yes.
25     Q   What does it do?

Page 40

1      A   It provides business counsel services
2  to Mr. Quiros and his companies.
3      Q   Any --
4      A   It also provides counsel -- business
5  counsel services to non-Mr. Quiros companies.
6  Primarily, Mr. Quiros companies.
7      MR. JAMES:  And before you get to Mr.
8  Quiros's companies, what other companies,
9  non-Quiros companies, does that entity provide
10 services to?
11     THE WITNESS:  Burke Mountain. It has
12 provided services to other companies, but not
13 under contract basis, so ad hoc services or
14 contracts every once in a while.
15     And then it provides services to
16 insurance companies, insurance agencies, claims
17 management companies. Most of those are either
18 New York or Florida based.
19     MR. JAMES:  And are those under
20 contract, also?
21     THE WITNESS:  Yes, those are always
22 under contract.
23     MR. JAMES:  So currently you're
24 providing business counseling services to Burke
25 Mountain. Are you currently providing these

Page 41

1  services to any of these ad hoc?
2      THE WITNESS:  Not under contract.
3  There have been a number of contracts, but
4  currently not under contract; although, there are
5  discussions with Inner Circle and those companies
6  today.
7      MR. JAMES:  Okay.
8      And is there any current contracts with
9  any of the insurance agencies?
10     THE WITNESS:  No. Under discussion.
11 They are under discussion. No contract at this
12 point, but there have been contracts in the past.
13     MR. JAMES:  Okay.
14     And you described Burke Mountain as a
15 non-Quiros?
16     THE WITNESS:  No. That's a Quiros
17 company. It is a Mr. Quiros company.
18     MR. JAMES:  Okay.
19     BY MS. FUCHS-SINDLER:
20     Q   If you could tell us the services --
21 when you said provided to Mr. Quiros's companies,
22 which are you referring to?
23     A   Burke Mountain.
24     Q   Just Burke Mountain?
25     A   Yes. Burke mountain is the only

Page 42

1  contracted company that I provide services to Mr.
2  Quiros to at this point, other than AnC Bio
3  Vermont, LLC.
4      Mr. Quiros has various business
5  interests where he will ask me -- it's not
6  necessary to have a contract. I'll provide the
7  services without a contract.
8    Q   In what instances are those?
9    A   He may need a contract done for
10  something, and I have a particular specialty in
11  creating and writing contracts, and so I will
12  write a contract for him for something, as I will
13  other non-Mr. Quiros.
14      My point is that there are contract
15  services that Inner Circle Professional Services
16  provides to clients. And then there are ad hoc
17  that are done without contracts. There have been
18  both.
19    Q   What percentage of Inner Circle's work
20  is provided to Mr. Quiros or his company?
21    A   Ninety percent.
22      MS. LAMA: When was Inner Circle formed
23  again? You may have mentioned this before.
24      THE WITNESS: Inner Circle was -- I
25  think we formed in 2009, I believe, Michelle. I

Page 43

1  was operating individually before formalizing
2  that into a company in 2009.
3      I've been providing business counsel
4  services to companies since 1994, and under
5  contracts.
6      MR. JAMES: When you say business
7  counsel service, what exactly is that?
8      THE WITNESS: Advice. Advice.
9  Typically, contractual counsel -- counseling.
10      MR. JAMES: We're talking about like
11  formation? We're talking about --
12      THE WITNESS: Corporate formation in
13  some cases. More often contract drafting for
14  transactions.
15      MS. LAMA: What kinds of transactions?
16      THE WITNESS: Companies might engage me
17  to look at insurance contracts that exist between
18  an insurance company and a client, claims
19  contracts that might exist between insurance
20  companies and clients, agency services contracts
21  that would exist between an insurance company and
22  a client.
23      Claimant companies might engage me to
24  look at representative agreements between
25  insurance companies and claim companies.

Page 44

1      Insurance companies might engage me to
2  look at policy formations under ISO policy,
3  Insurance Services Offices policy formations --
4  or policy protocols.
5      Those kinds of services are the types
6  of services that I've been providing since 1994.
7  And in 2008 or 2009, I formalized it into Inner
8  Circle Professional Services and began to write
9  the contracts through that company.
10      BY MS. FUCHS-SINDLER:
11    Q   Do you provide any legal services,
12  too?
13    A   No. No. I have an understanding of
14  legal principles. I do have a JD, so I have
15  understanding of legal principles, and I will
16  incorporate that into my business advice.
17    Q   And the compensation that Inner Circle
18  receives from Mr. Quiros or his company, how is
19  that paid, like through which entity?
20    A   Through the entity that engages me. So
21  for instance, Burke Mountain engages me and Burke
22  Mountain pays me -- or pays Inner Circle
23  Professional Services.
24      AnC Bio Vermont, LLC, engages NECS, who
25  they understand in full disclosure engages Inner

Page 45

1  Circle, and it's paid from AnC Vermont, LLC or
2  from the limited partnership that they are
3  working on behalf of. And those are always
4  either by check or wire transfers.
5      MS. LAMA: And how much compensation or
6  fees has Inner Circle received in connection with
7  AnC Bio -- or from AnC Bio?
8      THE WITNESS: I think that number is a
9  million, eight, but, again, I would really need
10  to do a calculation. But I can tell you it's
11  thirty-two percent of the prescribed fees paid,
12  basically, on a monthly basis, because the
13  contract between the limited partnerships and the
14  construction and fit-out are a monthly basis
15  contracts.
16      Again, the fees to NECS track precisely
17  with the construction or fit-out of the project.
18  So as the project pays construction or fit-out
19  expenses, NECS is then paid a percentage of that.
20  NECS retains its earned percentage of that. It
21  returns the rest to the sponsor company, all as
22  prescribed by the offering memorandum.
23      MS. LAMA: What do you mean by retains
24  its earned percentage and returns the rest to --
25      THE WITNESS: The contract between NECS

Page 46

1  and the limited partners and the AnC Bio Vermont,
2  LLC, is specific that for of the twenty percent
3  construction supervision fees to be paid, fees
4  and expenses to be paid, that NECS's portion of
5  that and NECS's work under that is limited to
6  thirty-two percent, cannot exceed thirty-two
7  percent.
8       NECS then performs those services for
9  the limited partners and for AnC, the sponsor
10  company, and returns the remainder of the twenty
11  percent fees to the sponsor company, as
12  prescribed by contract, and as prescribed by the
13  offering memorandum. So all of that is kind of
14  by protocol.
15       MS. LAMA: And so just to clarify,
16  that's the sixty-eight percent you referred to in
17  terms --
18       THE WITNESS: Yes. That is what goes
19  back to the sponsor company.
20       MS. LAMA: Which is the sixty-eight
21  percent --
22       THE WITNESS: Of the twenty percent.
23       MS. LAMA: -- of the twenty percent?
24       THE WITNESS: Yes. I'm sorry. Yes.
25  Yes, ma'am.

Page 47

1       MS. LAMA: And when you say sponsor
2  company, who -- or actually when the funds are
3  returned, who are the funds returned to? What
4  entity?
5       THE WITNESS: Whoever the sponsor
6  company tells me too, frankly. I mean, they
7  delegate. They give me wire instructions, and I
8  send them to that. The sponsor company gives me
9  wire instructions to send them to.
10       MS. LAMA: Okay.
11       So in the case of AnC Bio --
12       THE WITNESS: Yes.
13       MS. LAMA: -- who or what entity are
14  the funds returned to?
15       THE WITNESS: I think I've returned
16  them to, again, whoever the AnC Bio Vermont
17  delegates, but I think they have gone back to
18  different bank accounts. I don't know who the
19  bank accounts are. I mean, I can tell that I
20  think some of them is GSI has received some of
21  the funds. But they are directed to me by AnC
22  Bio Vermont, LLC, and I remit the funds to
23  whoever that company tells me to send them to.
24       MS. LAMA: Okay. So in addition to
25  GSI, what other entities have the funds been

Page 48

1  remitted to?
2       THE WITNESS: None. I think they've
3  all gone to either GSI or AnC Bio Vermont, LLC.
4       BY MS. FUCHS-SINDLER:
5       Q   And who at the sponsor company gives
6  you the instructions as to where to send that
7  money?
8       A   William Stenger and Ariel Quiros, the
9  -- the owners of the sponsor company.
10       Q   And how do they give you those
11  instructions?
12       A   I believe the secretary sends me the
13  wire instructions.
14       Q   Whose secretary?
15       A   Mr. Quiros's secretary sends me the
16  wire instructions.
17       Q   What's her name?
18       A   Katia. I don't know her last name, to
19  be honest with you.
20       Q   Has Mr. Stenger ever sent you
21  instructions?
22       A   Not that I know of.
23       Q   Or anyone act like his assistant?
24       A   Not that I know of.
25       Q   It's always come from Katia?

Page 49

1       A   It's always come from Mr. Quiros.
2       Q   It's always come from Mr. Quiros.
3       A   Mr. Quiros, certainly.
4       Q   Okay. So when you said Mr. Stenger or
5  Quiros gives the instructions, why did you say
6  that?
7       A   Because they own the company, and the
8  contract is with them.
9       Q   Oh, so they have authority to give you
10  the instructions?
11       A   That's correct.
12       Q   But the one who's actually giving you
13  the instructions is always Mr. Quiros; is that
14  correct?
15       A   Correct. That's correct.
16       MS. LAMA: And when you say contract,
17  which contract are you referring to?
18       THE WITNESS: That is the contract that
19  exists between Northeast Contract Services and
20  AnC Bio Vermont, LLC for the provision of the
21  construction and fit-out of the site services. I
22  believe I have submitted that contract to you.
23       MR. JAMES: Regarding the instructions
24  as to where to send that sixty-eight percent,
25  what form is that in? Is it in some type of memo

Page 50

1    from Mr. Quiros to yourself?  Is that an Email?
2         THE WITNESS:  He's just told me where
3    to send it, and I -- and I remit it to that
4    company, and then I confirm that they got it.
5         MR. JAMES:  How does he tell you that?
6    How does he communicate that information to you?
7         THE WITNESS:  I think probably
8    verbally, frankly.  I mean, I could look to see
9    whether or not I ever have a note that he has
10   written to me about that, but it's told to me
11   verbally.
12        MR. JAMES:  So as far as bank account
13   informations, so he calls you up, and he says,
14   send it to GSI's bank account --
15        THE WITNESS:  Yes.  And that's where I
16   usually get that, either from a phone call from
17   Katia.  And I will look to see whether or not
18   there's actually a note that's come to me for
19   that, but it's typically for that.  Once I set it
20   up once in my wire transfer template, it doesn't
21   come again.  I just automatically do it.  It's
22   required by contract.
23        (Ms. Lama leaves the room.)
24        MR. JAMES:  Okay.
25        And do you retain some type of

Page 51

1    recordkeeping of all the different amounts that
2    were wired?
3         THE WITNESS:  Oh, of course.  Yes, of
4    course.
5         MR. JAMES:  And then what form is that
6    kept in?  What exactly do you have?
7         THE WITNESS:  A record of wire
8    transfers to AnC Bio Vermont or their delegate,
9    pursuant to the contract.  I actually have a file
10   for that, of course.
11        BY MS. FUCHS-SINDLER:
12        Q    And when you say you keep that, is
13   that Inner Circle that keeps that or Northeast
14   Contract Services?
15        A    Northeast Contract Services.
16        Q    Okay.
17        So when Katia gives you the
18   instructions, do you -- is that just confirming
19   the construction -- the instructions that Mr.
20   Quiros has given you?
21        A    Yes.  And, again, the instructions are
22   given one time --
23        Q    Sir, we have to pause one moment.  We
24   apologize for the intrusion.
25        A    The instructions were given at one

Page 52

1    point, and I created a wire transfer template for
2    that in NECS's banking environment, and that's
3    where they go every month.  If there's a change
4    to that, I would get instructions to the change.
5         Q    And you would get those instructions
6    from Mr. Quiros?
7         A    From Mr. Quiros telling me that there
8    will be a change in the wire instructions, and
9    then I would typically get those from Katia, from
10   his secretary.
11        And that would happen -- I mean, I
12   can't even tell you whether that has ever
13   happened, but it may have happened once, so that
14   the wiring -- the wire from me is a templated
15   wire and it happens by protocol.
16        MR. JAMES:  So for the most part, the
17   template is for the money to go to GSI of Dade
18   County?
19        THE WITNESS:  I believe the account
20   they have delegated is to GSI of Dade County.
21        BY MS. FUCHS-SINDLER:
22        Q    Do you know what GSI of Dade County
23   is?
24        A    GSI of Dade County is a company owned
25   by Mr. Quiros.

Page 53

1         Q    And how do you know this?
2         A    Oh, because I've been around Mr. Quiros
3    for twenty-two years.
4         Q    I'm sorry.  For how long?
5         A    About twenty-two years.
6         MR. JAMES:  Do you have a role or a
7    function with GSI?
8         THE WITNESS:  I do not.  I never have.
9         BY MS. FUCHS-SINDLER:
10        Q    Do you know what GSI of Dade County
11   does?
12        A    I don't know that -- I believe it is a
13   holding company at this point.
14        MR. JAMES:  You said at this point.
15   Was it --
16        THE WITNESS:  It was at one point a
17   trading company.  It was -- it was a company that
18   I think did significant amounts of work with
19   foreign countries for trading of goods,
20   international trade.
21        BY MS. FUCHS-SINDLER:
22        Q    When you say trading of goods, what do
23   you mean?
24        A    Trading for commerce, for trading of
25   goods.  I think in particular the company may

Page 54

1  have worked for the country of South Korea, for
2  the government of South Korea.
3      I know they were involved in
4  international trade procuring goods and services
5  around the world typically for the country of
6  South Korea.
7      Q   And before, you mentioned there's a
8  contract between NECS and AnC Bio.  Is there also
9  a separate contract between AnC Bio or its
10 sponsor or any related entities and Inner Circle?
11     A   There's a contract between NECS and
12 Inner Circle, but not between AnC Bio and Inner
13 Circle.
14     Q   Okay.
15     A   In that contract between NECS and Inner
16 Circle is a familiar contract in that I am the
17 signer on both sides, but I document the
18 functions that will be provided, so that there's
19 clarity.
20     MR. JAMES:  Any particular reason why
21 it's structured that way?
22     THE WITNESS:  No.  Just because I have
23 provided services under Inner Circle Professional
24 Services for so much time.  It is where I am an
25 employee.  It is where I receive funds, report to

Page 55

1  the Internal Revenue Service, so that -- simply
2  for convenience.
3      It is me.  I am the only owner, and I'm
4  the only employee of Inner Circle.  So my
5  services are provided and documented there and
6  controlled there.  That's all.  Control and
7  convenience.
8      MR. JAMES:  And then you said that GSI
9  now functions as a holding company?
10     THE WITNESS:  I believe it does.
11     MR. JAMES:  And can you tell me more
12 about that as far as any assets or --
13     THE WITNESS:  I have no idea.  I'm not
14 related to GSI at all.  I -- you know, I simply
15 -- the wire transfers go to that entity, as
16 directed by AnC Bio.  I don't know anything about
17 the substance of that company.
18     MR. JAMES:  Okay.  But when you
19 described it as a holding company, you just based
20 on --
21     THE WITNESS:  I believe -- I believe
22 it's a holding company.  I don't know if it's a
23 holding company.  I believe it's a holding
24 company.
25     MR. JAMES:  Okay.

Page 56

1      BY MS. FUCHS-SINDLER:
2      Q   And to date, how much money has gone
3  to GSI from what you just described?
4      A   Again, I'd have to do the calculation,
5  but I can tell you that it is probably -- it is
6  -- all of the funds that have been paid under
7  construction and supervision fees pursuant to the
8  offering memorandum to NECS minus thirty-two
9  percent.  I can do that calculation, if you give
10 me time to do that, but I can do that.  I mean, I
11 --
12     MR. GORDON:  I don't think they're
13 asking you to do the math.
14     THE WITNESS:  Okay.  I can do that, but
15 okay.
16     BY MS. FUCHS-SINDLER:
17     Q   So all that has gone to --
18     A   Certainly, all of that is of record
19 that can be produced for NECS in terms of wire
20 transfers, all of those.
21     Q   It's all gone to GSI?
22     A   All gone to whatever bank account I
23 have been directed.  I believe that is always
24 GSI.  And, again, I say that because I'm always
25 really operating off of a template, that when the

Page 57

1  time comes and the fees are paid, it is within a
2  prescribed period of time returned, and I return
3  it to that template.
4      MR. JAMES:  Does NECS hold any bank
5  accounts?
6      THE WITNESS:  Yes.
7      MR. JAMES:  At what banks?
8      THE WITNESS:  People's Bank Vermont.
9  People's United Bank, I think is the actual name
10 of the bank.  People's United Bank in Vermont.  I
11 believe that's disclosed here.
12     BY MS. FUCHS-SINDLER:
13     Q   You're looking at your background
14 questionnaire?
15     A   Yes.
16     Yes.  The very last account identified
17 on my background questionnaire is, People's Bank
18 Vermont, business checking, account number, and
19 no to discretionary authority by anyone else.
20     MR. JAMES:  That's the NECS --
21     THE WITNESS:  That is an NECS bank
22 account, yes.
23     MR. JAMES:  And just for while we're
24 into list of bank accounts, are -- I know some
25 are personal --

Page 58

1     THE WITNESS: All of the other -- all
2  of the other business accounts are Inner Circle
3  Professional Services.
4     MR. JAMES: Okay. That was going to be
5  my question.
6     Let's just go through it just to make
7  sure. Going back to page five. The first one is
8  at SunTrust?
9     THE WITNESS: Yes.
10    MR. JAMES: A business checking ending
11 in 9480?
12    THE WITNESS: Yes.
13    MR. JAMES: Please tell me who that is.
14    THE WITNESS: Inner Circle Professional
15 Services. Anything that says business, other
16 than the last one, will be Inner Circle
17 Professional Services.
18    MR. JAMES: Okay. Including like I see
19 this money market?
20    THE WITNESS: All of those are Inner
21 Circle Professional Services. They are either
22 Inner Circle Professional Services, if it says
23 business. They are myself and my wife, if they
24 say personal. And they are NECS as to the last
25 entry.

Page 59

1     MR. JAMES: Okay. Perfect. Thank you.
2  BY MS. FUCHS-SINDLER:
3  **Q   So going back, I know we had talked**
4  **earlier about your role with NECS, and I**
5  **understand you, you know, told us about the —**
6  **who it contracts out with. But what do you**
7  **yourself do in connection with your role with**
8  **NECS?**
9  A   Supervise those contracted individuals
10 and supervise operations. So I personally attend
11 all of the meetings. I personally attend every
12 permit hearing. I personally attend every
13 charette for design. I personally attend every
14 construction debate. So I personally attend all
15 of those functions and manage of all of those
16 events and functions.
17    There are a series, of course, of
18 permits, state, federal, local permits. Each
19 permit must be -- most permits go through hearing
20 processes. Every permit goes through a
21 preliminary process. Every permit goes through a
22 fact-finding and data-finding process.
23    Every design phase goes through both
24 charettes, which are meetings with users, end
25 users, for the design of the facilities. Those

Page 60

1  are typically all over the country depending upon
2  where the engineers, the particular engineers
3  are, the designers are.
4     There are -- and, of course, then
5  preconstruction and construction meetings. I
6  oversee and manage all of the pay applications
7  for the limited partners for any pay application
8  that goes out to any preconstruction architect,
9  engineer, construction vendor. Not every vendor,
10 but every one in those -- in those environments,
11 those industries.
12    MR. JAMES: And these pay applications
13 are from the vendors submitting for payment for
14 the work that they've performed?
15    THE WITNESS: In an EB-5 project, in an
16 EB-5 project that I've ever worked with, there's
17 a protocol for pay for any vendor, and it's quite
18 -- it's quite thorough. There is a requirement
19 for a vendor to submit an invoice under a
20 prescribed set of rules.
21    Once that vendor submits the invoice,
22 it typically requires a second party, often times
23 an architect or an engineer, to sign off. So if
24 a construction company is pouring cement, it
25 requires an architect to sign off that that is

Page 61

1  the correct cement or concrete before that
2  concrete vendor can be paid. An architect must
3  sign off and say it actually applies to plans.
4     And that goes throughout the
5  construction process. If a framer is providing
6  services, before that framer can provide an
7  invoice and before that invoice can be paid, it
8  requires an architect to sign off to say that is,
9  in fact, what was ordered.
10    Subsequent to that architects signing
11 off, it will come to me, and then I will review
12 it again. If I believe the invoice is
13 appropriate, I will submit it to a financial
14 person. That financial person will then request
15 the general partner of the limited partnership
16 approve that particular invoice.
17    The limited -- the general partner of
18 the limited partnership will then go back to the
19 financial person and require the movement of the
20 money into an operating account from a holding
21 account. The movement of the money takes place,
22 and then the financial person comes back in to
23 approve the actual invoice being paid, the wire
24 transfer or check being written to that vendor.
25    So the vendor goes through a number of

Page 62

1  steps before they can be paid. And at least
2  three of four people must approve every -- every
3  invoice before it can be paid. And in the middle
4  of all that, I'm one of those people, that beyond
5  being at the meetings, you asked me, Trisha, I'm
6  also the person who reviews the pay applications
7  for vendor services in the construction and
8  fit-out part of the project.
9  (Ms. Lama enters the room.)
10  MR. JAMES: Okay.
11  Let me just walk you through that just
12  to make sure I get it. So we would go back and
13  the vendor performs whatever construction,
14  fit-out work they perform.
15  THE WITNESS: Yes.
16  MR. JAMES: And it is -- earlier you
17  mentioned, monthly payouts. Is this also on a
18  monthly basis?
19  THE WITNESS: Typically, those things
20  -- we -- those are paid on a monthly basis.
21  They're not performed on a monthly basis, but
22  they're typically paid on monthly basis. Yes, in
23  all cases.
24  MR. JAMES: So whatever work then
25  that's performed for this month, they submit an

Page 63

1  invoice?
2  THE WITNESS: Correct.
3  MR. JAMES: Okay.
4  And then you said then that invoice is
5  first submitted to either the architect or the
6  engineer for them to confirm that that work
7  that's being invoiced has actually occurred?
8  THE WITNESS: Reviewed by an architect,
9  an engineer, or someone who has special knowledge
10  of that particular invoice.
11  MR. JAMES: Okay.
12  THE WITNESS: But, typically, it's an
13  architect or engineer, and they must sign off on
14  it.
15  MR. JAMES: Okay.
16  And as far was what actually has
17  transpired, is that architect/engineer Mr.
18  McGuire?
19  THE WITNESS: No. No. No. That
20  architect -- well, Mr. McGuire may have been an
21  architect -- an engineer, not an architect, an
22  engineer who has signed off on an particular --
23  but he -- I don't believe Mr. McGuire has ever
24  signed off on an invoice of someone else. Mr.
25  McGuire has provided invoices himself, but I

Page 64

1  don't believe he has.
2  However, for any subcontractor or
3  contractor providing services to the limited
4  partnership, those are done through that process.
5  The limited partnerships are never paying an
6  invoice without that process taking place.
7  NECS may pay an invoice without that
8  process taking place.
9  MR. JAMES: Okay.
10  THE WITNESS: If I'm -- if I'm
11  personally -- if I am contracting with a vendor
12  to do work for NECS, that's different than if we
13  are asking a payment to come from the limited
14  partnership through the chain to a vendor.
15  MR. JAMES: But that latter example, is
16  the payment going from the partnership directly
17  to the vendor, does that occur, or does all the
18  payments go through NECS?
19  THE WITNESS: No. No. No. No. No.
20  They go directly to the vendor in those cases.
21  The only thing that comes to NECS will be for
22  construction supervision fees.
23  Invoices that are -- that are submitted
24  to the limited partnership for construction are
25  paid by the limited partnership to either the

Page 65

1  general contractor or to a subcontractor, but
2  that process takes place before they can be paid.
3  MR. JAMES: Okay.
4  So the architect or engineer that's
5  signing off on that vendor's invoice directly to
6  the limited partnership, who is that entity or
7  individual?
8  THE WITNESS: Gardner Kilcoyne is the
9  actual company.
10  MR. JAMES: Can you spell that for me?
11  THE WITNESS: G-A-R-D-N-E-R, Kilcoyne,
12  K-I-L-C-O-Y-N-E. Excuse me. I'm sorry. I'm
13  sorry. That is wrong. Forgive me. The
14  architect in this case is NNE Pharma Plan. I'm
15  sorry. I apologize.
16  MR. JAMES: NNE --
17  THE WITNESS: NNE Pharmaplan,
18  P-H-A-R-M-A-P-L-A-N. They're a worldwide
19  engineering firm. Their offices -- their
20  headquarter offices are in the United States in
21  Morrisville, North Carolina.
22  MR. JAMES: Okay.
23  Where else do they have offices?
24  THE WITNESS: All over the country, but
25  the only offices that I deal with them are in

Page 66

1  western North Carolina, one in Boston. Those are
2  the two.
3      NNE, they are a subsidiary of Nova
4  (sic) Novartis. I'm sorry. I can't -- it's a
5  Danish company that I have a hard time with the
6  name. Nova Novartis is the actual company.
7  They're a very, very large pharmaceutical
8  company.
9      They own a pharmaceutical design firm,
10  NNE Pharmaplan, and that who has been -- that is
11  the retained architect and engineering firm who
12  is designing all of the AnC Bio.
13      They have not had occasion yet to pay
14  off on an invoice, because there has not been any
15  construction done yet on the building.
16      MR. JAMES: For AnC Bio?
17      THE WITNESS: For AnC Bio.
18      All that has been done to this date is
19  abatement and demolition of that building -- of
20  the existing facility. But they will be the
21  architect that will sign off on every invoice
22  being paid for construction under their plans.
23      MR. JAMES: Okay.
24      But as you sit here today, they have
25  yet to perform that function because --

Page 67

1      THE WITNESS: That's correct. That's
2  correct.
3      MR. JAMES: -- the construction invoice
4  --
5      THE WITNESS: That's correct.
6      MR. JAMES: You have to let me finish.
7      THE WITNESS: Oh, I'm sorry. I'm
8  sorry.
9      MR. JAMES: Okay. And then just for
10  completeness, you mentioned Gardner Kilcoyne --
11      THE WITNESS: Yes. That's another
12  architectural firm in Vermont. I'm sorry. I
13  apologize.
14      MR. JAMES: Okay.
15      And then have you engaged their
16  services on prior project?
17      THE WITNESS: Yes. Yes. Yes, I've
18  used them.
19      MR. JAMES: So they've done this
20  function, the architect approving work invoice,
21  for earlier projects?
22      THE WITNESS: Yes.
23      MR. JAMES: Okay.
24      And now, for AnC Bio, NNE will be
25  performing that service?

Page 68

1      THE WITNESS: Yes. NNE today is the
2  engaged architectural design firm -- architect
3  and engineer design firm for the AnC Bio project.
4      They will be -- they don't know it yet,
5  but they will be engaged as what we will refer to
6  as the construction administration piece. Each
7  architectural firm for a project, a building
8  project, includes design. It includes
9  feasibility study of designs and, ultimately,
10  construction administration.
11      The part that I'm talking about is
12  construction administration. They will be --
13  they don't know that yet, but they will be --
14  they propose to be, and they will be. So they
15  have been retained for everything up to that
16  point, but when construction begins, they will be
17  engaged as the construction administration,
18  architect, and engineer, and they will sign off
19  on every construction piece that's done.
20      MR. JAMES: Okay.
21      And are there any current contracts
22  between NNE and any of the entities you've
23  mentioned today?
24      THE WITNESS: Yes. Oh, yes. They're
25  operating under contract today. They are

Page 69

1  designing the AnC Bio facility.
2      MR. JAMES: Okay.
3      So the contract is between NNE and what
4  entity?
5      THE WITNESS: The contracts are between
6  NNE and I believe the sponsor company, AnC Bio
7  Vermont, LLC.
8      MR. JAMES: And it's just one contract?
9      THE WITNESS: One contract, yes.
10      MR. JAMES: So once -- in this
11  instance, and, obviously, it hasn't occurred yet,
12  but just whether you want to refer to NNE or
13  Gardner in the past, so once the architect
14  confirms that the work being invoiced has been
15  performed, you then do a second review of that
16  work and also approve?
17      THE WITNESS: That's correct. I look
18  at those invoices as well. In that particular
19  case, I would rely on the expertise of the
20  architect to know what they're talking about, of
21  course. In other cases, it would be my review of
22  what has been done that would create the
23  authority to pay that invoice.
24      MR. JAMES: Okay.
25      And then just -- so the actual invoice

Page 70

1  itself by the vendor, is that sent directly to
2  the sponsor, or is that sent --
3       THE WITNESS: To the limited
4  partnership company.
5       MR. JAMES: It's sent to the limit
6  partnership?
7       THE WITNESS: Yes. I only be careful,
8  because some of those invoices are sent to a
9  general contractor, who then sends them to the
10  limit partnership company.
11       MR. JAMES: Okay.
12       So once you approve the architect's
13  approval of the invoice, you said that it's
14  submitted to the financial person?
15       THE WITNESS: Once the invoice is
16  approved by the party who is approving, in this
17  case the architect, it would then go to a
18  financial person, who would then request payment
19  by the general partner of the limited
20  partnership.
21       The general partner would then review
22  offering document materials and authorize the
23  payment to be paid to the vendor. The financial
24  person would then request the deposit of the
25  funds into an operating account, into a limited

Page 71

1  partnership operating account, from a limited
2  partnership holding account into a limited
3  partnership operating account, and then the
4  invoice would be paid by that financial officer.
5       It takes at least three people for an
6  invoice to be paid by the limited partnerships.
7       MR. JAMES: Let's see if we can attach
8  some names to these roles. So the financial
9  person would be who in this instance?
10       THE WITNESS: George Gulisano.
11       MR. JAMES: So once Mr. Gulisano
12  receives the request for -- sorry. Once you
13  submit the invoice to Mr. Gulisano and made the
14  request for payment, does he do anything else, as
15  far as any additional approvals or confirmation
16  of the invoice?
17       THE WITNESS: No. No. He simply moves
18  the funds or requests for a movement of the funds
19  from a holding account to a payable account.
20       MR. JAMES: Okay.
21       And who is he making that request to?
22  You said the GP.
23       THE WITNESS: Mr. Quiros, or to the
24  general partner at that point, yes, Mr. Quiros or
25  Mr. Stenger.

Page 72

1       MR. JAMES: Is it both or one or the
2  other?
3       THE WITNESS: It could be either. It's
4  more often Mr. Stenger than Mr. Quiros.
5       MR. JAMES: Okay.
6       And then Mr. Stenger gets this request
7  for transfer of funds and --
8       THE WITNESS: Moves them into the
9  operating account, and then Mr. Gulisano comes
10  back in and makes the payment to the vendor.
11       MR. JAMES: Okay.
12       So now we just have some construction
13  that has occurred. We have an invoice submitted
14  for payment, confirmation of work being actually
15  performed, and authorization for a payment of
16  that construction.
17       Where in this process is that twenty
18  percent for construction supervision? Is that --
19  does that come out of this at all or on top of
20  this?
21       THE WITNESS: Yes. In the process, all
22  construction or fit-out invoices need to pass in
23  front of me.
24       MR. JAMES: Okay. Tell us that aspect
25  of the process.

Page 73

1       THE WITNESS: They're submitted to me
2  after the architect or -- or whatever -- whoever
3  the signing off entity is. Once that entity has
4  signed off, they will pass by me. And then when
5  they pass by me, I will typically sign them, that
6  I have also approved them to be paid.
7       MR. JAMES: Okay.
8       And then it is the request that
9  actually goes for payment. Is there a component
10  of that that's identified as supervision fee for
11  that work?
12       THE WITNESS: No. No. I mean, that's
13  just part of the larger process of overseeing the
14  construction and fit-out.
15       So the oversight of the construction
16  and fit-out is ninety percent substantive in
17  terms of being on site, looking at erosion
18  control, looking at ANR, the natural resources,
19  looking at environmental controls, looking at --
20  and reporting to authorities every day on what's
21  happening in the -- in the performance of that
22  contract. Looking at the invoices that come in
23  to the limited partnership is one small piece of
24  it, but it does go by me for that -- for those
25  services.

Page 74

1    Now, the limited partnership might be
2  doing something entirely different that I would
3  not have anything to do with, but that's a
4  separate -- that's a separate function. The
5  construction supervision is only of construction
6  equipment and fit-out.
7    MR. JAMES: Okay.
8    So to the extent this process is
9  happening for construction invoices, I'm trying
10  to understanding when the fifteen and five
11  percent of the total of twenty percent of
12  construction supervision, when that is earned?
13  When is that paid?
14    THE WITNESS: When a construction
15  invoice is, ultimately, paid by that process,
16  then an invoice will be submitted by NECS for
17  twenty percent of those funds. That wire
18  transfer will take place by the limited
19  partnership. NECS will then engage Inner Circle
20  Professional Services for its role, and it will
21  return the sixty-eight percent to the sponsor
22  company for its role.
23    MR. JAMES: So we have a construction
24  invoice comes in, approved by architect, comes to
25  you. And then -- maybe I'm just not following.

Page 75

1  So at that point in time, do you then pull out
2  your calculator and say, well, this invoice is
3  for one million dollars for construction work,
4  it's approved by the architect that the work
5  actually occurred, do you now do one million
6  dollars times twenty percent?
7    THE WITNESS: Yes. Yes. Yes, sir.
8    MR. JAMES: Okay.
9    Okay. And then -- so then you come up
10  with the construction supervision on top of that
11  invoice amount?
12    THE WITNESS: Not on top, of separate
13  from, but, yes.
14    MR. JAMES: But it's based on the
15  amount of the invoice?
16    THE WITNESS: Yes. Yes, sir.
17    MS. LAMA: In the case of AnC Bio, what
18  kinds of invoices have been -- have gone through
19  this chain in which NECS has applied this twenty
20  percent?
21    THE WITNESS: The -- there's a contract
22  between the limited partnership and the
23  procurement company. The procurement company is
24  a company that is designed -- that is a US-based
25  company that is designed to be the gatekeeper, if

Page 76

1  you will. You can use a number of different
2  terms, too.
3    The limited partnership pays that US
4  company, that procurement company, on a monthly
5  basis. The limited partnership, the general
6  partner and that company came to terms early on
7  about paying the prescribed amounts in the
8  offering memorandum that are going to that
9  procurement company. They determined early on
10  that those payments would be made on a monthly
11  installment basis rather than on a per
12  performance basis, if you will.
13    So there is a contract that exists
14  between the limited partnership and JCM, a
15  Vermont-based US company, where the limited
16  partnership pays JCM installments of one
17  twentieth of their contract amounts every month
18  for twenty months.
19    The procurement duties of JCM are for
20  architectural fees, architectural services,
21  distribution rights, technology, if you will, and
22  equipment. So JCM is charged with procuring
23  those things for the limited partnership, and the
24  limited partnership pays that company one
25  twentieth every month.

Page 77

1    MS. LAMA: And how much is that?
2    THE WITNESS: Two point six million.
3  The total contract is fifty-two million. That is
4  made up of forty million dollars of equipment,
5  ten million dollars of distribution rights, and
6  two million dollars of architectural fees,
7  architectural engineering fees.
8    I believe fifteen payments have been
9  made to JCM from the limited partnership. And
10  for those portions of that that are based on
11  construction -- for those portions of that that
12  are applicable to construction supervision fees,
13  NECS has submitted a bill to the limited
14  partnership for those amounts.
15    So you could calculate, as I was about
16  to, twenty percent of two point six million
17  dollars, and those are the construction
18  supervision fees in many cases, not exactly, but
19  in many cases, not in every case, because there
20  are other things that are being acquired or
21  procured out of the two point six million dollars
22  that are not necessarily applicable to
23  construction supervision fees. And I do look at
24  those invoices before those invoices are
25  processed.

Page 78

1    MS. LAMA:  So based on your last
2  response, if fifteen payments have been made to
3  JCM from the LP, there have not necessarily been
4  fifteen invoices by NECS for construction
5  supervision, or there have been?
6    THE WITNESS:  I don't know if there's
7  been exactly.  But they're could've been fifteen
8  invoices, but it might not be exactly for the
9  same amount, because some of those invoices were
10  for other than construction supervision.
11    MS. LAMA:  Yes.  I'm sorry.  That's
12  what I meant.  So there have been fifteen
13  invoices --
14    THE WITNESS:  Yes.
15    MS. LAMA:  -- but not necessarily --
16    THE WITNESS:  For the same amount.
17    MS. LAMA:  -- for the amount of twenty
18  percent times two point six?
19    THE WITNESS:  Yes, that's correct.  I
20  -- I state that without having those invoices in
21  front of me, but I believe that is correct.
22    BY MS. FUCHS-SINDLER:
23    Q   **When you had mentioned sometimes it's**
24  **not always for construction supervision fees,**
25  **what else could it be for?**

Page 79

1    A   Distribution rights.  That's really the
2  only the exception.  In that scenario, the only
3  exception is distribution rights.  Part of that
4  fifty-two million dollar procurement contract is
5  for the procurement of ten million dollars of
6  distribution rights.
7    MS. LAMA:  And how --
8    THE WITNESS:  There's not construction
9  supervision applied there.
10    MS. LAMA:  Pardon me.
11    And how much has been paid to date
12  towards that ten million of distribution rights?
13    THE WITNESS:  All of it, I believe.
14    BY MS. FUCHS-SINDLER:
15    Q   **All ten million?**
16    A   All ten million, yes.  And I know that
17  the distribution rights and the patents and
18  technology applicable to that distribution rights
19  are in hand at the limited partnership today.  So
20  I presume all ten million of it has been paid,
21  since it's all been delivered.
22    MS. LAMA:  And when was that delivered?
23    THE WITNESS:  I don't know that.
24    MS. LAMA:  Was it recent?
25    THE WITNESS:  It's been over the

Page 80

1  fifteen-month period.  I don't -- I can't tell
2  you -- I can't tell you what date that was
3  delivered.  That would be outside of my purview,
4  but it was within that fifteen-month period.
5    MS. LAMA:  And I'm sorry.  You just
6  mentioned in hand.  How is it in hand?
7    THE WITNESS:  Because the distribution
8  contract is held in care, custody, and control of
9  the limited partnership at this point.  I believe
10  that's been produced as well.
11    Again, those parcels were disclosed and
12  identified specifically in the offering
13  memorandum to investors, exactly what was being
14  paid for distribution rights.
15    MS. LAMA:  And how is it that the
16  invoices reflect that a portion of that invoice
17  pertains to distribution rights?
18    THE WITNESS:  It doesn't.  It is simply
19  one part of a fifty-two million dollar contract.
20  But, presumably, the limited partnership, the
21  general partner, and the procurement company
22  agree on which pieces are paid under what
23  premise.
24    My position in that is to provide the
25  services on construction equipment supervision.

Page 81

1  And so I pay attention to that.
2    MS. LAMA:  So what's your understanding
3  then how that was paid out?
4    THE WITNESS:  My understanding is there
5  has been two point six million dollars paid to
6  the procurement company each month for fifteen
7  months.  I don't know that they were always
8  consecutive months, but for fifteen monthly
9  payments have been made to -- I believe almost
10  every month, have been made to the procurement
11  company by the limited partnership.
12    And I know that the distribution
13  agreement and the intended documents with that
14  distribution agreement were delivered at some
15  point to the limited partnership.  I know that
16  architectural fees have been paid on behalf of
17  the limited partnership through the procurement
18  company.  And I know equipment has been ordered.
19    And I can tell you that my
20  understanding of the distribution of those funds
21  and those processes are ten million has been paid
22  of distribution rights.  And I believe it's
23  because the original contract between the
24  procurement company and the limited partnership
25  called for an accelerated delivery of the

Page 82

1  distribution contract.
2      And about one point five million
3  dollars has been paid in architectural fees. And
4  about fourteen point five or fifteen million
5  dollars has been paid in equipment purchases, for
6  equipment purchases.
7      That is the breakout of what has been
8  paid between the limited partnership and the
9  procurement company to date that I know of.
10      MS. LAMA: And what is your basis for
11  understanding that breakdown?
12      THE WITNESS: I've reviewed the
13  procurement contract. And as part of the
14  preconstruction architect and engineering, there
15  is constant conversation and dialogue about the
16  equipment and what needs to be ordered and what
17  dates they need to be ordered.
18      So I understand -- I have a fairly
19  clear understanding, through my role as
20  construction supervision, attending every
21  engineering meeting and every architectural
22  meeting, as to what the requirements are earlier
23  and later for construction order -- for equipment
24  order.
25      MS. LAMA: Okay. I guess what we're

Page 83

1  trying to understand is, what determines what
2  piece of the two point six million goes into each
3  of these bucket? How is that determined?
4      THE WITNESS: I can't tell you. I
5  would have to -- I would have to review the
6  contract, but I believe the contract calls for an
7  acceleration -- an accelerated payment on the
8  distribution rights. But I would have to look at
9  the contract to tell you that.
10      MR. JAMES: And you testified that the
11  invoice itself does not delineate --
12      THE WITNESS: No, the invoice does not.
13  The invoice is a two point six million dollar per
14  month invoice, and that is pursuant to a
15  contract.
16      MS. LAMA: So, for example, when NC --
17  pardon me, NECS calculates its portion of the two
18  point six million, how do you determine what
19  piece you can apply the twenty percent to?
20      THE WITNESS: Because I take out any
21  portion that has been paid for the distribution
22  agreement.
23      MS. LAMA: And how do you determine
24  that?
25      THE WITNESS: Because I'm told that

Page 84

1  X-amount of money was paid for distribution.
2      MS. LAMA: And who tells you that?
3      THE WITNESS: At this point, Mr.
4  Quiros.
5      BY MS. FUCHS-SINDLER:
6  Q   At any point, was it someone else?
7  A   No. It's been Mr. Quiros.
8      MS. LAMA: And in how many instances
9  have you been told to exclude a portion from --
10  exclude a portion because it pertains to
11  distribution rights?
12      THE WITNESS: There were initially ten
13  million dollars of payments that were made that
14  were excluded. So there was a -- there was
15  initially I think a five point five million
16  dollar payment made. There were no -- there were
17  supervision fees taken on. And there were then
18  an additional remainder up to ten million
19  dollars, but no supervision fees were recovered
20  on.
21      MS. LAMA: Okay. And you said a five
22  point five million payment --
23      THE WITNESS: There was an initial five
24  -- excuse me. There was an initial five point
25  five million dollar payment made, I understand.

Page 85

1  I'm not privileged to that. But there was an
2  initial five point five million dollar payment
3  made to the procurement company.
4      MS. LAMA: Did you see that invoice?
5      THE WITNESS: I did not.
6      BY MS. FUCHS-SINDLER:
7  Q   And the procurement company is?
8  A   JCM.
9  Q   And when you said you're not
10  privileged to that, so how did you know about
11  that?
12  A   I was told. I was told that the -- in
13  fact, let me be clear about my statement. I was
14  told that a payment was made to -- a deposit
15  payment was made on the purchase of the -- the
16  procurement of the distribution rights of five
17  point five million, I believe.
18      Again, there are purchases or
19  procurements made that are not in the
20  construction supervision world, and those I am --
21  those are outside of my purview.
22  Q   And who told you about the five point
23  five million?
24  A   Mr. Quiros.
25  Q   When did he tell you?

Page 86

```
1      A   This is probably last year.  I cannot
2  tell you what date last year.
3      Q   How did he tell you?
4      A   Verbally.
5      Q   But why didn't you see a copy of any
6  documents?
7      A   It's outside of my purview.  What is
8  paid for, things other than construction,
9  preconstruction, architect preconstruction and
10 construction, are outside -- or equipment -- are
11 outside -- they're outside the purview of my
12 contract.  So he might share that with me, but he
13 has no requirement to.  That's general contractor
14 -- or general partner business.
15         MR. JAMES:  So are you receiving
16 invoices from the procurement company, JCM?
17         THE WITNESS:  I see those -- print
18 those invoices from the procurement company, yes.
19 Yes.  Those invoices go directly to the limited
20 partnership, but I review them before they do.
21         BY MS. FUCHS-SINDLER:
22     Q   And how do you get them?
23     A   Those come directly from the financial
24 officer who has received them, sends them to me,
25 and then I take them -- or they may come directly
```

Page 87

```
1  from the company.  They may come directly from
2  JCM.
3          MS. LAMA:  And before we go to that,
4  and we will, circling back to the distribution
5  rights, you mentioned this five point five
6  million payment.
7          THE WITNESS:  Yes.
8          MS. LAMA:  Now, the total distribution
9  rights were ten million.
10         THE WITNESS:  Correct.
11         MS. LAMA:  So the balance of four point
12 five million, can you tell us about the payment
13 of that?
14         THE WITNESS:  It would be within those
15 two point six million dollar payments.
16         MS. LAMA:  And can you tell us about
17 how that was determined, since these -- you did
18 review these invoices when you had to portion out
19 that piece.
20         THE WITNESS:  Correct.
21         MS. LAMA:  So can you walk us through
22 that, that four point five million?
23         THE WITNESS:  Without looking at the
24 contract, I can tell -- I mean, I would've done
25 it pursuant to the contract.  But without the
```

Page 88

```
1  contract in front of me, as I stated, I believe
2  the contract calls for an accelerated payment on
3  the distribution rights.
4          So although two point six million per
5  month times twenty months is for fifty-two
6  million dollars of services, I believe there is a
7  clause in the contract that calls for the
8  distribution rights to be paid first.
9          MS. LAMA:  Okay.  So when you -- can
10 you tell us about when was the first invoice you
11 received to which a portion was allocated to
12 distribution rights, and, therefore, you did not
13 take your twenty percent?
14         THE WITNESS:  I believe that would've
15 been in middle -- early 2013.
16         MS. LAMA:  So was it the first invoices
17 that were paid pursuant to the contracts in early
18 2013, was it the first or the initial invoices
19 that included this carve out?
20         THE WITNESS:  Within the first
21 invoices, I believe that would be true.
22         MS. LAMA:  So for those first invoices,
23 you would've not billed the twenty percent times
24 the two point --
25         THE WITNESS:  Correct.
```

Page 89

```
1          MS. LAMA:  And what entity was it that
2  was paid for the distribution rights?  Was that
3  AnC Biopharm?
4          THE WITNESS:  AnC Biopharm, I believe
5  it was, yes.
6          MS. LAMA:  And what entity paid AnC
7  Biopharm?
8          THE WITNESS:  I believe JCM.
9          MS. LAMA:  And so to date JCM has paid
10 AnC Biopharm ten million for distribution rights?
11         THE WITNESS:  I believe that's correct.
12         MS. LAMA:  And has JCM received
13 anything from AnC Biopharm showing the
14 satisfaction of that ten million?
15         THE WITNESS:  I cannot answer that.  I
16 don't know that.  I would presume they have, but
17 I -- I don't know.  I presume that they have.  I
18 know that -- I know that JCM has received and the
19 limited partnership has received the distribution
20 agreements and, as I suggested, the attending
21 document with those.
22         In terms of a receipt for the money, I
23 believe that -- I believe that JCM has receipts
24 for everything that they have paid, but I cannot
25 attest to that.
```

Page 90

1      MS. LAMA: So, for example, for the
2  equipment portion that has been paid to date
3  through these two point six million invoices from
4  JCM to AnC Biopharm, have you seen any receipts
5  for that?
6      THE WITNESS: No. I have only been
7  operating under the terms of the contract.
8      MS. LAMA: You mentioned earlier it's
9  your understanding that fourteen point five
10 million to fifteen million of payments have been
11 made for equipment purchases from JCM to AnC
12 Biopharm; is that right?
13     THE WITNESS: Correct. My recollection
14 is that twenty-six million dollars has been paid.
15     MS. LAMA: For?
16     THE WITNESS: From JCM -- or to JCM.
17 To JCM, excuse me, to JCM by the limited
18 partnership.
19     MS. LAMA: For?
20     THE WITNESS: Architectural
21 construction -- architectural equipment,
22 construction, distribution rights. The
23 procurement company has been paid for the
24 procuring of those services.
25     MS. LAMA: And it's your understanding

Page 91

1  that the procurement company, which is JCM --
2      THE WITNESS: Correct.
3      MS. LAMA: -- has paid all of those
4  funds to AnC Biopharm?
5      THE WITNESS: Correct.
6      MS. LAMA: And the equipment that has
7  been purchased, where is that equipment?
8      THE WITNESS: It is being designed and
9  procured through AnC Biopharm. Some of it
10 internationally, and some of it domestically.
11     BY MS. FUCHS-SINDLER:
12  Q   Can you give us -- can you expound on
13 that, please?
14  A   In what way would you like me to -- I
15 can tell you the types of equipment that are --
16 are earlier stage equipment that need to be
17 ordered in advance or designed in advance.
18 There's -- as I suggested, there's early-stage
19 equipment, middle-stage equipment, and late
20 equipment.
21     Microscopes can be ordered at the last
22 moment, but, you know, many of the other pieces
23 cannot be. And the list is fifteen million
24 dollars that I know is being designed and
25 procured through AnC Biopharm at this point.

Page 92

1      I actually have a list of the
2  equipment. I can recall much of it, but I can't
3  recite it to you of, course. But they are
4  autoclaves, for instance, that need to be
5  designed. There's a great deal of processing
6  equipment.
7      This facility, the one thing that's
8  very different about this facility than other
9  facilities is, this facility is made of up of
10 both a construction of a building, a facility,
11 but also the internal construction of, and
12 processing of, functions.
13     So there is an entire component of this
14 particular facility that has a processing
15 function. By that I mean, there may be pipes
16 installed in the building during construction,
17 but there will be specialty pipes involved in the
18 building based on processing.
19     This is a building where the processing
20 of human cells takes place, and the requirements
21 for that by CGMP and CGLP, which is good
22 laboratory practices and good manufacturing
23 practices standards, require certain kinds of
24 processing equipment.
25     So, for instance, the generators have

Page 93

1  to be of a particular type. The autoclaves, of
2  course, are autoclaves. The -- there are a
3  particular kind of sterile welders that need to
4  be procured. There are different kinds of
5  boilers that need to be procured.
6      There are particular kinds of water
7  vessels, pure water vessels, that must be
8  designed and procured. There are cooling towers
9  that must be built and designed for these process
10 that are inside. There are environmental
11 management systems and building management
12 systems that must be designed particularly for
13 this kind of a building.
14     Those kinds of equipments -- and I'm
15 monitoring the equipment that is being designed
16 and acquired. Those kinds of equipment are the
17 early-stage equipment, and there is to date a
18 little over fifteen million dollars of that
19 equipment that is being designed and procured.
20     MR. JAMES: What was that amount?
21 Sorry.
22     THE WITNESS: A little over fifteen
23 million.
24     I think they have been paid for
25 fourteen and half to fifteen million, but we are

Page 94

1   just over fifteen million now and quickly moving
2   on nineteen million dollars worth of equipment.
3           MS. LAMA:  And you mentioned you
4   monitor the equipment design and what has been
5   acquired. How do you --
6           THE WITNESS:  Not has been acquired,
7   but is being acquired, that is being designed and
8   acquired.
9           MS. LAMA:  And how do you monitor that?
10          THE WITNESS:  I attend the meetings
11  with the architects who require the equipment be
12  procured.  So I will meet with the architects and
13  the engineers weekly to determine what equipment
14  is being required at that point.
15      BY MS. FUCHS-SINDLER:
16      Q   Is this NNE Pharma Plan?
17      A   Yes.
18          And, frankly, that meeting is really of
19  NNE Pharma Plan and AnC Biopharm.  AnC Biopharm
20  is represented at every one of those weekly
21  meetings, the acquiring company, the company that
22  the procurement company is acquiring.
23      Q   Where are these meetings?
24      A   They are telephonically every Monday
25  evening, and they take place between Korea, South

Page 95

1   Korea, Morrisville, North Carolina, Boston,
2   Massachusetts, Burlington, Vermont, and me.
3       Q   Which individuals participate in the
4   meetings?
5       A   They are always attended by myself, by
6   the general contractor of the building.
7       Q   Who's that?
8       A   Peak CM, P-E-A-K, C-M, of Burlington,
9   Vermont.
10      Q   And who's the individual?
11      A   Jerry Davis.  There are a number of --
12  Jerry Davis.
13          Then there are a number of
14  subcontractors who are invited to those meetings
15  periodically.  We may have an HVAC subcontractor.
16  We may have an air purification subcontractor.
17  We may have a mechanical -- I mean, a mechanical
18  electrical plumbing contractor.
19          We may have a variety of subcontractors
20  attend those telephonic meetings as well.  They
21  are attended by AnC Biopharm.  That is typically
22  by Mr. Jang, Dr. Jang, J-A-N-G, Jong Choi, Mr.
23  Hahn.  Those are the primary functionaries, if
24  you will, from AnC Biopharm.
25          And then there will be -- there was --

Page 96

1   there will be Mike Curry, Michael Curry from AnC
2   -- from NNE, Fred Grossfield,
3   G-R-O-S-S-F-I-E-L-D.
4       Q   From where?
5       A   From NNE.  There will be -- there will
6   be any number of people from NNE.  There will be
7   ten or twelve people from NNE there, so -- and
8   they vary depending upon what the subject matter
9   of the evening is.
10          And then about once a month, we meet
11  typically in Morrisville, North Carolina or in
12  Vermont, either in Burlington, Vermont or closer
13  to the site in Vermont.  About once a month, we
14  meet with a much larger group, and these are
15  substantive meetings for the design and the
16  equipment of this building, of this facility.
17          We are at this point seventy percent
18  complete on design plans from that -- from that
19  function.  We will be ninety percent complete and
20  buildable, if you will, in another thirty days.
21          So in another thirty days, we will move
22  from design and architectural, we'll move to
23  construction administration by the architects.
24      Q   Those in-person meetings once a month,
25  does AnC Biopharm representatives, do they come?

Page 97

1       A   Yes.
2       Q   Those same individuals you just
3   mentioned?
4       A   More.  There's often times five or six
5   that will attend, lower-level scientists that
6   will attend.
7       Q   Are there ever meetings in Miami?
8       A   Not for that purpose, no.
9       Q   But for other purposes?
10      A   Meetings of -- sure.  We may have the
11  general contractor come down and meet with Ariel
12  and I and Mr. Stenger.  There may be -- there may
13  be meetings of the Korean team AnC Biopharm with
14  Mr. Quiros.
15          But there would not be -- there would
16  not be architectural meetings taking place in
17  Miami, that I can recall.  Often times, if the
18  Korean team is here in the United States, they
19  will take the opportunity to meet with Mr.
20  Quiros.
21      Q   In Miami?
22      A   In Miami.  Sure.  Well, in Miami or
23  wherever is convenient for all the parties, but
24  could be Miami.
25      Q   So they have met here?

Page 98

1    A  Oh, sure. Sure.
2    Q    How often?
3    A  Oh, over the last couple of years --
4  since the inception of the AnC Bio project, four
5  or five times, that I can recall. There may be
6  many more that I don't know. That I can recall,
7  four or five times.
8        MR. JAMES: Any sense of when the last
9  meeting occurred with the Korean team and Mr.
10  Quiros?
11        THE WITNESS: Sure. We were in -- wow,
12  forgive me. I can't remember whether we were in
13  Morrisville or we were in Vermont, but -- a month
14  or so ago, I can recall that we had meetings in
15  -- yes, I believe it was Morrisville. Forgive
16  me, but I can't tell you exactly which one.
17  There was so many. But I believe it was in
18  Morrisville. And subsequent to that meeting, I
19  know that some of the Korean team did come to
20  Miami to meet with Mr. Quiros.
21        MR. JAMES: Were you at the Morrisville
22  meeting?
23        THE WITNESS: I was.
24        MR. JAMES: And then you said after
25  that meeting, you believe some of the Korean team

Page 99

1    --
2        THE WITNESS: Korean team came to
3  Miami. I know they did.
4        MR. JAMES: And what about yourself,
5  did you also join them in Miami?
6        THE WITNESS: I joined them socially
7  for a short time. That's it.
8        MS. LAMA: And when was that?
9        THE WITNESS: Michelle, I can't tell
10  you the date. I can certainly get you the date.
11        BY MS. FUCHS-SINDLER:
12    Q    You just mentioned a few minutes ago
13  about the seventy percent completion.
14    A  Yes.
15    Q    What is seventy percent complete?
16    A  When you're designing architectural
17  drawings for a building, they are typically
18  managed by percentage of completion. So there
19  are feasibility studies that are done first. And
20  once the architects start drawing plans, they
21  will go with levels of detail. And one level of
22  detail may simply be floor plan, footprint. And
23  the next level of detail may be footprint with
24  structural walls. The next level of detail might
25  be structural footprint, structural, and

Page 100

1  mechanical and electrical and plumbing. And then
2  the next level.
3        Each level is agreed to by all of the
4  parties that they have reached a level, a
5  definable level of twenty-five percent, fifty
6  percent. Once you reach fifty percent, you get a
7  little bit more picky, and you're then at the
8  sixty, seventy, eighty, ninety percent levels.
9  And the reason for that is because all of the
10  different parties have to rely on what they
11  believe to be the completion level.
12      So as we begin to select advisors for
13  HVAC or mechanical, electrical, or plumbing, not
14  the contractors, simply advisors that we will
15  call in to give us advice and to review. We tell
16  them we're not going to call them in until the
17  plans that they are asking them to review are
18  seventy percent complete. So we need to know
19  that we have an agreement, a consensus that the
20  plans are seventy percent of buildable plans as
21  we move through that fifty to a hundred percent
22  level.
23      At ninety percent level, agreed-upon
24  level, there are a series of work performances
25  that take place all the way from scoping the

Page 101

1  entire project to creating bid packages for
2  subcontractors to bidding out the actual project.
3      So managing the level of completion of
4  the design plans is very, very important. Not to
5  digress, but the lack of that is what allows for
6  or permits change orders. Someone says, oh, I
7  didn't think that's what we were doing, let's
8  make a change. And that's always expensive, and
9  we can't allow that to happen.
10    Q    And before when Michelle had asked you
11  how do you monitor the equipment being designed
12  and procured, you mentioned those weekly
13  telephonic meetings and then the in-person
14  meetings. Any other way that you monitor the
15  equipment being designed and procured?
16    A  No. No. That's the way I -- other
17  than my conversations with the advisors.
18    Q    With who?
19    A  With the advisors. As I just
20  suggested, there are advisors that are called to
21  these meetings. And that's why it would be a
22  different set of parties that will be at any
23  given meeting, in the in-person meetings and in
24  sometimes the telephonic meetings.
25      I will ask advisors to join those

Page 102

1  meetings to listen, to review, and to opine to me
2  the substance of what is being said at those
3  meetings. I'm not -- I'm not an architect. I'm
4  not an engineer. But I certainly can have
5  individuals that are, who provide services to me,
6  so that I can supervise that design phase, make
7  sure that we don't have a bunch of change orders
8  coming in at some point.
9       And in those processes, we are
10 constantly reviewing the equipment that is part
11 of -- because some of the equipment actually
12 becomes part of the construction. Equipment is
13 not all deliverable as in boxes. It actually
14 becomes part of construction.
15      MS. LAMA: And what documents or
16 information or report does AnC Biopharm provide
17 concerning the work that it's doing and the
18 equipment it's designing and procuring?
19      THE WITNESS: They do not. We are
20 under a contract with -- I have to be careful.
21 JCM is under agreement with AnC Biopharm for the
22 provision of that equipment. My role is to
23 review the two point six million dollar payments
24 that are made from the limited partnership.
25      Remember, I represent to the most

Page 103

1  extent the limited partnership's interest. I
2  review that the monies that are paid by the
3  limited partnerships to JCM are pursuant to a
4  procurement contract.
5       I then participate in the discussions
6  at the meetings regarding the equipment that is
7  being anticipated and the dates upon which it's
8  anticipated. JCM is procuring that equipment
9  from AnC Biopharm.
10      My understanding -- not my
11 understanding -- my understanding is that the
12 contract allows for installment payments to JCM
13 and JCM to AnC Biopharm for the distribution
14 rights and the equipment rights, equipment
15 procurement, design and procurement, not just
16 procurement.
17      BY MS. FUCHS-SINDLER:
18 Q   Where is this equipment actually being
19 manufactured?
20 A   Depending upon the equipment, Trisha,
21 but some equipment, for instance, could be
22 manufactured by Siemens Corporation. The lead
23 time for most of this is that the procurement
24 company and the company they're procuring from
25 actually has to design the equipment and then put

Page 104

1  the design specifications to the manufacturer,
2  and the manufacturer design -- the manufacturer
3  manufactures to those design specs.
4       So the designs specs and the ultimate
5  procurement are coming through AnC Biopharm. AnC
6  Biopharm is being paid to design, order, acquire,
7  validate, and qualify all that equipment.
8  Q   Has there been any manufacturing yet?
9  A   I do not know that. Some of it -- some
10 of it I'm sure, because it won't require a great
11 deal of customization, but I cannot answer that,
12 whether it's been -- whether we're at
13 manufacturing level or not.
14 Q   Do you know the names of
15 manufacturers?
16 A   Siemens. Siemens will be a provider of
17 equipment -- or Siemens will probably be a
18 provider -- I can't tell you that they will be,
19 but they will probably be a provider of
20 equipment.
21      And part of what I hope to do is to
22 direct that most of the those equipment purchases
23 are done in the US. I can think of Nova Novartis
24 may be part of the equipment manufacturing
25 companies. They are -- for all intents and

Page 105

1  purposes, they are the standard companies that
2  you would know in the biomedical equipment world,
3  but I can't tell you they all will be.
4  Q   When you mentioned these entities,
5  Siemens, why do you say they probably will be?
6  Is that --
7  A   Because they are -- they are prolific
8  in the world of those -- those products. For
9  instance, the building management systems, the
10 environmental management systems, Siemens is
11 fairly competitive in that world.
12 Q   So you're saying that because of what
13 you know they do, but is there any contracts or
14 Letters of Intent with any of these -- with Nova
15 Novartis or Siemens?
16 A   Not that I know of. Not that I know
17 of.
18      Earlier, I testified that I will -- at
19 some point, NECS will retain someone with more
20 specific knowledge, not contract knowledge, but
21 more specific knowledge of verification,
22 validation, and qualification of biomedical
23 equipment. At the right time, that will be done.
24 Q   And what is the status of the design
25 specs you mentioned that AnC Biopharm is required

Page 106

1  to do?
2      A   I cannot tell you that. I cannot tell
3  you what is being done on the design or ordering
4  of any equipment from AnC Biopharm at this point.
5      Q   Because you don't know?
6      A   No. Because it's not necessarily
7  important to me yet.
8      Q   Who would know what the status is?
9      A   Oh, it's possible that the AnC Bio
10 Vermont, LLC may know. Remember, there's another
11 sixty-eight percent of supervision going on here.
12 It's possible that they would know.
13     Q   And when you say they, which
14 individuals are we talking about?
15     A   Stenger and Quiros. William Stenger
16 and Ariel Quiros.
17         I mean, there is another level of
18 construction supervision here, and I've agreed --
19 NECS has agreed to provide, you know, certain of
20 those services, and we are. And, frankly, most
21 of those services being provided today are around
22 preconstruction and understanding of equipment
23 that is coming into the process.
24     Q   So if we want to find out the status
25 of what you said the design specs, it would

Page 107

1  either be Mr. Quiros or Mr. Stenger?
2      A   Or I could request it.
3      Q   From them?
4      A   Yeah. Yeah. Or from AnC Biopharm. I
5  mean, I'm sure that I could make a request of
6  them to give me a particular update of where they
7  are. I don't have a standard that they're
8  performing to, but I could certainly ask them
9  where they are.
10     Q   Is it ever discussed during these
11 monthly or weekly meetings?
12     A   The equipment is discussed every month.
13 It's every meeting. Where they are in the
14 design, no. We certainly discuss the requirement
15 for and the timing for those pieces of equipment
16 to be put in, and then AnC Biopharm understands
17 that they have the -- both the right and the
18 responsibility of providing that equipment.
19         MS. LAMA: And on --
20         THE WITNESS: I trust these people much
21 more than I might some other vendor, frankly.
22 I've known these individuals for quite sometime,
23 so I have a bit of a trust level with these
24 individuals that I might not have with another
25 vendor.

Page 108

1          MS. LAMA: On these calls, is there any
2  discussion by the AnC Biopharm individuals about
3  how much money has been received to date for
4  equipment and how it's been spent?
5          THE WITNESS: Never. That would be
6  inappropriate in these meetings.
7          MS. LAMA: Why would that be
8  inappropriate?
9          THE WITNESS: Well, because these
10 meetings are about design and architecture and
11 amounts of money that are transacted. I mean,
12 the architects also don't talk about how much
13 they've been paid for the work they've done. I
14 wouldn't expect those kind of conversations to be
15 taking place.
16         MS. LAMA: So, for example, AnC
17 Biopharm, it's never been discussed on a call,
18 we've dedicated a certain percentage of the
19 monies that have been received for design?
20         MR. GORDON: I'm sorry. Do you mean
21 the weekly calls he's talking about or some other
22 type of calls?
23         MS. LAMA: No. Any call. The weekly
24 calls, you mentioned the weekly calls.
25         THE WITNESS: The weekly calls have a

Page 109

1  number of unrelated parties that we have;
2  vendors, subcontractors, general contractors,
3  advisors, engineers, architects, scientists. So
4  in those meetings, we would never discuss either
5  the amounts of money that are paid to anybody.
6          We discuss the percentages of
7  completion of the architectural drawings,
8  including the definition of equipment that is
9  required or going to be required pursuant to
10 those drawings. So we talk about the particular
11 equipment, the need for that equipment, the dates
12 for that equipment, but we don't talk about the
13 payment of that equipment.
14         Now, at some point, the architect will,
15 of course, have to sign off on that equipment.
16 When we get to construction administration, as
17 that equipment is being installed, there will be
18 architectural sign-off for that equipment against
19 the validity, the verification, the qualification
20 of that equipment, because there is a significant
21 series of specifications here. This is very,
22 very -- I mean, qualified equipment. The
23 specifications are incredible.
24         They not only have to be signed off by
25 -- when we get to that stage, it will not only

Page 110

1  have to be signed off by the architect, it will
2  also be signed off by an independent third-party
3  qualification and verification individual that
4  will be licensed by the FDA. In other words, the
5  equipment that's installed must meet standards,
6  very, very delicate standards.
7        MS. LAMA: So in any context, whether
8  on these calls, whether in an in-person meeting,
9  in any form of communication, has any individual
10 from AnC Biopharm ever discussed the percentage
11 of completion of work that they have performed in
12 any capacity in connection with the fourteen or
13 fifteen million that has been paid for equipment?
14       THE WITNESS: No.
15       MS. LAMA: Do you know whether they've
16 done anything, any such work?
17       THE WITNESS: No. I can presume, but
18 that's not what you're asking me. The
19 discussions would lead you to believe they are,
20 but I have not -- I cannot tell you exactly what
21 they've done. They've been contracted for a
22 performance, and I have every reason to believe
23 they are operating under that contract and their
24 performance requirements.
25       BY MS. FUCHS-SINDLER:

Page 111

1    Q    Do you know if anyone has actually
2  seen any designs, though, what they've done?
3    A    They -- I mean, has anyone on this side
4  seen what they've designed? No. No.
5        Again, the specifications for those
6  designs are discussed at the meetings. So, for
7  instance, when we talk about a particular chiller
8  or a particular type of boiler or a particular
9  type of processing piping, the design
10 specifications are talked about at the meeting.
11 So they are then back to the drawing board to
12 make sure that what they are providing meets
13 those design specifications. If they don't meet
14 those design specifications, they would be
15 rejected.
16   Q    And do you have any understanding as
17 to how long it will take to actually manufacture
18 the equipment needed for the AnC Bio project?
19   A    Some of it, I'm told, is as much as
20 eighteen months to design it, to design it and
21 manufacture it and procure it.
22   Q    From the design stage through the
23 manufacturing?
24   A    Through the acquisition, all the way to
25 acquiring it, having it ready for installation.

Page 112

1        Then there is different equipment.
2  Some equipment comes verified, qualified. And
3  some equipment has to be verified, qualified on
4  site. So once we -- once the equipment is
5  delivered and on site, some of it must be
6  verified and qualified as it's -- as it's built
7  into the -- built into the facility itself.
8        A microscope may be verified or
9  qualified before it comes. A clean room box
10 might not be qualified until it sees how it is
11 welded to the processing pipe coming in. That
12 processing -- that weld might need to be
13 qualified and verified. So the equipment can be
14 verified, but when it gets there it goes through
15 another process.
16       The micro-cabinets, for instance, are
17 qualified, verified before they leave the
18 manufacturing facility. They're qualified and
19 verified again once they are installed.
20       MS. LAMA: And who is supervising AnC
21 Biopharm's work and work product?
22       THE WITNESS: AnC Biopharm.
23       MS. LAMA: Who's validating their work?
24       THE WITNESS: I don't know that yet.
25 We will have a validation company assigned to the

Page 113

1  facility that will -- even if it's already
2  validated, they may have to revalidate some of
3  their work, because it has to be validated upon
4  installation.
5        So I can't tell you whether AnC
6  Biopharm has a validation company today, but they
7  will, or they will provide equipment that is
8  validated and qualified by the manufacturer.
9  Once it arrives here at the site and is
10 installed, it will have to be revalidated and
11 requalified, unless it is free standing.
12       MS. LAMA: And on behalf of the LP,
13 who's validating the progress of their work?
14       THE WITNESS: Who's validating the
15 progress of the --
16       MS. LAMA: Of AnC Biopharm.
17       THE WITNESS: I am. I am, and the
18 construction supervision fees are designed for
19 that purposes. And the sponsor company has the
20 responsibility for that, but I'm working with the
21 sponsor company to do that.
22       MS. LAMA: So how are you validating
23 what AnC Biopharm is doing, all this that we're
24 talking about?
25       THE WITNESS: Attending the meetings.

Page 114

1  Having the discussions. Talking with them about
2  the equipment. Talking with them about what's
3  being done. But not talking to them about the
4  level of design or the percentage of completion
5  of design or procurement they're in.
6         BY MS. FUCHS-SINDLER:
7     Q   Have you ever gone to -- their offices
8  are in South Korea?
9     A   They're offices are in South Korea.
10    Q   Have you ever gone there to see what
11 they're doing?
12    A   Not for this purpose, no.
13    Q   Have you ever gone there for any other
14 purpose?
15    A   Sure. I've been there a half a dozen
16 times. Probably have seen their work product.
17 As I suggested earlier, I have a bit of level of
18 trust of this group because I have, in fact, at
19 least viewed this group and what they do, the
20 quality of what they do, but we are yet to
21 validate and qualify their performance in the
22 design or acquisition. We have -- I understand
23 JCM has performed under the contract to pay them
24 to do this.
25         MS. LAMA: Have you seen any reports

Page 115

1  prepared by AnC Biopharm regarding the use of the
2  funds that they've received to date?
3         THE WITNESS: No.
4         MS. LAMA: Have you requested such
5  information?
6         THE WITNESS: No.
7         MS. LAMA: Do you know if any such
8  information exists?
9         THE WITNESS: No. I believe there has
10 been a declaration somewhere that they have --
11 they have attested to the receipt of the funds
12 for the purposes that I've been discussing here.
13        MR. JAMES: When you say you believe
14 there's a declaration, what's the basis for that
15 belief?
16        THE WITNESS: Because Mr. Quiros has
17 told me that there has been a declaration for the
18 receipt of the funds.
19        BY MS. FUCHS-SINDLER:
20    Q   And when did he tell you that?
21    A   A good couple of weeks ago.
22    Q   How did it come up that you discussed
23 this?
24    A   Because we constantly discuss the
25 payment to JCM on behalf the limited partnerships

Page 116

1  and what JCM has done with the funds in terms of
2  moving the process along with AnC Biopharm.
3         JCM is operating under a defined
4  contract that I'm fairly aware of. And JCM is a
5  US company, and so I'm, obviously, concerned with
6  the payments from the limited partnership to JCM
7  for the procurement of equipment, architectural,
8  and to some degree, distribution rights. Again,
9  just outside of my purview.
10        So I have conversations with Mr. Quiros
11 about those procurements. JCM then operates
12 under different agreements with AnC Biopharm for
13 the procurement of those services. When the
14 distribution rights agreement was delivered, I
15 was notified it was delivered. Frankly, I
16 reviewed it at the time it was delivered, and the
17 ancillary documents that came with it, and that
18 was the end of that.
19        On the equipment and the -- I've
20 reviewed what's going on with the architectural
21 processing. And in terms of the equipment, I
22 spend my time on the supervision of the equipment
23 that is going to be installed and why and whether
24 it's adequate and whether it is appropriate. And
25 I get a report from Mr. Quiros every once in a

Page 117

1  while that things are moving along. I don't know
2  why he knows that or how he knows that, but I'm
3  sure he knows that because he's in discussions
4  with the people that are designing the equipment.
5         MS. LAMA: And based on your
6  discussions with Mr. Quiros, has Mr. Quiros ever
7  informed you -- or in those discussions, that all
8  the payments that the LP has made to JCM have
9  been paid to AnC Biopharm?
10        THE WITNESS: All the payments that
11 have been paid to JCM are either at JCM or have
12 been paid to AnC Biopharm. That's my
13 understanding. Mr. Quiros has told me that.
14        MS. LAMA: Okay.
15        And can you elaborate on that? What do
16 you mean still at JCM?
17        THE WITNESS: Well, they may still be
18 at JCM. They may not have been paid to AnC
19 Biopharm yet. I'm not privileged to how JCM pays
20 AnC Biopharm in the acquisition, JCM's a
21 procurement company, and how they manage their
22 relationship with their suppliers. It's outside
23 my purview, other than to be sure at that we are
24 meeting time requirements for the provision of
25 equipment. Whether Mr. -- whether JCM has paid

Page 118

1 AnC Biopharm or what they paid AnC Biopharm is
2 between JCM and AnC Biopharm.
3     However, having said that, I just told
4 you Mr. Quiros has told me in the recent past
5 that AnC Biopharm has attested to the receipt of
6 funds from JCM for all of the above. Now, again,
7 all of the above I'm not -- I don't know as much
8 detail as Mr. Quiros might know about that.
9     MS. LAMA: And just to clarify, your
10 testimony was earlier, if I'm recalling
11 correctly, that at least twenty-six million has
12 been paid to AnC Biopharm?
13     THE WITNESS: I believe at least
14 twenty-six million has been paid to AnC Biopharm,
15 right.
16     MS. LAMA: Ten million for the
17 distribution rights, approximately, fifteen
18 million for equipment, and I believe one million
19 for architectural?
20     THE WITNESS: For architectural,
21 correct. That's my understanding.
22     MS. LAMA: And the contract is for two
23 point six million in monthly payments to AnC
24 Biopharm under the contract?
25     THE WITNESS: No. The contract's for

Page 119

1 two point six million from the limited
2 partnership to JCM. There's a contract between
3 the limited partners and JCM, the procurement
4 company, for two point six million per month.
5 And I have reviewed those invoices because I'm,
6 for all intents and purposes, watching on behalf
7 of the limited partners the money that leaves the
8 limited partnership for those purposes.
9     MS. LAMA: And what are the payment
10 arrangements between JCM and AnC Biopharm?
11     THE WITNESS: That, I don't know.
12     BY MS. FUCHS-SINDLER:
13     Q   Who would know?
14     A   Mr. Quiros.
15     Q   Anyone else?
16     A   Financial officers may know.
17     Q   Who's that?
18     A   George Gulisano.
19     Q   Anyone else?
20     A   Mr. Stenger.
21     Q   Anyone else?
22     A   In fact, Mr. Stenger might not even
23 know that. No. I think that would be Mr. Quiros
24 and the financial.
25     MS. LAMA: And what's your

Page 120

1 understanding as to what contracts or agreements,
2 if they are any, outline the payment arrangements
3 between JCM and AnC Biopharm?
4     THE WITNESS: I don't recall. There
5 may be -- there may be purchase orders between
6 them, but I do not recall that. I know -- I do
7 not recall that.
8     MS. LAMA: That's not something that's
9 under your purview?
10     THE WITNESS: No. That's between the
11 procurement company and the equipment designers
12 and manufacturers. And, again, I make sure that
13 the AnC Biopharm, as a designer and manufacturer
14 or acquirer of equipment, is in concert with me
15 at meetings, or that I'm in concert with them at
16 meetings, in terms what is being -- what the
17 understanding is of the needs and the time
18 requirements for equipment to be delivered.
19     BY MS. FUCHS-SINDLER:
20     Q   Before, when you had mentioned that
21 the declarations you talked about --
22     A   Yes.
23     Q   -- is it -- how many declarations?
24     A   A declaration from AnC Biopharm that
25 they have received X-amount of funds from JCM.

Page 121

1     Q   Okay.  Have you seen this declaration?
2     A   I have seen this declaration.
3     Q   When did you see it?
4     A   Possibly two weeks ago, two and a half
5 weeks ago.  Relatively shortly passed.
6     Q   How did you come to see it?
7     A   Mr. Quiros showed it to me.
8     Q   When was that?
9     A   Again, a couple of weeks ago.  Again, I
10 didn't study it, but I took a -- I looked at it.
11     Q   Where did he show it to you?
12     A   At the office.
13     Q   Do you know who prepared the
14 declaration?
15     A   I believe Mr. Gordon prepared the
16 declaration.
17     Q   And why do you believe that?
18     A   Because I --
19     MR. GORDON:  You can't reveal
20 communications with Counsel or communications
21 with Mr. Quiros for purposes of communicating
22 with Counsel.  If you can answer that question
23 otherwise, you can answer.
24     THE WITNESS:  A couple of weeks ago, I
25 was shown a copy of the declaration.  That's what

Page 122

1  -- that's when I saw it.
2         BY MS. FUCHS-SINDLER:
3     Q    You saw an executed copy?
4     A    Yes, I believe it was. Again, I didn't
5  study it at the time. I was really interested
6  that Mr. Quiros was telling me that there was
7  receipt of funds at AnC Biopharm. And that was
8  my concern, and that's all that I really looked
9  at it for. I believe it was executed.
10    Q    I'm sorry?
11    A    I believe it was executed. But, again,
12 I didn't study it.
13    Q    Is that the first time that you saw
14 the declaration?
15    A    Yes.
16    Q    Have you seen it since?
17    A    No.
18    Q    Do you have a copy?
19    A    No. No.
20        MR. JAMES:  Do you know who signed the
21 declaration on behalf AnC Biopharm?
22        THE WITNESS:  I believe the principals
23 of AnC Biopharm.
24        MR. JAMES:  What are their names?
25        THE WITNESS:  I believe that it was

Page 123

1  signed by Dr. Jang and Lyan Kim. Those are, as I
2  understand, principals at AnC Biopharm. Lyan
3  Kim, L-Y-A-N Kim.
4         I'm familiar with both of those people.
5  Lyan Kim is someone I'm familiar with for a
6  period of time from relationships in Korea. And
7  Dr. Jang is an individual that I work with on the
8  scientific team attending at these meetings
9  telephonically and in Morrisville.
10        BY MS. FUCHS-SINDLER:
11    Q    So you believe they both signed the
12 declaration?
13    A    I understand they both did, yes.
14    Q    But you only saw one?
15    A    I saw -- I saw a declaration. What I
16 saw was a piece of paper they put on the desk in
17 front of me, and that's all that I saw. And I
18 was -- and Mr. Quiros said we have a receipt from
19 AnC Biopharm for all of the funds that have been
20 paid to them.
21    Q    Why do you believe these two
22 gentlemen, Mr. Kim and Mr. Jang, were the ones
23 who signed the declaration?
24    A    I believe they represent the company
25 AnC Biopharm.

Page 124

1     Q    Did someone tell you specifically that
2  those were the two people who signed the
3  declaration?
4     A    Mr. Quiros told me that we have signed
5  declarations -- signed documents by Lyan Kim and
6  Dr. Jang from AnC Biopharm attesting to the
7  receipt of all of the funds that we have paid
8  them under JCM contracts -- under JCM agreements.
9  That's -- that's the extent of the conversation.
10 Understanding that I meet with Mr. Quiros in
11 Miami on a regular basis on a myriad of subjects,
12 and during one of those meetings, I was shown
13 this document.
14        MR. JAMES:  When was the last time you
15 saw or met with Dr. Jang or Mr. Kim?
16        THE WITNESS:  The last time that I met
17 with them would be on the telephone -- on the
18 telephonic conversation with Dr. Jang, and on one
19 of these weekly meetings. And the last time that
20 I saw Dr. Jang or Lyan Kim was subsequent to the
21 meeting in Morrisville or Burlington. I have to
22 determine which one that was. I don't know what
23 -- I don't know where that meeting was, but in
24 about the beginning of July I believe, we met in
25 the United States in Burlington or in

Page 125

1  Morrisville, and I'm quite sure it was
2  Morrisville. I don't believe it was Burlington.
3         And during -- and subsequent to that
4  meeting, there was a social meeting in Miami. I
5  joined Lyan Kim, Dr. Jang, and at least one or
6  two other members of the Korean scientific team
7  in Miami with Mr. Quiros.
8         MR. JAMES:  You said this was in the
9  beginning of July?
10        THE WITNESS:  I don't know the exact
11 date. I'm guessing it was probably in July. I
12 can certainly get you that answer, but I don't
13 know that answer. I don't know the answer exact
14 date, Brian.
15        MR. JAMES:  We're in July currently.
16        THE WITNESS:  I believe it was in July.
17        MR. JAMES:  Okay. So it's this month,
18 in the beginning of this month?
19        THE WITNESS:  Yeah, I believe it was
20 this month. It was earlier this month, I
21 believe.
22        MR. JAMES:  You said there were two
23 other individuals?
24        THE WITNESS:  There was. The
25 individuals that were at that meeting were

Page 126

1  individuals that came down from Morrisville, and
2  that would be I believe Sean Choi was there.
3  Lyan Kim was there. Dr. Jang was there. I
4  cannot recall whether Mr. Hahn was there. I
5  don't know that he was. I think that was all of
6  the individuals that were there.
7      MR. JAMES: And these are all
8  representatives of AnC Biopharm?
9      THE WITNESS: They are -- they are
10  representatives of either AnC Biopharm -- yeah, I
11  guess they're all AnC Biopharm. Yeah, I would
12  think they're all AnC Biopharm. They are
13  scientists that work on -- with me on -- with the
14  architects and the engineers on the design of the
15  facility and the equipment. So I believe they
16  probably all are AnC Biopharm. Dr. Jang and Lyan
17  Kim are AnC Biopharm, I know that. Sean Choi I
18  believe is also AnC Biopharm.
19      MR. JAMES: What's Dr. Jang's role or
20  position at AnC Biopharm?
21      THE WITNESS: Oh, I don't know that. I
22  presume he's a principal there. I don't know his
23  exact role. His role for my purposes with
24  architectural, engineering, and design is as a
25  scientist.

Page 127

1      MR. JAMES: But with the actual entity
2  itself, you think he's an officer?
3      THE WITNESS: Oh, I'm sure he probably
4  is, but I don't know his title.
5      MR. JAMES: And Mr. Kim, what's his
6  role, position?
7      THE WITNESS: Executive. I don't know
8  the -- I don't know the title.
9      MR. JAMES: And how long have you known
10  Mr. Kim and Dr. Jang?
11      THE WITNESS: I've known Lyan Kim
12  probably fifteen years. I know him marginally.
13  I know him. I've known of him. I have visited
14  with him in the country of Korea or in the United
15  States probably a total of eight or ten times in
16  my life, but I have known of him or known him,
17  probably met him fifteen years ago.
18      Dr. Jang, more recently. Dr. Jang, I
19  would've met in Korea at the facility in Korea
20  where he had responsibilities for the facility in
21  Korea, and that would've been -- that could've
22  been a couple of years ago. And, again, as a
23  scientist.
24      Lyan Kim is an executive in Korea. Dr.
25  Jang in my role -- in my understanding, has

Page 128

1  always been as a scientist.
2      MR. JAMES: And the meeting in Miami
3  that followed the meeting in Vermont or whatever,
4  Morrisville or what have you, you said that was
5  -- you think it was July. Was there -- did you
6  meet with them previously in Miami, the same
7  individuals, in the last couple months?
8      THE WITNESS: No. No. No. They came
9  to Miami to meet with Mr. Quiros, and I was
10  invited to come to have a bite to eat with them,
11  and that's what I did.
12      MR. JAMES: Do you recall where, where
13  you guys met?
14      THE WITNESS: At the office, at Mr.
15  Quiros's office.
16      MR. JAMES: Okay.
17      And you had dinner at the office?
18      THE WITNESS: I believe we had dinner
19  at Ceviche 105, I believe, but I can't attest to
20  that either. But I believe that's where we had
21  dinner.
22      MS. LAMA: And prior that meeting or
23  occasion where you were with these
24  representatives, what was the occasion prior to
25  that?

Page 129

1      THE WITNESS: Always with -- at the
2  engineering architectural meetings. Lyan Kim
3  attended some of them, but not all of them. Dr.
4  Jang would've been at every one of them.
5      MS. LAMA: And do you have a calendar
6  that reflects those meetings dates?
7      THE WITNESS: Oh, I do. I mean, I also
8  have the meetings notes from those meetings.
9  And, unfortunately, flight itineraries.
10      BY MS. FUCHS-SINDLER:
11  Q   How did you come to meet Mr. Kim
12  fifteen years ago?
13  A   I was visiting the country of Korea
14  relative to a US biotechnology company who was
15  interested in working with the country of Korea,
16  the government of Korea, and the government of
17  Korea was interested in working with that biotech
18  company. And so I visited with the president of
19  that biotech company. I visited Korea. It was
20  at that time that I met Mr. Kim.
21  Q   And the declarations that you talked
22  about before, do you know the purpose in having
23  these declarations?
24      MR. GORDON: Again, you can't reveal
25  communications with Counsel, but otherwise --

Page 130

1      THE WITNESS: Okay. My understanding
2  from the comments from Mr. Quiros to me were in
3  relation to understanding amounts paid to AnC
4  Biopharm and receipt of those funds. So although
5  we have -- we are operating under a contract,
6  there will always be a continuous effort to
7  determine the degree of performance that has been
8  made in Korea by AnC Biopharm, and amounts that
9  are paid to them must be, obviously, accounted
10  for. So I understand that part of that was
11  receipt of accounts paid for.
12     Q    And before you saw this declaration
13  you mentioned, did you know that a declaration
14  was going to be prepared?
15     A    That, I think I have to -- that
16  would've only been in conversations with Counsel.
17     MR. GORDON: You can't reveal your
18  communications with Counsel or information that
19  you -- you can't reveal information that you
20  learned exclusively from Counsel.
21     THE WITNESS: Okay.
22     BY MS. FUCHS-SINDLER:
23     Q    Did you have any role in helping to
24  prepare the declaration?
25     A    No.

Page 131

1      Q    Did you make any suggestions as to
2  what should be in it?
3      MR. GORDON: You can answer that as a
4  yes or a no, but you can't reveal the substance
5  of any communications you had with Counsel.
6      THE WITNESS: Then yes. Yes.
7      BY MS. FUCHS-SINDLER:
8      Q    You did?
9      A    Yes.
10     Q    Tell us about that.
11     MR. GORDON: Well, if they were
12  communications with Counsel, then you can't
13  answer.
14     THE WITNESS: Then I can't answer.
15     BY MS. FUCHS-SINDLER:
16     Q    Any communications with Mr. Quiros as
17  to suggestions --
18     A    No. No.
19     Q    -- what would be in there?
20     A    No. No.
21     MS. LAMA: Why was a declaration needed
22  regarding the receipt of funds?
23     MR. GORDON: Again, I caution you not
24  to reveal any communications with Counsel, or to
25  the extent that you have thoughts that are based

Page 132

1  solely on your communications with Counsel, you
2  can't reveal those, but if you have any thoughts
3  that go beyond that, certainly feel free to
4  answer that.
5      THE WITNESS: A good business acumen
6  says that you -- you do belts and suspenders
7  kinds of things. So in business practices, I'm
8  totally content operating under terms of
9  contracts or terms of agreements, but I believe
10  it is not inappropriate to ask for additional
11  guarantees, receipts, constructions showing what
12  has been done or where they are in terms of those
13  business contracts.
14     MR. JAMES: So prior to this point in
15  time regarding the declaration, did you ever
16  consider receiving some additional proof, if you
17  will, of what has been performed under the
18  contract?
19     THE WITNESS: No.
20     MR. JAMES: So this is the first time
21  that was obtained, if you will?
22     THE WITNESS: Yes.
23     BY MS. FUCHS-SINDLER:
24     Q    Do you have any understanding as to
25  who provided the source of the information

Page 133

1  contained in the declaration?
2      A    No.
3      Q    Did you look --
4      A    No, I believe I can't answer that
5  question actually. I mean --
6      Q    You can't answer because --
7      A    If I had any indication as to -- please
8  ask the question again.
9      Q    Who provided the -- do you know who
10  provided the information that was contained in
11  the declaration?
12     A    Oh, no. No, I do not. No, I do not.
13     Q    What did you think I meant? You were
14  a little confused. I just wanted to see --
15     A    I didn't know if you were asking me
16  whether or not one believes there should be
17  constructable evidence of following the last
18  question -- excuse me, Michelle's last question,
19  evidence of payment or of performance. I didn't
20  know you were asking me about the declaration
21  itself or something about the declaration.
22     Q    But you read through the actual
23  declaration; is that correct?
24     A    No, I don't believe I ever read through
25  the actual declaration. No. Including when I

Page 134

1   was shown it sometime shortly ago, no.
2   **Q   You just saw it?**
3   A   I saw it.
4   **Q   Did you read any of it?**
5   A   I mean, I glanced at it. I looked at
6   it to see that it was, in fact -- it served as a
7   receipt of funds, yes.
8   **Q   How much of it did you read?**
9   A   I'm a pretty quick reader. I glanced.
10  I flipped through the pages, looked for what --
11  you know, what interested me.
12  **Q   Did you notice who signed it?  Did you**
13  **look at that?**
14  A   Again, I was told by Mr. Quiros who
15  signed it. I did not look at the signatures.
16  **Q   Did you ever verify any of the**
17  **information contained in the declaration that you**
18  **saw?**
19  A   No. No.
20  **Q   Were you ever asked to by anyone?**
21  A   No.
22  **Q   Do you know who provided the**
23  **information that was contained in the**
24  **declaration?**
25  A   No.

Page 135

1   **Q   Do you have any understanding as to**
2   **who provided that information?**
3   A   No.
4   **Q   Do you have any understanding as to**
5   **who reviewed the declaration before it was**
6   **finalized?**
7   MR. GORDON: Do you need to confer
8   about a privilege issue?
9   THE WITNESS: Yes.
10  MR. GORDON: Had you gotten your full
11  question out yet?  I just wasn't sure if you were
12  done and --
13  MS. FUCHS-SINDLER: Yes, I was.
14  MR. GORDON: You were?
15  Can I just hear the question?  And then
16  maybe we need to step outside to talk about the
17  privilege issue.
18  (Whereupon, the question was read back
19  by the court reporter.)
20  MR. GORDON: Let's go outside and
21  confer.
22  (Whereupon, at 1:15 p.m., a short
23  recess was taken.)
24  MS. FUCHS-SINDLER: We'll have her read
25  that again.

Page 136

1   MR. GORDON: Yeah, let's hear it, and
2   then I'll give the Witness the instruction.
3   MS. FUCHS-SINDLER: Okay.
4   (Whereupon, the question was read back
5   by the court reporter.)
6   MR. GORDON: To the extent that you
7   have information that you obtained exclusively
8   through Counsel, you can't reveal what was
9   communicated to you, but if you have an
10  understanding that goes beyond that that's
11  independent of what you received through Counsel,
12  you can reveal that.
13  THE WITNESS: I should understand these
14  questions.
15  I understood that there was an
16  attestation of -- or an affirmation by AnC
17  Biopharm that payments had been made and been
18  received and accounted for, and understood that
19  there were documents that were going to be
20  prepared by AnC Biopharm evidencing that. And
21  that's all that I knew.
22  BY MS. FUCHS-SINDLER:
23  **Q   Documents going to be prepared by AnC**
24  **Biopharm, what are you talking about?**
25  A   Because the question was AnC Biopharm's

Page 137

1   receipt of funds. I understood that there were
2   going to be documents that were going to evidence
3   their receipt of funds.
4   **Q   And do you know what kind of documents**
5   **were going to be prepared?**
6   A   Well, I would understand those to be
7   declarations, but they could've been a number of
8   different kinds of documents.
9   **Q   And how did you get this**
10  **understanding?**
11  A   Which understanding?
12  **Q   That documents were going to be**
13  **prepared by AnC.**
14  MR. GORDON: Same instruction as
15  before, don't reveal your communications with
16  Counsel.
17  BY MS. FUCHS-SINDLER:
18  **Q   So you can't answer that one?**
19  A   I cannot answer that.
20  **Q   Because it's subject to privilege?**
21  A   Correct.
22  **Q   Okay.**
23  Do you have any understanding as to who
24  played any role in the preparation, editing, or
25  review of the declarations we talked about?

Page 138

1   A   I think I've already testified that I
2   understand that the declarants clearly would be
3   the ones that would be creating this declaration,
4   but I do believe that there may have been review
5   or participation by -- participation is the wrong
6   word. There may have been review by counsel here
7   in the United States.
8   Q   Anyone else?
9   A   No. I mean, I would not know of anyone
10   else.
11   Q   Okay.
12   And when you said that you thought that
13   AnC Bio would be preparing, why do you say that?
14   Do you know or is that just something that you
15   think would've happened?
16   A   No. In the context of what was being
17   done, I presume AnC Biopharm would be preparing
18   documents that would be their documents.
19   Q   But I'm saying, is that a presumption
20   or do you know for a fact that the people --
21   A   It's a presumption.
22   Q   Wait -- that the people who signed the
23   declarations were the ones who prepared them?
24   A   Presumption.
25   Q   Like, for instance, did you speak with

Page 139

1   Mr. Kim or Dr. Jang about the declaration?
2   A   No. My relationship with those people
3   is as a scientist and the engineering and design
4   of the building equipment, not --
5   Q   So you have no knowledge as to whether
6   or not they had any role in preparing the
7   declaration; is that correct?
8   A   Correct. Today, because I have seen a
9   document that I believe was signed by them, I was
10   told was signed by them, today I have knowledge.
11   Prior to today, prior to that date when I was
12   shown those, no.
13   Q   But you have knowledge of what?
14   A   Of the documents.
15   Q   Of the documents.
16   But you don't have any knowledge as to
17   whether or not they had any role in preparing
18   those documents --
19   A   No.
20   Q   -- those declarations; is that
21   correct?
22   A   No, I have no knowledge one way or the
23   other of that.
24   Q   Okay.
25   MR. JAMES: Like you said in your

Page 140

1   testimony is that the document or declaration,
2   basically, attests to the fact that AnC Bio has
3   received all of the monies under the agreements
4   with --
5   THE WITNESS: Yes. My question to Mr.
6   Quiros was, do you have -- do we have a receipt
7   for or any indication of receipt of funds paid to
8   AnC Biopharm for, in my particular case,
9   interested in the fourteen point five to fifteen
10   million dollars of equipment that I know is being
11   designed and ordered, and he said, yes, I do.
12   And so I understand from Mr. Quiros that a
13   document exists, which I've seen, that attests to
14   a receipt of those funds.
15   MR. JAMES: Okay.
16   But just the fourteen to fifteen
17   million or the entire twenty-six million?
18   THE WITNESS: No. No. To what's been
19   paid to them.
20   MR. JAMES: What amount?
21   THE WITNESS: My understanding is
22   twenty-six million has been paid to them.
23   MR. JAMES: To AnC Biopharm?
24   THE WITNESS: At this point, I believe
25   twenty-six million has been paid to AnC Biopharm

Page 141

1   -- excuse me. I'm sorry. I'm sorry. I take
2   that back -- I believe twenty-six million has
3   been paid.
4   MR. JAMES: To AnC Biopharm?
5   THE WITNESS: Yes. Yes.
6   BY MS. FUCHS-SINDLER:
7   Q   And what caused you to ask him that
8   question now, at this point?
9   A   Well, because we -- because I watched
10   the limited partnership funds being paid to JCM.
11   And some number -- I want to be careful -- I
12   should be careful. I'm not sure that that last
13   answer is correct.
14   I know that a certain amount of funds
15   have been paid by the limited partnership to the
16   procurement company, JCM, pursuant to that
17   contract. I believe that amount of money that
18   has been paid by the limited partnership to JCM
19   is twenty-six million dollars -- no. It's more
20   than that.
21   I believe that JCM has paid AnC
22   Biopharm an amount of money for services rendered
23   or being rendered. I believe the amount of money
24   that has been paid to AnC Biopharm at this point
25   is twenty-six million dollars.

Page 142

1    Q   Have you ever been an officer or
2  director of AnC Biopharm?
3    A  No.
4    Q   Or part owner?
5    A  No.
6    Q   Have you ever had any role with the
7  company?
8    A  No. There are predecessor companies to
9  AnC Biopharm, and I can't even define a
10 predecessor role, but I want to be not
11 misleading, that in the 90s, late 1990s and early
12 2000s, I had testified that I had gone with the
13 president of a biotech company to Korea to
14 introduce that biotech company to Korea and to
15 introduce Korea to that biotech company.
16       I was a member or a shareholder in a
17 company in that early stage of time. And
18 although there is no relationship between AnC
19 Biopharm and any of those companies, that is how
20 I ended up in Korea meeting those people, and I
21 was a shareholder of one of those companies early
22 on.
23    Q   What was the name?
24    A  Bioheart Korea was the actual name of
25 the company, which was a company -- Bioheart USA

Page 143

1  was the company in the United States, and the
2  Bioheart Korea was the company that was created.
3    Q   Thank you.
4       MR. JAMES:  And you were a shareholder
5  of Bioheart USA, also?
6       THE WITNESS:  Yes. Yes, unfortunately.
7       MS. LAMA:  If we could circle back for
8  just a moment. What was the basis for your
9  belief that twenty-six million has been paid to
10 AnC Biopharm?
11      THE WITNESS:  Because we have --
12 because my understanding is that JCM, who I know
13 what they have been paid, I understand has -- is
14 working with AnC Biopharm for the design,
15 acquisition, and procurement of, manufacture of,
16 equipment. And also JCM is working with AnC
17 Biopharm in the procurement of distribution
18 agreements for the limited partnership and in the
19 securance of architectural and engineering fees
20 for the limited partnership.
21      And so I know at this point what I
22 understand are the amounts of work we've required
23 of AnC Biopharm. We have required them to
24 deliver ten million dollars of distribution
25 rights. We have required them to deliver about a

Page 144

1  million and half dollars of architectural
2  services. And we have required them to deliver
3  about fifteen million dollars worth of work on
4  equipment. So I think those come to about
5  twenty-six million dollars.
6       BY MS. FUCHS-SINDLER:
7    Q   And is there any other basis for your
8  belief, other than you've mentioned?
9    A  No. No. And I'm told -- well, and I'm
10 told by Mr. Quiros that he has documentation
11 receipt for those amounts of money.
12    Q   And you've seen that?
13    A  I saw that piece -- that declaration
14 that we just talked about.
15    Q   Other than the declaration, did you
16 see any other documents?
17    A  No. No. No. No. No.
18    Q   Okay.
19    A  Deliverables, I mean, I've seen
20 deliverables. I've seen the master distribution
21 agreement. I've seen the intended documents with
22 that. I've seen the work product of the
23 architects and the engineers. And I've spoken
24 with in substance about the work product by the
25 equipment designers and manufacturers.

Page 145

1       But, no, I've not seen other documents,
2  other than that.
3       MS. LAMA:  And by work product that
4  you've seen, can you elaborate on that? You've
5  seen --
6       THE WITNESS:  Conversations,
7  discussions at working sessions on design of
8  building and equipment for this facility.
9       MS. LAMA:  But actual work product in
10 terms of --
11      THE WITNESS:  My work product is what
12 I'm referring to, which are the discussions, the
13 dialogue, and the efforts made at these meetings.
14      MS. LAMA:  And just to confirm if I'm
15 recalling correctly, your testimony was that to
16 date you have not seen reports or physical work
17 product prepared by AnC Biopharm, and I'm not
18 talking about discussions and conversations --
19      THE WITNESS:  Correct.
20      MS. LAMA:  Okay.
21      And what triggered this concern about
22 wanting an attestation by AnC Bio that payments
23 had been received and accounted for?
24      THE WITNESS:  Nothing triggered it. I
25 mean, good business practice say you try to work

Page 146

1  on those. And, as I suggested, I'd be very
2  comfortable with operating under a contractual
3  agreement. However, I'm a little bit of a belts
4  and suspenders kind of guy, and I just like --
5  but nothing triggered that.
6      I mean, tomorrow, I might ask another
7  question or another document that gives -- you
8  know, gives something different. Nothing
9  triggered that particular conversation.
10     BY MS. FUCHS-SINDLER:
11     Q    Do you have an understanding as to
12 whether or not Mr. Quiros wanted this declaration
13 because of any questions that we at the SEC had
14 asked him?
15     A   No, I do not.
16     MS. LAMA: Did you ask Mr. Quiros to
17 obtain that attestation?
18     THE WITNESS: No, I did not.
19     BY MS. FUCHS-SINDLER:
20     Q    Did he tell you about any of the
21 questions we asked during testimony?
22     A   No, he did not.
23     MS. LAMA: I'm sorry. I'm a little bit
24 confused. You mentioned that it's good business
25 practice to obtain such an attestation, but you

Page 147

1  didn't actually request the attestation?
2      THE WITNESS: I testified that it is
3  good business practices to go as far as one can
4  go, get as much documentation as one can get. I
5  did not testify to good practice is to get an
6  attestation.
7      I believe I testified that it is good
8  business practices to have belts and suspenders
9  in terms of your business practices. And so I
10 did not -- I don't believe I testified, Michelle,
11 that it was good business practices to get
12 attestations. This happens to be, as I
13 understand it, an attestation or evidence of
14 receipt, and that's good.
15     MS. LAMA: Okay. And I guess what I
16 just want to make sure I understand is, were you
17 asking for some kind of --
18     THE WITNESS: No, I was not.
19     MS. LAMA: -- evidence of receipt in
20 whatever form? So I'm not saying you asked for
21 an attestation, but instead I'm just asking, did
22 you request some type of payment receipt?
23     THE WITNESS: No, I did not.
24     BY MS. FUCHS-SINDLER:
25     Q    Do you happen to know Mr. Kim's

Page 148

1  passport number?
2      A   No.
3      Q    Do you know who would, other than him?
4      A   Mr. Kim's passport number?
5      Q    Yeah.
6      A   No, I do not. I have no idea. USCIS,
7  I presume. I do not.
8      Q    Same question for Dr. Jang?
9      A   No, I do not.
10     Q    Do you know if they have any
11 residences in the United States?
12     A   No, I do not.
13     THE WITNESS: I testified earlier,
14 Michelle, that at some point, NECS will engage
15 specialists that will be more detailed about work
16 product or work performances. That is, again, my
17 belief that good business practices suggest this,
18 this, and this.
19     We will continue to be belts and
20 suspenders type of people. I have all the
21 confidence in the world that we are spending
22 limited partnership's funds in the way they're
23 supposed to be spent, and I'm confident that
24 that's being done, but I'm going to always do
25 what I can to be more sure of that.

Page 149

1      MR. JAMES: In these weekly telephone
2  calls or monthly in-person meetings, is there
3  ever a representative from the State of Vermont
4  involved or attending or present?
5      THE WITNESS: I don't believe there
6  ever has been in one of those meetings, Brian.
7      MR. JAMES: Has there been separate,
8  other meetings where representatives from the
9  State of Vermont attend or send a representative
10 or -- in connection with AnC --
11     THE WITNESS: Yes. We are -- we work
12 with a number of attorneys who represent clients
13 who are interested in participating in AnC Bio
14 projects. In our meeting with those attorneys,
15 often times a representative from the State of
16 Vermont will join those meetings to talk about
17 the State of Vermont, its economic development,
18 and its -- its intent to attract businesses and
19 capital in Vermont.
20     Those State of Vermont employees will
21 often speak about the value of one of our EB-5
22 projects, the AnC Bio project, and how it is
23 impacting the economic development of the region.
24 That happens quite frequently during the course
25 of the year, but not at one of our architectural

Page 150

1  or planning design meetings.
2          MR. JAMES: So there's no meetings
3  where you have representatives from the State of
4  Vermont or and representatives of AnC Biopharm
5  present at the same meeting? That's never
6  occurred?
7          THE WITNESS: No, not that I can
8  recall.
9          There have been -- there could have
10  been a public meeting where there may have been
11  representatives from AnC Biopharm at the public
12  meeting and representatives from the State of
13  Vermont at the public meeting, and the public
14  meeting was for the purposes of economic
15  development in the State of Vermont through the
16  AnC Bio project, but they would not have been
17  there to meet with each other. They would've
18  been in the same room together.
19          MR. JAMES: Okay.
20          And nothing that we had talked about
21  deliverables of AnC Bio project or that type of
22  stuff?
23          THE WITNESS: No. No. No.
24          MR. JAMES: Okay.
25          MS. LAMA: If I may circle back just

Page 151

1  for a moment. I just want to clarify. At any
2  point in time, did you ever have any discussions
3  with Mr. Quiros or anyone else about obtaining
4  documents that evidenced receipt of funds for the
5  performance of services by AnC Biopharm?
6          MR. GORDON: Don't reveal any
7  communications with Counsel or any other
8  communications meant to facilitate or obtaining
9  communications with Counsel.
10          THE WITNESS: None of them would be
11  regarding that. I've had conversations with Mr.
12  Quiros over the course of two years or a year
13  that we constantly must be good stewards of the
14  limited partnership's funds. And to that end, we
15  should always be as diligent as we can about
16  making sure that the funds are being expended the
17  way they're supposed to be expended. This is not
18  an easy job.
19          And so, yes, there have been many
20  conversations between myself and Mr. Quiros,
21  myself and Mr. Stenger, myself and George
22  Gulisano about the need for fiduciary
23  responsibility and the diligent work effort on
24  behalf of these limited partners.
25          To that end, of course, we talk about

Page 152

1  measuring performance and such, not just about
2  AnC Biopharm, but about all of -- any vendor.
3  Probably the architects and the general
4  contractors more than anyone.
5          MS. LAMA: Okay.
6          But specifically in connection with AnC
7  Biopharm, can you tell us about discussions
8  you've had with Mr. Quiros about obtaining such
9  documents or evidence?
10          THE WITNESS: I -- I can only tell you
11  that during the course of -- during the course of
12  our relationship with AnC Biopharm, specifically
13  in relationship to AnC Bio -- Jay Peak Biomedical
14  Research Park and the limited partnership it
15  represents, I have had multiple conversations
16  with Mr. Quiros about prudent fiduciary
17  responsibilities and management of funds being
18  expended, including AnC Biopharm. But I have had
19  no specific discussions with Mr. Quiros about
20  activity with AnC Biopharm in regards to receipt
21  or anything beyond the terms of the contract, no.
22          General discussions about prudent
23  management of vendors, yes, constantly.
24          MS. LAMA: Did Mr. Quiros ever express
25  any resistance to getting that type of

Page 153

1  information from AnC Biopharm?
2          THE WITNESS: No. No, of course not.
3          MS. FUCHS-SINDLER: This might be a
4  good time for a lunch break. So let's go off the
5  record at 1:40.
6          (Whereupon, at 1:40 p.m., a luncheon
7  recess was taken.)
8          A F T E R N O O N   S E S S I O N
9          MS. FUCHS-SINDLER: We are back on
10  record at 2:45 after a lunch break.
11          BY MS. FUCHS-SINDLER:
12      Q   During that time, we had no
13  substantive conversations; is that correct?
14      A   Correct.
15      Q   And right before we went on the record
16  now, Mr. Kelly, you indicated you wanted to make
17  a comment?
18      A   During lunch, I thought about
19  testimony, particularly to Michelle about the
20  twenty percent NECS payments in synchronization
21  with each of the JCM payments. And when you
22  asked me the question, Michelle, I was
23  uncomfortable with when I took the reduced
24  amounts. And so I want to go back and look at
25  the records to determine when I took those,

Page 154

1  rather than assume or believe that it was in the
2  earlier -- I need to look at the NECS records to
3  determine that, and I will.
4          MR. JAMES: And when you say the NECS
5  records, what records are you talking about?
6          THE WITNESS: Invoices. Any invoices
7  of NECS to the limited partnership for
8  construction supervision fees.
9          MR. JAMES: Okay.
10         And then once you've looked at those
11 records, you believe you will be more comfortable
12 in your response?
13         THE WITNESS: Yes. A hundred percent,
14 yes. Yes.
15         MR. JAMES: A quick reminder before we
16 jump back in. Let us complete the question, and
17 then -- I know you're anticipating the answer,
18 but answer after that.
19         THE WITNESS: I apologize.
20         MR. JAMES: Thanks.
21         (SEC Exhibit No. 136 was
22          marked for identification.)
23 BY MS. FUCHS-SINDLER:
24     Q   We've spoken about many agreements and
25 different contracts, so we wanted to show you

Page 155

1  some of them. And prior to the going on the
2  record, the Court Reporter marked as Exhibit No.
3  136 a copy of what appears to be a Technical
4  License Agreement, and it has the date of
5  December 1st, 2012 between AnC Bio Vermont and
6  AnC Bio Korea.
7          Do you recognize this document?
8      A   Yes, I do.
9      Q   Okay. Can you tell us what it is?
10     A   The offering memorandum for Jay Peak
11 Biomedical Research Park limited partnership
12 presents AnC Bio Vermont, the sponsor company,
13 will enter into -- will identify a subsidiary of
14 AnC Bio Vermont who will be the joint venturer
15 with the limited partnership to create a joint
16 venture company that will manage and operate the
17 facility. AnC Bio Vermont will contribute to
18 that joint venture the technology necessary to
19 manufacture and produce the products that will be
20 distributed by the joint venture company.
21     Q   So previously when you referenced a
22 Technical License Agreement, this is what you
23 were talking about?
24     A   This Technical License Agreement is
25 specifically for the technology that is being

Page 156

1  transferred -- or that's being licensed from AnC
2  Bio Korea to AnC Bio Vermont, LLC, the sponsor
3  company. What I referenced prior was
4  distribution agreements and documents that are --
5  documents that are related to those distribution
6  agreements, not this Technical License Agreement.
7          This is a separate Technical License
8  Agreement, which deals only with technology. The
9  distribution agreement that flows between the
10 limited -- that flows between AnC Biopharm and
11 the limited partnership has attendant documents,
12 for instance -- attendant documents that describe
13 the distribution rights.
14     Q   Okay.
15         And the items that you mentioned, the
16 technology, is that what's referred to on the
17 last page of this exhibit, which is Bate marked
18 ANCBIO-004258?
19     A   Yes.
20     Q   Okay. And --
21     A   These are the technology for these
22 products, these same products, which will be
23 distributed under distribution rights owned by
24 the limited partnership.
25     Q   Okay.

Page 157

1          And those products were the Twin
2  Pulsatile Life Support System, C-PAK, E-Liver,
3  and Stem Cell Culturing and Factoring Processes?
4      A   Yes.
5      Q   Okay.
6          And the page immediately prior to that
7  that's Bates stamped ANCBIO-004257, do you see
8  where the signature for licensure AnC Bio Korea
9  and AnC Bio Vermont? Do you see that?
10     A   Yes, I do.
11     Q   Okay.
12         On behalf AnC Bio Korea, do you know
13 who signed that?
14     A   I do not.
15     Q   Do you recognize the signature?
16     A   I do not.
17     Q   Okay.
18         And for licensee, AnC Bio Vermont, do
19 you see where it says Ariel Quiros, Chairman?
20     A   Yes.
21     Q   And do you recognize his signature?
22     A   Yes.
23     Q   And have you had occasion to see his
24 signature before?
25     A   Yes.

Page 158

1  Q   On how many occasions?
2  A   Many.
3  Q   Over a hundred?
4  A   No.
5  Q   Over fifty?
6  A   Fifty.
7  Q   Okay. So you recognize it?
8  A   Somewhere around there. Yes, I
9  recognize it.
10  Q   Okay.
11       (SEC Exhibit No. 137 was
12        marked for identification.)
13  BY MS. FUCHS-SINDLER:
14  Q   I'm handing you what's been marked as
15  Exhibit No. 137. It says, Master Distribution
16  Agreement, dated as of December 1st, 2012,
17  between AnC Bio Korea, Jay Peak Biomedical
18  Research Park, and AnC Bio Vermont GP Services,
19  LLC.
20       Do you recognize this document?
21  A   Yes, I recognize it.
22  Q   What is it?
23  A   This is the Master Distribution
24  Agreement procured by the limited partnership
25  from AnC Biopharm for the rights to distribute

Page 159

1  the four products that are listed on page
2  ANCBIO-004242.
3  Q   Okay.
4       And this is the agreement that you were
5  talking about before?
6  A   Yes, this is the -- yes. This is the
7  agreement between the limited partnership for
8  their rights to distribute the products, correct.
9  Q   And if you could look at Bates stamp
10  ANCBIO-004240, where you see different
11  signatures, and on behalf of Jay Peak Biomedical
12  Research Park by its general partner, do you see
13  where it says it's signed by — appears to be
14  signed by William Stenger?
15  A   Yes.
16  Q   And do you recognize his signature?
17  A   Yes.
18  Q   And on how many occasions,
19  approximately, have you seen his signature?
20  A   A dozen or more.
21  Q   Okay.
22       And there where it's signed for AnC Bio
23  Korea, Inc., do you recognize that signature?
24  A   I don't.
25  Q   Do you have any idea who signed it on

Page 160

1  behalf of AnC Bio Korea?
2  A   I'm looking at the initials. I don't.
3  I don't. I'm sorry.
4  Q   It's okay.
5       And what is the relationship between
6  AnC Bio South Korea and AnC Biopharm?
7  A   There is no relationship I believe at
8  this time. AnC Bio Korea -- I don't think
9  there's any relationship. I think AnC Korea and
10  AnC Biopharm are two different companies. AnC
11  Biopharm may be a successor to AnC Bio Korea.
12  Q   I'm sorry. Did you say you thought it
13  might be a successor company?
14  A   It could be a successor company of AnC
15  Bio Korea.
16  Q   Why do you think that?
17  A   Because I believe there are a number of
18  persons that are in AnC Biopharm that were at AnC
19  Bio Korea.
20  Q   Who is that? Who are those people?
21  A   Dr. Jang, Sean Choi, Lyan Kim, Mr.
22  Hahn. That's all -- those are the only names that
23  I know.
24  Q   Is AnC Bio Korea, is that an operating
25  company now?

Page 161

1  A   I don't know that. I honestly don't
2  know that.
3  Q   Do you have any understanding? Do you
4  have any understanding as to whether it is?
5  A   No, I don't.
6  Q   Okay.
7  A   I have no reason to believe it's not.
8  I don't have any reason to believe it is. I have
9  no knowledge.
10  Q   Okay.
11       (SEC Exhibit No. 138 was
12        marked for identification.)
13  BY MS. FUCHS-SINDLER:
14  Q   The Court Reporter's just marked as
15  Exhibit No. 138, which I'm handing to you. It
16  appears to be a copy of what says, Memorandum of
17  Understanding for AnC Bio Inc. and AnC Biopharm.
18  And it pertains to the construction of AnC Bio
19  Vermont, LLC facility in Newport owned by Jay
20  Peak Biomedical Research Park. And then it -- do
21  you recognize this document?
22  A   I do.
23  Q   Can you tell us what it is?
24  A   When the government of Vermont
25  initially asked for a facility to be built in

Page 162

1  Newport that would accommodate jobs, and the
2  result of that request was AnC Bio and Jay Peak
3  Biomedical Research Park and this facility, there
4  was a fair amount of effort made to determine the
5  likelihood of use of the building.
6        In determining how the space would be
7  allocated, AnC Biopharm in Korea wanted a
8  particular amount of use of the building. And so
9  at the time, the sponsor company asked AnC
10  Biopharm to --
11     Q    The sponsor company being?
12     A    AnC Bio Vermont, LLC, who was the
13  developer and sponsor of the facility, asked a
14  number of entities to express their interest in
15  using the building, in using the facility. AnC
16  Biopharm was one of them.
17        And this is an understanding from AnC
18  Biopharm, and I presume the sponsor company --
19  yes, and the sponsor company indicating their
20  intent to use the building, to utilize the
21  building for operations. So a particular tenant,
22  a likely tenant.
23     Q    Okay.
24        And if you look at the second page of
25  this document, you'll see some signatures. It

Page 163

1  says, AnC Bio, Inc., slash, AnC Biopharm, Inc.
2  It says, Alex J.W. Choi, Chairman and CEO.
3        Do you recognize that to be his
4  signature?
5     A    I do.
6     Q    Do you know why it says AnC Bio, Inc.,
7  slash, AnC Biopharm?
8     A    I do not. I do not. It suggests there
9  was a relationship between those two and possibly
10  a successor company. I do not know.
11     Q    Do you know if Mr. Choi is still
12  Chairman and CEO of these entities?
13     A    He is Chairman and CEO -- yes, he is
14  Chairman and CEO of AnC Bio, Inc. I don't know
15  whether -- I don't believe he is of AnC Biopharm,
16  but he is of AnC Bio, Inc., yes.
17     Q    How do you know that?
18     A    How do I know that he was --
19     Q    How do you know that he is the
20  Chairman and CEO of AnC Bio, Inc.?
21     A    My last knowledge was that he was the
22  Chairman and CEO of AnC Bio, Inc. I know that
23  because I'm familiar with the company and Mr.
24  Choi and his role in that company.
25     Q    But you don't know what his role is --

Page 164

1     A    Today?
2     Q    -- with AnC Biopharm?
3     A    No, I do not.
4     Q    Do you know what it was in the past?
5     A    I don't know that it was any, because I
6  don't know what his relationship with AnC -- I
7  don't know what AnC Biopharm's relationship is
8  with AnC Bio Korea -- AnC Bio, Inc. But I do
9  know that Mr. Choi was and, for all intents and
10  purposes, still is Chairman of AnC Bio, Inc. I
11  don't know the relationship between AnC Bio, Inc.
12  and AnC Bio Vermont.
13     Q    Is Alex Choi related to Sean Choi?
14     A    No, he's not.
15     Q    Okay.
16     A    Not that know of. I believe he is not.
17     Q    Do you know Mr. Choi's relationship
18  with -- Alex Choi's relationship with Mr. Quiros?
19     A    They have been business partners and
20  business associates for a number of several
21  years.
22     Q    Do they have a family relationship,
23  too?
24     A    Not that I know of.
25     Q    Okay.

Page 165

1        And then you see where it says, AnC
2  Vermont, LLC, signed by Ariel Quiros, Chairman
3  and CEO?
4     A    Yes.
5     Q    Do you know if Mr. Quiros is still
6  Chairman and CEO of AnC Bio Vermont?
7     A    Yes. Yes. Yes.
8     Q    What is AnC Bio, Inc.?
9     A    AnC Bio, Inc. is a company that -- is a
10  Korean -- South Korean-based company that --
11  again, I have to be careful because I don't know
12  the technical side of this as much as I do -- I
13  referred earlier to Bioheart Korea. Bioheart
14  Korea was a company that was in business to work
15  with a US biomedical company.
16        That company at some point was -- went
17  public. Then went private. Then was disbanded.
18  And many of the individuals that were with
19  Bioheart Korea became involved with AnC Bio, Inc.
20  And AnC Bio, Inc. is the company that continued
21  operations in South Korea in the AnC Bio, Inc.
22  biomedical facility in South Korea to perform
23  research and development of medical devices and
24  medical therapies.
25        AnC Biopharm is a company that is

Page 166

1  providing scientific services and goods and
2  services to Jay Peak Biomedical Research Park. I
3  cannot tell you the legal physical relation
4  between the two.
5      Q   Do you know if AnC Biopharm provides
6  services to -- anyone -- any entity, other than
7  Jay Peak Biomedical Research Park?
8      A   I believe they do.
9      Q   Why do you believe that?
10     A   Because I believe there are -- there's
11 work going on between AnC Biopharm and other
12 companies currently. I believe there are other
13 business relationships.
14     Q   Did someone tell you that?
15     A   I'm led to believe that. No, I'm not
16 sure if someone ever told me that, but I know
17 that individuals that are at AnC Biopharm I
18 believe are working on projects and products with
19 other companies around the world related to the
20 same thing that we are at Jay Peak Biomedical
21 Research Park.
22     Q   Do you know what the relationship is
23 between AnC Bio, Inc. and AnC Bio Korea?
24     A   No. And I don't know that there is a
25 relationship. As I suggested, I think these are

Page 167

1  somehow successor companies. And the only reason
2  that I indicate that there may be a relationship
3  is because of the individuals that have worked
4  for the different companies, and I find those
5  individuals had worked for one company, and then
6  they are working for another of these mentioned
7  companies.
8      Q   Have you ever been an officer,
9  director, or played any other role with AnC Bio,
10 Inc.?
11     A   No.
12     Q   And how about with AnC Bio Korea?
13     A   No.
14     Q   Have you ever served as counsel to any
15 of these entities?
16         MR. GORDON: Do you mean a lawyer or --
17         MS. FUCHS-SINDLER: A lawyer.
18         MR. GORDON: A lawyer.
19         THE WITNESS: Oh, no. No. No. No.
20 No.
21         BY MS. FUCHS-SINDLER:
22     Q   Or to AnC Biopharm?
23     A   No. No.
24         MS. LAMA: AnC Bio, Inc., how large is
25 that operation? Or can you just describe the

Page 168

1  size?
2          THE WITNESS: AnC Bio, Inc. -- AnC Bio,
3  Inc. was -- again, I don't have technical
4  knowledge of this, Michelle, but my
5  understanding, having been in the industry, if
6  you will, I would suggest that AnC Bio, Inc. was
7  twenty to twenty-five individual people, and that
8  was the operational company for the biomedical
9  research and development facility in Seoul. My
10 knowledge of that comes as my -- from my visits
11 to that facility and meeting and greeting people
12 in the facility.
13         BY MS. FUCHS-SINDLER:
14     Q   When were you there?
15     A   Let me think the last time I was there.
16 I think it's a year ago, a year ago.
17     Q   Did AnC Bio, Inc., was it ever traded
18 on the South Korean stock exchange, to your
19 knowledge?
20     A   I don't believe so.
21     Q   How about --
22     A   Bioheart Korea I think was, but AnC
23 Bio, Inc., I don't believe was, no.
24     Q   How about AnC Bio Korea?
25     A   I don't think so, no.

Page 169

1  Bioheart Korea, which --
2      Q   Bioheart Korea.
3      A   Bioheart Korea was a private company
4  that went public, and then went back private
5  again. It went to public. And then it went back
6  private. And Bioheart Korea was traded publicly
7  on the exchange in Korea.
8      Q   And how about AnC Biopharm, was that
9  ever traded publicly?
10     A   Not that I know of, no.
11     Q   What was that?
12     A   Not that I know of, no.
13     Q   Okay.
14         And you said you had a role in Bioheart
15 Korea?
16     A   In Bioheart Korea, I introduced the
17 President of Bioheart USA to the President of
18 Bioheart Korea.
19     Q   What was your relationship between
20 those two entities?
21     A   Bioheart USA was a research and
22 development company in the business of taking a
23 MyoCell product, a product called MyoCell,
24 through commercialization with the FDA in the
25 United States.

Page 170

1    In doing that, they had relationships
2  with companies around the world, primarily in the
3  Netherlands, Australia, Germany, and now South
4  Korea, to do human clinical work that would
5  support their efforts to get FDA
6  commercialization approval in the United States.
7    Bioheart Korea operated as an entity
8  doing just those human clinical trials in the
9  country of South Korea and getting Korean FDA
10 approval for the processes in support of Bioheart
11 USA.
12   Q   Well, were you ever an officer,
13 director of Bioheart Korea --
14   A   No.
15   Q   -- when it was publicly traded?
16   A   No. Or when it wasn't publicly traded.
17   Q   Okay.
18     Let me show you what was previously
19 marked as Exhibit No. 89, a copy of a proforma
20 invoice. And tell me if you recognize this
21 document.
22   A   I do recognize this document.
23   Q   What is it?
24   A   This is the agreement -- this is an
25 agreement evidencing the relationship --

Page 171

1  evidencing the terms that exist between AnC
2  Biopharm and JCM --
3    Q   Okay.
4    A   -- for the procurement of -- for the
5  provision of the fifty-two million dollars of
6  goods and services I spoke about earlier. This
7  is the forty million dollars of equipment, ten
8  million dollars of distribution, and two point
9  one million dollars of architectural fees.
10   Q   And you see at the very top where it
11 says, AnC Bio, in large print, and then in small
12 print under that, AnC Biopharm?
13   A   I do.
14   Q   Seeing this now, does this jog your
15 memory or understanding as to the relationship
16 between these two entities?
17   A   No. I don't have an understanding of a
18 relationship between those two entities.
19   Q   Okay.
20     Do you know why it says AnC Biopharm
21 directly under AnC Bio?
22   A   No. I can -- conjecture would tell me
23 that as I see here before AnC Bio, Inc., slash,
24 AnC Biopharm, that they may be related companies,
25 but I have no knowledge of that.

Page 172

1    Q   Okay.
2      When you go to the second page of this
3  exhibit, do you see where it says under AnC
4  Biopharm, it's signed by -- it's spelled
5  W-O-N-G-Y-U, and then Jang, J-A-N-G, President?
6    A   Yes.
7    Q   That's Mr. Jang that we've been
8  talking about?
9    A   I believe that is Mr. Jang, yes.
10   Q   And do you recognize his signature
11 here?
12   A   I do not.
13   Q   Have you had occasion to see his
14 signature?
15   A   No.
16   Q   Okay.
17     And then do you see where it says,
18 accepted by Jay Construction Management, and then
19 it looks to be signed by -- I'll spell it out,
20 J-O-N-G, next word W-E-O-N, and then Choi,
21 C-H-O-I, as CEO?
22   A   Yes.
23   Q   Do you recognize that signature?
24   A   I do.
25   Q   And is that Alex Choi?

Page 173

1    A   Yes.
2    Q   And you've seen his signature in the
3  past?
4    A   Yes.
5    Q   About how many times?
6    A   A dozen.
7    Q   So at a certain point, he was CEO of
8  Jay Construction Management?
9    A   Yes.
10   Q   Okay.
11     During what period of time was that?
12   A   2011, 2012, and possibly 2013. 2011,
13 '12, and '13.
14   Q   And what is his role now with Jay
15 Construction Management?
16   A   None. He has no role with Jay
17 Construction Management at this point.
18   Q   So his relationship ended -- his role
19 with JCM ended in 2013?
20   A   Yes, I believe in 2013. It may have
21 been the end of 2013.
22   Q   And why was that, that his role
23 stopped?
24   A   Because JCM was changing its role as a
25 Jay Construction Management, where it was the

Page 174

1  general contractor of construction for five EB-5
2  projects at Jay Peak, and it became the role of
3  JCM to be the procurement company for products
4  procured from AnC Biopharm.
5        And I believe it was in the best
6  interest of no conflict of interest of the
7  parties to have Mr. Choi taken out of JCM,
8  because it's no longer a construction company,
9  and it is now a procurement company.
10       And so the company I believe was -- the
11 company was transacted, and the company was
12 changed from under the leadership of Mr. Choi to
13 under the leadership of Mr. Quiros.
14    Q   Do you know whose decision that was to
15 change -- to move Mr. Choi as CEO and bring in
16 Mr. Quiros into leadership?
17    A   Well, not move Mr. Choi as CEO, but the
18 actual company was purchased by one of Mr.
19 Quiros's companies, because at that date, it was
20 changing its role from a construction company to
21 a US-based, Vermont-based procurement company. It
22 would be Mr. Quiros's decision, Mr. Quiros and
23 Mr. Choi's, I'm sure.
24    Q   Whose decision was it to change the
25 role of JCM?

Page 175

1     A   I think both. Mr. Quiros and Mr. Choi
2  probably would have agreed that in the interest
3  of no conflict of interest that it would be wiser
4  for that to be a company owned not by the
5  supplier, AnC Biopharm, or any relation to them.
6     Q   And do you know if it was Mr. Quiros's
7  decision with Mr. Choi?
8     A   No. I presume it was Mr. Quiros and
9  Mr. Choi would've agreed on that together. But,
10 no, I don't have that knowledge. No.
11    Q   Do you know if Mr. Jang is still
12 President of AnC Biopharm?
13    A   I don't. I -- I don't. I know he's an
14 executive of AnC Biopharm, but I don't know what
15 his exact title is.
16       MS. LAMA: And you mentioned that Mr.
17 Quiros procured -- I'm sorry, purchased JCM?
18       THE WITNESS: Yes. Yes. The assets of
19 JCM were purchased by Q Resorts actually. That's
20 my understanding.
21       BY MS. FUCHS-SINDLER:
22    Q   And how do you have that
23 understanding?
24    A   I spoke with the CFO at the time, and I
25 believe it was important to have a US-based,

Page 176

1  Vermont-based company as the procurement company.
2  I was -- I was supportive of the concept of
3  having a US-based company in between the
4  procurement process, so that when the limited
5  partners were procuring goods, they were
6  procuring them from a US-based, Vermont-based
7  company in JCM, which would've otherwise been
8  administratively dissolved possibly at that time
9  because it did not have a role any longer or much
10 of a role left as a construction management
11 company.
12       I supported the concept that we leave
13 that company in place as a US, Vermont-based
14 company where the funds from the limited
15 partnerships would be deposited and the fiduciary
16 relationship would be between JCM and the limited
17 partnership in terms of the fifty-two million
18 dollars worth of goods and services that were
19 going to be procured.
20    Q   When you mentioned the CFO, are you
21 talking about Mr. Gulisano?
22    A   Yes. Yes.
23       MS. LAMA: And how much did Q Resorts
24 purchase JCM for?
25       THE WITNESS: I don't know that,

Page 177

1  Michelle.
2        MS. LAMA: And you mentioned that was
3  at the end of 2013?
4        THE WITNESS: At the end of 2013,
5  beginning of 2014. I believe it was probably the
6  beginning of 2014 actually, or early in 2014. I
7  don't know that date.
8        MS. LAMA: Did you have any discussions
9  with anyone concerning the purchase price paid by
10 Q Resorts to purchase JCM?
11       THE WITNESS: The purchase price? No.
12       BY MS. FUCHS-SINDLER:
13    Q   Do you know how the purchase price was
14 arrived at?
15    A   No. I'm sure there was an asset -- it
16 was an asset -- I'm sure they -- I don't know.
17       MS. LAMA: And what's your
18 understanding of what JCM's assets are?
19       MR. GORDON: Today?
20       MS. LAMA: Sure.
21       THE WITNESS: I don't know that.
22       BY MS. FUCHS-SINDLER:
23    Q   Were you ever aware of the assets of
24 JCM?
25    A   No.

Page 178

1    Q    Who would be aware of that?
2    A    Mr. Gulisano. George would. George
3  would understand the assets of JCM.
4    Q    Anyone else?
5    A    Mr. Quiros, Mr. Choi, I'm sure. But,
6  again, I'm speculating.
7    Q    And why do you say that Mr. Gulisano
8  would know the assets of JCM?
9    A    Because Mr. Gulisano is the CFO for Q
10 Resorts, and if Q Resorts purchased JCM, I would
11 suspect Mr. Gulisano would have knowledge of the
12 value of that transaction.
13       MS. LAMA: Your understanding is Mr.
14 Gulisano is the CFO of Q Resorts?
15       THE WITNESS: He acts in a financial
16 advisory position. I cannot say he's the CFO.
17 Let me retract that. He acts in a financial
18 advisory position to Mr. Quiros. I don't know
19 whether he's actually a CFO title of Q Resorts,
20 no.
21       MS. LAMA: As construction supervisor,
22 do you ever see financial information for JCM?
23       THE WITNESS: No.
24       BY MS. FUCHS-SINDLER:
25    Q    Have you ever?

Page 179

1    A    No.
2       MS. LAMA: Have you ever requested any
3  bank statements, bank records?
4       THE WITNESS: Never, no.
5       MS. LAMA: Financial reports?
6       THE WITNESS: No.
7       BY MS. FUCHS-SINDLER:
8    Q    I'm going to show you what was
9  previously marked as Exhibit No. 90. It's a Jay
10 Peak Biomedical Research Park, LP purchase order
11 between owner and supplier. It's dated March
12 1st, 2013.
13    A    Yes, I'm familiar with this document.
14       (Mr. James leaves the room.)
15       BY MS. FUCHS-SINDLER:
16    Q    Can you tell us what it is?
17    A    This is the fifty-two million dollar
18 contract that I referred to earlier, and this is
19 an invoice under this, Exhibit 89 --
20    Q    Okay.
21    A    -- is an invoice under or related to
22 this contract. This is the fifty-two million
23 dollar contract that exists between JCM as a
24 procurement company and Jay Peak Biomedical
25 Research Park, LP as a purchaser of these goods

Page 180

1  and services.
2    Q    Okay.
3    A    These are the same fifty-two million
4  dollars worth of services, goods and services.
5    Q    Okay.
6       And when you go to the last page where
7  it says supplier, JCM, do you recognize that
8  signature?
9    A    I believe that's Mr. Choi, Alex Choi,
10 yes.
11    Q    Okay.
12       And signing on behalf of Jay Peak
13 Biomedical Research Park, it appears to be Bill
14 Stenger. Do you recognize his signature?
15    A    Yes, I do.
16    Q    These exhibits I put before you today
17 -- you know, since we've come back from lunch,
18 did you have any role in drafting any of these
19 documents?
20       MR. GORDON: Can we just be clear about
21 which exhibit?
22       MS. FUCHS-SINDLER: Yeah. We'll go one
23 by one. Let's go one by one.
24       BY MS. FUCHS-SINDLER:
25    Q    Okay. So the first one we talked

Page 181

1  about, we showed you the Technical License
2  Agreement --
3    A    No.
4    Q    -- Exhibit 136?
5    A    No.
6    Q    So no role in preparing, editing, or
7  reviewing?
8    A    No, not that I recall.
9    Q    Do you know who did prepare it?
10    A    No, I do not.
11    Q    Okay.
12       Exhibit 137, the Master Distribution
13 Agreement?
14    A    I reviewed that document.
15    Q    Before it was finalized?
16    A    I believe so.
17    Q    Okay.
18       Did you have any changes to it?
19    A    Not that I recall.
20    Q    Do you know who prepared it?
21    A    No, I do not.
22    Q    Okay.
23       And do you know who prepared the
24 Technical License Agreement?
25    A    No, I do not.

Page 182

```
1       Q    All right.  The next one, the MOU,
2   which is Exhibit 138?
3       A   Yes.
4       Q    Did you have any role in preparing
5   this document?
6       A   I reviewed that document prior to it
7   being signed, yes.
8       Q    And who gave it to you to review?
9       A   I believe it came to me from the
10  sponsor company, AnC Bio Vermont, LLC.
11      Q    Who there?
12      A   Mr. Quiros.  I presume Mr. Quiros gave
13  it to me.
14      Q    Okay.  Do you know who drafted this
15  document?
16      A   No, I do not.
17      Q    Okay.
18          And then --
19      A   I may have had comments to this comment
20  -- to this document.  As I recall, I may have
21  made comments on that document.
22      Q    On Exhibit 138?
23      A   Yes.
24          (Mr. James enters the room.)
25          BY MS. FUCHS-SINDLER:
```

Page 183

```
1       Q    And Exhibit No. 89, the proforma
2   invoice, did you have any role in --
3       A   I did not.
4       Q    -- drafting, editing, or reviewing
5   this document?
6       A   I did not.
7       Q    Do you know who prepared it?
8       A   I do not.
9       Q    Okay.
10          Exhibit No. 90, same question?  This is
11  the purchase order.
12      A   Yes, I did.  I did participate in the
13  review and editing of this document.
14      Q    Do you know who drafted it initially?
15      A   I do not.
16      Q    Okay.
17          And who gave it to you to review and
18  edit?
19      A   This would've come from the general
20  partner of the limited partnership.  I assume
21  this would've come from Mr. Stenger.
22      Q    Okay.
23          MS. LAMA:  And do you know who provided
24  it to Mr. Stenger?
25          THE WITNESS:  I don't.  I'm sorry.
```

Page 184

```
1           BY MS. FUCHS-SINDLER:
2       Q    I'm sorry.  And the previous document
3   you said that you reviewed was the Master --
4       A   The Master Distribution Agreement.
5       Q    And that's Exhibit 137?
6       A   Yes.
7       Q    Who gave that to you to review?
8       A   That would have come from the -- I
9   believe that came from the offering memorandum.
10  I believe that was -- that particular document
11  was from the offering memorandum in draft form,
12  and that's what came to me.
13      Q    Okay.
14          Do you remember who provided that to
15  you?
16      A   The offering memorandum?
17      Q    I mean, who -- yes.  I mean, who
18  provided -- who asked you to take a look at this,
19  the Master Distribution --
20      A   Oh, I'm sure the general partner, the
21  general partner of the limited partnership, Bill
22  Stenger.
23      Q    Okay.
24      A   The general partner.  I don't know
25  whether it was Bill Stenger or Ariel Quiros, but
```

Page 185

```
1   it was the general partner who would've asked me
2   to take a look at this on behalf of the limited
3   partners.
4       Q    Okay.
5          (SEC Exhibit No. 139 was
6          marked for identification.)
7          BY MS. FUCHS-SINDLER:
8       Q    The Court Reporter has marked as
9   Exhibit No. 139 a copy of what appears to be an
10  agreement between AnC Bio Vermont, LLC, AnC Bio
11  Vermont GP Services, LLC, which says it's general
12  partner of Jay Peak Biomedical Research Park, and
13  Northeast Contract Services.
14          Can you please take a look at this
15  document.
16      A   Okay.
17      Q    Do you recognize this document?
18      A   I do.
19      Q    And what is it?
20      A   This is the contract for services to be
21  provided by NECS for these contract services to
22  the sponsor company, AnC Bio Vermont, LLC, on
23  behalf of the -- on behalf of the limited
24  partnership.
25      Q    And is this the document that you
```

47 (Pages 182 to 185)

Page 186

1    referring to earlier today?
2        A   Yes.  Well, I did refer to this
3    document earlier today, yes.
4        Q   And who prepared this document?
5        A   I prepared this document.
6        Q   Did anyone else prepare it?
7        A   No.
8        Q   Okay.
9            And if you look at the second to the
10   last page under, Northeast Contract Services, it
11   says, William Kelly, President.  Is that your
12   signature?
13       A   It is.
14       Q   And next to that, GP services for
15   itself and Jay Peak Biomedical Research Park, and
16   it's signed by Ariel Quiros, General Partner.  Do
17   you recognize that to be Mr. Quiros's signature?
18       A   I do.
19       Q   And for the record, it's dated January
20   30th of 2013 on the last page.
21           And do you see under, AnC Bio Vermont,
22   it says, Ariel Quiros, President and Managing
23   Member?
24       A   Yes.
25       Q   And do you recognize that to be his

Page 187

1    signature?
2        A   Yes.
3        Q   Did anyone else take part in
4    preparing, editing, reviewing this document?
5        A   No.
6        Q   Earlier on, you remember you had
7    referred to a potential conflict with Mr. Choi,
8    like they wanted to avoid a potential conflict.
9    You had mentioned that.
10       A   I believe I testified that I was in
11   support of a US, Vermont company.  You asked the
12   reason why they may have done that, and I
13   suggested it may have been because there could be
14   a potential conflict, because the procurement
15   company for the limited partnership would be --
16   would be done through JCM to AnC Biopharm.  I
17   don't know that there was a potential conflict.  I
18   suggested that that possibly could be.
19           My support of JCM being transacted to a
20   company owned by Mr. Quiros was that I saw it as
21   a US, Vermont-based company where the limited
22   partnership's money was going to be deposited as
23   a procurement company.
24       Q   Was there ever any discussion amongst
25   anyone regarding what you said was something that

Page 188

1    you thought could be a potential conflict with
2    Mr. Choi?
3        A   No.  No.  No.
4            MS. LAMA:  And what is Mr. Choi's
5    association with AnC Bio, AnC Biopharm, or any
6    AnC entity?
7            THE WITNESS:  Mr. Choi is the
8    President, Chairman of AnC Bio, Inc.  That is my
9    knowledge.
10           I don't know what the relationship is
11   between AnC Bio, Inc. and AnC Biopharm, and,
12   therefore, other than a document that you've
13   shown me where Mr. Choi has signed as the
14   President of AnC Biopharm, I don't know.
15           BY MS. FUCHS-SINDLER:
16       Q   And I think we -- I don't know if we
17   talked about what's the relationship between AnC
18   Bio Inc. and Jay Peak Biomedical Research Park?
19       A   Jay Peak Biomedical Research Park
20   procures goods and services from AnC Biopharm,
21   and I believe initially from AnC Bio, Inc.  And
22   then at some point, from AnC Bio, Inc. and AnC
23   Biopharm.
24       Q   So initially, it was procuring from
25   AnC Bio, Inc., and then later, AnC Biopharm?

Page 189

1        A   I believe it was originally procuring
2    goods and services from AnC Bio, Inc., and at
3    some point, the decision was made either within
4    the parties to change that AnC Biopharm.
5        Q   Do you know when that decision was
6    made?
7        A   I do not.
8        Q   Do you know who made the decision?
9        A   I do not.
10       Q   And do you know why the decision was
11   made?
12       A   I do not.
13       Q   So how did you come to understand that
14   the procurement was originally from AnC Bio,
15   Inc., and then later AnC Biopharm?
16       A   You will see a Master distribution
17   Agreement between AnC Bio Korea, Inc., your
18   Exhibit 137.
19       Q   Yes.
20       A   And that agreement is with -- that
21   agreement has gone from a distribution agreement
22   being agreed to by AnC Bio Korea, Inc. to part of
23   a procurement program with AnC Biopharm, because
24   those are being procured through AnC Biopharm.
25       Q   What is the other document that you're

Page 190

1  looking at?
2     A   I'm looking at the Master Distribution
3  Agreement that was referencing a Master
4  Distribution Agreement being acquired by Jay Peak
5  Biomedical Research Park, LP from AnC Bio, Inc.
6       That distribution agreement became part
7  and parcel of a Jay Peak Biomedical Research
8  Park, LP, JCM agreement calling for that ten
9  million dollar distribution.  It could very well
10 be that AnC Biopharm is buying it from or
11 procuring it through AnC Bio, Inc.  That, I do
12 not know.  But you have shown me documents today
13 where you show AnC Bio, Inc. and AnC Biopharm
14 signatures in similar places.
15    Q    Yeah.  There was one where it was
16 slash, and I think I had asked you about that.
17    A    So -- my thing is, I don't -- I don't
18 know what the relationship is between those two
19 companies are, but I know that we have a Master
20 Distribution Agreement that I have reviewed at
21 one point between AnC Bio, Inc. and Jay Peak
22 Biomedical Research Park.
23      Now, however, that Master Distribution
24 Agreement has AnC Biopharm's letterhead on it, so
25 they may very well be one in the same company.  I

Page 191

1  can't answer that.
2     Q    We were talking about that slash.  I
3  think we were referring to the Memorandum of
4  Understanding, which is Exhibit 138.
5     A    Correct.  Exhibit 138.
6     Q    Where Mr. Choi signs as Chairman and
7  CEO of AnC Bio, Inc., slash, AnC Biopharm.
8     A    Yes.
9        MS. LAMA:  If we could turn back to
10 Exhibit 89 for a moment, the proforma invoice.
11       THE WITNESS:  Yes.
12       MS. LAMA:  This proforma invoice
13 reflects an arrangement between AnC Bio and/or
14 AnC Biopharm between Jay Construction Management,
15 Inc.; is that right?
16       THE WITNESS:  Correct.
17       MS. LAMA:  Just to clarify here.  And
18 you mentioned before that this proforma invoice
19 is in connection with the purchase order that we
20 also looked at?
21       THE WITNESS:  It appears to be, yes.  I
22 believe it is.
23       MS. LAMA:  Okay.
24       And it relates to the fifty-two million
25 -- well, approximately, fifty-two million

Page 192

1  arrangement for the architectural fees,
2  equipment, and distribution agreement?
3       THE WITNESS:  Correct.
4       MS. LAMA:  Okay.
5       And if we look at the payment and bank
6  information provision included in this proforma
7  invoice in item three, in the second bullet
8  point, it says, "From the next month after the
9  first payment stated above, amount of US" --
10      THE WITNESS:  I'm sorry.  I'm not
11 following where you are.  Oh, on the proforma
12 invoices?
13      MS. LAMA:  Yes.
14      THE WITNESS:  We're on that.  Okay.
15      MS. LAMA:  Exhibit 89.
16      THE WITNESS:  Yes.  Okay.
17      MS. LAMA:  On the first page, in item
18 three, Payment and Bank Information, it has
19 information on a payment schedule.
20      THE WITNESS:  Okay.
21      MS. LAMA:  And you had testified
22 earlier about a two point six million monthly
23 payment?
24      THE WITNESS:  That goes between the
25 limited partnership and JCM.

Page 193

1       MS. LAMA:  Okay.
2       Here, in the second bullet point, it
3  reads, "From the next month after the first
4  payment stated above, amount of US two million,
5  six hundred thousand per month for a total of
6  twenty months shall be transferred to the
7  beneficiary by the end date of each month."  And
8  then the section continues on to read with bank
9  information, and it has the beneficiary as AnC
10 Biopharm, Inc.
11      Does that then -- from this, do you
12 have the understanding that the payment
13 arrangement between Jay Construction Management
14 and AnC Bio -- and/or AnC Biopharm is that AnC
15 Biopharm should be paid two point six million a
16 month from JCM?
17      THE WITNESS:  Yes.
18      MS. LAMA:  Okay.
19      So to clarify then, the LP pays JCM two
20 point six million monthly?
21      THE WITNESS:  Correct.
22      MS. LAMA:  And JCM pays AnC Bio and/or
23 AnC Biopharm, Inc. -- well, here, it says the
24 beneficiary is AnC Biopharm, Inc., the two point
25 six million monthly amount?

Page 194

1    THE WITNESS: That appears to be what
2  this is saying, yes.
3    MS. LAMA: Okay.
4    THE WITNESS: I know on the first part,
5  because I reviewed that, between the limited
6  partnership and JCM. As I testified earlier,
7  although now as you've shown me this document
8  here, it appears that the JCM is paying the exact
9  same amount of money to AnC Biopharm on the exact
10  same schedule. It does not surprise me.
11    MS. LAMA: And aside from the documents
12  that we have just gone through concerning the
13  agreements and arrangements for AnC Biopharm
14  Inc., are there any other agreements you're aware
15  of?
16    THE WITNESS: No.
17    MS. LAMA: Okay.
18    MR. JAMES: Mr. Kelly, if I could just
19  ask you for a moment to turn back to Exhibit 139.
20    THE WITNESS: Yes.
21    MR. JAMES: And if you could turn to
22  what would be page five, and the number is in the
23  upper right-hand corner. And you'll see that
24  paragraph five says, "Compensation payable to
25  NECS by Jay Peak Biomedical Research Park, LP,

Page 195

1  and/or GP Services." Do you see that?
2    THE WITNESS: Yes.
3    MR. JAMES: And then earlier, you
4  talked about the construction supervision
5  percentage that NECS collects for its supervision
6  of the AnC Bio project. Is this what you're
7  talking about, if you read that particular
8  section?
9    THE WITNESS: Yes, sir.
10    MR. JAMES: Okay.
11    And here it says it begins in February
12  1st, 2013?
13    THE WITNESS: I don't believe payments
14  were made until March or April of 2013. But,
15  yes, we believed it was beginning in February
16  2013.
17    MR. JAMES: Okay.
18    So as far as any invoices by NECS to
19  Jay Peak Biomedical Research Park, LP, the
20  earliest invoice would be February 2013?
21    THE WITNESS: Yes.
22    MR. JAMES: Okay.
23    And when you said you believe payments
24  began in March 2013, it would be for the February
25  2013 invoice?

Page 196

1    THE WITNESS: Yes. The first -- the
2  first invoice paid I believe was in March, but it
3  probably was for a February invoice.
4    MR. JAMES: Okay.
5    THE WITNESS: We began work in
6  February, but I don't think there were any
7  invoices paid until March.
8    MR. JAMES: Okay. Okay. Because the
9  invoices comes after work is completed?
10    THE WITNESS: Of course. Of course,
11  yes. The invoice from NECS only come when there
12  is the intended amount of fees paid for
13  construction or equipment. So it must be billed
14  first.
15    MR. JAMES: Okay.
16    But those fees are not paid until
17  they're billed for?
18    THE WITNESS: That's correct.
19    MR. JAMES: And then in theory, they're
20  not billed for until they're actually --
21    THE WITNESS: That's correct.
22    MR. JAMES: -- are incurred?
23    THE WITNESS: That's correct.
24    MR. JAMES: Let me finish.
25    So, for example, when you're talking

Page 197

1  about that whole process of the architect
2  confirming that what's being invoiced for has
3  occurred, that's what you're saying as far as
4  confirmation of the services that are being
5  invoiced?
6    THE WITNESS: Yes. Although, in those
7  particular cases, the architect would not be
8  confirming. Frankly, I would be confirming.
9    MR. JAMES: Exactly.
10    THE WITNESS: Yes.
11    MR. JAMES: And you had explained that
12  earlier when you had testified. Okay.
13    And then staying with that same
14  paragraph, I see a fifteen percent and a five
15  percent. Is that the percentages you were
16  referring to earlier that comes from the offering
17  materials for the AnC Bio project?
18    THE WITNESS: Yes, sir.
19    MR. JAMES: Okay.
20    And I think you also -- and if you flip
21  to the next page, Section 5.1, I think you also
22  went on to testify that of that fifteen and five
23  percent, which total twenty percent, that that's
24  what you invoiced for based on the JCM invoice
25  for services provided?

Page 198

1    THE WITNESS: I invoiced the twenty
2  percent based upon fees paid by the LP applicable
3  to construction supervision fees. So if JCM were
4  to invoice, then subsequent to their being paid,
5  then NECS would invoice. Did that answer your
6  question?
7    MR. JAMES: Okay. So -- but your --
8  the dollar amount that comes from the twenty
9  percent, that's based on whatever invoice has
10 been submitted and is now being paid by --
11   THE WITNESS: Right. Yes, sir.
12   MR. JAMES: Okay.
13   And then you talked about that twenty
14 percent is collected by NECS?
15   THE WITNESS: Correct.
16   MR. JAMES: And then you said you take
17 thirty-two percent of that?
18   THE WITNESS: (The witness nods head.)
19   MR. JAMES: Verbally. Sorry. You have
20 to be audible.
21   THE WITNESS: Yes. I'm sorry. Yes, we
22 retain thirty-two percent.
23   MR. JAMES: And then the sixty-eight
24 percent or at least the remainder percentage is
25 then I guess transferred back to the sponsor, how

Page 199

1  you referred to that entity previously?
2    THE WITNESS: Yes, sir.
3    MR. JAMES: Okay.
4    And in this case, the sponsor is who?
5    THE WITNESS: AnC Bio Vermont, LLC.
6    MR. JAMES: Okay.
7    And looking at Section 5.1, the last
8  paragraph, is that the discussion about what we
9  just talked about, the thirty-two percent and
10 sixty-eight percent?
11   THE WITNESS: Yes, sir.
12   MR. JAMES: Okay.
13   And just in theory, your cost,
14 construction supervision fee that you collect or
15 that you bill for, in your understanding based on
16 the offering documents, that's earned by you once
17 the actual work is done?
18   THE WITNESS: That's correct. When the
19 supervision is completed, then it is billed.
20   MR. JAMES: Okay.
21   For example, when you receive an
22 invoice -- not you, but when an invoice for JCM
23 is paid for February 2013 and JCM is invoicing
24 for the work it did, that is covered in that
25 invoice. Your fifteen percent is only based on

Page 200

1  that amount because that's the work that has been
2  done and is being paid at that time?
3    THE WITNESS: Yes, sir.
4    MR. JAMES: Okay. It's not based on,
5  you know, work that's going to be done next month
6  or the next quarter or at the end of the payment
7  schedule?
8    THE WITNESS: No, sir.
9    MR. JAMES: Okay.
10   THE WITNESS: The offering memorandum
11 is not specific about that, but I --
12   MR. JAMES: Okay. And what's your
13 basis for that?
14   THE WITNESS: Because that's the way it
15 should be done.
16   MR. JAMES: Okay. And is that Mr.
17 Quiros's understanding, also?
18   THE WITNESS: Yes.
19   MR. JAMES: And do you know of anyone
20 that we --
21   THE WITNESS: I can't speak for Mr.
22 Quiros. I presume that's Mr. Quiros's
23 understanding.
24   MR. JAMES: Okay. Has he said anything
25 to suggest to you that he disagrees with --

Page 201

1    THE WITNESS: No.
2    MR. JAMES: Okay.
3    What about anyone else that we've
4  talked about today, whether Mr. Stenger or anyone
5  else, Mr. Gulisano, is there anyone else as far
6  as you're aware of who disagrees with your
7  understanding that that's when the construction
8  supervision fees are earned, when the work is
9  actually performed and it's being paid for?
10   THE WITNESS: The construction
11 supervision fees are earned by the sponsor
12 company -- I don't know when the supervision fees
13 are earned by the sponsor company. That is
14 between the sponsor company and the limited
15 partners and governed by an offering memorandum
16 and the limited partnership agreement.
17   My understanding between NECS and the
18 sponsor company is that I will not bill for them
19 until that point, but I'm not speaking to any
20 understanding of the meeting of the minds of the
21 sponsor company, the general partner, or the
22 limited partnership company. I know that the
23 offering memorandum does not speak to that, but
24 in NECS, I do.
25   MR. JAMES: Okay.

Page 202

1    But as far as how you explain the
2  structure of the transaction, if you will, you
3  collect the construction supervision fees that,
4  ultimately, goes to the sponsor?
5    THE WITNESS: That's correct.
6    MR. JAMES: Okay.
7    So their payment is based on your
8  understanding of how or when that fee is earned
9  or at least when it should be paid?
10    THE WITNESS: When it should be paid.
11    MR. JAMES: Okay.
12    So that's consistent with --
13    THE WITNESS: I want to be careful with
14  the word earned as much it should be paid.
15    MR. JAMES: I agree.
16    So from your understanding, the sponsor
17  is being paid for its construction supervision
18  portion at the same time NECS is being paid for
19  its construction supervision percentage?
20    THE WITNESS: Yes.
21    MR. JAMES: Okay.
22    And as far as the actual invoices
23  themselves, and we may have discussed this, so
24  for you to invoice for your construction
25  supervision, you would need first to know what

Page 203

1  JCM is invoicing for, correct?
2    THE WITNESS: Correct.
3    MR. JAMES: I know we talked about
4  there's a set schedule that identifies the
5  amounts each month. And then using that schedule
6  I'm assuming, but for the most part you still
7  wait to see what JCM invoices?
8    THE WITNESS: Correct.
9    MR. JAMES: Okay.
10    Because could it be different than the
11  two point six or --
12    THE WITNESS: Certainly.
13    MR. JAMES: And as far as JCM's
14  invoice, are you involved at all with their
15  creation and preparation of their invoice?
16    THE WITNESS: No.
17    MR. JAMES: Okay.
18    But you get it before it goes to Jay
19  Peak Biomedical Research Park for payment,
20  correct?
21    THE WITNESS: Correct. There will be,
22  for instance, at some date in the future, there
23  will be not only JCM that will be being paid for
24  work performed during that month. There will be
25  -- that's a JCM contract. There will also be

Page 204

1  Peak CM construction contracts that will create
2  additional fees, and those fees will be reflected
3  in payments, too.
4    MR. JAMES: Okay.
5    And that's when you get into a
6  construction stage?
7    THE WITNESS: Correct.
8    MR. JAMES: That's the construction
9  build-out and fit-in?
10    THE WITNESS: Yes, sir.
11    MR. JAMES: And just so I completely
12  understand, so you receive a JCM invoice for that
13  time period, whether it's a month or whatever
14  you, and then based on that amount, you create
15  your NECS invoice for the fifteen, twenty percent
16  of JCM's invoice?
17    THE WITNESS: Yes, sir.
18    MR. JAMES: Okay.
19    And then what do you know send into the
20  CFO? Is it just those two invoices, or are you
21  doing like a cover page? Are you --
22    THE WITNESS: No. I'm sending -- I'm
23  actually signing those invoices, both NECS's and
24  JCM's. I'm signing that I have seen it and
25  approved it.

Page 205

1    MR. JAMES: Okay.
2    THE WITNESS: And then it goes on to
3  the CFO.
4    MR. JAMES: Okay.
5    And then on the JCM approval, what's
6  your basis for signing off in their invoice?
7    THE WITNESS: Because I understand that
8  that much money is being paid towards the
9  procurement of those goods and services.
10    MR. JAMES: Okay.
11    And that understanding is from the
12  actual agreement that lays out the schedule?
13    THE WITNESS: Yes, sir.
14    MR. JAMES: Okay.
15    MS. LAMA: The agreement that we just
16  went over?
17    THE WITNESS: Yes, ma'am.
18    MR. JAMES: Any other resources you
19  look to to confirm that amount, and if it,
20  basically, matches up with the schedule, then it
21  coincides with what you expect to see?
22    THE WITNESS: Yes. And if something
23  were amiss between what's happening in a form
24  prospective of these contracts and what's
25  happened substantively in my day-to-day work on

Page 206

1 the project, that would trigger an exception.
2 But without -- absent that trigger, yes.
3        MS. LAMA:  So then just to confirm, is
4 the construction supervision fee then taken in
5 accordance with the percentage of completion
6 based on a measurement of actual progress?
7        THE WITNESS:  No.  Percentage of
8 payment.
9        MS. LAMA:  So the fee is taken as a
10 percentage of the payment --
11        THE WITNESS:  Yes.
12        MS. LAMA:  -- or the -- for example,
13 the two point six million monthly billing,
14 there's no measurement of actual progress --
15        THE WITNESS:  That's correct.
16        MS. LAMA:  -- or delivery?
17        THE WITNESS:  That's correct.  In the
18 offering memorandum, there's provisions.  This is
19 why I say we must look at the difference between
20 NECS's contract with the limited partnership and
21 the offering memorandum that governs and the
22 partnership agreement that govern the
23 relationship between the limited partners and the
24 project.
25        The project says you can pay it at any

Page 207

1 point.  There is no definition as to when you can
2 pay it under the offering memorandum or the
3 disclosures to the investors and their review of
4 those disclosures.
5        NECS chose, and I chose, in the
6 drafting of this document in my agreement with
7 the limited partnership that I would take those
8 fees as a percentage of payment.
9        So, no, there is no relationship
10 between payment and completed operations, if you
11 will, Michelle.
12        MR. JAMES:  So the two point six is a
13 measure, as opposed to progress of actual
14 construction of the project?
15        THE WITNESS:  Yes, sir.  Albeit, not in
16 absence of.  I don't want to suggest that there
17 is no review or supervision of the project.  Of
18 course, there is.  But the measurement of the
19 payment is the two point six being paid, the
20 twenty percent being paid.
21        I don't want to somehow relate the two
22 together.  There is, of course, performance under
23 the contract.  But payment under the contract is
24 tied to a payment, not to a completed operations.
25        MR. JAMES:  So the schedule itself as

Page 208

1 these payments, isn't that -- doesn't that
2 coincide with completion?  Isn't the expectation
3 that --
4        THE WITNESS:  When you were in
5 construction, it would be.  But when you're in
6 ordering of equipment, it's not.
7        Once we reach construction, we then
8 reach -- we then move into that architectural
9 sign off of completed operations.  And, no, that
10 vendor will not be paid until we have sign off,
11 and, therefore, NECS will not be paid until
12 they're paid.
13        (SEC Exhibit No. 140 was
14        marked for identification.)
15        BY MS. FUCHS-SINDLER:
16 Q     The Court Reporter has just marked as
17 Exhibit No. 140 a document beginning with Bate
18 ANCBIO-004304.
19        Do you recognize this document?
20        MR. GORDON:  Can I just point out that
21 there is a page at the end that doesn't follow in
22 sequence.  Maybe you put it together
23 intentionally.  I just don't know that it looks
24 like -- it doesn't seem to be a stand alone
25 document based on the Bates stamp.

Page 209

1        MR. JAMES:  Yeah.  That last page is
2 ANCBIO-004267.  And the one that precedes it in
3 this particular exhibit is 004306.
4        MR. GORDON:  I'm sorry.  You mean to
5 have the last page of the exhibit would be
6 ANCBIO-004267?
7        MR. JAMES:  Yes.
8        MR. GORDON:  Okay.
9        MR. JAMES:  It's a composite exhibit.
10        MR. GORDON:  Okay.
11        MR. JAMES:  And, Mr. Kelly, if you
12 could take a look at the composite exhibit, all
13 the pages of the exhibit, and let me know if
14 you've seen --
15        THE WITNESS:  I recognize this.
16        MR. JAMES:  Okay.
17        How do you recognize it?
18        THE WITNESS:  This is a JCM invoice for
19 funding for February 2013.  I don't believe this
20 was paid until March, but this was a February
21 2013.  This would've been the initial request.
22 They're --
23        MR. JAMES:  That's a JCM invoice on
24 that Bates number 4267?
25        THE WITNESS:  Yes.

Page 210

1     MR. JAMES: Okay. Continue.

2     THE WITNESS: And the NECS invoice is

3  on 004305.

4     There are pages missing in this because

5  there are additional invoices from construction

6  companies, if I can recall, to the tune of

7  ninety-nine thousand dollars, if I recall. There

8  was about a hundred thousand dollars of

9  construction invoices at this point that would've

10  been attached to this.

11     And so the combination of the two point

12  six million from JCM and an additional invoice

13  from the construction company would have resulted

14  in the twenty percent tallying to five hundred

15  thirty-eight zero three six. But five

16  thirty-eight zero three six is not twenty percent

17  of two point six million dollars. There are

18  invoices missing here.

19     MR. JAMES: Okay.

20     So when you said there is a missing

21  invoice, you mentioned the construction company's

22  invoice?

23     THE WITNESS: Yes, sir.

24     MR. JAMES: Which company?

25     THE WITNESS: Peak CM.

Page 211

1     MR. JAMES: So with this exhibit, your

2  understanding is that what you submitted for

3  payment included a third invoice?

4     THE WITNESS: Yes, sir.

5     MR. JAMES: Okay. And that's based on

6  your memory, as well as the calculations --

7     THE WITNESS: No. That's based on my

8  memory.

9     MR. JAMES: Okay.

10     But also you just testified about the

11  amount that you invoiced for construction

12  supervision. You said that would be twenty

13  percent of the JCM invoice, plus the missing

14  invoice from Peak CM.

15     THE WITNESS: Twenty percent of two

16  point six million would be five hundred and

17  something thousand, less than five thirty-eight.

18     And I recall specifically that there's

19  another invoice missing here, that this was --

20  there were very few construction invoices, but

21  there was a construction invoice at this point.

22     MR. JAMES: And you prepared these

23  invoices that you submitted to the CFO?

24     THE WITNESS: I prepared the NECS

25  invoice that was submitted. I signed off on the

Page 212

1  construction invoice, and I signed off on this

2  JCM invoice.

3     MR. JAMES: Do you know why there's not

4  that third invoice from Peak CM? Do you know

5  whether or not that was produced?

6     THE WITNESS: It would have been part

7  of this package. Why that was not produced to

8  the SEC?

9     MR. JAMES: But do you know either way

10  whether it was or was not produced to the SEC?

11     THE WITNESS: I don't know. I presumed

12  it would be.

13     MR. JAMES: Okay.

14     BY MS. FUCHS-SINDLER:

15    **Q   Do you know who prepared the JCM**

16  **invoice, the last page of this exhibit?**

17    A   I would presume that would've been the

18  Accounting Department for JCM.

19    **Q   And who is that?**

20    A   The name is Ida Ovies, I believe.

21    **Q   Is there anyone else in the Accounting**

22  **Department at JCM?**

23    A   No. At JCM's accounting would have

24  been Ida. Again, that's the only one that I know

25  of.

Page 213

1    **Q   Is it your understanding that Ida has**

2  **prepared invoices for JCM in the past?**

3    A   It's my understanding, yes.

4    **Q   And is that your understanding from**

5  **Mr. Quiros?**

6    A   That's my understanding because I would

7  call for invoices, and that's where they would

8  come from.

9    **Q   And do you know when she prepared the**

10  **invoice, what was the source of her information**

11  **to prepare the invoice?**

12    A   I don't know that. I would presume it

13  was the contract, but I don't know that.

14     MR. JAMES: If I could turn your

15  attention back to the NECS invoice on page number

16  4305.

17     THE WITNESS: Yes, sir.

18     MR. JAMES: Maybe here it will show

19  what we just talked about where in the reference

20  box where it says, pay aps numbers one and two.

21     THE WITNESS: Yes, sir.

22     MR. JAMES: What does that refer to?

23     THE WITNESS: This would've been -- my

24  definition of pay ap would've been the JCM pay ap

25  and the construction ap is one and two.

Page 214

1    MR. JAMES: Okay.
2    So this is further evidence that there
3    was --
4    THE WITNESS: There was another invoice
5    for those, yes. I can provide that to the SEC.
6    MR. JAMES: Okay.
7    If you turn to the first page of that
8    Exhibit 140. Have you seen what appears to be a
9    memo from Mr. George Gulisano, the financial
10   person you referred to earlier, to Mr. Quiros
11   asking to transfer funds? Have you seen this?
12   THE WITNESS: Yes, sir.
13   MR. JAMES: Okay.
14   And tell me when you saw this, under
15   what circumstances?
16   THE WITNESS: These -- these are -- as
17   I suggested, there are many sign offs before an
18   invoice could be paid. This would be the -- this
19   would be the transaction that would take place
20   after the invoices were submitted to the CFO.
21   They were then submitted to me for sign
22   off. And once I sign them off, then George
23   Gulisano, the CFO, the financial person, would
24   request of the general partner authorization to
25   pay.

Page 215

1    Once Mr. Gulisano received
2    authorization to pay by the general partner, then
3    the money would be moved from the general -- from
4    the limited partner holding account to the
5    limited partner operating account, and then Mr.
6    Gulisano would've paid it.
7    But this is asking for -- see, there's
8    other pieces missing here. This says, "I have
9    attached the authorization of the general
10   partner, Bill Stenger, for this transaction, as
11   well as the invoices to be paid."
12   So this is the result of all of the
13   transactions that take place resulting in the
14   money being moved into the operating account.
15   MR. JAMES: Okay.
16   And based on what you're looking at,
17   your belief is that this packet is also missing
18   that authorization that's referenced as attached
19   --
20   THE WITNESS: Yes, sir. It says, "I
21   have attached." -- I didn't see that, did I?
22   Yeah. I did not see it here.
23   MR. JAMES: And do you know whether or
24   not that specific authorization was produced to
25   the SEC?

Page 216

1    THE WITNESS: I don't know, but I know
2    it exists.
3    MR. JAMES: And then -- so, basically,
4    you mentioned holding accounts and operating
5    accounts in the limited partnership. If you look
6    at paragraph one, is that the holding account,
7    the Raymond James partnership account, and then
8    the operating account is the People's Bank
9    partnership account, limited partnership account?
10   THE WITNESS: I believe so. And it's
11   from the Jay Peak Biomedical Research Park
12   Raymond James account to the Jay Peak LP People's
13   Bank operating account. Yes, sir.
14   MR. JAMES: Okay.
15   So, basically, this first page of this
16   Exhibit 140 is Mr. Gulisano, the CFO, basically,
17   asking Mr. Quiros to execute the transfer of
18   three point two five million dollars from the Jay
19   Peak Biomedical Research Park limited partnership
20   account at Raymond James to the Jay Peak
21   Biomedical Research partnership limited account
22   at People's Bank, correct?
23   THE WITNESS: In Vermont, that's
24   correct.
25   MR. JAMES: Okay.

Page 217

1    And then this other authorization that
2    we're missing, what would that say? What
3    instructions would be in that authorization?
4    THE WITNESS: That would -- that would
5    be from Mr. Gulisano to the general partners
6    saying, I have received the appropriate approvals
7    for these invoices. Please authorize the
8    movement of the funds or please authorize the
9    payment of these invoices. So the general
10   partner would sign as it is okay for the limited
11   partner to make these payments.
12   MR. JAMES: So the next step would be
13   then that would actually occur, that transaction
14   would be executed or authorized to be executed?
15   THE WITNESS: Yes, sir. So there'd be
16   an execution -- there would be an authorization
17   by the general partner attached to this before it
18   got to Mr. Quiros. Mr. Quiros would not move the
19   funds without the authorization of the general
20   partner to move the funds. That's the process.
21   MR. JAMES: And do you know whether --
22   I know we don't have that execution included in
23   this composite. We'll seek to get that from Mr.
24   Gordon after today, but do you know whether or
25   not as we sit here today whether this three point

Page 218

1 two five million was actually transferred to the
2 operating account of the limited partnership at
3 People's Bank?
4      THE WITNESS:  I would not be privileged
5 to the information, but I -- I do know that the
6 bills were paid, and the three point two five
7 would be the result of the two point six million,
8 the five hundred and thirty-eight, and the other
9 hundred thousand that I recall is the
10 construction -- the invoice missing here.
11      MS. LAMA:  And how do you know the
12 bills were paid?
13      THE WITNESS:  Because I would have be
14 having people all over me if they weren't.  I
15 have no indication from the general contractor
16 that it wasn't paid.  In fact, I have
17 conversations, obviously, that he has been paid
18 for that invoice. I know that I have been paid.
19 And Mr. Quiros would know that JCM had been paid.
20      (SEC Exhibit No. 141 was
21      marked for identification.)
22 BY MS. FUCHS-SINDLER:
23   Q    The Court Reporter has just marked as
24 Exhibit No. 141 a one-page document, a memo to
25 the attention of Joel Burstein, dated February

Page 219

1 26th, 2013 regarding wire transfer.
2      Do you recognize this document?
3   A    I do not.
4      MR. JAMES:  So you have not seen this
5 before?
6      THE WITNESS:  No.
7      MR. JAMES:  Let me ask you a different
8 question.  You just testified about the different
9 steps in the process of the request as far as the
10 payment.  At some point in time, would Mr. Quiros
11 contact Raymond James and ask or authorize them
12 to actually make that transfer from their Raymond
13 James limited partnership account to the People's
14 Bank limited partnership account?
15      THE WITNESS:  I would presume that
16 would be right.  I have no knowledge of that, but
17 I presume.
18      MR. JAMES:  Okay.
19      From you can tell of this document, and
20 if you need to, take a look, give you time to
21 read it, does it appear to be Mr. Quiros's
22 authorization to Raymond James to make that
23 transfer that we just saw that the CFO requested
24 in Exhibit 140?
25      THE WITNESS:  Yes.

Page 220

1      MR. JAMES:  So on February 26th, 2013,
2 Mr. Quiros, basically, authorized Joel Burstein
3 at Raymond James to transfer three point two five
4 million from the Jay Peak Biomedical Research
5 Park LP account at Raymond James to the Jay Peak
6 Biomedical Research Park LP account at People's
7 Bank?  Do you see that?
8      THE WITNESS:  Yes, sir.  Yes, sir.
9      MR. JAMES:  And the reference says,
10 "February funding for Jay Peak Biomedical
11 Research Park LP."
12      THE WITNESS:  Yes.
13      MR. JAMES:  Okay.
14      So based on this authorization, the
15 money that's being transferred is specifically
16 for the purposes of the February funding for Jay
17 Peak Biomedical Research Park LP?
18      THE WITNESS:  That appears to be the
19 case.
20      MR. JAMES:  Okay.
21      Do you know Mr. Joel Burstein?
22      THE WITNESS:  I know of him.  I do not
23 know him.
24      MR. JAMES:  Okay.  But have you met
25 him?

Page 221

1      THE WITNESS:  I've met him once, yes.
2      MR. JAMES:  How many times have you met
3 him?
4      THE WITNESS:  I've probably only met
5 Mr. Burstein one time.
6      MR. JAMES:  One time?
7      THE WITNESS:  One time.
8      MR. JAMES:  Under what circumstances?
9      THE WITNESS:  A social engagement.
10 BY MS. FUCHS-SINDLER:
11   Q    Have you spoken with him?
12   A    Only -- I've probably spoken with him
13 two or three times maximum and really only on a
14 social basis. I've never spoken with him about
15 any of these accounts or any of the business
16 between Mr. Quiros.
17      MS. LAMA:  Do you have any access to
18 the Jay Peak Biomedical Research Park LP accounts
19 at Raymond James?
20      THE WITNESS:  None.
21      MS. LAMA:  Do you have any access to
22 any of the accounts at Raymond James?
23      THE WITNESS:  No, never.
24 BY MS. FUCHS-SINDLER:
25   Q    Have you ever seen any of these

Page 222

1  statements for the Jay Peak Biomedical Research
2  Park at Raymond James?
3     A  No.
4        MS. LAMA:  What about for the accounts
5  at People's Bank?
6        THE WITNESS:  No.  At one point -- no.
7        BY MS. FUCHS-SINDLER:
8     Q    What were you thinking of when you
9  started saying at one point?
10    A    The administration account at People's
11  Bank, the administration funds are also held at
12  People's Bank. which are funds that belong to the
13  sponsor company.  I don't know if at one time I
14  was asked to review the activity in that account
15  by Mr. Quiros, but I don't believe I have.  That
16  was my thought.  I'm rarely asked to review bank
17  accounts.
18        MS. LAMA:  Did you ever see any Jay
19  Peak Biomedical -- I'm sorry, any bank records or
20  bank statements from Jay Peak -- from People's
21  Bank, pardon me, for any of the partnerships?
22        THE WITNESS:  No.
23        BY MS. FUCHS-SINDLER:
24    Q    We're showing you what was previously
25  marked as Exhibit No. 4, a copy of a Raymond

Page 223

1  James statement from March of 2013 for Jay Peak
2  Biomedical Research Research Park, AnC Bio Vermont GP.
3        Do you recognize?
4     A  No.  I've never seen a Raymond James
5  statement.
6        MR. JAMES:  But from what you can tell,
7  it appears to be a statement for the Jay Peak
8  Biomedical Research Park LP at the Raymond James
9  for the period of February 28th through March
10  28th, 2013?  Do you see that?
11        THE WITNESS:  I do.
12        MR. JAMES:  Do you see the account
13  number 54128224?
14        THE WITNESS:  I do.
15        MR. JAMES:  And if you turn back to
16  Exhibit 141, you'll see that that's the same
17  account number as requested on the authorization
18  Mr. Quiros sent to Raymond James?
19        THE WITNESS:  I do.
20        MR. JAMES:  Okay.
21        If you turn -- you're back on Exhibit
22  No. 4.  If you turn to page three of eight, and
23  the numbers are in the bottom right-hand corner.
24        THE WITNESS:  Yes, sir.
25        MR. JAMES:  And in the middle of the

Page 224

1  page, there's withdrawals is the sub-heading and
2  there's a March 8th, 2013 withdrawal.
3        THE WITNESS:  Yes, sir.
4        MR. JAMES:  And the description says,
5  "Cash wired to Jay Peak Biomedical."
6        THE WITNESS:  Yes, sir.
7        MR. JAMES:  And if you keep going all
8  the way to the right under the amount column, it
9  has that three point two five million amount that
10  we've been talking about?
11        THE WITNESS:  Yes.
12        MR. JAMES:  Okay.
13        So based on Exhibit No. 41 -- 141 --
14  sorry -- Exhibit No. 4, would you agree that it
15  appears that that authorization that Mr. Quiros
16  sent to Mr. Burstein in Exhibit No. 141 was
17  actually executed as evidenced by the statement,
18  Exhibit No. 4?
19        THE WITNESS:  It appears that way, yes.
20        MR. JAMES:  Okay.
21        THE WITNESS:  I testified earlier that
22  this -- I recall that this payment was made in
23  March.  This appears that this was withdrawn in
24  March.
25        MR. JAMES:  Okay.  So you were correct.

Page 225

1        Let me now mark and show you the next
2  exhibit.
3        (SEC Exhibit No. 142 was
4           marked for identification.)
5        BY MS. FUCHS-SINDLER:
6     Q    The Court Reporter has just marked as
7  Exhibit No. 142 a document.  It says, Statement
8  Of Account.  It's for Jay Peak Biomedical
9  Research Park.  And under that it says, William
10  Stenger and Ariel Quiros.
11        Do you recognize this document?
12    A    I do not.
13        MR. JAMES:  Have you had a chance to
14  flip through all of the pages of the document?
15        THE WITNESS:  No.  I was simply trying
16  to find out whose bank this was.
17        MR. JAMES:  Okay.
18        THE WITNESS:  It appears to be People's
19  Bank.  Okay.
20        MR. JAMES:  Do any of the pages look
21  familiar to you?
22        THE WITNESS:  No, I've never seen this
23  before.
24        MR. JAMES:  And let me ask you, in the
25  first page of Exhibit 142, if you look in the

Page 226

1  upper left corner where it says, Statement of
2  Account.
3  THE WITNESS: Yes, sir.
4  MR. JAMES: Do you see the digits that
5  follows, 6500346739?
6  THE WITNESS: Yes, sir.
7  MR. JAMES: Okay.
8  If you take a look back to Exhibit No.
9  141, an authorization that Mr. Quiros sent to
10 Raymond James asking that they transfer the three
11 point two five million, Exhibit 141. Do you see
12 that?
13 THE WITNESS: Yes, sir.
14 MR. JAMES: If you look in the body of
15 that memo where it says, Beneficiary account
16 number.
17 THE WITNESS: Yes, sir.
18 MR. JAMES: To the right of that you
19 will see 6500346739. Do you see that?
20 THE WITNESS: Yes, sir. Yes, sir.
21 MR. JAMES: Do you agree that that's
22 the same number that's reflected in Exhibit 142?
23 THE WITNESS: I do.
24 MR. JAMES: Okay.
25 If you go down to -- and I'm still on

Page 227

1  Exhibit 142. If you go down to the March 8th
2  wire credit domestic three point two five. Do
3  you see that?
4  THE WITNESS: Yes, sir, I do.
5  MR. JAMES: Okay.
6  So based on Exhibit 142, it appears
7  that the three point two five was received by the
8  Jay Peak Biomedical Research Park LP account at
9  People's Bank?
10 THE WITNESS: Yes, sir.
11 MR. JAMES: Okay.
12 And then let me -- so what we
13 established thus far through your testimony and
14 the exhibits is that the invoices came in from
15 Jay Construction Management?
16 THE WITNESS: Yes, sir.
17 MR. JAMES: Okay.
18 And in addition to that, while it's not
19 included in our exhibit, you testified there was
20 also an additional exhibit from Peak CM for
21 ninety-nine thousand dollars as well?
22 THE WITNESS: Yes, sir.
23 MR. JAMES: Okay.
24 And in the case of the total of those
25 two amounts, you invoiced the partnership for

Page 228

1  your twenty percent construction supervision fee?
2  THE WITNESS: Yes, sir.
3  MR. JAMES: Okay.
4  And the total was three point two five
5  million?
6  THE WITNESS: The total that was
7  invoiced by NECS was five hundred and
8  thirty-eight thousand. The total of all those
9  invoices was something, I'm sure, just less than
10 three point two five million.
11 MR. JAMES: Okay.
12 And is it your practice to just round
13 out to a full number?
14 THE WITNESS: I've heard that. I don't
15 understand that, but I've heard that.
16 MR. JAMES: Okay.
17 So what we've seen is the packet that
18 you submitted to the CFO containing those three
19 invoices, ultimately, ended up with Quiros asking
20 for those amounts to be transferred and now we're
21 seeing Exhibit 142, but now you have the three
22 point two five million in the People's Bank
23 account for the limited partnership?
24 THE WITNESS: Yes, sir, it appears that
25 that is --

Page 229

1  MR. JAMES: So the next step would be
2  now to let's pay these invoices, correct?
3  THE WITNESS: Yes, sir.
4  MR. JAMES: Okay.
5  Let's first start with the payment of
6  your invoice, NECS.
7  THE WITNESS: Yes, sir.
8  MR. JAMES: Did you -- and stick with
9  the same exhibit, 142. If you turn to -- I'm
10 going to use the Bates numbers on the lower left
11 corner. If you have the page under the landscape
12 direction. I'm not sure if that made sense. But
13 if you go to Bates number SEC-PUB-P-0001240.
14 It's almost all the way to the end, the second to
15 the last page.
16 THE WITNESS: Yes, sir.
17 MR. JAMES: Okay.
18 And if you go to the top where it says,
19 Wire transfer archive, and it goes across and
20 says, People's United Bank.
21 THE WITNESS: Yes, sir.
22 MR. JAMES: If you go down, there's an
23 amount for five hundred and thirty-eight thousand
24 and thirty-six dollars. Do you see that?
25 THE WITNESS: Oh, I see, under the

Page 230

1    amount. Yes, sir.
2         MR. JAMES: Okay.
3         Read that for me just to make sure
4    we're in the same place.
5         THE WITNESS: Under one, two, three --
6    fourth column in on this page, there is amount of
7    five hundred and thirty-eight thousand, zero
8    thirty-six dollars.
9         MR. JAMES: Okay.
10        And you can turn back to it, but do you
11   recall the amount that you invoiced for?  Do you
12   recall exactly what it was?  It's on Exhibit 140.
13        THE WITNESS: Five hundred and
14   thirty-eight thousand, zero thirty-six.
15        MR. JAMES: So that's the amount that
16   you invoiced for?
17        THE WITNESS: Yes, sir.
18        MR. JAMES: Okay.
19        So based on this exhibit, particularly
20   this payment, is appears that that amount that
21   you invoiced for was actually transferred to
22   NECS's bank account?
23        THE WITNESS: Yes, sir.
24        MR. JAMES: Okay.
25        So you got paid your construction

Page 231

1    supervision fee on the February 2013 invoices?
2         THE WITNESS: Yes, sir.  I might -- on
3    page 1236, you will notice the three invoices in
4    a row, two point six, five hundred and
5    thirty-eight, then ninety thousand, one
6    ninety-nine.  That's the third invoice.
7         MR. JAMES: Exactly.  I was going to
8    ask you that.  Thank you for helping move me
9    along.
10        Okay.  So going back to -- sticking
11   with that page you just showed me, so we have the
12   three point two five coming in.  Then we see the
13   three invoices being paid.  We just dealt with
14   your five thirty-eight.
15        THE WITNESS: Yes, sir.
16        MR. JAMES: So if you want to go to the
17   one above that, two point six.  Which invoice is
18   that that's being paid by the Jay Peak Biomedical
19   Research Park People's Bank account?
20        THE WITNESS: That would be JCM.
21        MR. JAMES: Okay.
22        THE WITNESS: Again, I'm presuming from
23   what I see in front of me that's JCM.
24        MR. JAMES: Okay.  And that's based
25   upon the amounts match up?

Page 232

1         THE WITNESS: Yes, sir.
2         MR. JAMES: Okay.
3         And that ninety-one nine nine, although
4    we haven't seen the invoices, that's the amount I
5    think you just testified to that evidences the
6    Peak CM invoice being paid?
7         THE WITNESS: Yes, sir.  If you look at
8    page 1239 in your Bates stamp, you'll see that
9    amount was paid to Peak CM, LLC.
10        MR. JAMES: Exactly.
11        And then just for completeness, if you
12   turn to the last page, Bates 1241, you'll see the
13   transfer of that two point six go into JCM.  Do
14   you see that?
15        THE WITNESS: Yes, sir.
16        MR. JAMES: Okay.
17        So based on this, it appears that all
18   three invoices were paid by the Jay Peak
19   Biomedical Research Park limited partnership,
20   correct?
21        THE WITNESS: Yes, sir.
22        MR. JAMES: And do you know whether or
23   not the monies that are coming out of the
24   People's Bank Jay Peak Biomedical Park limited
25   partnership are investor funds?

Page 233

1         THE WITNESS: Could you repeat that,
2    please?
3         MR. JAMES: Do you know whether this
4    two point six, or the five thirty-eight, plus
5    thousand, or the ninety thousand, do you know
6    whether those amounts are funds that came from
7    investors in the Jay Peak Biomedical Research
8    Park limited partnership?
9         THE WITNESS: Again, I don't touch
10   banking documents, but from the discussions we
11   have just had, the trail certainly appears to be
12   the case.  I have no reason to believe otherwise.
13        MR. JAMES: Okay.
14        MS. LAMA: And just a quick follow-up
15   question on the payment that you received that we
16   referred to a moment ago.  Where does Northeast
17   Contract Services have its bank accounts?
18        THE WITNESS: People's -- People's Bank
19   in Burlington.
20        MS. LAMA: And how many accounts do you
21   have at People's bank?
22        THE WITNESS: One, one account.
23        MS. LAMA: So Northeast has one account
24   at People's Bank?
25        THE WITNESS: Yes, ma'am.  And that is

## Page 234

1  referred to in my questionnaire.
2          MS. LAMA: Okay. Thank you.
3          So Northeast does not have accounts in
4  any other bank?
5          THE WITNESS: No, ma'am.
6          MR. JAMES: And let me ask you a
7  question similar to Michelle. So we have the
8  five thirty-eight, plus that goes to NECS's bank
9  account at People's Bank?
10         THE WITNESS: Yes, sir.
11         MR. JAMES: At that point in time, if
12  we look at that bank, would we then see the
13  sixty-eight percent of that amount then going out
14  --
15         THE WITNESS: Yes, sir.
16         MR. JAMES: -- to the sponsor?
17         THE WITNESS: Yes, sir.
18         MR. JAMES: And do you do that
19  immediately, or is it lime elapses, the month
20  after?
21         THE WITNESS: Within thirty days by
22  contract, but I do it within probably five days.
23         MR. JAMES: Okay.
24         THE WITNESS: It's always done -- it's
25  always done within a few days.

## Page 235

1          MR. JAMES: Okay.
2          And that account, what other monies
3  comes into NECS's bank account?
4          THE WITNESS: No other monies come into
5  that account.
6          MR. JAMES: So the monies that come in
7  are --
8          THE WITNESS: No other monies have come
9  into that account. No other monies have come
10  into that account.
11         MR. JAMES: And then similar question
12  while I have this exhibit -- oh, this one's
13  already marked actually. Similar question. So
14  we just talked about the monies that go from the
15  partnership to NECS's bank account, and then the
16  sixty-eight percent is then sent on to the
17  sponsor for their construction supervision
18  portion. Now the monies that are now going to
19  pay the JCM invoice, once that gets to JCM, I
20  think your testimony a short while ago in
21  response to one of Michelle's questions is that
22  at that point, JCM then passes on the entire
23  amount to AnC Biopharm?
24         THE WITNESS: I -- I don't know that.
25  It appears from this pro forma invoice that I've

## Page 236

1  been shown that the terms of the payment between
2  JCM and AnC Biopharm are just that. I cannot
3  testify as to whether that's actually done.
4          MR. JAMES: Okay.
5          MS. FUCHS-SINDLER: We're going to have
6  to go off the record for a break at 4:22.
7          (Whereupon, at 4:22 p.m., a short
8  recess was taken.)
9          (Ms. Fuchs-Sindler and Ms. Lama are not
10  present in the room.)
11         MR. JAMES: We're back on the record at
12  4:34 p.m.
13         And as we did earlier, I just want to
14  confirm, Mr. Kelly, we did not have any
15  discussions about the case during our last break;
16  is that correct?
17         THE WITNESS: That's correct.
18         MR. JAMES: Okay.
19         So when we broke, and if I'm off a
20  little bit, just I apologize, but we were talking
21  about the February 2013 invoices and the payments
22  that started with the invoices, and then went
23  through the whole process. And the monies are
24  wired from the Jay Peak Biomedical LP account at
25  People's Bank to pay the invoice from NECS. We

## Page 237

1  saw that documented in the exhibits.
2          Then we saw the amount that went to
3  Peak CM for the ninety, plus thousand invoice.
4  And then we were talking about the two point six
5  million that went to JCM for that invoice.
6          THE WITNESS: The documents appear to
7  show that, yes.
8          MR. JAMES: And then I had just asked
9  you about the JCM invoice, that once they
10  received payment, that they then paid AnC
11  Biopharm on that same invoice?
12         THE WITNESS: Yes, sir, the documents
13  appear to show that as well.
14         MR. JAMES: Okay.
15         And based on the documents, it says
16  that the dollar to dollar payment, that if they
17  collect two point six million from the limited
18  partnership, they, in turn, pay two point six
19  million to AnC Biopharm.
20         THE WITNESS: Yes, sir. And that was
21  the intent as well.
22         MR. JAMES: Okay.
23         Let me show you what has been marked
24  previously as Exhibit No. 5. And I'll have a
25  copy for Mr. Gordon.

Page 238

1     MR. GORDON: Thank you.
2     MR. JAMES: Have you seen what has been
3   previously marked as Exhibit 5 before?
4     THE WITNESS: No, I have not.
5     MR. JAMES: Okay.
6     And let me just give a review of it,
7   and you tell me whether or not that appears to
8   your impressions, also. It appears to be a
9   Raymond James statement for account holder Jay
10  Construction Management, Inc. for the period of
11  February 28th to March 28th, 2013, account number
12  ▪▪▪174. Do you see that?
13    THE WITNESS: Yes, sir.
14    MR. JAMES: Okay.
15    And Jay Construction Management, Inc.,
16  that's JCM, correct?
17    THE WITNESS: Yes, sir.
18    MR. JAMES: Okay.
19    So have you ever seen a Jay
20  Construction Management statement for their
21  Raymond James account?
22    THE WITNESS: No, sir.
23    MR. JAMES: Okay.
24    So you don't have access to those
25  accounts?

Page 239

1     THE WITNESS: No, sir.
2     MR. JAMES: Okay.
3     But you've seen statements before in
4   general, whether it's Jay Construction Management
5   or some other entity?
6     THE WITNESS: I've seen bank statements
7   before, yes, but never Raymond James statements.
8     MR. JAMES: Okay.
9     So with Exhibit 5, if you could turn to
10  the second page where the sub-heading is, Your
11  Activity. If you go down, you'll see there's a
12  March 11th, 2013 cash receipt. It says, Wire
13  from People's United, and the amount is two point
14  six million. Do you see that?
15    THE WITNESS: Yes, sir.
16    MR. JAMES: Okay.
17    Based on this statement accepting that
18  it is a Raymond James statement for JCM's bank
19  account, does this appear to be the receipt of
20  the two point six million that was transferred
21  from Jay Peak Biomedical Research Park LP's
22  People's Bank account?
23    THE WITNESS: Yes, sir, it appears to
24  be.
25    MR. JAMES: And this is in payment of

Page 240

1   that two point six million invoice that you
2   submitted on behalf of JCM?
3     THE WITNESS: That JCM submitted --
4     MR. JAMES: Through you?
5     THE WITNESS: Through me, yes, sir.
6     MR. JAMES: And then based on what
7   we've discussed through your testimony and the
8   documents, what should happen next is that we
9   should now see this two point six now -- and when
10  I say now, I don't mean immediately or the next
11  day, but that we should now see some evidence
12  subsequently of that two point six going from the
13  JCM bank account to AnC Biopharm?
14    THE WITNESS: The contract would call
15  for that, but I have no knowledge of that, but it
16  appears the contract you showed me calls for that
17  to happen, yes, sir.
18    MR. JAMES: Okay.
19    So what we're looking at, that March
20  11th wire from People's for two point six
21  million, that's in the deposit row. Do you see
22  that, the sub-heading, Deposits?
23    THE WITNESS: Yes, sir. Yes, sir.
24    MR. JAMES: If you go down, you see,
25  Income, and then you go down further, you see,

Page 241

1   Withdrawals. Do you see that?
2     THE WITNESS: Yes, sir.
3     MR. JAMES: Okay.
4     So just follow me, let's see if we can
5   find that two point six million going out. So we
6   see a bunch of withdrawals on March 11th, 2013,
7   and the amounts do not seem to coincide.
8     If you turn to the next page, page
9   three of ten, if you see about a third down, do
10  you see a March 11th, 2013 withdrawal cash
11  description says, Wire to AnC Biopharm for two
12  million? Do you see that?
13    THE WITNESS: Yes, sir.
14    (Ms. Fuchs-Sindler and Ms. Lama enter
15  the room.)
16    MR. JAMES: Okay.
17    Does that appear to you to be a payment
18  from JCM to AnC Biopharm based on the
19  descriptions in the document?
20    THE WITNESS: It appears to be, yes,
21  sir.
22    MR. JAMES: But my question now to you,
23  I mean, if you know, so we talked about the
24  dollar to dollar amounts that comes into JCM and
25  then goes out to AnC Biopharm?

Page 242

```
 1        THE WITNESS:  Yes, sir.
 2        MR. JAMES:  In this instance -- and
 3   we'll continue with the statements.  In this
 4   instance, what we've seen so far is that two
 5   point six million did come in in payment of that
 6   two point six million dollar invoice, but so far,
 7   we've only seen two million go out to AnC
 8   Biopharm; is that correct?
 9        THE WITNESS:  Yes, sir.
10        MR. JAMES:  Okay.
11        So let me just ask you to -- and as you
12   sit here today without looking at the statement,
13   do you know whether or not that additional six
14   million was actually paid -- six hundred
15   thousand, sorry, was actually paid to AnC
16   Biopharm?
17        THE WITNESS:  I would have no knowledge
18   of that.
19        MR. JAMES:  Okay.
20        So let's -- we'll continue through this
21   statement and let's see if we see any other
22   entries that have a similar description or any
23   reference to AnC Biopharm.
24        So as we go down the same page, I don't
25   see any, but if you catch one, just let us know.
```

Page 243

```
 1   So do you agree that there's no other wires out
 2   to AnC Biopharm on page three of ten?
 3        THE WITNESS:  One second, please.
 4        MR. JAMES:  Sure.  Take your time.
 5        THE WITNESS:  I don't see any other
 6   wires that are apparent to me to be to AnC
 7   Biopharm on this statement.
 8        MR. JAMES:  Okay.
 9        Did you flip through the additional
10   pages?
11        THE WITNESS:  I did.
12        MR. JAMES:  Okay.
13        Let me -- and, again, this -- I'm going
14   to hand you -- and, again, I know your testimony
15   was that specifically to the NECS invoices and
16   the amounts that -- the sixty-eight percent that
17   goes to the sponsor, you said, you know, you
18   typically do it the next day, but you have thirty
19   days do that?
20        THE WITNESS:  Yes, sir.
21        MR. JAMES:  Okay.
22        In the instance of the money that JCM
23   receives that is then supposed to go AnC
24   Biopharm, do you know whether that could be done
25   the next day, within thirty days, sixty days?
```

Page 244

```
 1   Any sense of what's the requirements on those
 2   payments?
 3        THE WITNESS:  I have no knowledge,
 4   other than the contract that you showed me, the
 5   pro forma invoice that you showed me, Exhibit 89,
 6   says, Shall be transferred to the beneficiary by
 7   the end date of each month.
 8        MR. JAMES:  Of each month.  Okay.
 9        So we just looked at the February 28th
10   to March 28th statement, and we did not see that
11   additional six hundred thousand being
12   transferred, and that's Exhibit 5?
13        THE WITNESS:  That's correct.
14        MR. JAMES:  Okay.
15        So just for completeness, let me show
16   you the following months, and we can do the same
17   exercise just to make sure, and it's pretty
18   thick, but, again, it's easy to flip through.
19        MR. GORDON:  Do you have work privilege
20   issue you want to discuss?
21        THE WITNESS:  No.  I have a question.
22   The absence of them here doesn't mean it wasn't
23   done.
24        MR. GORDON:  Say it on the record.
25        MR. JAMES:  I'm going to mark for you
```

Page 245

```
 1   the next exhibit.  As I said before, it's the
 2   following months statements for the JCM account
 3   at Raymond James.
 4             (SEC Exhibit no. 143 was
 5             marked for identification.)
 6        MS. FUCHS-SINDLER:  So I'm now handing
 7   you what's just been marked as Exhibit No. 143,
 8   the Raymond James account statement for April
 9   2013 for Jay Construction Management.
10        MR. JAMES:  And just for completeness,
11   it's a composite exhibit that includes the April
12   2013 statement for JCM, the May 2013 statement
13   for JCM, the June 2013 statement for JCM, the
14   July 2013 statement for JCM, August 2013
15   statement for JCM, September 2013 statement for
16   JCM, November, December 2013 statements for JCM,
17   and then the January 2014 statement for JCM.
18        MS. LAMA:  October 2013 is also
19   included.
20        MR. JAMES:  Oh, I missed that one?
21        THE WITNESS:  So this is a composite?
22        MR. GORDON:  Do you have a copy?
23        MR. JAMES:  Yes.
24        THE WITNESS:  I don't appear to see
25   where one statement ends and the next begins.
```

Page 246

1    MR. JAMES: Yeah, it's not divided by a
2    marker. It's kind of you reach the end, and then
3    you go to the begin.
4        THE WITNESS: Okay.
5        MR. JAMES: But if you want, you can
6    take your time and flip through carefully, or you
7    can accept my representation that it's the
8    statements for that time period from April 2013
9    through January 2014.
10       THE WITNESS: I don't understand why I
11   don't see other pages that look like this page
12   for the other months. Maybe I'm just missing
13   them.
14       MR. JAMES: I'll help you with Bates
15   numbers.
16       MS. LAMA: And I can also help you
17   answer your last question. It looks like the
18   format of the statement was changed.
19       THE WITNESS: Okay. That would explain
20   it. So let me just separate these into the
21   months that we're talking about.
22       MR. JAMES: Let's start with April
23   2013, May 2013 starts on Bates number 4646.
24       THE WITNESS: Okay.
25       MR. JAMES: What we'll do is --

Page 247

1    obviously, the question is: Do you see any
2    entries in any of these statements suggesting
3    that that additional six hundred thousand was
4    actually wired out to AnC Biopharm? And to do
5    that, we could just go through the withdrawals
6    and look for that entry similar to what we saw
7    before where it says, Wire to AnC Biopharm, or we
8    can look for the amount of six hundred thousand.
9        THE WITNESS: I could look, but I see
10   --
11       MR. JAMES: And then just so -- I'm
12   sorry, or if you see any other indication to you
13   that that entry reflects that amount or a portion
14   of that amount going to AnC Biopharm.
15       And if you could let me know once
16   you're finished with the May 2013 statement, and
17   then we'll continue from there.
18       THE WITNESS: Okay.
19       The May 31st to June 28th, Mr. James?
20       MR. JAMES: You can stop there. So
21   you've reviewed the April 2013 and the May 2013.
22   So you've reviewed the composite exhibit up to
23   that point in time, the June 2013 statement,
24   correct?
25       THE WITNESS: April 30th up to May

Page 248

1    31st, I renewed.
2        MR. JAMES: Okay.
3        So -- and I think based on the contract
4    terms, I think your testimony is that that amount
5    that JCM invoices is supposed to be paid to AnC
6    Biopharm within thirty days of receipt, is what
7    we saw?
8        THE WITNESS: I see by your Exhibit 89
9    that there is language in the contract that would
10   call for payments to be made to AnC Biopharm
11   within thirty days of JCM's receipt of the funds,
12   and I've reviewed two of your months -- or three
13   of your months of activity of the Raymond James
14   account. And, although, I don't think my review
15   of those accounts conclude that they were not
16   paid, I don't see anywhere in those accounts
17   where they were.
18       MR. JAMES: And that's the question.
19       THE WITNESS: Yes, sir.
20       MR. JAMES: And so your understanding,
21   whether personally or through someone else, is
22   there other ways that the amounts could be paid
23   to AnC Biopharm?
24       THE WITNESS: I have no -- I have no
25   knowledge of that. I mean, it -- well, of

Page 249

1    course, there could be. I don't know what they
2    would be. I have no knowledge of that.
3        MR. JAMES: Are you aware of any other
4    means that that six hundred thousand would've
5    been paid to AnC Biopharm by JCM, other than
6    through its bank account, whether or not you're
7    aware of any?
8        THE WITNESS: I'm not aware of any
9    other. I don't know that. And I don't know if
10   there are other accounts either.
11       MR. JAMES: Okay.
12       But what we do know is that the two
13   point six was transferred to that account, the
14   JCM account?
15       THE WITNESS: Yes, sir.
16       MR. JAMES: Okay.
17       So we saw that come in and we only saw
18   two million going out to AnC Biopharm directly?
19       THE WITNESS: Yes, sir.
20       MR. JAMES: Okay.
21       THE WITNESS: But I believe I saw other
22   fees going out of this account to other JCM
23   accounts, I thought.
24       MR. JAMES: Okay. Tell me where you
25   see it. Do you have a particular line that you

Page 250

1   recall, or --
2        THE WITNESS: On 4/15/2013, there was a
3   wire to Jay Construction of three million.
4        MR. JAMES: What Bates number?
5        THE WITNESS: 004639. And I have no
6   knowledge of what that is.
7        MR. JAMES: You said 4639?
8        THE WITNESS: Yes, sir, 004639.
9        MR. JAMES: Okay.
10       And what would be your suggestion of
11  that entry?
12       THE WITNESS: I don't have a
13  suggestion. My question is -- your question to me
14  was: Do I have any indication that this money
15  was or was not paid based on these documents to
16  AnC Biopharm? And I cannot conclude from my
17  review of these documents that it was or was not
18  paid.
19       I do not see a wire transfer to AnC
20  Biopharm for the six hundred thousand dollars,
21  but nothing by my review of these documents would
22  ever conclude that it wasn't done based on that.
23       MR. JAMES: Okay. But the documents --
24       THE WITNESS: But I do not see that
25  here.

Page 251

1        MR. JAMES: Okay. Perfect.
2        Let me now show you --
3        MR. GORDON: I'm sorry. Are you asking
4   him to stop, though, at a particular date?
5   Because I think he hadn't looked through the
6   entire exhibit.
7        MR. JAMES: Yeah, I did ask him to stop
8   before he got to June 2013.
9        MR. GORDON: Okay. I just want to make
10  sure.
11       MR. JAMES: Yeah.
12       MR. GORDON: Okay.
13       MR. JAMES: And we'll continue. I just
14  wanted to show another exhibit before we continue
15  on with June 2013.
16            (SEC Exhibit No. 144 was
17            marked for identification.)
18       MS. FUCHS-SINDLER: The Court Reporter
19  has just marked as Exhibit 144 a composite
20  exhibit. The first page is ANCBIO-004381
21  regarding payments that are due. And the memo's,
22  dated June 18th, 2013.
23       MR. JAMES: Let me ask you to flip
24  through different pages of Exhibit 144.
25       THE WITNESS: Yes, sir.

Page 252

1        MR. JAMES: And just my initial
2   question, does this appear to be a similar
3   payment packet as to the one we looked at for
4   February 2013?
5        THE WITNESS: Yes, sir, except this is
6   from all four months.
7        MR. JAMES: Okay. And what months?
8        THE WITNESS: This is for the --
9        MR. JAMES: Is it March 2013, April
10  2013?
11       THE WITNESS: This is for March, April,
12  May, and June of 2013.
13       MR. JAMES: Okay.
14       So we've already looked at February?
15       THE WITNESS: Yes, sir.
16       MR. JAMES: And now we're looking at
17  the next four months?
18       THE WITNESS: Yes.
19       MR. JAMES: Obviously, you just
20  testified about the earlier packet and some of
21  these are the same documents. So from an invoice
22  standpoint, this packet contains invoices from
23  your entity, Northeast Construction Services,
24  correct?
25       THE WITNESS: Yes, sir.

Page 253

1        MR. JAMES: Okay.
2        And it contains an invoice for March,
3   an invoice for April, an invoice for May, an
4   invoice of June --
5        THE WITNESS: Yes, sir.
6        MR. JAMES: -- in the amount of five
7   hundred and twenty thousand dollars, correct?
8        THE WITNESS: Yes, sir.
9        MR. JAMES: Okay.
10       For construction supervision services?
11       THE WITNESS: Yes, sir.
12       MR. JAMES: Okay.
13       And that amount for each month, the
14  five twenty, that's based on the JCM invoices,
15  and if you could turn to those, the packet
16  includes a JCM invoice for March 2013, April
17  2013, May 2013, and June 2013, correct?
18       THE WITNESS: Yes, sir.
19       MR. JAMES: And each of those are in
20  the amount of two point six million each?
21       THE WITNESS: Yes, sir.
22       MR. JAMES: And the description is,
23  Architectural engineering fees and deposits for
24  equipment?
25       THE WITNESS: Yes, sir.

Page 254

1    MR. JAMES: Okay.
2        So the JCM invoices amount is what you
3    based your construction supervision percentages
4    off of?
5        THE WITNESS: Yes, sir.
6        MR. JAMES: And as you testified
7    before, you create your invoice based on JCM's
8    invoice, you look at JCM's invoice and approve
9    it, and then you send it to CFO, and then that
10   starts the process of getting these transactions
11   executed?
12       THE WITNESS: Yes, sir.
13       MR. JAMES: Okay.
14       If you go back to the first page, this
15   page is different. It's in addition to what we
16   saw in the February 2013 packet, correct?
17       THE WITNESS: This is the page that was
18   missing or not attached.
19       MR. JAMES: Exactly.
20       THE WITNESS: This is the form of the
21   page that was not attached. There were two pages
22   not attached in my belief to the first package.
23       MR. JAMES: Okay.
24       THE WITNESS: One was the general
25   partner's authorization, and the second one was a

Page 255

1    ninety thousand, one ninety-nine invoice from
2    Peak CM.
3        MR. JAMES: Okay.
4        THE WITNESS: This is a representative
5    of the page that was missing by the general
6    partner's authorization, yes, sir.
7        MR. JAMES: And in this instance, it
8    comes from the general partner of the Jay Peak
9    Biomedical Research Park LP, AnC Bio Vermont GP
10   Services, LLC, as indicated on Exhibit 144,
11   correct?
12       THE WITNESS: Yes, sir.
13       MR. JAMES: And it is June 18th, 2013?
14       THE WITNESS: Yes, sir.
15       MR. JAMES: And as we said, pursuant to
16   contracts between Jay Peak Biomedical Research
17   Park, and Northeast Construction Services, and
18   Peak CM, and Jay Construction Management, Inc.,
19   and it goes on, "Further detail in the offering
20   memorandum published by that limited partnership
21   in December 2012." And then it goes on to list
22   each of those invoice totals, and then it rounds
23   it up to a whole dollar amount, correct?
24       THE WITNESS: Yes, sir.
25       MR. JAMES: And that whole dollar

Page 256

1    amount is twelve point five six million, correct?
2        THE WITNESS: Yes, sir.
3        MR. JAMES: Okay.
4        And that's comprised loosely of the ten
5    point four million for JCM invoices and the total
6    of two point one, plus million for Northeast
7    Contract Services invoices, correct?
8        THE WITNESS: Yes, sir.
9        MR. JAMES: Okay.
10       So what we will now see is -- or what
11   we should now see, based on what we saw with the
12   earlier exhibit from February 2013, we should now
13   see for bank statements these monies being
14   transferred from Jay Peak Biomedical LP account
15   at Raymond James to the Jay Peak Biomedical
16   Research Park account at People's Bank, correct?
17       THE WITNESS: Yes, sir.
18       MR. JAMES: And then we should see
19   those amounts going from that Jay Peak Biomedical
20   Research Park LP's account at People's Bank first
21   to NECS's account at People's Bank, correct?
22       THE WITNESS: Yes, sir.
23       MR. JAMES: And then we should expect
24   to see that ten point four million going from
25   that same Jay Peak Biomedical Research Park LP's

Page 257

1    People's Bank account to JCM's bank account,
2    correct?
3        THE WITNESS: Yes, sir.
4        MR. JAMES: Okay.
5        And then based on the documents and
6    testimony we just developed, we should then see
7    on your account the sixty-eight percent going to
8    the sponsor?
9        THE WITNESS: Yes, sir.
10       MR. JAMES: Okay.
11       And then likewise, we should see in the
12   JCM account that dollar to dollar amount, the ten
13   point four million going to AnC Biopharm?
14       THE WITNESS: Based upon the documents
15   I see.
16       MR. JAMES: Yes.
17       THE WITNESS: But, again, I have no
18   knowledge of that transaction.
19       MR. JAMES: Okay. I'm talking about
20   just as far the structure --
21       THE WITNESS: Yes, sir.
22       MR. JAMES: -- of the transaction --
23       THE WITNESS: Yes, sir.
24       MR. JAMES: -- of the invoice to
25   ultimate payment, that's the path that we expect

Page 258

1  to see?
2       THE WITNESS: Yes, sir.
3       MR. JAMES: Okay.
4       And, again, I'm moving through these
5  quickly just so we can understand the structure.
6       So let me mark for you the next
7  exhibit. And, again, the amount we're talking
8  about is that twelve point five six million.
9       THE WITNESS: Yes, sir.
10      (SEC Exhibit No. 145 was
11          marked for identification.)
12  BY MS. FUCHS-SINDLER:
13  **Q    Okay. I'm handing you what's been**
14  **marked as Exhibit No. 145. It's a one-page**
15  **document Bates stamped RJQUIROS-009948, a**
16  **transfer request. It appears to be from Mr.**
17  **Quiros to Mr. Burstein, dated June 18th, 2013.**
18  **    Do you recognize this document?**
19  A   No, I do not.
20      MR. JAMES: And -- but do you agree
21  that this appears to be another document that we
22  looked at earlier that shows Mr. Quiros
23  authorizing Raymond James to transfer that
24  amount, the twelve point five six million, from
25  the Raymond James LP account to the People's Bank

Page 259

1  LP account?
2       THE WITNESS: It appears to be that,
3  yes.
4       MR. JAMES: Okay.
5       So based on this, we see the
6  authorization goes to Raymond James, so next we
7  should see that wire actually occurring, that
8  twelve point five six going from Raymond James to
9  People's for Jay Peak Biomedical Research Park.
10      Let me mark the next exhibit.
11      (SEC Exhibit No. 146 was
12          marked for identification.)
13      MS. FUCHS-SINDLER: The Court Reporter
14  has just marked as Exhibit No. 146 a copy of a
15  multiple-page document of Jay Peak Biomedical
16  Research Park, AnC Bio Vermont. Copies of
17  Raymond James statements.
18      MR. JAMES: Do you have exhibit 146 in
19  front of you, Mr. Kelly?
20      THE WITNESS: I do.
21      MR. JAMES: And, again, this is based
22  on the overview I just gave. This is that
23  statement from Raymond James for the LP account.
24      If you turn to the pages Bates number
25  005479, the bottom right-hand corner, 5479. Let

Page 260

1  me when you're there.
2       THE WITNESS: Yes, I'm there.
3       MR. JAMES: Okay.
4       If you look probably the second -- the
5  first -- the second entry under, Active Detail,
6  you'll see on June 19th, 2013, there's a
7  withdrawal from this Raymond James account for --
8  it's Raymond James account of twelve point five
9  six million. Do you see that?
10      THE WITNESS: Yes, sir.
11      MR. JAMES: It goes all the way across
12  to additional detail and says, Wire to People's?
13      THE WITNESS: Yes, sir.
14      MR. JAMES: Okay.
15      And that's that same figure we just
16  saw, an authorization from Mr. Quiros to Raymond
17  James?
18      THE WITNESS: Yes, sir.
19      MR. JAMES: So based on that, now we
20  know the twelve point five six million that
21  represents the two invoice -- sorry, the invoice
22  packet for June 2013, that that amount, total
23  twelve point five six, and as far as what the
24  documents have shown thus far, that money's now
25  in the People's Bank account for the Jay Peak

Page 261

1  Biomedical Research Park LP?
2       THE WITNESS: It appears that way, yes,
3  sir.
4       MR. JAMES: And just to confirm that,
5  let me know you the next exhibit. And this --
6       (SEC Exhibit No. 147 was
7          marked for identification.)
8       MS. FUCHS-SINDLER: Okay. I'm showing
9  you what's just been marked as Exhibit No. 147.
10      MR. JAMES: And you do recognize this
11  as the statement for the account activity for the
12  Jay Peak Biomedical Research Park LP account at
13  People's Bank, and if you go down in the first
14  page, second to last entry says, 06-19?
15      THE WITNESS: Yes, sir.
16      MR. JAMES: And it shows twelve point
17  five six million coming into this account,
18  correct? Do you see that?
19      THE WITNESS: Yes, sir.
20      MR. JAMES: Okay.
21      Do you also see -- so now we've
22  established the money has come in to the Jay Peak
23  Biomedical Research Park LP account at People's
24  Bank. And right under that, do you see ten point
25  four million going out the next day on June 20th?

Page 262

1      THE WITNESS: Yes, sir.
2      MR. JAMES: Okay.
3      So we see the money comes in, and then
4  we see the portion that represents the four
5  months of JCM invoices, that ten point four
6  million, that's now going out?
7      THE WITNESS: Yes, sir.
8      MR. JAMES: Okay.
9      And like we did before with the
10 February 2013, if you turn to the second to last
11 page, 5080, and then the last page is 5081,
12 you'll see that individual wire that's at twelve
13 point five six coming in, and then -- yeah,
14 that's it.  Do you see the twelve point five six
15 coming in?
16     THE WITNESS: Yes, sir.
17     MR. JAMES: Okay.
18     So now if you could go back to Exhibit
19 143, which is that composite.
20     THE WITNESS: Yes, sir.
21     MR. JAMES: If we turn to June 2013
22 statement.  And if you recall, we left off after
23 the May 2013 statement.  So June 2013 was the
24 next month.
25     THE WITNESS: The next month I have is

Page 263

1  April 30th to May 31st.
2      MR. JAMES: But that one, you've looked
3  at already.  If you keep flipping, you'll see the
4  statement for June.
5      THE WITNESS: I have not looked at that
6  one, but I can now.  Would you like me to review
7  that statement?  I have not reviewed that
8  statement today.
9      MR. JAMES: And when you say that one
10 --
11     THE WITNESS: The April 30th to May
12 31st, 2013, I have not reviewed yet.  I stopped
13 at the previous one, unless this is more of the
14 same.  I reviewed March 28th to April 30th.
15     MR. JAMES: Okay.  We'll come back to
16 it.  Let me turn your attention to June 2013.
17     (Ms. Lama leaves the room.)
18     THE WITNESS: May 31st to June 2013?
19     MR. JAMES: Exactly.
20     THE WITNESS: Yes, sir.
21     MR. JAMES: And if you go to -- bear
22 with me.  And if you go to Bates number 4668,
23 and, again, that's in the -- located in the lower
24 right-hand corner, 4668.
25     THE WITNESS: Yes, sir.

Page 264

1      MR. JAMES: And, again, we're looking
2  at JCM's bank statements for that Raymond James
3  account.  So if you're on Exhibit 143, Bates
4  number 4668 page, you'll see in the activity
5  detail mid-section, there's a June 20th, 2013
6  cash receipt by this JCM account for ten point
7  four million.  Do you see that?
8      THE WITNESS: Yes, sir.
9      MR. JAMES: If you go all the way to
10 additional detail, it says, Wire from People's
11 United Bank.
12     THE WITNESS: Yes, sir.
13     MR. JAMES: Okay.
14     So what we have established up to this
15 point is that the ten point four million that JCM
16 invoiced for that you approved and calculated
17 your construction supervision fees on was,
18 ultimately, paid by the limited partnership on
19 June 20th, 2013, ten point four million?
20     THE WITNESS: It appears to be true,
21 yes, sir.
22     MR. JAMES: So what we should see,
23 based on the contract and the documents we
24 reviewed, we should now see ten point four
25 million going out to -- you tell me -- AnC

Page 265

1  Biopharm.  That's what we should expect to see,
2  right?
3      THE WITNESS: The terms of the contract
4  provide for that, yes, sir.
5      MR. JAMES: Yeah.
6      And under the contract says thirty
7  days.  So let's flip through, and if you go to --
8  and, again, the question is: Can you identify
9  for me on the statement any amounts going -- of
10 that ten point four million going out to AnC
11 Biopharm, whether as a whole amount or whether as
12 a lesser amount?  Let's see what we could locate.
13     So I didn't see any for June that said,
14 Wire to AnC Biopharm.  Let me see if you see any.
15 And it wouldn't be in March because you get the
16 invoices and payment is received by JCM in June,
17 so whatever amounts they pay out to AnC Biopharm
18 would follow that date?
19     THE WITNESS: Yes, sir.
20     MR. JAMES: Let's look at the June.
21 And I'm on to July, but I'll let you know, if I
22 see any.
23     (Ms. Lama enters the room.)
24     MR. JAMES: I'm on July now, so let me
25 know when you catch up to me.

Page 266

1      THE WITNESS: I'm on July to August
2  30th, July 30th to August 30th.
3      MR. JAMES: Do you see any yet?
4  Because I just looked at one on July 12th, 2013,
5  Bates number 4680, there's a five hundred
6  thousand dollar wire to AnC Biopharm.
7      THE WITNESS: I don't see 4680 in my
8  Bates numbers anywhere.
9      MR. JAMES: You don't? Where are you
10 on there?
11     THE WITNESS: I'm on July 31st to
12 August 30th.
13     MR. JAMES: Okay. No. June 28th to
14 July 31st. Go back to Bates number 4680.
15     THE WITNESS: That's scary. That means
16 I missed one.
17     MR. JAMES: Well, there's a lot.
18     THE WITNESS: 4680?
19     MR. JAMES: Yes.
20     THE WITNESS: Yes, sir.
21     MR. JAMES: Okay.
22     That one is five hundred thousand, and
23 do you see the wire to AnC Biopharm, Inc.?
24     THE WITNESS: I do.
25     MR. JAMES: Okay.

Page 267

1      So -- and this is -- it's the next
2  month, so it's still within those thirty days or
3  right around that thirty-day time period. So we
4  see five hundred of the ten point four million
5  going out to AnC Biopharm.
6      THE WITNESS: Or five hundred from the
7  six hundred from the prior statement, it could
8  be.
9      MR. JAMES: Okay.
10     So do you have any information --
11     THE WITNESS: I do not.
12     MR. JAMES: -- beyond that?
13     THE WITNESS: No, I do not.
14     And for, you know, full disclosure,
15 I've already gone through all of these
16 statements, and I've attempted to identify any
17 similar entries that are labeled wires to AnC
18 Biopharm, and I found two more and the one that I
19 just showed you. So let me just direct you to
20 those.
21     Again, I'll do the Bates number because
22 the next one is not until October. So if you go
23 to Bates 8406.
24     THE WITNESS: Yes, sir.

Page 268

1      MR. JAMES: You'll see on October 16th,
2  2013, there's one million wired to AnC Biopharm,
3  Inc. Do you see that?
4      THE WITNESS: Yes, sir.
5      MR. JAMES: So thus far, since the June
6  2013, payment to JCM of ten point four million,
7  we've seen five hundred thousand going out in
8  July, and now we see a million going out in
9  October --
10     THE WITNESS: Yes, sir.
11     MR. JAMES: -- which, obviously, is
12 three month later. So it's outside the
13 thirty-day time period, but nonetheless, we see a
14 total of one point five million of the ten point
15 four going out to JCM based on the exhibit?
16     THE WITNESS: Yes, sir.
17     MR. JAMES: So the next one I located
18 is in December, and that's on Bates number 8431.
19 If you could just skip to that. And that's a
20 December 5th, 2013.
21     THE WITNESS: Yes, sir.
22     MR. JAMES: Okay.
23     And that's for a million. It says,
24 Wire to AnC Biopharm, Inc. Again, all the
25 descriptions are identical to what we've seen

Page 269

1  before?
2      THE WITNESS: Yes, sir.
3      MR. JAMES: So as of December 5th,
4  2013, we've seen the five hundred thousand
5  dollars in July, the one million in October, and
6  the one million in December going out to AnC
7  Biopharm from that ten point four million?
8      THE WITNESS: Yes, sir.
9      MR. JAMES: Okay.
10     So I didn't see any others in the
11 statements that go all the way through to January
12 2014, but do you have any explanation or any
13 reason to know why only two point five million is
14 showing as going out to AnC Biopharm of that ten
15 point four million that JCM collected for AnC
16 Biopharm?
17     THE WITNESS: JCM collected from the
18 limited partnership for the purposes of procuring
19 those services. I would have to know -- I cannot
20 -- I have no knowledge of why JCM would or would
21 not have paid them within the thirty-day period.
22 I have no reason to know whether or not they did
23 or they did not.
24     MR. JAMES: Okay.
25     But based on the documents, it appears

Page 270

1 that only two point five --
2 THE WITNESS: Yes, sir, it does. From
3 the documents I reviewed, yes, sir.
4 MR. JAMES: Okay.
5 Just based on the sequence then, the
6 next payment packet, if you will, would've been
7 when, do you recall?
8 THE WITNESS: Yes, sir. There was --
9 the next payment package would've been in 2014 in
10 -- I do not recall. I believe it was in early
11 2014. And the next package was an eight-month
12 package, if I believe -- if I'm correct.
13 MR. JAMES: Okay.
14 So the last one we just looked at was
15 June 2013 --
16 THE WITNESS: That's right. So July,
17 August, September, October, November, December,
18 January. I believe it would've been in about
19 January.
20 MR. JAMES: Okay. So it'd February
21 2014 covering --
22 THE WITNESS: The prior months. That's
23 correct.
24 BY MS. FUCHS-SINDLER:
25 Q Was there any discussion as to whether

Page 271

1 -- between you and Mr. Quiros as to whether or
2 not you would ever receive or review copies of
3 the Raymond James statements?
4 A No, ma'am.
5 Q Did you ever ask him for copies?
6 A No.
7 MR. JAMES: Let me hand you what has
8 been previously marked, and it's a series of
9 exhibits, so I'll give you them altogether one at
10 a time, and then I'll you some questions about
11 it.
12 The first one I'll hand you has been
13 previously marked Exhibit 121, and the date is
14 February 28th, 2014. I'm also to go to hand you
15 what has previously been marked Exhibit 122, same
16 date. I'm going to hand you also 123. And,
17 lastly, I'm going to hand you 124.
18 While you flip through these, let me
19 just identify these for the record. Have you had
20 a chance to look at each exhibit?
21 THE WITNESS: Yes, sir.
22 MR. JAMES: All right.
23 I know we've gone through this. I
24 won't be as detailed. But, essentially, as you
25 testified to, the next payment submission by you

Page 272

1 on behalf of NECS and JCM would've been in
2 February 2014, and Exhibit 123 -- sorry, Exhibit
3 121, 122, and 123, it appears to reflect that --
4 just that, invoices on behalf of JCM. If we
5 start with 121 for the months of --
6 THE WITNESS: There's one package
7 missing, sir.
8 MR. JAMES: Yes. And that's what I
9 noticed.
10 THE WITNESS: Okay.
11 MR. JAMES: But essentially I'll just
12 ask you some general questions. So just based on
13 what we've seen already, this appears to be again
14 your submission of invoices on behalf of NECS
15 that's based on -- for construction supervision
16 fees that's based on the invoices that you
17 received from JCM for their architectural
18 engineering?
19 THE WITNESS: Yes, sir.
20 MR. JAMES: And then essentially what
21 happens is that it covers those months that we
22 talked about, and it's submitted to the CFO, and
23 then those monies are authorized to be
24 transferred from the Raymond James LP account to
25 the People's Bank LP account, then to NECS's

Page 273

1 account and to JCM's account?
2 THE WITNESS: Yes, sir.
3 MS. LAMA: And in this circumstance
4 with the issuance of this February 2014 payment
5 package, which, in its -- which, in its complete
6 form, totaled or included eight months, as you
7 mentioned before?
8 THE WITNESS: Yes, ma'am.
9 MS. LAMA: What was the delay in
10 between the payment packages between June 2013
11 and February 2014?
12 THE WITNESS: There was not necessarily
13 an intent delay; however, this was the period of
14 time when we were waiting for delays caused by
15 USCIS in approvals of I-526 petitions on behalf
16 immigrant investors, and, therefore, we all
17 believed it was prudent to slow down the transfer
18 of funds from the limited partnership into
19 operating accounts and into paying invoices.
20 BY MS. FUCHS-SINDLER:
21 Q And prudent for what reason?
22 A Well, because we're raising -- monies
23 are being invested by investors and they're
24 investors into a project. And all of that
25 project is dependent upon certain approvals from

Page 274

1  USCIS. And one of the key approvals is that each
2  investor must apply or petition the USCIS to
3  approve themselves and the project as acceptable
4  under the terms of USCIS EB-5 protocol, that
5  they, the individual, immigrant petition and that
6  the project meet all of the specifications of
7  USCIS.
8      So there was a time when the
9  preferential treatment to EB-5 investors would
10  mean they would get their application approved
11  within six to eight months. USCIS moved their
12  service center from California to Washington, DC
13  in this period of time, and when they moved their
14  service center, the adjudication of those I-526
15  applicant petitions slowed down considerably.
16  There was not anything wrong with the project
17  necessarily or anything wrong with the people
18  necessarily, the petitioners, but the process
19  slowed down considerably for the entire country.
20      And so prudent practices would say,
21  let's slow down the building process, if you
22  will. Now let's not necessarily slow down the
23  performances. In other words, let's keep the
24  architects moving, because a delay to them is a
25  significant delay to the project. Let's not slow

Page 275

1  down the equipment design and manufacturing.
2  Let's just slow down the payments. It's that
3  simple.
4      MS. LAMA: And during this timeframe,
5  was AnC Biopharm requesting payment?
6      THE WITNESS: Was AnC Biopharm
7  requesting payment? Not that I know of.
8  Architects were, but I do not know that AnC
9  Biopharm -- again, as I suggested, there is a bit
10  of trust between AnC Biopharm or AnC Bio, Inc.
11  and Mr. Quiros and his companies, and so I think
12  that there was an understanding of a balance as
13  we moved along here, that they would understand
14  why were being prudent. Architects might not
15  feel quiet so.
16      BY MS. FUCHS-SINDLER:
17      Q  Whose making that decision to slow
18  down that you're talking about to be prudent?
19      A  The general partner.
20      Q  Which individuals?
21      A  Ariel Quiros and Bill Stenger, William
22  Stenger. They are the general partner, and they
23  move on behalf of the limited partnership in
24  every event. And so they believed, not that the
25  production should show down, but maybe that the

Page 276

1  payment should be slowed down, delayed. I
2  presume everyone agreed to that -- not everyone
3  agreed to that, but I did, and I presume AnC
4  Biopharm did.
5      The one that didn't agree to it, quite
6  frankly, was the architects. They said, if we're
7  going to keep working, we're going to have to
8  continue to be paid. And so it was a little more
9  difficult.
10      MS. LAMA: So it's your understanding
11  that the AnC Biopharm and the parties in Korea
12  continued to work for this eight-month period
13  even though they weren't paid according to the
14  monthly billing of two point six million as
15  prescribed in the contracts?
16      THE WITNESS: Everyone did continue to
17  work, yes, ma'am.
18      BY MS. FUCHS-SINDLER:
19      Q  How do you know?
20      A  Because I was one of the ones that
21  continued to work. And, again, I was very much
22  involved with the construction management
23  company, the architect, the designers, the site
24  people, with everybody, everybody. It was very
25  difficult, but we support the project to move.

Page 277

1      MS. LAMA: Okay.
2      So your understanding is that this
3  February 2014 funding request and invoice package
4  was to -- at least the portion that pertains to
5  the JCM invoices for the two point six million
6  monthly billing, that this was an eight-month, so
7  to speak, catch up of payments to AnC Biopharm?
8      THE WITNESS: Oh, yes, ma'am -- to JCM.
9  I cannot speak to AnC Biopharm as to how they
10  were paid for their catch up. Again, we have
11  just reviewed bank statements to determine
12  whether they were paid. But I can attest to the
13  fact that JCM was paid and NECS was paid and
14  architects were paid and Peak CM was paid.
15  Anybody was paid, except the relationship between
16  AnC Biopharm. Whether they were paid, I cannot
17  attest to that. I don't know that.
18      MS. LAMA: But these packages are to
19  authorize --
20      THE WITNESS: The catch up, yes, ma'am.
21      MS. LAMA: -- the catch up?
22      THE WITNESS: Yes, ma'am.
23      MS. LAMA: And payments to AnC Biopharm
24  under the terms of the contracts?
25      THE WITNESS: Yes, ma'am, presumably.

Page 278

1    These were marked for these particular month's
2    work. Yes, ma'am.
3              MS. LAMA: Okay.
4              MR. JAMES: And did you testify that
5    you don't know whether or not once those monies
6    were collected by JCM for that catch up, do you
7    know whether or not, as we looked at earlier,
8    whether it then turned around and it was sent on
9    to AnC Biopharm?
10             THE WITNESS: I cannot testify to that.
11   I can only testify that sometime ago Mr. Quiros
12   said to me that AnC Biopharm has produced a
13   document that demonstrates receipt of the
14   funding. Therefore, I take Mr. Quiros's word that
15   -- and although I did not study the documents, I
16   presume that we have receipt from AnC Biopharm
17   that they are paid up-to-date, but I don't -- I
18   mean, I have no -- that's not -- that is not
19   within my purview, frankly.
20             MR. JAMES: Okay. And let me --
21             THE WITNESS: Unless they were not paid
22   at some point in time and they were then not
23   produced, then it would be my interest, of
24   course.
25             MR. JAMES: And as far as your

Page 279

1    understanding that AnC Bio has said that they
2    have been paid -- I think you said earlier
3    twenty-six million, I think you had said?
4              THE WITNESS: My understanding is that
5    AnC Bio at this point has been paid twenty-six
6    million dollars, about twenty-six million
7    dollars.
8              MR. JAMES: And do you get that
9    understanding from anywhere else, other than the
10   declarations that we've been referring to?
11             THE WITNESS: I get that from comments
12   from Mr. Quiros that he has paid this amount and
13   this amount.
14             MR. JAMES: Okay. When you say this
15   amount and this amount --
16             THE WITNESS: Five point five million
17   dollars and then twenty-one million dollars.
18             MR. JAMES: Okay.
19             And was that statement by Mr. Quiros to
20   you, was that in connection with you discussing
21   the declaration, or was that a separate comment?
22             THE WITNESS: No. That was as a result
23   of our ongoing conversations about who's doing
24   the work, and who's being paid, and are they
25   up-to-date, and where are we on our fiduciary

Page 280

1    responsibility to everyone?
2              MR. JAMES: Okay. Okay.
3              And those ongoing conversations, were
4    those -- did those occur after you discussed the
5    declarations with Mr. Quiros, or were those
6    conversations that preceded --
7              THE WITNESS: Those conversations would
8    go on all the time, but certainly the ones where
9    he showed me this document would be subsequent to
10   that document being produced, yes.
11             MR. JAMES: Okay.
12             MS. LAMA: And the five point five
13   million piece that you just mentioned --
14             THE WITNESS: Yes, ma'am.
15             MS. LAMA: -- what was -- what bucket
16   did that piece pertain to?
17             THE WITNESS: I believe that was part
18   of the twenty-six million, and I cannot testify
19   to that, but I believe that is part of the
20   twenty-six million that has been paid to AnC
21   Biopharm.
22             MS. LAMA: Okay.
23             And why that separation of twenty-one
24   million versus the five point five million?
25             THE WITNESS: Because I know there was

Page 281

1    -- or I understood there was an acceleration of
2    the amounts of money to be paid on the
3    distribution agreement, which I now have many
4    questions in my own mind that I need to report
5    back to you with my understanding there was an
6    acceleration on monies to be paid for the
7    distribution agreement. So there was an initial
8    deposit, I understood. There was an initial
9    deposit of that amount of money towards that
10   distribution agreement.
11             MR. JAMES: And that's the five --
12             THE WITNESS: Yes.
13             MR. JAMES: -- point five million?
14             THE WITNESS: Yes, sir.
15             MS. LAMA: And do you know about the
16   time of that -- I'm sorry, when that deposit was
17   made?
18             THE WITNESS: I do not.
19             MR. JAMES: Do you know the -- was it
20   five point five million? Do you know if there
21   was any change?
22             THE WITNESS: I only know that the
23   comment to me was the five point five million, as
24   a result of me saying to Mr. Quiros at one point,
25   have we accelerated payment on the distribution

Page 282

```
 1   agreement, and he said, we have some, and he
 2   reported to me in conversation that five point
 3   five million had been paid upfront.
 4        MR. JAMES:  And that would've occurred
 5   --
 6        THE WITNESS:  I saw no evidence of
 7   that, other than --
 8        MR. JAMES:  That was going to be my
 9   question.  We looked at February 2013 through --
10   well, detail wise, we went all the way through
11   January.  Would it have been reflected in one of
12   those statements for JCM?
13        THE WITNESS:  I honestly cannot answer
14   that.  I have no idea where it would've been.  As
15   to my point of reviewing those statements, those
16   statements are one piece of statement reviewed,
17   but I don't know if there are others to be
18   reviewed.
19        MR. JAMES:  So the fact that the
20   payment was an accelerated payment, is your
21   testimony that it would've occurred early on --
22   early, if the contract started February '13 --
23        THE WITNESS:  Yes, sir, I believe it
24   would've been earlier -- it would be in an
25   earlier period.
```

Page 283

```
 1        MR. JAMES:  Okay.
 2        And we looked at those, you and I and
 3   Mr. Gordon, and we didn't see --
 4        THE WITNESS:  Yes, sir.
 5        MR. JAMES:  Okay -- that amount
 6   reflected in those statements?
 7        MR. GORDON:  Can we -- you correct the
 8   record, the statement, and we didn't see that --
 9   we're just making sure we're not making a
10   representation about anything I saw or didn't
11   see, correct?
12        MR. JAMES:  I agree.
13        Let me show you Exhibit 131 and Exhibit
14   132, which appears to be marked as such.
15        THE WITNESS:  This appears to be the
16   reason we did not see these payments being made
17   to AnC Biopharm.
18        MR. JAMES:  What do you mean by that?
19        THE WITNESS:  When we were looking for
20   payments to AnC Biopharm, we couldn't find them.
21        MR. JAMES:  Okay.  And what's the
22   reason?
23        THE WITNESS:  It appears here that AnC
24   Biopharm has directed the payments be made
25   elsewhere.
```

Page 284

```
 1        MR. JAMES:  Okay.
 2        So we're looking at Exhibit No. 131?
 3        THE WITNESS:  Yes, sir.
 4        MR. JAMES:  And 132?
 5        THE WITNESS:  Yes, sir.
 6        MR. JAMES:  And my first question, have
 7   you seen either or both of these exhibits before?
 8        THE WITNESS:  I believe that one of
 9   these exhibits is the document that Mr. Quiros
10   showed me when he made the comment that he has
11   receipt for all of the money due to AnC Biopharm.
12        MR. JAMES:  And do you recall which
13   one?
14        THE WITNESS:  I do not.
15        MR. JAMES:  Okay.
16        MR. GORDON:  Just one second, I've got
17   five minutes, so hopefully let's wind up, please.
18        BY MS. FUCHS-SINDLER:
19     Q   Where were you looking at when you
20   said that looks like -- what paragraph of --
21   we'll just take Exhibit 131, for example?  What
22   paragraph are you looking at?
23     A   Paragraph six.
24     Q   Okay.
25        Where it says, "AnC Biopharm directed
```

Page 285

```
 1   that, approximately, twenty-one million owed by
 2   JCM to AnC Biopharm for services be paid to Jay
 3   Peak, Inc." Are you surprised to see that?
 4     A   Well, a little bit.  I've been looking
 5   for payments here in Raymond James statements.
 6     Q   Did you have any understanding of AnC
 7   Biopharm ever directing about twenty-one million
 8   to be paid to Jay Peak?
 9     A   I understood that there was receipt for
10   the monies that were owed to AnC Biopharm.
11     Q   I'm sorry.  Explain.
12     A   I understood that the monies that were
13   owed to AnC Biopharm were accounted for.
14        MR. JAMES:  By AnC Biopharm?  Was
15   received by --
16        THE WITNESS:  Yes, sir.  Yes, sir.
17        BY MS. FUCHS-SINDLER:
18     Q   But did you ever have any
19   understanding as to whether or not AnC Biopharm
20   ever directed that twenty-one million be paid to
21   Jay Peak for services provided to the Jay Peak
22   Biomedical Research Park?
23     A   In any conversations that I have had
24   about the -- with Mr. Quiros about this receipt
25   and AnC Biopharm directing this money to be paid
```

Page 286

1  -- or AnC Biopharm providing receipt for this
2  money, that is what my knowledge is of this.
3      Q   No, but did you ever hear that?
4  Before reading this now, did you ever hear that
5  AnC Biopharm said words to the effect, go pay Jay
6  Peak the twenty-one million, instead of us?
7      A   I could assume that, Tricia, but I
8  cannot state that.
9      Q   Why could you assume that?
10     A   Because if they were taking credit for
11 the twenty-one million dollars, or for some
12 amount of money here, if they were taking credit
13 for twenty-one million dollars being paid to
14 them, they would've directed that money be paid
15 to somebody.
16         MR. JAMES: But you're basing that on
17 your review right now of Exhibit 131? That's
18 what you're basing that on?
19         THE WITNESS: I'm basing that on
20 Exhibit 131, and any conversations that I
21 would've had with Mr. Quiros over the last couple
22 of weeks about the receipt of -- receipt by AnC
23 Biopharm of funds owed them under the twenty --
24 the fifty-two million dollar contract.
25         MR. JAMES: Okay.

Page 287

1      Your testimony was that Mr. Quiros told
2  you that AnC Biopharm received the twenty-six
3  million?
4          THE WITNESS: No. My testimony was
5  that Mr. Quiros told me that they -- showed me a
6  document that said that they had receipt of the
7  -- of the funds that we owed them.
8          MR. JAMES: AnC Biopharm?
9          THE WITNESS: Yes, sir.
10         MR. JAMES: Okay.
11     So I think -- her question is: Is this
12 surprising to you that AnC Biopharm is claiming
13 to have allowed for that or directed that money
14 to be paid to JPI?
15         THE WITNESS: No, not surprising to me.
16 No.
17         MR. JAMES: You've heard that before,
18 that --
19         THE WITNESS: I've heard that there was
20 receipt -- I've heard that there was a
21 declaration. I testified I heard there was a
22 declaration. I knew that there was a declaration
23 and the declaration provided for receipt of the
24 funds.
25         BY MS. FUCHS-SINDLER:

Page 288

1      Q   No, but I want to specifically know,
2  before you saw this today, did you have any
3  discussions with anybody that AnC Biopharm said
4  words to the effect, go pay Jay Peak, Inc. that
5  twenty-one million, instead of us? That's what I
6  want to know, specifically that.
7      A   Yes, I understood that.
8      Q   When did you understand that?
9      A   Two weeks ago or a couple of weeks ago
10 when I had the conversation with Mr. Quiros.
11     Q   At that time, did Mr. Quiros say --
12 was it like a, hey, AnC Biopharm paid Jay Peak
13 this twenty-one million?
14     A   I don't recall whether he said those
15 words, to be honest with you.
16     Q   I said words to the effect.
17     A   I don't recall if he said words to the
18 effect. I was focusing on whether or not AnC
19 Biopharm had been paid.
20     Q   But two weeks ago, when you talked
21 with him, did he mention that twenty-one million,
22 instead of going to AnC Biopharm, went to Jay
23 Peak?
24         THE WITNESS: I think I need to talk to
25 Mr. Gordon.

Page 289

1          MR. GORDON: We have a privilege issue?
2  I think this is probably pretty much the end
3  anyway. So let's see if we can get an answer or
4  not.
5          (Mr. Gordon and Mr. Kelly leave the
6  room.)
7          (Mr. Gordon and Mr. Kelly enter the
8  room.)
9          MS. FUCHS-SINDLER: Okay. We are back
10 on the record, so you could talk with Counsel.
11         THE WITNESS: Tricia, I was concerned
12 whether or not conversations with Mr. Quiros
13 related to this document were privileged.
14     Mr. Quiros, when he showed me these
15 documents a couple of weeks ago, he did use the
16 words that would lead me to believe that AnC
17 Biopharm had directed payment to be made to JPI.
18         MR. JAMES: And tell me exactly what he
19 said.
20         THE WITNESS: When we were in a
21 discussion of, as we often are, fiduciary
22 responsibility, payments being made, reporting to
23 the LP, he told me that the AnC Biopharm had a
24 relationship -- the relationship between AnC
25 Biopharm and JCM originally was such that AnC

Page 290

```
 1   Biopharm -- where JCM would be paying money to
 2   AnC Biopharm, that AnC Biopharm had directed him
 3   to have monies owed by JCM to JPI paid by JCM.
 4   So that the monies that would have been traveling
 5   between JCM and AnC Biopharm that we have
 6   discussed today, those funds, instead of being
 7   paid to AnC Biopharm, AnC Biopharm had directed
 8   Mr. Quiros to pay Jay -- pay JPI for funds that
 9   JCM owed to JPI.
10        MR. JAMES:  And what you just testified
11   to, that's what Mr. Quiros said to you in that
12   same conversation where he showed you the
13   declaration two weeks ago?
14        THE WITNESS:  When he showed me his
15   declarations and I -- about two weeks ago, those
16   were words to the effect that Mr. Quiros had with
17   me.  The --
18        MR. JAMES:  What was your reaction?
19        THE WITNESS:  My question was:  What
20   was the reason for -- confirming, not what was,
21   confirming why JCM owed JPI those funds, which
22   were for services that were provided by JPI to
23   JCM.
24        MR. JAMES:  That's what Mr. Quiros
25   said?
```

Page 291

```
 1        THE WITNESS:  Yes.  And I know that to
 2   be the case.
 3        MR. JAMES:  And how do you know that?
 4        THE WITNESS:  I know that to be the
 5   case because I know there is a relationship
 6   between JPI and JCM and has been for a number of
 7   years for services to be provided by JPI to JCM.
 8        MS. LAMA:  Were those services related
 9   to Jay Peak Biomedical Research Park or AnC Bio
10   or for other partnerships?
11        THE WITNESS:  Those -- the money that
12   JCM owed to JPI were for other -- other purposes.
13        MS. LAMA:  Other purposes or other
14   partnerships?
15        THE WITNESS:  Other partnerships.
16        MS. LAMA:  So not Jay Peak Biomedical
17   Research Park?
18        THE WITNESS:  Monies that JCM owed Jay
19   Peak, Inc., JPI, were for other projects, yes.
20   They're for the work that was done.
21        MR. JAMES:  They're for what?
22        THE WITNESS:  That was for other work
23   that was done.
24        MR. JAMES:  On other partnerships?
25        THE WITNESS:  Yes.
```

Page 292

```
 1        MR. JAMES:  Okay.
 2        So none of the monies that, according
 3   to your testimony now, that AnC Biopharm directed
 4   JCM to pay the money to JPI, that was not for
 5   services that JCM performed for JPI in connection
 6   with the AnC Bio project?
 7        THE WITNESS:  I don't believe that's
 8   accurate.
 9        MR. JAMES:  Okay.  Tell me.
10        THE WITNESS:  The money that JCM owed
11   to AnC Biopharm was for services of AnC -- of the
12   Jay Peak Biomedical Research Park Limited
13   Partnership.
14        MR. JAMES:  Yes.
15        THE WITNESS:  That payment would have
16   taken place between JCM and AnC Biopharm, but for
17   the fact that apparently AnC Biopharm directed
18   JCM to, instead of paying them, pay some other
19   entity, but for the services provided to Jay Peak
20   Biomedical Research Park LP.
21        MR. GORDON:  Okay.  I got to go.  I
22   think we gave you guys -- we gave you plenty of
23   time.
24        MR. JAMES:  Okay.  I'm confused and --
25   I'm confused of your answer, first of all.  And,
```

Page 293

```
 1   second of all, so up until just now your
 2   testimony didn't touch on any of this.  Your
 3   testimony was that Mr. Quiros showed you a
 4   declaration and told you that AnC Biopharm had
 5   attested to receiving twenty-six million from JCM
 6   in connection with the Jay Peak Biomedical
 7   Research Park LP project.
 8        THE WITNESS:  That is correct.
 9        MR. JAMES:  Was that your testimony --
10        THE WITNESS:  Yes, sir.
11        MR. JAMES:  -- that started at 10:00
12   today and went all the way until --
13        THE WITNESS:  Yes, sir, that's correct.
14        MR. JAMES:  5:49 p.m.?
15        THE WITNESS:  Yes, sir, that's correct.
16        MR. JAMES:  So we showed you the
17   declaration, asked you the questions again, and
18   your response to words to this effect was that,
19   oh, that explains why I did not see any monies
20   going from JCM to AnC Biopharm when we looked at
21   all of the statements, correct?
22        THE WITNESS:  I'm not sure that I would
23   relate those two, but, yes.
24        MR. JAMES:  Okay.  Well, that was my
25   question.  We have the transcript, so we can look
```

Page 294

```
 1   it up.
 2          So you take a break and you come back
 3   in, and then your testimony now is very vivid and
 4   clear as to what Mr. Quiros told you about the
 5   monies that were owed to AnC Biopharm by JCM?
 6          MR. GORDON:  Just to be clear, the only
 7   there was no break taken.  There was a conference
 8   to discuss an attorney/client privilege issue.
 9   We never went off the record, and the only thing
10   -- and I'll tell you, the only thing that was
11   discussed was whether or not there was a
12   privilege issue.
13          MR. JAMES:  Okay.
14          THE WITNESS:  So understanding there
15   was not a privilege, I then gave you my testimony
16   to what I understood from the words of Mr. Quiros
17   about this receipt of funds by AnC Biopharm from
18   JCM.
19          MR. JAMES:  So throughout the entirety,
20   you had this knowledge, but you did not share
21   because you thought it was an attorney/client
22   issue?
23          THE WITNESS:  Yes, sir.
24          MR. JAMES:  Is that your testimony?
25          THE WITNESS:  Yes, sir.
```

Page 295

```
 1          MR. JAMES:  Okay.
 2          And when Mr. Quiros told about that
 3   decision by AnC Bio to direct that money to be
 4   paid to JPI, had you ever heard of that before?
 5          THE WITNESS:  Please, ask that again.
 6          MR. JAMES:  Okay.  Was that the first
 7   time you ever heard of that instruction from AnC
 8   Bio to JCM, that it pays JPI the monies that are
 9   invoiced on --
10          THE WITNESS:  Directly, yes.  Directly,
11   yes.
12          MR. JAMES:  You heard it indirectly
13   previously?
14          MR. GORDON:  Are you thinking about
15   communications with Counsel?
16          THE WITNESS:  I'm thinking about both,
17   yes.
18          MR. GORDON:  Well, you can't reveal
19   communications with Counsel, but if you learned
20   something separate from communications with
21   Counsel --
22          THE WITNESS:  I didn't.
23          MR. GORDON:  -- answer that -- you did
24   not?
25          THE WITNESS:  I did not receive
```

Page 296

```
 1   information, other than in conversation with
 2   Counsel -- conversations with Counsel -- yes.
 3   Yes, that's my answer.
 4          MR. JAMES:  So other than conversations
 5   with Counsel, have you heard any other
 6   information about this decision by AnC Biopharm
 7   --
 8          THE WITNESS:  Only in conversation with
 9   Counsel, but that could include conversation with
10   Mr. Quiros and Counsel, I presume.
11          MR. GORDON:  I'm sorry.  Are you saying
12   that would be you, me and Mr. Quiros?
13          THE WITNESS:  Yes.
14          MR. GORDON:  Obviously, he can't talk
15   about that either.
16          MR. JAMES:  I understand that.
17          Just a couple of last questions.  So in
18   the twelve years that you've known Mr. Jang, Dr.
19   Jang -- how long have you known him?  You've
20   known him twelve years, I think you said?
21          THE WITNESS:  I've known Mr. Kim
22   probably twelve years.  I've only known Dr. Jang
23   a few years.  But I don't know Dr. Jang.  I'm
24   familiar with Dr. Jang.
25          MR. JAMES:  Okay.  But you interact
```

Page 297

```
 1   with him weekly on your telephone --
 2          THE WITNESS:  Now, yes, sir.
 3          MR. JAMES:  Okay.
 4          And in all the instances, whether it's
 5   on the telephone, in person, in Morrisville,
 6   Vermont, in Miami, Florida, has Dr. Jang or Mr.
 7   Kim ever told you that they directed JCM to pay
 8   JPI the monies that are owed from JCM?
 9          THE WITNESS:  They have not and would
10   not.  That would never be a subject of a
11   conversation between myself and Mr. Jang.
12          MR. JAMES:  Why not?
13          THE WITNESS:  As I testified earlier,
14   when I'm in these meetings, there are multiple
15   parties in these meetings, and I would no more
16   talk about architectural fees with the architects
17   in those meetings than I would talk about AnC
18   Biopharm fees, for my perspective JCM fees,
19   within the meetings with them.
20          MR. JAMES:  Other communications
21   outside of the meetings, Emails?
22          THE WITNESS:  I don't have other
23   communications outside of the meetings.  My
24   communications with him are specifically about
25   architectural engineering and construction and
```

Page 298

1  equipment.
2      MR. JAMES: Okay.
3      So when you met them at Ceviche 105 --
4      THE WITNESS: Yes.
5      MR. JAMES: -- I'm assuming there
6  weren't any other individuals outside of you, the
7  individuals on behalf of AnC Biopharm, Mr. Quiros
8  --
9      THE WITNESS: There's no conversation
10  about that.
11      MR. JAMES: So they never said to you
12  --
13      THE WITNESS: No, sir. There was no
14  conversation about these.
15      MR. JAMES: Let me finish. They never
16  said to you or even suggested to you that they
17  had directed JCM to pay twenty-one million to
18  JPI?
19      THE WITNESS: No, sir. And they would
20  not have. There would be no cause for that.
21      MR. JAMES: The question is: Did they
22  ever suggest to you --
23      THE WITNESS: No, sir. I'm sorry.
24      MR. JAMES: -- that they had made that
25  decision, had instructed JCM to pay JPI the

Page 299

1  twenty-one million?
2      THE WITNESS: No, sir. I know that
3  information only from conversations with Mr.
4  Quiros or conversations with Mr. Quiros and
5  Counsel.
6      MR. JAMES: Okay.
7      And you just shared it to us five
8  minutes ago; although, we've been asking
9  questions about these monies for the last seven
10  hours?
11      THE WITNESS: I did not know what I
12  could and could not say or were privileged.
13      MR. JAMES: But a number of times you
14  turned to Mr. Gordon and you asked for
15  clarification, whether you could answer
16  something, but I don't think you did that as to
17  this until just now. Would you agree with --
18      THE WITNESS: Earlier today, you asked
19  me to testify whether or not I have seen,
20  apparently, this document, and I told you that I
21  have seen a document similar to this and that
22  that document represented receipt by AnC Biopharm
23  for monies that were owed under a contract.
24  That's what I said and that is what happened. I
25  can only expand on that based upon whether or not

Page 300

1  it is privileged, and I don't know whether it was
2  privileged.
3      MR. JAMES: That's your testimony under
4  oath?
5      THE WITNESS: Yes, sir.
6      MR. GORDON: Let me just make one thing
7  perfectly clear, not only did we -- not only did
8  I tell you that we were done at 5:45 when I said
9  that earlier, and we haven't asked for a single
10  break today, so we're done.
11      The other thing to say is, you've made
12  an issue about I guess what Mr. Kelly said now,
13  as opposed to what he said earlier today. I
14  think it's noteworthy that we went outside and he
15  asked whether there was a privilege. The answer
16  was, no, go ahead and talk.
17      If he had something to hide -- if we
18  were trying to hide something all day long, I
19  don't think that would've been the outcome of our
20  conference out there.
21      Anyway, thank you.
22      MS. FUCHS-SINDLER: Okay. So I know
23  your Counsel has to leave, so --
24      MR. GORDON: Let's go. Sorry. I don't
25  mean to be rude, but we're ten minutes over what

Page 301

1  I said I could do, and I have someone downstairs,
2  and I can't miss my plane.
3      MS. FUCHS-SINDLER: Can we ask one more
4  question?
5      BY MS. FUCHS-SINDLER:
6  Q   Do you have any awareness of whether
7  or not there was ever a margin loan?
8  A   I do not.
9      MS. LAMA: Do you know whether this
10  twenty-one million was used to pay off a Jay
11  Peak, Inc. margin loan?
12      THE WITNESS: I do not.
13      MS. FUCHS-SINDLER: Okay. So we are
14  not ending, but we're adjourning for today.
15  We'll continue.
16      Thank you so much. We appreciate you
17  coming in.
18      (Whereupon, at 5:57 p.m., the
19  examination was concluded.)
20           * * * * *
21
22
23
24
25

Page 302

```
 1              PROOFREADER'S CERTIFICATE
 2
 3    In The Matter of:   JAY PEAK, INC.
 4    Witness:        William Kelly
 5    File Number:      FL-03815-A
 6    Date:           Thursday, July 24, 2014
 7    Location:        Miami, FL
 8
 9          This is to certify that I, Maria E.
10    Paulsen, (the undersigned), do hereby swear and
11    affirm that the attached proceedings before the U.S.
12    Securities and Exchange Commission were held
13    according to the record and that this is the
14    original, complete, true and accurate transcript
15    that has been compared to the reporting or recording
16    accomplished at the hearing.
17
18    _____    _____
19    (Proofreader's Name)    (Date)
20
21
22
23
24
25
```

Page 302

1                    PROOFREADER'S CERTIFICATE

2

3    In The Matter of:    JAY PEAK, INC.

4    Witness:             William Kelly

5    File Number:         FL-03815-A

6    Date:                Thursday, July 24, 2014

7    Location:            Miami, FL

8

9              This is to certify that I, Maria E.

10   Paulsen, (the undersigned), do hereby swear and

11   affirm that the attached proceedings before the U.S.

12   Securities and Exchange Commission were held

13   according to the record and that this is the

14   original, complete, true and accurate transcript

15   that has been compared to the reporting or recording

16   accomplished at the hearing.

17

18   _____   8/6/14

19   (Proofreader's Name)        (Date)

20

21

22

23

24

25

1          UNITED STATES SECURITIES AND EXCHANGE

2             REPORTER'S CERTIFICATE

3

4     I, BRIGITTE ROTHSTEIN, Court Reporter, hereby
certify that the foregoing transcript of 30l pages

5   (July 24th, 2014) is a complete, true and accurate
transcript of the testimony indicated held on

6   July 24th, 2014 at 10:22 a.m. in the matter of:
JAY PEAK, INC.

7

8     I further certify that this proceeding was
recorded by me, and that the foregoing transcript

9   was prepared under my direction.

10

11  Date:  August 1st, 2014
Official Reporter:  Brigitte Rothstein

12  Diversified Reporting Services, Inc.

13

14

15

16

17  _____

18  BRIGITTE ROTHSTEIN, Court Reporter
Notary Public - State of Florida

19  Commission No.:  EE 175314
Expires:  March 17th, 2016

20  Transmittal Number:

21

22

23

24

25