Page 1

UNITED STATES SECURITIES AND EXCHANGE COMMISSION


In the Matter of:      )

                       )    File No.:  FL-03815-A

JAY PEAK, INC.         )


WITNESS:   Joel Burstein

PAGES:     1 through 203

PLACE:     801 Brickell Avenue

           Suite 1800

           Miami, Florida 33131

DATE:      March 27th, 2014


     The above-entitled matter came on for

hearing, pursuant notice, at 10:27 a.m.



PLAINTIFF'S
EXHIBIT
42

Diversified Reporting Services, Inc.

(202) 467-9200

## Page 2

```
 1   APPEARANCES:
 2   On behalf of the Securities and Exchange Commission:
 3      TRISHA SINDLER, ESQ.
 4      BRIAN JAMES, ESQ.
 5      CHEDLEY DUMORNAY, ESQ.
 6      MICHELLE LAMA, ACCOUNTANT
 7      Division of Enforcement
 8      Securities and Exchange Commission
 9      801 Brickell Avenue
10      Suite 1800
11      Miami, Florida 33131
12      (305) 982-6300
13
14   On behalf of the Witness:
15      MARK BARRACCA, ESQ.
16      MELISSA BLAIR, PARALEGAL
17      Raymond James Financial, Inc.
18      880 Carillon Parkway
19      St. Petersburg, Florida 33716
20      (727) 567-5179
21
22   Also Present:
23      Nataly Masica, SEC Intern
24
25
```

## Page 3

### CONTENTS

```
 3   WITNESS:                    EXAMINATION
 4   Joel Burstein                   10
```

```
 6   EXHIBITS:   DESCRIPTION          IDENTIFIED
 7    1   Form 1662                  8
 8    2   Subpoena              10
 9    3   Background Questionnaire    13
10    4   Statement, dated 3/28/13    120
11    5   Statement, dated 2/18 - 3/38  121
12    6   Bates 8241              124
13    7   Credit Agreement         129
14    8   Credit Agreement         133
15    9   Credit Agreement         141
16   10   Credit Agreement         144
17   11   Credit Agreement         145
18   12   Credit Agreement         146
19   13   Credit Agreement         147
20   14   Credit Agreement         148
21   15   Credit Agreement         151
22   16   Debit Account          153
23   17   Stock Transfer Agreement    166
24   18   Board Minutes, dated 6/20/08   167
25   19   Bates 001196           178
```

## Page 4

### CONTENTS (cont.)

```
 3   EXHIBITS:   DESCRIPTION          IDENTIFIED
 4   20   Bates 4686             181
 5   21   Bates 2045 - 2046        188
 6   22   Email, dated 12/10/12      192
 7   23   Email              195
```

## Page 5

### PROCEEDINGS

```
 2        MS. SINDLER:  We are on the record at
 3   10:27 a.m. on March 27th, 2014.  And we're
 4   here to take the testimony of Joel Burstein
 5   at the SEC offices in Miami, Florida.
 6        Mr. Burstein, would you, please, raise
 7   your right hand.
 8        Do you swear to tell the truth, the
 9   whole truth and nothing but the truth?
10        THE WITNESS:  I do.
11   Whereupon,
12            JOEL BURSTEIN
13   was called as a witness and, having been first
14   duly sworn, was examined and testified as
15   follows:
16        MS. SINDLER:  Please, state and spell
17   your full name for the record.
18        THE WITNESS:  Joel Nathan Burstein,
19   Jr., J-O-E-L, N-A-T-H-A-N, B-U-R-S-T-E-I-N, Jr.
20        MS. SINDLER:  Have you ever been known
21   by any other name?
22        THE WITNESS:  No.
23        MS. SINDLER:  Okay.
24        My name is Trisha Sindler.  I'm a
25   Senior Counsel with the Division of Enforcement
```

Page 6

1   of the United States Securities and Exchange
2   Commission. With me are Brian James, also Senior
3   Counsel, Michelle Lama, an accountant, and Netaly
4   Masica, a law student who's interning with us,
5   and we appreciate your agreement to allow Netaly
6   to sit in today. Chedley Dumornay, an Assistant
7   Regional Director with the Division of
8   Enforcement, may be joining us later. We are
9   Officers of the Commission for the purposes of
10  this proceeding.
11        This is an investigation by the
12  Commission in the matter of Jay Peak, Inc., File
13  Number 3815, to determine whether there have been
14  violations of certain provisions of the federal
15  securities laws; however, the facts developed in
16  this investigation might constitute violations of
17  other federal or state, civil or criminal laws.
18        I'm going to briefly explain the
19  procedure that we'll be following today. We're
20  going to be asking you a series of questions.
21  All of us here, except for Netaly who's just
22  observing, might come in and ask some follow-up
23  questions.
24        And, at any time, if you want to take a
25  break, please, let us know, and we'll be happy to

Page 7

1   accommodate you. The only thing we ask is, if
2   there's a pending question, if you answer that
3   question before asking for a break.
4         THE WITNESS: I understand.
5         MS. SINDLER: The court reporter
6   transcribes these proceedings and will create a
7   transcript of your testimony at the end. So,
8   please, make sure to answer verbally, because the
9   court reporter can't pick up any nodding or any
10  type of gestures.
11        Do you understand that?
12        THE WITNESS: I understand.
13        MS. SINDLER: Okay.
14        We'd also ask that you, please, allow
15  us to complete the question before answering.
16  Sometimes people anticipate what the full
17  question is going to be, but just so the record
18  is clear, please, allow us to complete the
19  question.
20        THE WITNESS: Understood.
21        MS. SINDLER: Okay.
22        Also, if we have a conversation about
23  the case while we're off the record or during a
24  break, we're going to need to summarize that
25  conversation when we go back on.

Page 8

1         THE WITNESS: Okay.
2         MS. SINDLER: Are you under any type of
3   medication that would affect your memory today or
4   ability to testify completely and truthfully?
5         THE WITNESS: No.
6         MS. SINDLER: Any other type of
7   substance that would affect your ability to
8   testify completely and accurately?
9         THE WITNESS: No.
10        MS. SINDLER: Prior to the opening of
11  the record, you were provided with a copy of the
12  Formal Order of Investigation in this matter. It
13  will be available to you for your examination
14  during the course of this proceeding. We also
15  note that Mr. James previously provided a copy of
16  the Formal Order to your Counsel, Mr. Barracca.
17        Mr. Burstein, have you had an
18  opportunity to review the Formal Order?
19        THE WITNESS: I have.
20              (SEC Exhibit No. 1 was
21              marked for
22              identification.)
23        MS. SINDLER: Prior to the opening of
24  the record, you were provided with a copy of the
25  Commission's Supplemental Information Form 1662,

Page 9

1   which the court reporter has marked as Exhibit
2   Number 1.
3         Have you had an opportunity to read
4   Exhibit Number 1?
5         THE WITNESS: I have.
6         MS. SINDLER: Do you have any questions
7   concerning that exhibit?
8         THE WITNESS: No.
9         MS. SINDLER: Are you represented by
10  counsel?
11        THE WITNESS: Yes.
12        MS. SINDLER: Would Counsel, please,
13  identify himself. Please, state your name, the
14  name of your -- the name of the company where you
15  work, and the telephone number, and then, please,
16  introduce who you brought with you.
17        MR. BARRACCA: Sure.
18        My name is Mark P. Barracca. I'm
19  Associate General Counsel at Raymond James &
20  Associates. My phone number is (727) 567-5179.
21        And I have with me today my paralegal,
22  Melissa Blair, B-L-A-I-R.
23        MS. SINDLER: And, Mr. Barracca, are
24  you representing Mr. Burstein as his counsel
25  today?



Page 10

1    MR. BARRACCA: Yes, I am.
2    MS. SINDLER: And my understanding is
3    that Melissa will be helping you in terms of
4    notes and documents.
5    MR. BARRACCA: That's correct.
6    MS. SINDLER: Okay.
7    (SEC Exhibit No. 2 was
8    marked for
9    identification.)
10    EXAMINATION
11    BY MS. SINDLER:
12    Q   Mr. Burstein, can you take a look at
13    what the court reporter has marked as Exhibit
14    Number 2. That is a copy of the subpoena that we
15    sent to you with a letter and attachments, dated
16    February 7th, 2014.
17    Do you recognize this document?
18    A   I do.
19    Q   Okay.
20    And have you seen it before?
21    A   I have.
22    Q   And is this a copy of the subpoena
23    pursuant to which you're appearing here today?
24    A   Yes, it is.
25    Q   The subpoena calls for the production

Page 11

1    of certain documents. Have you produced
2    documents called for by the subpoena?
3    A   We have.
4    Q   Please, describe the search that was
5    conducted for the requested documents and state
6    who conducted that search.
7    A   It was done through Raymond James. We
8    went through our documents, and the firm went
9    through their documents, and we provided it.
10    Q   Who conducted the search?
11    A   I believe I did on my end. I'm not
12    sure who did it at our corporate office.
13    Q   When you say you did it on your end,
14    what did you personally do?
15    A   Oh, I went through my -- my files in my
16    office and provided any paper document that we
17    may have had.
18    Q   Any of -- any files, other than in your
19    office?
20    A   No. Anything that was in my office or
21    what was recorded through electronics at our --
22    at our corporate office.
23    Q   When you say electronics, what are you
24    referring to?
25    A   A new account form might be something

Page 12

1    that we scan in and so that would be on our -- on
2    our electronic system.
3    Q   Did you do any type of search on any of
4    your personal computers or other electronic
5    devices?
6    A   I did.
7    Q   Can you tell us what you did?
8    A   I went through personal Email and text
9    messages, and provided those, as well. I don't
10    have any personal Email, but the text messages I
11    did provide.
12    Q   And did you do any search for hard
13    copy?
14    A   I did. Those were -- whatever was in
15    my office. I went through our hard files, and
16    provided those as well.
17    Q   Okay.
18    And who did you provide the subpoena to
19    once you got it?
20    A   I provided it to Mark Barracca.
21    Q   Okay.
22    Have you withheld any documents called
23    for by the subpoena based on any claim of
24    privilege?
25    A   No.

Page 13

1    Q   Have you withheld any documents based
2    on any -- based on an other ground?
3    A   No.
4    Q   Okay.
5    Do you know of any documents that were
6    called for by the subpoena, but that were not
7    provided that you had in your possession at a
8    prior time, perhaps, because they were lost or
9    destroyed or otherwise disposed of?
10    A   No.
11    Q   And do you have a personal -- you have
12    a personal computer that you checked for
13    documents?
14    A   I have Email, personal Email.
15    Q   Okay.
16    Any personal computer at home that you
17    checked?
18    A   No -- oh, yes, I checked the computer,
19    but I don't have anything on it.
20    Q   Okay.
21    Can you state your home address,
22    please.
23    A   It's _____ Coral Gables,
24    Florida 33146.
25    (SEC Exhibit No. 3 was

Page 14

1                marked for
2                identification.)
3    BY MS. SINDLER:
4         Q   Let me hand you what the court reporter
5    just marked as Exhibit Number 3. It appears to
6    be a copy of the filled out background
7    questionnaire, which we sent to your Counsel,
8    dated March 21st, 2014.
9         Do you recognize this document?
10        A   I do.
11        Q   Can you tell me what it is?
12        A   It's a background questionnaire with my
13   information on it.
14        Q   Is that your handwriting?
15        A   It is.
16        Q   Okay.
17        Is all the information contained in
18   this correct?
19        A   Yes.
20        Q   Is there any information that was
21   omitted for any reason?
22        A   No.
23        Q   Are you currently married?
24        A   I am.
25        Q   What is your spouse's name?

Page 15

1         A   Caroline.
2         Q   And when did you get married?
3         A   September 2013.
4         Q   Okay.
5         Have you ever served as an officer,
6    director of any privately-held company?
7         A   No.
8         Q   Okay.
9         And we appreciate you filling out the
10   questionnaire. That allows us to get through the
11   testimony more quickly.
12        A   No problem.
13        Q   When did you first come to work at
14   Raymond James?
15        A   1999.
16        Q   Okay.
17        Can you tell us about your progression,
18   your title when you first came --
19        A   Sure.
20        Q   -- and how that title that's evolved
21   over time?
22        A   Absolutely. I started in 1999 as an
23   intern. I was at the University of Miami at the
24   time. I worked there for a little over a year
25   and a half. I graduated in December of 2000.

Page 16

1         I moved to the Philadelphia area, ended
2    up moving back to Tampa for weather reasons, and
3    I got a job as a Financial Advisor for a small
4    firm that is currently out of business, Simmers
5    Capital Management, for about two months.
6         I then left and got a job back at
7    Raymond James in our Tampa office as an
8    assistant.
9         Q   When was that?
10        A   April of 2001.
11        I stayed there until, I believe,
12   November of 2001, moved back to Miami as an
13   assistant here.
14        In 2004, I became the Operations
15   Manager for the Miami office.
16        In 2007, I believe, I became the
17   Complex Administrative Manager for the Miami
18   area.
19        And in March of 2013, I believe, I
20   became -- I think it was March -- the Branch
21   Manager of the Miami office, our Dadeland office
22   and our Miami Beach office.
23        Q   Okay.
24        And since you moved to Miami or
25   Dadeland, who have been your supervisors and

Page 17

1    during what periods of time?
2         A   Frank -- well -- I'm sorry. Since I
3    moved --
4         Q   Since you've come back.
5         A   In the beginning '99 or --
6         Q   No. Just since you've come to the
7    Miami -- once you had come to the Miami office,
8    if you can tell us by the years who's been your
9    supervisors.
10        A   Okay. Well, when I was interning, it
11   was Margaret Starner, and the Branch Manager was
12   Pat Maroney at the time. In 2001 through today,
13   it's been Frank Amigo, A-M-I-G-O.
14        Q   He's been your supervisor?
15        A   Yes.
16        Q   And what is his title?
17        A   He's the Complex Manager.
18        Q   Have you had any other supervisors
19   during that time?
20        A   No.
21        Q   Do you supervise anyone?
22        A   I do.
23        Q   Okay.
24        Who do you supervise?
25        A   I have probably sixty-two direct

Page 18

1    employees, so I supervise three branches;
2    financial advisors, managers and staff.
3        Q   And how long has that been that you've
4    been supervising these, approximately, sixty-two
5    employees?
6        A   I became a manager in 2004 in that
7    office, so in some form or fashion since 2004.
8        Q   Okay.
9            You're familiar with the name Jay Peak?
10       A   I am.
11       Q   Tell us about how you became familiar
12   with that name.
13       A   Jay Peak is a ski resort in Vermont. I
14   went to college with a girl by the name of Nicole
15   Quiros, Q-U-I-R-O-S.
16           In 2004, Nicole and I, four years after
17   college, started dating. We ended up getting
18   married in 2006.
19           Her father is Ariel Quiros. He was a
20   -- as a kid grew up going to Jay Peak, so we took
21   family vacations to Jay Peak in '05, '06. So I
22   learned about it at that point.
23       Q   When were you divorced from Nicole?
24       A   2009 -- we were separated in 2009. I
25   believe the official date sometime in 2010. I

Page 19

1    don't know the exact date.
2        Q   Okay.
3            And so when did you meet Mr. Quiros?
4        A   2004.
5        Q   Do you socialize with him?
6        A   Then?
7        Q   Then.
8        A   (The witness nods head.)
9        Q   Now?
10       A   No.
11       Q   What type of relationship do you have
12   with him now?
13       A   Professional. My divorce was not
14   pretty. There was child custody hearings. It
15   was drawn out. My ex-wife has since moved my
16   daughter to New York. It's been a custody battle
17   back and forth for -- since '09.
18           When she left, I had to get legal
19   involved so that I could see my daughter, so it
20   was not a very pretty divorce. And so he and I
21   kept it professional. We did not -- it was not
22   plausible to do anything else.
23       Q   So you still have a professional
24   relationship with him?
25       A   Yes, ma'am.

Page 20

1        Q   How do you communicate with him?
2        A   Phone, Email, a couple of texts when
3    he's in and out of the country or not available
4    by Email.
5        Q   How often do you communicate with him?
6        A   It depends on the week. Depends on
7    what's going on. It -- it varies. It depends on
8    where he is. He may spend two weeks out of the
9    country, and we don't usually talk much when he's
10   in Asia. So we do --
11       Q   Can you give me an example of how it
12   might range?
13       A   I would tell you there are points when
14   it's once a week. There are points when it's
15   once every two to three weeks. But I would say I
16   talk to him on a month maybe two to three times.
17       Q   Apart from to going to Jay Peak on
18   vacations, you mentioned, in 2006, what else is
19   your understanding of what Jay Peak, Inc. does?
20       A   Jay Peak is a ski resort. I mean, it's
21   very straightforward, lift tickets, people
22   skiing. They own, you know -- they -- they run a
23   golf resort. They have golf during the summer.
24   They have winter sports during the winter time.
25   And then they have an EB-5 program, which is

Page 21

1    where we get involved. But, you know, it's a ski
2    resort.
3        Q   And when you said there's an EB-5
4    program where you get involved, what do you mean
5    by that?
6        A   The EB-5 program is where I, as a money
7    manager, asset manager, gets involved with Jay
8    Peak. We help him manage his cash when it is --
9    we invest it short-term treasury bills over a
10   very short timeframes to insure he can construct
11   his resort.
12       Q   When you say you help him manage his
13   cash, are you referring to Mr. Quiros?
14       A   Yes.
15       Q   What's your understanding of what an
16   EB-5 program is?
17       A   Well, my understanding the EB-5 -- and,
18   my -- again, my understanding of it is not from a
19   legal standpoint, but from a business standpoint,
20   that the EB-5 is foreign investors who purchase
21   green cards through Customs and Immigration for
22   five hundred thousand dollars.
23           They invest in a regional center, such
24   as Jay Peak. Jay Peak creates ten jobs with
25   that, per their agreement with Customs and

Page 22

1   Immigration, CIS. The five hundred thousand
2   comes into the account. As soon as it's
3   available to build or needed to build, we send
4   the money back through -- through a wire.
5      Q   I'm sorry. When you say -- can you
6   explain what you just said --
7      A   Sure.
8      Q   -- whenever it's ready to build, we
9   send it back through wire?
10     A   Yeah. He will contact me and say, we
11  need to use X-amount of dollars to pay an invoice
12  for glass or piping, and we will wire the money
13  back, per his instructions, per his signed
14  authorization.
15     Q   And that's Mr. --
16     A   Quiros.
17     Q   Is there anyone else who you would do
18  transfers pursuant to their instructions, other
19  than Mr. Quiros?
20     A   No. No.
21     Q   Has Mr. Quiros ever told you could
22  follow someone else's instructions?
23     A   No. No.
24     Q   What is Mr. Quiros's role in connection
25  with the Jay Peak EB-5 program?

Page 23

1      A   Ariel Quiros is the owner of Q Resorts,
2   which is the owner of Jay Peak, Inc.
3      Q   And how do you know this?
4      A   We have a Board of -- Minutes from a
5   Board meeting that shows the transfer of -- of
6   the Jay Peak, Inc. assets from the previous owner
7   to Q Resorts and signed by them, and another
8   letter stating from Bill Stenger that they
9   transferred the assets to Ariel Quiros and Q
10  Resorts.
11     Q   And by previous owner, who are you
12  referring to?
13     A   MMSI.
14     Q   And do you know what MMSI stands for?
15     A   I don't recall.
16     Q   Let's back up a second.
17     A   Sure.
18     Q   How did you learn about this, that Q
19  Resorts was going to be acquiring Jay Peak from
20  MMSI?
21     A   Mr. Quiros told me.
22     Q   When did he tell you?
23     A   I don't know. I don't know the exact
24  date.
25     Q   When he told you, how, how did he tell

Page 24

1   you?
2      A   I was married to his daughter at the
3   time, so we were at dinner.
4      Q   So it was informal?
5      A   Very.
6      Q   Was anyone else present when he told
7   you about --
8      A   My ex-wife.
9      Q   Anyone else?
10     A   No.
11     Q   Anyone who worked in connection with
12  Jay Peak?
13     A   No.
14     MR. JAMES: Was this just casual
15  conversation, or was it he was telling you for a
16  particular purpose or reason?
17     THE WITNESS: I don't remember the
18  specifics. I do remember sitting there and him
19  saying that he was interested and he was going to
20  make an offer to buy JPI, Jay Peak, Inc. That's
21  what I -- I mean, it was, I guess, 2007, 2008. I
22  don't -- I mean, I don't remember exactly.
23     MS. LAMA: At any point in time, did
24  the -- did your conversations with Quiros evolve
25  in terms of how to -- how he would finance the

Page 25

1   purchase?
2      THE WITNESS: We did have discussions
3   about it at a later time.
4      MS. LAMA: Can you tell us about that?
5      THE WITNESS: I don't remember when,
6   but we did -- we did discuss, you know, using a
7   margin loan to finance part of the purchase.
8      BY MS. SINDLER:
9      Q   When was that discussion?
10     A   I don't know.
11     Q   Was that a casual conversation or was
12  that a more formal conversation?
13     A   It was a formal conversation.
14     Q   Who was there?
15     A   I was there. Frank Amigo was there.
16  And Ariel Quiros was there.
17     Q   Anyone else?
18     A   No.
19     Q   Where did the conversation take place?
20     A   Ariel's office.
21     Q   Where's that?
22     A   Downtown. I don't know the exact
23  address. ██████, I think.
24     Q   In Miami?
25     A   Yes, in Miami.

Page 26

1   **Q   How long was the meeting?**
2   A   I have no idea.  I don't remember.
3   **Q   Did anyone take notes?**
4   A   No.
5   **Q   Was the meeting memorialized in some**
6   **way?**
7   A   No.
8   **Q   Any kind of memo or Email?**
9   A   No.
10  **Q   How long did the meeting last?**
11  A   I don't remember.
12  **Q   What was discussed in the meeting?**
13  A   Well, his plan to buy it and a margin
14  loan.
15  **Q   Can you give us a little more flavor**
16  **and detail?**
17  A   Honestly, it was six to seven years
18  ago.  I don't remember the exact specifics.  I do
19  remember the general gist of the conversation.
20  **Q   Just tell us the general gist that you**
21  **remember.**
22  A   That he was going to buy it and that we
23  use a margin loan for it.
24       MR. JAMES:  Was that his suggestion,
25  the use of a margin loan, or was that something

Page 27

1   Raymond James proposed?
2        THE WITNESS:  To be honest with you, I
3   don't remember.
4        BY MS. SINDLER:
5   **Q   Did you discuss with him how that would**
6   **work, the use of the margin loan?**
7   A   Yes.  We discussed in general how a
8   margin loan works.  Yeah, absolutely.
9   **Q   And just for the record, using very**
10  **simple, basic language, explain to us how that**
11  **would work.**
12  A   We would use assets, funds in an
13  account, and we would collateralize those assets,
14  per his authorization, and give him a loan based
15  on the assets available.
16  **Q   And you say, we, you're talking about**
17  **Raymond James?**
18  A   Yes.
19  **Q   And what documents would he have to**
20  **provide in order to get this margin loan?**
21  A   He would have to sign a new account
22  form, like every other client.  He initials on
23  the new account form that he's authorizing us to
24  pledge his assets.
25  **Q   Anything else, besides that**

Page 28

1   authorization?
2   A   No.
3   **Q   Was there discussion of how much in a**
4   **margin loan Raymond James would provide?**
5   A   Sure.  We discussed using different
6   securities as different collateral.  We discussed
7   Treasury bills and the amount of collateral he
8   could utilize with a Treasury bill.
9   **Q   Can you explain that a little more to**
10  **us?**
11  A   Sure.  He could collateralize ninety
12  percent of it with Treasury bills.
13  **Q   Ninety percent of what?**
14  A   Of his assets.  So he could borrow
15  ninety percent on -- on whatever dollar amount he
16  brought in.
17  **Q   Was there any discussion if he was**
18  **going to put up any of his own money in order to**
19  **purchase Jay Peak, Inc.?**
20  A   I don't remember.
21  **Q   At any point, do you remember?**
22  A   No.
23  **Q   And what assets did he put up?**
24  A   The EB-5 assets.
25  **Q   What do you mean by the EB-5 assets?**

Page 29

1   A   The assets he brought in through the
2   EB-5 program.
3   **Q   Can you explain what you mean by that?**
4   A   Well, the EB-5 assets would be the
5   assets that were brought in from foreign
6   investors that were given to the partnership, and
7   he was margining those particular assets.
8        MR. JAMES:  When you say assets, you're
9   referring to cash, you're referring to --
10       THE WITNESS:  Yes, cash.  Yes.  I'm
11  sorry.
12       BY MS. SINDLER:
13  **Q   And you're referring to money that**
14  **these foreign investors made in various limited**
15  **partnerships?**
16  A   Yes.
17       MR. BARRACCA:  May I clarify something?
18       So you said made.  Did you say what
19  foreign investors made in these?
20       MS. SINDLER:  Invested.
21       MR. BARRACCA:  Or you're saying
22  invested?
23       MS. SINDLER:  Invested.
24       THE WITNESS:  Yes.
25       MR. BARRACCA:  Thanks.

Page 30

1    MS. LAMA: Was a dollar amount of the
2  margin loan discussed, a dollar range in terms of
3  how much he would need?
4    THE WITNESS: How much he would need?
5    MS. LAMA: How much he would want to
6  finance.
7    THE WITNESS: Well, it was ninety
8  percent. So we -- we figured out whatever money
9  there was, and we discussed ninety percent of it
10 being invested in Treasury bills, and so whatever
11 that -- that portion was.
12    We didn't -- I don't recall exactly
13 what the numbers were -- what was -- what those
14 numbers were at the time because the numbers
15 fluctuated over time. But, yeah, we discussed
16 whatever ninety percent would be. That was how we
17 framed it.
18    MS. LAMA: And was it over twenty
19 million, over twenty-five million? What was the
20 range in terms of how much he wanted to borrow
21 using EB-5 investor funds as collateral?
22    THE WITNESS: I don't remember what the
23 discussion was. Again, I don't -- I don't
24 remember exactly how or what terms we came to.
25 And I don't remember how much was in the account

Page 31

1  that day or that given time, but whatever it was,
2  we were just sticking to the ninety percent of it
3  was what he could -- was what he could margin,
4  which fell under the corporate guidelines of what
5  we wanted to do, so -- or what he wanted to do --
6  what was available at the time, actually.
7    BY MS. SINDLER:
8    Q   Do you have any understanding as to why
9  Mr. Quiros wanted to finance it like that with
10 the margin rather than some other way?
11    A   To my recollection, it was because our
12 -- our interest rate was significantly more
13 affordable than a bank rate would be.
14    Q   What was the interest rate?
15    A   One point seven five. It's what it is
16 today. I don't remember if it was the same then.
17    Q   At the time, what did you know about
18 Mr. Quiros's finances? How would you describe
19 it?
20    A   Not much. He was my father-in-law. We
21 didn't really get into that side of it until it
22 was an opportunity to manage assets. We really
23 didn't have personal discussions. I'd only been
24 married to his daughter a very brief time. We
25 didn't -- we didn't get into that conversation.

Page 32

1    Q   What was your understanding of his net
2  worth at the time?
3    A   Well, when he filled out the new
4  account form, I'm pretty sure he put about five
5  million dollars, so --
6    MR. JAMES: So prior to the EB-5
7  investments, had you managed any of his assets
8  prior to that point in time?
9    THE WITNESS: I had an account for him,
10 a joint account with him and his wife. I don't
11 remember when he funded that.
12    BY MS. SINDLER:
13    Q   And the whole purchase of Jay Peak
14 through MMSI, was that being done through his
15 company, Q Resorts?
16    A   Yes.
17    Q   Okay.
18    Do you know if Q Resorts was formed for
19 the purpose of acquiring Jay Peaks from MMSI?
20    A   I believe it was.
21    Q   Why do you believe it was?
22    A   If I remember correctly, I think that's
23 what he told me.
24    Q   What do you think he told -- what --
25 what did he tell you?

Page 33

1    A   I don't -- I mean, it's 2008. I -- I
2  don't remember the specific words.
3    Q   Without the specific words, as close as
4  you can remember.
5    A   I do remember him saying that Q Resorts
6  was formed by resorts -- Q Resorts, Q being
7  Quiros, Resorts being Resorts. So it made sense.
8    Q   Was that at a meeting when he told you?
9    A   I have no idea. Sorry.
10    Q   Other than purchasing Jay Peak from
11 MMSI, do you know if Q Resorts did any other type
12 of business?
13    A   Not that I was aware of. Not that I
14 was aware of that it did any other business. I'm
15 only aware of the Jay Peak portion.
16    Q   Do you know what the sources of income
17 are for Q Resorts?
18    A   No.
19    Q   Do you have any understanding?
20    A   Of sources of income?
21    Q   Yes.
22    A   No. I -- I manage the assets. I did
23 not get involved in corporate financing for any
24 of his corporations.
25    Q   What's your understanding of the assets

Page 34

1    of Q Resorts?
2        A   I don't manage those assets. I manage
3    -- my understanding of Q Resorts is that it was a
4    holding company for the Jay Peak shares, and his
5    accountants decided that that was the proper
6    method for him to fund his EB-5 construction in
7    the beginning. And that's what we used it for
8    was a holding company, was my understanding.
9        Q   And did you ever have any discussions
10   with Mr. Quiros as to why he wanted Q Resorts to
11   acquire Jay Peak from MMSI?
12       A   No.
13       Q   Was there ever any discussion as to why
14   it was Mr. Quiros, Mr. Quiros's company, Q
15   Resorts, purchasing Jay Peak from MMSI, rather
16   than anyone else; for example, Mr. Bill Stenger?
17       A   No, not that I recall.
18       Q   Do you know Bill Stenger?
19       A   I have met Bill. Absolutely.
20       Q   And who is he?
21       A   I believe he's the current President of
22   Jay Peak, and he was the existing President when
23   Ari purchased the resort.
24       Q   About the time that Ari purchased the
25   -- Ari's Mr. Quiros?

Page 35

1        A   Yes. Sorry. Ariel. Yes. Sorry.
2        Q   At the time that Mr. Quiros was
3    purchasing Jay Peak from MMSI, did you have any
4    discussions with him as to Mr. Quiros's
5    conversations with Mr. Stenger regarding the
6    purchase?
7        A   I'm sorry. Did I have conversations
8    with Mr. Quiros about Mr. --
9        Q   Yes. Did you have conversations with
10   Mr. Quiros regarding his, Mr. Quiros's,
11   conversations with Mr. Stenger concerning the
12   purchase?
13       A   Not that I remember.
14       Q   Okay.
15           MS. LAMA: What was your understanding
16   of Mr. Stenger's role in the purchase?
17           THE WITNESS: I don't recall. I don't
18   recall. I recall that -- that Mr. Stenger was
19   the -- the -- he ran the resort from a ski
20   operation side. So his role was to manage the
21   resorts, lift tickets, hotels, food, all -- all
22   types of ski resort projects, so --
23           BY MS. SINDLER:
24       Q   Did you have any conversations with Mr.
25   Stenger regarding the margin loans?

Page 36

1        A   I may have had conversations with Mr.
2    Stenger while Mr. Quiros was on the phone, but I
3    don't remember anything in particular. I very
4    rarely spoke with Bill.
5        Q   And when you said you may have had
6    conversations with him about -- Mr. Stenger about
7    the margin loans, what makes you think you may
8    have?
9        A   Because I remember having a
10   conversation with people about the interest rate.
11   They were hoping to get the interest rate lower,
12   and we had discussions about it.
13       Q   And when you had discussions, was that
14   a telephone conversation?
15       A   Yes.
16       Q   A telephone discussion?
17       A   (The witness nods head.)
18       Q   Yes?
19       A   Yes.
20       Q   Who participated in those discussions?
21       A   If I remember correctly, it would be
22   Mr. Quiros and Mr. Stenger and myself, of course.
23       Q   Anyone else?
24       A   No.
25       Q   Were those conversations memorialized

Page 37

1    in any way?
2        A   No.
3        Q   Did you have conversations with anyone
4    else, other than Mr. Stenger and Mr. Quiros about
5    the margin loans?
6        A   No.
7        Q   For example, Mr. Kelly, Bill Kelly?
8        A   Not at the time.
9        Q   At any time?
10       A   I don't think I've ever had a
11   conversation with Bill Kelly about a margin loan.
12   It -- I don't -- I don't recall speaking to Bill
13   about this.
14       Q   And who is Bill Kelly?
15       A   Bill Kelly was Ariel's attorney at the
16   time. I believe he is involved in the resort as
17   the Chief Operating Officer today. But I don't
18   get too involved in the day-to-day operations of
19   the resort. It's not -- not what we do. We're
20   asset managers, and I did my best to stay on that
21   side of the business.
22       Q   To date, have you had conversations
23   with anyone else, other than Mr. Quiros or Mr.
24   Stenger, about the margin loans?
25       A   Not to my recollection, no.

Page 38

1    Q    None of the -- no Controller or CFO
2 from Jay Peak?
3    A    (The witness shakes head.)
4    Q    No?
5    A    Not that I remember.
6    Q    None of their attorneys?  Mr. Caroll?
7    A    During the purchase, I might've had
8 conversations, but I don't recall Mr. -- is that
9 Scribner?
10   Q    Yes, from Caroll & Scribner.
11   A    I may have.  I may have.  There may
12 have been correspondence.
13        When the resort was being purchased,
14 there was a lot of conversations with different
15 people, so I don't remember -- it's been six
16 years.  I don't remember exactly who, but the
17 name's familiar.
18       So I don't know if it was through an
19 Email.  I don't know exactly how.  Maybe he said
20 something.  Maybe Ariel said something.  I don't
21 remember exactly.  But the name is familiar, so
22 it's possible there was some discussion, but I
23 don't remember the specifics of it.
24   Q    Which name is familiar?
25   A    Scribner, Ed Scribner -- or Mark

Page 39

1 Scribner, as well.
2    Q    Mark Scriber.
3    A    Yes.
4    Q    And Ed Caroll?
5    A    Oh, Ed Caroll.  See.  Yes.  Yes.  Yes.
6    Q    Okay.
7        How about anyone at -- any accountants
8 for Jay Peak, have you had any conversations with
9 any of them about the margin loans?
10   A    I believe Ariel has called me with
11 someone from Mallah Furman.  I believe it was
12 Michael Rosenberg.
13   Q    David Rosenbaum?  Was it David
14 Rosenbaum?
15   A    Thank you.  Yes.  Yes.
16   Q    Okay.
17       Tell us about that.
18   A    He just asked me a question.  Again, it
19 was either about the -- usually about the
20 interest rate.  Never anything more specific than
21 that.  We don't -- never got into it.
22   Q    Okay.
23       MS. LAMA:  How many -- did you have
24 several conversations with Mr. Rosenbaum from
25 Mallah Furman or --

Page 40

1        THE WITNESS:  No.
2        MS. LAMA:  What was the range of
3 communication there?
4        THE WITNESS:  I was in Ariel's office
5 once, and he walked in.  I said hello.  I don't
6 remember having much of a conversation with him.
7 I never really spoke with Mallah Furman much at
8 all.  I know they've asked for some 1099s, maybe
9 some documents.  You know, no different than any
10 other accounting firm would ask us.  We provided
11 stuff like that.
12       But as far as margin loan
13 conversations, we did not -- I don't have --
14 remember having conversations about that.
15       I know during the purchase, there were
16 some conversations with different people during
17 -- for the margin.  There were some conversations
18 about that.
19       MR. JAMES:  When was the last time you
20 spoke with Mr. Quiros?
21       THE WITNESS:  Recently?
22       MR. JAMES:  Yes.
23       THE WITNESS:  I don't know.  Two weeks
24 ago, three maybe.
25       BY MS. SINDLER:

Page 41

1    Q    Did you discuss your subpoena with him?
2    A    No.  I was specifically told not to.
3    Q    Has he talked with you at all about the
4 SEC's investigation?
5    A    He did mention it to me.
6    Q    When?
7    A    I don't remember the exact date.
8    Q    Approximately?
9    A    Last year.
10   Q    What did he say?
11   A    He said that the SEC was -- was
12 interested in whether or not the investments to
13 -- the EB-5 investors' investments should've been
14 a registered security.  I think he said Reg D or
15 Reg C or something like that.  I don't know the
16 specifics.
17   Q    Anything else?
18   A    No.  No.  We did have a conversation
19 about his cross margin that we had.  That was
20 another conversation we did have, but -- that
21 they -- they were looking at that -- FINRA was
22 looking at that.
23   Q    Tell us about that.
24   A    We have a -- a multi-purpose margin --
25 we have a margin with multiple accounts on it

Page 42

1  collateralizing the loan.
2     Q   Can you, please, expand on that?
3     A   It's just more than one account that is
4  backing a margin loan.
5     Q   Which accounts?
6     A   A couple of accounts, but his -- his
7  partnership accounts.
8     Q   Whose partnership accounts?
9     A   The Jay Peak partnership accounts,
10 whatever partnership has that he set up.
11    Q   So these are -- when you said the
12 multiple accounts, you're referring to Jay Peak
13 related accounts at Raymond James; is that what
14 you're referring to?
15    A   Yes.
16    Q   And you don't know which ones?
17    A   I do. I don't remember them all. I
18 mean, there was a fair amount of accounts, but
19 his -- his accounts.
20    Q   How many?
21    A   Six, five, four. It did change.
22    Q   When you say it changed, what do you
23 mean?
24    A   When it was -- we could only
25 collateralize accounts that had money in it, so

Page 43

1  if there was no money in it, we didn't
2  collateralize it. So as an account had money in
3  it, we would collateralize that account.
4     Q   When did Mr. Quiros talk with you about
5  what you refer to as the cross margin?
6     A   It was -- it was something we discussed
7  in the beginning.
8     Q   What do you mean beginning?
9     A   When we first talked about margin
10 loans.
11    Q   So when was that?
12    A   I don't remember the exact date.
13    Q   Approximately.
14    A   Before he purchased the resort, so
15 whenever that was.
16    Q   Had you spoken about that since?
17    A   The --
18    Q   The cross margin.
19    A   We recently paid off the margin loan.
20    Q   When you say we, what are you referring
21 to?
22    A   I'm sorry?
23    Q   You said we recently paid off the
24 margin loan.
25    A   I -- I apologize. Ariel recently paid

Page 44

1  off the margin loan.
2     Q   When was that?
3     A   I'm sorry?
4     Q   When?
5     A   When? Two weeks ago.
6     MR. JAMES: Any sense of why?
7     THE WITNESS: My understanding is,
8  according to my firm, FINRA and the SEC don't
9  agree with our policy on cross margining loans,
10 so I was under the instructions from the firm to
11 close the loan about six months ago.
12    We had a conversation with Mr. Quiros
13 and explained to him that that needed to be
14 closed. He understood. And it was a June time
15 frame. We spoke to him about it. He spoke with
16 his accountants and lawyers, made a decision. It
17 was paid off.
18    BY MS. SINDLER:
19    Q   When you say we spoke about it, who's
20 the we? You said six months ago at the firm.
21    A   Who did I speak with at the firm?
22    Q   Yes.
23    A   Our Customer Accounts Area.
24    Q   Who?
25    A   John Carriero, Steve Bartalo.

Page 45

1     Q   Anyone else?
2     A   Not that I remember.
3     Q   Okay.
4     Was it more than one discussion?
5     A   Probably.
6     Q   How many?
7     A   I have no idea. Five, four.
8     Q   Were those discussions memorialized in
9  any way?
10    A   On my end, there may have been an Email
11 here and there. I don't know.
12    Q   I'm sorry. You don't know?
13    A   No, I don't know if we -- we didn't
14 write anything particular, but there may be some
15 Emails back and forth.
16    Q   And have those been produced?
17    A   I believe so. I believe so. I believe
18 we did.
19    MR. BARRACCA: They should've been.
20 Sure.
21    THE WITNESS: Yeah.
22    BY MS. SINDLER:
23    Q   Were they memorialized in any other
24 way, such as notes or a memo?
25    A   No.

Page 46

```
1      Q   And what was your understanding of the
2   issues with FINRA? You had mentioned FINRA.
3      A   Nothing. It just -- I think they
4   didn't agree with our policy on margining --
5   cross margining accounts.
6      Q   Do you have an understanding as to why?
7      A   No.
8          MR. JAMES: And what is your policy --
9   you meaning Raymond James, what's Raymond James's
10  policy in cross margins?
11         THE WITNESS: I'd have to defer -- a
12  policy --
13         MR. BARRACCA: They're asking you.
14         BY MS. SINDLER:
15     Q   You, your understanding.
16     A   My understanding of the policy is that
17  we were allowed to do it.
18     Q   And what's that understanding based on?
19     A   Filling out the proper paperwork. And
20  there's a form that allows us to do it. It's a
21  cross margin form.
22         MR. JAMES: Keep your voice up for the
23  court reporter.
24         THE WITNESS: Sorry.
25         There's a form that allows us to --
```

Page 47

```
1   it's a specific form that we have that allows us
2   to do it. I fill out the form, have the client
3   sign it, send it to the firm.
4          MS. LAMA: What form is this?
5          THE WITNESS: It's a -- I don't know
6   the exact name of it, but it does have a number.
7   It is a specific form. I don't -- I don't know
8   the number. It is -- it's just a -- it's hard to
9   describe. Just a form.
10         MS. LAMA: Does it have a title?
11         THE WITNESS: It does.
12         MS. LAMA: What is it?
13         THE WITNESS: Don't remember.
14         MS. LAMA: Is there a written policy
15  concerning cross margin loans?
16         THE WITNESS: I don't know.
17         BY MS. SINDLER:
18     Q   Was that ever anything you discussed
19  with anyone at Raymond James, whether there was
20  any type of policy?
21     A   To my understanding, it was allowed
22  within the firm's guidelines.
23     Q   And that understanding was based on
24  what?
25     A   The form. Having a form that I could
```

Page 48

```
1   submit, be approved.
2      Q   Was it based on anything, other than
3   the form?
4      A   Not other than a form. And I don't
5   recall having a specific conversation, but I'm
6   pretty comfortable I made a phone call and had a
7   discussion about it, and they said, you need to
8   fill out this form. And that was -- that's
9   pretty much my answer.
10     Q   Do you know who you called?
11     A   No.
12     Q   Who would you have called?
13     A   Customer Accounts. Our Customer
14  Accounts Area.
15     Q   Any particular person?
16     A   No.
17     Q   Okay.
18         MR. JAMES: Have you done this -- prior
19  to this instance with Mr. Quiros, had you done
20  this cross margin with any prior accounts or
21  account holders at Raymond James?
22         THE WITNESS: Not that I recall.
23         BY MS. SINDLER:
24     Q   So he's the only -- his entities are
25  the only clients that you've ever had a cross
```

Page 49

```
1   margin with; is that correct?
2      A   Yes.
3      Q   And when you said Mr. Quiros recently
4   paid off the margin loan a few weeks ago, what
5   was the source of funding to pay off the margin
6   loan?
7      A   He and his accountants and his lawyers
8   decided that they would take it from the Jay Peak
9   Biomedical account, and they sent it to People's
10  Bank. People's Bank sent it to the Jay
11  Construction account. And the Jay Construction
12  account paid down the margin.
13         MS. LAMA: And about how much was paid
14  down?
15         THE WITNESS: Nineteen million, I
16  believe.
17         BY MS. SINDLER:
18     Q   And how do you know all this that
19  you've just explained to us about Mr. Quiros, his
20  accountants, lawyers, what you just explained?
21  How do you know all this?
22     A   Because that's the advice we've always
23  given him when he does things of the sort. It's
24  not our -- it's not our place or our profession
25  to give legal and tax advice. We don't do it.
```

Page 50

1  Never have. It's -- he has to make those
2  decisions with his counsel and his attorney.
3      Q   Understood.
4          But when you just said to us Mr. Quiros
5  and his accountants and lawyers decided to take
6  the money from Jay Peak Biomedical and you
7  explained how it went to People's and then Jay
8  Construction and then back to pay off loan --
9      A   Right.
10     Q   -- what's your understanding of that
11  based on, when you said they decided?
12     A   He told me.
13     Q   When did he tell you that?
14     A   I don't know the date.
15     Q   Approximately.
16     A   A few weeks ago -- three weeks ago,
17  give or take. Whenever we paid it down, whatever
18  day that was.
19     Q   And he explained to you what you just
20  explained to us; is that correct?
21     A   That is correct.
22     Q   What he explained to you, was it on the
23  phone, was it by text?
24     A   Phone.
25     Q   And who participated in that

Page 51

1  conversation?
2      A   Just he and I. I'm sorry. Just Mr.
3  Quiros and I.
4      Q   How did you memorialize -- did you
5  memorialize that conversation in any way?
6      A   Well, we have the signed letters from
7  him authorizing the transfer.
8      Q   Other than the signed letters -- that's
9  okay, I know it's hard to remember -- was it
10  memorialized in any other way?
11     A   No.
12     Q   So he told you his accountants and
13  lawyers decided to take the money and use it in
14  that way?
15     A   Absolutely.
16     Q   Was there any discussion -- and when --
17  what is the Jay Peak Biomedical account?
18     A   It is one of the partnerships for his
19  AnC Bio project.
20     Q   And that's one of the EB-5 limited
21  partnerships; is that correct?
22     A   That is correct.
23     Q   So was it your understanding that the
24  money that was taken from the Jay Peak Biomedical
25  account was money that investors invested in the

Page 52

1  -- in that Jay Peak Biomedical limited
2  partnership?
3      A   As far as I was aware. He explained to
4  me that there was a portion that was his profit,
5  so --
6      Q   Keep going, please.
7      A   How that was worked out, again, was
8  between his accountants and his attorney.
9      Q   And he told you that?
10     A   Yes.
11     Q   Did he say how much of a portion was
12  his -- how much of a portion was his profit?
13     A   I don't remember.
14         MR. JAMES: That's a portion of what
15  was in the account at the time.
16         THE WITNESS: Yes. Sorry. Yes. Yes. Yes.
17         BY MS. SINDLER:
18     Q   Sorry. He said it was his profits?
19     A   Yes.
20     Q   Profits from what?
21     A   I don't know.
22     Q   Did you discuss that with him?
23     A   I asked him. He says that he's
24  entitled to certain profits from it. But, again,
25  I don't -- I don't -- I don't get involved in

Page 53

1  those particular -- I ask the questions. He
2  gives me an answer. He's got accountants and
3  lawyers that know this stuff better than I do, so
4  my unexpert opinion was not warranted.
5      Q   So you did ask him about the profits;
6  is that right?
7      A   I asked him, and he gave me that
8  answer, and that was the answer I went with.
9      Q   What did you ask him about the profits?
10     A   Nothing. I just -- I just said, is
11  this okay? He said, yeah, I have a portion of
12  the profits. That's it.
13     Q   When you said, is this okay, what did
14  you mean by that?
15     A   Well, I meant did he check with his
16  accountants. Did he check with his lawyers, like
17  did he go through his -- his steps.
18     Q   Were you concerned if it was okay?
19     A   I mean, I asked the question. I think,
20  as any advisor you, should ask that question. It
21  was not a red flag for me to raise it. This is
22  six years later. I assumed his accountants and
23  his attorneys were doing their due diligence.
24     Q   Do you know what the status of Jay Peak
25  Biomedical was at the time that he told you about

Page 54

1   moving the money from there?
2      A  No, I do not.
3      Q  Do you have an understanding if there's
4   any type of building or operation that would
5   produce profits?
6      A  I don't know. I stayed out of the
7   underlying business and just managed assets, so
8   --
9      Q  And why did the money -- what was your
10  understanding as to why the money would go from
11  Jay Peak Biomedical account to People's Bank to
12  Jay Construction?
13     A  We -- we did transfers. We tried to do
14  transfers when we got there that were the same
15  registration. So he sent it from our Jay Peak
16  Biomedical to the Jay Peak Biomedical account at
17  People's Bank.
18        His -- again, his accountants and
19  attorneys, you know, that's where I went with the
20  -- with the answers. It was -- you know, that
21  was the answer I got, was that that was what his
22  accountants wanted, that was the method that they
23  wanted to use. And it was consistent with the
24  method that we'd been using to transfer other
25  EB-5 assets for construction purposes.

Page 55

1      Q  Did you wonder why the money was going
2   from Jay Peak Biomedical to People's to Jay
3   Construction? Why that route?
4      A  He -- again, I asked. The question
5   (sic) was, his accountants had advised it that
6   way.
7      Q  Did you wonder why?
8      A  I wondered enough to ask the question.
9   But, again, listen, I'm just an advisor in Miami.
10  He has Mallah Furman and bigger accountants.
11  It's not my place to really make that call or
12  continue to ask the question.
13        I ask. He gives me an answer. The
14  answer seems valid enough to me. It's a major
15  corporation. There are employees. When I ask,
16  if he says his accounting firm says that, there
17  was no real way for me to go anywhere else. It
18  seemed to make sense.
19     Q  Did you have any concerns about that,
20  the money going from Jay Peak to People's to Jay
21  Construction?
22     A  Jay Construction, as my understanding
23  from Mr. Quiros, was that it was a holding
24  company to pay certain bills, and that's what we
25  did for months.

Page 56

1      Q  Did you have any concerns, though,
2   about routing of the money?
3      A  Not once he explained it. I would ask
4   a question. He gives me an answer. I -- it
5   seemed valid to me.
6      Q  But was it fair to say you asked the
7   questions because you did have concerns
8   initially?
9      A  I would say I asked the questions
10  because I didn't understand. I think it's
11  legitimate to ask a question when you're not sure
12  and get an answer.
13     Q  So did you have concerns at any point?
14     A  No. I would say once he told me his
15  accountants were involved, I -- I did not have
16  concerns.
17        I did have a concern in 2011. I did
18  think of things. And I did -- I did go to my AML
19  Department in 2011 and ask the question about Jay
20  Construction. And I specifically said, you know,
21  is this something we can do due to the volume of
22  wires? We went through the process.
23        Our Anti-Money Laundering Department
24  vetted it, checked it out, and they said the
25  wires were going where they were supposed to go.

Page 57

1   They were sent to pay vendors. The LOAs that he
2   signed had invoice numbers on them. He wrote on
3   there what the specifics were for.
4         You know, there was no real reason on
5   my end to question when he sends money to build a
6   resort for pipes, for plumbing, so --
7      Q  Okay. Can we just back up for a
8   second?
9      A  Sure.
10     Q  When you said that Mr. Quiros had
11  explained that Jay Construction was a holding
12  company to pay certain bills, when did he tell
13  you that?
14     A  When he opened it up.
15     Q  When was that, approximately?
16     A  I believe 2011, which is when I
17  contacted our AML Department.
18     Q  Your what?
19     A  I'm sorry. Anti-Money Laundering
20  Department. I'm sorry.
21     Q  Okay.
22        Did you have an understanding as to why
23  Jay Construction was needed to be created to --
24  sorry.
25        Was it your understanding that Jay

Page 58

1   Construction was created to be a holding company
2   to pay bills?
3       A   Yeah, that was my understanding.
4       Q   From who?
5       A   Ariel Quiros.
6       Q   Do you know why, you're understanding
7   as to why Mr. Quiros wanted an entity to be
8   created to pay bills?
9       A   The answer he gave me was, it was an
10  accounting measure so they could keep control on
11  their vendors. They could keep control and tabs
12  of their bill pay. They could sort of see it.
13      Q   Do you know who controlled Jay
14  Construction?
15      A   The President was John Won Choi. I
16  believe his secretary was a legal -- one of his
17  lawyer's secretaries. And then he was given
18  Power of Authority by John Won Choi to process
19  transactions.
20      Q   That was Mr. Quiros?
21      A   Yes, Mr. Quiros.
22      Q   Do you know why it was set up like that
23  --
24      A   No.
25      Q   -- with Mr. Choi being President and

Page 59

1   Mr. Quiros having authority?
2       A   No, I do not.
3       Q   Did you ever have any discussions with
4   Mr. Quiros about that?
5       A   Same answer I always get. I ask the
6   question. It was a little different, not that I
7   was concerned, but it was different, so I asked
8   the question. The question was legally that was
9   the way they wanted to set it up. They wanted to
10  have an arms length distance. And I said, okay.
11      Q   Who wanted to have an arms length
12  distance?
13      A   They did. They being Ariel Quiros, I
14  guess, and Jay Peak. Again, that was fine.
15      Q   Who's Mr. Choi?
16      A   He's a business partner of Mr. Quiros.
17      Q   How do you know that?
18      A   Mr. Choi has been a business partner of
19  Mr. Quiros for a very long time. I met Mr. Choi
20  a few times, as being his son-in-law for a time
21  period. I did meet Mr. Choi, so I talked to him
22  before.
23      Q   You met Mr. Choi here?
24      A   In the United States?
25      Q   Uh-huh.

Page 60

1       A   Yes.
2       Q   Why did you meet Mr. Choi?
3       A   Family reasons. My daughter was born.
4   I mean, nothing --
5       Q   Is Mr. Choi a friend or relative of Mr. .
6   Quiros?
7       A   A business partner and friend.
8       Q   And you mentioned in 2011, you had
9   concerns?
10      A   No. I mentioned 2011 I asked the
11  specific question, because he wanted to wire
12  twenty, twenty-two times, whatever those numbers
13  were of vendors. And so I went to my AML
14  Department and asked -- sorry, my Anti-Money
15  Laundering Department and asked, are we going to
16  have any issues with such a -- with what this
17  account is doing what we're doing? And they went
18  through their process and came back to me and
19  confirmed it would be fine.
20          MR. JAMES: Did they generate some type
21  of a report or analysis?
22          THE WITNESS: I did not get anything.
23          BY MS. SINDLER:
24      Q   And the margin loan that you said was
25  paid off a few weeks ago, that was the cross

Page 61

1   margin loan for which account? You said how many
2   accounts?
3       A   At the time, it may have been one or
4   two.
5       Q   Do you know remember the names of those
6   accounts?
7       A   Jay Peak Biomedical, I think -- I
8   think. Maybe -- maybe Q Resorts. I -- I'd have
9   to look at it. It's changed over time. I -- I'd
10  have to look at it.
11          MS. LAMA: And what entity held the
12  loan?
13          THE WITNESS: Jay Peak, Inc.
14          MS. LAMA: And do you know what the
15  loan was for?
16          THE WITNESS: He used it to purchase
17  the resort.
18          MR. JAMES: Say that again.
19          THE WITNESS: He used it to purchase
20  the resort in the beginning. As it went on, he
21  would use it to fund construction projects when
22  the Treasury bills had yet to mature. And so he
23  did it as a bridge financing for -- for parts of
24  it, as well.
25          MR. BARRACCA: Would you mind if we

Page 62

```
1    took a ten-minute break?
2         MS. SINDLER:  Sure.
3         We'll go off the record at 11:31.
4         (Whereupon, at 11:31 a.m., a short
5    recess was taken.)
6         (Mr. Dumornay is present the room.)
7         MS. SINDLER:  We're back on the record
8    at 10:12 after a break.
9         BY MS. SINDLER:
10    Q    During the break, we had no
11   conversations; is that correct?
12    A    That is correct.
13        MR. JAMES:  Just one quick follow-up.
14   I think before we broke, you had stated in your
15   answer that the margin loan that was paid off, I
16   guess, approximately, two to three weeks ago was
17   the margin loan that was taken out to purchase
18   the resort.  I think that was your answer.
19        THE WITNESS:  Yes.
20        MR. JAMES:  Okay.  Can you just tell us
21   which resort are you referring to that was
22   purchased with the margin loan?
23        THE WITNESS:  Jay Peak, Incorporated.
24        BY MS. SINDLER:
25    Q    And that was the purchase we discussed
```

Page 63

```
1    earlier of Jay Peak from MMSI?
2     A    Yes.
3         MS. LAMA:  When you discussed the
4    payoff of the margin loan with Quiros, you said
5    you asked him some questions.  You mentioned you
6    asked him -- or you discussed with him that he
7    was entitled to certain profits from Jay Peak
8    Biomedical; is that right?
9         THE WITNESS:  Yes.
10        MS. LAMA:  Okay.
11        What other questions did you ask him?
12        THE WITNESS:  That was all that I
13   remember asking him.
14        MS. LAMA:  Aside from the profits,
15   there was nothing else you discussed with him
16   concerning the payoff of the loan?
17        THE WITNESS:  Not that I recall, no.
18        BY MS. SINDLER:
19    Q    So now the margin loan has been
20   completely paid down; is that correct?
21    A    That is correct.
22        MR. JAMES:  I just have a question
23   regarding the actual transfer of funds from point
24   A to point B.  I guess what you testified to was
25   that the money went from the Jay Peak Biomedical
```

Page 64

```
1    Raymond James account to the Jay Peak Biomedical
2    People's account?
3         THE WITNESS:  That's correct.
4         MR. JAMES:  Okay.
5         And then from there, it went to the Jay
6    Construction Raymond James account?
7         THE WITNESS:  That's correct.
8         MR. JAMES:  Okay.
9         And then that was used to pay off the
10   margin loan held by Jay Peak, Inc.?
11        THE WITNESS:  Yes.
12        MR. JAMES:  Okay.
13        And you said the Jay Peak, Inc. margin
14   loan was a cross margin loan that covered a
15   number of accounts?
16        THE WITNESS:  Yes.
17        MR. JAMES:  Okay.
18        Was one of those accounts the Jay Peak
19   Biomedical account?
20        THE WITNESS:  It was.
21        MR. JAMES:  Okay.
22        So the money in the Jay Peak Biomedical
23   account that was the collateral for the margin
24   loan was used to essentially pay off the margin
25   loan?
```

Page 65

```
1         THE WITNESS:  That is correct.
2         MR. JAMES:  Is that how it's typically
3    done, that actual collateral itself is used to
4    pay off the loan?
5         THE WITNESS:  Typically, I don't have
6    an answer to that question.  Some clients do it
7    differently depending on their situation,
8    depending on the amount outstanding.  It varies.
9    So it can be paid off in the account.  Other
10   clients have brought in assets.  It depends on
11   how their finances work.
12        MS. LAMA:  Was any other account used
13   besides the Jay Peak Biomedical account?
14        THE WITNESS:  I don't believe so.
15        MS. LAMA:  Did any of the other
16   accounts have funds in it?
17        THE WITNESS:  Yes.
18        MS. LAMA:  Was there any --
19        THE WITNESS:  I'm sorry.  I did
20   remember.  I believe he did use some of his
21   personal account.  I believe so.  Personal
22   account, his Q Resorts account, and I -- I think
23   that's it.
24        MR. JAMES:  So his personal account,
25   the Q Resorts account and the Jay Peak Biomedical
```

Page 66

1   account?
2        THE WITNESS: Yes.
3        MR. JAMES: And what was the balance in
4   the Jay Peak Biomedical account after the payoff?
5        THE WITNESS: I don't remember.
6        MR. JAMES: Any sense of whether it was
7   a large amount, whether it was close to being
8   zero?
9        THE WITNESS: No. No. I -- just a
10  guess because I don't remember exactly, but six,
11  seven million, I believe, was remaining.
12       MR. JAMES: After the payout? After
13  the payout?
14       THE WITNESS: Yes.
15       BY MS. SINDLER:
16   Q   Is that account still open?
17   A   It is.
18   Q   And when you said that Mr. Quiros also
19  used money from his personal account, is that the
20  personal joint account with his wife?
21   A   Yes.
22   Q   Do you know how much money he used from
23  that?
24   A   I believe it was the whole thing, which
25  would've been one point seven million.

Page 67

1    Q   Did you have any discussions with him
2   why he was using that money from his personal
3   account?
4    A   No.
5    Q   And you said he also used money from
6   the Q Resorts account. How much money did he use
7   from that account?
8    A   I don't remember. I -- I -- I don't.
9    Q   Is there still money left in that
10  account?
11   A   I don't think so, but I'm not a hundred
12  percent sure.
13   Q   Do you have any understanding as to why
14  he used money from the Q Resorts account?
15   A   I'm -- I'm trying to remember, and I
16  don't remember specifically, but he did -- I
17  believe he closed -- he took the funds from his
18  personal account and from his Q Resorts account
19  and it went to -- I -- I don't remember if he
20  sent those to HSBC, where he also has like named
21  accounts, or whether it went to People's Bank. I
22  don't -- I don't remember the exact transfer.
23       I do remember selling the positions,
24  closing the accounts and moving the money out,
25  but it was all -- it was a lot of stuff going on,

Page 68

1   so --
2        MS. LAMA: I'm sorry. Could you walk
3   us through that again?
4        THE WITNESS: Sure. There was -- he
5   did sell -- sell the positions that were in his
6   joint account, and, I believe, he sold the
7   positions in his Q Resorts account. And then he
8   wired the money, but I don't remember exactly
9   where. I'd have to look at the Letters of
10  Authorization.
11       MS. LAMA: Okay.
12       And when you say sold positions, what
13  are you referring to?
14       THE WITNESS: We had purchased stocks,
15  mutual funds in -- in his personal account and
16  his Q Resorts account.
17       MS. LAMA: Do you remember the dollar
18  range in terms of how much was sold in the joint
19  account? Is that about the one point seven
20  million?
21       THE WITNESS: No. I think one point
22  five maybe was invested. I think two hundred
23  thousand was in cash.
24       MS. LAMA: And what about in the Q
25  Resorts account?

Page 69

1        THE WITNESS: I think that was all in
2   -- no. Maybe three hundred or four hundred
3   thousand was invested, I think, in other -- I
4   think the number was seven hundred thousand, and,
5   I think, there was two or three hundred also in
6   cash.
7        MS. LAMA: In the Q Resorts account?
8        THE WITNESS: I believe so. I'm not a
9   hundred percent sure.
10       MR. BARRACCA: We'd be happy to provide
11  the account statements for those accounts. I
12  think since the activity would've occurred this
13  month, they would be available next week.
14       BY MS. SINDLER:
15   Q   Did you say that the accounts were
16  closed?
17   A   No. We closed the positions.
18   Q   Closed the positions.
19   A   I believe the accounts are still open.
20  He did close something -- I -- I'd have to look.
21  Again, I don't -- I don't remember exactly what
22  he decided to do, but I can look at an LOA and
23  tell you -- I'm sorry, a Letter of Authorization
24  and tell you.
25   Q   You said you think he closed one of the

Page 70

1  accounts?
2      A   Yeah. I remember him asking to close
3  an account, but he may have been asking me to
4  close something else. It's just there was --
5  what we did at the time was we did different
6  things, and so I don't remember specifically what
7  they were, but we have it all documented on the
8  Letter of Authorization when he did it, so I'd
9  have to look at it and tell you.
10     Q   Do you have an understanding as to why
11 he used assets from these particular accounts,
12 the Q Resorts and his personal?
13     A   I do not. I do not.
14     Q   And when you said some of the assets
15 might have gone to HSBC, why do you believe that?
16     A   He had -- he had similar registration
17 accounts at HSBC. And so if he had a joint
18 account with his wife, he had a joint account at
19 HSBC. And so when he'd send money, he normally
20 sent it specifically from his account at Raymond
21 James to the same registration that is at HSBC.
22     MS. LAMA: Do you know why he did it in
23 that manner?
24     THE WITNESS: No.
25     BY MS. SINDLER:

Page 71

1      Q   And for that Q Resorts account, was he
2  the one who had control over that account?
3      A   That is correct, to my knowledge.
4      Q   Do you know if anyone else had any type
5  of control over that account?
6      A   Not that I was aware of.
7      Q   When you -- when there were any
8  transactions in connection with Q Resorts or any
9  other Jay Peak related accounts, was he the
10 person who you dealt with?
11     A   Yes.
12     Q   Did you deal with anyone else?
13     A   No.
14     Q   Was it your understand that he was the
15 person who had control over all those accounts?
16     A   It was.
17     MR. JAMES: And the Q Resorts account,
18 the money that was in there was used to pay off
19 the margin loan. Do you have any sense of the
20 source of the money, where it originated from?
21     THE WITNESS: I don't remember. I'd
22 have to look.
23     MR. JAMES: I think earlier you had
24 testified that, as far as you knew, Q Resorts
25 they don't really have any other means of

Page 72

1  generated revenues beyond the Jay Peak?
2      THE WITNESS: That as far as I know,
3  yeah.
4      MS. LAMA: The amounts transferred from
5  Quiros's personal account and from Q Resorts, is
6  that in addition to the nineteen million you
7  mentioned before from Jay Peak Biomedical, or was
8  the total amount nineteen million?
9      THE WITNESS: To the best of my memory,
10 the nineteen million was all from the Jay Peak
11 Biomedical.
12     BY MS. LAMA:
13     Q   And so these other amounts from the Q
14 Resorts and his personal account, that was also
15 used to pay off the margin; is that correct?
16     A   When it went to People's Bank -- again,
17 I don't remember where those funds from his
18 personal account or Q Resorts went. When it went
19 to People's Bank, and he sent it back into Jay
20 Construction, I don't know if that was anything,
21 other than the money that I -- that -- that we
22 sent from his Jay Peak Biomedical account.
23     So whether they put it together or not,
24 I don't know. I just know that we sent the
25 nineteen million. I know he sold the positions

Page 73

1  in the account, because I remember selling the
2  positions. And I'm pretty sure he -- he wired
3  the money out. I don't remember where.
4      But the nineteen million was wired out
5  to Jay Peak Biomedical. I believe a similar
6  amount came back in Jay Construction, and we paid
7  off the margin loan from there.
8      Q   Do you know why it just wasn't
9  transferred directly from the Jay Peak Biomedical
10 to Jay Construction?
11     A   I don't. Most of the transactions
12 where we sent money came through Jay
13 Construction, so it was not unique.
14     Q   Was there any discussion that you had
15 with Mr. Quiros as to why it just wasn't
16 transferred directly from the Jay Peak Biomedical
17 to Jay Construction? Why it went through
18 People's?
19     A   No, to be honest with you. I just
20 asked -- you know, again, is this okay, in
21 essence -- I'm not sure if that's the exact words
22 I used, but, in essence, to just confirm that he
23 had spoken with his people about this, his people
24 being his accountants and his attorneys. And the
25 method was very similar to what we were doing, so

Page 74

1  I thought that was legitimate.
2      Q   I just -- I was uncertain, because, I
3  think, before we discussed that the Jay
4  Construction was used to pay vendors; is that
5  correct?
6      A   Uh-huh.
7      Q   So in this instance -- I guess I'm just
8  trying to understand, since it's not to pay a
9  vendor, why the money would go into Jay
10  Construction?
11      A   I don't have an answer to that. I
12  don't know.
13      MR. DUMORNAY:  Did you ever ask
14  yourself that question?
15      THE WITNESS:  You know, I -- I -- I
16  didn't really question what his accountants made
17  a decision on. I didn't -- I didn't feel as
18  though I had enough information to sort of make
19  that determination.
20      So, again, we were -- we had moved
21  money many times to Jay Construction for various
22  reasons, because that was how he chose to pay
23  things. Whether it was a margin loan or not, it
24  was -- that's how he paid stuff. So it sort of
25  added up in my head when I asked. He goes,

Page 75

1  that's the method we want to use. He said it was
2  consistent. That seemed legitimate to me at the
3  time.
4      MR. JAMES:  And, again, we may have
5  asked you before, but how did he communicate his
6  instructions to you as far as how the transfers
7  would be structured to pay off the margin loan?
8      THE WITNESS:  Well, he -- he -- he --
9  he called me. He told me. And then we completed
10  Letters of Authorization specifically saying -- I
11  do remember on the Letter of Authorization it
12  does say one -- he had payment one, two, three,
13  and four, like he'd broken it out, sort of
14  invoiced in his own method, which, again, was
15  very similar, and then sent four different
16  Letters of Authorization for that process, signed
17  all of them. And so that was how we -- how we
18  processed it.
19      MR. JAMES:  So it's reflected in those
20  the Letters of Authorization that the money goes
21  out to People's Bank and it comes back in to
22  Raymond James? That's reflected --
23      THE WITNESS:  The specific letter of
24  Authorization just shows that one transfer, that
25  it literally went from Raymond James to People's

Page 76

1  Bank, same registration.
2      MR. JAMES:  Okay.
3      THE WITNESS:  There's a separate Letter
4  of Authorization that shows Jay Construction
5  paying off the margin, but -- so there's two
6  separate -- he did it on separate -- separate
7  pieces of papers.
8      MR. JAMES:  Okay.  So as far as the
9  money that came back to Jay Construction, there's
10  not an LOA or Letter of Authorization that
11  captures that portion of the transaction?
12      THE WITNESS:  I don't have it. That
13  would normally be on People's Bank side to
14  process that. So, no, I don't have it.
15      MS. LAMA:  So this sequence of steps
16  was all simultaneously authorized?
17      THE WITNESS:  To the best of my
18  knowledge, it was. I think there may have been a
19  day in between when it came back, but, yeah.
20      MS. LAMA:  Did you discuss this payoff
21  of this margin loan with anyone else?
22      THE WITNESS:  I had discussed it with
23  my firm, my -- my people in my Customer Accounts
24  Area.
25      BY MS. SINDLER:

Page 77

1      Q   And who is that?
2      A   Steve Bartalo and John Carriero, same
3  people from before.
4      Q   And what did you discuss with them?
5      A   The fact that FINRA and the SEC was --
6  was asking us to close these cross margin loans,
7  you know, was this -- is this -- you know, this
8  is what we're going to do, here's the plan, will
9  this suffice? The answer was yes. I let them
10  know out of courtesy that we were closing a
11  fairly large margin loan, per their request.
12      MR. JAMES:  You said you let them know.
13  Who?
14      THE WITNESS:  Steve -- Steve Bartalo
15  and John Carriero.
16      BY MS. SINDLER:
17      Q   Have you ever spoken with any Jay Peak
18  Biomedical investors?
19      A   No.
20      Q   Have you ever spoke with any investor
21  in any of the Jay Peak related limited
22  partnership?
23      A   No.
24      Q   Have you seen the offering materials
25  for any of the Jay Peak limited partnership?

Page 78

```
 1      A   Not that I recall.
 2      Q   Have you ever gone to any presentation
 3   or meeting with any prospective investors or
 4   investors related to the Jay Peak limited
 5   partnership?
 6      A   I have not.
 7      MR. JAMES:  Have you ever visited any
 8   of the projects, any of the EB-5 projects?
 9      THE WITNESS:  I -- I have not visited
10   any of them.  Why?  When I got divorced, again,
11   we very much separated it, so I made no trips to
12   Jay Peak.
13      BY MS. SINDLER:
14      Q   In connection with, you know, when you
15   had mentioned about FINRA and the SEC, did you
16   speak with anyone from FINRA or the SEC about
17   what you were told were issues with the margin
18   loan?
19      A   No.
20      Q   And do you know who from your firm
21   spoke with anyone from the SEC or FINRA?
22      A   The people I spoke with were, again,
23   Steve Bartalo and John Carriero.  So whoever
24   spoke -- they -- they were the only people -- I
25   mean, they are liaisons really, so I did not talk
```

Page 79

```
 1   to anybody.  They were the only ones that
 2   informed me.
 3      MS. LAMA:  And what are their positions
 4   again?
 5      THE WITNESS:  John Carriero -- I don't
 6   know their exact positions.  I know John Carriero
 7   sort of handles the margin loans.  Steve Bartalo
 8   runs our Customer Accounts Area, which is -- he's
 9   John's boss.  Excuse me.  And Steve manages the
10   entire department.
11      MR. JAMES:  Are there any other margin
12   loans remaining after the Jay Peak one that was
13   paid off?
14      THE WITNESS:  For -- for Jay?
15      MR. JAMES:  Yes.
16      THE WITNESS:  No.
17      MS. LAMA:  This margin loan, when was
18   it created?
19      THE WITNESS:  I don't know the exact
20   day, but it was 2008.
21      MS. LAMA:  And can you kind of walk us
22   through the creation of it and walk us through to
23   present concerning this margin loan?
24      THE WITNESS:  Well --
25      MS. LAMA:  The best that you can.
```

Page 80

```
 1      THE WITNESS:  Sure.
 2      It was created in 2008.  It was a -- we
 3   used -- kept it very straightforward, used
 4   Treasury bills, collateralized, again, ninety
 5   percent of the Treasury bills, gave him a check,
 6   basically, of which he sent money to MMSI, I
 7   believe.  I don't know exactly, but to purchase
 8   the resort.
 9      And the margin loan has been in
10   existence in its exact same form for the last six
11   years.  It's always been collateralized by
12   Treasury bills.  As far as I remember, it's been
13   -- it hasn't really changed much.  I know the
14   numbers have fluctuated based on -- over that
15   time frame, the numbers have fluctuated based on
16   short-term liquidity needs and building the
17   resort and when Treasury bills matured, because,
18   at the time, it made sense for us to wait for
19   Treasury bills to mature, as opposed to selling
20   them at losses.  We just waited till they
21   matured, and then we would pay it off.  So there
22   would be short-term bridge loans in between.
23      MS. LAMA:  Can you elaborate on that,
24   short-term bridge loans in between?
25      THE WITNESS:  Sure.
```

Page 81

```
 1      If I bought -- I would buy one-month
 2   Treasury bills.  I'd buy them a month out. So it
 3   was a very simple process.  I'd buy -- whatever
 4   the month was, if I owned that month, I got the
 5   next month and next month three, four million
 6   dollars at a time.  Due to the very tiny interest
 7   rate that was available, I had to buy enough of
 8   Treasury bills to make it useful.
 9      And then, let's say, I had something
10   that matured March 26th, just a random number,
11   March 26th, the -- he may have needed to pay a
12   vendor March 8th, so we would use that to pay the
13   vendor on March 8th.  When the Treasury bill was
14   matured on March 26th, we would put that money
15   back into the -- into the margin account, in
16   essence, to cover what was taken for that
17   two-week spread in there, as opposed to me
18   selling something that may -- that's going to
19   mature at par or at a hundred -- a hundred cents
20   on the dollar and taking a loss for the client,
21   because if I resold it, I would take a loss for
22   him.  So we would bridge that two to three weeks,
23   because I always had something coming due every
24   month for the short-term liquidity.
25      MS. LAMA:  Okay.
```

Page 82

```
1        So you mentioned the margin loan was
2   created in 2008. Was the -- can you continue to
3   walk us through the progression of the margin
4   loan? Was it always held by Jay Peak, Inc.? Was
5   it held by a different entity before?
6        THE WITNESS: You know, I think it was
7   held by a -- I believe it was held by a Jay Peak
8   partnership account. I don't remember the exact
9   name, but I do remember it being a partnership
10  account. At some point, his accountants and
11  attorneys had decided that it should be held by
12  Jay Peak, Inc. So it was -- if I remember
13  correctly, it was closed and reopened under the
14  parent -- the parent company, Jay Peak, Inc.
15       MS. LAMA: And when was that?
16       THE WITNESS: I -- I don't remember the
17  exact date.
18       MS. LAMA: Was the margin loan
19  originally held by Jay Peak Hotel Suites, LP-1
20  and Jay Peak Hotel Suites, LP-2?
21       THE WITNESS: Yes. Yes.
22       MS. LAMA: And can you tell us a little
23  bit about this change in terms of the margin loan
24  then being held by Jay Peak, Inc.? What was
25  discussed concerning that and how did that take
```

Page 83

```
1   place?
2        THE WITNESS: I don't remember the
3   specifics. I don't remember the date. I don't
4   remember the specifics. And I -- I do remember
5   it switching, it could've been three years ago.
6   But we did close it and then reopen it under Jay
7   Peak, Inc.
8        BY MS. SINDLER:
9    Q   Why was that?
10   A   My understanding was, it was accounting
11  reasons. It seemed that his accountants thought
12  that it made sense for it to be under the parent
13  company.
14   Q   And is that what Mr. Quiros explained
15  to you?
16   A   Yes.
17   Q   Did he explain to you why his
18  accountants thought that would make sense?
19   A   Not that I remember.
20       MR. JAMES: Was this in verbal
21  conversation or was this through Emails?
22       THE WITNESS: Yes. Yes, it was a
23  verbal conversation.
24       BY MS. SINDLER:
25   Q   Just the two of you?
```

Page 84

```
1    A   I believe so, yes.
2        MS. LAMA: Did he tell you anything
3   else about this change?
4        THE WITNESS: I don't remember.
5        MR. JAMES: And what was your response?
6   Did you have a response either way as to
7   switching the holder of the margin loans?
8        THE WITNESS: To be honest, he was the
9   authorized party, so we -- he -- he had the
10  ability to do that. So when he said it and he
11  told me his accountants said it, I took him at
12  his word.
13       MS. LAMA: And what was the amount of
14  the margin loan at that time, approximately?
15       THE WITNESS: I can guess. I would
16  tell you it's around the twenty-three million
17  dollar area.
18       MS. LAMA: And did the collateral
19  change when the margin loan was moved --
20       THE WITNESS: No.
21       MS. LAMA: -- from the partnership
22  accounts to Jay Peak, Inc.?
23       THE WITNESS: No.
24       MS. LAMA: Was there any discussion
25  about changing the collateral?
```

Page 85

```
1        THE WITNESS: Not that I remember.
2   It's always been the same.
3        MS. LAMA: Okay.
4        And at that time, what was the
5   collateral?
6        THE WITNESS: The Treasury bills.
7        MS. LAMA: Oh, let me ask the question
8   again. Was the Jay Peak, Inc. margin loan
9   cross-collateralized?
10       THE WITNESS: Yes. The
11  cross-collateralization has always existed. Yes.
12       MS. LAMA: Okay.
13       And at that -- in -- well, stepping
14  back. In the beginning in 2008, what was the
15  cross-collateralization of the loan?
16       THE WITNESS: In 2008?
17       MS. LAMA: Yes.
18       THE WITNESS: Jay Peak 1 -- I'm sorry,
19  Jay Peak Hotel Suites, LP-1, or something like
20  that, 1, and then the identical name, but 2.
21       MS. LAMA: Okay. So Jay Peak Hotel
22  Suites, LP-1 and Jay Peak Hotel Suites, LP-2?
23       THE WITNESS: Yes.
24       MS. LAMA: Okay.
25       And when the margin loan was moved to
```

Page 86

1  Jay Peak, Inc., was there any change in the
2  cross-collateralization?
3        THE WITNESS: No, not -- not that I
4  remember. Whatever accounts we were
5  collateralizing it with then, we collateralized
6  it with the same --
7        MS. LAMA: The same accounts?
8        THE WITNESS: I believe so.
9        MS. LAMA: And what transpired next
10  with this margin loan?
11        THE WITNESS: I'm sorry. In what
12  sense?
13        MS. LAMA: Did it change entities
14  again, or is this the same Jay Peak, Inc. that
15  was just -- margin loan that was recently paid
16  off?
17        THE WITNESS: It was the same Jay Peak,
18  Inc. margin loan that was just paid off.
19        MS. LAMA: At any point in time, were
20  there any other margin loans?
21        THE WITNESS: Not that I was aware of.
22        MS. LAMA: So as new partnerships came
23  online and they started -- Jay Peak started
24  having additional projects, how did the
25  collateral change? Were -- when new projects

Page 87

1  began, was -- for example, Jay Peak Biomedical is
2  recent, or more recent, and this margin loan is
3  from 2009. So how did that work in terms as
4  things progressed?
5        THE WITNESS: The way it was -- was
6  structured was that there was different -- as he
7  opened up another project, Jay Peak Hotel Suites,
8  Jay Peak Penthouse, Golf and Mountain, Lodge and
9  Townhouse, Jay Peak Stateside, as an account was
10  depleted to build whatever they were building --
11  so in the first case, they built a hotel. I
12  think the second time they also built a hotel and
13  a water park. As those accounts were depleted to
14  build whatever they needed, the next account they
15  were raising money at simultaneous time in a --
16  not for the next project. Once each project was
17  filled, they would finish depleting it to -- to
18  build. The next account would then -- would then
19  be filled up with new EB-5 investors, and then we
20  would collateralize the margin against the new
21  EB-5 assets.
22        BY MS. SINDLER:
23    Q   And when you say new EB-5 assets,
24  you're talking about investor's investment money?
25    A   Yes. New incoming investor assets.

Page 88

1    Q   Okay.
2        MR. JAMES: But when the money is still
3  in LP-1 and LP-2 and that's being used to -- as
4  collateral for the margin loan, is that money
5  restricted somehow, or can it be -- is it being
6  paid off and now the collateral is less than the
7  actual loan itself?
8        THE WITNESS: Is the collateral less
9  than the loan? No. No. No. It -- it is
10  restricted to the ninety percent, so, in essence,
11  he needed to keep ten percent in equity,
12  basically, in the account. And so we monitored
13  that ten percent equity and made sure he stayed
14  above that number. So he'd have thirteen,
15  fourteen, fifteen percent, twenty sometimes,
16  whatever that percentage was, but he couldn't go
17  below the ten percent.
18        We started -- you know, we would've had
19  a margin call had there been anything below the
20  required -- required amount, and we would've made
21  him pay it. But he never -- to the best of my
22  recollection, he did not have any margin calls.
23        MR. JAMES: So at least ten percent of
24  the money in the account, which came from
25  investor funds, could not be used to build the

Page 89

1  project?
2        THE WITNESS: Correct. Correct.
3        MR. JAMES: It had to be kept in that
4  account to support --
5        THE WITNESS: Correct. But as they had
6  another project, the other project would take
7  over for it. So you never really had that --
8  that ten percent was never an issue, because the
9  next project more than covered it. Each project
10  was more than covered the margin loan.
11        MR. JAMES: Okay.
12        MS. LAMA: So each time a different
13  project was added as a collateral, what were the
14  mechanics of that? Would a new credit agreement
15  be issued? Can you walk us through how that
16  change would be made?
17        THE WITNESS: Yes. We would have to
18  get a new credit agreement.
19        MS. LAMA: And what was involved in
20  getting a new credit agreement?
21        THE WITNESS: It's just a three-page or
22  four-page document. I Email it or fax it to him
23  with the proper account numbers that we are going
24  to collateralize. He signs it, sends it back.
25        BY MS. SINDLER:

Page 90

1      Q   The he is Mr. Quiros?
2      A   Yes.  Sorry.  Yes, Mr. Quiros.
3          MS. LAMA:  And how was it decided in
4      terms of what would be the proper account
5      numbers?
6          THE WITNESS:  We -- excuse me.  He
7      decided.  We had a conversation about it, and he
8      decided what accounts he wanted to.
9          BY MS. SINDLER:
10     Q   Did you have a discussion with him as
11     to the basis of his decision?
12     A   No.  It's within the parameters of the
13     firm, so we didn't have any need to ask these
14     questions.
15         MS. LAMA:  How do you mean it's within
16     the parameters of the firm?
17         THE WITNESS:  Well, we could cross
18     margin various accounts, as long as he was the
19     controlling -- as long as he -- they were his
20     accounts.  He can't cross margin someone random,
21     but his accounts, he was able to cross margin.
22         BY MS. SINDLER:
23     Q   Did he ever use any assets from his
24     personal account as collateral?
25     A   I believe he did.

Page 91

1      Q   Do you know how much?
2      A   No.
3          MS. LAMA:  Do you know about how many
4      times the credit agreement was changed?
5          THE WITNESS:  I don't remember.  I
6      don't remember.
7          MR. DUMORNAY:  Can I ask you a quick
8      question?
9          THE WITNESS:  Yes, sir.
10         MR. DUMORNAY:  When you said he could
11     cross-collateralize his accounts, when you said
12     his accounts, which accounts are included?
13         THE WITNESS:  I don't remember all the
14     names, but for what we did, they were the ones
15     that he had authority on to sign.  He was a
16     signer on the accounts.
17         MR. DUMORNAY:  So like Hotel Suites --
18         THE WITNESS:  Yes.
19         MR. DUMORNAY:  -- LP-1, you considered
20     his account; meaning to secure his account?
21         THE WITNESS:  He was the authorized
22     signer, so, yeah, we considered it his control,
23     basically.
24         MR. DUMORNAY:  So any of the Jay Peak
25     accounts --

Page 92

1          THE WITNESS:  Correct.
2          MR. JAMES:  -- you would consider to be
3      Mr. Quiros's accounts?
4          THE WITNESS:  Based on the document we
5      had, he was the -- he was the authorized party on
6      our accounts.
7          MS. LAMA:  Other than Quiros, was there
8      any other authorized party, or he was the sole
9      authorized party?
10         THE WITNESS:  On Raymond James
11     accounts, he was the sole authorized party.  With
12     Jay Construction, being John Won Choi, you know,
13     and any joint account where his wife may have
14     been, but as far as those partnerships accounts,
15     he was the only signer that I remember.
16         MR. DUMORNAY:  So even though these are
17     accounts that are holding investor funds that are
18     raised through an EB-5 offering, you considered
19     them to be Mr. Quiros's accounts because he was
20     the sole authorizer on the accounts?
21         THE WITNESS:  We didn't consider them
22     to be his, per se.  We considered them that he
23     was the authorized party to act in whatever
24     manner he saw fit.  So from that perspective,
25     yes, we considered him to the person who could

Page 93

1      make decisions on the account.
2          MS. LAMA:  For Jay Construction
3      Management, Quiros was also an authorized party;
4      is that right?
5          THE WITNESS:  He was.  He was given a
6      Power of Attorney on that account.
7          BY MS. SINDLER:
8      Q   Did Mr. Choi ever give any instructions
9      concerning the Jay Construction account?
10     A   No.
11         MS. LAMA:  Did Mr. Choi ever execute
12     any transactions with Jay Construction
13     Management, or it was always Quiros?
14         THE WITNESS:  To the best of my memory,
15     it was always Mr. Quiros.
16         BY MS. SINDLER:
17     Q   In connection with the Jay Construction
18     account, were there ever any -- was there any
19     time that you communicated with Mr. Choi directly
20     about the account, or was it always through Mr.
21     Quiros?
22     A   I don't recall ever speaking with Mr.
23     Choi about the account.  I -- I do remember --
24     I'm pretty sure I spoke only with Mr. Quiros.  I
25     don't recall any conversations with Mr. Choi.

Page 94

1  Q   Was there any different type of process
2  regarding the collateralization because it was
3  investor money that was being used as the
4  collateral?
5      A   No. They were partnerships or
6  corporate funds. You know, we can margin
7  corporate funds, and it was no deeper than that.
8      MR. DUMORNAY: But was there like any
9  due diligence or anything conducted because of
10 that reason, because of the fact it was investor
11 funds? I mean, was there any due diligence that
12 was done to make sure that whatever was being
13 done with the money was in line with what was
14 disclosed to investors in the offering materials?
15     THE WITNESS: Well, from our
16 perspective, we -- when he purchased the resort,
17 there was, you know, the meeting Minutes, that Q
18 Resorts purchased it, that Ariel Quiros was in
19 charge. He was the authorized signer on the
20 accounts. We went through our process. We gave
21 him the forms. He signed it.
22     You know, and, again, it was -- it's
23 not policy or procedure, but we could look it up
24 on Google and see that he was the owner of the
25 resort. We could -- you know, we -- we didn't

Page 95

1  have any reason to doubt the fact that he was, in
2  fact, the authorized party.
3      MR. DUMORNAY: No. I understand that.
4  But the money that's going to the accounts
5  doesn't belong to him, right?
6      THE WITNESS: Again, he -- he said
7  there was a portion that was his profits. What
8  portion that was, I don't know.
9      MR. DUMORNAY: Did you know how much
10 was raised from investors for each of the
11 offerings? Do you have any idea of that?
12     THE WITNESS: He -- he would give me a
13 number, but until it was actually there and
14 started to draw down, I don't know.
15     MR. DUMORNAY: But you knew it was
16 investor funds, right? You knew it wasn't his
17 money?
18     THE WITNESS: Well, I knew it was -- it
19 was corporate funds. That's how we viewed it.
20     MR. DUMORNAY: Investor money?
21     THE WITNESS: I would say we saw it as
22 corporate funds. Because, in essence, our
23 thought was very simple, that they invested in
24 the regional center. They were buying a visa.
25 The money went to the corporation. The

Page 96

1  corporation then invested it in buying property.
2  That's corporate funds.
3      BY MS. SINDLER:
4      Q   You said they were buying a visa. What
5  do you mean?
6      A   Well, an EB-5 program is purchasing, in
7  essence, the green cards to get into the United
8  States. They had to go through this process and
9  be approved by CIS. And when they were approved
10 by CIS, they had to pay X-amount of dollars to
11 create the ten jobs.
12     Q   But they were -- was it your
13 understanding that the people were making
14 investments in these various limited
15 partnerships?
16     A   Our understanding of -- of it was that
17 the five hundred thousand was to get the visa.
18 Whether it was set up as an investment or how the
19 structure was, I don't know. I don't have any
20 information on that. Our -- our understanding of
21 the EB-5 program was that this was their -- their
22 purchase of a green card, like they --
23     MR. DUMORNAY: So why wouldn't they
24 just send the money to the USCIS to get the green
25 card then?

Page 97

1      THE WITNESS: Well, I thought the EB-5
2  program was an investment in -- I guess, an
3  investment in a regional center.
4      MR. DUMORNAY: Right. So --
5      THE WITNESS: But I don't --
6      MR. DUMORNAY: Right. So you must've
7  understood there was a reason why the money was
8  going to a project?
9      THE WITNESS: Right.
10     MR. DUMORNAY: It was to create the
11 jobs, and if they created the jobs, they get the
12 visa, right? They weren't just simply buying a
13 visa? That couldn't have been your
14 understanding.
15     THE WITNESS: Well, the regional center
16 was, in essence, to create the ten jobs.
17     MR. DUMORNAY: Okay.
18     THE WITNESS: And it was the regional
19 center's responsibility to create those ten jobs.
20 Then when they gave them the five hundred
21 thousand, the assumption would've been that the
22 regional center will go ahead and create those
23 ten jobs. The agreement is, that I'll give you
24 the five hundred thousand, you go create those
25 ten jobs for us, and I'll get a green card. So

Page 98

1  --
2        MR. DUMORNAY: Once the ten jobs are
3  created?
4        THE WITNESS: Sure -- well, I'm not
5  sure about that portion of it. That, I don't
6  know. But -- I don't know exactly where in the
7  process the ten jobs is created. I don't know
8  when the money comes in versus -- we don't escrow
9  it, so I don't know that particular portion of
10  where the five hundred thousand comes in and how
11  it all -- how it all works from that side.
12        What I do know is that they -- they're
13  getting a green card, and so they have to be
14  approved by CIS. CIS offers them the green card,
15  but they're not going to give them the green card
16  if they haven't put up the five hundred thousand.
17        And then there -- the regional center,
18  they do that on purpose so that, in essence, the
19  investors -- or whatever they're called. I mean,
20  they're investors really -- they're -- they're
21  supposed to -- the regional center creates ten
22  jobs for them.
23        BY MS. SINDLER:
24    Q   Did you ever speak with anyone at the
25  USCIS regarding these investments?

Page 99

1    A   No. No, I did not.
2    Q   And what you just explained to us, your
3  understanding of how it worked, how did you get
4  that understand, from who?
5    A   Mr. Quiros.
6    Q   Do you know who the regional center is?
7    A   I believe it's Jay Peak.
8    Q   Do you have an understanding as to the
9  role of the State of Vermont, if that has ever
10  acted as a regional center in connection with the
11  Jay Peak related investments?
12    A   I -- I know the State of Vermont's
13  involved. To what extent and to what, how -- how
14  the State takes care of that, I -- I don't know.
15    Q   Did you ever speak with anyone from the
16  State of Vermont regarding any of the various Jay
17  Peak limited partnerships?
18    A   I did not.
19    Q   And so what's your understanding of how
20  the State of Vermont is involved?
21    A   I've seen it on websites. I've seen,
22  you know, the Governor or the Senator involved on
23  a website or having a press conference or saying
24  something to that effect, but that -- I mean, the
25  Governor represents the State, so that was --

Page 100

1    Q   On the website, is that a Jay Peak
2  website that you've seen that?
3    A   Oh, news -- news outlet. It could be
4  an article or -- yeah, I mean, Jay Peak being
5  one, but -- you know, and it was in the New York
6  Times, for example. And Bill Stenger was on CNBC
7  once. I mean, so lots of media outlets.
8    Q   Have you ever seen the Jay Peak
9  website?
10    A   Yeah.
11    Q   How often have you looked at it?
12    A   I can't tell you how many times I've
13  looked at it, but I have seen it. I've seen it a
14  fair amount of times. I have gone on for various
15  reasons to see the process of the projects going
16  up, and they have pictures of the new hotel and
17  what's going on. and, you know.
18        I -- I don't need to go on all that
19  often. I -- I know what's going on. I would
20  tell you in the beginning, we probably looked a
21  little more. But, again, as being divorced I've
22  -- you know, I'm involved in the process, but I,
23  you know, keep an arms distance at some point.
24  So I go on when I need to.
25    Q   But you did read through it at some

Page 101

1  point regarding the Jay Peak EB-5 investment
2  program?
3    A   I looked at it. I can't tell you I
4  remember reading much. I probably look at it
5  years ago and never really had any reason to go
6  back.
7        (Ms. Masica leaves the room.)
8        MS. LAMA: Did you conduct your own
9  research regarding the EB-5 program?
10        THE WITNESS: I'd -- I'd read a little
11  bit on CIS's website in the beginning in 2008,
12  2009. Do I remember what I read? No. I remember
13  vaguely the gist of it.
14        MR. JAMES: What do you know about the
15  AnC Bio project limited partnership?
16        THE WITNESS: I know that AnC Bio is a
17  biotech company that, I believe, is
18  publicly-traded in Korea. I -- I -- AnC Bio
19  Vermont is, I believe, the American arm of this.
20  I know they purchased a facility in, I believe,
21  it's New Port, which is near Jay. And they were
22  going to be putting up a biotech facility for
23  some of the stuff, I believe, they're doing in
24  Korea. And, I think, they were going to have
25  some, I believe, clean rooms or something to that

Page 102

1   effect to where people could do FDA approval drug
2   trials and things like that.
3       MR. JAMES: You learned this from who?
4       THE WITNESS: Mr. Quiros.
5       MR. JAMES: Do you recall when he first
6   spoke to you about AnC Bio?
7       THE WITNESS: No, I do not.
8       MR. JAMES: Approximately?
9       THE WITNESS: I don't know. Two years
10  ago. I don't know. A year ago. I don't know.
11      MR. JAMES: Was it before he opened up
12  the Jay Peak Biomedical account?
13      THE WITNESS: Yes. A week before that.
14  Sure.
15      MR. JAMES: And in opening that
16  account, did he need to provide any documents or
17  information about the AnC Bio project?
18      THE WITNESS: Nothing more than we've
19  already asked for everything else; the new
20  account form, corporate resolutions, partnership
21  agreements, our forms, our corporate resolutions.
22      MR. JAMES: Did anything with this
23  project strike you as different or unique from
24  the other types of projects Mr. Quiros had been
25  involved in with Jay Peak?

Page 103

1       THE WITNESS: Sure. It was a biotech
2   versus ski resort, so --
3       MR. JAMES: Did you ever ask him about
4   the endeavors in the type of business they were
5   getting into with this AnC Bio?
6       THE WITNESS: Well, I believe -- I
7   believe John Won Choi is the CEO of AnC Bio
8   Korea. And so they were doing an EB-5 project in
9   Vermont, the Vermont arm of it. And my
10  understanding was that it was Jay Biomedical.
11  And when we asked about the EB-5, he said that
12  this is going to fall under the Jay Peak
13  umbrella.
14      MR. JAMES: He meaning Quiros?
15      THE WITNESS: Yes. I'm sorry. Yes.
16  Mr. Quiros said that it was falling under the --
17  the Jay Peak umbrella.
18      MS. LAMA: How so?
19      THE WITNESS: I asked him the question,
20  and he gave me the answer. It was Jay
21  Biomedical. I didn't -- you know, I took him at
22  his word for it. He signed the proper paperwork.
23  I asked the question. You know, I --
24      MS. LAMA: And what was his answer?
25      THE WITNESS: His answer was that it's

Page 104

1   falling under the Jay Peak umbrella. That's just
2   -- it's under -- it defer -- he said there was --
3   I'm trying to remember. He said there was -- I
4   don't remember exactly. He said it was under the
5   Jay Peak umbrella. That, I do remember. I don't
6   remember the specific conversation.
7       BY MS. SINDLER:
8       Q   Did it strike you as unusual that this
9   is so different from the other Jay Peak projects?
10      A   It's different, but, again, he'd done
11  this five or six times. He'd done different
12  things. He -- you know, how it all worked -- you
13  know, we -- I happened to look online, as I was
14  curious about it. He sent me -- I think he sent
15  me actually a news article about it, and Bill
16  Stenger was involved. You know, it was not --
17  similar people involved in Jay were involved in
18  AnC Bio, so --
19      Q   Did he send you any offering materials?
20      A   No. No.
21      Q   Did you ask for any?
22      A   No, I did not.
23      Q   Did you ask for offering materials for
24  any of the other limited partnerships?
25      A   I did not.

Page 105

1       Q   Any reason you didn't ask for any
2   offering materials?
3       A   Yes. We are the asset manager.
4           The EB-5 program was very new when it
5   came out. What they were doing was unique at the
6   time. And our decision was very clear. We were
7   going to help him manage his cash balances. We
8   chose not to be involved in the escrowing the
9   EB-5, the investors. We made a conscious
10  decision not to get involved in that particular
11  part of the process.
12          He was a corporation -- he was a
13  corporate owner. He owned the resort. He had
14  the partnerships. He signed all the paperwork to
15  make all the authorization -- all the authorized
16  transfers. We -- we stuck to our core business,
17  which was managing assets.
18      MR. DUMORNAY: Who owned the
19  partnerships, though? Was it Mr. Quiros or the
20  investors? Weren't the investors the limited
21  partners?
22      THE WITNESS: I believe -- I believe
23  so.
24      MR. DUMORNAY: So the investors own the
25  partnerships, not Mr. Quiros, right, or no?

Page 106

1    THE WITNESS: I don't know. I don't
2    have an answer.
3        MR. DUMORNAY: Okay.
4    BY MS. SINDLER:
5    Q   When you said we made a decision not to
6    ask for those documents, who -- was it discussed
7    or something?
8    A   Well, Frank Amigo and I, and we did
9    talk to AML. We -- we realized we didn't
10   understand EB-5 business, and it made sense for
11   us to not get involved in something we didn't
12   fully comprehend.
13       We can buy Treasury bills. I can give
14   a corporation margin. Those are things that are
15   within the realm of what I know and what I do.
16   And so it was not anything further than we didn't
17   understand it, and I don't think a lot of people
18   did at the time, but we were not about to --
19   listen, understanding it, not understanding it,
20   we were not about to go learn. We were not about
21   to just delve into the intricate world of Customs
22   and Immigration, EB-5, foreign investors from
23   random countries, escrow accounts, you know,
24   subscription agreements. That's beyond the scope
25   of -- of what our knowledge base was. And so we

Page 107

1    made a conscious effort to say, we're just going
2    to be your asset manager.
3        (Ms. Masica enters the room.)
4        MR. JAMES: Well, and lender?
5        THE WITNESS: Yes. And margin.
6        MR. JAMES: And which one actually came
7    first, as far as the roles? Was the relationship
8    started based on Raymond James assisting Mr.
9    Quiros with purchasing Jay Peak, or was it
10   managing the assets and then the margin came
11   afterwards?
12       THE WITNESS: I think he had an account
13   prior, so he had a joint account.
14       MR. JAMES: A personal account?
15       THE WITNESS: Yes. Yes. I'm sorry, a
16   personal account with his wife.
17       And so this opportunity came up, as,
18   you know, this was sort of simultaneous. The
19   asset management and the margin were
20   simultaneous.
21   BY MS. SINDLER:
22   Q   At the point a few weeks ago when Mr.
23   Quiros used nineteen million from the Jay Peak
24   Biomedical to pay off the margin loan, how much
25   had been raised at that point from investors from

Page 108

1    the Jay Peak Biomedical offering?
2    A   It changes. I don't -- it changes
3    because as money comes in, they take it to do
4    what they're doing. So I remember, I think, what
5    it topped out at, but I can't tell you what the
6    flow was. I think it was like twenty-four
7    million, twenty-six maybe. I don't know the
8    exact number. I don't know how much came in
9    either. I don't -- I don't know what the number
10   was on top of that. I just know the net number.
11       MR. JAMES: And then since then, has
12   additional investor funds come into the account
13   since the money was used to pay off the margin?
14       THE WITNESS: I've -- I've been
15   traveling, so I have not had a chance to delve
16   into the actual account. I was out of town for a
17   week, and then been traveling, so I really
18   haven't looked at it to see if there's any money
19   flow. What -- he's asked to withdraw some money,
20   so we do check on that. But I don't -- I don't
21   -- again, I'd have to go back and get a history,
22   because everything comes in in half million
23   dollar lots. I'd have to go check to see what
24   the -- what the transaction. I don't know the
25   net numbers.

Page 109

1    BY MS. SINDLER:
2    Q   How often --
3    A   Go ahead. I'm sorry.
4    Q   How often do you check to see the
5    amounts that are coming in?
6    A   It depends. Probably, at the least,
7    once a month.
8    Q   Don't you send Mr. Quiros Emails
9    telling him when money comes in?
10   A   No. I send it to him -- it's a lot of
11   transactions. He preferred to get it, you know,
12   give or take monthly.
13       He -- he's also aware from the money --
14   the money's in escrow. It's not -- it doesn't --
15   it gets to me -- from what I understand, it gets
16   to me after it's been escrowed, so he already
17   knows what's at People's. It's not new
18   information to him.
19       MS. LAMA: And by People's, you mean
20   People's United Bank?
21       THE WITNESS: Yes.
22       MS. LAMA: Other than this nineteen
23   million withdrawal from the Jay Peak Biomedical
24   account, have there been any other withdrawals
25   from that account?

Page 110

```
 1        THE WITNESS:  My guess is yes, but I'd
 2   have to look.
 3        BY MS. SINDLER:
 4     Q   And when you say your guess is yes, why
 5   do you think yes?
 6     A   Because he was taking money to build or
 7   move it to Jay Peak Biomedical.  He was always
 8   moving money back to Jay Peak Biomedical for --
 9   once they start raising money, the projects are
10   ongoing.  So they're continuing to build
11   something or --
12     Q   Why do you think the money's being used
13   to build something?
14     A   That was the whole point of the
15   project, from my understanding, was that they
16   were going to build -- they were buying a -- a
17   building, and they were getting some supplies.
18   They were getting supplies for it, things of that
19   nature.  He did tell me that once, so --
20        MR. JAMES:  So we know that at least
21   nineteen million went to pay off the margin loan?
22        THE WITNESS:  Correct.
23        MR. JAMES:  So at least we know the
24   nineteen million did not go to build anything at
25   AnC Bio?
```

Page 111

```
 1        THE WITNESS:  That -- that would be the
 2   best guess.
 3        MR. JAMES:  Or do you have any other
 4   reason to think that that amount did go to AnC
 5   Bio?
 6        THE WITNESS:  That nineteen million?
 7        MR. JAMES:  Yes.
 8        THE WITNESS:  No.  I would say that it
 9   was a clear money trail going back to pay off the
10   margin.
11        MR. JAMES:  Okay.
12        BY MS. SINDLER:
13     Q   So when you said it's a guess, it's
14   more than a guess, because it could not go to
15   build anything; isn't that true?
16     A   I guess anything's possible.  Again,
17   it's not something -- here's -- here's the
18   answer, how his accountants account for that, I
19   don't know.  And so it's not my place to say.
20        I can tell you what we did with that
21   money, and it went down, but how and where that
22   -- to speculate whether that's ever going to make
23   it there, whether he pays it back from something
24   else, whether his accountants had figured out a
25   loan structure, there's lots of pieces that I am
```

Page 112

```
 1   not aware of.
 2        So I don't know.  The project is not
 3   finished.  So if the project gets finished in a
 4   year, he might find a solution to pay that back,
 5   but that's beyond the scope of what I would know.
 6     Q   Do you know what the status of the
 7   project is, what's going on now?
 8     A   I do not, not as of today.
 9     Q   When did you know?  When was the most
10   recent time you knew what the status was?
11     A   I don't know.  I'd have to ask.  I'd
12   have to look.
13     Q   Offhand?  It's a relatively new
14   project, isn't it?
15     A   Yes.
16     Q   So when's the -- when do you recall the
17   last time that you spoke with Mr. Quiros to
18   discuss the status of the project?
19     A   A few months ago, maybe.
20     Q   What did he say a few months ago?
21     A   We had -- we were wiring some money --
22   I don't know.  I do remember wiring some money,
23   but it could've been more than a few months ago.
24   It could've been five.
25        We wired some money to AnC Bio Korea.
```

Page 113

```
 1   And I asked him what that was for, and he said he
 2   was buying supplies.  So that told me they were
 3   using it to continue to --
 4        MR. JAMES:  Do you recall how much was
 5   wired to AnC Bio Korea?
 6        THE WITNESS:  It was two million at
 7   that time.
 8        MR. JAMES:  And this was in one sum?
 9        THE WITNESS:  (The witness nods head.)
10        MR. JAMES:  Verbally.  Sorry.
11        THE WITNESS:  Yes.  Oh, God.  Sorry.
12   Yes.  Yes, it was.
13        BY MS. SINDLER:
14     Q   Do you know what the supplies were for?
15     A   I do not.
16     Q   Do you know why the money would be
17   wired -- it was wired to South Korea; is that
18   right?
19     A   AnC Bio in Korea.
20     Q   In Korea?
21     A   Yes.
22     Q   Do you know why it would be wired to
23   Korea to buy supplies for a project that was
24   being built in Vermont?
25     A   I assumed they were -- again, it seemed
```

Page 114

1  logical at the time that if you're building
2  something through a company called AnC Bio and
3  you were buying supplies, you could be buying
4  supplies in Korea. That didn't seem far fetched
5  to me at all.
6       It went to an AnC Bio. It was a Korean
7  entity. I don't know what supplies they would
8  have in Korea that they may need to move to
9  Vermont. It's not -- you know -- so --
10  Q  But is there a building that is built
11  now?
12  A  I believe there's a facility that
13  exists that needed to be renovated.
14  Q  Do you know what the status of the
15  renovation is?
16  A  I do not.
17  Q  Do you know if it's been renovated?
18  A  I do not.
19       MR. DUMORNAY: Have you seen this
20  building, or this is what Mr. Quiros told you?
21       THE WITNESS: I've seen pictures of it.
22       MR. DUMORNAY: You saw pictures of the
23  building?
24       THE WITNESS: Sure. I've seen -- you
25  know, there's a press conference, I think, where

Page 115

1  they -- they showed pictures of the building.
2       MR. DUMORNAY: Okay.
3       Was this like -- how did you see this
4  picture -- these pictures of the building?
5       THE WITNESS: Oh, just through the
6  press. There was a video of a press conference.
7       MR. DUMORNAY: Okay.
8       But who -- when did you see this video?
9  I'm just trying to understand.
10       THE WITNESS: I don't know when I saw
11  the video. It was probably a few months ago.
12       MR. DUMORNAY: But who showed it to
13  you? I mean, what was --
14       THE WITNESS: Oh, I think he may have
15  sent it to me. He may have sent it to me, the
16  link.
17       MR. DUMORNAY: Okay. Okay.
18       THE WITNESS: Yeah.
19       MR. JAMES: You mean Quiros when you
20  say he?
21       THE WITNESS: Yes.
22       MR. DUMORNAY: You said Quiros sent you
23  the video.
24       And was this -- and what was the
25  purpose of this video? How was, you know --

Page 116

1       THE WITNESS: He was just proud of it.
2  He just -- at least to me, he seemed very proud
3  of it, and he was like, look what we're doing,
4  kind of cool.
5       MR. DUMORNAY: So he made the video for
6  you, is that what --
7       THE WITNESS: No. No. No. It was a
8  video of a press conference. They had -- it was
9  on like the news channel.
10       MR. DUMORNAY: Oh, okay.
11       THE WITNESS: Like Channel 2 had
12  covered it, or whatever the channel is in
13  Vermont. And they had a press conference, and so
14  it was on YouTube or somewhere.
15       MR. DUMORNAY: Okay.
16       THE WITNESS: Like their website. And
17  he just sent me the link to their -- the news
18  website, and I looked at it.
19       MR. DUMORNAY: It was about AnC Bio?
20       THE WITNESS: I believe so, yeah.
21       MR. DUMORNAY: Okay.
22       I just want to ask you about the two
23  million dollars. What was the name of the
24  account to which the money was wired, the two
25  million?

Page 117

1       THE WITNESS: I'd have to double check,
2  but, I think, it was AnC Korea, AnC Bio Korea.
3       MR. DUMORNAY: Okay.
4       Was any other money wired to AnC Bio
5  Korea, besides the two million dollars that you
6  just mentioned?
7       THE WITNESS: I'd have to check. I
8  don't remember.
9       MR. DUMORNAY: Do you remember the date
10  of the two million wire?
11       THE WITNESS: No.
12       MR. DUMORNAY: Roughly? Was it this
13  year? Was it last year?
14       THE WITNESS: I'm pretty sure it was
15  last year.
16       MR. DUMORNAY: Do you remember late
17  last year, early last year?
18       THE WITNESS: Middle, I think. Pure
19  guess.
20       MR. DUMORNAY: But you don't know if
21  there were any other wires, besides the two
22  million dollars?
23       THE WITNESS: I think there was, but I
24  don't remember the specifics about them. I don't
25  remember how many. I don't remember what they

Page 118

1    were. I'd have to -- I mean --
2          MR. DUMORNAY: So there were others?
3    You remember being others?
4          THE WITNESS: I think there were
5    others. I would have to look.
6          MR. DUMORNAY: Okay.
7          The others, were they -- what was the
8    dollar range of those amounts?
9          THE WITNESS: I don't remember the
10   specifics about them.
11         MR. DUMORNAY: Were they like hundreds
12   of thousands of dollars, or were they in the
13   millions --
14         THE WITNESS: No. Probably hundreds of
15   thousands. That was sort of the MO. There was a
16   lot of hundred -- he'd very rarely -- unless
17   there was the vendors from Jay Construction, most
18   of the wires were of a larger dollar amount, a
19   couple hundred thousand here and there. So I
20   would imagine they were.
21         MR. DUMORNAY: Was it your
22   understanding that AnC Bio in Vermont was -- was
23   it your understanding it was a separate company
24   from the Korean company or part of the Korean
25   company, a sub, or what was your understanding of

Page 119

1    that?
2          THE WITNESS: I don't -- I don't know.
3    I don't -- I don't -- my understanding -- my
4    understanding of it was that it was a sub-unit in
5    some way, shape or form. I don't know exactly
6    the entity structure, but I -- I do remember
7    there being a press release and article about the
8    Korean version of it. I do remember seeing those
9    pieces, so it led me to believe that there was
10   some connection between the two.
11         MR. DUMORNAY: Okay.
12         The investors who are the limited
13   partners of AnC Bio Vermont, do you know if they
14   have an ownership interest in the Korean company?
15         THE WITNESS: I have no idea.
16         MR. JAMES: The two million that was
17   transferred from -- to AnC Bio Korea, was that
18   directly from Jay Peak Biomedical account, or did
19   that go through Jay Construction, like the other
20   transfers we've talked about?
21         THE WITNESS: I'd have to look. I'd
22   have to look.
23         MS. LAMA: Have you ever heard of AnC
24   Uda Cell?
25         THE WITNESS: I have heard the name. I

Page 120

1    don't know anything about it.
2          MS. LAMA: Were there any payments to
3    AnC Uda Cell?
4          THE WITNESS: I'd have to look.
5          MS. LAMA: Okay.
6          MR. DUMORNAY: Can we take a quick
7    break? I know we're getting close to --
8          MS. SINDLER: It's five to one. We'll
9    take a quick break. We'll go off the record.
10         (Whereupon, at 12:55 p.m., a short
11   recess was taken.)
12         MS. SINDLER: We're back on the record.
13         During the break, we had no substantive
14   conversations; is that correct?
15         THE WITNESS: That is correct.
16         MS. SINDLER: Okay.
17         We're going to go off the record for a
18   lunch break, and we'll discuss once we're off the
19   record how long we need.
20         (Whereupon, at 1:11 p.m., a luncheon
21   recess was taken.)
22         A F T E R N O O N   S E S S I O N
23             (SEC Exhibit No. 4 was
24             marked for
25             identification.)

Page 121

1          MS. SINDLER: We're back on the record
2    at 2:19 p.m.
3          BY MS. SINDLER:
4      Q   During the lunch break, we had no
5    substantive conversations; is that correct?
6      A   That's correct.
7      Q   The court reporter has marked as
8    Exhibit Number 4 a copy of a Raymond James
9    statement for the Jay Peak Biomedical Research
10   Park account, an AnC Bio, dated March 28th, 2013.
11   I give that to you.
12         Do you recognize this document?
13     A   Yes.
14     Q   And what is it?
15     A   It's a Raymond James statement.
16     Q   And if you can take a look at the
17   second page, which is Bates ending 4625. Do you
18   see where it says, March 3rd, 2013 deposit from
19   People's Bank for two point six million?
20     A   What -- I'm sorry. What page was that?
21         MS. SINDLER: Let me mark this Exhibit
22   5.
23             (SEC Exhibit No. 5 was
24             marked for
25             identification.)

Page 122

1    BY MS. SINDLER:
2        Q   Let me show you what's been marked as
3    Exhibit Number 5, a copy of a Raymond James
4    statement for Jay Construction Management,
5    February 18th to March 28th. I'm sorry. I was
6    confused and gave you the wrong one. So this is
7    Number 5. If you could look at the second page
8    with Bates 4625.
9        A   Yes.
10       Q   Okay. And do you where on March 11th,
11   2013 a deposit from People's Bank for two point
12   six million?
13       A   I do.
14       Q   Okay.
15           Do you know if that deposit came from
16   the Jay Peak Biomedical AnC Bio account?
17       A   I'd have to check. I don't know
18   offhand.
19       Q   Okay.
20           MR. DUMORNAY: Can I -- can you maybe
21   just turn to the page with the transfer, the
22   transfer out?
23           MS. SINDLER: Oh, the withdrawal?
24           MR. DUMORNAY: Yeah.
25           BY MS. SINDLER:

Page 123

1        Q   Could you look at -- go the next page
2    with Bate 4626. Do you see the withdrawal on
3    March 11th also for two million to AnC Bio Farm?
4        A   I do.
5        Q   Is that the same transfer we were
6    talking about before the lunch break?
7        A   I believe so.
8            MR. DUMORNAY: So do you know if that
9    deposit on page two is the deposit for that
10   transfer?
11           THE WITNESS: Do I know if this
12   withdrawal was --
13           MR. BARRACCA: Could you repeat the
14   question?
15           MR. DUMORNAY: If the transfer out to
16   AnC Bio Korea, that this deposit is the money for
17   that withdrawal, for that transfer out?
18           THE WITNESS: I understand. So are you
19   -- got you. Was this deposit, this two point six
20   million dollar deposit the withdrawal that went
21   out here? Am I following that properly?
22           MR. DUMORNAY: Yeah.
23           THE WITNESS: It's the same day. I
24   don't know. I'd have to see where this -- this
25   particular two point six came from on the LOA.

Page 124

1            MR. DUMORNAY: Okay.
2            (SEC Exhibit No. 6 was
3            marked for
4            identification.)
5        BY MS. SINDLER:
6        Q   The court reporter's just marked as
7    Exhibit Number 6 a copy of a spreadsheet. At the
8    bottom, it says, "Quiros Incoming Wires." And
9    you'll see on the bottom, it's Bates 8241. And
10   then you'll see the number after that, the
11   ████████174.
12           Do you recognize this document?
13       A   I don't recognize the document, but --
14       Q   Okay.
15           Can you go -- could you look on the
16   second page.
17       A   Sure.
18       Q   Go about seven lines up from the bottom
19   where it says, March 11th, 2013 --
20       A   Sure.
21       Q   -- and you'll see two point six
22   million.
23       A   Uh-huh.
24       Q   And then you go across the spreadsheet
25   --

Page 125

1        A   Uh-huh.
2        Q   -- and it shows Jay Peak Biomedical
3    Research Park.
4        A   Okay.
5        Q   So comparing that now with the
6    statement that I just showed you, Exhibit 5, does
7    it now appears that that was -- does it now
8    appear to you that was money that came in from
9    the Jay Peak Biomedical Research Park, that was
10   the two point six million into the Jay
11   Construction?
12       A   I'm sorry. I -- I've got to see this
13   spreadsheet.
14           Can I ask him a question?
15           MR. DUMORNAY: Yeah. Do you want us to
16   --
17           THE WITNESS: No. I just didn't
18   prepare it, so I don't --
19           MR. BARRACCA: He hasn't seen this
20   spreadsheet and doesn't know that it exists.
21           MR. DUMORNAY: Can we go off the record
22   for a second, and then we can give you a chance
23   to talk to him about it.
24           MS. SINDLER: Yeah. Okay. We'll go
25   off the record.

Page 126

1      (Whereupon, at 2:26 p.m., a short
2  recess was taken.)
3      MS. SINDLER:  We're back on the record,
4  so Mr. Burstein could confer with Counsel.
5      BY MS. SINDLER:
6  **Q   During that time, we had no substantive**
7  **conversations; is that correct?**
8  A   That's correct.
9  **Q   Okay.**
10  A   Yes, it appears to be the two million
11  that it came from Jay Peak -- Jay Peak
12  Biomedical.  It does seem to be.
13  **Q   And is that in accordance with your**
14  **understanding that money, when it was transferred**
15  **from AnC Bio, would go through Jay Construction**
16  **first before going out?**
17  A   Yes.
18  **Q   And were there anymore similar**
19  **transactions like this, like the two million**
20  **transaction?**
21  A   I don't remember.  I do remember that
22  one specifically, but I don't remember all of the
23  transactions.
24      MR. DUMORNAY:  I think you testified
25  earlier that with this particular transaction,

Page 127

1  you knew -- obviously, from the statement you
2  can't tell, but that you said you knew that the
3  money came from AnC Bio.  Then it went to Jay
4  Construction Management.  From there to the Korean
5  AnC Bio company.  How did you know that given that
6  these documents -- you haven't seen that
7  spreadsheet before?
8      THE WITNESS:  Well, we normally do it
9  through LOAs.  So I see the LOA.  I can see it --
10  I don't view anything through the spreadsheet.
11      MR. DUMORNAY:  Okay.
12      THE WITNESS:  The way I do it, I see it
13  through very different systems, so, I mean, you
14  get used to seeing things in certain patterns.
15  It's just hard to read it.  So I wanted to make
16  sure I understood what I was reading.  But, yeah,
17  I view it different ways.
18      MR. DUMORNAY:  So from the LOA, you
19  knew that?
20      THE WITNESS:  That --
21      MR. DUMORNAY:  That the money came from
22  -- when you testified earlier, you knew that two
23  million dollars went to AnC Bio Korea.  And, I
24  think, your testimony was that you knew the money
25  came originally from AnC Bio.  Then it was

Page 128

1  transferred to Jay Construction, and from there,
2  it went to AnC Bio Korea.
3      THE WITNESS:  Yes, I believe so.
4      MR. DUMORNAY:  I'm asking how did you
5  know that?
6      THE WITNESS:  I had a -- I had a
7  conversation with Mr. Quiros.
8      MR. DUMORNAY:  He told you that?
9      THE WITNESS:  Well, we asked the
10  question through a text message.  I had asked him
11  what the two million was for, and he replied back
12  to me, and that was one that I remembered having
13  a specific conversation about.
14      Now, I don't remember the date of that
15  particular conversation, so -- but the two
16  million was -- I had a conversation about a two
17  million dollars with him.
18      MR. DUMORNAY:  Okay.
19      And so during that conversation, he
20  told you this money came from AnC Bio's account?
21      THE WITNESS:  No.  He said -- if I
22  remember correctly, the -- the question I asked
23  was:  This two million dollars that went from Jay
24  Construction, did that -- should that have come
25  from Jay Biomedical, and, I believe, his answer

Page 129

1  was Jay Construction's the holding company, and
2  that's how we pay the suppliers.
3      MR. DUMORNAY:  Okay.
4      Did we get text messages from Raymond
5  James?
6      MS. SINDLER:  Yes.
7      MR. DUMORNAY:  Thanks.
8      (Ms. Lama leaves the room.)
9      MR. JAMES:  Mr. Burstein, I want to
10  turn your attention back to our discussion about
11  the margin loans that we'd talked about earlier.
12      If we have the court reporter mark that
13  for me, please.
14          (SEC Exhibit No. 7 was
15           marked for
16           identification.)
17      MR. JAMES:  I'm handing you what has
18  just been marked as Exhibit Number 7.  It appears
19  to be a credit agreement, multiple pages.  Can
20  you take a look at that, and let me know if
21  you've seen it before.
22      THE WITNESS:  I have.
23      MR. JAMES:  What is it?
24      THE WITNESS:  It's a credit agreement.
25      MR. JAMES:  And earlier you had

Page 130

1   testified about a margin loan that was,
2   basically, issued to Jay Peak, Inc. If you could
3   look at that credit agreement, and tell me
4   exactly if this credit agreement relates to the
5   margin loan you testified about earlier.
6         THE WITNESS: Yes.
7         MR. JAMES: Okay.
8         And then how do you know this relates
9   to that margin loan?
10        THE WITNESS: I don't know. I read it.
11  It says it on there.
12        MR. JAMES: Tell me where you're
13  reading.
14        THE WITNESS: "The credit agreements
15  made by Jay Peak Hotel Suites, LP."
16        MR. JAMES: Okay.
17        And is this the original margin loan
18  that was issued by Raymond James?
19        THE WITNESS: I believe it is.
20        MR. JAMES: Okay.
21        And if you can look at paragraph number
22  three.
23        THE WITNESS: Okay.
24        MR. JAMES: We're still looking at
25  Exhibit Number 7. Do you see those two account

Page 131

1   numbers that are referenced in paragraph number
2   three?
3         THE WITNESS: I do.
4         MR. JAMES: What accounts are those?
5         THE WITNESS: I would have to double
6   check, but my -- my guess is that they're Jay
7   Peak 1 and Jay Peak 2 -- I'm sorry, Jay Peak
8   Hotel Suites, LP-1 and Jay Peak Hotel Suites,
9   LP-2.
10        (Ms. Lama enters the room.)
11        MR. JAMES: Okay.
12        And then if you look at paragraph
13  number four.
14        THE WITNESS: Uh-huh.
15        MR. JAMES: Those two numbers are
16  reflected in paragraph number four again. Do you
17  see that?
18        THE WITNESS: Yes.
19        MR. JAMES: Okay.
20        So explain to me exactly what's the
21  significance of these numbers noted in paragraph
22  three and paragraph number four.
23        THE WITNESS: They are the account
24  numbers that held assets that we were
25  collateralizing.

Page 132

1         MR. JAMES: Okay.
2         So in paragraph number three shows the
3   two accounts, which you recall to be LP-1 and
4   LP-2, and you're saying these two accounts
5   collateralized the margin loan issued to Jay Peak
6   Hotel Suites?
7         THE WITNESS: LP.
8         MR. JAMES: LP.  Sorry.
9         THE WITNESS: Yes.
10        MR. JAMES: Okay.
11        And they raise reference again in
12  paragraph four those two accounts.  What's the
13  significance of them being listed in paragraph
14  number four?  Feel free to read the paragraph, if
15  it helps.
16        THE WITNESS: It's, basically, saying
17  -- I'm not -- but it's, basically, saying that we
18  have the right to any of the property should he
19  default on paying his loan.
20        MR. JAMES: Okay.
21        And is this credit agreement
22  representative of all the credit agreements that
23  were issued in connection with the margin loan
24  that we're talking about?
25        THE WITNESS: To the best of my

Page 133

1   knowledge, it should be.
2         MR. JAMES: Okay.
3         Let me know you what I am now marking
4   as the next exhibit, which, I think, is Number 8.
5               (SEC Exhibit No. 8 was
6                marked for
7                identification.)
8         BY MS. SINDLER:
9         Q   Before Mr. James hands you Exhibit 8,
10  can I just for Exhibit 7, that first credit
11  agreement, the June 18th.  If you look at the
12  last page and you see that signature, Ariel
13  Quiros.
14        A   Yes. Yes.
15        Q   Is that his signature?
16        A   It looks like his signature.
17        Q   Have you seen his signature on many
18  different occasions?
19        A   I have.
20        Q   And are you familiar with it?
21        A   I am.
22        Q   And so do you recognize that to be his
23  signature?
24        A   It looks like his signature to me.
25        MR. JAMES: All right. Let me hand you

Page 134

1 what has been marked as Exhibit Number 8, which
2 appears to be another credit agreement issued by
3 Raymond James to the Jay Peak Hotel Suites. I'm
4 also handing a copy to your Counsel.
5 I'm sorry. Have you had a chance to
6 look at Exhibit Number 8?
7 THE WITNESS: Oh, yes. I'm sorry.
8 Yes.
9 MR. JAMES: Okay.
10 What's Exhibit Number 8?
11 THE WITNESS: I'm sorry?
12 MR. JAMES: What is it?
13 THE WITNESS: It's a credit agreement.
14 MR. JAMES: Okay.
15 Between who?
16 THE WITNESS: Jay Peak Hotel Suites,
17 LP.
18 MR. JAMES: And Raymond James?
19 THE WITNESS: And Raymond James.
20 MR. JAMES: Okay.
21 And we were talking about the margin
22 loan just now in reference to Exhibit Number 7.
23 What margin loan does Exhibit Number 8 relate to?
24 THE WITNESS: The same margin loan
25 before.

Page 135

1 MR. JAMES: Okay.
2 So let me ask you, as to paragraph
3 number three, it references a different account
4 number that was referenced in paragraph number
5 three of Exhibit 7. Do you see that?
6 THE WITNESS: I do.
7 MR. JAMES: Can you tell me why that
8 is?
9 THE WITNESS: I don't remember.
10 MR. JAMES: Okay.
11 Do you recognize that account number,
12 what account holder that relates to?
13 THE WITNESS: No. I'd have to check on
14 that one.
15 MR. DUMORNAY: I believe that that's
16 the Jay Peak, Inc. account. So do you know --
17 because you testified earlier that the two
18 accounts were consolidated. Could this be what
19 is happening here?
20 THE WITNESS: It's absolutely possible.
21 There was that transfer. I apologize. I don't
22 remember all the account numbers, but if -- if I
23 saw it, I could tell you.
24 MR. JAMES: Well, why don't we see if
25 we can find some way to identify what account

Page 136

1 number that number reflects.
2 But your testimony is that you believe
3 that Exhibit 8 reflects the consolidation of
4 Exhibit 7 into one margin loan?
5 THE WITNESS: It appears that way.
6 MR. JAMES: Okay.
7 And then in paragraph number four where
8 it lists two of the accounts that were referenced
9 in Exhibit 7, and then it adds a third account
10 ending in 4710.
11 THE WITNESS: Yes.
12 MR. JAMES: Do you recognize that
13 account number, by chance?
14 THE WITNESS: If I say, I'm guessing.
15 Again, I don't know the numbers. It'd be a
16 guess, but --
17 MR. DUMORNAY: But whatever account
18 that is, it would be the same situation, that
19 account would be indebted to for the margin loan?
20 THE WITNESS: Yes. Yes. Yes.
21 MR. DUMORNAY: It's the same situation,
22 right?
23 THE WITNESS: Yes.
24 MR. DUMORNAY: Okay.
25 THE WITNESS: We're just -- in essence,

Page 137

1 what we're doing is we're adding the accounts.
2 MR. DUMORNAY: Right. Because we're
3 not asking you what the account numbers are,
4 because, actually, we know what the account
5 numbers are.
6 THE WITNESS: Okay.
7 MR. DUMORNAY: So we're just trying to
8 find out, like to the extent this account is
9 added, that means that now this account is now
10 like the other two, right?
11 THE WITNESS: That is correct. And --
12 yeah.
13 MR. DUMORNAY: And to the extent that
14 Exhibit Number 8, account number 726, that is Jay
15 Peak, Inc., is that consistent with your
16 testimony before that the LP-1 and LP-2 margin
17 loans were transferred over to the Jay Peak, Inc.
18 account?
19 THE WITNESS: Yes. If -- yes. Yes.
20 MR. DUMORNAY: Is that -- to the extent
21 that was done --
22 THE WITNESS: I -- I -- I'm trying to
23 piece it together. If I remember correctly, this
24 is just from my memory, I believe this account --
25 this -- not this. Jay Peak Hotel Suites, LP-1

Page 138

1  and Jay Peak Hotel Suites 2, initially, when we
2  purchased -- I apologize. When he purchased the
3  resort, we had margin on these two accounts.
4       They then later consolidated into a Jay
5  Peak, LP -- Jay Peak Hotel Suites, LP account,
6  which we used to house just a debit balance, as
7  opposed to a debit balance in two accounts. It
8  was moved over to be held in one account.
9       The Jay Peak, Inc. piece that you're
10  referencing is a separate -- it's coming back to
11  me -- is a -- it was done separately. This was
12  also under this LP. It was just a separate
13  account that was created. That's what I believe
14  without checking what this ████ 0726 number was.
15       MS. LAMA: So just to clarify for the
16  record, account ████ 0726 is Jay Peak Hotel
17  Suites, LP, Jay Peak Management, Inc. partner?
18       THE WITNESS: Correct.
19       MR. JAMES: And then the 26 -- can you
20  say that number again? I'm sorry.
21       MS. LAMA: The account number ████ 0726
22  pertains to Jay Peak Hotel Suites, LP.
23       MR. JAMES: Okay.
24       MR. BARRACCA: Which is what he --
25       MR. JAMES: Just said.

Page 139

1       MR. BARRACCA: Of sorts, you know, what
2  he just said.
3       MR. JAMES: So just to confirm. So,
4  initially, the first margin loan was issued to
5  what it says there, Jay Peak Hotel Suites, LP at
6  the Exhibit Number 7 and it was collateralized by
7  these two accounts listed in paragraph three and
8  four, which we believe to be LP-1 and LP-2?
9       THE WITNESS: Yes.
10       MR. JAMES: At some point in time, that
11  was -- those two were consolidated into a new Jay
12  Peak Hotel Suites, LP account, and that was
13  collateralized by the same two accounts, plus
14  this additional account that ends in 4710?
15       THE WITNESS: Yes.
16       MR. JAMES: But separate from that,
17  there is another margin loan that's held by Jay
18  Peak, Inc.?
19       THE WITNESS: No. At this point, there
20  was no other margin loan. This was the only one
21  that existed.
22       At another point, and I do not remember
23  the date, they made a decision to pay off their
24  loan and move it to the Jay Peak, Inc. That is a
25  separate -- that was a separate transaction that

Page 140

1  they chose to do.
2       MR. DUMORNAY: But was it the same
3  margin loan, but just being moved?
4       THE WITNESS: Yes. Yes.
5       MR. DUMORNAY: So it was the same loan?
6       MR. BARRACCA: Well -- is that true?
7       THE WITNESS: Technically, it was this
8  -- it was the funds being -- according to the
9  instructions that I got, it was moved to the
10  parent company, so they were the parent company.
11  Was it the exact same loan that was moved to
12  another -- to, basically, the parent company. So
13  it was the same funds being borrowed.
14       MR. DUMORNAY: It stems from the same
15  transaction?
16       THE WITNESS: Yes, it all stemmed from
17  the same -- it was not a separate --
18       MR. DUMORNAY: Right. But, typically,
19  maybe it was two different margin loans?
20       THE WITNESS: I don't know whether it'd
21  be considered two different margin loans, but it
22  did stem from the same transaction.
23       MR. JAMES: So they didn't exist at the
24  same time; is what you're saying?
25       THE WITNESS: That is correct, they did

Page 141

1  not exist at the same time.
2       MR. JAMES: And do you recall exactly
3  when that transaction occurred?
4       THE WITNESS: I do not.
5       MR. JAMES: Like we asked you before as
6  to Exhibit Number 7, if you turn to the fourth
7  page of Exhibit Number 8, do you recognize the
8  signature on that last page, Bates number 3270?
9       THE WITNESS: Yes.
10       MR. JAMES: Okay.
11       And who's that signature?
12       THE WITNESS: It appears to be Mr.
13  Quiros.
14       MR. JAMES: Okay.
15       And you're familiar with this signature
16  and you've seen it before?
17       THE WITNESS: I am.
18       MR. JAMES: So let me see if I can show
19  you another exhibit that hopefully you can
20  explain to us what this reflects.
21       You can mark that.
22            (SEC Exhibit No. 9 was
23             marked for
24             identification.)
25       MR. JAMES: I'm about to hand you what

Page 142

1  has been marked as Exhibit Number 9. You can
2  take a look at that, and let me know once you've
3  reviewed it. I'll give a copy of same to Mr.
4  Barracca.
5       THE WITNESS: Okay.
6       MR. JAMES: Okay. So Exhibit Number 9
7  also says Jay Peak Hotel Suites, LP. Do you see
8  that?
9       THE WITNESS: I do.
10      MR. JAMES: Okay.
11      And also in paragraph three has the
12  same account number that was reflected in Exhibit
13  Number 8. Do you see that?
14      THE WITNESS: I do.
15      MR. JAMES: Okay.
16      However, it does not include that third
17  account number that ends in 4710 that's in
18  paragraph four of Exhibit Number 8. Do you see
19  that?
20      THE WITNESS: I do.
21      MR. JAMES: Okay.
22      So could you tell me what is Exhibit 9?
23  Is this still the same margin loan that's
24  reflected in Exhibit 7 and Exhibit 8, or is this
25  something different?

Page 143

1       THE WITNESS: No. It is the same
2  margin loan.
3       MR. JAMES: Okay.
4       And tell me, so why was this one
5  created, if you recall?
6       THE WITNESS: Sure. This, again, as
7  best my memory serves me, the -- this -- the
8  credit -- Exhibit 9 is a change from the -- this
9  was after -- this is 2010 -- this is -- sorry.
10  Exhibit 8 is 2010. Exhibit 9 is 2009. And
11  Exhibit 7 was 2008. In 2008, the -- am I missing
12  this wrong?
13      MR. JAMES: No. Sorry. Go ahead.
14  Sorry.
15      THE WITNESS: No.
16      Initially, when it was started, the
17  margin loan was in each of the Jay Peak, LP --
18  Jay Peak Hotel Suites, LP accounts. It appears
19  as though in 2009, not 2010, the -- the margin
20  debit was moved to its own independent account,
21  which is ███0726. And, at that point, we still
22  collateralized it with the Jay Peak, LP -- Jay
23  Peak Hotel Suites, LP-1 and LP-2.
24      In 2010, it looks like we added a third
25  account to that process a little bit later.

Page 144

1       MR. JAMES: So it's essentially Exhibit
2  9 came before Exhibit 8?
3       THE WITNESS: Yes.
4       MR. JAMES: Okay. Okay.
5       So let me continue this with a fourth
6  credit agreement. If you could have that marked
7  for me as Exhibit Number 10. Copy of same to
8  your counsel.
9            (SEC Exhibit No. 10 was
10                marked for
11                identification.)
12      THE WITNESS: Thank you.
13      MR. JAMES: If you take a look at
14  Exhibit Number 10, and tell me where this fits in
15  the sequencing of these credit agreements.
16      THE WITNESS: This would be of the four
17  that -- Exhibit 10 would be the -- of the four
18  that are in front of me, the most recent. This
19  was latest of them, October 2010.
20      Again, the same debit account where
21  that margin was housed, and it appears as though
22  the 6365 account, which would've been, again, I'm
23  not a hundred percent sure because I don't know,
24  but that being Jay Peak 1 was liquidated and
25  fully paid out, and we added -- we -- we rewrote

Page 145

1  the agreement with the Jay Peak 2, the 710
2  account. A 503, which would have been a new
3  account, and a 772, I'm not sure what those
4  accounts correspond to. But all we did was keep
5  the same loan and add new accounts to
6  collateralize it.
7       MR. JAMES: Okay.
8       So is this what you had testified
9  earlier about where you said as a new project
10  came online and a current project depleted their
11  funds, that you were substituting that new
12  project?
13      THE WITNESS: That is correct.
14      MR. JAMES: Okay.
15      And, again, we did this before, and if
16  you don't know, I understand, but the two
17  additional account numbers in paragraph four of
18  Exhibit 10, do you know which projects those are,
19  if you know?
20      THE WITNESS: I don't offhand.
21      MR. JAMES: So keep it going to pick up
22  the pace a little bit. I'll mark that as Exhibit
23  Number 11.
24            (SEC Exhibit No. 11 was
25                marked for

Page 146

1        identification.)
2        MR. JAMES: And same question. Tell us
3   about Exhibit 11 and how it fits into the
4   sequence.
5        THE WITNESS: Exactly the same thing.
6   This is 2011. Again, an account fell off as it
7   was liquidated for a project, and then other
8   accounts were added. Some of the same accounts
9   are still on there, but a new account was added,
10  the 9776 it looks like.
11       MR. JAMES: Okay.
12       And, again, you can't tell by the
13  actual number which accounts these are?
14       THE WITNESS: Sorry.
15       MR. JAMES: Okay. Just a couple more.
16  You can mark this as Exhibit Number 12.
17       (SEC Exhibit No. 12 was
18       marked for
19       identification.)
20       MR. JAMES: Same questions.
21       THE WITNESS: Sure. Same process. We
22  added some more accounts to it, to the -- to the
23  credit agreement.
24       MR. JAMES: And same thing, some fell
25  off; some were added?

Page 147

1        THE WITNESS: Yes.
2        MR. JAMES: So that's why we haven't
3   seen the margin loan that you've talked about
4   relating to Jay Peak, Inc.?
5        THE WITNESS: Have you seen that as of
6        MR. JAMES: Have you seen that as of
7   yet?
8        THE WITNESS: I have not.
9        MR. JAMES: Okay. Now, Exhibit Number
10  -- what will be marked as Exhibit Number 13, a
11  copy to Mark.
12       (SEC Exhibit No. 13 was
13       marked for
14       identification.)
15       MR. JAMES: And if you just keep going
16  as to Exhibit Number 13.
17       THE WITNESS: Same -- sure. Same, we
18  added some more accounts under this credit
19  agreement, but nothing has changed.
20       MR. JAMES: In your recollection, are
21  any of these credit agreements beyond August
22  25th, 2011 that relates to this particular 0726
23  account?
24       THE WITNESS: I don't recall.
25       MR. JAMES: I think we are on Exhibit

Page 148

1   14, I believe.
2        (SEC Exhibit No. 14 was
3        marked for
4        identification.)
5        MR. JAMES: A copy to Mark and Melissa.
6        THE WITNESS: Okay. So this one is Jay
7   Peak, Inc., account number changed, and then this
8   is the part I was referencing earlier, the backup
9   accounts that were collateralizing it look to be
10  similar. Yeah.
11       MR. JAMES: Okay. So in -- let me just
12  give you some dates. In August 2013, what
13  transpired?
14       THE WITNESS: The best of my
15  recollection, they -- they decided to -- I don't
16  think it's the right word, but they decided to
17  have the margin loan fall up under the
18  corporation, under the parent.
19       MR. JAMES: And do you recall why that
20  was done?
21       THE WITNESS: No.
22       MR. JAMES: And that was at the request
23  of Quiros, or was that a Raymond James decision?
24       THE WITNESS: It was most likely at the
25  request of him, of Mr. Quiros.

Page 149

1        MR. JAMES: But you can't recall why?
2        THE WITNESS: No, I don't -- offhand, I
3   have no idea. I don't remember why.
4        MR. JAMES: And, ultimately, Exhibit
5   14, is this the margin loan that was paid off by
6   the Jay Peak Biomedical, Q Resorts and personal
7   accounts that you testified to about earlier?
8        THE WITNESS: I believe so.
9        MR. JAMES: So beyond this, are there
10  any other margin loans?
11       THE WITNESS: No.
12       MR. JAMES: Okay.
13       And by this one being paid off, this
14  meaning Exhibit Number 14, did that also, I
15  guess, distinguish what we've gone through so
16  far, Exhibit 7 through 13?
17       THE WITNESS: I'm sorry. Say that
18  again.
19       MR. JAMES: By Mr. -- by the margin
20  loan that's reflected in Exhibit 14, when that
21  got paid off by the Jay Peak Biomedical account,
22  did that also satisfy the credit agreements that
23  are reflected in Exhibit 7 through Exhibit 13, or
24  were those already satisfied once it was
25  transferred to this new margin held by Jay Peak,

Page 150

1  Inc.?
2       THE WITNESS: I would imagine -- I
3  would imagine they were satisfied by -- when this
4  was moved to Jay Peak, Inc., those were
5  satisfied, and this became the new one and only
6  agreement.
7       MR. JAMES: Okay. At that time?
8       THE WITNESS: Yes.
9       MR. JAMES: Okay.
10      MS. LAMA: Do you recall how it was
11  satisfied, the margin loan held in Jay Peak Hotel
12  Suites, LP?
13      THE WITNESS: I don't remember.
14      MR. DUMORNAY: Do you know what records
15  we need -- we would need to look at to make that
16  determination, how those -- the other margin loan
17  was satisfied, the one out of the Hotel Suites
18  account?
19      THE WITNESS: I would assume the
20  statements would be my best guess. Everything
21  should be in there. It was all reported, you
22  know, how it's done.
23      MR. DUMORNAY: Did Mr. Quiros ask you
24  to transfer the margin loan to the parent
25  company?

Page 151

1       THE WITNESS: We had a conversation
2  about it, and he did authorize it.
3       MR. DUMORNAY: He talked to you about
4  it?
5       THE WITNESS: Yes.
6       MR. DUMORNAY: When did you have this
7  conversation with him?
8       THE WITNESS: I don't know. I don't
9  remember.
10      MR. DUMORNAY: Did he say why he was
11  wanting to transfer the margin loan to the parent
12  company?
13      THE WITNESS: He told me that his
14  accountants and attorneys decided that that was a
15  better avenue for it.
16      MR. JAMES: Let me just mark one more
17  that I overlooked, which will be Exhibit Number
18  15. I apologize.
19      (SEC Exhibit No. 15 was
20          marked for
21          identification.)
22      THE WITNESS: This is also the same in
23  2012. This looks like this was prior to Exhibit
24  13, but --
25      MR. JAMES: Or Exhibit 14.

Page 152

1       THE WITNESS: I'm sorry, Exhibit 14. I
2  was thinking of 2013. Exhibit 14, this looks
3  like it was prior to it, so, I guess, at this
4  point, it was changed.
5       MR. JAMES: Okay.
6       And then looking at paragraph four and
7  comparing that to Exhibit 14, is that also where
8  you talked about where, as an account for a
9  project is depleted, you add on --
10      THE WITNESS: Yes.
11      MR. JAMES: -- a substituting new
12  project?
13      THE WITNESS: Sorry. Yes.
14      MR. JAMES: Okay.
15      And looking at Exhibit 14, you may not
16  notice, but do you recognize any of those
17  accounts in paragraph four to be the Jay Peak
18  Biomedical, LP account?
19      THE WITNESS: Offhand, no.
20      Can I get a quick break? Is it
21  possible?
22      MR. JAMES: Sure. Yeah.
23      All right. We're off the record.
24      (Whereupon, at 2:56 p.m., a short
25  recess was taken.)

Page 153

1       MR. JAMES: We're back on the record.
2       When we broke, we were talking about
3  the margin loans, and, I think, the discussions
4  that when one was satisfied and then another one
5  was made as to Jay Peak, Inc. I wanted to show
6  you what we're about to about to mark as Exhibit
7  Number 16, please.
8       (SEC Exhibit No. 16 was
9          marked for
10          identification.)
11      MR. JAMES: If you could take a look at
12  Exhibit Number 16, and tell me what that is.
13      THE WITNESS: It looks like the debit
14  account.
15      MR. JAMES: For?
16      THE WITNESS: Wait a second. Sorry.
17      It looks like the original debit
18  account.
19      MR. JAMES: For which entity?
20      THE WITNESS: The Jay Peak Hotel
21  Suites, LP.
22      MR. JAMES: Okay.
23      And do you see an account number
24  reflected on there?
25      THE WITNESS: I do.

Page 154

1     MR. JAMES: What account number is
2  that?
3     THE WITNESS: ████0726.
4     MR. JAMES: Okay.
5     And is that the same account number
6  that's reflected in, say, for example, Exhibit
7  Number 8 in paragraph three?
8     THE WITNESS: Yes.
9     MR. JAMES: Okay.
10    So, essentially, does that mean that
11 this debit account reflects the account that held
12 the margin loan for Jay Peak Hotel Suites back in
13 the beginning of 2010?
14    THE WITNESS: Yes.
15    MR. JAMES: Okay.
16    If you turn to the third page of
17 Exhibit Number 16, that's the Raymond James
18 account, debit account.
19    THE WITNESS: Yes.
20    MR. JAMES: If you see where it says,
21 "Activity Detail," do you see that?
22    THE WITNESS: Activity detail. I do.
23    MR. JAMES: Yeah. And if you go down,
24 there's four transactions listed.
25    THE WITNESS: Yes.

Page 155

1     MR. JAMES: Before you get to the first
2  transaction, it shows a beginning balance, and it
3  shows a negative twenty-three point three
4  million, plus.
5     THE WITNESS: Yes.
6     MR. JAMES: Okay.
7     What does that mean?
8     THE WITNESS: That's the -- that's the
9  margin loan that he had -- the debit balance that
10 he had outstanding.
11    MR. JAMES: Okay.
12    So as of this statement, this date, the
13 debit balance outstanding on the margin loan for
14 this account was -- is twenty-three point three,
15 plus million dollars?
16    THE WITNESS: That is correct.
17    MR. JAMES: Okay.
18    So if you look at the first
19 transaction, which is dated February 24th, 2012,
20 it says, "Deposit," and it's a cash deposit of
21 twenty-three point four million. Do you see
22 that?
23    THE WITNESS: Yes. Yes.
24    MR. JAMES: And if you continue going,
25 it says, "Addition Detail." It says, "TRF FR

Page 156

1  number ████4772."
2     THE WITNESS: Yes.
3     MR. JAMES: Do you recognize that
4  account number, by any chance?
5     THE WITNESS: I'd be guessing. I don't
6  recognize -- I mean, yes, I recognize the number.
7  What's -- what's the name on the account, I don't
8  remember exactly.
9     MR. JAMES: Okay.
10    And so you see the amount at
11 twenty-three point four million?
12    THE WITNESS: Uh-huh. Yes.
13    MR. JAMES: What is that transaction?
14    THE WITNESS: That was him -- if I
15 remember correctly, that was him paying off that
16 particular margin loan to reopen it under the Jay
17 Peak, Inc.
18    MR. JAMES: Okay. So explain that to
19 me. So, basically, was he required to pay it off
20 before it could be moved to Jay Peak, Inc.?
21    THE WITNESS: Yes.
22    MR. JAMES: Okay.
23    All right. So earlier, you had talked
24 about the nineteen million that was paid off by
25 the Jay Peak Biomedical, LP account.

Page 157

1     THE WITNESS: Yes.
2     MR. JAMES: Okay.
3     So in addition to that nineteen
4  million, what we're seeing in Exhibit 16, is that
5  prior to that twenty-three point four million was
6  paid off in the margin loan?
7     THE WITNESS: Yes.
8     MR. JAMES: Okay.
9     So combined, we have the twenty-three
10 point four million, and we have the nineteen,
11 plus million through Jay Peak, Inc. that was paid
12 off?
13    THE WITNESS: Not -- it's not combined.
14    MR. JAMES: Okay. Tell me why not.
15    THE WITNESS: This twenty-three million
16 was then opened up under the Jay Peak, Inc. as a
17 twenty-three million dollar debit. It's the same
18 twenty-three million dollars. It's not -- it's
19 not in addition to it.
20    The nineteen million that was
21 eventually paid off was a -- he had paid some
22 money towards that later, and that's why the
23 number was nineteen million. It's not in
24 addition. It is the same twenty-four million
25 dollars.

Page 158

```
1        MR. JAMES: Okay.
2        So just for my edification. So you
3  have the twenty-three point four million dollar
4  pay off of the margin loan, that's reflected in
5  Exhibit 16?
6        THE WITNESS: Correct.
7        MR. JAMES: Okay.
8        So when you opened up the Jay Peak,
9  Inc. margin loan, what's the beginning balance in
10 that account?
11       THE WITNESS: I'd have to look. It
12 would probably be somewhere around this same
13 number. Probably very similar.
14       MR. JAMES: So it would start off as a
15 positive?
16       THE WITNESS: No. It would start off
17 as a negative.
18       MR. JAMES: Okay.
19       And it would be negative what amount?
20       THE WITNESS: Probably very similar to
21 this. I don't know the exact dollar amount, but
22 it would be close to this.
23       MR. JAMES: Okay. So you're saying it
24 was more of a transfer than a payoff?
25       THE WITNESS: Correct.
```

Page 159

```
1        MR. DUMORNAY: I'm not following that
2  at all, because if cash was used to pay off this
3  debit balance, and then there's a debit -- so
4  that cash was used to pay off that. Then there's
5  a debit balance in another account, right, that
6  was opened in the Jay Peak account? There's now
7  a debit balance in that second account.
8        THE WITNESS: So --
9        MR. DUMORNAY: And then recently, that
10 account was paid off, the nineteen million. Isn't
11 that two separate transactions? I really don't
12 understand.
13       THE WITNESS: No. I understand.
14       There was a debit balance initially of
15 twenty-three million dollars, plus. I'll just
16 use twenty-three because I don't know the dollar
17 amount. Twenty-three million dollars that was in
18 this partnership account.
19       When they moved it, we couldn't just
20 change the name on the account. You can't just
21 -- we couldn't do that. We had to, in essence --
22 and it was -- it was just the way it was designed
23 -- to pay off.
24       So in another account, he took the
25 debit balance -- he took a margin loan in a Jay
```

Page 160

```
1  Peak, Inc. account of twenty-four -- twenty-three
2  million, plus, took that -- that margin balance
3  there to simultaneously pay off the twenty-three
4  million dollars that was here, and, in effect,
5  transferred -- in effect, transferred the debit
6  balance from the partnership to the corporate
7  account. It was a pay off.
8        That same dollar amount was just moved
9  to the new account, to the Inc. account. It sat
10 there until it was eventually paid off at
11 nineteen million. It was not another
12 twenty-three million. It was a simultaneous
13 transfer.
14       MR. JAMES: Okay. So just referring
15 back to Exhibit 16. So that transfer from
16 ████772, are you saying that's from a margin
17 account?
18       THE WITNESS: Yes. That's from Jay
19 Peak, Inc. So there should be a Jay Peak, Inc.
20 account that -- well, it's not Jay Peak, Inc.
21 I'm not sure -- this is either -- I think this is
22 a Q Resorts account. I'd have to check, because
23 that was --
24       MS. LAMA: We can represent to you that
25 that's a Q Resort's account.
```

Page 161

```
1        THE WITNESS: Okay.
2        So the parent company, in essence, paid
3  this in cash, and simultaneously took out the
4  exact same loan under their Jay Peak, Inc.
5  account.
6        MR. DUMORNAY: Oh, okay. Okay. I see.
7  Because it's Q Resorts?
8        THE WITNESS: Correct. So the parent
9  moved the loan from -- to its subsidiaries just
10 like -- just -- in essence, paid it off, and then
11 took out the loan from another entity.
12       MR. DUMORNAY: Okay.
13       Let's say that money wasn't the parent
14 company's money. Then it would be paid off
15 twice, right?
16       THE WITNESS: I'm sorry. Say that
17 again.
18       MR. DUMORNAY: Let's say the
19 twenty-three million dollars that was used to pay
20 off --
21       THE WITNESS: Correct.
22       MR. DUMORNAY: -- this margin loan,
23 this debit balance --
24       THE WITNESS: Correct.
25       MR. DUMORNAY: -- let's say that money
```

## Page 162

1  came from investors, was investor money. In
2  fact, it was not the parent's money.
3       THE WITNESS: Was it, is that what
4  you're asking me?
5       MR. DUMORNAY: I'm asking --
6       THE WITNESS: Oh.
7       MR. DUMORNAY: -- trying to understand
8  the transaction. I don't know if it was or not.
9  I'm just trying to understand.
10      THE WITNESS: I don't recall.
11      MR. DUMORNAY: Okay.
12      THE WITNESS: I'd have to look at it.
13      MR. DUMORNAY: But would that make a --
14 I mean, would that make a difference if it wasn't
15 Q Resorts, the parent -- do you see what I'm
16 asking?
17      THE WITNESS: Yeah. I would --
18      MR. DUMORNAY: Maybe I'm confusing
19 myself.
20      THE WITNESS: No. The way it worked
21 wasn't -- it wasn't really to change sort of
22 funding. There was no funding change. It really
23 was to just, basically, have the debit be a -- a
24 debit of the parent company. That was the only
25 objective here. It was not to change financially

## Page 163

1  the dollar amount or the structure of it. It was
2  simply to move it from the partnerships to the
3  corporation. That was -- so it was simultaneously
4  the same dollar amount. It was not to add or
5  diminish any sort of dollar amount or change
6  anything in the structure.
7       MR. DUMORNAY: Okay.
8       I have to -- can we go off the record?
9  I have some questions I want to ask about this.
10 So go off the record.
11      (Whereupon, at 3:26 p.m., a short
12 recess was taken.)
13      (Ms. Lama, Mr. Dumornay and Ms. Masica
14 are not present in the room.)
15      MR. JAMES: We're back on the record.
16 Just to confirm, we did not have any substantive
17 discussions during our last break?
18      THE WITNESS: No.
19      MR. JAMES: Okay.
20      You had testified earlier about the
21 margin loan and the ten percent holdback, if you
22 will, and the ability to borrow against that up
23 to ninety percent of whatever assets are in the
24 account. Can you explain to me again just to be
25 a little bit more specific, I'm trying to

## Page 164

1  understand what amount, basically, has to be
2  retained in the account during the life of the
3  margin loan.
4       THE WITNESS: So if he had thirty -- as
5  an example, if he had thirty million dollars, he
6  could borrow twenty-seven million dollars from
7  there. Three million of that -- the difference
8  being three million dollars, he would need to
9  keep in the account as equity, and he could
10 borrow ninety percent of whatever the value is.
11 So he could borrow ninety percent of thirty
12 million dollars being twenty-seven million
13 dollars.
14      MR. JAMES: Okay.
15      So what happens if there's a margin
16 call at some point --
17      THE WITNESS: He would have to pay that
18 back.
19      MR. DUMORNAY: -- and there's only ten
20 percent in the account?
21      THE WITNESS: He would have to pay that
22 back.
23      MR. JAMES: Through some other source?
24      THE WITNESS: However, but, yes. Yeah.
25      MR. JAMES: So what's your collateral

## Page 165

1  for that? What if he says, I'm not going to pay
2  that ninety percent, what's your collateral?
3       THE WITNESS: That would be whatever
4  accounts he's agreed to collateralize.
5       MR. JAMES: Okay.
6       But if there's only ten percent in
7  those accounts?
8       THE WITNESS: We had assets. So, in
9  essence, we would buy -- that's the Treasury
10 bills. We owned thirty million dollars in
11 Treasury bills. He's taking out twenty-seven
12 million dollars of that thirty million dollars.
13 We would be able to liquidate that thirty
14 million, and we would -- we would be whole.
15      MR. JAMES: Okay. So as much as that
16 ninety percent is not there in cash, it's there
17 in some other --
18      THE WITNESS: It's there in Treasury
19 bills.
20      MR. JAMES: Okay.
21      THE WITNESS: It has to be held in
22 Treasury bills in order for us to collateralize a
23 security. We don't collateralize cash.
24      MR. JAMES: Speaking of that, is this
25 type of -- and, obviously, we've talked a lot

Page 166

1    about the activity in these accounts, and, you
2    know, from you what you produced, there's a lot
3    more activity we haven't even touched. Is this
4    typical for a Raymond James account, these
5    constant transfers, daily transfers, large dollar
6    amounts, small dollar amounts, multiple accounts,
7    is this a typical, I guess, transaction history
8    for a Raymond James customer?
9            THE WITNESS: I would say that the
10   business is very typical. Treasury bills is very
11   straightforward, simple. It's considered a
12   risk-free asset. But it is a very simple, simple
13   asset management.
14           The number of transactions is unique.
15   The size of -- of the account would warrant a lot
16   of that transactions and the business of what
17   they're doing. So the transactions were a little
18   unique to -- again, I can't speak for the entire
19   firm, but, in general, for us, they would be a
20   little bit unique.
21           (Mr. Dumornay enters the room.)
22           MR. JAMES: I'm going to hand you what
23   I'm about to have marked as Exhibit Number -- I
24   wish I remembered -- 17.
25           (SEC Exhibit No. 17 was

Page 167

1            marked for
2            identification.)
3            MR. JAMES: Do you recognize Exhibit
4    Number 17?
5            THE WITNESS: No, not that I remember.
6            MR. JAMES: Okay.
7            Have you seen Exhibit 17 before now
8    that you've flipped through it?
9            THE WITNESS: Not that I recall.
10           (Mr. Dumornay leaves the room.)
11           MR. JAMES: Actually, let me -- maybe
12   it will refresh your recollection. Let me have
13   this marked as Exhibit Number 18.
14           (SEC Exhibit No. 18 was
15           marked for
16           identification.)
17           MR. JAMES: I think the court reporter
18   just handed to you what has been marked as
19   Exhibit Number 18, which is entitled, "Minutes of
20   the Special Meeting of the Board of Directors of
21   Jay Peak, Inc., June 20th, 2008."
22           Earlier, you had testified about
23   Minutes regarding the acquisition of Jay Peak by
24   Q Resorts. Do you recall that testimony?
25           THE WITNESS: I do.

Page 168

1            MR. JAMES: Now, is Exhibit 18 the
2    Minutes you were referring to?
3            THE WITNESS: A little different than I
4    remember.
5            MR. JAMES: Take your time. Read
6    through it.
7            THE WITNESS: No. I did. It's a
8    little different than I remember. I feel as
9    though I've seen some -- I feel as though I've
10   seen something similar, but I do feel, though,
11   parts of it are a little different than what I
12   remember.
13           MR. JAMES: Any particular parts stands
14   out as not being what you recall seeing
15   previously?
16           THE WITNESS: This voted section, I
17   don't -- I remember the top part, but I don't
18   remember this voted section in there.
19           MR. JAMES: Okay.
20           But you would agree that this Minutes,
21   basically, is a reflection of the Board of Jay
22   Peak, Inc. authorizing this Stock Transfer
23   Agreement, which I just handed you as Exhibit
24   Number 17 --
25           THE WITNESS: That's correct.

Page 169

1            MR. JAMES: -- between Q resorts and
2    the seller of Jay Peak, Inc.?
3            THE WITNESS: That's correct.
4            MR. JAMES: Okay.
5            In as much as you have not seen those,
6    your recollection is that you have not seen
7    Exhibit 17 before, you would agree that this
8    appears to be the document that governs the sale
9    of Jay Peak, Inc. to Q Resorts?
10           THE WITNESS: It appears to be so.
11           MR. JAMES: Okay.
12           And do you recall what role, if any,
13   Raymond James played in the acquisition of Jay
14   Peak, Inc. by Q Resorts?
15           THE WITNESS: Sure. We -- we
16   communicated a little bit with the other parties
17   about what we were doing, what we were
18   transferring the money, but who we were
19   loaning out the money to -- that we were going to
20   be loaning money to Mr. Quiros.
21           MR. JAMES: Okay.
22           Did you recall any discussions, whether
23   verbally or in written form, with attorneys for
24   the sellers regarding how the monies in the LP-1,
25   LP-2 account could or could not be used?

Page 170

1     THE WITNESS: They -- they wrote a
2  letter that -- about their opinion of it.
3     MR. JAMES: Okay.
4     MR. Quiros disagreed with
5  that opinion. Mr. Quiros was our client. We
6  were specific with them that we would do what the
7  authorized parties requested.
8     MR. JAMES: Okay.
9     And what was that opinion?
10    THE WITNESS: Whatever the authorized
11 parties had asked us to do from a corporate
12 standpoint, we would follow our policies and
13 procedures with a corporation, how they were
14 handled.
15    MR. JAMES: Do you recall specifically
16 the attorneys for the seller, basically, stating
17 that the monies, which were the investor monies,
18 that were in the LP-1 and LP-2 accounts of
19 Raymond James could not be used as collateral or
20 for margin loans? Do you recall those
21 discussions?
22    THE WITNESS: I do. I do.
23    MR. JAMES: Okay.
24    And what was your response at that
25 time, if you recall?

Page 171

1     THE WITNESS: To that?
2     MR. JAMES: Yes.
3     THE WITNESS: I don't remember what the
4  -- what the response was. We were very clear
5  that it is not our place to make that decision.
6  That's between him and the seller. And if I
7  remember correctly, we didn't inform them they
8  need to speak with Mr. Quiros about any of their
9  opinions on this. It's not our -- it was not our
10 position to make a judgment call.
11    MR. JAMES: Okay.
12    But you do recall -- and I can pull one
13 of the letters in a second -- but you do recall
14 them saying that this is investor funds --
15    THE WITNESS: Yes.
16    MR. JAMES: -- and, therefore, it could
17 not be restricted, it couldn't be collateral, it
18 couldn't be --
19    THE WITNESS: Yes.
20    MR. JAMES: -- from the margin loan?
21 You do recall that?
22    THE WITNESS: Yes, I do recall that.
23    MR. JAMES: And, at that point in time,
24 they were still the holders of these accounts?
25    THE WITNESS: They were holders of

Page 172

1  their own accounts.
2     MR. JAMES: When you say their own
3  accounts, what does that mean?
4     THE WITNESS: MMSI had -- had their own
5  Jay Peak 1 and Jay Peak 2 account.
6     MR. JAMES: At Raymond James?
7     THE WITNESS: Correct.
8     MR. JAMES: Okay.
9     THE WITNESS: They did not have margin
10 on their account. They made a decision they did
11 not want to.
12    MR. JAMES: Okay.
13    THE WITNESS: As soon as their money
14 was transferred to Mr. Quiros, his opinion was
15 different. And he made that decision, that it
16 was his corporation. He could do what he wanted
17 to. And we said that we would follow the
18 instructions of the authorized party.
19    As soon as they gave up ownership --
20 per their request, the MMSI accounts never had
21 margin on them. Per Mr. Quiros's request, per
22 his attorneys, that's what he told will me, per
23 his attorneys, he was fine to do it. As far as
24 our corporate policy works, a corporation can
25 margin their corporate assets, and that's how we

Page 173

1  viewed it.
2     MR. JAMES: Okay.
3     But just from a timing standpoint, if
4  the margin loans that were issued on the LP-1 and
5  LP-2 accounts that continued as to funds, if that
6  margin loan is used to purchase Jay Peak, how
7  could it be Quiros's account at that point in
8  time? Wouldn't the margin loans need to be
9  issued before we could actually get the funds to
10 actually acquire Jay Peak?
11    THE WITNESS: MMSI agreed to transfer
12 the funds simultaneously. The funds were there
13 first. They agreed to transfer the funds to Mr.
14 Quiros first, and we gave them the loan
15 afterwards.
16    MR. JAMES: Okay. So you knew at the
17 time -- you meaning yourself and Raymond James,
18 you knew at the time that that was how the
19 transaction was going to unfold --
20    THE WITNESS: Yes.
21    MR. JAMES: -- that you're going to
22 issue a margin, I guess, simultaneously as the
23 transaction's occurring?
24    THE WITNESS: Yes.
25    MR. JAMES: Was that disclosed to the

Page 174

1   seller, that that was their intention?
2        THE WITNESS: It was not, because it's
3   privacy. We didn't discuss what MMSI did. We
4   didn't discuss what Jay Peak did. We did what
5   MMSI wanted when the money was theirs. We did
6   what Mr. Quiros wanted when the money was his.
7        MR. JAMES: Okay.
8        So although you have a conversation
9   with the seller saying that it will not be used
10  in this manner, at that time, you knew that it
11  would be used in that manner once it was
12  transferred to Q Resorts?
13       THE WITNESS: If I recall -- sorry.
14       MR. JAMES: Go ahead, sir.
15       THE WITNESS: If I recall, we said they
16  -- they needed to discuss that with Mr. Quiros.
17  It was not our place to -- to make an opinion.
18  But that's what I -- that's what I remember.
19  BY MS. SINDLER:
20       Q   Did you have any verbal conversations,
21  or was it all via letter or Email?
22       A   There were some verbal conversations.
23       Q   And who did you speak with?
24       A   There was times when they wanted to
25  confirm the money where it was going, addresses.

Page 175

1   There could've been three or four people on the
2   phone at the time. I don't remember.
3        MR. JAMES: And so what else, if
4   anything else, did Raymond James do in connection
5   with the acquisition by Q Resorts? Obviously, it
6   was lender in the transaction. Did you do
7   anything else, any other responsibilities?
8        THE WITNESS: Not that I remember, no.
9   We strictly stayed as the lender and asset
10  manager.
11       (Mr. Dumornay, Ms. Lama and Ms. Masica
12  enters the room.)
13       MR. JAMES: Actually, while that's
14  being marked, I'm going to ask you one other
15  question. When you talk about using the Treasury
16  bills --
17       THE WITNESS: Yes.
18       MR. JAMES: -- was that the process
19  with all of the accounts, the money would come in
20  from People's Bank, investor funds, and
21  immediately you would acquire Treasury bills with
22  ninety percent of that money?
23       THE WITNESS: I -- I would -- I would
24  buy Treasury bills with the -- with the money.
25       MR. JAMES: Okay.

Page 176

1        And then you would hold them, you said
2   for --
3        THE WITNESS: Nothing was longer than a
4   year. So they were monthly Treasury bills.
5   Stayed within -- depends on how much funds were
6   in the account. It could've been seven, eight
7   months out. But three or four million for that
8   month, three or four million for the next month.
9   In essence, it was designed to liquidate to pay
10  three or four million a month out to the account.
11       MR. JAMES: Okay.
12       So was there any point in time where a
13  particular account did not have that ninety
14  percent, whether in cash or in T-bills?
15       THE WITNESS: Not that I remember. We
16  had it -- we -- he always had enough funds to
17  cover the margin.
18       MR. JAMES: Okay.
19       Whether it was in cash or in Treasury
20  bills?
21       THE WITNESS: It should've been in
22  Treasury bills. I -- we can only collateralize
23  the Treasury bills.
24       MR. JAMES: Okay.
25       And do you know whether or not there's

Page 177

1   an ability to -- with regard to these Treasury
2   bills, whether or not that was consistent with
3   the purposes in which the investor funds were to
4   be used for?
5        THE WITNESS: It seemed like, as an
6   investment advisor, that money that would need to
7   be short-term used should be in probably the
8   safest security. And, again, for the collateral
9   purposes, T-bills made the most amount of sense.
10  It avoided the margin calls, and it seemed like
11  the right product.
12       MR. JAMES: Okay.
13       And the interest on the T-bills, would
14  that become investor revenue, or does that go to
15  Mr. Quiros or Q Resorts?
16       THE WITNESS: It -- it stayed in the
17  account, accumulated in the account, and how they
18  used it afterwards -- it -- Treasury bills have
19  done nothing since 2000 -- since late 2008. The
20  money was de minimis, to be honest with you. So
21  it maybe worked out to be thirty, forty, fifty
22  grand out of a seventy million dollar account.
23  What they chose to do with it at the end could
24  have been -- I'm not sure.
25       MR. JAMES: And the interest on the --

Page 178

1  that accrued on the margin loans, was that also
2  the responsibility of the account holder, in one
3  instance the limited partners, or was that some
4  notes paid by Q Resorts separately?
5       THE WITNESS: The interest was
6  accumulated into the account, so whatever
7  interest there was charged that month would then
8  be added to the debit balance.
9       MR. JAMES: Okay. And, ultimately,
10 paid by the monies that are in that account?
11      THE WITNESS: Yes. In this case, it
12 was, ultimately, paid by the Jay Peak Biomedical
13 account.
14      MR. JAMES: Okay.
15          (SEC Exhibit No. 19 was
16           marked for
17           identification.)
18      BY MS. SINDLER:
19  Q  The court reporter has just marked as
20 Exhibit Number 19 a copy of a Q Resorts account
21 statement for February of 2012. It begins with
22 Bates 001196.
23      Do you recognize this document?
24  A  I do.
25      MS. LAMA: If we could also point you

Page 179

1  to at the same time Exhibit Number 16, which we
2  were looking at shortly before, which was the
3  February 2012 account statement for Jay Peak
4  Hotel Suites, LP --
5       THE WITNESS: Yes. Yes.
6       MS. LAMA: -- ending in -- the account
7  number ending in 0726.
8       THE WITNESS: Yes.
9       MS. LAMA: And before, we were looking
10 at in Exhibit 16 the payoff of the debit balance
11 in that account. That was on Bates 2748. And
12 there was a twenty-three point four million
13 deposit into that account transferred from
14 account number████4772.
15      THE WITNESS: Oh, yes. Yes.
16      MS. LAMA: Okay.
17      So if we look at Exhibit Number 19,
18 which is the Q Resorts account statement for
19 February 2012, and we flip to the last page, we
20 see a transfer out from Q Resorts account in the
21 same amount, twenty-three million, four hundred
22 nineteen thousand, four hundred and ninety-five
23 dollars. Does this help refresh your memory as
24 to the sequence concerning the payoff of this
25 margin loan?

Page 180

1       THE WITNESS: Yes.
2       MS. LAMA: Okay.
3       Can you tell us what you're recalling?
4       THE WITNESS: It looks like it
5  transferred money into the account from -- it
6  looks like a 1581 and a 3066. Again, I don't
7  know those numbers offhand. But brought that
8  into this account, to the Q Resorts, the parent
9  company account, and then wired that -- sorry,
10 transferred that to the Jay Peak Hotels Suites
11 again.
12      MS. LAMA: Okay. Sorry. Could you
13 repeat that.
14      THE WITNESS: It looks like on February
15 24th, there were two transfers from a 1581
16 account and from a 3066 account. I don't know
17 the numbers. I don't know what those numbers
18 correspond -- what the name on those accounts
19 correspond to. But it looks like that was rolled
20 into the account, and then he paid off the margin
21 loan in the Jay Peak Hotel Suites, LP with those
22 assets.
23      MS. LAMA: Okay.
24      And so does that -- how does that
25 comport with what you explained before about the

Page 181

1  debit balance being transferred over to Jay Peak,
2  Inc.?
3       THE WITNESS: It -- it appears as
4  though he used funds from -- again, where I'm not
5  sure, but we can look at that -- used funds,
6  brought it into the parent company, and then sent
7  it to -- to pay off the LP account, and then
8  opened up the debit under one of these other
9  accounts. I'd have to see. It'd have to be
10 under the Jay Peak, Inc. account.
11      MS. LAMA: And how would that work?
12 What do you mean he opened up the debit under
13 another account?
14      THE WITNESS: I'd have to see it. This
15 is -- reminds me. I mean, I can read it. I'm not
16 sure exactly how. I need to see more.
17      MS. LAMA: Okay.
18          (SEC Exhibit No. 20 was
19           marked for
20           identification.)
21      BY MS. SINDLER:
22  Q  We're handing you what's been marked as
23 Exhibit Number 20. You'll see a Raymond James
24 account for Jay Peak, Inc. And the first page
25 you'll see for the month -- it says -- the cover

Page 182

1   page says February 28th, 2012.
2       A   Okay.
3       Q   And it starts with Bates ending 4686.
4       Do you recognize this document?
5       A   I do. It's a Raymond James statement.
6           MS. LAMA: So earlier, you had
7   mentioned that if the debit balance was
8   transferred from the Jay Peak Hotel Suites, LP
9   account to the Jay Peak, Inc. account, then there
10  would be a beginning balance with that same
11  margin debit amount in the Jay Peak, Inc.
12  account.
13          Here, we have the opening balance for
14  the Jay Peak, Inc. account on Bates 004686 for
15  account number ███6859, which is Jay Peak, Inc.
16  And can you -- based on looking at this, can you
17  help us to understand how that could be the same
18  debit balance?
19          THE WITNESS: It looks like -- it looks
20  like in the -- what exhibit?
21          MR. BARRACCA: 18 or 16?
22          THE WITNESS: Oh, sorry. I ripped it.
23  Exhibit 19, I believe. Yeah.
24          It looks like the money that was
25  transferred into the Q Resorts account came from

Page 183

1   a ███3066 account. This Jay Peak, Inc. account
2   that had five point seven -- point seven seven --
3   five point seven eight, Jay Peak, Inc. sent money
4   to whatever this ███3066 account was, and then
5   that sent it to Q Resorts.
6           MS. LAMA: Okay. Can you point to the
7   pages that you're pointing to?
8           THE WITNESS: Sure.
9           MS. LAMA: Using the Bates numbers that
10  are on the bottom.
11          THE WITNESS: What's a Bates number?
12          MS. SINDLER: See the number on the
13  bottom?
14          THE WITNESS: Oh, the longer number.
15          MS. SINDLER: Yes.
16          THE WITNESS: Oh, sorry.
17          4686, that's the Jay Peak, Inc.
18  On page 4687, there is a transfer of
19  five point seven eight million to account number
20  ███066.
21          On page number 1202, you'll see that
22  transfer from that account, so Jay Peak, Inc.
23  initiated that transfer to 3066. 3066 sent it to
24  Q Resorts. And then Q Resorts, on page 1203,
25  sent that to the Jay Peak Hotel Suites, LP debit

Page 184

1   account.
2           MS. LAMA: Okay.
3           And do you have an understanding of why
4   this transaction was done that way?
5           THE WITNESS: I don't remember.
6           MR. JAMES: Who's the account holder
7   for the account ending -- ended in 3066?
8           THE WITNESS: I don't know.
9           MR. JAMES: So there's an account in
10  between the Jay Peak, Inc. and Q Resorts?
11          THE WITNESS: There is, and that's one
12  I don't remember what that corresponds to.
13          MS. LAMA: Account number ███3066 is
14  Jay Peak Hotel Suites Stateside.
15          MR. BARRACCA: Would you mind if we go
16  off the record?
17          MS. SINDLER: Sure.
18          We're off the record at seven minutes
19  to four.
20          (Whereupon, at 3:53 p.m., a short
21  recess was taken.)
22          MS. SINDLER: We're back on the record
23  after a short break.
24          BY MS. SINDLER:
25      Q   During that time, there were no

Page 185

1   substantive conversation; is that correct?
2       A   That's correct.
3           MS. LAMA: Continuing on with Exhibit
4   Number 20, which are the Raymond James account
5   statements with Jay Peak, Inc. If we flip to the
6   April account statement, and specifically to
7   Bates number ending 4697, we see some
8   transactions occurring in the month of April
9   2012.
10          THE WITNESS: I do.
11          MS. LAMA: Okay.
12          In terms of the first transaction, the
13  three point nine six million coming in.
14          THE WITNESS: Yes.
15          MS. LAMA: And then we see on April
16  3rd, 2012 three point nine six million going out
17  to Q Resorts.
18          THE WITNESS: Yes.
19          MS. LAMA: Do you recall the
20  circumstances surrounding this transaction?
21          THE WITNESS: I don't.
22          MS. LAMA: And for the record, account
23  ███581, where three point nine six million was
24  transferred into the Jay Peak, Inc. account from
25  the account ending 1581, that is Jay Peak Lodge

Page 186

1 and Townhouse, LP.
2        So it looks like in this transaction,
3 three point nine six million is coming in from
4 Jay Peak Lodge and Townhouse, and then being
5 transferred out to Q Resorts, which is account
6 number ████ ▄772. Does that help refresh your
7 memory about this transfer, or this transaction?
8        THE WITNESS: No. But it looks like
9 the withdrawal was first and the deposit was
10 after.
11        MS. LAMA: Oh, yeah. I apologize.
12        THE WITNESS: Yeah. No, I don't
13 remember.
14        MS. LAMA: Okay.
15        On April 20th, 2012, there's also an
16 eight million dollar withdrawal to Q Resorts. Do
17 you recall the nature of that eight million
18 dollar transfer?
19        THE WITNESS: I do not.
20        MR. JAMES: Just while Michelle is
21 still flipping, to the question as to where it
22 says, "Expenses," the April 30th, 2012, the
23 margin loan interest --
24        THE WITNESS: Yes, sir.
25        MR. JAMES: -- and the seventeen

Page 187

1 thousand. Do you see that's deducted from the
2 amounts that are in this account?
3        THE WITNESS: Yes.
4        MS. LAMA: And just in general, what's
5 your understanding of why money was coming from
6 the different partnership LPs and being
7 transferred to Q Resorts? What's the basis for
8 that?
9        THE WITNESS: I don't recall the
10 specifics of it. I just -- I don't recall. I
11 would have to -- the answer is, you know, we
12 probably had a conversation about whether how his
13 accountants wanted to do it, and he went through
14 the -- the -- went through the process no
15 differently than -- than I asked him. But I
16 don't remember any specifics about it. I don't
17 recall.
18        MS. LAMA: Okay. Continuing on to the
19 May statement, and specifically the Bates ending
20 4701. There's a seven million wire transfer,
21 dated May 16th, 2012 to wire to Cole Taft Trust
22 account.
23        THE WITNESS: Yes.
24        MS. LAMA: Are you familiar with this
25 transaction, and who is Cole Taft Trust account?

Page 188

1        THE WITNESS: I don't remember. I'd
2 have to look at the Letter of Authorization.
3        MR. BARRACCA: Do you recall -- can I
4 ask a question, if you don't mind?
5        Do you recall if the LOAs contain a
6 field or a space to write the reason for the
7 transaction?
8        THE WITNESS: I do believe he wrote the
9 reason for the transaction on the LOAs. We did
10 ask him to do that, so it should've been on
11 there.
12        MR. BARRACCA: Thank you.
13        MS. LAMA: Did you routinely see wires
14 going out to that account, Cole Taft Trust?
15        THE WITNESS: Not that I recall, no.
16        MS. LAMA: Do you know if that was a
17 vendor?
18        THE WITNESS: I don't remember.
19        (SEC Exhibit No. 21 was
20        marked for
21        identification.)
22        BY MS. SINDLER:
23  Q   Let me show you what's been marked as
24 Exhibit Number 21. It's a two-page document.
25 It's Bates ending -- beginning 2045 and 2046.

Page 189

1 The first page appears to be a copy of a letter
2 dated November 15th, 2012 from Joel Burstein to
3 Ariel Quiros regarding wire transaction to AnC
4 Uda Cell Tech.
5        Do you recognize this document?
6  A   I do.
7  Q   What is it?
8  A   It's a letter to -- to Mr. Quiros.
9  Q   And the second page?
10  A   It says, authorization asking to wire
11 money to AnC Uda Cell Technology, Incorporated.
12  Q   Okay.
13        And what's your understanding for the
14 reasoning of this Letter of Authorization to
15 transfer the -- to wire the eight hundred and
16 nineteen thousand?
17  A   My understanding is that there was some
18 technology -- Bioheart USA is a Florida -- I'm
19 sorry. Bioheart Florida was a Florida-based
20 company that, I believe, was in Weston. They
21 were doing some type of -- I don't know the
22 biotechnical term, but maybe some stem cell
23 research where they were regenerating heart
24 growth.
25        Mr. Quiros told me that Bioheart

Page 190

1  Florida was the American arm of the patent -- I
2  guess there was a patent for this type of
3  technology. And AnC Korea owned the patent for
4  Asia, and so they were the Asian marketing arm of
5  the technology. It was my understanding of
6  Bioheart. AnC Bio was -- was part of that
7  business.
8    Q   And so what was the purpose of sending
9  the money? What was it for?
10   A   It was funding for Bioheart Florida.
11   Q   Do you know who would -- do you know
12 whether Mr. Quiros is an officer, director of
13 Bioheart Florida?
14   A   No, I don't remember.
15   Q   Do you know if he has any ownership
16 interest in Bioheart Florida?
17   A   He did own stock in Bioheart Florida --
18 maybe Bio USA. I'm not sure which one's publicly
19 traded. I don't know if it was USA or Florida,
20 but does -- he does own shares of Bioheart.
21   Q   Okay.
22       And do you know why money would be
23 going from Q Resorts to Korea when it's -- the
24 funding's on behalf of Bioheart Florida?
25   A   Well, again, my understanding of -- was

Page 191

1  that Bioheart Florida was related to AnC Bio from
2  a patent and technology perspective. Again, AnC
3  Bio was part of the Florida project. And so what
4  relation that is, my understanding was that it
5  was a Jay -- Biomedical was, when he explained to
6  me, was also part of the umbrella, the Jay Peak
7  umbrella. And what specifically it was for, I
8  don't know.
9    Q   Okay.
10       Do you recognize the handwriting on the
11 second page?
12   A   Yes, I do.
13   Q   Can you identify it for me?
14   A   Sure. The handwriting is Mr. Quiros
15 signed on the left-hand side. Frank Amigo, who's
16 our Complex Manager, signed on the right-hand
17 side.
18   Q   So it references spoke with client. So
19 did Mr. Amigo speak with Mr. Quiros about this?
20   A   That's correct.
21       MR. JAMES: Let me ask you a question,
22 please. In reviewing your production, we've seen
23 a number of LOAs in different versions. Some are
24 in letters; some are more of a form. But it's not
25 often that we see a cover letter sending back

Page 192

1  confirmation to Mr. Quiros.
2        Is there a particular reason why, in
3  this instance, he sent to you the authorization
4  that's dated October 12th, and then over a month
5  later, you send him back this cover page
6  attaching the authorization?
7        THE WITNESS: Mostly likely, he asked me
8  to send him confirmation of it. That's all it
9  was, was confirmation of an existing wire.
10       MR. JAMES: Any reason for the delay?
11       THE WITNESS: This could've been the
12 time he asked me. I don't recall, but just when
13 he was asking me for it.
14       MR. DUMORNAY: You know he asked you
15 for sure for this one?
16       THE WITNESS: I wouldn't have sent it
17 any other way. He would've had to have asked me
18 for that.
19       MR. DUMORNAY: What -- and the company
20 that's listed here on this Exhibit is AnC Uda
21 Cell Tech, Inc. What is that company?
22       THE WITNESS: I -- I don't know
23 offhand.
24           (SEC Exhibit No. 22 was
25           marked for

Page 193

1           identification.)
2  BY MS. SINDLER:
3    Q   Let me show you what's been marked as
4  Exhibit Number 22, a one-age document. It
5  appears to be a copy of an Email from Joel
6  Burstein to Ariel Quiros, cc'ing Tracy Brinson
7  regarding money to AnC Bio Korea, sent December
8  10th, 2012. Just take a look at this document.
9    A   Yes.
10   Q   Do you recognize it?
11   A   I do.
12   Q   What is it?
13   A   It's an Email to Mr. Quiros.
14   Q   Okay.
15       Can you tell me more about it?
16   A   There was some issues with the bank --
17 I think the bank -- I don't remember the
18 specifics, but there was some issue with the bank
19 crediting it properly. At least, you know, he
20 needed confirmation that it was actually
21 received. It went to Korea, and there was some
22 complication from the bank side of it.
23       And so we -- we -- we, being my
24 assistant, Tracy, at the time, reached out to the
25 bank to help them understand where the wire was

Page 194

1   coming from and that it was sent or whatever
2   information that could've been useful for them
3   locating the -- the funds.
4       Q   Was there some particular urgency
5   because of -- with this Uda Cell transaction?
6       A   Not that I recall. I mean, the wire
7   went out on October. This is, you know, December
8   6th, so --
9       Q   Do you remember any other transactions
10  that were sent from Bioheart Florida, LLC?
11      A   Not that I recall.
12      Q   Do you recall any situation involving a
13  loan or infusion of cash that was supposed to
14  come from AnC Bio to Bioheart, the
15  publicly-traded company?
16      A   No.
17      Q   Or -- sorry. Not from AnC Bio. From
18  AnC Bio Korea to Bioheart, not Bioheart Florida,
19  LLC, but Bioheart the publicly-traded company?
20      A   So from AnC Bio Korea to Bioheart?
21      Q   Yes.
22      A   No, I didn't have an AnC Bio Korea
23  account for Bioheart. We just owned the
24  publicly-traded shares for him. So I don't know.
25      Q   When you say we --

Page 195

1       A   We, being Raymond James had held the
2   shares for him. That's all we had.
3       Q   So he -- Mr. Quiros had shares of
4   Bioheart in his trading account; is that --
5       A   Yes, he did.
6       Q   Okay.
7       So he never talked with you about
8   anything regarding AnC Korea and Bioheart?
9       A   No.
10      MR. JAMES: Mark this one.
11          (SEC Exhibit No. 23 was
12          marked for
13          identification.)
14      MR. JAMES: And a copy for --
15      You've just been handed what has been
16  marked as Exhibit Number 23, which appears to be
17  an Email from Janice Naymark to a number of
18  individuals, including yourself, Ariel Quiros,
19  Frank Burgess, Mark Scribner, Bill Stenger.
20      Do you recall receiving this Email?
21      THE WITNESS: Yes.
22      MR. JAMES: Okay.
23      What is being discussed in this Email?
24      THE WITNESS: Do you mind if I read it?
25      MR. JAMES: Oh, please.

Page 196

1       (Ms. Masica leaves the room.)
2       THE WITNESS: Okay.
3       MR. JAMES: So let me ask you again.
4   So what's being discussed in this Email of June
5   18th, 2008?
6       THE WITNESS: Well, I believe, there
7   was a -- I think there -- I think Janice Naymark
8   or Alwynn Gillett sent an Email regarding a list
9   of six or seven things that we could not comment
10  on one way or the other.
11      We wrote an -- a letter back to them
12  stating that -- that we just couldn't comment on
13  some of these things, and we were responsible to
14  the authorized party.
15      This was her reply to that Email saying
16  that her Email caused some confusion, and she
17  apologized for not being clear. She mentioned
18  that there are Phase I subscriptions, which would
19  be the Jay Peak I account. That there was an
20  escrow account. The escrow account was held at
21  Chittenden, which was not here. As soon as the
22  money would be approved through the escrow
23  process, which means it would be approved by CIS,
24  we would then retain the funds. We were not
25  doing any escrow business.

Page 197

1       The second bullet point, she says, is,
2   approximately, five point four million left in
3   Phase I escrow account, pending visa approval.
4   Again, that's where it's escrowed while CIS goes
5   through the process.
6       And, again, this is all my
7   understanding. We didn't do it, so this is how I
8   understood it.
9       They said Phase I was oversubscribed.
10  In case some of the visas weren't approved, I
11  guess, this was -- my assumption is that since it
12  was brand new at the time, they accommodated for
13  people being -- not -- not being approved by CIS.
14  But -- so those -- those people have been
15  oversubscribed left their money at Chittenden.
16      When they created Phase II, I suppose
17  they were given the option to move into the Phase
18  II project. It says it should happen shortly.
19      And she suggested speaking to Mark
20  Scribner and Bill Stenger, I guess, to clarify
21  the CIS processing in the escrow accounts and
22  what was being done in Chittenden.
23      MR. JAMES: So that seven point six
24  million that's referenced in paragraph three --
25      THE WITNESS: Yes.

Page 198

1    MR. JAMES: -- it's an oversubscription
2  amount, was that money transferred to Raymond
3  James LP-2 account?
4    THE WITNESS: The way we did this
5  process was that it had to have gone through
6  escrow and cleared CIS. So our agreement was to
7  only take money that had already cleared. We were
8  not getting into the escrow part of it.
9    My very, very basic understanding of
10  the process is that there were agreements that
11  the people had to sign. They had to fill out
12  their own paperwork and who they were, and do a
13  background check with CIS.
14    Until CIS says, you're cleared of, I
15  assume, basically, of being a terrorists, that
16  you're clear, the money sits in escrow. You have
17  to escrow the funds saying you're committed to
18  it. They'll go through the background process, I
19  assume -- go through the background process.
20    At that point, once they're cleared
21  from the escrow, from CIS, the money then becomes
22  corporate assets of which our job was to
23  prudently manage for that short time frame.
24    MR. JAMES: Okay.
25    I guess I asked a different question.

Page 199

1  Are you aware or did you have any discussions
2  with Mr. Quiros or anyone else about monies that
3  initially were invested for Phase I then being
4  transferred to Phase II?
5    THE WITNESS: I did not. I did not.
6    MR. JAMES: Did you see that at any
7  point where the -- through the different
8  transfers that were authorized?
9    THE WITNESS: I don't recall. But the
10  process was supposed to be set up where it came
11  from like account to like account at Chittenden
12  to Raymond James.
13    MR. JAMES: Okay.
14    What about discussions with anyone at
15  Jay Peak, whether any of the former CFOs, any
16  discussions about monies being used for --
17    THE WITNESS: Not that I recall.
18    MR. JAMES: -- one partnership that
19  were earmarked for another?
20    THE WITNESS: Not that I recall.
21    BY MS. SINDLER:
22    Q  Did you ever have any conversations
23  with Mr. Carpenter or Mr. Dupont from Jay Peak?
24    A  Not that I recall, no.
25    Q  Do you ever recall anyone, a former

Page 200

1  controller or a CFO of Jay Peak trying to obtain
2  copies of statements from any of the Jay Peak
3  accounts?
4    A  Not that I recall.
5    Q  Have you discussed with anyone the fact
6  that you would be coming in to testify today?
7    A  My firm.
8    Q  Other than your firm?
9    A  No. My wife. No.
10    Q  Not Mr. Quiros or --
11    A  No. I was specifically instructed from
12  Mark to not saying anything, so I did not discuss
13  this with him at all.
14    Q  Were you contacted by anyone at Jay
15  Peak or their attorneys requesting documents from
16  you?
17    A  No. No.
18    Q  Do you know of anyone else who's been
19  subpoenaed in this matter?
20    A  I have no idea, no.
21    MS. SINDLER: Is there anything that
22  you'd like to clarify or explain in connection
23  with anything that we've discussed today?
24    THE WITNESS: No. No.
25    MS. SINDLER: Okay.

Page 201

1    Counsel, we just want to give you an
2  opportunity.
3    MR. BARRACCA: No. I think everything
4  -- the questions you asked were clear, and the
5  answers were accurate, to the best of my
6  knowledge. So I don't have anything to clarify.
7    MS. SINDLER: Or anything you wanted to
8  add or ask?
9    MR. BARRACCA: No.
10    MS. SINDLER: All right. Okay.
11    So at this time, we're going to end the
12  testimony. In the future, if we need to speak
13  with you again, we'll be in contact with your
14  attorney.
15    We appreciate you coming in today.
16    And we're off the record at 4:35.
17    (Whereupon, at 4:35 p.m., the
18  examination was concluded.)
19    * * * * *
20
21
22
23
24
25

Page 202

```
 1            PROOFREADER'S CERTIFICATE
 2
 3    In The Matter of:   JAY PEAK, INC.
 4    Witness:       Joel Burstein
 5    File Number:       FL-03815-A
 6    Date:          Thursday, March 27, 2014
 7    Location:      Miami, FL
 8
 9           This is to certify that I, Maria E.
10    Paulsen, (the undersigned), do hereby swear and
11    affirm that the attached proceedings before the U.S.
12    Securities and Exchange Commission were held
13    according to the record and that this is the
14    original, complete, true and accurate transcript
15    that has been compared to the reporting or recording
16    accomplished at the hearing.
17
18    _____   _____
19    (Proofreader's Name)    (Date)
20
21
22
23
24
25
```

```
                                                      Page 202

 1                 PROOFREADER'S CERTIFICATE

 2

 3    In The Matter of:    JAY PEAK, INC.

 4    Witness:             Joel Burstein

 5    File Number:         FL-03815-A

 6    Date:                Thursday, March 27, 2014

 7    Location:            Miami, FL

 8

 9           This is to certify that I, Maria E.

10    Paulsen, (the undersigned), do hereby swear and

11    affirm that the attached proceedings before the U.S.

12    Securities and Exchange Commission were held

13    according to the record and that this is the

14    original, complete, true and accurate transcript

15    that has been compared to the reporting or recording

16    accomplished at the hearing.

17

18    _____    _____

19    (Proofreader's Name)         (Date)

20

21

22

23

24

25
```

1        UNITED STATES SECURITIES AND EXCHANGE

2              REPORTER'S CERTIFICATE

3

4       I, BRIGITTE ROTHSTEIN, Court Reporter. hereby
   certify that the foregoing transcript of 203 pages
5  (March 27th, 2014) is a complete, true and
   accurate transcript of the testimony indicated
6  held on March 27th, 2014 at 10:27 a.m. in the
   matter of: JAY PEAK, INC.

7

8       I further certify that this proceeding was
   recorded by me, and that the foregoing transcript
9  was prepared under my direction.

10

11  Date:  March 31st, 2014
    Official Reporter:  Brigitte Rothstein
12  Diversified Reporting Services, Inc.

13

14

15

16

17                    _____
                      BRIGITTE ROTHSTEIN, Court Reporter
18                    Notary Public - State of Florida
                      Commission No.:  EE 175314
19                    Expires:  March 17th, 2016
                      Transmittal Number:  M000163
20

21

22

23

24

25