## DECLARATION OF BERNARD LEDEZMA

Pursuant to 28 U.S.C. Section 1746, the undersigned states as follows:

1.     My name is Bernard Ledezma.   I am over twenty-one years of age and have personal knowledge of the matters set forth herein.

2.     In 2013, I went to the Jay Peak Resort for vacation.  While I was there, I learned about an EB-5 limited partnership investment offering in Jay Peak Biomedical Research Park L.P. ("Jay Peak Biomedical"). Bill Stenger told me Jay Peak Biomedical was a new EB-5 project and that it would be doing biomedical research.  He told me that Jay Peak Biomedical would use investor money to construct a facility to conduct medical research, manufacturing, and development. A lady who works with Mr. Stenger, Karen Bennett, gave me some materials regarding Jay Peak.  At some point, Karen Bennett also told me that Jay Peak Biomedical was either in the beginning or middle phases of building its research facility.

3.     In addition to speaking with Mr. Stenger, I also read about EB-5 limited partnership offerings on Jay Peak's website and the projects that Jay Peak had done in the past.

4.     In or about late October 2013, my immigration attorney emailed my signed escrow agreement to Alexandra MacLean, a Jay Peak representative.   Also, in late October, Ms. MacLean emailed my attorney asking whether I was interested "in the AnC Bio Project or the Burke Project."

PLAINTIFF'S EXHIBIT 43

1

5.     After I made a deposit, Jay Peak sent my immigration attorney various documents regarding Jay Peak Biomedical, which my attorney then provided to me.   One of the documents was a cover letter about the project, which was signed by Bill Stenger, President and CEO of Jay Peak Resort and General Partner, AnC Bio Vermont GP Services LLC. A copy of the cover letter is attached as Exhibit A.

6.     The letter stated that "[o]ver the past five years Jay Peak Resort in cooperation with the State of Vermont has developed six highly successful EB-5 investment projects." The letter also discussed a new project with "technology affiliation with AnC Bio Korea. . . [which] has for 15 years been a leader in biotech research, manufacturing and development.   The products and service AnC Bio Korea has perfected will be the cornerstone of the AnC Bio Vermont project." In addition, the letter talked about how AnC Bio Vermont would conduct stem cell research and manufacture and distribute artificial organs such as a portable heart/lunch machine and portable liver dialysis machine and operate 50 clean room testing facilities.   There was a photo of a 90,000 sq. foot building and a discussion that "A 60,000 sq. ft. research tower will be construction 2013 (Note the attached photo). This will bring the facility to 150,000 sq. ft."

7.     The letter also said that "[o]nce AnC Bio Vermont opens in 2014 each investor is expected to earn 4-6% through the proceeds of the business operations.     In the case of AnC Bio Vermont, income will be derived from manufacturing, distribution and sales of FDA approved artificial organs; stem cell research; vaccine production and 'clean room' rental."   In late 2013 or January 2014, Jay Peak sent my attorney various materials

2

pertaining to the offering, including offering documents containing, among other things, a business plan for Jay Peak Biomedical. Copies of these materials are attached as Exhibit B.

8.      The offering materials provide that my $500,000 investment in Jay Peak Biomedical would be used for the Jay Peak Biomedical project and showed how investor funds would be used for this project.  (For example, see Exhibit B, "Use of Proceeds" section, Bate stamped BL-0000114 and p. 9 of Business Plan in Section 2, Bate stamped BL-0000161).  There is no provision in the materials that my money could be used for any other project or any other purpose. These representations in the offering materials regarding the use of investor funds was important to me in deciding to invest in Jay Peak Biomedical.  I have not consented to any borrowing from the limited partnership by the general partner or any commingling of partnership funds.

9. .   In January 2014, I wired my $500,000 investment to an escrow account at People's United Bank for my investment in Jay Peak Biomedical, plus an administrative fee.

10.     On August 18, 2015, I received an email from Lizzy Button at Jay Peak, attaching a letter from Bill Stenger and a link to amended offering and subscription agreements for Jay Peak Biomedical.  A copy of this second letter is attached as Exhibit C.  The second letter states, in part, that in order to extend the duration of the Jay Peak Biomedical offering and allow additional time to raise funds for the project, the general partner has amended the private placement memorandum.

3

11.    The second letter also states that no material changes have been made to the project, its business plan, or the job count analysis, and that approximately $76 million had already been raised through the offering.   The second letter further stated it was enclosing an amended subscription agreement and amended offering document and asked that I execute and return the amended subscription agreement following my review of the amended offering document.

12.    In addition, the second letter indicated that I should let Jay Peak Biomedical know if I decided not to re-subscribe and wanted my $500,000 investment returned to me, adding that "[s]uch action would terminate [my] ability to gain a green card through this program." I

generally reviewed the amended offering document on the link provided, but did not print out a copy.  I subsequently signed the amended subscription agreement.

I declare under penalty of perjury that the foregoing is true, correct, and made in good faith.

_Bernard Ledezma_

Executed on this _27_ day of October 2015

4

**A**

Cover Letter Project.



BL-0000011A



2013

Bill Stenger
President & CEO

Over the past five years Jay Peak Resort in cooperation with the State of Vermont has developed six highly successful EB-5 investment projects. Since 2007 we have welcomed over 550 investors from 60 countries. In doing so, the Jay Peak projects have created thousands of jobs in the Northern Region of Vermont. Over the past 24 months in cooperation with the State of Vermont we have created a dynamic Biotech Research and Development EB-5 Project associated with Jay Peak. Myself and my partner at Jay Peak, Ariel Quiros, are also co-owners of this new biotech company.

This project will be located near Jay Peak in the Jay Peak Biomedical Research Park, a 40 acre campus with over 90,000 square feet of current facility. This Research Park, located a few minutes from Jay Peak Resort's main facility will host AnC Bio Vermont, a dynamic biotech research company with technology affiliation with AnC Bio Korea.

AnC Bio Korea has for 15 years been a leader in biotech research, manufacturing and development. The products and service AnC Bio Korea has perfected will be the cornerstone of the AnC Bio Vermont project. There is very strong market demand for the products and services that will be provided by AnC Bio Vermont and it is this business success that will be the basis for the investor's return on investment.

<u>AnC Bio Vermont's Mission</u>
AnC Bio Vermont will conduct stem cell research for medical applications throughout the North and South American markets. It will also manufacture and distribute artificial organs not currently available in these markets such as a portable heart/lung machine and the portable liver dialysis machine, L liver. This technology is innovative on a worldwide level and will have significant market demand in this hemisphere.

One of the most beneficial parts of the AnC Bio facility will be the operations of 50 clean rooms. "Clean Rooms" are climate controlled, germ free testing facilities that allow companies and universities to conduct research in F.D.A. approved facilities and to develop products and test research assumptions under approved controlled conditions. These types of facilities are in very short supply in the U.S. and Canada. High rental demand exists for these types of facilities.

Current Status – AnC Bio Vermont has its headquarters in the Jay Peak Biomedical Research Park located in Newport, Vermont and is part of a 40 acre technology campus

1

BL -12

BL-0000012

with a 90,000 sq. ft. hub (Note attached photo).   A 60,000 sq. ft. research tower will be construction 2013 (Note the attached photo).  This will bring the facility to 150,000 sq. ft.

Government Support – AnC Bio Vermont has significant governmental support at the local, state and federal levels. AnC Bio Vermont is an approved State Regional Center EB-5 project.  Gov. Jim Douglas, governor of Vermont from 2004 to 2010 traveled to South Korea in 2010 to visit AnC Bio Korea and sign a cooperation agreement on behalf of the State of Vermont and the Company.  (Note attached magazine article.)

Our current Governor, Peter Shumlin and Senator Patrick Leahy have also been staunch supporters of our EB-5 programs.   Senator Leahy has been outspoken in his support for the AnC Bio Vermont EB-5 Project (Note attached photo and letters).

Over 200 investors will be welcomed to this project.  The complete offering documents are available now and I-526 applications could be filed within 30 days of signing subscription documents.

The four major questions every investor is interested in knowing answers to are:

1. How long will the I-526 conditional green card take to get?

   *Jay Peak projects, of which the AnC Bio Vermont Project is affiliated, take between 4 and 6 months to get USCIS approval.  This approval comes through the USCIS California Service Center in Laguna Nigel, California.*

2. What kind of income can the investor expect while in the program?

   *Once AnC Bio Vermont opens in 2014 each investor is expected to earn 4-6% through the proceeds of the business operations.  In the case of AnC Bio Vermont, income will be derived from manufacturing, distribution and sales of FDA approved artificial organs; stem cell research; vaccine production and "clean room" rental.*

   *Each of these areas of bio-science business have strong market demand and will benefit from significant sales activity.*

3. Will enough jobs be created to assure the removal of conditions at the I-829 level?

   *Thorough economic data will be provided to USCIS at the I-526 level justifying the job creation needs for each investor.  Direct, indirect and induced jobs will all be part of the AnC Bio Vermont economic models provided by independent economists.  At the time of removal of conditions petition the project investment*

2

BL-13

*will have fully been made and manufacturing, sales and investor proceeds will also be fully underway.  Meeting the removal of conditions criteria will go successfully as it has for all Jay Peak projects. Jay Peak projects have 100% success rates at the I-526 and I-829 stages.*

4. When and how will the investor get their investment back?

*After removal of conditions of our partners (approximately 4-5 years) the project general partner will pay the partners back from proceeds from the sales of FDA products, services and rental of the over 50 "clean rooms" that make up the company's operations.*

*Because of the innovative technology, AnC Bio product demand worldwide will be significant.  Clean room rental and product sales are expected to provide sufficient funds for the repayment of the investors' funds.  (Note:  USCIS regulations prohibit any guarantee of income or return of investment.  Our expectations are based on experience and market conditions but guarantees are not legally permissible.)*

Included with this letter are the following items for your information and review.

1. AnC Bio Vermont Memorandum of Understanding (MOU) with the State of Vermont Regional Center.

2. AnC Bio Vermont business description and plan.

3. AnC Bio Vermont fact sheets.

4. Jay Peak Biomedical Research Park site photo.

5. AnC Bio Vermont Research Tower Photo.

6. AnC Bio Vermont leadership and Vermont government officials photo.

7. Korean People Magazine article.

8. AnC Bio Vermont Press Conference video.

This project has over 40 investors already in the process of subscription and we expect the offering to be fully subscribed by the end of this calendar year.  If you or your clients

3

BL-14

wish to visit Jay Peak to see firsthand the project and its site location I welcome you to do so.

If after reviewing the enclosures you have any questions, please feel free to contact me at Jay Peak Resort at the coordinates listed below.

Sincerely,

Bill Stenger
President & CEO Jay Peak Resort
General Partner, AnC Bio Vermont GP Services LLC

Vermont Rte. 242 • Jay, Vermont 05859-9621 • Direct Dial (802) 327-2222 • Fax (802) 988-4049
E-Mail: bstenger@jaypeakresort.com • **JAYPEAKRESORT.COM**

4

BL _ 15

B

Letter of US Citizenship and Immigration Services Approval



BL-0000015A

Exhibit A5





U.S. Department of Homeland Security
24000 Avila Road, 2ⁿᵈ Floor
Laguna Niguel, CA 92677

**U.S. Citizenship
and Immigration
Services**

October 6, 2009

Kevin L. Dorn
State of Vermont                                  File No.   W09000920
Agency of Commerce and Community Development
National Life Building, Drawer 20
Montpelier, VT 05620-0501

Application:        Request to Amend Designation as a Regional Center
Applicant(s):       Kevin L. Dorn

Re:                 VACCD Regional Center

Pursuant to Section 610 of the Appropriations Act of 1993, on June 26, 1997, the VACCD Regional Center, was approved and designated as a regional center to participate in the Immigrant Investor Pilot Program. On June 11, 2007, the designation was reaffirmed. In a written request dated August 17, 2009, VACCD Regional Center sought to amend its initial Regional Center designation, to expand the types of approved economic activities and industrial clusters as follows:

1. To add manufacturing, professional services, education, information and lending institutions to their current list of approved industries.
2. To add the economic activities of design, development and production of new products; expansion or renovation of existing facilities; establishing and expanding post secondary schools including building, development and operation of the schools; design, development & publishing of software, books and other information publishing activities.
3. To provide direct equity investments in to the industry clusters and/or to provide indirect investments to the industries through investment in an enterprise which in turn will lend the funds for specific industry related project(s).

Based on its review and analysis of the request to amend the previous VACCD Regional Center designation and prior amended proposals, business plan, and supplementary evidence, the U.S. Citizenship and Immigration Services (USCIS) amends the designation of the Regional Center as requested to incorporate the above 2 changes. In accepting the amendment, USCIS has updated its records of your Regional Center approval, designation, and business plan to encompass these amendments relative to the investment focus of the Regional Center on 5 areas of commercial enterprise:

www.uscis.gov

*BL.16*

BL-0000016

VACCD Regional Center/W09000920
Page 2

1. The Ski and related Tourism Industry
2. Manufacturing
3. Professional Services
4. Education
5. Information Publishing

As such, aliens seeking immigrant visas through the Immigrant Investor Pilot Program may file individual petitions with USCIS for these new commercial enterprises located within the VACCD Regional Center regional center area is comprised of the State of Vermont.

The geographic focus of this area may contain some High Unemployment Targeted Employment Areas (TEAs) as designated by the State of Vermont, and rural TEAs as defined in 8 CFR 204.6(e). Therefore, the minimum capital investment threshold for any individual immigrant investment into an approved commercial enterprise throughout the Regional Center shall be not less than $500,000, if the investment target is located within a TEA or $1,000,000 if it is located outside of a TEA. No debt arrangement will be acceptable unless it is secured by assets owned by the alien entrepreneur. A full capital investment must be made and placed at risk.

Alien entrepreneurs who file petitions for commercial enterprises located in the regional center area must fulfill all of the requirements set forth in 8 CFR 204.6, except that the petition need not show that the new commercial enterprise directly hired ten new employees as a result of the alien entrepreneur's investment. Rather, the investor must show at the time of removal of conditions that they performed the activities described in the model and on which the approved methodology is based.

To demonstrate that it is associated with the your regional center, each individual alien entrepreneur petition in conjunction with addressing all the requirements for that petition, shall also contain as supporting evidence relating to this regional center designation, as follows:

1. A copy of this letter of the amended approval and designation.

2. A copy of the approved job creation methodology required in 8 CFR 204.6(j)(4)(iii), as contained in the VACCD Regional Center amended regional center application which has been approved by USCIS, which reflects that investment by an individual alien investor of at least AMOUNT $500,000 for state designated high unemployment area, $500,000 for a rural area or $1,000,000.

3. A signed legally executed and certified copy of the limited partnership agreement between the new commercial enterprise and the alien investor.

The designation by the USCIS of the VACCD Regional Center as a regional center does not reflect any determination on the merits of individual petitions filed by alien entrepreneurs under the Investor Pilot Program. All petitions for alien entrepreneurs who invest within the regional center will be adjudicated by the USCIS on a case-by-case basis and each petition must be fully documented. The individual petitions must be submitted to the California Service Center.

$BL.17$

BL-0000017

VACCD Regional Center/W09000920
Page 3

## DESIGNEE'S RESPONSIBILITIES INHERENT IN CONDUCT OF THE REGIONAL CENTER:

The law, as reflected in the regulations at 8 CFR 204.6(m)(6), requires that an approved Regional Center in order to maintain the validity of its approval and designation must continue to meet the statutory requirements of the Immigrant Investor Pilot Program by serving the purpose of promoting economic growth, including increased export sales (where applicable), improved regional productivity, job creation, and increased domestic capital investment. Therefore, in order for USCIS to determine whether your Regional Center is in compliance with the above cited regulation, and in order to continue to operate as a USCIS approved and designated Regional Center, your administration, oversight, and management of your Regional Center shall be such as to monitor all investment activities under the sponsorship of your Regional Center and to maintain records, data and information on a quarterly basis in order to report to USCIS upon request the following year to date information for each Federal Fiscal Year[1], commencing with the initial year as follows:

1. Provide the principal authorized official and point of contact of the Regional Center responsible for the normal operation, management and administration of the Regional Center.

2. Be prepared to explain how you are administering the Regional Center and how you will be actively engaged in supporting a due diligence screening of its alien investors' lawful source of capital and the alien investor's ability to fully invest the requisite amount of capital.

3. Be prepared to explain the following:

   a. How the Regional Center is actively engaged in the evaluation, oversight and follow up on any proposed commercial activities that will be utilized by alien investors.

   b. How the Regional Center is actively engaged in the ongoing monitoring, evaluation, oversight and follow up on any investor commercial activity affiliated through the Regional Center that will be utilized by alien investors in order to create direct and/or indirect jobs through qualifying EB-5 capital investments into commercial enterprises within the Regional Center.

4. Be prepared to provide:

   a. the name, date of birth, petition receipt number, and alien registration number (if one has been assigned by USCIS) of each principal alien investor who has made an investment and has filed an EB-5/I-526 Petition with USCIS, specifying whether:
      i. the petition was filed,
      ii. was approved,
      iii. denied, or
      iv. withdrawn by the petitioner, together with the date(s) of such event.

   b. The total number of visas represented in each case for the principal alien investor identified in 4.a. above, plus his/her dependents (spouse and children) for whom immigrant status is sought or has been granted.

---

[1] A Federal Fiscal Year runs for twelve consecutive months from October 1st to September 30th.

BL-18

BL-0000018

VACCD Regional Center/W09000920
Page 4

    c. The country of nationality of each alien investor who has made an investment and filed an EB-5/I-526 petition with USCIS.

    d. The U.S. city and state of residence (or intended residence) of each alien investor who has made an investment and filed an EB-5/I-526 petition with USCIS.

    e. For each alien investor listed in item 4.a., above, identify the following:

        i. the date(s) of investment in the commercial enterprise;

        ii. the amount(s) of investment in the commercial enterprise; and

        iii. the date(s), nature, and amount(s) of any payment/remuneration/profit/return on investment made to the alien investor by the commercial enterprise and/or Regional Center from when the investment was initiated to the present.

5. Be prepared to identify/list each of the target industry categories of business activity within the geographic boundaries of your Regional Center that have:

    a. received alien investors' capital, and in what aggregate amounts;

    b. received non-EB-5 domestic capital that has been combined and invested together, specifying the separate aggregate amounts of the domestic investment capital;

    c. of the total investor capital (alien and domestic) identified above in 5.a and 5.b, identify and list the following:

        i. The name and address of each "direct" job creating commercial enterprise.

        ii. The industry category for each indirect job creating investment activity.

6. Be prepared to provide:

    a. The total aggregate number of approved EB-5 alien investor I-526 petitions per each Federal Fiscal Year to date made through your Regional Center.

    b. The total aggregate number of approved EB-5 alien investor I-829 petitions per each Federal Fiscal Year to date through your Regional Center.

7. The total aggregate sum of EB-5 alien capital invested through your Regional Center for each Federal Fiscal Year to date since your approval and designation.

8. The combined total aggregate of "new" direct and/or indirect jobs created by EB-5 investors through your Regional Center for each Federal Fiscal Year to date since your approval and designation.

9. If applicable, the total aggregate of "preserved" or saved jobs by EB-5 alien investors into troubled businesses through your Regional Center for each Federal Fiscal Year to date since your approval and designation.

10. If for any given Federal Fiscal Year your Regional Center did or does not have investors to report, then provide:

    a. a detailed written explanation for the inactivity,

BL-19

BL-0000019

VACCD Regional Center/W09000920
Page 5

b. a specific plan which specifies the budget, timelines, milestones and critical steps to:

    i. actively promote your Regional Center program,

    ii. identify and recruit legitimate and viable alien investors, and

    iii. a strategy to invest into job creating enterprises and/or investment activities within the Regional Center.

11. Regarding your website, if any, please be prepared to provide a hard copy which represents fully what your Regional Center has posted on its website, as well as providing your web address. Additionally, please provide a packet containing all of your Regional Center's hard copy promotional materials such as brochures, flyers, press articles, advertisements, etc.

12. Finally, please be aware that it is incumbent on each USCIS approved and designated Regional Center, in order to remain in good standing, to notify the USCIS within 15 business days at USCIS.ImmigrantInvestorProgram@dhs.gov of any change of address or occurrence of any material change in:

- the name and contact information of the responsible official and/or Point of Contact (POC) for the RC
- the management and administration of the RC,
- the RC structure,
- the RC mailing address, web site address, email address, phone and fax number,
- the scope of the RC operations and focus,
- the RC business plan,
- any new, reduced or expanded delegation of authority , MOU, agreement, contract, etc. with another party to represent or act on behalf of the RC,
- the economic focus of the RC,  or
- any material change relating to your Regional Center's basis for its most recent designation and/or reaffirmation by USCIS.

If you have any questions concerning the Regional Center approval and designation under the Immigrant Investor Pilot Program, please contact the USCIS by Email at USCIS.ImmigrantInvestorProgram@dhs.gov.

Sincerely,

*Christina Poulos*

Christina Poulos
Director
California Service Center

BL-20

Exhibit A7



B2-21

BL-0000021



# New Hamp
## Ver

**New Hampshire**

Land Area: 8,992 sq. mi. (44)
Population: 920,610 (42)
Capital: Concord, N-9
Largest City: Manchester, O-9

*Index page 121*

**Selected Recreational & Historical Sites**

Burton Island State Park (VT), E-2
Green Mountain National Forest (VT), J-3
Lake Winnipesaukee (NH), L-10
Mount Mansfield State Forest (VT), F-4
Mount Washington (NH), H-10
Old Man of the Mountains (NH), I-8
Quechee Gorge (VT), L-5
White Mountain National Forest (NH), I-9

Vermont Travel Division, 134 State Street, Montpelier, VT 05602 (802) 828-3236

B2-22

BL-0000022

Exhibit A8

## U.S. Census Bureau

DP-1 **Profile of General Population and Housing Characteristics: 2010**
**2010 Demographic Profile Data**

NOTE: For more information on confidentiality protection, nonsampling error, and definitions, see

Geography: Newport city, Vermont

| Subject | Number | Percent |
|---|---|---|
| **SEX AND AGE** | | |
| Total population | 4,589 | 100 0 |
| Under 5 years | 250 | 5 4 |
| 5 to 9 years | 229 | 5 0 |
| 10 to 14 years | 267 | 5 8 |
| 15 to 19 years | 272 | 5 9 |
| 20 to 24 years | 356 | 7 8 |
| 25 to 29 years | 323 | 7.0 |
| 30 to 34 years | 300 | 6 5 |
| 35 to 39 years | 283 | 6 2 |
| 40 to 44 years | 264 | 5.8 |
| 45 to 49 years | 321 | 7 0 |
| 50 to 54 years | 343 | 7.5 |
| 55 to 59 years | 289 | 6 3 |
| 60 to 64 years | 275 | 6.0 |
| 65 to 69 years | 198 | 4.3 |
| 70 to 74 years | 151 | 3.3 |
| 75 to 79 years | 139 | 3 0 |
| 80 to 84 years | 160 | 3.5 |
| 85 years and over | 169 | 3 7 |
| | | |
| Median age (years) | 40 3 | (X) |
| | | |
| 16 years and over | 3,798 | 82 8 |
| 18 years and over | 3,681 | 80.2 |
| 21 years and over | 3,503 | 76 3 |
| 62 years and over | 977 | 21 3 |
| 65 years and over | 817 | 17 8 |
| | | |
| Male population | 2,340 | 51 0 |
| Under 5 years | 114 | 2 5 |
| 5 to 9 years | 105 | 2 3 |
| 10 to 14 years | 130 | 2.8 |
| 15 to 19 years | 144 | 3 1 |
| 20 to 24 years | 222 | 4 8 |
| 25 to 29 years | 196 | 4 3 |
| 30 to 34 years | 184 | 4 0 |
| | | |
| 35 to 39 years | 160 | 3 5 |
| 40 to 44 years | 153 | 3 3 |

BL-23

BL-0000023

letter for Designation as a Regional Center for The State of Vermont.

BL-0000023A

05/19/04  WED 10:38 FAX 802 828 3383    SOV ACCD    @002
06/27/97   12:31   ☎202 514 0198    ADJUDICATION    @002



SOV ACCD
ADJUDICATION

U.S. Department of Justice
Immigration and Naturalization Service                    Exhibit A3

HQ 70/8.5-C

425 I Street NW.
Washington, DC 20535

Howard Dean, MD                    JUN 26 1997
Governor
Office of the Governor
State of Vermont
Montpelier, Vermont 05609

RE:  Application for Designation as a Regional Center for the
     State of Vermont, Agency of Commerce and Community Development

Dear Mr. Dean:

Pursuant to Section 610 of the Appropriations Act of 1993, the
State of Vermont, Agency of Commerce and Community Development
(ACCD) has been designated as a regional center to participate in
the Immigrant Investor Pilot Program.  As of this date, aliens
seeking immigrant visas through the Immigrant Investor Pilot
Program may file individual petitions with the Immigration and
Naturalization Service (Service) for new commercial enterprises
located within the State of Vermont.

Alien entrepreneurs who file petitions for commercial enterprises
located within the State of Vermont must fulfill all of the
requirements set forth in 8 CFR 204.6, except that the petition
need not show that the new commercial enterprise hired ten new
employees as a result of the alien entrepreneur's investment.  The
petition may contain evidence that the investment indirectly
created or will create full-time positions for not fewer than ten
persons, using economically or statistically valid methodologies as
described in 8 CFR 204.6(j)(4)(iii), through revenues generated
from increased exports resulting from the Pilot Program.

The designation by the Service of the State of Vermont as a
regional center does not reflect any determination by the Service
on the merits of individual petitions filed by alien entrepreneurs
under the Investor Pilot Program.  All petitions for alien
entrepreneurs who invest within the regional center will be
adjudicated by the Service on a case-by-case basis and each
petition must be fully documented.  The individual petitions must
be submitted to the Vermont Service Center.

BL-24

BL-0000024

06/27/97 (FRI) 19:36 FAX 202 528 3293      SOV ACCP      ☒003

Page 2
Howard Dean, MD
Governor

If you have any questions concerning Vermont ACCD's designation under the Immigrant Investor Pilot Program, please contact Katherine Lorr at (202) 514-5014.

Sincerely,

Michael L. Aytes
Assistant Commissioner
Benefits Division

BL-25

BL-0000025

USCIS Acknowledgment Of EB-5 Designations Letter

BL-0000025A



JAMES H. DOUGLAS
Governor

Exhibit A4

RECEIVED NOV 2 7 2006

State of Vermont
OFFICE OF THE GOVERNOR

November 16, 2006

Mr. Maurice R. Berez
Chief Adjudications Officer
Investor and Regional Center Unit
Business and Trade Services
USCIS Service Center Operations
20 Massachusetts Avenue, N.W. (2nd Floor)
Washington, D.C. 20529

Re:    USCIS Acknowledgment of EB-5 Designations

Dear Mr. Berez:

I am writing to kindly request that USCIS acknowledge certain designations I have made with respect to Vermont's EB-5 Regional Center Immigrant Investor Program. Those designations are as follows:

**Kevin L. Dorn**, Secretary of the Agency of Commerce and Community Development (ACCD), as the principal representative of ACCD in its capacity as a Regional Center.

**John W. Kessler**, ACCD General Counsel, as the principal administrator.

**Jay Peak Hotel Suites L.P.**, to assist in the management, administration, and overall compliance of the Alien Entrepreneur project organized by Jay Peak within ACCD's Regional Center with U.S. immigration laws and regulations controlling the investment process and participation in a regional center, and to report upon the activities of the project to ACCD and respond to ACCD inquiries about the project, and assist ACCD to comply with its obligations as a regional center with respect to the Jay Peak project.

My understanding is that the above-referenced designations respond satisfactorily to recent guidance you provided on the administration of Vermont's Regional Center. We are eager for this program to yield fruitful investments in Vermont, and appreciate your continued support and guidance in our efforts. While I stand ready to offer my assistance, it is clear to me that Vermont's Regional Center is in good hands at ACCD.

Sincerely,

James H. Douglas
Governor

JHD/okb
cc:    Kevin Dorn, ACCD Secretary
       John Kessler, ACCD General Counsel

109 STATE STREET · THE PAVILION · MONTPELIER, VT 05609-0101 · WWW.VERMONT.GOV
TELEPHONE: 802.828.3333 · FAX: 802.828.3339 · TDD: 802.828.3345

BL-26

Picture about the Project.

BL-0000026A



## Jay Peak Biomedical Research Park L.P.
### A LIMITED PARTNERSHIP CHARTERED IN THE STATE OF VERMONT

An investment opportunity located in Newport Vermont–within the Vermont Regional Center; a US Government designated regional center. This Partnership is structured to assist investors in obtaining an EB-5 Investment Visa giving lawful and permanent residency into the United States of America.

B2-27

BL-0000027

The Subscription Documents.

BL-0000027A





## Section 4

# The Subscription Documents

$BL28$

BL-0000028

{This Page was intentionally left blank}

BL-29

BL-0000029

Subscription Agreement Jay Peak Biomedical Research Park L.P. - Exhibit A

## Section 4 of the Offering Memorandum

# Jay Peak Biomedical Research Park L.P. Subscription Documents

**INSTRUCTIONS FOR COMPLETION**

In connection with your subscription for an interest in Jay Peak Biomedical Research Park L.P., enclosed herewith are the following documents which must be properly and fully completed, signed and returned as set forth herein:

**Exhibit A: Subscription Agreement Jay Peak Biomedical Research Park L.P., including Consent to Limited Partnership Agreement** – To be completed and signed by you as indicated.  Please make your checks payable to (i) "Jay Peak Biomedical Research Park L.P." in the amount of $500,000 and (ii) AnC Bio Vt LLC (the "AnC Bio VT") in the amount of $50,000, or make wire transfer(s) in said amounts (see below), being a total of $550,000 and equaling the subscription amount to participate in the Offering.

**Exhibit B:  Purchaser Investor Questionnaire Jay Peak Biomedical Research Park L.P.** – To be completed and signed by you as indicated.

**Exhibit C:  Investor Escrow Agreement** – To be signed by you if used to reserve a place in the Offering.

Please return the aforementioned subscription documents, and checks or confirmation of wire transfer (except to the extent Investor Escrow Agreement is used as to the funds subject to said Agreement), to the Limited Partnership c/o:

> **PAYMENT INSTRUCTIONS  FOR WIRE TRANSFER:**
> **People's United Bank**
> 2 Burlington Square
> Burlington, Vermont 05401
> **ABA Number: 0210000089**
> **Credit Account #: 75C009901**
> **Credit Account:** Jay Peak Biomedical Research Park L.P.
>  For benefit of: ........................................... (The Investor)

© 2012 Carroll & Scribner. P.C.
131 Church Street, Burlington, VT 05401

BL-30

BL-0000030

Subscription Agreement Jay Peak Biomedical Research Park L.P. - Exhibit A

### Exhibit A
### Subscription Agreement

Dated: _____/_____/_____ (dd/mm/yyyy)

**Jay Peak Biomedical Research Park L.P.**
c/o William Stenger
4850 VT Route 242
Jay, VT, USA 05859

> Subscription Agreement
> For Purchase of a Limited Partnership Interest in
> Jay Peak Biomedical Research Park L.P.

Gentlemen:

The undersigned (or "I" or "me" or "my," as applicable), subject to the terms and conditions herein, hereby irrevocably subscribes for one limited partnership interest (the "Interest") in **Jay Peak Biomedical Research Park L.P.**, a Vermont limited partnership (the "Limited Partnership" or "Partnership"). The minimum[1] capital contribution (the "Capital Contribution") is Five Hundred Thousand Dollars (US$500,000) as required under 8 U.S.C.§ 1153 (B)(5)(A) - (D); INA § 203 (B)(5)(A) - (D) of the Immigration & Nationality Act (the "Act") to be eligible under The EB-5 Visa Program.

In addition, though not part of the undersigned investor's EB-5 investment into the Partnership, under the terms of the Offering Memorandum each investor must also pay an administration fee payable to AnC Bio Vt LLC in the amount of Fifty Thousand Dollars (US$50,000) to partially cover administration and other Offering issuance expenses incurred by the AnC Bio VT in the development, creation and structuring of the Project and preparation and distribution of the Offering Memorandum (the "Administration Fees"), for a total cost of Five Hundred Fifty Thousand Dollars (US$550,000) ("the Subscription Amount"). Upon execution by me of this Subscription Agreement, I agree to tender to the Limited Partnership the Capital Contribution, and to AnC Bio VT the Administration Fees, unless I request additional time to conduct my due diligence by making a refundable deposit of US$10,000 with People's United Bank (the "Deposit Escrow Agent") as set forth herein. All capitalized terms used herein and not otherwise defined shall have the same meanings as used in the Limited Partnership Agreement and Offering Memorandum.

An "Interest" is defined in the Limited Partnership Agreement as the partner's right, title, and interest in the Partnership, including any and all assets, distributions, losses, profits and shares of the Partnership, whether cash or otherwise, and any other interests and economic incidents of ownership whatsoever of such partner in the Partnership.

---

[1] The minimum Capital Contribution for purposes of this Limited Partnership for an investor seeking lawful permanent resident status under the so-called EB-5 program under the Immigration and Nationality Act, as amended, is $500,000. For investors not seeking the benefits of such EB-5 program, the minimum Capital Contribution may be reduced at the sole discretion of the General Partner (as defined in the Limited Partnership Agreement).

© 2012 Carroll & Scribner, P.C.
131 Church Street, Burlington, VT 05401

BL-31

BL-0000031

The undersigned agrees that the Partnership may reject this Subscription Agreement in its sole and absolute discretion within fifteen (15) days of receipt of this Subscription Agreement, if the undersigned subscriber is not an accredited investor.

I have received and read the Offering Memorandum, dated as of November 30, 2012, including the Limited Partnership Agreement and Exhibits thereto (the "Memorandum"), covering the sale of the Interests (the "Offering") and hereby acknowledge that I am not acting on the basis of any representations and warranties other than those contained in the Memorandum. I hereby acknowledge that all matters relating to the Memorandum have been explained to me to my satisfaction and approval, and that I understand the speculative nature and the risks involved in the proposed investment. I agree to be bound by all of the terms and conditions of the Offering Memorandum, the exhibits thereto, and the Limited Partnership Agreement.

I realize that (i) an investment into the Partnership is of a speculative nature and may result in a loss of my entire investment; (ii) the Interests have not been registered under the Securities Act of 1933 or the laws of any state; (iii) unless the purchaser is a resident and living in the United States, wherein Regulation D under the Act shall apply, the Interests may not be offered or sold in the United States, or to any natural person resident in the United States or to any entity formed in the United States or whose owners (directly or indirectly) are "U.S. persons" within the meaning of Regulation S issued by the Securities and Exchange Commission; (iv) the Interest is not transferable except in compliance with the restrictions on transferability indicated in the Memorandum and in the Limited Partnership Agreement and to be written on all certificates evidencing the Interest, as imposed by applicable federal and state securities laws or otherwise and, accordingly, an investment in the Partnership lacks liquidity; (v) this is not a "tax shelter" investment and the nature and tax consequences to me of an investment in the Partnership may depend upon my circumstances; and (vi) no federal or state agency has made any finding or determination as to the fairness of the Offering, or any recommendation or endorsement of the Interests.

I agree to be bound by all of the terms and provisions of the Offering Memorandum and to perform any obligations therein imposed on a purchaser with respect to an Interest purchased as a result thereof, and I acknowledge that the Limited Partnership will be relying on the agreements and information as provided by me in determining my qualifications to invest in the Partnership.

I have accumulated a net worth, individually or jointly with my spouse, of not less than $US1,000,000, not including residence, home furnishings or automobiles, or have an individual income of not less than US$200,000 per annum or a joint income with my spouse of not less than US$300,000 per annum and have a reasonable expectation of reaching the same income level in the current year.

I reaffirm the representations concerning me made in the Investor Questionnaire and the Acknowledgment of Receipt of Offering Memorandum, all of which are hereby incorporated herein by reference. I further represent and warrant as follows:

(a) I have read and am familiar with the Offering Memorandum and its Exhibits;

(b) I am:

    (i) A resident of, and living in the U.S. at the time of sale and therefore Regulation D of the Act shall apply; or

Subscription Agreement Jay Peak Biomedical Research Park L.P. - Exhibit A

(ii) Not resident in the United States at this time, nor will I be at the time of sale, and therefore Regulation S of the Act may apply;

(c) The Interest for which I hereby subscribe will be acquired solely for my account and is not being purchased for subdivision or fractionalization thereof or for the benefit of a United States person (unless that person is resident and living in the U.S) as that term is defined in Regulation S; and I have no contract, undertaking, agreement or arrangement with any person to sell, transfer or pledge to such person, or to anyone else, the Interest which I hereby subscribe to purchase or any part thereof, and I have no present plan to enter any such contract, undertaking, agreement or arrangement;

(d) The Limited Partnership has made all documents pertaining to this investment available to me and, if I so requested, to my attorney and/or accountant;

(e) I have relied solely upon the Offering Memorandum presented by the Limited Partnership, the Exhibits to the Offering Memorandum, and such independent investigations as made by me in making a decision to purchase the Interest subscribed for herein;

(f) I am investing in my own name; and I was not solicited by any form of general solicitation or general advertising, including, but not limited to the following:

(i)     any advertisement, article, notice of other communications published in any newspaper, magazine, or similar media or broadcast over television or radio in the United States; and

(ii)    any seminar or meeting whose attendees had been invited by any general solicitation or general advertising in the United States;

(g) I acknowledge an understanding of the restrictions on transferability of the Interest and realize that no transfer may occur, excepting as permitted under Article 10 of the Limited Partnership Agreement, and in any event only after registration of the Interests under the Securities Act of 1933 or pursuant to an exemption from the securities laws and regulations; and

(h) I agree that the Interest may not be sold in the absence of registration unless such sale is exempt from registration as evidenced by a written opinion of counsel of the Limited Partnership, and further that I shall be responsible for compliance with all conditions on transfer imposed by any Commissioner of Securities of any state and for any expenses incurred by the Limited Partnership for legal or accounting services in connection with reviewing any proposed transfer or issuing opinions in connection therewith.

I recognize that the offer and sale of the Interest to me was based upon my representations and warranties contained above and I hereby agree to indemnify the Limited Partnership, its General Partner, its affiliates, their managers, members, shareholders, officers and directors, and to hold each harmless from and against all liabilities, costs or expenses (including attorney's fees) arising by reason of or in connection with any misrepresentation or any breach of such warranties by me, or my failure to fulfill any of my covenants or agreements set forth herein, or arising as a result of the sale or distribution of the Interest by me in violation of the Securities Exchange Act of 1934, as amended, the Securities Act of 1933, as amended, or any other applicable law.

© 2012 Carroll & Scribner, P.C.
131 Church Street, Burlington, VT 05401

B2-33

BL-0000033

Subscription Agreement Jay Peak Biomedical Research Park L.P. - Exhibit A

This subscription and the representations and warranties contained herein shall be binding upon my heirs, legal representatives, successors and assigns.

To facilitate the expeditious administration of the business operations of the Limited Partnership, I hereby designate and appoint William Stenger, or his designee, my agent and attorney-in-fact in my name, place and stead to do any act or thing and to make, execute, swear to and acknowledge, amend, file, record, deliver and publish (a) any certificate of limited partnership, or amended certificate of limited partnership required to be filed on behalf of the Limited Partnership under the laws of the State of Vermont, or required or permitted to be filed or recorded under the statutes relating to limited partnerships under the laws of any jurisdiction in which the Limited Partnership shall engage or seek to engage in business; (b) any fictitious or assumed name certificate required or permitted to be filed by or on behalf of the Limited Partnership; (c) any other instruments necessary to conduct the operations of the Limited Partnership or which may be required or permitted by law to be filed on behalf of the Partnership; and (d) a social security number (SSN) or an individual tax identification number (ITIN) in connection with distributions to be made to me under the Limited Partnership Agreement. Provided, however, the said agent and attorney-in-fact may not take any action which under the Limited Partnership's Agreement of Limited Partnership requires or permits the holders of the Interests to vote. The existence of this power of attorney, which shall not be affected by my disability, shall not preclude execution of any such instrument by me individually on such matter. The foregoing power of attorney is coupled with an interest, shall be irrevocable and shall survive my death, bankruptcy or incapacity and the assignment by me of my Interest. Any person dealing with the Limited Partnership shall conclusively presume and rely upon the fact that any such instrument executed by such agent and attorney-in-fact is authorized, regular and binding without further inquiry. I shall execute and deliver to the Limited Partnership within five days after receipt of a request therefore by the Limited Partnership such further designations, powers of attorney and other instruments as the Limited Partnership shall reasonably deem necessary.

Upon the Partnership's acceptance of this Subscription Agreement and related exhibits, and receipt of the undersigned's full Capital Contribution, and the AnC Bio VT's receipt of the Administrative Fees, the Partnership shall notify the undersigned that it has accepted the subscription herein by delivering to the undersigned a fully signed copy of the Subscription Agreement and the undersigned shall be admitted as a Limited Partner of the Partnership, with a certificate evidencing the undersigned's Interest in the Partnership issued in the undersigned's name to the undersigned within a reasonable period of time.

Partnership Interests are available on a first-come, first-serve basis. Those Investors who need additional time to complete their due diligence may make a refundable deposit of US$10,000 for up to thirty (30) days. As set forth in the Memorandum, after reserving an interest in the Limited Partnership by making an escrow deposit of $10,000 with the Escrow Agent subject to the terms of an Investor Escrow Agreement, each Limited Partner shall have thirty (30) days to conduct his due diligence, and an additional forty-five days thereafter to complete his investment into the Project by paying the rest of the Subscription Amount, which time periods may be extended by the General Partner at its sole discretion.

If applicable to my investment in the Partnership, with respect to my qualifications as an "alien entrepreneur" for purposes of the EB-5 program under the Immigration and Nationality Act, as amended (the "EB-5 Program"), I represent, acknowledge and warrant as follows:

(a) I, the undersigned, have attained the age of 18 years and have the legal capacity and competence to execute all necessary documents in connection with this Offering and to take all actions required pursuant to those documents;

© 2012 Carroll & Scribner, P.C.
131 Church Street, Burlington. VT 05401

BL-34.

BL-0000034

(b) I shall hire independent counsel for immigration processing and other legal matters. The undersigned shall be responsible for payment of my own legal fees and costs;

(c) I understand that Jay Peak Biomedical Research Park L.P. and the General Partner shall use their reasonable best efforts to assist my immigration counsel with the filing of my I-526 petition.

(d) I understand that Jay Peak Biomedical Research Park L.P. and the General Partner shall use their reasonable best efforts to assist my immigration counsel with the filing of my I-829 petition under the EB-5 Program, and hereby authorize and will reimburse the General Partner to engage with, delegate to, and reasonably compensate qualified persons in the assemblage and preparation of documents, reports and required verification of requisite job creation in connection with and in support of my I-829 Petition to remove conditions to obtaining permanent residency;

(e) I understand that upon subscribing to this Offering and becoming a limited partner, it is at the sole responsibility and risk of the undersigned to file my I-526 and I-829 petitions and move for adjustment of status or consular processing to obtain a visa. There is no refund of my Subscription Amount for failure to file my I-526 or I-829 petitions;

(f) I understand that in the event my I-526 petition is denied at any time, my rights are limited solely to the return of my $500,000 Capital Contribution (but not the $50,000 Administration Fees) within ninety (90) days of written request therefore to the General Partner, unless said denial is based on fraud or material misrepresentation of the undersigned, in which event no refund shall be due. The returned $500,000 Capital Contribution is separate from any previously paid or currently due Partnership distribution of profits. I understand there is no right to a refund of any of my Subscription Amount in the event my I-829 petition is denied;

(g) I understand that the regional center pilot program, created in support of the EB-5 Program and further described in the Memorandum (the "Pilot Program"), has lapsed in the past, only to be reauthorized retroactively so that no investor rights were prejudiced by a lapse in the program. The same scenario may occur should the current Pilot Program lapse, but this result cannot be assured. If the Pilot Program lapses, and my I-526 petition is filed with USCIS but is not yet adjudicated on or before the date of lapse, my $500,000 Capital Contribution shall remain invested in the Partnership provided:

1. the Pilot Program is reauthorized retroactively or is pending reauthorization within a twelve (12) month period following its lapse, and my I-526 Petition is in due course adjudicated; or
2. legislation is enacted or pending providing substantially similar immigration benefits to foreign investors like me as under the lapsed Pilot Program and the EB-5 Program within a twelve (12) month period following the Pilot Program's lapse, and my petition for substantially similar benefits is in due course adjudicated.

If neither of the events described under 1 and 2 above occur, or are pending as stated, at my option I may either remain invested in the Partnership, or request in writing a refund of my Capital Contribution of $500,000. Upon receipt of a request of refund to the General Partner, the Capital Contribution will be refunded by the Limited Partnership within a period of ninety (90) days from receipt of such request, and my Interest in the Limited Partnership shall automatically be terminated and I shall no longer have any of the rights and benefits of ownership of an Interest or any right to participate in any manner whatsoever in the

BL-0000035

Subscription Agreement Jay Peak Biomedical Research Park L.P. - Exhibit A

affairs of the Partnership. I acknowledge that my rights in this regard are limited solely to the return of my Capital Contribution of $500,000.

(h) If I do not have a social security number (SSN) or an individual tax identification number (ITIN) at the time of the investment, I must apply for and provide one in a timely manner after the investment and prior to any distributions to me as described in the Limited Partnership Agreement.

## INTENTIONALLY LEFT BLANK

© 2012 Carroll & Scribner, P.C.
131 Church Street, Burlington, VT 05401

BL-36
BL-0000036

Subscription Agreement Jay Peak Biomedical Research Park L.P. - Exhibit A

## Consent to Limited Partnership Agreement

The undersigned hereby consents (the "Consent") to the terms and conditions of the Limited Partnership Agreement (the "Agreement") of **Jay Peak Biomedical Research Park L.P.** (the "Partnership") in connection with the undersigned's subscription for a limited partnership interest in the Partnership (an "Interest"), comprised of the Capital Contribution of US$500,000 payable to the Partnership, plus the Administration Fees of US$50,000 payable to AnC Bio Vt LLC in consideration of and to partially reimburse it for incurring all costs to develop, create and structure the Project and to prepare and distribute the Offering Memorandum, for a total cost of US$550,000, and agrees that this Consent shall constitute the equivalent of signing the Agreement.

The undersigned also confirms and attests that I have received and reviewed, and understand and am fully satisfied with, all of the information and documentation I consider necessary or appropriate in deciding whether to purchase an Interest in the Partnership, including but not limited to the Offering Memorandum dated as of November 30, 2012, all exhibits thereto (including the Agreement) and all financial information disclosed therein or under the Agreement; have had the opportunity to ask questions and receive answers from the General Partner (as defined in the Agreement) and the Partnership regarding the terms and conditions of the purchase of an Interest in the Partnership, and regarding the business, properties, prospects, risk factors and financial condition of the Partnership and AnC Bio VT; and have had the opportunity to review the books and records of the Partnership and to obtain additional information (to the extent the Partnership possessed such information or could acquire it without unreasonable effort or expense) necessary to verify the accuracy of any information furnished to me or to which I have had access.

**The undersigned acknowledges the receipt of a true and correct copy of the Offering Memorandum including the Limited Partnership Agreement and agrees to be bound by its terms. My Capital Contribution shall be used to further the business purposes of the Partnership as set forth in the Limited Partnership Agreement.**

**I have the right to withdraw from this subscription within 72 hours after executing this Subscription Agreement.**

Individual Investor

Name _____

Signature _____ Date _____

Address _____

_____

Email Address: _____

Country of Residence _____

Place of Birth _____

8 of 9
© 2012 Carroll & Scribner, P.C.
131 Church Street, Burlington, VT 05401

BL-0000037

Subscription Agreement Jay Peak Biomedical Research Park L.P. - Exhibit A

**ACCEPTANCE:**

On this _____ day of _____, 201_, Jay Peak Biomedical Research Park L.P. (the "Limited Partnership") hereby accepts the subscription of _____ for one Interest, on the terms set forth herein.

Jay Peak Biomedical Research Park L.P.
BY: AnC Bio Vermont GP Services, LLC, the General Partner

BY:        _____
                William Stenger, Member
                And duly authorized agent

## ACCEPTANCE OF AGENT UNDER POWER OF ATTORNEY

William Stenger acknowledges that the foregoing Subscription Agreement contains a power of attorney from the specific Investor, and he accepts his appointment as the Investor's true and lawful agent and attorney-in-fact. William Stenger understands his duties under the Subscription Agreement and Vermont law regarding powers of attorney as defined in 14 V.S.A. Section 3503(e).

_____
William Stenger

## Witness Affirmation

The undersigned witness to the signature of William Stenger affirms that he appeared to be of sound mind and free from duress at the time the power of attorney contained in the foregoing instrument was signed, and that he affirmed that he was aware of the nature of the foregoing document and the power of attorney contained therein and signed it freely and voluntarily.

_____
Witness

© 2012 Carroll & Scribner, P.C.
131 Church Street, Burlington, VT 05401

BL-38

BL-0000038

Purchaser Investor Questionnaire Jay Peak Biomedical Research Park L.P. - Exhibit B

## Exhibit B

# PURCHASER INVESTOR QUESTIONNAIRE

THE FOLLOWING INVESTOR QUESTIONNAIRE IS ESSENTIAL TO ENSURE THAT THIS OFFERING IS CONDUCTED IN FULL COMPLIANCE WITH REGULATION D OR REGULATION S OF THE SECURITIES ACT OF 1933, AS AMENDED. THE QUESTIONNAIRE WILL REMAIN ON FILE IN CONFIDENCE IN THE OFFICES OF JAY PEAK BIOMEDICAL RESEARCH PARK L.P. (THE "LIMITED PARTNERSHIP") FOR A PERIOD OF 4 YEARS.

YOUR COOPERATION IN THE FULL COMPLETION OF THE INVESTOR QUESTIONNAIRE IS GREATLY APPRECIATED.

JAY PEAK BIOMEDICAL RESEARCH PARK L.P.

_____

_____

_____

Name and Address of Prospective Investor

Gentlemen:

I understand that the limited partnership interest (the "Interest") offered for sale to me by **Jay Peak Biomedical Research Park L.P.** (the "Limited Partnership") will not be registered under the Securities Act of 1933, as amended (the "Act") or any applicable state securities laws (the "State Acts"). I also understand that in order to ensure that the offering and sale of the Interests (the "Offering") are exempt from registration under the Act and the State Acts, the Limited Partnership is required to have reasonable grounds to believe, and must actually believe, after making reasonable inquiry and prior to making any sale:

- that purchasers not resident in the United States at the time of the offer and purchase are purchasing for their own account and not for the benefit of a United States person, as that term is defined in Regulation S; or
- that the purchaser is resident and is living in the United States, in which event Regulation D under the Act shall apply.

In order to induce the Limited Partnership to permit me to purchase an Interest, I hereby warrant and represent to the Limited Partnership as follows:

**NOTE: The information provided herein will be relied upon in connection with the determination as to whether you meet the standards imposed by Regulation D or Regulation S promulgated under the Act, since the interests offered hereby have not been and will not be registered under the Act and are being sold in reliance upon the exemption provided by Regulation S or Regulation D as applicable to the investor. All information supplied will be treated in confidence, except that this Questionnaire may be presented to such parties as deemed appropriate or necessary to establish that the sale of an interest to you will not result in violation of the exemption from registration under the Act which is being relied upon in connection with the sale of the interest.**

INSTRUCTIONS: Please answer each question fully and attach additional information, if necessary. If the answer to any question is "None" or "Not Applicable" please so state. Please sign and date the Questionnaire on the final page.

© 2012 Carroll & Scribner, P.C.
131 Church Street, Burlington, VT 05401

**1.**

Name: _____

Date of Birth: _____ **(mm/dd/yyyy)**

Employer Name: _____

Business Address: _____

Business Telephone Number: _____

Residence Address: _____

**2.**

**(a)** Education: _____

_____

_____

Other specialized Education or Instruction:

_____

_____

**(b)** All Professional Memberships or Licenses:

_____

_____

**3.** Occupation

Present occupation (with date of commencement):

_____

_____

Occupations during last five years (with dates):

_____

© 2012 Carroll & Scribner, P.C.
131 Church Street, Burlington, VT 05401

_____

4. My net worth (excluding home, home furnishings and automobiles) is at least $US_____. My proposed investment will ☐ will not ☐ exceed ten percent of my net worth.

5. My income ☐ has ☐ has not exceeded $US200,000 in each of the two most recent years, and I ☐ have ☐ do not have a reasonable expectation of reaching the same income level in the current year.

   My joint income with my spouse ☐ has ☐ has not exceeded $US300,000 in each of the two most recent years, and I ☐ have ☐ do not have a reasonable expectation of reaching the same income level in the current year.

6. I do not have any other investments or contingent liabilities which I reasonably anticipate could cause the need for sudden cash requirements in excess of cash readily available to me.

   ☐ Yes        ☐ No

7. I have checked my investment objectives where applicable:

   ☐ Income        ☐ Appreciation        ☐ Other

8. I can bear the risk of the proposed investment, including the loss of my entire investment, a lack of liquidity in the investment or an inability to sell the investment for an indefinite period of time.

   ☐ Yes        ☐ No

9. I learned about this investment in the following manner (check each applicable line).

   ☐ Personal contact or acquaintance
   ☐ Investment adviser or counselor
   ☐ Prior investment or Association with the Limited Partnership
   ☐ Broker-dealer

   © 2012 Carroll & Scribner, P.C.
   131 Church Street, Burlington, VT 05401

BL-0000041

☐ Affiliation with business or management

☐ Immigration Research

☐ Other (please state):

**10.** I have received a copy of the Offering Memorandum, dated as of November 30, 2012, and all Exhibits thereto (the "Memorandum") setting forth information relating to the Limited Partnership and the terms and conditions of a purchase of an Interest, as well as any other information I deemed necessary or appropriate to evaluate the merits and risks of an investment in the Interest. I further acknowledge that I have had the opportunity to ask questions of, and to receive answers from, representatives of the Limited Partnership concerning the terms and conditions of the Offering and the information contained in the Memorandum.

☐ Yes      ☐ No

Name and position of person talked to (if applicable): _____

I acknowledge that the individual(s) to whom I have spoken did only clarify the information contained in the Memorandum and that I am continuing to rely solely upon the information, representations and disclosures contained in the Memorandum.

**11.** If I am an EB-5 investor, with respect to my qualifications as an "alien entrepreneur" for purposes of the Regulations to the Immigration and Nationality Act, as amended, I represent and warrant that:

**(a)** I have attained the age of 18 years and have the legal capacity and competence to execute all necessary documents in connection with this Offering;

**(b)** I have complied and will continue to comply with all the requirements, terms and conditions prescribed by U.S Citizen and Immigration Services and the U.S. Department of State in connection with my forthcoming petition as an EB-5 fifth employment-based visa preference "alien entrepreneur" and subsequent applications for lawful permanent residence;

**(c)** I have accumulated a net worth of not less than $US1,000,000, not including residence, home furnishings or automobiles; or an individual income in excess of $200,000 each of the two most recent years; or a joint income with my spouse in excess of $300,000 in each of the two most recent years and reasonably expect to reach the same income level in the current year;

**(d)** I am in good health and know of no health impairment which would likely result in exclusion under the Immigration and Nationality Act, as amended; and

© 2012 Carroll & Scribner, P.C.
131 Church Street, Burlington, VT 05401

(e) I have never been convicted of any criminal offense or engaged in any acts which constitute crimes of which I have not been convicted and I do not know of any facts which would result in my failure to meet the requirements of an "alien entrepreneur" or to be admitted to the United States as a lawful permanent resident.

12. I was not solicited by any general form of advertisement for this investment.

13. I am aware that there are limitations on my ability to sell the Interest and that the certificate evidencing the Interest will carry a restrictive legend.

14. I am purchasing the Interest for personal investment and without a view to redistribution.

15. I represent and warrant to the Limited Partnership and its general partner that the information contained in this Investor Questionnaire is true, complete and correct.

16. I agree to notify the Limited Partnership promptly of any change in the foregoing information which may occur prior to transfer of the Interest to me.

**Dated:** _____     **Investor Signature:** _____

© 2012 Carroll & Scribner, P.C.
131 Church Street, Burlington, VT 05401

BL-43

BL-0000043

# Investor Escrow Agreement

**THIS INVESTOR ESCROW AGREEMENT** (the "Agreement") is made by and between the undersigned (the "Investor") and

People's United Bank
2 Burlington Square
Burlington, VT  05401,

a savings bank chartered under the laws of the United States of America (the "Escrow Agent"), as of the date the Escrow Agent signs the Agreement.

*Recitals*

A. <u>Offering</u>.  Jay Peak Biomedical Research Park L.P., a Vermont limited partnership (the "Limited Partnership"), is in the process of offering to sell limited partnership interests to investors (collectively, the "Investors" and individually, an "Investor"), pursuant to an Offering Memorandum of contemporaneous date hereof (the "Offering Memorandum") and a Limited Partnership Agreement to be attached thereto as an exhibit (the "LP Agreement"), as a means to securing funds to financially assist in  the construction of a new manufacturing and research facility in Newport, Orleans County, Vermont USA that will manufacture portable dialysis machines, cell therapy machines, vaccines and other bio-medical supplies, as well as conduct cutting-edge research and development, and to do all other acts which may be necessary, incidental or conducive to the foregoing (the "Offering"). The general partner of the Limited Partnership is AnC Bio Vermont GP Services, LLC (the "General Partner"). The business of the Limited Partnership and the use of Investor monies (the "Project") will be fully explained in the LP Agreement and Offering Memorandum.  The required minimum amount of investment funds into the Offering per Investor is US$500,000 (the "Investment"), plus an additional US$50,000 in administrative fees (the "Administrative Fees) to be paid to AnC Bio Vt LLC (the "Company") to partially reimburse it for costs it has incurred in developing, creating and structuring the Project and preparing and disseminating the Offering Memorandum.

B. <u>Purpose of Agreement</u>.  The Escrow Agent has been retained by the Company to hold on deposit monies received from Investors in an account for the benefit of the Investors, the Company and the Limited Partnership, deposited to reserve a place in the Offering while Investors conduct due diligence.

*Terms and Provisions*

In consideration of the respective covenants and agreements hereinafter set forth, and other good and valuable consideration now paid by each party to the other (the sufficiency and receipt of which is hereby acknowledged), the parties hereto agree as follows:

1. <u>Acknowledgment of Escrow Agent and Ratification of its Duties</u>. As of the date of this Agreement, the Escrow Agent acknowledges receipt from the Investor of US$10,000 to reserve a place in the Offering (the "Minimum Deposit").  Any monies deposited by the Investor with the Escrow Agent in excess of the Minimum Deposit and allocated towards the Investor's Investment or

Administrative Fees, whether simultaneously hereof or subsequent to the date of this Agreement, will also be subject to this Agreement, and all funds deposited with the Escrow Agent shall be defined herein as the "Escrow Funds". The Escrow Agent agrees with the Investor to hold the Escrow Funds in an account (the "Escrow Account") and disburse the Escrow Funds as set forth herein.

2. Acknowledgements of Investor.

(a) The Investor acknowledges that the Minimum Deposit is tendered to reserve a place in the Offering and that all Escrow Funds shall be subject to this Agreement.

(b) The Investor represents that he or she is a bona fide, qualified Investor seeking to invest into the Offering, and that the Escrow Agent, the Company and the Limited Partnership are relying on this representation in accepting the Escrow Funds into Escrow and into the Offering upon release of the Escrow Funds. The Investor also acknowledges that the Limited Partnership and Company are each a third party beneficiary of this Agreement.

3. Refund of Escrow Funds to Investor.  At any time up to thirty (30) days after payment of the Minimum Deposit, or up to thirty (30) days after the Investor's receipt of the Offering, whichever is the last to occur, unless such period is extended in writing by the General Partner with a copy of such extension sent to Escrow Agent (the "Due Diligence Period"), the Investor upon written notice received by Escrow Agent prior to the expiration of such Due Diligence Period, with a copy to the General Partner, shall be entitled to a full refund of the Escrow Funds.

4. Release of Escrow Funds to Limited Partnership.

(a) After the expiration of the Due Diligence Period, unless refunded pursuant to the notice set forth in section 3 above, the Minimum Deposit is strictly non-refundable and will automatically be released by the Escrow Agent to the Limited Partnership. Thereafter, the Investor shall have an additional forty-five (45) days to complete payment of his or her Investment, if not already done, by depositing the balance owed into the Escrow Account, and paying the Administrative Fees to the Company.

(b) Notwithstanding the above, at such time that the Investor deposits the balance of the Investment into the Escrow Account, pays the Administrative Fees to the Company and the Escrow Agent receives a copy of the subscription documents executed by Investor and accepted by the Limited Partnership (the "Subscription Documents"), the Escrow Agent shall immediately release all Escrow Funds paid by the Investor to the Limited Partnership, pursuant to the executed Subscription Documents.  To the extent any of the Escrow Funds are properly allocated to Administrative Fees, the Escrow Agent shall instead release such portion to the Company.

5. Effect of Release of Escrow Funds to the Limited Partnership. The Investor confirms that upon release of the Escrow Funds to the Limited Partnership and Company pursuant to the terms of section 4 above, the Escrow Funds shall be committed by the Investor to the Offering and be available for the Project immediately and irrevocably upon such release; subject, however, to the refund provisions of the Offering Memorandum, including the LP Agreement.

6. Duties and Responsibilities of Escrow Agent.

(a) As Escrow Agent hereunder, Escrow Agent, acting in such capacity, shall have no duties or responsibilities except for those expressly set forth herein.

(b) The Limited Partnership and the Investor shall jointly and severally indemnify and hold harmless the Escrow Agent against any loss, damage or liability, including, without limitation, reasonable attorney's fees which may be incurred by the Escrow Agent in connection with this Agreement, except any such loss, damage or liability incurred by reason of the negligence or misconduct of the Escrow Agent.

(c) The Escrow Agent, acting as such, shall not be liable to anyone by reason of an error in judgment, a mistake of law or fact, or for any act done or step taken or omitted, in good faith, and this provision shall survive the termination of this Agreement.

(d) At the time the Escrow Funds are released by Escrow Agent in accordance with this Agreement, Escrow Agent shall be discharged from any obligation under this Agreement.

7. Rights of Escrow Agent Upon Dispute.

(a) In the event of any disagreement between the Escrow Agent and the Investor or between them and any other person, resulting in adverse claims or demands being made in connection with the Escrow Funds, or in the event that the Escrow Agent, in good faith, shall be in doubt as to what action it should take hereunder, the Escrow Agent may, at its option, refuse to comply with any claims or demands on it or refuse to take any other action hereunder, so long as such disagreement continues or doubt exists, and in any such event, the Escrow Agent shall not be or become liable in any way or to any person for its failure or refusal to act, and the Escrow Agent shall be entitled to continue so to refrain from acting until (i) the rights of the Escrow Agent and the Investor shall have been fully and finally adjudicated by a court of competent jurisdiction, or (ii) all differences shall have been adjusted and all doubt resolved by agreement between the Escrow Agent and the Investor, and the Escrow Agent shall have been notified thereof in writing.

(b) In the event Escrow Agent becomes involved in litigation in connection with this Agreement, the Investor and Limited Partnership agree to jointly and severally indemnify and hold the Escrow Agent harmless from all losses, costs, damages, expenses, liabilities, judgments and reasonable attorney's fees suffered or incurred by Escrow Agent as a result thereof, except that this indemnity obligation shall not apply to any litigation in which relief is sought for the negligence or misconduct of the Escrow Agent.

(c) The Escrow Agent may consult with independent legal counsel in the event of any dispute or questions as to the construction of any of the provisions hereof or its duties hereunder and it shall incur no liability and shall be fully protected in acting in accordance with the opinion and instructions of counsel. The Escrow Agent shall have the right to file legal proceedings, including interpleader, to determine the proper dispositions of assets hereunder, all costs thereof constituting an expense of administration of this Agreement.

BL-46

BL-0000046

8. <u>Notices</u>. All notices, instructions and other communications required or permitted to be given hereunder or necessary or convenient in connection herewith shall be in writing and shall be deemed to have been duly given if delivered personally, by facsimile or mailed, postage prepaid, registered or certified mail, as follows:

(a)    If to the Investor:

_____
_____
_____

(b)    If to Escrow Agent:

People's United Bank
2 Burlington Square
Burlington, VT  05401  Attn: Institutional Trust

With a copy of each to:

Jay Peak Biomedical Research Park L.P.
c/o William Stenger
4850 VT Route 242
Jay, VT 05859

Any notice delivered or telexed as aforesaid shall be deemed to have been received by the party or parties to whom it is sent on the date of its being so delivered or telexed.  Any notice mailed as aforesaid shall be deemed to have been received by the party or parties hereto to whom it is so mailed five business days after the date of its being so mailed.

9. <u>Generally</u>. (a) This Agreement shall be governed by and construed and in accordance with the laws of the State of Vermont, United States of America.

(b) The section headings are for reference purposes and shall not affect the meaning or interpretation of this Agreement.

(c) This Agreement shall be binding upon, and inure to the benefit of and be enforceable by the parties hereto and their respective successors and assigns.

(d) The terms and provisions of this Agreement may only be amended, modified, waived, superseded or canceled by written instrument executed by both of the parties hereto or, in the case of a waiver, by the party or parties waiving compliance.  Notwithstanding the foregoing, no term which affects the Investor's rights or responsibilities may be amended, modified, superseded or canceled without the prior express written consent of the Investor.

BL-47

BL-0000047

Subscription Agreement.

BL-0000047A

Subscription Agreement Jay Peak Biomedical Research Park L.P. - Exhibit A

## Exhibit A

## Subscription Agreement

Dated: _____ / _____ / _____ (dd/mm/yyyy)

**Jay Peak Biomedical Research Park L.P.**
c/o William Stenger
4850 VT Route 242
Jay, VT, USA 05859

>   Subscription Agreement
>   For Purchase of a Limited Partnership Interest in
>   Jay Peak Biomedical Research Park L.P.

Gentlemen:

The undersigned (or "I" or "me" or "my," as applicable), subject to the terms and conditions herein, hereby irrevocably subscribes for one limited partnership interest (the "Interest") in **Jay Peak Biomedical Research Park L.P.**, a Vermont limited partnership (the "Limited Partnership" or "Partnership"). The minimum[1] capital contribution (the "Capital Contribution") is Five Hundred Thousand Dollars (US$500,000) as required under 8 U.S.C.§ 1153 (B)(5)(A) - (D); INA § 203 (B)(5)(A) - (D) of the Immigration & Nationality Act (the "Act") to be eligible under The EB-5 Visa Program.

In addition, though not part of the undersigned investor's EB-5 investment into the Partnership, under the terms of the Offering Memorandum each investor must also pay an administration fee payable to AnC Bio Vt LLC in the amount of Fifty Thousand Dollars (US$50,000) to partially cover administration and other Offering issuance expenses incurred by the Development Company in the development, creation and structuring of the Project and preparation and distribution of the Offering Memorandum (the "Administration Fees"), for a total cost of Five Hundred Fifty Thousand Dollars (US$550,000) ("the Subscription Amount"). Upon execution by me of this Subscription Agreement, I agree to tender to the Limited Partnership the Capital Contribution, and to the Development Company the Administration Fees, unless I request additional time to conduct my due diligence by making a refundable deposit of US$10,000 with People's United Bank (the "Deposit Escrow Agent") as set forth herein. All capitalized terms used herein and not otherwise defined shall have the same meanings as used in the Limited Partnership Agreement and Offering Memorandum.

An "Interest" is defined in the Limited Partnership Agreement as the partner's right, title, and interest in the Partnership, including any and all assets, distributions, losses, profits and shares of the Partnership, whether

---

[1] The minimum Capital Contribution for purposes of this Limited Partnership for an investor seeking lawful permanent resident status under the so-called EB-5 program under the Immigration and Nationality Act, as amended, is $500,000. For investors not seeking the benefits of such EB-5 program, the minimum Capital Contribution may be reduced at the sole discretion of the General Partner (as defined in the Limited Partnership Agreement).

© 2012 Carroll & Scribner, P.C.
131 Church Street, Burlington, VT 05401

BL-4B

BL-0000048

cash or otherwise, and any other interests and economic incidents of ownership whatsoever of such partner in the Partnership.

The undersigned agrees that the Partnership may reject this Subscription Agreement in its sole and absolute discretion within fifteen (15) days of receipt of this Subscription Agreement, if the undersigned subscriber is not an accredited investor.

I have received and read the Offering Memorandum, dated as of November 30, 2012, including the Limited Partnership Agreement and Exhibits thereto (the "Memorandum"), covering the sale of the Interests (the "Offering") and hereby acknowledge that I am not acting on the basis of any representations and warranties other than those contained in the Memorandum. I hereby acknowledge that all matters relating to the Memorandum have been explained to me to my satisfaction and approval, and that I understand the speculative nature and the risks involved in the proposed investment. I agree to be bound by all of the terms and conditions of the Offering Memorandum, the exhibits thereto, and the Limited Partnership Agreement.

I realize that (i) an investment into the Partnership is of a speculative nature and may result in a loss of my entire investment; (ii) the Interests have not been registered under the Securities Act of 1933 or the laws of any state; (iii) unless the purchaser is a resident and living in the United States, wherein Regulation D under the Act shall apply, the Interests may not be offered or sold in the United States, or to any natural person resident in the United States or to any entity formed in the United States or whose owners (directly or indirectly) are "U.S. persons" within the meaning of Regulation S issued by the Securities and Exchange Commission; (iv) the Interest is not transferable except in compliance with the restrictions on transferability indicated in the Memorandum and in the Limited Partnership Agreement and to be written on all certificates evidencing the Interest, as imposed by applicable federal and state securities laws or otherwise and, accordingly, an investment in the Partnership lacks liquidity; (v) this is not a "tax shelter" investment and the nature and tax consequences to me of an investment in the Partnership may depend upon my circumstances; and (vi) no federal or state agency has made any finding or determination as to the fairness of the Offering, or any recommendation or endorsement of the Interests.

I agree to be bound by all of the terms and provisions of the Offering Memorandum and to perform any obligations therein imposed on a purchaser with respect to an Interest purchased as a result thereof, and I acknowledge that the Limited Partnership will be relying on the agreements and information as provided by me in determining my qualifications to invest in the Partnership.

I have accumulated a net worth, individually or jointly with my spouse, of not less than $US1,000,000, not including residence, home furnishings or automobiles, or have an individual income of not less than US$200,000 per annum or a joint income with my spouse of not less than US$300,000 per annum and have a reasonable expectation of reaching the same income level in the current year.

I reaffirm the representations concerning me made in the Investor Questionnaire and the Acknowledgment of Receipt of Offering Memorandum, all of which are hereby incorporated herein by reference. I further represent and warrant as follows:

(a) I have read and am familiar with the Offering Memorandum and its Exhibits;

(b) I am:

© 2012 Carroll & Scribner, P.C.
131 Church Street, Burlington, VT 05401

BL-49.

BL-0000049

Subscription Agreement Jay Peak Biomedical Research Park L.P. - Exhibit A

(i) A resident of, and living in the U.S. at the time of sale and therefore Regulation D of the Act shall apply; or

(ii) Not resident in the United States at this time, nor will I be at the time of sale, and therefore Regulation S of the Act may apply;

(c) The Interest for which I hereby subscribe will be acquired solely for my account and is not being purchased for subdivision or fractionalization thereof or for the benefit of a United States person (unless that person is resident and living in the U.S) as that term is defined in Regulation S; and I have no contract, undertaking, agreement or arrangement with any person to sell, transfer or pledge to such person, or to anyone else, the Interest which I hereby subscribe to purchase or any part thereof, and I have no present plan to enter any such contract, undertaking, agreement or arrangement;

(d) The Limited Partnership has made all documents pertaining to this investment available to me and, if I so requested, to my attorney and/or accountant;

(e) I have relied solely upon the Offering Memorandum presented by the Limited Partnership, the Exhibits to the Offering Memorandum, and such independent investigations as made by me in making a decision to purchase the Interest subscribed for herein;

(f) I am investing in my own name; and I was not solicited by any form of general solicitation or general advertising, including, but not limited to the following:

(i) any advertisement, article, notice of other communications published in any newspaper, magazine, or similar media or broadcast over television or radio in the United States; and

(ii) any seminar or meeting whose attendees had been invited by any general solicitation or general advertising in the United States;

(g) I acknowledge an understanding of the restrictions on transferability of the Interest and realize that no transfer may occur, excepting as permitted under Article 10 of the Limited Partnership Agreement, and in any event only after registration of the Interests under the Securities Act of 1933 or pursuant to an exemption from the securities laws and regulations; and

(h) I agree that the Interest may not be sold in the absence of registration unless such sale is exempt from registration as evidenced by a written opinion of counsel of the Limited Partnership, and further that I shall be responsible for compliance with all conditions on transfer imposed by any Commissioner of Securities of any state and for any expenses incurred by the Limited Partnership for legal or accounting services in connection with reviewing any proposed transfer or issuing opinions in connection therewith.

I recognize that the offer and sale of the Interest to me was based upon my representations and warranties contained above and I hereby agree to indemnify the Limited Partnership, its General Partner, its affiliates, their managers, members, shareholders, officers and directors, and to hold each harmless from and against all liabilities, costs or expenses (including attorney's fees) arising by reason of or in connection with any misrepresentation or any breach of such warranties by me, or my failure to fulfill any of my covenants or agreements set forth herein, or arising as a result of the sale or distribution of the Interest by me in violation

BL-50

BL-0000050

Subscription Agreement Jay Peak Biomedical Research Park L.P. - Exhibit A

of the Securities Exchange Act of 1934, as amended, the Securities Act of 1933, as amended, or any other applicable law.

This subscription and the representations and warranties contained herein shall be binding upon my heirs, legal representatives, successors and assigns.

To facilitate the expeditious administration of the business operations of the Limited Partnership, I hereby designate and appoint William Stenger, or his designee, my agent and attorney-in-fact in my name, place and stead to do any act or thing and to make, execute, swear to and acknowledge, amend, file, record, deliver and publish (a) any certificate of limited partnership, or amended certificate of limited partnership required to be filed on behalf of the Limited Partnership under the laws of the State of Vermont, or required or permitted to be filed or recorded under the statutes relating to limited partnerships under the laws of any jurisdiction in which the Limited Partnership  shall engage or seek to engage in business; (b) any fictitious or assumed name certificate required or permitted to be filed by or on behalf of the Limited Partnership; (c) any other instruments necessary to conduct the operations of the Limited Partnership or which may be required or permitted by law to be filed on behalf of the Partnership; and (d) a social security number (SSN) or an individual tax identification number (ITIN) in connection with distributions to be made to me under the Limited Partnership Agreement.  Provided, however, the said agent and attorney-in-fact may not take any action which under the Limited Partnership's Agreement of Limited Partnership requires or permits the holders of the Interests to vote.  The existence of this power of attorney, which shall not be affected by my disability, shall not preclude execution of any such instrument by me individually on such matter.  The foregoing power of attorney is coupled with an interest, shall be irrevocable and shall survive my death, bankruptcy or incapacity and the assignment by me of my Interest.  Any person dealing with the Limited Partnership shall conclusively presume and rely upon the fact that any such instrument executed by such agent and attorney-in-fact is authorized, regular and binding without further inquiry.  I shall execute and deliver to the Limited Partnership within five days after receipt of a request therefore by the Limited Partnership such further designations, powers of attorney and other instruments as the Limited Partnership shall reasonably deem necessary.

Upon the Partnership's acceptance of this Subscription Agreement and related exhibits, and receipt of the undersigned's full Capital Contribution, and the Development Company's receipt of the Administrative Fees, the Partnership shall notify the undersigned that it has accepted the subscription herein by delivering to the undersigned a fully signed copy of the Subscription Agreement and the undersigned shall be admitted as a Limited Partner of the Partnership, with a certificate evidencing the undersigned's Interest in the Partnership issued in the undersigned's name to the undersigned within a reasonable period of time.

Partnership Interests are available on a first-come, first-serve basis. Those Investors who need additional time to complete their due diligence may make a refundable deposit of US$10,000 for up to thirty (30) days. As set forth in the Memorandum, after reserving an interest in the Limited Partnership by making an escrow deposit of $10,000 with the Escrow Agent subject to the terms of an Investor Escrow Agreement, each Limited Partner shall have thirty (30) days to conduct his due diligence, and an additional forty-five days thereafter to complete his investment into the Project by paying the rest of the Subscription Amount, which time periods may be extended by the General Partner at its sole discretion.

If applicable to my investment in the Partnership, with respect to my qualifications as an "alien entrepreneur" for purposes of the EB-5 program under the Immigration and Nationality Act, as amended (the "EB-5 Program"), I represent, acknowledge and warrant as follows:

© 2012 Carroll & Scribner, P.C.
131 Church Street, Burlington, VT 05401

R2_51

BL-0000051

Subscription Agreement Jay Peak Biomedical Research Park L.P. - Exhibit A

(a) I, the undersigned, have attained the age of 18 years and have the legal capacity and competence to execute all necessary documents in connection with this Offering and to take all actions required pursuant to those documents;

(b) I shall hire independent counsel for immigration processing and other legal matters. The undersigned shall be responsible for payment of my own legal fees and costs;

(c) I understand that Jay Peak Biomedical Research Park L.P. and the General Partner shall use their reasonable best efforts to assist my immigration counsel with the filing of my I-526 petition.

(d) I understand that Jay Peak Biomedical Research Park L.P. and the General Partner shall use their reasonable best efforts to assist my immigration counsel with the filing of my I-829 petition under the EB-5 Program, and hereby authorize and will reimburse the General Partner to engage with, delegate to, and reasonably compensate qualified persons in the assemblage and preparation of documents, reports and required verification of requisite job creation in connection with and in support of my I-829 Petition to remove conditions to obtaining permanent residency;

(e) I understand that upon subscribing to this Offering and becoming a limited partner, it is at the sole responsibility and risk of the undersigned to file my I-526 and I-829 petitions and move for adjustment of status or consular processing to obtain a visa. There is no refund of my Subscription Amount for failure to file my I-526 or I-829 petitions;

(f) I understand that in the event my I-526 petition is denied at any time, my rights are limited solely to the return of my $500,000 Capital Contribution (but not the $50,000 Administration Fees) within ninety (90) days of written request therefore to the General Partner, unless said denial is based on fraud or material misrepresentation of the undersigned, in which event no refund shall be due. The returned $500,000 Capital Contribution is separate from any previously paid or currently due Partnership distribution of profits. I understand there is no right to a refund of any of my Subscription Amount in the event my I-829 petition is denied;

(g) I understand that the regional center pilot program, created in support of the EB-5 Program and further described in the Memorandum (the "Pilot Program"), has lapsed in the past, only to be reauthorized retroactively so that no investor rights were prejudiced by a lapse in the program. The same scenario may occur should the current Pilot Program lapse, but this result cannot be assured. If the Pilot Program lapses, and my I-526 petition is filed with USCIS but is not yet adjudicated on or before the date of lapse, my $500,000 Capital Contribution shall remain invested in the Partnership provided:

1. the Pilot Program is reauthorized retroactively or is pending reauthorization within a twelve (12) month period following its lapse, and my I-526 Petition is in due course adjudicated; or
2. legislation is enacted or pending providing substantially similar immigration benefits to foreign investors like me as under the lapsed Pilot Program and the EB-5 Program within a twelve (12) month period following the Pilot Program's lapse, and my petition for substantially similar benefits is in due course adjudicated.

If neither of the events described under 1 and 2 above occur, or are pending as stated, at my option I may either remain invested in the Partnership, or request in writing a refund of my Capital Contribution of $500,000. Upon receipt of a request of refund to the General Partner, the Capital Contribution will be

BL-0000052

Subscription Agreement Jay Peak Biomedical Research Park L.P. - Exhibit A

refunded by the Limited Partnership within a period of ninety (90) days from receipt of such request, and my Interest in the Limited Partnership shall automatically be terminated and I shall no longer have any of the rights and benefits of ownership of an Interest or any right to participate in any manner whatsoever in the affairs of the Partnership. I acknowledge that my rights in this regard are limited solely to the return of my Capital Contribution of $500,000.

(h) If I do not have a social security number (SSN) or an individual tax identification number (ITIN) at the time of the investment, I must apply for and provide one in a timely manner after the investment and prior to any distributions to me as described in the Limited Partnership Agreement.

<strong>INTENTIONALLY LEFT BLANK</strong>

© 2012 Carroll & Scribner, P.C.
131 Church Street, Burlington, VT 05401

BL -53

BL-0000053

Subscription Agreement Jay Peak Biomedical Research Park L.P. - Exhibit A

## Consent to Limited Partnership Agreement

The undersigned hereby consents (the "Consent") to the terms and conditions of the Limited Partnership Agreement (the "Agreement") of **Jay Peak Biomedical Research Park L.P.** (the "Partnership") in connection with the undersigned's subscription for a limited partnership interest in the Partnership (an "Interest"), comprised of the  Capital Contribution of US$500,000 payable to the Partnership, plus the Administration Fees of US$50,000 payable to AnC Bio Vt LLC in consideration of and to partially reimburse it for incurring all costs to develop, create and structure the Project and to prepare and distribute the Offering Memorandum, for a total cost of US$550,000, and agrees that this Consent shall constitute the equivalent of signing the Agreement.

The undersigned also confirms and attests that I have received and reviewed, and understand and am fully satisfied with, all of the information and documentation I consider necessary or appropriate in deciding whether to purchase an Interest in the Partnership, including but not limited to the Offering Memorandum dated as of November 30, 2012, all exhibits thereto (including the Agreement) and all financial information disclosed therein or under the Agreement; have had the opportunity to ask questions and receive answers from the General Partner (as defined in the Agreement) and the Partnership regarding the terms and conditions of the purchase of an Interest in the Partnership, and regarding the business, properties, prospects, risk factors and financial condition of the Partnership and Development Company; and have had the opportunity to review the books and records of the Partnership and to obtain additional information (to the extent the Partnership possessed such information or could acquire it without unreasonable effort or expense) necessary to verify the accuracy of any information furnished to me or to which I have had access.

**The undersigned acknowledges the receipt of a true and correct copy of the Offering Memorandum including the Limited Partnership Agreement and agrees to be bound by its terms. My Capital Contribution shall be used to further the business purposes of the Partnership as set forth in the Limited Partnership Agreement.**

**I have the right to withdraw from this subscription within 72 hours after executing this Subscription Agreement.**

Individual Investor

| | |
|---|---|
| Name | Bernard Ledezma |
| Signature | _(signature)_   Date   12/19/2013 |
| Address | 11808 Waterstone Loop Drive |
| | Winter Garden, Florida 34786 |
| Country of Residence | United States |
| Place of Birth | Venezuela |
| Email Address | mary@maryvisa.com   Telephone (407) 545-4747 |

8 of 9
© 2012 Carroll & Scribner, P.C.
131 Church Street, Burlington, VT 05401

Subscription Agreement Jay Peak Biomedical Research Park L.P. - Exhibit A

**ACCEPTANCE:**

On this _____ day of _____, 201_, Jay Peak Biomedical Research Park L.P. (the "Limited Partnership") hereby accepts the subscription of _____ for one Interest, on the terms set forth herein.

Jay Peak Biomedical Research Park L.P.
BY: AnC Bio Vermont GP Services, LLC, the General Partner

BY: _____

   William Stenger, Member
   And duly authorized agent

## ACCEPTANCE OF AGENT UNDER POWER OF ATTORNEY

   William Stenger acknowledges that the foregoing Subscription Agreement contains a power of attorney from the specific Investor, and he accepts his appointment as the Investor's true and lawful agent and attorney-in-fact. William Stenger understands his duties under the Subscription Agreement and Vermont law regarding powers of attorney as defined in 14 V.S.A. Section 3503(e).

_____
William Stenger

## Witness Affirmation

   The undersigned witness to the signature of William Stenger affirms that he appeared to be of sound mind and free from duress at the time the power of attorney contained in the foregoing instrument was signed, and that he affirmed that he was aware of the nature of the foregoing document and the power of attorney contained therein and signed it freely and voluntarily.

_____
Witness

9 of 9
© 2012 Carroll & Scribner, P.C.
131 Church Street, Burlington, VT 05401

BL-SS

The limited Partnership Agreement.

BL-0000055A





## Section 3

# The Limited Partnership Agreement

BL_56.

BL-0000056

{This Page was intentionally left blank}

$BL\_57$

BL-0000057

## LIMITED PARTNERSHIP AGREEMENT OF
## JAY PEAK BIOMEDICAL RESEARCH PARK L.P.
## A VERMONT LIMITED PARTNERSHIP

The parties to this Agreement of Limited Partnership of **JAY PEAK BIOMEDICAL RESEARCH PARK L.P.** (the "Partnership" or "Limited Partnership") are:

**ANC BIO VERMONT GP SERVICES, LLC**, a Vermont limited liability company with its principal place of business at 4850 VT Route 242, Jay, VT 05859, in its respective capacities as the General Partner and the Initial Limited Partner. As additional persons invest in the Partnership, and take such steps as are required hereunder and under the subscription agreements contained in the Confidential Memorandum (as defined in section 2.06(d)) to become Limited Partners, such additional Limited Partners shall become parties to this Agreement and shall be legally bound by the terms and conditions herein.

### Recitals

**WHEREAS**, the parties desire to form a limited partnership to (i) purchase land and on said parcel, (ii) to construct, fit up, furnish, develop and partially lease out a 67,500 square foot facility, and (iii) to enter into a joint venture agreement (the "JV Agreement") with an entity, (the "Joint Venturer") owned by AnC Bio VT LLC and that will have a business relationship with AnC Bio Korea Inc. (the "Existing Asian AnC Entity") to create and own a joint venture business (the "Joint Venture Entity") that will (a) operate the new facility, including the research, development, production and distribution of artificial organs, cellular based therapy medicine, stem cell therapy and bioengineering products (collectively the "AnC Bio Products") under distribution and certain intellectual property license or transfer agreements with the Existing Asian AnC Entity, and (b) will operate and staff clean rooms for third parties conducting research into related and other scientific fields (collectively the "Project"); and

**WHEREAS**, the parties expect to raise substantial funds from, among other investors, persons who are not United States' citizens or lawful permanent residents of the United States and who desire to become limited partners in the Partnership, and this Partnership may enable such investors to become eligible for admission to the United States of America as lawful permanent residents with their spouses and unmarried, minor children; and

**WHEREAS**, this Agreement sets forth the terms and provisions of the Partnership;

**NOW THEREFORE**, in consideration of the foregoing, of the mutual promises of the parties hereto, and of other good and valuable consideration, the receipt and sufficiency of which are hereby acknowledged, the parties hereto, intending legally to be bound, hereby agree as follows:

### ARTICLE I - Definitions and Rules of Construction

**Section 1.01. Definitions.**

The following additional defined terms used in this Agreement shall have the meanings specified below:

"Accountants" – Mullah Furman, or such other firm of independent certified public accountants selected by the General Partner that is reasonably acceptable to the Limited Partner.

"Act" - the Vermont Revised Uniform Limited Partnership Act (11 V.S.A. ch. 23) and any corresponding provision or provisions of succeeding law, as it or they may be amended from time to time.

© 2012 Carroll & Scribner, P.C.
131 Church Street, Burlington, VT 05401

BL-58

BL-0000058

"Adjusted Capital Account Deficit" - with respect to any Partner, the deficit balance, if any, in the Partner's Capital Account as of the end of the relevant Fiscal Year, after giving effect to the following adjustments:

(i)     credit to such Capital Account any amounts that such Partner is obligated to restore pursuant to any provision of this Agreement, is otherwise treated as being obligated to restore under Treasury Regulation Section 1.704-1 (b)(2)(ii)(c), or is deemed to be obligated to restore pursuant to the penultimate sentences of Treasury Regulation Sections 1.704-2(g) and 1.704-2(i)(5); and

(ii)     debit to such Capital Account the items described in Treasury Regulation Sections 1.704-1(b)(2)(ii)(d)(4), (5), and (6).

The foregoing definition of Adjusted Capital Account Deficit is intended to comply with the provisions of Treasury Regulation Section 1.704-1 (b)(2)(ii)(d) and shall be interpreted consistently therewith.

"Adjusted Capital Contribution" - with respect to each Partner, the aggregate capital contributed to the Partnership by such Partner reduced, from time to time, (i) by any return of a Capital Contribution made pursuant to the Agreement, and (ii) by the aggregate distributions of Net Proceeds from a Capital Transaction made to such Partner pursuant to the Agreement.

"Admission Date" - the date on which a Limited Partner is admitted to the Partnership, as set forth in Section 3.02(b).

"Affiliate" - as to the General Partner, any Person who directly or indirectly through one or more intermediaries, controls, is controlled by or is under common control of the General Partner.

"Agreement" - this Agreement of Limited Partnership, including the Recitals and all of the exhibits attached hereto and made a part hereof, as amended and in effect from time to time.

"AnC Bio VT" – an existing limited liability company organized in the State of Vermont, USA, that will itself or through others inject $8,000,000 of infrastructure into the Project, will own the Joint Venturer as a wholly owned subsidiary and will facilitate the negotiation of certain business agreements with the Existing AnC Asian Entity to foster the Joint Venture Entity's development and production of AnC Bio Products at the Clean Room Facility.

"Available Cash Flow" - funds provided from operation of the Partnership, without deductions for payments made to service Secured Debt and for depreciation, but after deducting funds used to pay all expenses and other debts of the Partnership, including administrative operational expenses, debt payments other than Secured Debt, capital improvements and less the amount set aside by the General Partner, in the exercise of its sole discretion, for reserves.

"Buildings" – the improvements to be constructed on the Property using Partnership funds, including the Clean Room Facility.

"Capital Account" - the capital account maintained by the Partnership for each Partner, determined in accordance with Section 7.01.

"Capital Contribution" - the total amount of cash or any cash equivalents or property (net of liabilities and commitments secured by such contributed property that the Partnership may have assumed) contributed or agreed to be contributed to the Partnership by each Partner, including all adjustments thereto, as provided in this Agreement.

"Capital Transaction" - the sale or other disposition of all or substantially all of the Partnership

2

BL-0000059

Property in a single transaction or a series of related transactions.

"Certificate" - the certificate of limited partnership for the Partnership, as it may be amended from time to time, that is prepared and filed in accordance with the Act.

"Clean Room Facility" – the building to be constructed by the Partnership and Development Entity using Partnership funds and non-Partnership funds.

"Code" - the Internal Revenue Code of 1986, as amended from time to time, or any corresponding provision or provisions of succeeding law.

"Consent of the General Partner" - the written consent or approval of the General Partner, which shall be obtained prior to the taking of any action for which it is required hereunder; if there is more than one General Partner, "Consent of the General Partner" shall require the affirmative consent of General Partners holding at least a majority of the aggregate Interests of the General Partners.

"Consent of the Limited Partner" - the written consent or approval of the Limited Partner, which shall be obtained prior to the taking of any action for which it is required hereunder; if there is more than one Limited Partner, "Consent of the Limited Partner" shall require the affirmative consent of sixty-six and two-thirds percent (66.67%) of the Limited Partners authorized to vote.

"Environmental Hazard" - any hazardous or toxic substance, waste or material, or any other substance, pollutant, or condition that poses a risk to human health or the environment, including, but not limited to: (a) any "hazardous substance" as that term is defined under the Comprehensive Environmental Response, Compensation and Liability Act of 1980, 42 U.S.C. Section 9601, et seq. as amended, (b) petroleum in any form, lead-based paint, asbestos, urea formaldehyde insulation, methane gas, polychlorinated biphenyls ("PCB's"), radon, or lead in drinking water, except for ordinary and necessary quantities of office supplies, cleaning materials and pest and insect control supplies stored in a safe and lawful manner and petroleum products contained in motor vehicles or otherwise properly stored; (c) any underground storage tanks not properly registered with the appropriate government agencies; or (d) accumulations of debris, mining spoil or spent batteries, except for ordinary trash and garbage stored in receptacles for regular removal.

"Event of Bankruptcy" - with respect to any Person,

(1) the entry of a decree or order for relief by a court having jurisdiction in respect of such Person in an involuntary case under the federal bankruptcy laws, as now constituted or hereafter amended, or any other applicable federal or state bankruptcy, insolvency or similar law, or appointing a receiver, liquidator, assignee, custodian, trustee, sequestrator (or other similar official) for such Person or for any substantial part of its property, or ordering the winding-up or liquidation of its affairs, and the continuance of any such decree or order unstayed and in effect for a period of sixty (60) consecutive days;

(2) the commencement by such Person of a voluntary case under the federal bankruptcy laws, as now constituted or hereafter amended, or any other applicable federal or state bankruptcy, insolvency or similar law, or the consent by such Person to the appointment of or taking possession by a receiver, liquidator, assignee, trustee, custodian, sequestrator (or other similar official) for such person or for any substantial part of its property, or the making by such Person of any assignment for the benefit of creditors, or the taking of action by such Person in furtherance of any of the foregoing;

(3) the commencement against such Person of an involuntary case under the federal bankruptcy laws, as now constituted or hereafter amended, or any other applicable federal or state bankruptcy insolvency or similar laws which has not been vacated, discharged or bonded within sixty

3

© 2012 Carroll & Scribner, P.C.
131 Church Street, Burlington, VT 05401

BL-60

BL-0000060

(60) consecutive days;

(4) the admission by such Person of its inability to pay its debts as they become due; or

(5) such Person becoming "insolvent" by the taking of any action or the making of any transfer or otherwise, as insolvency is or may be defined pursuant to federal bankruptcy laws, the Uniform Fraudulent Transfer Act, any state or federal act or law, or the ruling of any court.

"Event of Default" - as set forth in Section 9.02(b).

"Final Determination" - with respect to any issue, the earliest to occur of (a) a decision, judgment, decree, or other order being issued by any court of competent jurisdiction, which decision, judgment, decree, or other order has become final (i.e., all allowable appeals filed by the parties to the action have been exhausted or the time for such appeals has expired); (b) the IRS having entered into a binding agreement with the Partnership or having reached a final administrative or judicial determination which, whether by law or agreement, is not subject to appeal; or (c) the expiration of the applicable statute of limitations.

"Fiscal Year" - the calendar year or such other year that the Partnership is required by the Code to use as its taxable year.

"Gain" - the income and gain of the Partnership for federal income tax purposes arising from a sale or other disposition of all or any portion of the Partnership Property.

"General Partner" – AnC BIO Vermont GP Services, LLC and any additional or substitute general partners of the Partnership named in any duly adopted amendment to this Agreement; if there is more than one general partner, "General Partner" shall refer collectively to all such general partners and their successors.

"GP Limited Interests" – as to the General Partner or its Affiliate, its right, title and interest as a Limited Partner in the Partnership in consideration if it must advance funds to complete the Project. The GP Limited Interests shall be in a separate Class B of ownership from the other Limited Partners, under which class the General Partner or its Affiliate shall not share in any Partnership income nor have any voting rights otherwise permitted Limited Partners, but shall share in any gain or loss, or in distributions in the event of a Capital Transaction, on a pro rata basis, *pari passu*, based on its Percentage Interest.

"Initial Limited Partner" – AnC BIO Vermont GP Services, LLC.

"Interest" - as to any Partner, the Partner's right, title, and interest in the Partnership, including any and all assets, distributions, losses, profits and shares of the Partnership, whether cash or otherwise, and any other interests and economic incidents of ownership whatsoever of such Partner in the Partnership.

"IRS" - the Internal Revenue Service of the United States of America.

"JV Agreement" – the joint venture agreement to be entered into by and between the Limited Partnership and a wholly owned subsidiary of AnC Bio VT, for the purpose of creating and owning the Joint Venture Entity that will run the business operations in the Clean Room Facility.

"Land" - an approximately 7 acre parcel of land to be sold to the Limited Partnership pursuant to a Puchase and Sale Agreement to be entered into (the "Purchase Agreement", a draft of which is attached as an Exhibit to the Confidential Memorandum), on which the Buildings will be constructed.

4

© 2012 Carroll & Scribner, P C
131 Church Street, Burlington, VT 05401

"Limited Partner" – AnC BIO Vermont GP Services, LLC, as the Initial Limited Partner, and any additional or substitute limited partner or partners of the Partnership as provided herein, in each such person's capacity as a limited partner. If there is more than one limited partner, "Limited Partner" or "Limited Partners" shall refer collectively to all such limited partners. In no event, however, shall there be more than two hundred eight (208) Limited Partners at any one time who are also Qualified Investors (as defined in Section 2.06(a)), unless the General Partner in its sole discretion determines that the Project can support additional Qualified Investors, in which case the General Partner may amend this Agreement to allow for additional Limited Partners who are Qualified Investors.  If the General Partner or its Affiliate must advance funds to complete the Project, this Agreement will be modified by the General Partner if necessary and understood to reflect that the General Partner or its Affiliate will be given a Limited Partnership Interest in a separate Class B and also become a Limited Partner (see "GP Limited Interests").

"Limited Partnership Interest" - "Interest" or "Limited Partnership Interest" or "Partner Interest" means the ownership interest of a Partner in the Partnership at any particular time including the right of such Partner to any and all benefits to which such Partner may be entitled as provided in the Agreement and under the Act, together with the obligations of such Partner to comply with all the terms and provisions of the Agreement and Act.

"Loss" - the loss of the Partnership for federal income tax purposes arising from a sale or other disposition of all or any portion of the Partnership Property. If the value at which an asset is carried on the books of the Partnership pursuant to the capital account maintenance rules of Treasury Regulation Section 1.704-1(b) differs from its adjusted tax basis and loss is recognized from a disposition of such asset, the loss shall be computed by reference to the asset's book basis rather than its adjusted tax basis.

"Net Cash Flow" - the amount, determined for any Fiscal Year or portion thereof, equal to the excess, if any, of Cash Flow over the sum of the amounts payable from Cash Flow in such year described in Section 8.01.

"Net Loss" – the net loss of the Partnership for federal income tax purposes for each Fiscal Year.

"Net Profit" - the taxable income of the Partnership for federal income tax purposes for each Fiscal Year.

"Notice" - a writing containing the information required by this Agreement and sent by registered or certified mail, postage prepaid, return receipt requested, or sent by commercial delivery service, by hand delivery, or by telecopy, paid for by the sender, to a Partner at the last address or addresses designated for such purpose by such Partner in Section 16.01 or as provided therein, the date of receipt of such registered mail or certified mail or the date of actual receipt of such writing by commercial delivery service, hand delivery or telecopy, being deemed the date of the Notice.

"Partner" or "Partners" - the General Partner and the Limited Partner, either individually or collectively, and their successors.

"Partnership" – **JAY PEAK BIOMEDICAL RESEARCH PARK L.P.,** a limited partnership formed in the State of Vermont under and pursuant to the Act, and governed by this Agreement.  The Partnership is also sometimes referred to herein as the Limited Partnership.

"Partnership Property" - the Partnership's interest (i) as owner of the Land and Buildings, (ii) as a party to the JV Agreement and (iii) as a party to all distribution rights agreements entered into with the Existing Asian AnC Entity or AnC Bio VT.

5
© 2012 Carroll & Scribner, P.C
131 Church Street, Burlington, VT 05401

BL-62

BL-0000062

"Person" - an individual or entity, such as, but not limited to, a corporation, general partnership, joint venture, limited partnership, limited liability company, trust, cooperative, or association and the heirs, executors, administrators, legal representatives, successors, and assigns of the Person where the context so requires.

"Property" – a 7 acre parcel of real property owned by GSI of Dade County, Inc. and located in Newport, Vermont, which parcel is to be sold to the Partnership, located within the State of Vermont Regional Center.

"Related Documents" – the Confidential Memorandum and exhibits thereto, as defined in Section 2.06(f).

"State" - The State of Vermont.

"Term" - The period of time the Partnership shall continue in existence as stated in Section 2.07.

"Treasury Regulations" - the temporary and final regulations promulgated under the Code, as such regulations may be amended from time to time (including corresponding provisions of succeeding regulations).

**Section 1.02. Rules of Construction.**
(a) Unless the context clearly indicates to the contrary, the following rules apply to the construction of this Agreement:

(1)   words importing the singular number include the plural number and words importing the   plural number include the single number;

(2)   words of the masculine gender include correlative words of the feminine and neuter genders, and vice-versa;

(3)   the headings or captions used in this Agreement are for convenience of reference and do not constitute a part of this Agreement, nor affect its meaning, construction, or effect;

(4)   any reference in this Agreement to a particular "Article," "Section" or other subdivision shall be to such Article, Section, or subdivision of this Agreement unless the context shall otherwise require;

(5)   Words such as "herein", "hereinbefore," "hereinafter," "hereof" and "hereunder" refer to this Agreement as a whole and not merely to a subdivision in which such words appear unless the context otherwise requires; each reference in this Agreement to an agreement or contract shall include all amendments, modifications, and supplements to such agreement or contract unless the context shall otherwise require; and

(6)   when any reference is made in this Agreement or any of the schedules or exhibits attached hereto to the Agreement, it shall mean this Agreement, together with all other schedules and exhibits attached hereto, as though one document.

(b) In the event there is more than one Limited Partner or more than one General Partner, the following additional rules of construction shall apply unless otherwise provided:

(1)   allocations to the General Partner and Limited Partner of Gain, Net Profits, Net

6

© 2012 Carroll & Scribner, P.C.
131 Church Street, Burlington, VT 05401

BL-63

BL-0000063

Losses and Loss under Article VII, and distributions of Net Cash Flow and Capital Proceeds under Article VIII shall be further allocated and/or distributed between or among the General Partners and/or Limited Partners in proportion to each General or Limited Partner's respective Interest, to be set forth on Exhibit A, as amended. Unless otherwise provided herein, no General Partner shall have a superior right to receive distributions than any other General Partner and no Limited Partner shall have a superior right to receive distributions than any other Limited Partner;

(2)     with respect to any matter on which the approval or ratification of the General Partner or the Limited Partner is required or may be given, such approval or ratification shall not be deemed to have been given unless given by Consent of the General Partner or the Consent of the Limited Partner, as the case may be; and

(3)     with respect to any matter on which the approval or ratification of the General Partner or the Limited Partner is required or may be given, each General Partner or Limited Partner, as the case may be, shall be entitled to vote.

### Section 1.03. Imputation of Knowledge and Notice.
Notice or knowledge received by the Partnership is effective for a particular transaction from the time when it is brought to the attention of the individual conducting that transaction or event, and in any event from the time when it would have been brought to its or her attention if the Partnership had exercised due diligence. The Partnership exercises due diligence if it maintains reasonable routines for communicating significant information to the person conducting the transaction or event and there is reasonable compliance with the routines. Due diligence does not require an individual acting for the Partnership to communicate information unless such communication is part of its or her regular duties or unless he or she has reason to know of the transaction or event and that the transaction or event would be materially affected by the information.

### Section 1.04. Successor Statutes and Agencies.
Any reference contained in this Agreement to specific statutory or regulatory provisions, including without limitation the Act and the Code, or to specific governmental agencies or entities shall include any successor statute or regulation, or agency or entity, as the case may be.

### ARTICLE II - Partnership Business Purpose

### Section 2.01. Formation of Partnership.
The General Partner and the Initial Limited Partner hereby form the Partnership.

### Section 2.02. Partnership Name.
The name of the Partnership is " JAY PEAK BIOMEDICAL RESEARCH PARK L.P. ".

### Section 2.03. Principal Place of Business.
The principal office of the Partnership and the office to be maintained pursuant to the Act shall be located at the offices of **ANC BIO VERMONT GP SERVICES, LLC**, a Vermont limited liability company with its principal place of business currently at 4850 VT Route 242, Jay, VT 05859.

### Section 2.04. Registered Agent.
The name and address of the registered agent and registered office of the Partnership for service of process is Mark H. Scribner, 131 Church Street, Suite 300, Burlington, Vermont 05401.

### Section 2.05. Title to Partnership Property.
Legal title to Partnership Property shall be in the name of the Partnership, and no Partner, individually, shall have any ownership of or leasehold interest in such Partnership Property, except in

© 2012 Carroll & Scribner, P C
131 Church Street, Burlington, VT 05401

BL-64.

BL-0000064

its capacity as a Partner.

**Section 2.06. Purposes of the Partnership.**
The purposes, nature, and general character of the business of the Partnership shall consist of:

(a) acquiring, owning, constructing, developing, and holding for economic gain the Partnership Property, including without limitation the Land and Clean Room Facility, and, if appropriate and desirable in the opinion of the General Partner in its sole reasonable discretion but only in compliance with the IN Act, selling or allocating or otherwise disposing of the Partnership Property or any substantial part thereof in settlement of the Limited Partnership Interests;

(b) carrying on any and all activities, to enter into, perform and carry out contracts of any kind necessary to, incidental to or related to the foregoing or the Project in accordance with this Agreement, including without limitation entering into and performing under the Purchase Agreement and the JV Agreement;

(c) mortgaging, selling, transferring, exchanging, subjecting to condominium ownership or otherwise conveying or encumbering all or part of the Partnership Property in furtherance of any and all of the objectives of the Partnership business, but only in compliance with the IN Act;

(d) assisting in enabling no more than two hundred twenty (220) qualified foreign investors at any one time (each a "Qualified Investor") to make qualifying "at risk" investments in a commercial enterprise (each a "Qualifying Investment"), which, though not restricted to such investments, is intended to also meet the requirements under 8 U.S.C. § 1153 (b)(5)(A) - (D); INA § 203 (b)(5)(A) - (D) of the Immigration & Nationality Act (the "IN Act") and qualify under this program (the "EB-5 Program") as an "Alien Entrepreneur", as more fully described in the JAY PEAK BIOMEDICAL RESEARCH PARK L.P. Private Offering Memorandum, a copy of which has been distributed to each Limited Partner in connection with the offering of Limited Partnership Interests hereunder (the "Offering") and each Limited Partner acknowledges receiving (the "Confidential Memorandum"); and

(e) as to those Qualified Investors who are not United States' citizens or lawful permanent residents of the United States (each an "EB-5 Investor" and collectively, the "EB-5 Investors"), using its reasonable best efforts to assist independent legal counsel acting for EB-5 Investors with the filing of each of the EB-5 Investors' petitions with USCIS, and of verifying required direct and indirect employment until removal of each of the EB-5 Investors' conditions to obtaining permanent residency.

**Section 2.07. Partnership Term and Dissolution.**
The Partnership shall continue in full force and effect until December 31, 2061 unless sooner terminated in accordance with Article XII. Upon termination of the Partnership, the General Partner shall take all actions necessary to terminate the Partnership in accordance with requirements of this Agreement and the Act.

**Section 2.08. Filing of Certificate.**
If not already done, the General Partner shall cause the Certificate to be filed with the State in accordance with the Act immediately after the execution of this Agreement by the Partners.

<u>**ARTICLE III - Partnership Interests and Sources of Funds**</u>

**Section 3.01. Identity of Partners and Interests.**
The names and business addresses of the General Partner and the Limited Partners are as identified on Exhibit A, as such Exhibit may be amended from time to time in accordance with this Agreement, and each such Partner has the Interest indicated next to its name on Exhibit A. The failure of the General Partner to periodically amend Exhibit A and list each new Limited Partner, however, shall not

8
© 2012 Carroll & Scribner, P C
131 Church Street, Burlington, VT 05401

act to limit or detract in any way from each Limited Partner being considered a Limited Partner once its Capital Contribution is made.

**Section 3.02. Capital Contributions.**

(a) <u>General Partner.</u> Subject to the provisions of this Section, the General Partner shall be obligated to (and does hereby covenant and agree to) contribute to the capital of the Partnership the cash or property set forth after the General Partner's name on Exhibit A. The General Partner shall be obligated or permitted to make additional Capital Contributions to the Partnership only in accordance with this Agreement. The General Partner at its sole option may make additional voluntary Capital Contributions to the Partnership at any time. A portion of the General Partner's Capital Contribution may arise from loan proceeds borrowed to fund construction costs in excess of the Partnership's equity capital, using the Project as security for the loan (the "Secured Debt"). To the extent Secured Debt proceeds cause the Partnership's capital to increase, each Partner's interest in the Partnership shall be recalculated as a percentage of the sum of the Secured Debt proceeds plus existing General and Limited Partner equity Capital Contributions. The Limited Partners hereby acknowledge, consent and approve of the General Partner granting one or more security interests encumbering all or portions of the Partnership Property, including the Partnership's interest in the Land and Clean Room Facility. The General Partner shall be responsible for repaying the Secured Debt according to its terms from the General Partner's allocation of Available Cash Flow and net proceeds from a Capital Transaction, from the sums distributed to the General Partner upon dissolution of the Partnership, and/or from the General Partner's own funds. In addition, the General Partner intends to use Capital Contributions invested into the Partnership by newly admitted Limited Partners to pay down the principal balance of the Secured Debt, if any. The Limited Partners shall have no obligation or liability for retiring the Secured Debt and at no time shall any Limited Partner who is also a Qualified Investor have its Capital Contribution reduced or repaid in cash with Partnership funds until such time as all I-829 petitions filed under the EB-5 Program for the Qualified Investors have been adjudicated by USCIS, with any appeals having been decided.

(b) <u>Limited Partner.</u> Subject to the provisions of this Section, each Limited Partner shall be obligated to (and does hereby covenant and agree to) contribute to the capital of the Partnership, by wire transfer or other form of available funds, the aggregate amount set forth herein. The subscription amount of each Limited Partner shall equal $550,000 in cash (the "Subscription Amount"), of which $500,000 shall be applied as a Capital Contribution to the Project as investor funds (also referred to as the "Investment") and $50,000 will be paid outright to AnC Bio VT to be applied in its sole discretion to cover administration and other expenses it has incurred in the development of the Project, the preparation and distribution of the Confidential Memorandum, including but not limited to accounting and legal fees, and miscellaneous expenses (collectively, the "Administration Fees").

As further set forth in the Confidential Memorandum, if an investor chooses to reserve an interest in the Limited Partnership by making an escrow deposit of at least $10,000 into an escrow account (the "Escrow Account") to be opened with Peoples United Bank in Burlington, Vermont (the "Escrow Agent"), subject to the terms of an Investor Escrow Agreement which the Investor will need to execute, the Limited Partner making the deposit shall have thirty (30) days to conduct his due diligence, and an additional forty-five (45) days thereafter to complete his investment into the Project by paying the rest of the Subscription Amount into the Escrow Account, which time periods may be extended by the General Partner at its sole discretion.

The Limited Partner shall not be obligated to make any additional Capital Contributions to the Partnership. All required Capital Contributions shall be subject to any applicable adjustments if otherwise permitted by this Agreement. Investment as a Limited Partner is available as a means of financing the installation of necessary infrastructure at the Project, and the planning, acquisition of control or ownership of necessary land and equipment, and construction and start-up of the Clean

BL-66

BL-0000066

Room Facility. This investment may be beneficial, but is not limited, to investors who seek lawful permanent residence pursuant to the EB-5 Program under the IN Act, as more fully described in the Confidential Memorandum. There are other requirements of the EB-5 Program and other relevant immigration laws which the investor must observe or risk denial of lawful permanent residence pursuant to the EB-5 Program.

Investors shall begin the process to purchase a Limited Partnership Interest by completing the subscription procedure mandated by the Partnership, including (i) completing the required subscription agreements, including signing a consent to this Agreement, (ii) making payment of the balance owed of the Investment, over and above any funds paid to reserve an interest in the Limited Partnership under the Investor Escrow Agreement, and (iii) depositing the Administration Fees into a designated Administration Fees account. Upon acceptance by the General Partner (the "Admission Date"), closing shall occur and the investor will be issued an Interest in the Partnership (at which time each Limited Partner will again be deemed to confirm its acceptance of all of the provisions and terms in this Agreement) and the investor's Investment will be final and irrevocable, subject to the terms hereof.

In the event the General Partner receives official notice of denial of a Limited Partner's I-526 Petition, other than based on the fraud or material misrepresentation of the investor, the Limited Partnership or the General Partner shall arrange to pay back the Investment within ninety (90) days of written request by the Limited Partner and the Interest of such Limited Partner shall automatically be terminated upon such repayment without the necessity for such Limited Partner to take such steps as are required under Section 10.01. The Limited Partner must provide a copy of the notice of such denial to the General Partner to facilitate the return of his Investment and the Limited Partner also agrees to provide the General Partner with copies of all notices received by the Limited Partner in connection with his I-526 and any other petition filed on his behalf in connection with his Investment into the Project. The Limited Partner's rights in this case are limited solely to the return of the $500,000 Investment and once the Investment is returned, the Limited Partner shall no longer have any of the rights and benefits of ownership of an Interest or any right to participate in any manner whatsoever in the affairs of the Partnership.

Upon subscribing to the Offering as set forth in the Confidential Memorandum and becoming a Limited Partner, it is at the sole responsibility and risk of each EB-5 Investor to file their I-526 petition, which each EB-5 Investor agrees to file within ninety (90) days of subscribing. There is no refund of the Investment or the Administration Fees for failure to file, for whatever reason, an EB-5 Investor's I-526 petition, adjustment of status application or I-829 petition. In addition to the time requirement imposed on the EB-5 Investor on the filing of his I-526 petition, the EB-5 Investor agrees to file all applications and petitions within a reasonable period of time of when he is eligible to file such application or petition. In addition, as and as set forth in the Confidential Memorandum, it may be beneficial for EB-5 Investors to file their I-829 petitions as soon as they are entitled to in the event less than all of the jobs projected to be preserved and created by the Project are preserved or created, as such jobs will be allocated with preference first to those EB-5 Investors whose I-829 petitions are approved, then to those EB-5 Investors who have obtained lawful permanent admission to the United States.

If the regional center pilot program, created in support of the EB-5 Program and further described in the Confidential Memorandum (the "Pilot Program"), lapses, for each EB-5 Investor whose I-526 petition is filed with USCIS but not adjudicated on or before the date of lapse, their $500,000 Investment shall remain invested in the Partnership provided:

1.    the Pilot Program is reauthorized retroactively or is pending reauthorization within a twelve (12) month period following its lapse, and the EB-5 Investor's I-526 petition is in due course adjudicated; or

2.    legislation is enacted or pending providing substantially similar immigration benefits to EB-5 Investors as under the lapsed Pilot Program and the EB-5 Program within a twelve month

10

© 2012 Carroll & Scribner, P C
131 Church Street, Burlington, VT 05401

BL-0000067

period following the Pilot Program's lapse, and the EB-5 Investor's I-526 petition is in due course adjudicated.

If neither of the events described under 1 and 2 above occur, or are pending as stated, the EB-5 Investor at his option may either remain invested in the Project or request in writing a refund of his Investment of $500,000. Upon receipt of a request of refund to the General Partner, the Investment will be refunded to the requesting EB-5 Investor by the Limited Partnership within a period of ninety (90) days from receipt of such request, and the EB-5 Investor's Interest as a Limited Partner shall automatically be terminated as set forth above with respect to the termination of a Limited Partner's Interest. The EB-5 Investor's rights upon termination of his Interest are limited solely to the return of their Investment of $500,000.

Notwithstanding anything herein to the contrary, in the event that the General Partner or its Affiliate invests funds or makes financial commitments to complete the Project, the General Partner or Affiliate will be issued the remaining unsold Interests in the Partnership for no additional consideration and thereafter hold its Interest(s) subject to the terms of this Agreement.  If there are no unsold Interests in the Partnership, the Partnership will create a new class of Limited Partner Interests allocable only to the General Partner or its Affiliate after it funds the completion of the Project, and such GP Limited  Interests will be issued in consideration of the General Partner or its Affiliate investing funds to complete the Project, in a number sufficient to reimburse the General Partner or its Affiliate, and thereafter the General Partner or its Affiliate will hold its GP Limited Interests subject to the terms of this Agreement.

## Section 3.03 Interest on Capital Contributions
No interest shall be paid to a Partner on Capital Contributions. Interest will be credited by the Partnership to a Partner on the sum of any deemed distributions charged to such Partner's Capital Account from obligations owed to the Partnership by a General Partner arising under section 5.03(b) concerning federal income tax withholding. The interest charged will be computed on a calendar year compounded basis at a rate equal to two percent above the rate of interest from time to time announced by Peoples United Bank to be its "prime rate" or "base rate", such interest to be collected by reduction of any distributions payable to the Partnership immediately following the calculation of the years interest by the General Partner. To the extent that there are no distributions against the interest that can be applied, then the interest will be charged to the Partner's Capital Account. This section 3.03(a) will survive the termination of a Partner's status as a Partner.

## Section 3.04 Service of Secured Debt
Payments to service the Secured Debt shall be made by the General Partner out of its share of Available Cash Flow, net proceeds from a Capital Transaction and sums distributed upon dissolution of the Partnership. For the security of the Limited Partners, the Partnership will service the Secured Debt directly out of the General Partner's share of these items including the General Partner's share of distributions to the Partners as set forth in section 8.01. If amounts required for the service of the Secured Debt are in excess of the General Partner's share of these items, then the General Partner will timely pay such amounts from its own funds. In the event that the General Partner fails to repay the Secured Debt according to its terms, any or all of the Limited Partners may, at their option, pay the unpaid amount and the amount paid shall be converted to equity for the benefit of the Limited Partners who made such payment, with the effect that the Interest of the General Partner will be pro-rata diluted and the Interest of the Limited Partners who paid pro-rata increased. The dilution will not affect the Interest of any other Limited Partner who did not make such payments.

## Section 3.05. Right to Require Repayment of Capital.
No Partner shall have the right to withdraw from the Partnership all or any part of its Capital Contribution. No Partner shall have any right to demand and receive property of the Partnership in return for its Capital Contribution or in respect of its Interest, except as provided in this Agreement. No Limited Partner shall have priority over any other Limited Partner as to any return of Capital Contributions or as to any distributions made by the Partnership pursuant to Article VIII.

© 2012 Carroll & Scribner, P C
131 Church Street, Burlington, VT 05401

BL-0000068

**Section 3.06. Deficit Restoration.**
If, upon liquidation of

(a) the General Partner's Interest (whether or not in connection with the liquidation of the Partnership), the General Partner has a negative balance in its Capital Account (as determined after taking into account Capital Account adjustments pursuant to Section 7.01 as well as adjustments for the Partnership Fiscal Year during which the liquidation of the General Partner's Interest occurs, other than those for contributions made pursuant to this Section), then the General Partner shall be required to contribute to the capital of the Partnership, immediately prior to the liquidation of its General Partner's Interest, the amount necessary to restore its Capital Account to zero. Such contributions shall be receipts of the Partnership available for payment of operating expenses and debts of the Partnership or distribution to the Partners, in accordance with the terms of this Agreement; and

(b) the Limited Partner's Interest (whether or not in connection with the liquidation of the Partnership), the Limited Partner has a negative balance in its Capital Account, the Limited Partner shall have no obligation to make any contribution to the capital of the Partnership and the negative balance of the Limited Partner's Capital Account shall not be considered a debt owed by the Limited Partner to the Partnership or any other Person for any reason whatsoever.

**Section 3.07. No Third-Party Beneficiary.**
None of the provisions of this Agreement shall be construed as existing for the benefit of any creditor of the Partnership or for the benefit of any creditor of the Partners, and no provision shall be enforceable by a party not a Partner.


## ARTICLE IV - Right to Mortgage

**Section 4.01. Right to Mortgage.**

(a) In the General Partner's sole reasonable discretion and to facilitate the purposes of the Partnership, the General Partner may, in the name and on behalf of the Partnership, borrow money (including but not limited to Secured Debt) and issue evidences of indebtedness and secure the same by granting mortgages and security interests pledging all or any portion of the Partnership Property, and to pay, prepay, extend, amend or otherwise modify the terms of any such borrowing and to sign any documents required on behalf of the Partnership in connection with said transaction(s), without the consent and signatures of the Limited Partners. The Limited Partners hereby acknowledge, consent and approve of same transaction(s).

(b) Except to the extent required by any lender and agreed to by the General Partner, no General Partner shall have any personal liability to such lender(s) or to the Partnership for the payment of all or any part of borrowed money or Secured Debt of the Partnership, except for customary exclusions for fraud, misappropriation of funds or waste.


## ARTICLE V - Rights, Powers and Obligations of the General Partner

**Section 5.01. Authority of General Partner.**

(a) Subject to the terms of this Agreement, the General Partner shall be further responsible for the overall management and control of the business assets and affairs of the Partnership, and the General Partner shall have the right, power, and authority, acting for and on behalf of and in the name of the Partnership, to: (i) execute and deliver on behalf of the Partnership any contract, agreement, or

12
© 2012 Carroll & Scribner, P C
131 Church Street, Burlington, VT 05401

BL-0000069

other instrument or document required or otherwise appropriate to acquire, construct, lease, operate, encumber, mortgage or refinance the Partnership Property (or any part thereof), including without limitation the Purchase Agreement and the JV Agreement; (ii) convey Partnership Property by deed, mortgage, certificate, bill of sale, agreement, or otherwise, as appropriate; (iii) bring, compromise, settle, and defend actions at law or in equity; (iv) delegate its authority, power, and right to manage the Partnership Property provided, however, that any such delegation shall not relieve the General Partner of its obligations and responsibilities to ensure the proper management of the Partnership Property unless it finds a suitable replacement General Partner as governed by Section 9.01; and (v) use Partnership funds in performance of its rights, duties and powers, and reimburse itself for its incurred costs to exercise its rights and perform its duties; (vi) set up various accounts, reserves and other financial facilities to further the business objectives of the Project; and (vii) subject the Land and Buildings to condominium ownership in its sole reasonable discretion.

(b) The General Partner shall

(i)    cause the Partnership to do all things necessary to maintain its status as a limited partnership in good standing and to enable the Partnership to engage in its business;

(ii)    not act in any manner that will cause the Partnership to fail to qualify as a limited partnership under the Act, or the Limited Partner to be liable for Partnership obligations;

(iii)    cause the Partnership to take all commercially reasonable actions under the laws of the State and any other applicable jurisdiction that are necessary to protect the limited liability of the Limited Partner under the Act;

(iv)    during and after the period in which it is a Partner, provide the Partnership with such information and sign such documents as are reasonably necessary for the Partnership to make timely, accurate and complete submissions of federal and state income tax returns;

(v)    furnish to counsel for the Limited Partner promptly as and when requested in connection with the rendering of any legal opinion concerning federal income tax relating to the Limited Partner's investment in the Partnership all documents reasonably requested by counsel for the Limited Partner;

(vi)    promptly inform the Limited Partner of any litigation, action, investigation, event, or proceeding that is pending which, if adversely resolved, would have a material adverse effect on the Partnership or the Partnership Property; have a material adverse effect on the ability of the General Partner to perform its obligations under this Agreement; or have a material adverse effect on the financial condition of the General Partner;

(vii)    promptly inform the Limited Partner if it receives notice of any violation with respect to the Partnership Property of any law, rule, regulation, order, or decree of any governmental authority having jurisdiction, which would have a material adverse effect on the Partnership Property or the use, occupancy, or operation thereof;

(viii)    negotiate and enter into the JV Agreement with the Joint Venturer to create and own the Joint Venture Entity to operate the Clean Room Facility, in compliance with all applicable federal, state and local governmental regulations, ordinances, laws and rules, and this Agreement;

(ix)    cause the Partnership to maintain necessary insurance against risks that are of a character usually insured by Persons engaged in a similar business and in form and amount and covering such risks as is usually carried by such Persons;

(x)    take all actions necessary to ensure that the Partnership Property contains no, and is not affected by the presence of, any Environmental Hazard, and to ensure that the Partnership Property

13

© 2012 Carroll & Scribner, P.C
131 Church Street, Burlington, VT 05401

BL70

is not in violation of any federal, or local statute, law, regulation, rule, or ordinance. It shall promptly deliver to the Limited Partner a copy of any notice received from any source whatsoever of the existence of any Environmental Hazard on the Partnership Property or of a violation of any federal, state, or local statute law, regulation, rule or ordinance, including any Environmental Law with respect to the Partnership Property. If any Environmental Hazard is found to exist or be present, it shall commence promptly the taking of action to assure it will be either removed from the Partnership Property and disposed of or encapsulated and/or otherwise corrected, contained and made safe and inaccessible, all in strict accordance with federal, state and local statutes, laws, regulations, rules and ordinances;

(xi)    investigate and report to the Limited Partner any bona fide proposal or offer of any Person, including any Partner, to acquire the Partnership Property or any part thereof;

(xii)    set up one or more reserve fund accounts with Partnership funds and disburse funds from such accounts in an amount sufficient, so far as it is able, to meet the obligations of the Partnership;

(xiii)    identify additional Limited Partners and provide information on the Project and the Partnership to them, but in no case will the General Partner give advice on investment into the Project;

(xiv)    perform services in connection with the development of the Clean Room Facility. Further services of the General Partner shall include, but not be limited to, act on behalf of the Partnership with federal, state and local authorities with respect to the Project; monitor compliance with zoning, land use and other requirements; and prepare or cause to be prepared such third party studies as it deems necessary in connection with the acquisition, sale and leasing of the Partnership Property and construction of the Clean Room Facility and other necessary improvements on the Partnership Property;

(xv)    deal with and, if appropriate, use Partnership funds to purchase or otherwise redeem a Limited Partner Interest that is the subject of an insolvency or bankruptcy proceeding;

(xvi)    directly or through its designee or in concert with a third party, including without limitation AnC Bio VT, oversee construction of the Clean Room Facility and any other improvements;

(xvii)    to landscape the property adjoining the Clean Room Facility and contribute Partnership funds to the costs thereof;

(xviii)    Expenses: The Partnership shall promptly pay all costs and expenses of the Project which may include, but is not limited to:

1)    Printing and all other expenses incurred in connection with insurance, distribution, transfer, registration and recording documents evidencing ownership of an interest in the Partnership in connection and with the business of the Partnership.
2)    Fees and expenses paid to contractors, bankers for financing facilities, brokers and services, leasing agents, consultants, on site managers, real estate brokers, insurance brokers and other agents, including Affiliates of the Partnership, or any General Partner or its officers.
3)    Expenses in connection with the acquisition, preparation, improvement, development, disposition, replacement, alteration, repair, remodeling, refurbishment, leasing, renting, costs of insurance, financing and refinancing of Partnership Property.
4)    All costs of personnel directly employed by the Partnership or performing services for the Partnership.
5)    All costs of borrowed money (except the Secured Debt) including repayment of advances to the Partnership made by a Partner, which shall be paid monthly, interest only at a rate equal to two percent above the rate of interest from time to time announced by Peoples United Bank

14
© 2012 Carroll & Scribner, P C
131 Church Street, Burlington, VT 05401

BL-0000071

to be its "prime rate" or "base rate", and repaid in one lump sum five years after the date of the initial advance.

6)   Legal, audit, accounting, brokerage and other fees including expenses of organizing, revising, amending, converting, modifying or terminating the Partnership.

7)   Expenses in connection with distributions made by the Partnership to, the communications and book keeping and clerical work necessary in maintaining relations with, Limited Partners.

8)   Expenses in connection with preparing and mailing reports required to be furnished to Partners for required tax reporting or other purposes which the General Partner deems appropriate, cost incurred in connection with any litigation, including any examination or audits by regulatory agencies, and costs of preparation and dissemination of informational material and documentation relating potential sale, refinancing or other disposition of Partnership Property;

(xix)   loan, or otherwise contribute equity to the Partnership, either directly or by an Affiliate, such funds as are necessary to complete the Project in the event the funds of the Partnership, after all Limited Partner Interests available for Qualified Investors have been sold, are insufficient to complete the Project, but in no event will a loan by the General Partner or an Affiliate be a personal liability or obligation of any Limited Partner, and the General Partner or Affiliate shall have no recourse to recoup such a loan against any Limited Partner; and

(xx)   issue certificates representing Limited Partnership Interests to all Limited Partners, including Class A and Class B Interests if applicable, and take such other steps if required to evidence or set up different classes of ownership in the Partnership.

In consideration for agreeing to act as General Partner, and for any services already performed as set forth in this Agreement, the General Partner has received its Interest, and will not be compensated in any additional way.  **Without limiting the foregoing, the General Partner may not receive any compensation for any advice or representations made to any Limited Partner, the General Partner expressly disavows giving any advice to Limited Partners for the purpose of inducing them to invest into the Project and Limited Partnership or otherwise, and each Limited Partner by executing the consent to the Agreement acknowledges that no advice or representations have been made by the General Partner or any person on its behalf for the purpose of inducing them to invest into the Project and Limited Partnership or otherwise.**

(c) Except for matters for which Consent of the Limited Partner is required as set forth in Section 5.02(b), all decisions made for and on behalf of the Partnership by the General Partner shall be binding upon the Partnership. Except as expressly otherwise set forth in this Agreement, the General Partner (acting for and in the name and on behalf of the Partnership), in extension and not in limitation of the rights and powers given it by law or by the other provisions of this Agreement, shall, in its sole discretion, have the full and entire right, power and authority, in the management of the Partnership's day-to-day business, to do any and all acts and things necessary, proper, ordinary, customary or advisable to effectuate the purposes and to conduct the business of the Partnership.

**Section 5.02. Limitations on the Authority of the General Partner.**

(a) Notwithstanding any other provision of this Agreement, the General Partner shall have no authority to perform any act in violation of any applicable law or regulations; to do any act required to be approved, consented to, voted on, or ratified by the Limited Partner under the Act or under this Agreement unless such approval, vote, consent, or ratification has been obtained; to cause the Partnership to engage in any business other than as set forth in Section 2.06; or do any act that would make it impossible to carry out the business of the Partnership as contemplated herein.

(b) In addition, the prior Consent of the Limited Partner is required before the General Partner may:

© 2012 Carroll & Scribner, P.C.
131 Church Street, Burlington, VT 05401

BL-72

BL-0000072

(i)     sell, mortgage or convey all or any substantial portion of the Partnership Property, other than (a) the entering into the JV Agreement to operate the Clean Room Facility or subjecting the Land and Clean Room Facility to condominium ownership or (b) as otherwise set forth in Section 3.02(a) or Section 4.01(a);

(ii)    acquire any real property in addition to the Partnership Property (other than land, easements, rights of way or similar rights required by governmental rule or regulations, or necessary or convenient for the development of the Partnership Property, including without limitation the leasing of the Clean Room Facility);

(iii)   voluntarily file a bankruptcy petition on behalf of the Partnership;

(iv)    dissolve or wind up the Partnership except as set forth in Article 12;

(v)     confess any judgment;

(vi)    modify or amend this Agreement except as expressly provided in this Agreement;

(vii)   admit any Person as a Partner, except as otherwise provided in this Agreement;

(viii)  borrow from the Partnership or commingle Partnership funds with the funds of any Person; or

(ix)    receive any rebates or give-ups or participate in any reciprocal business relationships in circumvention of this Agreement.

(c)  In addition, the General Partner may be replaced by the Limited Partner pursuant to Section 9.02.

**Section 5.03. Tax Matters Partner.**

(a)     AnC BIO Vermont GP Services, LLC, in its capacity as General Partner, is hereby designated as the tax matters partner and shall maintain the books and records of the Partnership, and shall be responsible, on a timely basis, for (i) preparing all required tax returns and related information, (ii) making all tax elections, if appropriate, and (iii) preparing all financial information, all in accordance with this Agreement. It shall keep the Partners informed of all administrative and judicial proceedings, shall furnish to each Partner (within five days after receipt) a copy of each notice or other communication received by it from the IRS, and shall not respond to any notice or other communication from the IRS which questions or challenges any item which has been or may be reported on a Partnership tax return until after notice of the proposed response is given to the Limited Partner. It shall have no authority, without the Consent of the Limited Partner, to (i) enter into a settlement agreement with the IRS which purports to bind Partners other than the General Partner, (ii) file a petition as contemplated in Section 6226(a) or 6228 of the Code, (iii) intervene in any action as contemplated in Section 6226(b) of the Code, (iv) file any request contemplated in Section 6227(b) of the Code, (v) enter into an agreement extending the period of limitations as contemplated in Section 6229(b)(1)(B) of the Code, (vi) to file any tax related litigation in a court other than the United States Tax Court, or (vii) submit any report to the IRS.

(b)     Federal Income Tax Withholding: In the event any of the Partners are subject to federal income tax withholding, the General Partner is authorized to withhold any sums required by the Internal Revenue Code even if such withholding conflicts with any of the terms and conditions of this Agreement or otherwise affects distributions, allocations or payments to the Partners. In the event that the General Partner learns of withholding obligations subsequent to the distribution to which the withholding obligations relate, the General Partner will issue an invoice to the Partner. If the invoice is not paid within sixty (60) days, the General Partner will charge the amount against the Partner's Capital Account. This section will survive the termination of a Partner's status as a Partner.

© 2012 Carroll & Scribner, P.C.
131 Church Street, Burlington, VT 05401

BL-0000073

**Section 5.04. Outside Activities.**
The General Partner shall devote to the management of the business of the Partnership so much of its time as it deems reasonably necessary in order to comply with this Agreement. The General Partner and its Affiliates, and their officers, directors, agents, employees, representatives, attorneys, accountants and other persons operating on its behalf, may engage in and possess any interest in other business ventures (including limited partnerships) of every kind, nature, and description whatsoever, independently or with others, whether existing at the date hereof or hereafter coming into existence, including, without limitation, acting as general partner or limited partner of other partnerships that own, directly or through interests in other partnerships, projects similar to, or in competition with, the Clean Room Facility. Neither the Partnership nor the Partners shall have any rights by virtue of this Agreement in or to such other business ventures or to the income or profits derived therefrom and nothing shall be construed to render them partners in any such business ventures.

**Section 5.05. Liability to Partnership and Limited Partner.**
The General Partner, and its Affiliates, and their officers, directors, agents, employees, representatives, attorneys, accountants and other persons operating on its behalf shall not be liable, responsible, or accountable in damages or otherwise (including attorneys fees and expenses) to the Limited Partner or to the Partnership for any acts performed in good faith and within the scope of authority of the General Partner, or its Affiliates if any of the General Partner's duties have been contractually delegated to them, pursuant to this Agreement.

**Section 5.06. Indemnification of General Partner.**
(a) To the maximum extent permitted by law, the Partnership shall indemnify, defend, and hold harmless each General Partner and its Affiliates, and their officers, directors, agents, employees, representatives, attorneys, accountants, consultants and other persons operating on its behalf from and against any loss, liability, damage, cost, or expense (including reasonable attorney's fees) arising out of or alleged to arise out of any demands, claims, suits, actions, or proceedings against the General Partner, by reason of any act or omission performed by it (including its employees and agents) while acting in good faith on behalf of the Partnership and within the scope of the authority of the General Partner pursuant to this Agreement, and any amount expended in any settlement of any such claim of liability, loss, or damage; provided, however, that (i) the General Partner must have in good faith believed that such action was in the best interests of the Partnership, and such course of action or inaction must not have constituted breach of its fiduciary duty; and (ii) any such indemnification shall be recoverable from the assets of the Partnership, not from the assets of the Limited Partner, and no Partner shall be personally liable therefore. This indemnity shall be operative only in the context of third-party suits, and not in connection with demands, claims, suits, actions or proceedings initiated by any Partner or any Affiliate thereof against another Partner. In no event, however, shall a Limited Partner bring suit against the General Partner, or recover damages from the General Partner, in an amount that exceeds the amount invested by the Limited Partner in the Partnership.

(b) Notwithstanding anything contained in this Section, the General Partner shall not be indemnified or saved harmless from any liability, loss, damage, cost, or expense incurred by it in connection with: (i) any civil or criminal fines or penalties imposed by law; (ii) any claim or settlement involving the allegation that federal or state securities laws were violated by the General Partner or the Partnership, except as to a claim asserted by the Limited Partner; or (iii) any claim involving breach of a fiduciary duty, unless (A) the General Partner is successful in defending such action on the merits, or (B) such claims have been dismissed in favor of the General Partner with prejudice on the merits by a court of competent jurisdiction, or (C) a court of competent jurisdiction approves a settlement and determines that the General Partner is entitled to costs.

(c) The General Partner, when entitled to indemnification pursuant to this Section, shall be entitled to

17
© 2012 Carroll & Scribner, P.C
131 Church Street, Burlington, VT 05401

receive, upon application therefore, reasonable advances to cover the costs of defending any proceedings against it but only if (i) the action relates to the performance of the duties or services by the General Partner on behalf of the Partnership; (ii) the action is commenced by a third party who is not a Partner or Affiliate thereof; and (iii) the General Partner covenants in advance to repay the advance of funds to the Partnership in accordance with this Section in the event it is determined that the General Partner is not entitled to indemnification hereunder. All rights of the General Partner to indemnification shall survive the dissolution of the Partnership and the death, retirement, incompetency, insolvency, bankruptcy, or withdrawal of the General Partner.

### Section 5.07. Dealing with Affiliates: Fees.

The General Partner may, in the name and on behalf of the Partnership, enter into agreements or contracts for performance of services for the Partnership with an Affiliate or designee of the General Partner, including without limitation services necessary to oversee construction of the Clean Room Facility and other improvements, and the General Partner may obligate the Partnership to pay compensation for and on account of any such services; provided, however, such compensation shall be at costs to the Partnership not in excess of those disclosed in the Confidential Memorandum, but such limitation on costs shall not prevent the General Partner, if necessary, from advancing funds to complete the Project and being reimbursed with the grant of GP Limited Interests.

### ARTICLE VI - Rights and Obligations of the Limited Partner

### Section 6.01. Management of the Partnership.

To the full extent permitted by the Act and without being deemed a general partner, each Limited Partner shall participate in the management of the business of the Partnership by making suggestions or recommendations to the General Partner on issues of policy important to the Partnership, by participating in one or more of the activities set forth in 11 V.S.A. §3423(b), and as otherwise set forth in Section 5.02(b) and Section 9.02. The Limited Partner shall not have the power or authority, however, to bind the Partnership or to sign any agreement or document in the name of the Partnership.

### Section 6.02. Limitation on Liability of the Limited Partner.

Notwithstanding any other provision of this Agreement, the liability of the Limited Partner shall be limited to its Capital Contributions at any given time as and when payable under the provisions of this Agreement. The Limited Partner shall not have any other liability to contribute money to or in respect of the liabilities, obligations, debts or contracts of the Partnership, nor shall the Limited Partner be personally liable for any liabilities, obligations, debts or contracts of the Partnership. A Limited Partner shall be liable to the Partnership only to make payment of its Capital Contribution as and when due and, after its Capital Contribution shall be fully paid, no Limited Partner shall, except as otherwise required by the Act, be required to make any further Capital Contributions or lend any funds to the Partnership.

### Section 6.03. Outside Activities.

Nothing herein contained in this Agreement shall be construed to constitute the Limited Partner the agent of any other Partner hereof or to limit in any manner the Limited Partner in the carrying on of its own businesses or activities. The Limited Partner may engage in and possess any interest in other business ventures (including limited partnerships) of every kind, nature and description, independently or with others, whether existing as of the date hereof or hereafter coming into existence, including, without limitation, acting as general partner or limited partner of other partnerships which own, directly or through interests in other partnerships and projects similar to, or in competition with, the Project. Neither the Partnership nor any of the Partners shall have any rights by virtue of this Agreement in or to any such other business ventures or to the income or profits derived therefrom and nothing shall be construed to render them partners in any such business ventures.

© 2012 Carroll & Scribner, P C
131 Church Street, Burlington, VT 05401

BL-75

BL-0000075

**Section 6.04. Inspection of the Project.**
The Limited Partner and/or its agent or designee shall have the right to inspect the Project upon reasonable notice to the General Partner and the General Partner shall provide all reasonable assistance to the Limited Partner in such effort.

**Section 6.05. Representations.**
The Limited Partners who are Qualified Investors each represent, warrant, and covenant to the Partnership and the General Partner, in addition to all other representations as are contained in this Agreement, as follows:

(a) He is an "accredited investor" within the meaning of the definition in Rule 501(a), promulgated under the Securities Act of 1933 (the "Securities Act");

(b) He is responsible for obtaining his own advice regarding the Investment, including without limitation income tax advice, can bear the economic risk of his Investment, and has such knowledge and experience in financial and business matters that he is capable of evaluating the merits and risks of the Investment in an Interest in the Partnership;

(c) He is acquiring his Interest in the Partnership for investment for his own account, and not as a nominee or agent, and not with a view to the resale or distribution of any part thereof, and that he has no present intention to sell, grant any participation in, or otherwise distribute the same;

(d) None of the Interests in the Partnership have been registered under the Securities Act or any applicable state securities laws on the basis that the sale provided for in this Agreement and the issuance of the Interests hereunder are exempt from registration under the Securities Act and any applicable state securities laws;

(e) He has received and reviewed, and understands and is fully satisfied with, all of the information and documentation he considers necessary or appropriate when deciding whether to purchase an Interest in the Partnership, including but not limited to the Confidential Memorandum, all exhibits thereto and all financial information disclosed therein or under this Agreement; has had the opportunity to ask questions and receive answers from the General Partner and the Partnership regarding the terms and conditions of the purchase of an Interest in the Partnership and the business, properties, prospects, and financial condition of the Partnership; and has had the opportunity to review the books and records of the Partnership and to obtain additional information (to the extent the Partnership possessed such information or could acquire it without unreasonable effort or expense) necessary to verify the accuracy of any information furnished to it or to which it had access;

(f) Its Interest in the Partnership may not be sold, transferred, or otherwise disposed of without registration under the Securities Act and any applicable state securities laws or an exemption therefrom and compliance with this Agreement, and in the absence of an effective registration statement covering its Interest in the Partnership or an available exemption from registration under the Securities Act and any applicable state securities laws, its Interest must be held indefinitely;

(g) Any certificate or other document evidencing a partnership interest in the Partnership shall be endorsed with a legend substantially in the form set forth below:

**THE INTEREST IN THE PARTNERSHIP REPRESENTED HEREBY HAS NOT BEEN REGISTERED UNDER THE SECURITIES ACT OF 1933, AS AMENDED, NOR UNDER THE VERMONT UNIFORM SECURITIES ACT (2002) OR SECURITIES LAWS OF ANY OTHER JURISDICTION AND MAY NOT BE SOLD, TRANSFERRED, ASSIGNED, PLEDGED, OR HYPOTHECATED UNLESS AND UNTIL REGISTERED UNDER SUCH ACTS, OR UNLESS THE PARTNERSHIP HAS RECEIVED AN OPINION OF COUNSEL OR OTHER EVIDENCE SATISFACTORY TO THE PARTNERSHIP AND ITS COUNSEL THAT SUCH REGISTRATION IS**

© 2012 Carroll & Scribner, P.C.
131 Church Street, Burlington, VT 05401

B2-76

BL-0000076

**NOT REQUIRED;**

(h) No representation, warranty or statement by it in this Agreement or in any document, certificate or schedule furnished or to be furnished to the General Partner pursuant hereto contains or will contain any untrue statement of a material fact or omits or will omit to state a material fact necessary to make the statements or facts contained therein not misleading; and

**(i) That nothing set forth in this Agreement constitutes a guaranty of repayment of said Limited Partner's Capital Contribution or can be considered a redemption agreement, and such Capital Contribution is totally at risk.**

## ARTICLE VII - Allocations of Profits and Losses

**Section 7.01. Maintenance of Capital Accounts.**
The Partnership shall maintain a Capital Account for each Partner. Each Capital Account shall be maintained in accordance with Treasury Regulation Section 1.704-1 (b)(2)(iv). To each Partner's Capital Account there shall be credited such Partner's Capital Contributions, and its distributive share of Net Profits and Gains and any item in the nature of income or gain allocated to such Partner pursuant to Section 7.02. From each Partner's Capital Account there shall be debited the amount of cash and the fair market value (as of the date of distribution) of any Partnership property (net of liabilities securing the distributed property that such Partner assumes or subject to which such Partner takes the distributed property) distributed to such Partner pursuant to any provision of this Agreement and the Partner's distributive share of Net Losses and Loss and any items in the nature of expenses or deductions that are allocated to the Partner pursuant to Section 7.02 and to the amounts charged under section 5.03(b) to such Partner. This Section is subject to the caveat that the General Partner or its Affiliate, if it is allocated GP Limited Interests, will not be allocated any income towards such GP Limited Interests.

© 2012 Carroll & Scribner, P.C.
131 Church Street, Burlington, VT 05401

BL-0000077

**Section 7.02. Profits and Losses.**

After giving effect to the special allocations set forth in Section 7.03, the Net Profits, Net Losses, Gain and Loss of the Partnership shall be allocated pursuant to each Limited Partner's Interest or, in the event of Secured Debt being assumed by the Partnership, in the same manner as their proportionate share of Available Cash Flow and net proceeds from a Capital Transaction, provided, however, that no Net Profits, Net Losses, Gain and Loss of the Partnership for any Fiscal Year shall be allocated to a Limited Partner to the extent such allocation would cause or increase an Adjusted Capital Account Deficit with respect to that Partner, and those Net Losses, Losses or Partnership deductions shall instead be allocated to the General Partner.  Any intangible expenses including, but not limited to, depreciation or amortization are to be allocated in accordance with each Partner's Interest.

**Section 7.03. Special Allocations and Limitations.**

(a)      Notwithstanding the provisions of Section 7.02, Partners shall be specially allocated items of Partnership Net Profits, Net Losses, Gain and Loss to comply with the Code and with all applicable Treasury Regulations regarding special allocations for partners of a partnership (the "Regulatory Allocations"). Such provisions include, but are not limited to, minimum gain chargeback requirements, changes in recourse and nonrecourse debts and liabilities, and elimination of Adjusted Capital Account Deficits. The Regulatory Allocations shall be taken into account in allocating other profits, losses and other items of income, gain, loss and deduction to the Partners so that, to the extent possible, the net amount of such allocations of profits and losses and other items shall be equal to the amount that would have been allocated to each Partner had the Regulatory Allocation not occurred. The Tax Matters Partner shall have the absolute discretion to apply the Regulatory Allocations in a manner consistent with this Agreement, and to make any and all determinations of special allocations thereunder.

(b) The respective interest of the Partners in the Net Profits, Net Losses, Gain, and Loss or items thereof shall remain as set forth above unless changed by amendment to this Agreement.

## ARTICLE VIII - Cash Distributions

**Section 8.01. Distributions of Available Cash Flow.**

Available Cash Flow shall be distributed by the General Partner to and among the Partners and for the purposes below, within thirty (30) days after the close of each calendar month, as follows:

(a) first, to the repayment or part thereof of any remaining unpaid loans made by the General Partner or its Affiliates or third party interests to the Partnership;

(b) second, to the payment of any debts owed to the Limited Partners; and

(c) the balance to the Partners according to their Interests.

Notwithstanding the foregoing, it will be up to the General Partner in its sole discretion and if in the best interest of the Partnership to make any distributions.  Distributions can only be made monthly, or such extended period of time, as the General Partner, in its sole discretion, may deem appropriate from the accumulated balance of Available Cash Flow.

**Section 8.02. Distributions of Proceeds from Capital Transaction.**

Proceeds from a Capital Transaction (defined as the net proceeds, after all costs, expenses and

BL-0000078

payments to Affiliates and any third party interests, upon liquidation of the Partnership resulting from the sale of the Partnership Property as set forth in Article XII), shall be distributed to and among the Partners in the following amounts and order of priority:

(a) first, to the payment of all matured debts and liabilities of the Partnership other than debts, liabilities and fees owed to Partners or their Affiliates;

(b) second, to the repayment of any remaining unpaid loans from the General Partner or its Affiliates to the Partnership;

(c) third, to the payment of any debts owed to the Limited Partner and their Affiliates;

(d) fourth, to the Partners to the extent of their Adjusted Capital Account Deficits; and

(e) last, to the Partners (including the General Partner or its Affiliate as to GP Limited Interests if applicable) according to their Percentage Interests in the Partnership.

### Section 8.03 Deficit Capital Accounts at Liquidation

The Limited Partners shall have no liability to the Partnership, to the General Partners or to the creditors of the Partnership on account of any deficit balance in their capital accounts upon liquidation of the Partnership, provided however that any Partner for whom any payments have been made to his capital account by reason of the obligations under section 3.03 and section 5.03(b) will immediately reimburse the Partnership upon written demand of the General Partner. This section 8.03 will survive the termination of the Partners' status as a Partner. A Partner must also pay any attorneys' or accountants' fees actually and reasonably incurred by the Partnership or a General Partner in collecting amounts under this provision from the Partner.

### Section 8.04 Limitation of Liability

No Limited Partner shall have any personal liability whatsoever, whether to the Partnership, to any Partners or to the creditors of the Partnership, for the debts or obligations of the Partnership or any of its losses beyond his Capital Contribution, to be set forth opposite his name in exhibit A attached hereto; provided, however, that any Partner for whom any charges have been made to his Capital Account by reason of the obligations described in section 8.02, section 3.03 and or section 5.03(b), is required to reimburse the Partnership for the amount of any negative balance in his Capital Account, but such reimbursement shall not exceed the sum of such Partner's obligations under section 8.03 and section 8.04. This section 8.04 will survive the termination of a Partner's status as a Partner. A Partner must also pay any attorneys' or accountants' fees actually and reasonably incurred by the Partnership or a General Partner in collecting amounts under this provision from the Partner.

### Section 8.05 Death or Incapacity of Limited Partner

The death, legal incapacity, dissolution, termination, merger, consolidation or bankruptcy (each a "Triggering Event") of one or more Limited Partners shall not cause dissolution of the Partnership, but the rights of such Limited Partner(s) to share in the profits and losses of the Partnership, to receive distributions from the Partnership and to assign an Interest in the Partnership shall, on the happening of such a Triggering Event, devolve upon such Limited Partner's executor, administrator, guardian, conservator or other legal representative or successor as the case may be, subject to the terms and conditions of this Agreement, and the Partnership shall continue as a Limited Partnership. However, in any such Triggering Event such legal representative or successor or any assignee of such legal representative or successor shall be admitted to the Partnership as a Limited Partner only in accordance with and pursuant to all of the terms and conditions of this Agreement.

© 2012 Carroll & Scribner, P.C.
131 Church Street, Burlington, VT 05401

B2-79.

BL-0000079

**Section 8.06 Recourse of Limited Partners**

Each Limited Partner shall look solely to the Project for all distributions with respect to the Partnership, his Capital Contribution thereto and profits and losses thereof, and shall have no recourse therefore upon dissolution of the Partnership or otherwise against the General Partner or any other Limited Partner, except to the extent of any required General Partner contributions to the Partnership required by Article III.

**Section 8.07  No Right to Property**

No Limited Partner shall have a right to demand or receive any distribution from the Partnership in any form other than cash, upon dissolution of the Partnership or otherwise, except as otherwise set forth in this Agreement.

**ARTICLE IX - Admission of Successor and Additional General Partners; Removal and Withdrawal of General Partner**

**Section 9.01. Voluntary Withdrawal of General Partner/Admission of Successor or Additional General Partners.**

(a) The General Partner shall not have any right to retire or withdraw voluntarily from the Partnership or to sell, transfer, or assign all or any portion of its Interest, without the Consent of the Limited Partner, which consent shall not be unreasonably withheld, delayed or conditioned. In the event that the Consent of the Limited Partner has been obtained by the General Partner, the General Partner shall designate one or more persons to be its successor. In no event shall the Interests of the other Partners be affected thereby. The designated successor General Partner shall be admitted as such to the Partnership upon approval of the Limited Partner and upon satisfying the conditions of this Agreement. Any voluntary withdrawal by the General Partner from the Partnership or any sale, transfer, or assignment by the General Partner of its Interest shall be effective only upon the admission of the successor General Partner in accordance with this Agreement, at which time the predecessor General Partner shall no longer have any obligations or liability under this Agreement.

(b) A successor General Partner shall, by its execution of an amendment to this Agreement and as a condition precedent to being admitted as a successor General Partner and to receiving any Interest in the Partnership or the Partnership Property, agree to be bound by this Agreement to the same extent and on the same terms as the predecessor General Partner.

(c) Upon the execution of the amendment to this Agreement by the successor General Partner and the admission of a successor General Partner, an amendment to the Certificate shall be executed by the successor General Partner and filed in accordance with the Act.

**Section 9.02. Removal of General Partner/Admission of Additional General Partner Under Certain Circumstances.**

(a) Upon the occurrence of an Event of Default, as defined herein, the Limited Partner shall have the right to cause a Person to be admitted to the Partnership as an additional General Partner and to remove a defaulting General Partner or both. The Limited Partner shall have the right in the name of the General Partner to take all actions and do all things necessary or appropriate to implement and carry out the provisions of this Section, provided that the replacement or addition of a General Partner must be an Affiliate of the Initial General Partner, unless prohibited by state or federal law.

(b) The following shall each be an Event of Default:

© 2012 Carroll & Scribner, P.C.
131 Church Street, Burlington, VT 05401

BL-80

BL-0000060

(1)     the General Partner has, in connection with the Partnership or the Project, performed an act or failed to perform any act constituting fraud, intentional misconduct, material breach of fiduciary duty, misappropriation or commingling of funds, or dishonesty;

(2)     the General Partner has breached any material written representation, covenant or warranty under this Agreement that substantially impairs the performance or purpose of the Partnership; or

(3)     an Event of Bankruptcy shall have occurred with respect to the General Partner;

(c) If the Limited Partner elects to

(1) admit a Person as an additional General Partner upon the occurrence of an Event of Default, such admission shall occur automatically and without further action by the General Partner upon the giving of notice thereof by the Limited Partner to the General Partner, and each of the Partners hereby agrees and consents in advance to the foregoing admission. Upon the occurrence of such admission, any delegation of authority given to the defaulting General Partner (whether expressly set forth in this Agreement or otherwise) shall be canceled and of no further force and effect, and instead the defaulting General Partner shall be deemed to have delegated, automatically and without the requirement of a writing or any other action other than as set forth above, all its powers and authority (including, without limitation, all right to deposit to, withdraw from and otherwise control all Partnership bank accounts) to the Person so designated by the Limited Partner in its capacity as an additional General Partner. Notwithstanding its admission to the Partnership, the additional General Partner may withdraw as a General Partner without the consent of any other Partner.

(2)     remove the General Partner, then the Limited Partner shall have the right, without the consent of any of the General Partner, to designate a successor General Partner and elect to continue the business of the Partnership; such removal shall occur automatically and without further action by any Partner upon the giving of notice thereof by the Limited Partner to the General Partner. Upon such removal, (A) the removed General Partner shall have the obligation to sell its Partnership Interest as General Partner to the successor General Partner or its designee for $10.00US; and (B) such removed General Partner shall thereafter cease to have any interest in the capital, profits, losses, distributions, and all other economic incidents of ownership of the Partnership.

(d) The Limited Partner shall not have the right to exercise any remedies pursuant to this Article as a result of any Event of Default if the failure or violation is curable and if the General Partner shall cure such failure or violation within 30 days after notice.

### Section 9.03. Event of Bankruptcy of a General Partner.

(a) The General Partner shall cease to be the General Partner upon an Event of Bankruptcy with respect to the General Partner, or, with the Consent of the Limited Partner, upon the occurrence of the General Partner's insolvency. Upon such an Event of Bankruptcy, or, with the Consent of the Limited Partner, such insolvency, the remaining or successor General Partner shall cause the Partnership to redeem the General Partner's Interest as General Partner for $10.00US and the General Partner shall thereafter cease to have any interest in the capital, profits, losses, distributions, and all other economic incidents of ownership of the Partnership.

(b) If, at the time of an Event of Bankruptcy with respect to the General Partner, the General Partner is the sole General Partner, the Limited Partner shall have the right, in its sole discretion, to designate a successor General Partner and the Limited Partner may, within the maximum number of days permitted by the Act after the General Partner's ceasing to be a General Partner of the Partnership, elect to continue the business of the Partnership.

24

© 2012 Carroll & Scribner, P.C
131 Church Street, Burlington, VT 05401

BL-0000081

**Section 9.04. Continuation of the Business of the Partnership.**

(a) If, at the time of an Event of Default, the General Partner was not the sole General Partner, the remaining General Partner or General Partners may elect to continue the business of the Partnership and shall immediately: (i) give Notice to the Limited Partner of such Event of Default; and (ii) subject to the Consent of the Limited Partner, make any amendments to this Agreement and execute and, if required by the Act, file for recording any amendments or other documents or instruments necessary to reflect the termination of the Interest of the General Partner as and in order to comply with the requirements of the Act.

(b) A Person shall be admitted as a successor or additional General Partner with the Consent of the Limited Partner if an amendment to the Certificate evidencing the admission of such Person as a General Partner shall have been filed with the Secretary of State of the State. Each General Partner hereby agrees to execute promptly any such amendment to the Certificate, if required, in the event of its withdrawal or removal pursuant to the provisions of this Article. The Limited Partner shall have the right in the name of the General Partner to execute any such amendment in the event of the General Partner's withdrawal or removal. The election by the Limited Partner to remove any General Partner or admit any additional General Partner under Section 9.02 shall not limit or restrict the availability and use of any other remedy that the Limited Partner or any other Partner might have with respect to any General Partner in connection with its undertakings and responsibilities under this Agreement.

## ARTICLE X- Assignability of Interests of Limited Partner

**Section 10.01. Substitution and Assignment of a Limited Partner's Interest.**

(a) Other than as set forth herein, no Limited Partner shall have the right to assign, sell, transfer, convey, encumber or pledge its Interest. In no event shall any Interest of a Limited Partner, or any portion thereof, be sold, transferred or assigned to a minor or incompetent, and any such attempted sale, transfer or assignment shall be void and ineffectual and shall not bind the Partnership or the General Partner. This investment may be beneficial to investors who seek lawful permanent residence pursuant to the EB-5 Program under the IN Act, as more fully described in the Confidential Memorandum. Failure of a Limited Partner desiring lawful permanent residence to remain invested fully in the Limited Partnership may result in the denial of lawful permanent residence for such Limited Partner as an outcome of this investment. There are other requirements of the EB-5 Program which the interested investor must observe or risk denial of lawful permanent residence pursuant to the EB-5 Program, as further set forth in the Confidential Memorandum. Notwithstanding the foregoing, in the event a Limited Partner wants to sell his Interest back to the Partnership, the Partnership through the General Partner may at its sole option agree to purchase, or arrange for a purchase by an independent third party, such Interest for the amount of the Limited Partner's Capital Contribution less a ten percent (10%) buy back fee, provided that the Limited Partner execute an assignment of his Interest to the Partnership, a general release for the benefit of the Limited Partnership, the General Partner and any other parties the General Partner reasonably requests, and any other documents reasonably requested by the General Partner, and provided further that, in the opinion of counsel to the Partnership, none of the matters set forth in (b) below would impair the ability of the Partnership to effect such a buy back.

(b) No assignment of the Interest of a Limited Partner shall be made if, in the opinion of counsel to the Partnership, such assignment (i) may not be effected without registration under the Securities Act, (ii) would result in the violation of any applicable state securities laws, (iii) would result in a termination of the Partnership under Section 708 of the Code (unless consented to by the General Partner), (iv) would result in the treatment of the Partnership as an association taxable as a corporation or as a "publicly-traded limited partnership" for tax purposes (unless consented to by the General Partner), or

25

© 2012 Carroll & Scribner, P C
131 Church Street, Burlington, VT 05401

(v) would jeopardize the ability of any other Limited Partner to qualify under the EB-5 Program to become a lawful permanent resident of the United States. The Partnership shall not be required to recognize any such assignment until the instrument conveying such interest has been delivered to the General Partner for recordation on the books of the Partnership and the General Partner has consented to the assignment under the parameters set forth herein. Unless an assignee becomes a substitute Limited Partner in accordance with the provisions of subsection (c), he shall not be entitled to any of the rights granted to a Limited Partner hereunder, other than the right to receive all or part of the share of the Net Profits, Net Losses, cash distributions or returns of capital to which its assignor would otherwise be entitled.

(c) An assignee of the Interest of a Limited Partner, or any portion thereof, shall become a substitute Limited Partner entitled to all the rights of a Limited Partner if, and only if:

    (i)    the assignor (or, if the assignor is a defaulting Limited Partner, the General Partner pursuant to the power of attorney granted in Section 16.09) gives the assignee such right;

    (ii)    the assignee pays to the Partnership all costs and expenses howsoever incurred in connection with such substitution, including, specifically, without limitation, costs incurred in the review and processing of the assignment and in amending the Partnership's then current Certificate and/or Agreement of Limited Partnership, if required; and

    (iii)    the assignee executes and delivers such instruments, in form and substance satisfactory to the General Partner, as the General Partner in its sole discretion may deem necessary or desirable to effect such substitution and to confirm the agreement of the assignee to be bound by all the terms and provisions of this Agreement.

(d) The Partnership and the General Partner shall be entitled to treat the record owner of any Partnership Interest as the absolute owner thereof in all respects, and shall incur no liability for distribution of cash or other property made in good faith to such owner until such time as a written assignment of such Interest has been received and accepted by the General Partner and recorded on the books of the Partnership. The General Partner may refuse to accept an assignment until the end of the next successive quarterly accounting period.

### Section 10.02. Withdrawal of Initial Limited Partner.

Notwithstanding the provisions of Article X, the Interest of the Initial Limited Partner shall be terminated and of no further force or effect upon the first admission of a Limited Partner other than the Initial Limited Partner. The termination of the interest of the Initial Limited Partner shall be automatic and require no action on its part or on the part of any other Person, and the General Partner shall cause to be prepared appropriate amendments to Exhibit A of this Agreement and to the Certificate.

### Section 10.03. Termination of Partnership

Notwithstanding anything herein to the contrary, once all I-829 petitions filed under the EB-5 Program for all Qualified Investors who have invested into the Partnership have been adjudicated, with any appeals having been decided, the General Partner in its sole discretion shall decide if, when and how to disburse all funds on hand to the Partners on a pro rata basis as set forth herein, and whether, when and how to pursue an exit strategy to terminate the Partnership. Possible exit strategies for the Partnership are set forth in the Confidential Memorandum. The termination of the Partnership will be managed and conducted exclusively by the General Partner or its designee on terms to be determined by General Partner in its sole discretion in accordance with the provisions of this Limited Partnership Agreement, including without limitation Article XII, and applicable law.

**Each Limited Partner acknowledges and agrees by their receipt of this Agreement and**

26
© 2012 Carroll & Scribner, P C
131 Church Street, Burlington, VT 05401

investment into the Partnership that the possible exit strategies discussed herein and in the Confidential Memorandum do not constitute a redemption or guaranty of a return of their investment or a guaranty that their interest will be redeemed for a set price at any certain time.

## ARTICLE XI - Management Compensation, Etc.

**Section 11.01. Management Compensation, Etc.**
Other than receiving its interest as a General Partner herein, being reimbursed for all of its expenses and costs incurred related directly or indirectly to the development of the Project (including but not limited to permitting fees, professional fees and third party consultant fees), and receiving reimbursement for expenses and other costs incurred directly or indirectly by the General Partner to fulfill its duties hereunder, the General Partner shall not be entitled to compensation for its services rendered pursuant to this Agreement.

## ARTICLE XII - Dissolution of Partnership

**Section 12.01. Dissolution.**
The Partnership shall be dissolved, and the business of the Partnership shall be terminated in accordance with the Act, upon the occurrence of any of the following events:

(a) the dissolution, liquidation, withdrawal, retirement, removal, death, insanity, disability and/or Event of Bankruptcy of a General Partner, under such circumstances where no other remaining General Partner desires to continue the Partnership; provided, however, that the Partnership shall not be dissolved as aforesaid if the Limited Partner shall, within the maximum number of days permitted by the Act, elect to continue the Partnership and the Partnership business, and shall designate a successor General Partner;

(b) an election to dissolve the Partnership made in writing by all of the Partners in accordance with the Act;

(c) the sale or other disposition of all or substantially all of the Partnership Property, whether under Section 10.03 or otherwise;

(d) the expiration of the Term; or

(e) The occurrence of any other event causing the dissolution of a limited partnership under the laws of the State.

**Section 12.02. Distribution of Partnership Assets.**
Upon the dissolution of the Partnership, the Partnership business shall be wound up and its assets liquidated, and the net proceeds of such liquidation shall be distributed to the Partners as set forth in Section 8.02.

**Section 12.03. Termination of the Partnership.**
Subject to the conditions precedent set forth at Section 12.01 above, the Partnership shall terminate when all Partnership Property shall have been disposed of (except for any liquid assets not so disposed of), and the net proceeds therefrom, as well as any other liquid assets of the Partnership, have been distributed to the Partners as provided in Sections 12.02 and 8.02 and in accordance with the Act.

## ARTICLE XIII - Accounting and Reports

27
© 2012 Carroll & Scribner, P.C.
131 Church Street, Burlington, VT 05401

B2-84.

BL-0000084

**Section 13.01. Bank Accounts.**
The General Partner shall deposit the funds of the Partnership in the name of the Partnership in such separate bank account or accounts, and with such bank or banks or other financial institutions as shall be determined by and in the sole reasonable discretion of the General Partner. The General Partner shall arrange for the appropriate operation of such account or accounts.

**Section 13.02. Books of Account.**
The General Partner shall at the expense of the Partnership keep at the principal office of the Partnership true, correct, and complete books of account, maintained in accordance with generally accepted accounting principles, consistently applied, in which shall be entered fully and accurately each and every transaction of the Partnership. For federal income tax and financial reporting purposes, the Partnership shall use the accrual method of accounting and the fiscal year shall end December 31. Each Partner shall have access thereto to inspect and copy such books of account at all reasonable times upon reasonable advance written notice to the General Partner. The Partnership shall retain all books and records for the longest of the periods required by applicable laws and regulations.

**Section 13.03. Reports.**
The General Partner shall at Partnership expense cause to be prepared and delivered to the Limited Partner and, when required, shall cause the Partnership to file with relevant governmental agencies, each of the following:

(a) by March 15 of each calendar year, unless an extension has been requested, the Partnership's federal income tax return including Schedule K-1's to form 1065 and all other information from the Partnership necessary for the preparation of the Limited Partner's federal income tax return;

(b) within forty-five (45) days after being produced by Partnership accountants in each subsequent calendar year, for the prior fiscal year a financial statement and report prepared for the Partnership in accordance with generally accepted accounting principles recognized in the United States; and

(c) in addition, General Partner at its sole discretion may distribute interim financial reports.

**Section 13.04. Tax Elections and Adjustments.**
The General Partner is authorized to cause the Partnership to make, forego or revoke such elections or adjustments for Federal income tax purposes as they deem necessary or advisable in their sole discretion, provided such elections or adjustments are consistent with federal income tax rules and principles, including but not limited to, in the event of a transfer of all or part of the Limited Partnership Interest of any Partner, an election pursuant to section 754 of the Code to adjust the basis of the assets of the Partnership or any similar provision enacted in lieu thereof. The Partners will, upon request, supply any information necessary to properly give effect to any election or adjustment.

## ARTICLE XIV - Meetings of the Partnership

**Section 14.01. Meetings of the Partnership.**
Meetings of the Partnership may be called for any matters upon which the Partners may vote as set forth in this Agreement. The calling of a meeting shall be made:

(a) by the General Partner, which shall give Notice to the Partners setting forth (i) a statement of the purposes of the meeting, and (ii) the date of the meeting (which shall be a date no fewer than 15 days and no more than 30 days after the date of the Notice); or

(b) by the Limited Partner (which for the limited purpose of this subsection shall require at least sixty-six percent (66.67%) of the Limited Partners agreeing to such call for a meeting), which shall give

© 2012 Carroll & Scribner, P C
131 Church Street, Burlington, VT 05401

BL-0000085

Notice to the Partners setting forth a statement of the purposes of the meeting. No more than 15 days after receipt of such Notice, the General Partner shall provide Notice of the meeting to the other Partners in accordance with subsection (a).

## ARTICLE XV - Amendments

**Section 15.01. Generally.**
In addition to amendments otherwise authorized in this Agreement, this Agreement may be amended in any respect from time to time by the General Partner without written approval or consent of Limited Partners including but not limited to the following:

(a) by the General Partner, without the Consent of the Limited Partner, to

(1) add to its duties or obligations or to surrender any right or power given to it by this Agreement;

(2) cure any ambiguity, correct or supplement any provision of this Agreement which may be inconsistent with any other provision of this Agreement or make any other provisions with respect to matters or questions arising under this Agreement which are not inconsistent with the provisions of this Agreement;

(3) reflect on Exhibit A the removal, addition or substitution of the General Partner or the Limited Partner;

(4) correct or modify any provision to comply with the Act or satisfy USCIS; or

(5) any other amendment in the General Partner's sole discretion, so long as the amendment does not allow the Limited Partner to take part in the control of the Partnership's business in a manner that would reduce or eliminate the limited liability of the Limited Partner, or otherwise modify the limited liability of the Limited Partner, or increase the liability or obligations of the Limited Partner, or as to change the Capital Contributions required, or rights and interests in profits, losses and distributions of any Partner or dilute the Interest of the Limited Partner below what this Agreement contemplates.

**Section 15.02. Signatures.**
The General Partner shall sign any amendment to this Agreement adopted in accordance with the terms of this Agreement.

## ARTICLE XVI - Miscellaneous Provisions

**Section 16.01. Notices. etc.**
All notices, requests, consents, and other communications hereunder shall be in writing and shall be deemed to have been duly given if (i) delivered or mailed by first-class registered or certified mail, postage prepaid, to the respective parties hereto at their respective addresses set forth in Exhibit A or in each case at such other address as such party may have furnished to the Partnership in writing, (ii) delivered in hand to a party, (iii) on the business day next following delivery to a nationally recognized overnight courier, or (iv) when transmitted by facsimile with electronic confirmation of transmission receipt.

**Section 16.02. Survival of Representations.**
All representations, warranties, and indemnifications contained herein shall survive the dissolution and final liquidation of the Partnership.

29
© 2012 Carroll & Scribner, P C
131 Church Street, Burlington, VT 05401

**Section 16.03. Entire Agreement.**
This Agreement contains the entire understanding between and among the parties and supersedes any prior understandings and agreements between and among them respecting the subject matter of this Agreement.

**Section 16.04. Applicable Law.**
It is the intention of the parties hereto that all questions with respect to the construction, enforcement, and interpretation of this Agreement and the rights and liabilities of the parties hereto shall be determined in accordance with the laws of the State without regard to principles of conflicts of laws.

**Section 16.05. Severability.**
This Agreement is intended to be performed in accordance with, and only to the extent permitted by, all applicable statutes, laws, ordinances, rules, and regulations. If any provision of this Agreement or the application thereof to any Person or circumstance shall, for any reason and to any extent, be invalid or unenforceable, the remainder of this Agreement and the application of such provision to other Persons or circumstances shall not be affected thereby, but rather shall be enforced to the greatest extent permitted by law.

**Section 16.06. Binding Effect.**
(a) Each Partner, including any additional General Partner, successor General Partner, additional Limited Partner and substitute Limited Partner, shall be deemed to have adopted, and to have agreed to be bound by, all the provisions of this Agreement.

(b) When entered into by a Partner, this Agreement is binding upon, and inures to the benefit of, the parties hereto and their respective spouses, heirs, executors and administrators, personal and legal representatives, successors and assigns.

**Section 16.07. Counterparts.**
This Agreement and any amendments hereto may be executed in several counterparts, each of which shall be deemed to be an original copy, and all of which together shall constitute one agreement binding on all parties hereto, notwithstanding that all the parties shall not have signed the same counterpart.

**Section 16.08. No Implied Waiver.**
No failure on the part of any Partner to exercise, and no delay in exercising, any right under this Agreement shall operate as a waiver thereof; nor shall any single or partial exercise of any right under this Agreement preclude any other or further exercise thereof or the exercise of any other right. No term or provision of this Agreement shall be deemed waived and no breach excused unless such waiver or excuse shall be in writing and signed by the party claimed to have so waived or excused.

**Section 16.09. Power of Attorney.**
Each Limited Partner, including any additional or substituted Limited Partner, by the execution of this Agreement or any counterpart thereof, does hereby irrevocably constitute and appoint the General Partner's designee William Stenger, with full power of substitution, acting alone or jointly, its true and lawful agent and attorney-in-fact, with full power and authority in its name, place and stead, to make, execute, acknowledge, swear to, deliver, file and record such documents and instruments as may be necessary or appropriate to carry out the provisions of this Agreement, including, but not limited to: (i) such amendments to this Agreement and the Partnership's Certificate of Limited Partnership, as amended from time to time, as are necessary to effectuate the provisions of this Agreement, including without limitation to admit to the Partnership a substituted Limited Partner or a substituted General Partner, (ii) such documents and instruments as are necessary to cancel the Partnership's Certificate of Limited Partnership, (iii) an amended Certificate of Limited Partnership reflecting the terms of this Agreement, (iv) all certificates and other instruments deemed advisable by the General Partner to

30

© 2012 Carroll & Scribner, P C
131 Church Street, Burlington, VT 05401

BL-87

BL-0000087

permit the Partnership to become or to continue as a limited partnership or partnership wherein the Limited Partner has limited liability in the jurisdiction where the Partnership may be doing business, (v) all fictitious or assumed name certificates required or permitted to be filed on behalf of the Partnership and (vi) all other instruments which may be required or permitted by law to be filed on behalf of the Partnership. The foregoing power of attorney is coupled with an interest, shall be irrevocable and shall survive the death, bankruptcy or incapacity of any Limited Partner and the assignment by any Limited Partner of its limited partnership interest.

**Section 16.10. Partition.**
The Partners hereby agree that no Partner, nor any successor-in-interest to any Partner, shall have the right while this Agreement remains in effect to have the property of the Partnership partitioned, or to file a complaint or institute any proceeding at law or in equity to have the property of the Partnership partitioned, and each Partner, on behalf of himself, his successors, representatives, heirs, and assigns, hereby waives any such right. It is the intention of the Partners that during the term of this Agreement, the rights of the Partners and their successors-in-interest, as among themselves, shall be governed by the terms of this Agreement, and that the right of any Partner or successor-in-interest to assign, transfer, sell or otherwise dispose of its interest in the Partnership's Property shall be subject to the limitations and restrictions of this Agreement.

**Section 16.11. Confidentiality.**
A prospective investor into the Partnership, by accepting receipt of this Agreement, agrees not to duplicate or to furnish copies of this Agreement or to divulge information garnered from this Agreement or its exhibits to persons other than such investor's investment and tax advisors, accountants and legal counsel, and such advisors, accountants and legal counsel together with the prospective investors and any other persons to which this Agreement or the Related Documents come into their possession are prohibited from duplicating or using this Agreement, the Related Documents and all exhibits thereto in any manner other than to determine whether the investor wants to invest into the Partnership.   Prospective investors are not to construe the contents of this Agreement as legal, investment, immigration or tax advice, or any other advice related to the efficacy of the investment to them. The General Partner has not engaged any legal or other advisors to represent prospective investors. Each prospective investor should consult their own advisors as to legal, tax and related matters concerning the efficacy of this investment and the appropriateness of this investment to them and any other matters concerning this investment. The expense of such consultations shall be paid separately by the investor.

**Section 16.12. Approval of Agreement.**
All Qualified Investors who invest in the Partnership and become a Limited Partner, by their receipt of this Agreement and investment into the Partnership hereby approve this Agreement, all Related Documents and all exhibits thereto, and approve without limitation the use of their investment proceeds, the investment itself, and all management and exit strategies, all as disclosed herein.

**Section 16.13. No Guarantees or Redemption Rights.**
Each Limited Partner acknowledges and agrees by their receipt of this Agreement and investment into the Partnership that no promises or guarantees of performance, investment results or returns, rights to redeem their Interests or removal of conditions under the EB-5 Program have been made to them by anyone, including but not limited to by the General Partner or any of its Affiliates, and their agents, representatives, officers, salesmen, managers, employees, attorneys, consultants and third party contractors, and they are not relying on anything from the General Partner or any of its Affiliates, and their agents, representatives, officers, salesmen, managers, employees, attorneys, consultants and third party contractors except this Agreement and the Related Documents in making their decision to invest.

**Section 16.14. Arbitration Clause.**
**Any and all disputes arising under or relating to the interpretation or application of this**

© 2012 Carroll & Scribner, P C
131 Church Street, Burlington, VT 05401

BL-88

BL-0000088

Agreement shall be subject to arbitration in Vermont under the then existing rules of the American Arbitration Association and pursuant to the Vermont Arbitration Act, codified at 12 V.S.A. section 5651, et seq. (the "VAA"), and if any conflict exists between said rules and VAA, the VAA shall control. Judgment upon the award rendered may be entered in any court of competent jurisdiction. The cost of such arbitration shall be borne equally by the parties. Nothing contained in this Section shall limit the right of the General Partner, either on behalf of the Partnership or on its own behalf, and Limited Partner from seeking or obtaining the assistance of the courts in enforcing their constitutional or civil rights.

### ACKNOWLEDGMENT OF ARBITRATION.

The parties to this Agreement understand that this Agreement contains an agreement to arbitrate. After signing this Agreement, or the investment subscription documents as set forth in Section 3.02(b) herein, each Partner understands that it will not be able to bring a lawsuit concerning any dispute that may arise which is covered by the arbitration agreement, unless it involves a question of constitutional or civil rights. Instead, each Partner agrees to submit any such dispute to an impartial arbitrator.

**GENERAL PARTNER:**
ANC BIO VERMONT GP SERVICES, LLC

**INITIAL LIMITED PARTNER:**
ANC BIO VERMONT GP SERVICES, LLC

BY: _____
William Stenger, Managing Member
and Duly Authorized Agent

BY: _____
William Stenger, Managing Member
and Duly Authorized Agent

**Section 16.15. Reimbursement of Expenses and Costs.**
Notwithstanding anything herein to the contrary, the General Partner and its Affiliates will be reimbursed by the Partnership for all expenses and costs incurred by the General Partner or its Affiliates in exercising the duties and powers delegated to and granted the General Partner herein.

**Section 16.16. Translation of Agreement, Etc.**
Each prospective Partner, by their receipt of this Agreement, acknowledges that it is their responsibility to obtain and pay for the translation of this Agreement, Related Documents and exhibits thereto if they cannot read or understand English. No such translation may alter, modify or otherwise change the terms of this Agreement as set forth in English in any manner or way whatsoever.

**Section 16.17. Gender Clause.**
Common nouns and pronouns will be deemed to refer to the masculine, feminine, neuter, singular and plural, as the identity of the person or persons, firm or corporation may in the context require.

DATED: _____

**GENERAL PARTNER:**
ANC BIO VERMONT GP SERVICES, LLC

**INITIAL LIMITED PARTNER:**
ANC BIO VERMONT GP SERVICES, LLC

BY: _____
William Stenger, Managing Member
and Duly Authorized Agent

BY: _____
William Stenger, Managing Member
and Duly Authorized Agent

32
© 2012 Carroll & Scribner, P.C.
131 Church Street, Burlington, VT 05401

BL-89

BL-0000089

**Exhibit A**

| Name | Address | Initial Interest | Capital Contribution |
|---|---|---|---|
| *General Partner* | | | |
| ANC BIO VERMONT GP SERVICES, LLC | | 1.00% | |
| *Limited Partner* | | | |
| ANC BIO VERMONT GP SERVICES, LLC | | 99.00% | |

33
© 2012 Carroll & Scribner, P.C.
131 Church Street, Burlington, VT 05401

$BL$-90

BL-0000090

{This Page was intentionally left blank}

BL-91.

BL-0000091

Client Invesment Process.

BL-00000091A

*PROCESS: STEP BY STEP*

## Client Investment Process

**Initial Deposit and Commence Due Diligence Period**
- To commence the process and begin the due diligence period, a prospective investor is required to make a $10,000 deposit to the Q Burke Mountain Lodge & Conference Center LP Escrow account at People's United Bank in Vermont.
- Within the up to 30-day review period following the initial deposit your client (or representative) is offered a complimentary stay at Jay Peak Resort to meet with the Resort CEO and review the project.

**Review Project Documentation and Questionnaire to Q Burke**
- Once deposit is received, you are provided with the Offering Memorandum, Business Plan and Limited Partnership Agreement. Investor Questionnaires are also included for the investor to complete and return to Q Burke.
- If you choose not to proceed within the up to 30 day review period, the deposit is fully refundable.

**Return Investor Questionnaire to Q Burke**
- Return completed Investor Questionnaire to determine Investor eligibility.
- Return completed subscription documents to Q Burke for acceptance and inclusion in your
- I-526 petition.
- Provide us details of your immigration attorney, or one can be recommended.

**Complete Investment and Return Subscription Documents**
- Balance of investment funds to be paid within 45 days or sooner, at which point subject to acceptance of Investor Subscription Documents, the investment funds are released into the project.
- Investor I-526 petition cannot be submitted to USCIS without full investment funds invested.

**Regional Center Documentation Issued**
- Once full balance has been received and subscription documents signed, the Regional Center documentation is released to the acting attorney to include in clients Investor petition.

**Attorney to Prepare I-526 Petition**
- Acting attorney will prepare your petition, Q Burke may, if required, review and provide assistance with documentation to validate Investor's source of funds.
- Approximate time to complete petition is 3 weeks.

**Submit I-526 Petition to USCIS**
- The petition is sent to USCIS and the attorney is to provide Q Burke with the USCIS receipt number for USCIS auditing purposes. Attorney is also to inform Q Burke of subsequent USCIS decision on petition.
- Average petition approved in 150 days from time of submission but may take up to 180 days or more.

**I-526 Adjudicated and Forward for Immigrant Visa Application**
- The petition is approved by USCIS. Your attorney is to provide Q Burke with approval notice
- Approved petition is now sent forward for either adjustment of status or consular processing.
- Form I-485 or DS-260 is submitted, approval from this point can take 1 to 6 months or more.

**Jay Peak Resort and its EB-5 staff provide administrative support for the Q Burke Mountain Lodge & Conference Center LP project. Please direct questions or concerns to the following address 830 Jay Peak Rd, Jay, VT 05859 or by email; Bill Stenger bstenger@jaypeakresort.com, Karen Bennett kbennett@jaypeakresort.com or Lizzy Button lbutton@jaypeakresort.com**

*BL. 92*

BL-0000092

**Proceso de Inversión del Cliente - Programa de Visa EB-5 AnC Bio de Jay Peak en Vermont**

**Depósito Inicial y Plazo para el Comienzo de la Diligencia de Investigación**
- Para iniciar con el proceso y comenzar con el plazo de la diligencia de investigación, se le solicitará al inversionista un depósito de $10,000 dólares americanos en la cuenta del fideicomiso AnC Bio Vermont Jay Peak en el banco Peoples United Bank en Vermont.
- Hay un periodo de análisis con una duración de hasta 30 días después del depósito inicial del cliente (o su representante) y se le ofrecerá una estancia gratuita en el Jay Peak Resort para reunirse con el director general y revisar el proyecto.

**Documentación para la Revisión del Proyecto y Cuestionario del Inversionista para Jay Peak**
- Una vez que se recibe el depósito inversionista, se le proporcionará un Memorándum de Oferta, un Plan de Negocios y un Acuerdo de la Sociedad Limitada. También se incluirán los Cuestionarios del Inversionista para que los llene y regrese a Jay Peak.
- Si el cliente decide no proceder con la diligencia dentro de los 30 días que dura el plazo de revisión, el depósito es completamente reembolsable.

**Cuestionario del Inversionista que se deberá regresar a Jay Peak**
- El inversionista regresará el Cuestionario del Inversionista con su llenado completo para determinar la elegibilidad del inversionista.
- El inversionista regresará los documentos de suscripción completos para aceptación incluyendo su petición I-526 a Jay Peak.
- El inversionista proporcionará los detalles acerca de su abogado de inmigración, o en su defecto, se le puede recomendar uno.

**Realización de la Inversión y Retorno de los Documentos de Suscripción**
- El saldo de los fondos de inversión se pagará dentro de los 45 días, o antes, considerando que en todo momento se encontrará sujeto a la aceptación de los Documentos de Suscripción, el pago del saldo de los fondos de inversión liberarán el proyecto.
- La petición I-526 del inversionista no se podrá entregar al USCIS si no está liquidado en su totalidad el saldo de los fondos de inversión.

**Expedición al Centro de Documentación Regional**
- Una vez que se cubre el saldo y se firman los documentos de suscripción, se expedirán los documentos al Centro Regional y posteriormente se harán llegar abogado representante del cliente potencial para incluir la petición de inversión del mismo.

**El Abogado Prepara la Petición I-526**
- El abogado representante del cliente potencial preparará la petición, en caso de que se requiera, Jay Peak puede revisar y proporcionar asistencia con la documentación para validar el origen de los fondos del Inversionista.
- El tiempo aproximado para completar la solicitud es de 3 semanas.

**Enviar la Petición I-526 al USICS**
- La petición se envía al USCIS y el abogado representante del cliente potencial proporciona a Jay Peak el número de recibo USCIS para propósitos de auditoria de USCIS. El abogado también informará a Jay Peak la resolución posterior sobre la petición de USCIS.
- El promedio de aprobación a la petición es de 150 días a partir de la presentación pero podría tardar hasta 180 días o más.

BL-00 92

BL-0000945



February 22, 2013

Wire instructions for wires originating from United States Banks (Continental United States):

| | |
|---|---|
| Bank Name: | People's United Bank |
| Address: | 2 Burlington Square |
| Address: | Burlington, Vermont |
| ABA/Routing Number #: | 221172186 |
| Account Number #: | 0019100316 |
| Reference: | Institutional Trust Department |
| For Further Credit: | Jay Peak Escrow **with Investor Name** |

International wire instructions effective February 22, 2013:

| | |
|---|---|
| Bank Name: | Peoples United Bank |
| Address: | 850 Main Street |
| Address: | Bridgeport, Connecticut |
| Swift code: | PESBUS31 |
| Routing #: | 2211-7218-6 |
| Account #: | 0019100316 |
| FBO: | Jay Peak **(Project Name)** |
| FFC: | **Investor's Name** |

Note: Wire amounts to be credited must be net of wire transaction fees. Originator of wire must provide all wire fees to originating bank.

BL-79

BL-0003094

From: **Lizzy Button** lbutton@jaypeakresort com
Subject: RE: Bernard Ledezma
Date: January 29, 2014 at 8:43 AM
To: Mary Teruya mary@maryvisa com

Mary,
Here they are

Lizzy Button
Administrative Assistant

**JAY 🎿 PEAK**

802-327-2328

IMPORTANT DISCLOSURE: The Investing Member acknowledges and agrees that (i) the Manager,
Regional Center and Developer have not given, and have no authority to give, any investment and/or
legal advice with respect to the purchase of a security; and (ii) a prospective subscriber has not requested
or otherwise sought any such investment/legal advice from the Manager, Regional Center
and/or Developer; provided, however, that investment/legal advice may have been given by an
independent third-party agent which is marketing the security and unaffiliated with the
Manager, Regional Center and/or Developer.

**See More** from Mary Teruya



VIA E-MAIL: kbennett@jaypeakresort.com; lbutton@jaypeakresort.com

January 21, 2014

Bill Stenger – Jay Peak
Karen Bennett – Jay Peak
Lizzy Button – Jay Peak

RE: Bernard Ledezma

Dear Bill, Karen and Lizzy:

This letter is confirmation for receipt of funds in regards to the Jay Peak Escrow   Biomedical
Research Park, LP as follows:

Date: January 21, 2014          Amount: $500,000.00

BL-95

BL-0000095



Febrero 22, 2013

Instrucciones para transferencias desde bancos en Estados Unidos (Contitental United States):

| | |
|---|---|
| Nombre del Banco: | Direeción del People's |
| United Bank: | 2 Burlington Square |
| Address: | Burlington, Vermont |
| ABA/Ruta Bancaria #: | 221172186 |
| Número de Cuenta #: | 0019100316 |
| Referencia: | Institutional Trust Department |
| Para Crédito Adicional: | Agente de Jay Peak **con el Nombre del Inversionista** |

Instrucciones para el envío internacional de efectivo

Febrero 22, 2013 Nombre del

| | |
|---|---|
| Banco: | Peoples United Bank |
| Dirección: | 850 Main Street |
| Address: | Bridgeport, Connecticut |
| Código Swift : | PESBUS31 |
| Ruta bancaria #: | 2211-7218-6 |
| Cuenta #: | 0019100316 |
| Beneficiario: | Jay Peak |

**(Nombre del Proyecto)** para nuevos créditos:

**Nombre del Inversionista**

Nota: Las cantidades a acreditarse deben ser netas de las comisiones de transacción.

El generador del envío debe proporcionar todas las comisiones por la transacción bancarias.

BL - 96

*wiring instructions*



February 22, 2013

Wire instructions for wires originating from United States Banks (Continental United States):

| | |
|---|---|
| Bank Name: | People's United Bank |
| Address: | 2 Burlington Square |
| Address: | Burlington, Vermont |
| ABA/Routing Number #: | 221172186 |
| Account Number #: | 0019100316 |
| Reference: | Institutional Trust Department |
| For Further Credit: | Jay Peak Escrow **with Investor Name** |

International wire instructions effective February 22, 2013:

| | |
|---|---|
| Bank Name: | Peoples United Bank |
| Address: | 850 Main Street |
| Address: | Bridgeport, Connecticut |
| Swift code: | PESBUS31 |
| Routing #: | 2211-7218-6 |
| Account #: | 0019100316 |
| FBO: | Jay Peak **(Project Name)** |
| FFC: | **Investor's Name** |

Note:  Wire amounts to be credited must be net of wire transaction fees.
        Originator of wire must provide all wire fees to originating bank.

BL-97

BL-0000097

The Offering.

BL-0000097A



# JAY✳PEAK

## Section 1

# The Offering

BL-98

BL-0000098

{This Page was intentionally left blank}

BL-99

BL-0000099

# CONTENTS

THE OFFERING...........................................................................................1
IMPORTANT INFORMATION............................................................................4
INVESTOR SUITABILITY STANDARDS.................................................................8
SUMMARY OF THE OFFERING..........................................................................10
    INTRODUCTION....................................................................................10
    SECURITIES BEING OFFERED.....................................................................10
    PURCHASE TERMS.................................................................................10
    EXEMPTION FROM REGISTRATION.................................................................10
    THE PROJECT SPONSOR...........................................................................11
    THE LIMITED PARTNERSHIP/NCE..................................................................11
    THE GENERAL PARTNER...........................................................................11
    THE JOINT VENTURER.............................................................................11
    THE JOINT VENTURE ENTITY......................................................................12
    PROJECT SUMMARY...............................................................................12
    PROXIMITY TO BUSINESS AND JAY PEAK RESORT.................................................13
    USE OF PROCEEDS................................................................................13
    MISCELLANEOUS CONSIDERATIONS................................................................13
    TAX MATTERS....................................................................................19
    TRANSFER RESTRICTIONS.........................................................................19
    EXIT STRATEGIES................................................................................19
RISK FACTORS(ALSO SEEE IMMIGRATION RISK FACTORS).............................................20
    TAX RISKS......................................................................................23
U.S. IMMIGRATION OVERVIEW FOR EB-5, ALIEN ENTREPRENEUR INVESTORS.............................25
    EB-5 OVERVIEW..................................................................................25
    AMOUNT OF INVESTMENT: A TARGET EMPLOYMENT AREA...........................................27
    COUNTING EMPLOYMENT POSITIONS CREATED......................................................27
    THE STATE OF VERMONT- A REGIONAL CENTER.....................................................28
    THE I-526 PETITION PROCESS.....................................................................29
    THE I-526 PETITION APPROVAL....................................................................30
    CONSULAR PROCESSING OR ADJUSTMENT OF STATUS................................................30
    CONSULAR PROCESS...............................................................................30
    NUMERICAL QUOTAS...............................................................................31
    VISA ISSUANCE..................................................................................31
    ADMISSION TO U.S. AFTER VISA ISSUED..........................................................32
    ADMISSION AFTER INVESTING, FILING THE I-526 OR DURING CONSULAR PROCESS.....................32
    ADJUSTMENT OF STATUS...........................................................................32
    TRAVEL DURING ADJUSTMENT IF STATUS PROCESSING..............................................33
    EMPLOYMENT DURING THE ADJUSTMENT OF STATUS PROCESSING.....................................33
    REMOVAL OF CONDITIONS..........................................................................34
IMMIGRATION RISK FACTORS..........................................................................34
    GENERAL........................................................................................34
    APPROVAL OF INVESTMENT IN THE PROJECT........................................................35
    PROCESSING TIMES...............................................................................35
    GOVERNMENT FILING FEES.........................................................................35
    LIMITATIONS ON RETURN OF FUNDS IF I-526 PETITION IS DENIED..................................36
    TARGETED EMPLOYMENT AREAS AND THE MINIMUM INVESTMENT AMOUNT...............................36
    ATTAINING LAWFUL PERMANENT RESIDENCE.........................................................37
    GROUNDS FOR EXLUSION...........................................................................37
    NO RETURN OF FUNDS IF VISA OF ADJUSTMENT OF STATUS IS DENIED...............................39
    CONDITIONAL LAWFUL PERMANENT RESIDENCE.......................................................39
    NO REGULATIONS REGARDING REMOVAL OF CONDITIONS GENERALLY..................................39
    BUSINESS CHANGES AND BUSINESS FAILURES.......................................................39
    JOB CREATION AND TENANT OCCUPANCY............................................................40
    MATERIAL CHANGE IN THE EB-5 PROJECT..........................................................41
    REVIEW OF I-526 COMPLIANCE DURING THE I-829 PROCESS........................................41
    NUMERICAL QUOTAS...............................................................................41

BL-100

EXPIRATION OF THE REGIONAL CENTER PILOT PROGRAM.........................................42
ACTIVE PARTICIPATION IN LIMITED PARTNER.................................................43
RISK ATTENDANT TO EB-5 STATUS...........................................................43
CONSULAR PROCESSING- VISA NOT GUARANTEED.................................................44
ADMISSION AFTER INVESTING, FILING THE I-526 OR DURING CONSULAR PROCESSING.................44
ADJUSTMENT OF STATUS.....................................................................44
REMOVAL OF CONDITIONS....................................................................45
FAMILY RELATIONSHIPS.....................................................................45

BL- 101

BL-0000101

Section 1. Jay Peak Biomedical Research Park L.P.

## SECTION 1

**JAY PEAK BIOMEDICAL RESEARCH PARK L.P.**
(a Vermont limited partnership)
Newport, Vermont

A Private Offering of Limited Partnership Interests

All of the Limited Partnership Interests (also called "Interests" herein) are being offered by Jay Peak Biomedical Research Park L.P., the New Commercial Enterprise ("NCE") and the issuer (sometimes referred to herein as the NCE, "Issuer", "Partnership" or "Limited Partnership"). There is no public market for these interests. See Risk Factors.

**NO PARTIES EXCEPT THE PARTNERSHIP ARE RESPONSIBLE FOR THE CONTENTS OF THIS OFFERING MEMORANDUM (REFERRED TO HEREIN AS THIS "MEMORANDUM" OR "OFFERING MEMORANDUM"), AND NO OTHER PARTY EXCEPT SALES AGENTS AUTHORIZED BY THE PARTNERSHIP WILL BE INVOLVED IN THE OFFERING OF INTERESTS UNDER THE MEMORANDUM OR THE ACCEPTANCE OF SUBSCRIPTIONS FROM INVESTING LIMITED PARTNERS.**

## THE OFFERING

**US$110,000,000. The minimum investment for each Limited Partnership Interest is $500,000 (the "Offering").**

Jay Peak Biomedical Research Park L.P., by and through its General Partner, AnC Bio Vermont GP Services LLC (the "General Partner"), will use the invested funds raised in this Offering to purchase land in Newport, Vermont, USA, and undertake certain real estate development on the land including the construction and equipping of a world class certified GMP (Good Manufacturing Practice) and GLP (Good Laboratory Practice) building and clean room facility, and additionally undertake certain business activities in the new facility pursuant to a Joint Venture Agreement by and between the NCE and AnC Bio USA LLC or other similarly named subsidiary (the "Joint Venturer") of AnC Bio VT LLC ("AnC Bio VT"), which will include: (1) the research, development, manufacture and distribution of artificial organs, cell based therapy medicine and medical devices (collectively the "AnC Bio Products"), and other affiliated business operations in the new facility, and (2) the operation and staffing of clean rooms in the new building to be used by third parties (collectively, the "Project"). The Joint Venture Agreement will acknowledge, among other things, that the Joint Venturer and the Limited Partnership will establish and own a third entity to be named AnC Bio LLC (or similar name) set up to run the business operations in the new facility (the "Joint Venture Entity"). An organizational chart detailing this structure can be found in the business plan set forth in section 2 of the Offering Memorandum ("Business Plan").

The Project seeks funds amounting to a maximum capital raise of $110.0 million of development and operating costs to be financed pursuant to this Offering Memorandum (see Summary of Offering; Project

BL-102

BL-0000102

Section 1. Jay Peak Biomedical Research Park L.P.

Summary).

Through the funds raised in this Offering, the NCE known as Jay Peak Biomedical Research Park L.P. will stimulate economic development and create many jobs at the Project site in Newport, Vermont, within the State of Vermont Regional Center, within the northeastern United States and within the rest of the United States.

All Limited Partnership Interests are payable in full upon subscription. The minimum capital contribution to invest into the Partnership shall be $500,000 (subject to the General Partner's discretion for investors who are not seeking qualification as an "alien entrepreneur", as defined below). Each investor must also pay a nonrefundable administration fee of $50,000 payable to Joint VenturerAnC Bio VTto partially reimburse it for costs and expenses incurred by AnC Bio VT in connection with development of the Project, business planning and to produce and distribute this Offering, for a total subscription amount of $550,000. There is no minimum capital contribution requirement, except for foreign investors seeking qualification as an "alien entrepreneur" under the EB-5 Program under the Act (as those terms are defined below), where the minimum capital contribution amount is currently $500,000 as set by law because the investment is situated in a Targeted Employment Area (TEA). The General Partner in its sole discretion may waive the minimum subscription amount and/or raise the minimum amount in the future. The Offering will continue until it has raised $110,000,000, unless terminated sooner by the General Partner in its sole discretion, but in no event will the Offering be open past December 1, 2013. This Offering supersedes in its entirety all prior Offerings made by the Issuer, if any.

While this investment offering has been structured so that investors may meet the requirements under 8 U.S.C.§ 1153 (b)(5)(a) - (d); INA § 203 (b)(5)(a) - (d) of the Immigration & Nationality Act (the "Act") and qualify under this program (the "Program" or "EB-5 Program") to become eligible for admission to the United States of America as lawful permanent residents and confer this benefit upon their spouses and unmarried, minor children, the investment offering is also open to investors not seeking immigration benefits.

In making an investment decision investors must rely on their own examination of the Issuer and the terms of the Offering, including the merits and risks involved. You should depend solely on the written information contained in this private placement Memorandum. These securities have not been recommended or approved by any federal or state securities commission or regulatory authority. Furthermore, those authorities have not passed upon the accuracy or adequacy of this document. Any representation to the contrary is a criminal offense.

The US Securities and Exchange Commission (the "Commission" or "SEC") does not pass upon the merits of any securities offered or the terms of the Offering, nor does it pass upon the accuracy or completeness of any offering circular or selling literature. These securities are offered under and rely upon one or more exemptions from registration; however, the Commission has not made an independent determination that these securities are exempt from registration.

Investment in small businesses involves a high degree of risk. An investment in Interests of the Limited Partnership involves substantial risks including but not limited to reliance and continuity of management, third party services, general market forces and risks, profitability of the operations run by the Joint Venture Entity and complex tax issues. Investors should not invest any funds in this Offering unless they can afford to lose their entire investment. See the "Risk Factors" section of the Offering Memorandum for the risk factors that management believes present the most substantial (but not necessarily all) the risks to an investor in this Offering. See also the projections and financial data contained in the Business Plan contained in the Memorandum. There is currently no public market for the Interests and transferability of the Interests will be

2 of 46

BL-0000103

Section 1   Jay Peak Biomedical Research Park L.P

limited.

This Offering is made only to "accredited investors", as defined in rule 501(a) of Regulation D, and who are sophisticated in financial and business matters, unless the investor is not resident in the United States at the time he or she is given a copy of the Offering nor at the time of sale of a limited partnership interest to the investor, whereupon Regulation S of the 1933 Securities Act may apply. Each intending investor should obtain the advice of their own professional advisors including legal, financial, tax, investment and other advisors including immigration if applicable before deciding to invest.

|  | Price To Investors | Proceeds To Limited Partnership for Investment in the Project |
|---|---|---|
| Minimum Investment | $ 500,000.00 | $ 110,000,000 |
|  |  | Proceeds to AnC Bio VT LLC |
| Administration Fee | $ 50,000.00 | $ 11,000,000 |

All invested funds are stated and payable in US dollars.

Notes:

1. See "Risk Factors."  Possible acquisition of Interests by affiliates and others.

2. Though not part of the investor's investment, under the terms of the Memorandum each investor is required to pay Offering issuance expenses, herein referred to as administrative fees, to AnC Bio VT in the amount of $50,000, to partially reimburse it for all the costs incurred by it in connection with its conceptual design, creation and development of the Project, legal, accounting, administration and all other costs relating to the Project, producing, issuing and distributing the Memorandum, and communicating with interested parties and their professional advisors.

3. Though not part of the investor's investment into the Project, each investor may also be required to pay a fee to the State of Vermont Regional Center, estimated at this time to be $1,500, but said amount may change at the discretion of the State of Vermont, which fee will be used by the State of Vermont to help defray its costs in administering the Vermont Regional Center. Each prospective investor should consult with his or her own immigration counsel with respect to this issue.

The date of this Memorandum is November 30, 2012.

This Memorandum # ... has been provided to: _____

BL-104

BL-0000104

Section 1. Jay Peak Biomedical Research Park L.P.

## IMPORTANT INFORMATION

Review all information — A potential investor should carefully review all the information and exhibits contained in this Memorandum including the Limited Partnership Agreement, the Business Plan, including the financial and operating projections of the Project attached hereto, which is incorporated herein by reference, and the Subscription Agreement in making an investment decision. Investors must rely on such investor's own examination of the terms of the Offering, including the merits and risks involved. Each prospective investor is invited to ask questions of, and upon request may obtain additional information from the General Partner concerning the Limited Partnership, its contemplated business, the terms and conditions of such Offering and any other relevant matters to the extent the General Partner possesses such information or can acquire it without unreasonable effort or expense.

Sources of information — The information contained herein has been obtained from the Limited Partnership and AnC Bio VT. No representation or warranty, expressed or implied, is made as to the accuracy or completeness of such information and nothing contained in this Memorandum is or shall be relied on as a promise or representation as to the future. This Memorandum is provided subject to amendment and supplementation by the General Partner in its sole discretion, and the transaction contemplated herein may be modified or withdrawn at any time, with notice to prospective investors who have received this Memorandum and to investors who have already subscribed (who must subsequently re-subscribe pursuant to the amended Memorandum). The obligations of the parties to this transaction will be set forth and governed by the documents referred to in this Memorandum.

Authorized statements — This Offering Memorandum contains all of the representations by the Partnership concerning this Offering, and no person shall make different or broader statements than those contained herein. Investors are cautioned not to rely upon any information not expressly set forth in this Memorandum.

Memorandum not legal advice — Prospective investors should not construe the contents of this Memorandum or any prior or subsequent communications from the Partnership as investment, financial, legal or tax advice. Each investor must rely solely upon his or her own representatives (including his or her legal counsel, accountant and other personal advisors) as to legal, tax, immigration, business and related matters concerning a prospective investment in the Partnership. **PROSPECTIVE INVESTORS BY THEIR INVESTMENT INTO THE PROJECT ACKNOWLEDGE THAT THEY HAVE NOT RECEIVED ANY ADVICE ON INVESTING IN THE LIMITED PARTNERSHIP OR INTO THE PROJECT FROM THE JOINT VENTURER, THE LIMITED PARTNERSHIP, THE GENERAL PARTNER, ANC BIO VT OR ANY AFFILIATED ENTITIES OR ANY OF THEIR RESPECTIVE OFFICERS, OWNERS, EMPLOYEES OR AGENTS (COLLECTIVELY, THE "INTERESTED PARTIES"), NOR HAS ANY CONSIDERATION BEEN PAID BY SAID INVESTORS TO ANY OF THE INTERESTED PARTIES FOR ANY ADVICE SPECIFIC TO INVESTING IN THE LIMITED PARTNERSHIP OR INTO THE PROJECT.**

Private Memorandum — This Memorandum has been prepared solely for the information of persons and entities interested in the private placement of the Interests offered hereby and may not be reproduced or used for any other purpose. Any reproduction or distribution of this Memorandum, in whole or in part, without the prior written consent of the Partnership is prohibited. By accepting this Memorandum, prospective investors agree that they will not disclose its contents to anyone other than to their professional advisers, or reproduce it, in whole or in part, which advisors by their acceptance of the Memorandum similarly agree not to disclose its consents or reproduce it, without the prior written consent of the Partnership.

BL-105

BL-0000105

Section 1. Jay Peak Biomedical Research Park L.P.

Determination of Offering price — The price of the minimum Interest was determined by the Partnership to assist investors who wish to meet the requirements under the Act.

Best Efforts Offering — All interests are offered by the Partnership on a "best efforts" non-minimum basis. There is no assurance that all or any of the desired capital will be raised through the Offering. The Offering has no minimum amount and the Partnership will utilize proceeds as they are received. See Completion of Project.

Liquidity and capital resources — The Partnership's liquidity needs to date, if any, have been satisfied by support from related parties. Management believes that the maximum proceeds of this Offering will generate sufficient capital to conduct the business of the Partnership.

Miscellaneous — The description in this Memorandum of any agreement, document, statute, rule, regulation, or proposed legislation is not advice and is not designed to be complete and is, therefore, qualified in its entirety by reference to the respective agreement, document, statute, rule, regulation or proposed legislation.

**FORWARD-LOOKING STATEMENTS AND PROJECTIONS — THIS OFFERING MEMORANDUM CONTAINS FORWARD-LOOKING STATEMENTS AND PROJECTIONS THAT MAY ADDRESS, AMONG OTHER THINGS, PROJECTED DATES OR HIRES, DEVELOPMENT OF PRODUCTS, USE OF PROCEEDS, PROJECTED REVENUE AND CAPITAL EXPENDITURES, OPERATING COSTS, LIQUIDITY, DEVELOPMENT OF ADDITIONAL REVENUE SOURCES, DEVELOPMENT AND MAINTENANCE OF PROFITABLE MARKETING AND MANAGEMENT AND MAINTENANCE ALLIANCES. THESE STATEMENTS MAY BE FOUND IN THE SECTIONS OF THIS MEMORANDUM ENTITLED "SUMMARY OF OFFERING," "RISK FACTORS," "USE OF PROCEEDS," "BUSINESS PLAN" AND IN THIS MEMORANDUM GENERALLY. ACTUAL RESULTS COULD DIFFER MATERIALLY FROM THOSE ANTICIPATED IN THESE FORWARD-LOOKING STATEMENTS AND PROJECTIONS AS A RESULT OF VARIOUS FACTORS, INCLUDING ALL THE RISKS DISCUSSED IN "RISK FACTORS" AND ELSEWHERE IN THIS MEMORANDUM.**

Speculative offering and risk — The Interests offered hereby should be considered only by persons who can afford to sustain a loss of their entire investment. Investors will be required to represent that they are familiar with and understand the terms of this Offering, and that they or their purchaser representatives have such knowledge and experience in financial and business matters that they are capable of evaluating the merits and risks of this investment. Investors should be aware that their investment in the Limited Partnership may be illiquid indefinitely.

Restrictions on transfers — No Interests may be resold or otherwise disposed of by an investor unless, in the opinion of counsel to the Partnership, registration under the applicable federal or state securities laws is not required or compliance is made with such registration requirements. Restrictions will also arise from the requirements of and compliance with immigration laws and regulations and the Limited Partnership Agreement. For example, no Interests may be resold or otherwise disposed of by an investor unless, in the opinion of immigration counsel to the Partnership, such sale or disposition will not jeopardize the Project's compliance with applicable immigration law or subject other investors to possible loss of immigration benefits.

Limits on disclosure — The Offering materials are submitted in connection with the private offering of the Interests and do not constitute an offer or solicitation by anyone in any jurisdiction in which such an offer or solicitation is not authorized or is only authorized following registration or other legal requirements which

BL - 106

BL-0000106

Section 1. Jay Peak Biomedical Research Park L.P

have not been met. Any reproduction or distribution of the Offering materials in whole or in part, or the divulgence of any of their contents, without the prior written consent of the Partnership is prohibited. Any person acting contrary to the foregoing restrictions may place himself and the Partnership in violation of federal or state securities laws.

Voidability of sales – The Interests offered herein will be sold to and acquired by a purchaser in a transaction exempt from registration under federal and certain states securities laws and regulations, and may not be offered for sale or resold except in a transaction exempt from said securities laws and regulations, or pursuant to an effective registration statement hereunder. Sales made pursuant to exemptions from federal and state securities laws are voidable by each subscriber upon notice to the General Partner given within three days following the later of receipt by the subscriber of this Memorandum or the receipt and acceptance by the General Partner of the subscriber's executed subscription Agreement. The Limited Partnership will offer such rescission right to each subscriber, irrespective of the subscriber's state or country of residency, and notwithstanding the lack of such requirements under any federal or state securities laws that may apply to each subscriber.

Offering being made pursuant to certain states securities law registration exceptions — Any and all notices under this section should be sent by certified mail, return receipt requested, to the Limited Partnership in care of William Stenger, 4850 VT Route 242, Jay, Vermont 05859-9621.

Restrictive information:
Interests will be offered without registration under the Securities Act or state securities acts, as summarized below, and more specifically detailed hereunder:

Within the United States, in reliance upon Rule 506 of Regulation "D" promulgated by the SEC, only to persons who are "accredited investors", within the meaning of Rule 501 promulgated by the SEC; and,

Outside the United States, in reliance upon regulation "S" promulgated by the SEC only to persons who are not "U.S. persons" within the meaning of such regulations, or in reliance on Regulation "D", only to persons who are "accredited investors".

For the purposes of this Memorandum, "U.S. person" means any natural person resident in the United States.

The inclusion of information for each state in this Memorandum is not intended to imply that the Interests covered by this Memorandum are to be offered for sale in every state, but is merely a precaution in the event this Memorandum may be transmitted into any state other than by the issuer.

For residents in all states:

The securities offered hereby have neither been registered under the Securities Act of 1933, as amended (the "1933 Securities Act"), nor pursuant to the securities laws of any state, and are therefore being offered and will be sold to and acquired by purchasers in transactions which the Partnership believes to be exempt from the registration requirements of the 1933 Securities Act pursuant, to §§3(b) and 4(2) or other applicable section(s) thereof, and of the securities laws of the states in which the interests may be offered for sale (pursuant to the exemptions identified below). Once purchased by a subscriber, these securities may not be re-offered for sale or re-sold other than by an effective registration statement or in a transaction exempt from registration under the applicable law. The securities have neither been approved or disapproved by the United States Securities and Exchange Commission or any state securities regulatory authority, nor has the

BL-0000107

Section 1. Jay Peak Biomedical Research Park L.P.

commission or any such authority passed upon or endorsed the merits of this Offering or the accuracy or adequacy of this Memorandum. Any representation to the contrary is unlawful.

For Vermont residents only:

The sale of Limited Partnership Interests offered and described in this Memorandum will only be sold to and acquired by investors in a transaction exempt from registration of securities with the Vermont Department Of Financial Regulation under section 5202(13)(c) or other applicable section(s) of the Vermont Uniform Securities Act (2002) (the "Vermont Act"). As such, the Limited Partnership Interests have not been registered as securities under the Vermont Act. Any representation to the contrary is unlawful.

For persons resident outside the United States of America only:

The interests are also being offered in accordance with Regulation "S" promulgated by the Securities and Exchange Commission pursuant to the Securities Act of 1933. This Offering Memorandum does not constitute an offer or solicitation in the United States of America or any jurisdiction in which such offer or solicitation is not permitted under applicable law or to any U.S. person or individual who does not possess the qualifications described in this Memorandum.

## FOR ALL NON-U.S. INVESTORS GENERALLY:

IT IS THE RESPONSIBILITY OF ANY PERSONS WISHING TO SUBSCRIBE FOR THE PURCHASE OF INTERESTS OFFERED HEREBY TO INFORM THEMSELVES OF AND TO OBSERVE ALL APPLICABLE LAWS AND REGULATIONS OF ANY RELEVANT JURISDICTIONS. PROSPECTIVE INVESTORS SHOULD INFORM THEMSELVES AS TO THE LEGAL REQUIREMENTS AND TAX CONSEQUENCES WITHIN THE COUNTRIES OF THEIR CITIZENSHIP, RESIDENCE, DOMICILE AND PLACE OF BUSINESS WITH RESPECT TO THE ACQUISITION, HOLDING OR DISPOSAL OF THE INTERESTS OFFERED HEREBY, AND ANY FOREIGN EXCHANGE OR OTHER NON-U.S. RESTRICTIONS THAT MAY BE RELEVANT THERETO.

Interests will not be offered to any person except as set forth above. Any person wishing to buy an Interest will be required to demonstrate that he or she is an eligible investor in accordance with the foregoing. This Memorandum does not constitute an offer to sell to, or a solicitation of an offer to buy from, any person in any jurisdiction to whom such an offer or solicitation would be unlawful.

### INTENTIONALLY LEFT BLANK

BL-18

BL-0000108

Section 1. Jay Peak Biomedical Research Park L.P.

## INVESTOR SUITABILITY STANDARDS

The purchase of Interests in this Offering involves a high degree of risk and is not a suitable investment for all potential investors. See "Risk Factors." Accordingly, the Partnership will offer and sell Interests only to investors who are "accredited investors" as that term is defined in Regulation D as promulgated under the 1933 Securities Act, unless the investor is not resident in the United States at the time of the Offering nor at the time of sale of a limited partnership interest to the investor, whereupon Regulation S of the 1933 Securities Act shall apply. Any person wishing to buy an Interest will be required to demonstrate that he or she is an eligible investor in accordance with the foregoing. The Partnership has the unconditional right to reject any subscription.

This Memorandum does not constitute an offer to sell to, or a solicitation of an offer to buy from, any person in any jurisdiction to whom such an offer or solicitation would be unlawful. In addition to restrictions on transfer imposed by the Partnership in the Limited Partnership Agreement, an investor seeking to transfer his Interests subsequent to his initial investment will be subject to the provisions of the federal and state securities laws and the transfer restrictions which may be imposed pursuant to said laws.

The offer and sale of Interests are exempt from the registration and prospectus delivery requirements of the 1933 Securities Act and applicable state securities laws pursuant to exemptions therein. Investment in the Interests is suitable only for those who have adequate means of providing for their current needs and personal contingencies and have no need for liquidity in an investment of this type. Prior to the purchase of the Interests, each prospective purchaser will be required to represent that he meets each of the following requirements: (a) he has the requisite knowledge or has relied upon the advice of his own professional advisor(s) with regard to the tax and other considerations involved in making such an investment and (b) he is acquiring the Interests for investment and not with a view to resale or distribution thereof.

Prior to a purchase of Interests, each prospective purchaser will be required to represent that he is an "accredited investor" as defined in Regulation D, unless the investor is not resident in the United States at the time of the Offering nor at the time of sale of a Limited Partnership Interest to the investor, whereupon Regulation S of the 1933 Securities Act may apply. Among other categories, an "accredited investor" is an investor who, at the time of purchase of the interests, meets one of the following requirements:

(i) any natural person whose individual net worth, or joint net worth with that person's spouse, at the time of the purchase exceeds $1,000,000, excluding home, home furnishings and automobiles;

(ii) any natural person who had an individual income in excess of $200,000 each of the two most recent years or joint income with that person's spouse in excess of $300,000 in each of the two most recent years and who reasonably expects to reach the same income level in the current year; or

(iii) any entity in which all of the equity owners are accredited investors.

If, in the opinion of the Limited Partnership, a prospective purchaser lacks the knowledge and experience in financial and business matters so that he is not capable of evaluating the merits and risks involved in the purchase and ownership of the Limited Partnership Interest, the Limited Partnership may require the prospective purchaser to use the services of a purchaser representative to serve the investor in evaluating the merits and risks of the prospective investment. If such a purchaser representative is required and used, the Limited Partnership will provide the prospective investor the appropriate forms for both the prospective

BL-0000109

Section 1   Jay Peak Biomedical Research Park L.P.

investor and purchaser representative to sign and return to the Limited Partnership.

Prior to purchase of a Limited Partnership Interest, an investor questionnaire (Exhibit B) and a subscription Agreement (Exhibit A), including a Consent to the Limited Partnership Agreement, must be signed and delivered by a prospective purchaser to the Partnership.

If the Partnership is incorrect in its assumption as to the circumstances of a particular prospective investor, then the delivery of this Memorandum to such prospective investor shall not be deemed to be an offer and this Memorandum shall be returned to the Partnership immediately.

The suitability standards defined above represent suitability standards for prospective investors. Each prospective investor should determine whether an investment in the Partnership is appropriate in view of his or her own particular circumstances.

**INTENTIONALLY LEFT BLANK**

BL-110

BL-0000110

Section 1. Jay Peak Biomedical Research Park L.P.

# SUMMARY OF THE OFFERING

## INTRODUCTION

This summary highlights and outlines certain information regarding the Offering and may not contain all the information that is important to you.  The summary is qualified in its entirety by the information appearing in the Limited Partnership Agreement, and elsewhere in this Memorandum, including the exhibits and the Business Plan and financial data of the Limited Partnership attached hereto and incorporated herein by reference (the "Financial Data"), which contains more detailed information with respect to each of the matters summarized herein as well as other matters not covered by this summary.  Prospective investors should read the Memorandum and the Financial Data in their entirety, along with the Limited Partnership Agreement, the Subscription Agreement and accompanying documents and exhibits.

## SECURITIES BEING OFFERED

Investors are being offered the opportunity to purchase a limited partnership interest.  All Limited Partnership Interests are payable in full upon subscription (the "Offering").  There is no minimum sale requirement, in accord with the provisions of the Limited Partnership Agreement, excepting for foreign investors seeking qualification as an "alien entrepreneur", where the minimum amount, currently $500,000, is set by law, the General Partner may in its sole discretion both waive the minimum subscription amount, and may raise the minimum amount in the future. The Offering will continue until it has raised $110,000,000 unless terminated sooner by the General Partner in its sole discretion, but in no event will the Offering be open past December 1, 2013. The minimum amount required of foreign investors may increase if the law or regulations of the EB-5 Program controlling the minimum amount are amended.

## PURCHASE TERMS

The minimum capital contribution to the Limited Partnership to purchase an interest shall be five hundred thousand and no/100 dollars ($500,000 US) (herein referred to as a "Capital Contribution"). Each prospective investor must also pay an administration fee of $50,000 to the Joint Venturer in consideration for AnC Bio VT covering all the costs and expenses incurred to create, structure and develop the Project, for business planning, to prepare and distribute this Offering Memorandum, and to communicate with interested parties and their professional advisors, for a total cost to each prospective investor of $550,000. The subscription price is payable in cash and in full upon subscription and payment must accompany delivery of the Subscription Agreement. The Limited Partnership reserves the right to reject any subscription in whole or in part, in its sole discretion.

## EXEMPTION FROM REGISTRATION

The Limited Partnership is claiming exemption from registration requirements under section 4(2) of the Securities Act of 1933, as amended, and Rule 506 of Regulation D promulgated thereunder, and for persons outside the United States under Regulation S promulgated by the SEC only to persons who are not "U.S. persons" within the meaning of the regulations. Accordingly, no registration statement will be filed with the SEC in connection with this Offering and sale of the Interests pursuant to this Memorandum. In addition, this Offering is being made without registration under the securities laws of any state or any other jurisdiction.

Prospective investors are invited to make an independent examination of the books, records and other documents of the Limited Partnership, and may question the appropriate officers, members or directors of

BL-111

Section 1.  Jay Peak Biomedical Research Park L.P.

the General Partner to the extent that such investors deem it necessary in their sole discretion to analyze the
risks involved with this investment. Prospective investors should not rely on the Limited Partnership, or any of
their officers, directors, employees or agents, with respect to the judgments relating to their investment in the
Limited Partnership. Prospective investors should retain their own professional advisors to review and
evaluate the economic, tax and other consequences of an investment in the Limited Partnership. The Limited
Partnership will make available, upon reasonable notice, but shall not incur any unreasonable expenses, to
provide any other documents or information available to the Limited Partnership concerning the affairs of the
Limited Partnership which a prospective investor requests, subject to receipt of reasonable assurances that
such matters will be maintained in confidence between the investor and its professional advisors.

## THE PROJECT SPONSOR

The Project sponsor is AnC Bio VT LLC, a limited liability company organized in the State of Vermont with its
principal place of business in Newport, Vermont.  The sole members of AnC Bio VT LLC are Ariel Quiros,
William Stenger and Ary Quiros.

## THE LIMITED PARTNERSHIP/NCE

Jay Peak Biomedical Research Park L.P. is a newly formed Vermont limited partnership with its principal
place of business in Newport, Vermont. Its General Partner, AnC Bio GP Services LLC, is a newly formed
Vermont limited liability company with its principal place of business in Jay, Vermont.  The Limited
Partnership will be granted certain distribution rights as to the distribution of AnC Bio Products, which rights
will be contributed by it to the joint venture.

## THE GENERAL PARTNER

The General Partner will be responsible for marketing the Offering to prospective investors who may be
interested in becoming limited partners, for the day to day decisions on behalf of the Limited Partnership and,
either by itself or through its designee(s), members, manager or affiliates, for managing the development and
operation of the Project.  The sole members of the General Partner are William Stenger and Ariel Quiros.

## THE JOINT VENTURER

A wholly owned subsidiary of AnC Bio VT, proposed to be known as AnC Bio USA LLC and to be set up in
the State of Vermont, will enter into the Joint Venture Agreement with the NCE to set forth the agreements by
and between both entities with respect to managing the business operations at the new facility in Newport,
Vermont.  The Joint Venturer will contribute the intellectual property and technology needed to produce the
AnC Bio Products to the joint venture.  The Joint Venture Agreement will, among other things, acknowledge
the creation by the NCE and the Joint Venturer of the Joint Venture Entity owned by them, proposed to be
known as AnC Bio LLC.

## THE JOINT VENTURE ENTITY

AnC Bio LLC, or similarly named entity, will be formed and owned by the NCE/Limited Partnership and the
Joint Venturer as a Vermont limited liability company with its principal place of business in Newport, Vermont.
It will manage all the business operations at the new facility on behalf of the Joint Venturer and the
NCE/Limited Partnership, including hiring staff to operate and run the research, development, manufacturing
and distribution divisions to produce and distribute the AnC Bio Products, as well as to operate and staff the

BL-112

BL-0000112

Section 1. Jay Peak Biomedical Research Park L.P.

clean rooms available for use by third parties.

## PROJECT SUMMARY

The Project will include: (1) construction of a world class certified GMP (Good Manufacturing Practice) and GLP (Good Laboratory Practice) building and facility in Newport, Vermont, (2) supply of all necessary equipment and technicians in the facility, (3) research, development, manufacture and distribution of the AnC Bio Products under intellectual property and distribution agreements from and with AnC Bio Inc., South Korea (the "Existing AnC Entity") and AnC Bio VT, and (4) operation of clean room spaces in the building by third parties, including without limitation the Existing AnC Entity, so that those third parties may conduct research into certain affiliated industries. These third parties will include businesses, universities and colleges looking to expand such research but have in the past been hampered by a lack of adequate, geographically close clean room facilities. A more detailed summary is included in the Business Plan.

The projected overall cost of the Project is $118 million, which development and initial operating costs will be financed pursuant to this Offering Memorandum as well as from equity contributed by AnC Bio VT or its designee (see Business Plan - Section 2).

Most importantly, the Project will stimulate economic development and create many new jobs, primarily within the State of Vermont Regional Center and the northeastern United States of America (See the Exhibit to the Offering titled "Economic and Job Creation Impacts of the Prospective AnC Bio VT Facility in the Vermont Regional Center" prepared by Economic Development Research Group, Inc., and dated November, 2012, referred to herein as the "EDR Report"), a critical component of the Project to meet the Act's requirements for job creation with respect to foreign investors' investment into the Limited Partnership. See also Immigration Discussion below.

## PROXIMITY TO AND BUSINESS RELATIONSHIP WITH JAY PEAK RESORT

The Project is located within 20 miles of the Jay Peak Resort in Jay, Vermont, which has used funds invested by foreign investors under the EB-5 Program to greatly expand the services and amenities the Jay Peak Resort offers its guests. The Jay Peak EB-5 projects are widely considered to be some of the most successful development projects in the United States using EB-5 funds. The owners of the Jay Peak Resort are also owners of AnC Bio VT and they will play an integral part in developing and operating the Project. For a more detailed summary of the many successful Jay Peak projects, see the exhibit titled "Jay Peak EB-5 Projects" in the Exhibits to the Offering.

BL-113

BL-0000113

Section 1. Jay Peak Biomedical Research Park L.P.

## USE OF PROCEEDS

The proceeds from the sale of the Limited Partnership Interests will be used to purchase the land on which the new facility will be built (see draft Purchase and Sale Agreement in the Offering Memorandum), to construct and equip the clean room manufacturing and research facility and attract and hire qualified individuals to work at the facility in Orleans County, Vermont, all of which will create thousands of jobs primarily within the Vermont Regional Center and within the northeastern United States. See the Financial Data for an expanded analysis of how the proceeds will be used in acquiring control of the land underneath the new building to be constructed, to construct and equip the building and to operate the facility. The Joint Venture Agreement will control the operations by the Joint Venture Entity at the facility site, on behalf of the NCE and the Joint Venturer.

## MISCELLANEOUS CONSIDERATIONS

### OFFERING MEMORANDUM ONLY AVAILABLE IN US ENGLISH LANGUAGE

In the event the prospective purchaser cannot understand or read the English language, and/or is unable to fully comprehend all documents and exhibits related to this Offering, it is the prospective purchaser's sole responsibility at the purchaser's sole cost to obtain all assistance required with interpretation and translation of this Offering Memorandum and exhibits thereto. No such translation may alter, modify or otherwise change the terms of this Offering Memorandum as set forth in English in any manner or way whatsoever.

### TAX MATTERS

**PURSUANT TO INTERNAL REVENUE SERVICE CIRCULAR NO. 230, BE ADVISED THAT ANY FEDERAL TAX ADVICE IN THIS OFFERING MEMORANDUM, INCLUDING ANY ATTACHMENTS OR ENCLOSURES, WAS NOT INTENDED OR WRITTEN TO BE USED, AND IT CANNOT BE USED BY ANY INDIVIDUAL OR ENTITY TAXPAYER, FOR THE PURPOSE OF AVOIDING ANY INTERNAL REVENUE CODE (THE "CODE") PENALTIES THAT MAY BE IMPOSED ON SUCH PERSON OR ENTITY. SUCH ADVICE WAS WRITTEN TO SUPPORT THE PROMOTION OR MARKETING OF THE TRANSACTION(S) OR MATTER(S) ADDRESSED BY THE WRITTEN ADVICE. EACH PERSON OR ENTITY SHOULD SEEK ADVICE BASED ON ITS PARTICULAR CIRCUMSTANCES FROM AN INDEPENDENT TAX ADVISOR.**

**PRIOR TO INVESTMENT, A PROSPECTIVE INVESTOR THAT IS NOT A U.S. PERSON SHOULD CONSULT WITH HIS OR HER NON-U.S. AND U.S. TAX ADVISORS WITH REGARD TO THE TAX CONSEQUENCES OF BECOMING A LAWFUL PERMANENT RESIDENT OF THE UNITED STATES, AND, FURTHER, OF INVESTING IN, OWNING AND DISPOSING OF THE INTERESTS, AND ALL OTHER TAX CONSEQUENCES IN CONNECTION WITH AN INVESTMENT IN THE PARTNERSHIP.**

**THE FOLLOWING DISCUSSION IS NOT TAX ADVICE. PROSPECTIVE INVESTORS ARE STRONGLY URGED TO CONSULT THEIR OWN TAX ADVISORS WITH RESPECT TO THE TAX CONSEQUENCES OF AN INVESTMENT IN THE PARTNERSHIP.**

No federal income tax ruling will be requested from the IRS with respect to any of the income tax consequences or federal estate tax consequences related to the Partnership's activities or an investor's ownership of a Interest. Therefore, a material risk exists that, upon audit, certain items of deduction may be

B2-114

BL-0000114

Section 1.  Jay Peak Biomedical Research Park L.P.

disallowed in whole or in part or required to be capitalized by the Partnership.  It is presently intended that the Partnership's tax filings will be prepared based upon interpretations of tax law deemed to be most favorable to the majority of investors.  However, it will be the responsibility of each investor to prepare and file all appropriate tax returns that he or she may be required to file as a result of his or her participation in the Partnership.  EACH PROSPECTIVE INVESTOR IS STRONGLY URGED TO CONSULT WITH HIS OR HER OWN TAX ADVISOR AND COUNSEL WITH RESPECT TO ALL TAX ASPECTS OF THE ACQUISITION AND OWNERSHIP OF AN INTEREST IN THE PARTNERSHIP.

*United States Tax Status*

The Partnership will be classified for U.S. federal income tax purposes as a partnership rather than as an association taxable as a corporation under currently applicable tax laws.  This classification, however, is not binding on the IRS or the courts, and no ruling has been, or will be, requested from the IRS.  No assurance can be given that the IRS will concur with such classification or the tax consequences set forth below.  This summary also does not discuss all of the tax consequences that may be relevant to a particular investor or to certain investors subject to special treatment under the federal income tax laws, including financial institutions, insurance companies, tax-exempt investors or non-U.S. Limited Partners.  Moreover, this summary does not address the U.S. federal estate and gift tax or alternative minimum tax consequences of the acquisition, ownership, disposition or withdrawal of an investment in the Partnership.

*Certain Considerations for U.S. Investors*

The following discussion summarizes certain significant U.S. federal income tax consequences to an investor who:  (a) owns, directly or indirectly through a partnership or other flow-through entity, an interest as a U.S. taxpayer;  (b) is, with respect to the United States, a citizen or resident individual, a domestic corporation, an estate, the income of which is subject to U.S. federal income taxation regardless of its source, or a trust for which a court in the United States is able to exercise primary supervision over its administration and one or more United States persons have the authority to control all substantial decisions, as such terms are defined for U.S. federal income tax purposes;  and (c) is not tax-exempt.  An investor meeting the foregoing criteria is referred to herein as a "**U.S. Investor.**"

*Taxation of Partnership Income, Gain and Loss*

The Partnership will not pay U.S. federal income taxes, but each Limited Partner will be required to report his or her allocable share (whether or not distributed) of the income, gains, losses, deductions and credits of the Partnership on such Limited Partner's income tax return.  It is possible that the investors could incur income tax liabilities without receiving from the Partnership sufficient cash distributions to defray such tax liabilities.  Each investor is required to take into account in computing his or her federal income tax liability, and to report separately on his or her own federal income tax return, his or her distributive share of the Partnership's income, gain, loss, deductibility and credit for any taxable year of the Partnership ending within or with the taxable year of such investor.

Pursuant to the Limited Partnership Agreement, items of the Partnership's taxable income, gain, loss, deduction and credit are allocated so as to take into account the varying interests of the investors over the term of the Partnership.  The Limited Partnership Agreement will contain provisions intended to comply substantially with IRS regulations describing partnership allocations that will be treated as having "substantial economic effect," and hence be respected, for tax purposes.  However, those regulations are extremely complex, and there can be no assurance that the allocations of income, deduction, loss and gain for tax purposes made pursuant to the Limited Partnership Agreement will be respected by the IRS if reviewed.  It is possible that the IRS could challenge the Partnership's allocations as not being in compliance with applicable

14 of 46

B2.115

BL-0000115

Section 1. Jay Peak Biomedical Research Park L.P.

Treasury regulations. Any resulting reallocation of tax items may have adverse tax and financial consequences to a Limited Partner.

The Partnership's tax year will be the calendar year, or such other year as required by the Code. Tax information will be distributed to each investor as soon as reasonably practicable after the end of the year.

*Investment Interest and Passive Activity Limitations*

There are limits on the deduction of "investment interest," (*i.e.*, "interest for indebtedness properly allocable to property held for investment"). In general, investment interest will be deductible only to the extent of the taxpayer's "net investment income." For this purpose "net investment income" will generally include net income from the Partnership and other income from property held for investment (other than income treated as passive business income). However, long-term capital gain is excluded from the definition of net investment income unless the taxpayer makes a special election to treat such gain as ordinary income rather than long-term capital gain. Interest which is not deductible in the year incurred because of the investment interest limitation may be carried forward and deducted in a future year in which the taxpayer has sufficient investment income. The Partnership will report separately to each investor his or her distributive share of the investment interest expense of the Partnership, and each investor must determine separately the extent to which such expense is deductible on the investor's tax return.

Non-corporate investors (and certain closely held, personal service and S corporations) are subject to limitations on using losses from passive business activities to offset active business income, compensation income, and portfolio income (e.g., interest, dividends, capital gains from portfolio investment, royalties, etc.). The Partnership's distributive share of income or losses generally may be treated as passive activity income or losses. Accordingly, an investor will be subject to the passive activity loss limitations on the use of any allowable Partnership losses and allocable Partnership expenses.

*Deductibility of Partnership Investment Expenditures and Certain Other Expenditures*

Investment expenses of an individual, trust or estate are deductible only to the extent they exceed 2% of the taxpayer's adjusted gross income for the particular taxable year. In addition, the Code further restricts the ability of individuals with an adjusted gross income in excess of a specified amount to deduct such investment expenses. Moreover, such investment expenses are miscellaneous itemized deductions which are not deductible by a noncorporate taxpayer in calculating such taxpayer's alternative minimum tax liability.

These limitations on deductibility may apply to a Limited Partner's share of the trade or business expenses of the Partnership. The Partnership may make an allocation of its expenses among its various activities. There can be no assurance that any of its expenses will be considered trade or business expenses nor can there be any assurance that the IRS will agree with any allocation made by the Partnership.

A Limited Partner will not be allowed to deduct syndication expenses attributable to the acquisition of Interests that are paid by such Limited Partner or the Partnership. Any such amounts will be included in the Limited Partner's adjusted tax basis for his or her Interests.

The consequences of these limitations will vary depending upon the particular tax situation of each taxpayer. Accordingly, Limited Partners should consult their own tax advisors with respect to the application of these limitations and on the deductibility of their share of items of loss and expense of the Partnership.

BL-116

Section 1. Jay Peak Biomedical Research Park L.P.

*Application of Basis and "At Risk" Limitations on Deductions*

The amount of any loss of the Partnership that an investor is entitled to deduct on such investor's income tax return is limited to such investor's adjusted tax basis in his or her Interests as of the end of the Partnership's taxable year in which such loss is incurred. Generally, an investor's adjusted tax basis for such investor's Interests is equal to the amount paid for such Interests, increased by the sum of (i) such investor's share of the Partnership's liabilities, as determined for federal income tax purposes, and (ii) such investor's distributive share of the Partnership's realized income and gains, and decreased (but not below zero) by the sum of (a) distributions (including decreases in such investor's share of Partnership liabilities) made by the Partnership to such investor and (b) such investor's distributive share of the Partnership's losses and expenses.

An investor that is subject to the "at risk" limitations (generally, non-corporate taxpayers and closely held corporations) may not deduct losses of the Partnership to the extent that they exceed the amount such investor has "at risk" with respect to such investor's Interests at the end of the year. The amount that an investor has "at risk" will generally be the same as such Limited Partner's adjusted basis as described above, except that it will generally not include any amount attributable to liabilities of the Partnership (other than certain loans secured by real property) or any amount borrowed by the investor on a non- recourse basis.

Losses denied under the basis or "at risk" limitations are suspended and may be carried forward in subsequent taxable years, subject to these and other applicable limitations.

*Certain U.S. Tax Considerations for Foreign Investors*

The U.S. federal income tax treatment of a non-resident alien investing as an Investor in the Partnership (a "**non-U.S. Investor**") is complex and will vary depending on the circumstances and activities of such investor and the Partnership. Each non-U.S. Investor is urged to consult with his or her own tax advisor regarding the U.S. federal, state, local and foreign income, estate and other tax consequences of an investment in the Partnership. The following discussion assumes that a non-U.S. Investor is not subject to U.S. federal income taxes as a result of the investor's presence or activities in the United States other than as an investor in the Partnership.

*Withholding*

A non-U.S. Investor will generally be subject to U.S. federal withholding taxes at the rate of thirty percent (30%) (or such lower rate provided by an applicable tax treaty) on his or her share of Partnership income from dividends interest (other than interest that constitutes portfolio interest within the meaning of the Code) and certain other income.

The Partnership may be deemed to be engaged in a U.S. trade or business. In such event, a non-U.S. Investor's share of Partnership income and gains will be deemed "effectively connected" with such a U.S. trade or business of the Partnership (including operating income from Partnership) and will be subject to tax at normal graduated U.S. federal income tax rates. A non-U.S. Investor generally will be required to file a U.S. federal income tax return with respect to the non-U.S. Investor's share of effectively connected income. If the Partnership is deemed to be engaged in a U.S. trade or business, then the Partnership will be required to withhold U.S. federal income tax with respect to the non-U.S. Investor's share of Partnership income that is effectively connected income.

*Backup Withholding*

BL-0000117

Section 1. Jay Peak Biomedical Research Park L.P.

Backup withholding of U.S. tax, currently at a rate of 28%, may apply to distributions or portions thereof by the Partnership to Limited Partners who fail to provide the Partnership with certain identifying information, such as a Limited Partner's taxpayer identification number. A U.S. Investor may comply with these identification procedures by providing the Partnership with a duly executed IRS Form W-9, Request for Taxpayer Identification Number and Certification. Non-U.S. Investors may comply by providing the Partnership with a duly executed IRS Form W-8BEN or other appropriate IRS Form W-8.

*Estate Tax*

Additionally, each non-U.S. Investor is subject to U.S. estate tax on his or her interest in the Partnership. If at the time of death, the non-U.S. Investor remains a non-U.S. resident under the Internal Revenue Code, a non-U.S. Investor may pass, free of U.S. estate tax, the first $60,000 of U.S. situs assets. The value in excess of this $60,000 exemption will be subject to federal estate tax at a 35% rate, which rate may change after 2012 if the current tax law related to this matter is not renewed. Treaties and various exemptions may reduce or eliminate the estate tax, but no assurance can be made that a treaty or exemption will apply.

The United States charges income and estate tax on all U.S. citizens and permanent residents based on worldwide income. Treaties and various exemptions eliminate some but not all of the risk of double taxation. Each state in the United States has its own separate income tax system. All but four states raise revenue through state income tax. Investors should consider the tax effects of becoming a U.S. resident before investing. Foreign persons (i.e., non-U.S. persons) that become permanent residents of the United States generally are subject to U.S. federal income tax on their worldwide income in the same manner as a U.S. citizen. Prior to making an investment in the Partnership, an investor that is not a U.S. person should consult with his or her non-U.S. tax advisors with regard to the consequences of becoming a lawful permanent resident of the United States.

This Memorandum does not address all of the U.S. federal income tax consequences to the investor of an investment in the Partnership, and does not address any of the state or local tax consequences of such an investment to any investor, or all of the United States or foreign tax consequences of such an investment to any Limited Partner that is not a United States person or entity. Each investor is advised to consult his or her own tax counsel as to the U.S. federal income tax consequences of an investment in the Partnership and as to applicable state, local and foreign taxes. Special considerations may apply to investors who are not United States persons or entities and such investors are advised to consult his or her own tax advisors with regard to the United States, state, local and foreign tax consequences of an investment in the Partnership.

It is anticipated that upon the acceptance of an investor's I-526 Petition and the issuance of a temporary resident visa, such investor will automatically become a United States taxpayer and not be subject to the tax treatment afforded non-resident persons unless such investor's tax status would change in the future.

*State and Local Taxes*

Investors should consider the potential state and local tax consequences of an investment in the Partnership. In addition to being taxed in its own state or locality of residence, an investor may be subject to tax return filing obligations and income, franchise and other taxes in jurisdictions in which the Partnership operates. Investors should consult their tax advisers regarding the state and local tax consequences of an investment in the Partnership.

BL-0000118

Section 1. Jay Peak Biomedical Research Park L.P.

*Disposition of the Interests*

There are limitations on the transfer, assignment or disposition of the Interests. Generally, a U.S. Investor will recognize capital gain or loss on the sale, redemption, exchange or other taxable disposition of an interest in the Partnership, excluding amounts attributable to interest (which will be recognized as ordinary interest income) to the extent the U.S. Investor has not previously included the accrued interest income. The deductibility of capital losses may be subject to limitation. The consequences of the limitations will vary depending on the tax situation of each taxpayer. Accordingly, each Limited Partner should consult their own tax advisors with respect to these limitations.

Any gain from the sale or disposition of the Interests by a non-U.S. Investor will generally be treated as gain or loss effectively connected with a trade or business in the United States and would be subject to federal net income tax. Accordingly, each non-U.S. Investor should consult their own tax advisors prior to the sale or disposition of an Interest in the Partnership.

*Possible IRS Challenges; Tax Audits.*

Investors should be aware that the IRS may challenge the Partnership's treatment of items of income, gain loss, deduction and credit, or its characterization of the Partnership's transactions, and that any such challenge, if successful, could result in the imposition of additional taxes, penalties and interest charges. The General Partner decides how to report the items on the Partnership's tax returns. In the event the income tax returns of the Partnership are audited by the IRS, the tax treatment of the Partnership's income and deductions generally is determined at the partnership level in a single proceeding rather than by individual audits of the Limited Partners. If the IRS audits the Partnership's tax returns, however, an audit of the Limited Partner's own tax returns may result. The General Partner, designated as the "Tax Matters Partner," has considerable authority to make decisions affecting the tax treatment and procedural rights of all Limited Partners. In addition, the Tax Matters Partner has the authority to bind certain Limited Partners to settlement agreements and the right on behalf of all investors to extend the statute of limitations relating to the investors' tax liabilities with respect to Partnership items. The legal and accounting costs incurred in connection with any audit of the Partnership's tax returns will be paid off by the Partnership, but each Limited Partner will bear the cost of audits of his or her own return.

*Possible Legislative or Other Action Affecting Tax Aspects*

The foregoing discussion is only a summary and is based upon existing U.S. federal income tax law. Investors should recognize that the U.S. federal income tax treatment of an investment in Interests may be modified at any time by legislative, judicial or administrative action. Any such changes may have retroactive effect with respect to existing transactions and investments and may modify the statements made above. The rules dealing with U.S. federal income taxation are constantly under review by persons involved in the legislative process and by the IRS and the Treasury Department, resulting in revisions of Treasury Department regulations and revised interpretations of established concepts as well as statutory changes. Revisions in U.S. federal tax laws and interpretations thereof could adversely affect the tax aspects of an investment in the Partnership. There can be no assurance that legislation will not be enacted that has an unfavorable effect on an investor's investment in the Partnership.

**EACH INVESTOR NEEDS TO BE AWARE THAT CHANGES TO U.S. FEDERAL AND STATE TAX LAWS AND RATES ARE SCHEDULED BEGINNING JANUARY 1, 2013 THAT MAY EFFECT THE ABOVE ASSUMPTIONS. EACH INVESTOR NEEDS TO CONSULT WITH HIS OR HER OWN TAX ADVISOR AND COUNSEL WITH RESPECT TO THE IMPACT AND TAX CONSEQUENCES SUCH CHANGES WILL HAVE ON EACH INVESTOR'S ACQUISITION AND OWNERSHIP OF A UNIT.**

B2-119

BL-0000119

Section 1. Jay Peak Biomedical Research Park L.P.

## TRANSFER RESTRICTIONS

The Offering of the Limited Partnership Interests has not been registered with the Securities and Exchange Commission pursuant to the Securities Act of 1933 or any applicable state securities laws. the Offering is restricted to a limited number of individuals who are either U.S. citizens, current U.S. lawful permanent residents, or foreign investors resident and living in the United States in valid immigration status, thereby causing Regulation D of the Act to apply in connection with a purchase, or foreign investors without valid immigration status who must represent to the Limited Partnership that they are not resident in the United States at the time of the offer, will not be resident in the United States at the time of the sale, and are not acquiring the Limited Partnership Interest for the benefit of a United States person, as that term is defined in Regulation S. The investor understands that he or she may not offer to sell, or sell, a Limited Partnership Interest unless it is registered under the Securities Act of 1933 and any applicable state securities regulations or an exemption is available from the registration requirements, and that the purchasing investor's wealth or income qualify him or her as a suitable purchaser.

To preserve the exemptions from registration under federal and state securities laws, pursuant to which exemptions purchase of the Limited Partnership Interests are being offered, subsequent sales of the Limited Partnership Interests are restricted to buyers who qualify as "accredited investors," as described in rule 501 of the Securities And Exchange Commission or whose purchase otherwise will not require registration of the Limited Partnership Interests. There are additional matters concerning transfer restrictions under the terms of the Limited Partnership Agreement, and all purchasers should review Article 10 of the said Agreement for specific restrictions. Certificates evidencing the Limited Partnership Interests will bear a legend describing the transfer restrictions.

## EXIT STRATEGIES

It is projected that after at least five (5) years of operations an exit strategy will be considered by the General Partner in its sole discretion, whereby individual Limited Partners' Interests may be repurchased over time as conditions warrant. In no event, however, will any funds invested into the Offering and Project, if at all, be used to repurchase Limited Partners' Interests prior to the time that all I-829 petitions filed under the EB-5 program for all qualified investors who have invested into the Partnership have been adjudicated, with any appeals having been decided. The income from operation of the Project is projected to generate sufficient cash flow to enable the Limited Partnership to eventually repurchase Limited Partners' Interests, but other options will be explored as well, including without limitation the subdivision of clean rooms into separate condominium units for sale by the Limited Partnership or the sale of the business operations.

**Without limiting the foregoing, no interests of EB-5 investors will be repurchased or otherwise acquired by the Limited Partnership unless such acquisition of investor limited partnership interests complies with the requirements of United States immigration EB-5 laws and regulations.**

**Each Limited Partner is hereby deemed to acknowledge and agree by their signed Consent to the Limited Partnership Agreement and investment into the Partnership that nothing outlined or discussed in the Offering constitutes a promise or guaranty of the redemption of his interest or the repayment of said Limited Partner's investment.**

BL-120

BL-0000120

Section 1. Jay Peak Biomedical Research Park L.P.

Limited Partners may sustain a capital gain or loss regardless when, how and if any exit strategy is pursued by the General Partner. Nothing in the Offering shall be construed as an offer to the investor or an agreement with the investor, made now or to be made in the future, to provide the return of investor capital, in whole or in part, to the investor or the investor's nominee now or at any time in the future.

## RISK FACTORS (ALSO SEE IMMIGRATION RISK FACTORS)

The Limited Partnership Interests described in this Offering Memorandum involve a degree of risk. Among the risk factors that a prospective purchaser should carefully consider are the following (this list is not exhaustive):

Purchase of the Limited Partnership Interests is limited to those who have attained the age of at least 18 years and all of whom must purchase for investment and not with a view to resale. A declaration, representation and covenant to this effect are required to be made in the Subscription Agreement.

The Limited Partnership Interests will not be registered under the Securities Act of 1933 or under any state laws and, in offering the Limited Partnership Interests, the Limited Partnership will rely on one or more exemptions from registration.

There will be restrictions on the ability of a purchaser to sell his Limited Partnership Interest. No resale can occur within one year from the date of the first offer. Any resale must be made pursuant to Regulation S or Regulation D as is applicable or after registration of the Limited Partnership Interests pursuant to the Securities Act of 1933 and any applicable state laws or pursuant to an exemption from the registration requirements. Certificates evidencing Limited Partnership Interests will carry a legend to the effect that transfers of the Limited Partnership Interests are prohibited unless in compliance with the foregoing. The Limited Partnership will refuse to register a transfer not made in accordance with Regulation D or Regulation S and any applicable state laws, unless the transfer is made after registration under the Securities Act of 1933 and any applicable state laws or is otherwise exempt from registration. These restrictions may render it difficult or impossible to locate a prospective purchaser if and when an owner wishes to sell his Limited Partnership Interest.

There is no public market for the sale and purchase of the Limited Partnership Interests. These interests are not readily transferable. There are restrictions on the sale of the Limited Partnership Interests. There may be no market for resale of these Limited Partnership Interests. There can be no assurances that a purchaser can be found if and when an owner wishes to sell his interest. A purchaser may never be able to liquidate his investment in the Limited Partnership.

The Limited Partnership is a limited partnership created pursuant to Vermont law. The rights of limited partners in a limited partnership differ materially from the rights of partners in a general partnership or shareholders in corporations.

The Partnership's investment in the Project will be subject to the risks related to, and forming a part of, the ownership. These include but are not limited to uncertainty of cash flow to meet fixed obligations, adverse changes in general, national or local economic conditions, changes in governmental rules and or fiscal policies, adverse economic conditions, adverse changes in interest rates and taxes, reduction in the cost of operating competing businesses and products, relative appeal of competing businesses and products,

20 of 46

BL-121

BL-0000121

Section 1. Jay Peak Biomedical Research Park L.P.

changes in legislation, reduced demand for AnC Bio Products, and other factors referenced elsewhere within the risk factors, many if not all of which are beyond the control of the Limited Partnership and the General Partner.

The General Partner of the Limited Partnership will have certain powers and rights not granted to the owners of the Limited Partnership Interests.

Whether the Limited Partnership can make distributions to the Limited Partners is dependent on market conditions, demand for the AnC Bio Products, operating costs, Partnership expenses, the Joint Venture Agreement, and numerous other factors which affect the General Partner's determination whether or to what extent distributions should be made to Limited Partners.

The General Partner or its designee will provide the management for the Project on behalf of the Limited Partnership. If AnC Bio Vermont GP Services LLC elects to cease being the General Partner, it may be difficult to find a replacement.

Insurance: certain risks related to the Project may not be insurable such as, but not limited to, terrorism and acts of god. If an uninsurable loss occurs the Partnership could suffer loss of capital and profits.

Dependence on key personnel: the Joint Venturer, Joint Venture Entity, General Partner and Limited Partnership will rely on the active participation of William Stenger and Ariel Quiros. The loss of said individuals' services could create a significant adverse effect on the Limited Partnership.

The financial forecasts contain estimates of future results based on information available as of the date of this Offering Memorandum that the General Partner believes are reasonable. However, no representation is or can be made as to future operations or of the amount of any future income or loss from the Project.

The Project involves real estate development in Newport, Vermont, USA. There may be delays in entering into satisfactory real estate arrangements, getting permits, in construction timetables due to adverse weather conditions or otherwise, either within or beyond the control of the General Partner. Any delays may affect the ability of the Project to generate cash flow or may increase costs and reduce projected rate of return.

Future value of the Project: the economy of the State of Vermont, of the United States generally, demographic changes, interest rates, tax changes, the success of producing and marketing products from the Project, the success in securing third parties to operate clean rooms at the facility, and many other factors will determine the future value of the Project assets. There is no assurance that the Project assets will hold or increase in value.

While the General Partner believes the financial projections, sources of funds, time frames and other information within the business plan are based upon reasonable assumptions concerning certain factors affecting the probable future operations of the Partnership and the Project, purchasers should recognize that the financial forecasts make assumptions about gross revenues from the sale of the AnC Bio Products and operation of the clean rooms which are subject to substantial fluctuation. Although the Limited Partnership does not believe such projections to be unreasonable, prospective purchasers should be aware that there is no assurance that such sales projections will be achieved or maintained. If such sales projections are not achieved, the operating results may be less favorable than those projected. No assurance can be made that these forecasts will prove accurate, and purchasers are warned against placing excessive reliance on such information when deciding whether to invest in the Partnership.

BL-122

BL-0000122

Section 1. Jay Peak Biomedical Research Park L.P.

An investor may suffer adverse tax consequences in the event of a sale of his Limited Partnership Interest.

The Limited Partnership is a startup business that does not have an operating history.

The Limited Partnership's business is dependent upon the Limited Partnership obtaining sufficient capital to invest into the Project.

Even if the Limited Partnership obtains its $110,000,000.00 equity financing and uses it as described in the Financial Data and Business Plan, there can be no assurance that any operations will result in the anticipated revenues or net income to the Limited Partnership.

Restricted securities, long term nature of investment and no public market: investors who purchase securities in this Offering must bear the economic risk of the investment for an indefinite period because the securities have not been registered under the 1933 Securities Act or any state laws, and therefore cannot be sold in the public market unless they are subsequently registered under the 1933 Securities Act and any applicable state laws or an exemption from such registration is available.

The Limited Partnership has not prepared audited financial statements.

No independent counsel has been retained to represent the interests of the Limited Partners. Each prospective purchaser should consult with his own counsel as to the terms of the Partnership Agreement and exhibits thereto, and their financial and tax advisers as to the Business Plan and exhibits thereto.

The Joint Venturer will be a wholly owned subsidiary of AnC Bio VT and will contribute intellectual property and technology licensed to it or contracted for from the Existing Asian AnC Entity or AnC Bio VT. The Joint Venturer is a startup business that has no operating history and will be dependent on AnC Bio VT for its capital.

AnC Bio VT is an existing business in the State of Vermont with ownership and business ties to the Existing Asian AnC Entity and who have been involved in the management of the Existing Asian AnC Entity for more than 12 years.

The Existing Asian AnC Entity has been in existence in South Korea for many years, but has no presence in the United States. The Project is dependent on obtaining intellectual property and technology from the Existing Asian AnC Entity or AnC Bio VT in order to develop and manufacture the AnC Bio Products that will be distributed worldwide by the Joint Venture Entity.

The Project is also dependent on the NCE obtaining certain distribution rights from the Existing Asian AnC Entity or AnC Bio VT in order for NCE to contribute such distribution rights to the joint venture.

The Joint Venture Entity will be wholly owned by the NCE and the Joint Venturer. It will be a startup business with no operating history that will be dependent on the NCE and the Joint Venturer for its capital.

Certain of the business and operational agreements referenced in the Offering Memorandum have not been executed yet and the Project is dependent on these agreements being negotiated, executed and performed under. These agreements include without limitation the Purchase and Sale Agreement, the Joint Venture

BL-123

Section 1. Jay Peak Biomedical Research Park L.P.

Agreement and agreements relating to distribution rights, intellectual property and technology transfers.

**TAX RISKS:**

**PURSUANT TO INTERNAL REVENUE SERVICE CIRCULAR NO. 230, BE ADVISED THAT ANY FEDERAL TAX ADVICE IN THIS COMMUNICATION, INCLUDING ANY ATTACHMENTS OR ENCLOSURES, WAS NOT INTENDED OR WRITTEN TO BE USED, AND IT CANNOT BE USED BY ANY PERSON OR ENTITY TAXPAYER, FOR THE PURPOSE OF AVOIDING ANY INTERNAL REVENUE CODE PENALTIES THAT MAY BE IMPOSED ON SUCH PERSON OR ENTITY. SUCH ADVICE WAS WRITTEN TO SUPPORT THE PROMOTION OR MARKETING OF THE TRANSACTION(S) OR MATTER(S) ADDRESSED BY THE WRITTEN ADVICE. EACH PROSPECTIVE INVESTOR SHOULD SEEK ADVICE BASED ON ITS PARTICULAR CIRCUMSTANCES FROM AN INDEPENDENT TAX ADVISOR.**

**PROSPECTIVE INVESTORS SHOULD CONSULT THEIR OWN TAX ADVISORS WITH RESPECT TO THE TAX CONSEQUENCES (INCLUDING U.S. FEDERAL, STATE AND LOCAL TAX CONSEQUENCES AND NON-U.S. TAX CONSEQUENCES) OF AN INVESTMENT IN THE PARTNERSHIP. UNLESS WAIVED BY THE MANAGER IN ITS SOLE DISCRETION, INTERESTS IN THE PARTNERSHIP ARE ONLY BEING SOLD TO ACCREDITED INVESTORS WHO HAVE REPRESENTED THAT THEY ARE RELYING, IF AT ALL, SOLELY UPON THE ADVICE OF THEIR OWN ADVISORS WITH RESPECT TO LEGAL, IMMIGRATION, TAX, BUSINESS, FINANCIAL AND OTHER ASPECTS OF AN INVESTMENT IN THE PARTNERSHIP.**

There are various U.S. federal and state income tax risks associated with an investment in the Interests. Some, but not all, of the various risks associated with the federal income tax aspects of the Offering of which prospective Investors should be aware are set forth below. The effect of certain tax consequences on an investor will depend, in part, on other items in the investor's tax return. No attempt is made herein to discuss or evaluate the state or local tax effects on any investor. Each investor is urged to consult the investor's own tax advisor concerning the effects of federal, state and local income tax laws on an investment in the Interests and on the investor's individual tax situation. Neither the General Partner nor its affiliates nor counsel for AnC Bio, the Joint Venturer, the Joint Venture Entity or the Partnership has provided any tax (or other legal) advice to any holder of Interests or prospective Investors. The following discussion is not tax advice. This summary does not discuss the impact of various proposals to amend the Internal Revenue Code, which could change certain of the tax consequences of an investment in the Partnership.

    1.    <u>There are Risks Related to the Status of the Partnership for Federal and State Income Tax Purposes.</u> The Partnership has been organized as a limited partnership under the laws of the State of Vermont. The Partnership will not apply for a ruling from the Internal Revenue Service (the "IRS") that it will be treated as a partnership for federal income tax purposes, but intends to file its tax returns as a partnership for federal and state income tax purposes. Investors should recognize that many of the advantages and economic benefits of an investment in the Interests depend upon the classification of the Partnership as a partnership (rather than as an association taxable as a corporation) for federal income tax purposes. A change in this classification would require the Partnership to pay a corporate level tax on its income which would reduce cash available to fund distributions to investors, prevent the flow-through of tax benefits, if any, for use on investors' personal tax returns, and could require that distributions be treated as dividends, which together could materially reduce the yield from an investment in the Partnership. In addition, such a change in the Partnership's tax status during the life of the Partnership could be treated by the IRS as a taxable event, in which event the investors could have tax liability without receiving a cash distribution from the Partnership to enable them to pay such tax liability. The discussion herein assumes that the Partnership will at all times be treated as a partnership for federal tax purposes. The continued treatment of the Partnership

B2-124

BL-0000124

Section 1. Jay Peak Biomedical Research Park L.P.

as a partnership is dependent on present law and regulations, which are subject to change, although there is no current legislation in existence or presently contemplated that would otherwise affect the Partnership's classification as a partnership for U.S. federal and state income tax purposes.

2.      Investors may have Possible Federal and State Income Tax Liability In Excess of Cash Distributions.  Each investor will be taxed on the investor's allocable share of the Partnership's taxable income, regardless of whether the Partnership distributes cash to investors.  Investors should be aware that although the Partnership will use its best efforts to make distributions in an amount necessary to pay income tax at the highest effective individual income tax rate on the Partnership's taxable income, the federal and state income tax on an investor's allocable share of the Partnership's taxable income may exceed distributions to such investor.  An investor's allocable share of the Partnership's cash distributions is subject to federal income taxation only to the extent the amount of such distribution exceeds an investor's tax basis in its Interests at the time of the distribution.  Additionally, distributions that exceed the amount for which an investor is considered "at-risk" with respect to the activity could cause a recapture of previous losses, if any. There is a risk that an investor may not have sufficient basis or amounts "at-risk" to prevent allocated amounts from being taxable.  The deductibility of various Partnership expenses allocable to certain Limited Partners may be subject to various limits for U.S. federal income tax purposes.  It is possible that losses of the Partnership or of a particular activity of the Partnership could exceed income in a given year.  Any such losses may be passive losses, which may subject Limited Partners to limits on deductions for losses. Additionally, the deductibility of capital losses are also subject to limitations.  Limited Partners should consult their own tax advisers regarding potential limitations on the deductibility of their allocable share of items of losses and expenses of the Partnership.  Each Limited Partner will be required to report on his or her own U.S. federal income tax return his or her share of the Partnership's income, gains, losses, deductions and credits for the taxable year of the Limited Partner, whether or not cash or other property is distributed to that Limited Partner.

3.      Information Reporting to Limited Partners by the Partnership.  The Partnership will file an information return on IRS Form 1065 and will provide information on Schedule K-1 to each Limited Partner following the close of the Partnership's taxable year.  Delivery of this information by the Partnership will be subject to delay in the event of the late receipt of any necessary tax information from an entity in which the Partnership holds an interest.  It is therefore possible that, in any taxable year, Limited Partners will need to apply for extensions of time to file their tax returns.

4.      Tax Auditing Procedures will be under Control of the General Partner.  Any audit of items of income, gain, loss or credits of the Partnership will be administered at the Partnership level.  The decisions made by the General Partner with respect to such matters will be made in good faith consistent with the General Partner's fiduciary duties to both the Partnership and to the investors, but may have an adverse affect upon the tax liabilities of the investors.

5.      Changes in Federal and State Income Tax Laws and Policies may Adversely Affect Investors. There can be no assurance that U.S. federal and state income tax laws and IRS administrative policies respecting the income tax consequences described in this Memorandum will not be changed in a manner which adversely affects the interests of investors.

IN VIEW OF THE FOREGOING, IT IS ABSOLUTELY NECESSARY THAT EACH AND EVERY PROSPECTIVE INVESTOR CONSULT WITH THE INVESTOR'S OWN ATTORNEYS, ACCOUNTANTS AND OTHER PROFESSIONAL ADVISORS AS TO THE LEGAL, TAX, ACCOUNTING AND OTHER CONSEQUENCES OF AN INVESTMENT IN THE INTERESTS.

BL-125

BL-0000125

Section 1. Jay Peak Biomedical Research Park L.P.

## U.S. IMMIGRATION OVERVIEW FOR EB-5, ALIEN ENTREPRENEUR INVESTORS

The immigration information provided in this Offering Memorandum is not intended to be, should not be considered as and is not legal advice to the foreign investor. Each foreign investor must consult independent immigration counsel regarding U.S. immigration law implications, strategies, admonitions, benefits, if any, and all other immigration-related issues regarding the investor and the investor's qualifying family members.

## EB-5 OVERVIEW

The EB-5, employment-based visa preference, is intended to encourage the flow of capital into the U.S. economy and to promote employment of U.S. workers. To accomplish these goals and so that foreign investors may obtain immigration benefits for having made an investment, the Program mandates the minimum capital that foreign investors must contribute and it mandates that 10 full-time employment positions be created on account of each investment. In addition to the return that investors hope to achieve on their investment, foreign investors and their qualifying family members are offered the prospect of lawful permanent residence in the United States, provided they satisfy the requirements of the EB-5 Program.

The Project has been structured in an effort to assist investors to meet the requirements of the EB-5 Program under the act and qualify via investment in this Project to become eligible for admission to the United States of America as lawful permanent residents with the investor's qualifying family members, although there is no assurance that this result will be obtained.

The Project expects to qualify under separate provisions in the law that permit: (1) a reduced investment, relying upon the presence of the principal place of business of the EB-5 enterprise within a Targeted Employment Area (TEA); and, (2) reliance, in whole or in part, upon indirect creation of employment positions, a privilege granted to EB-5 projects that are within and affiliated with an approved Regional Center, in this instance, the Vermont Regional Center authorized by the act under a Pilot Program. *(see Immigration Risk Factors)* Qualification of the Project structure and compliance with the law is determined by the USCIS, as part of its review of investor immigration petitions.

The discussion of immigration matters below reflects the Limited Partnership's current understanding of EB-5, alien entrepreneur law, regulations and EB-5 Program guidance from USCIS concerning its practices as of the date of this Offering Memorandum. The EB-5 alien entrepreneur law, regulations and USCIS practices, indeed the entire EB-5 Program may be altered in the future by amendments to the law, regulations and practice guidelines from USCIS with no advance notice to EB-5 projects or investors. In the event of such changes, the investor and the Project will be required to comply with such future alterations. (See, *Risk Factors, General and No Regulations Regarding Removal Of Conditions*).

## FOR EB-5 INVESTORS

Foreign investors are specifically directed to review certain important matters listed hereunder and in the immigration risk factors.

Legal counsel: the investor will require the services of independent legal counsel for U.S. immigration law due diligence, advice, preparation and filing of petitions and all other U.S. immigration matters. If the

BL-0000126

Section 1. Jay Peak Biomedical Research Park L.P.

investor chooses to hire the same law firm that advised AnC Bio VT on this Offering for his or her immigration services, the investor acknowledges by his or her subscription to this Offering that said law firm will not and cannot advise the investor on any business matters or due diligence relating to the investor's decision to invest into the Partnership, but only will advise the investor on immigration issues germane to the investor's investment into the Partnership. The investor is responsible for payment of all legal fees and costs, including USCIS application fees, incurred in connection with the receipt of such legal services.

Filing the immigrant petitions: the Limited Partnership, the General Partner and AnC Bio VT shall use their reasonable best efforts to assist the foreign investors' legal counsel with the filing of investors' I-526 and I-829 petitions, and verifying required direct and indirect employment, until removal of such investors' conditional permanent residency.

In the event an investor's I-526 petition is denied at any time, the investor's rights are limited solely to the return of the investor's $500,000 capital contribution from the Partnership within ninety (90) days of written request therefore to the General Partner. In such case the administration fee will be kept by AnC Bio VT to partially compensate it for its costs incurred to date to develop the Project and prepare and distribute the Offering Memorandum.

Upon subscribing to this Offering and becoming a Limited Partner it is the sole responsibility of the foreign investor to file the I-526 petition expeditiously and within one hundred twenty (120) days of subscribing, and thereafter to file expeditiously applications for lawful permanent residence and the I-829, petition by entrepreneur to remove conditions. It is the further, sole obligation of the Limited Partner to notify the General Partner at least 90 (ninety) days prior to the due date of filing their I-829 petition to afford the General Partner adequate time to provide documentation in support of the petition. The General Partner shall not be liable in any manner, cost, or for any other liability for the failure of a Limited Partner to provide timely the filing due date of the I-829 petition filing. If, in the sole opinion of the General Partner, the investor's delayed filing or failure to file any immigration-related petition or application will result or has resulted in the inability of the Project to conduct its business in a timely fashion, the General Partner may terminate the investor's Limited Partnership Interest and participation in the Project. There is no refund of the capital contribution of $500,000 or the administration fee of $50,000 for failure of the foreign investor to file or file timely the I-526 petition.

Administrative and other costs borne by the investor cannot be paid from the sum invested by the EB-5 investor. In this Project, $50,000.00 administrative fees are payable by each investor to AnC Bio VT, in addition to the required $500,000 minimum investment into the Project.

If the Regional Center Pilot Program lapses, for each investor whose I-526 case is filed with USCIS prior to that date and not yet adjudicated, their $500,000 capital contribution shall remain invested in the Partnership provided:

1. The Regional Center Pilot Program is reauthorized retroactively or is pending reauthorization within a twelve month period following its lapse, and the investor's I-526 petition is in due course adjudicated;

   or

2. Legislation is enacted or pending providing substantially similar immigration benefits to investors as under the lapsed Regional Center Pilot Program and EB-5 Program within a twelve month period following the Regional Center Pilot Program's lapse, and the investor's I-526 petition is in due course adjudicated.

BL-0000127

Section 1.  Jay Peak Biomedical Research Park L.P.

If neither of the events described under 1 and 2 occur, the investor at his option may either remain invested in the Project, or request in writing a refund of the capital contribution of $500,000. Upon receipt of a request of refund to the General Partner, the capital contribution will be refunded by the Limited Partnership within a period of 90 days from receipt of such request and the investor's interest in the Limited Partnership shall automatically be terminated and the investor shall no longer have any of the rights and benefits of ownership of an interest or any right to participate in any manner whatsoever in the affairs of the Partnership. The investor's rights are limited solely to the return of their capital contribution of $500,000.

## AMOUNT OF INVESTMENT: A TARGETED EMPLOYMENT AREA

The EB-5 Program requires a minimum investment of $1,000,000 USD to be invested by an investor. However, for the Project, this sum may be reduced to $500,000 USD because the investment is situated in a targeted employment area (TEA). TEA's must meet one of two criteria, the first, concerning population, and the second, concerning high rates of unemployment in towns whose population equals or exceeds 20,000.

The first criterion, concerning population, is the relevant criteria for this Project, as it states that if an investment is made in a town or city whose population is less than 20,000, and the town or city is not within a metropolitan statistical area (MSA) as designated by the U.S. Office Of Management And Budget, the investment is deemed to have been made in a TEA. The Project believes it complies with this criteria because it relies on the fact that it is situated in Newport, Vermont, a city whose population was 5,005 according to the 2000 census and whose population is estimated by the U.S. census bureau to have decreased to 4,589 as of 2010, (see Economic Development Research Group analysis incorporated into Business Plan) based upon the most recently reported data from this agency believed to be published.

The second criterion is not relevant to the Project because the city of Newport's population does not equal or exceed 20,000 and the city of Newport is not situated in a metropolitan statistical area.

## COUNTING EMPLOYMENT POSITIONS CREATED

To qualify as an EB-5 investor, each investor must demonstrate that 10 full-time, year-around employment positions will be created on account of the investment.

These employment positions must be for U.S. citizens, lawful permanent residents and other immigrants lawfully authorized to be employed in the United States. Non-immigrant (temporary) workers are not included in the count. Also excluded are the investor, the investor's spouse and the investor's children.

A full-time employment position (including one position shared by more than one employee) means one that requires at least 35 hours each week to fulfill.

An employment position is deemed created when the worker is remunerated on the payroll of the new enterprise. Independent contractors are excluded from the direct employment position creation count.

An exception to the requirement of payment or other remuneration coming directly from the new enterprise is made if the enterprise is located within and affiliated with a Regional Center created under a Pilot Program first enacted in 1993. The entire State of Vermont is such a Regional Center. An investor in an enterprise, such as this Project, established in Vermont, is permitted to demonstrate that some, possibly all,

BL-128

BL-C000128

Section 1   Jay Peak Biomedical Research Park L.P.

of the employment positions created on account of the investment in the enterprise will be indirect employment positions, i.e., not on the payroll of the new commercial enterprise. It is incumbent upon the investor to show how many employment positions are expected to be created indirectly by reliance upon reasonable methodologies such as multiplier tables, feasibility studies, analyses of foreign and domestic markets for the goods or services to be exported, and other economically or statistically valid forecasting devices which indicate the likelihood that the business will result in increased employment. USCIS review of methodologies and underlying data used to determine indirect employment creation is becoming increasingly detailed, leading to an increase in the number of Requests for Evidence (RFE) issued by USCIS; and, the agency is increasingly demanding highly detailed business plans and market analyses regarding job-creation assertions by EB-5 project developers.

All such full time equivalent employment positions expected to be created will be applied only to foreign investors who seek to utilize this investment for immigration purposes under the Program, not to any investors in the Project who are not relying on the Program.

## THE STATE OF VERMONT - A REGIONAL CENTER

The U.S. Congress created a pilot program, rescheduled to sunset on September 30, 2015, that provides for the authorization of regional centers by the U.S. Department of Justice, Immigration and Naturalization Service (n/k/a USCIS). Enterprises located within and affiliated with a Regional Center are not required to employ ten (10) workers for each EB-5 qualifying investment. It suffices if the investor demonstrates that at least ten (10) qualifying employment positions will be created directly or indirectly on account of the investment.

In June 1997, the State of Vermont, Agency of Commerce and Community Development (ACCD), was granted a designation as an approved Regional Center under this pilot program. An investment in a commercial enterprise situated within and affiliated with the Regional Center, the State of Vermont, that fosters economic expansion through increased exports, greater regional productivity, employment creation or additional domestic capital investment, qualifies for the broader view of employment creation.

The Project has conducted an economic impact assessment to determine the number of employment positions expected to be created as a result of two hundred twenty (220) foreign investors each contributing $500,000 US to the Program. This analysis was conducted using the so-called _IMPLAN methodology.

The current analysis focused on this Project, specifically, as a source of employment creation, so that it is more specific than the analysis that supported the original Regional Center designation for the greater State of Vermont. This analysis demonstrates that the combined project development and business activities carried on by the Limited Partnership is expected to create greater than 3,000 indirect jobs, primarily within the Vermont Regional Center and Northeastern United States, over the development phase and first few years of the operations phase in the Project. These projected employment positions are in excess of the 2,200 employment positions required under EB-5 law and regulations if all 220 Limited Partnership Interests are sold to foreign investors using the EB-5 Program. See the comment on expiration of Regional Center Pilot Program at page 35. *(see Risk Factors)*

BL-129

BL-0000129

Section 1. Jay Peak Biomedical Research Park L.P.

**THE I-526 PETITION PROCESS**

For investors seeking lawful permanent residence, the first step in the process is to file an I-526 Petition for Alien Entrepreneur, together with accompanying evidence in support of the Program's requirements. USCIS adjudicates I-526 petitions by reviewing these criteria, among others:

New commercial enterprise: there must be evidence that shows in most instances that the enterprise is new and authorized to transact business.

Investment capital: the petition must be supported by evidence that the petitioner has invested the minimum required capital. USCIS expects these funds to be "at risk", connoting an irrevocable commitment to the enterprise. The funds must be used by the enterprise exclusively to create employment. Funds used to pay administrative costs or other obligations undertaken to promote the investment, to create reserve accounts or for any purpose that does not lead to the creation of employment by the enterprise are not deemed "at risk". Any commitment by the EB-5 enterprise to the investor that is deemed to transform the relationship from an investment to a debt arrangement (for example, a promise to pay a fixed rate of return or to repay some or all of the investment on a date certain or to repay some or all of the investment irrespective of the financial performance of the Project) will disqualify the invested funds from being deemed "at risk". Funds that are not deemed "at risk" will not be counted towards the minimum sum required to be invested, possibly resulting in the denial of the I-526 petition and the disqualification of the Project to support all EB-5 investor petitions.

Source of capital: evidence must support the investor's legal acquisition of capital. In support of the I-526 petition, an investor should expect to provide detailed records demonstrating the personal and business financial transactions through which the investor acquired the invested funds, and managed those funds during the entire period of ownership by the investor and demonstrating the transactions by which the funds were transferred by the investor into the EB-5 project. Where countries require by law the filing of annual individual and business tax returns the investor should also expect to provide at least the last five (5) years tax returns in certain instances. When, for example, the investor acquires investment funds as a gift, or in the case of the investor taking loans from individuals or some entities to acquire the investment funds, the donor or the lender, as the case may be, will be expected to provide financial records of comparable detail establishing that the funds were lawfully acquired. Funds earned or obtained in the United States while the investor was in unlawful immigration status are not deemed by USCIS to be lawfully acquired. If USCIS is not satisfied that the invested funds were acquired by the investor lawfully, such funds will not be counted towards the mandatory investment sum, potentially causing the I-526 petition to fail. Investment in an EB-5 project is not appropriate for those who are unable or unwilling to provide all financial records that USCIS may require to demonstrate that invested funds have been lawfully acquired by the investor.

Managerial role: the investor is expected to participate in the management of the new commercial enterprise by assisting in the formulation of the enterprise's business policy, by participating in one or more of the activities permitted in section 3423(b) of the Vermont Revised Uniform Limited Partnership Act ("VRULPA"), and as otherwise set forth in the Limited Partnership Agreement. The Limited Partnership Agreement provides that this management role consists, in part, of the right to replace the General Partner under certain circumstances. Limited partner investors in an EB-5 enterprise must have all the rights and duties usually accorded to limited partners by the Uniform Limited Partnership Act (ULPA), as adopted in Vermont as VRULPA. The Limited Partnership Agreement presented by the Project, in its view, provides such rights and duties to the limited partners. The investor is advised to seek competent counsel to review the Limited Partnership Agreement compliance with both VRULPA and immigration law requirements. (see Risk Factors, Active Participation In Limited Partnership Business).

BL130

BL-0000130

Section 1. Jay Peak Biomedical Research Park L.P.

## THE I-526 PETITION APPROVAL

The I-526 Petition by Alien Entrepreneur will be approved only if USCIS is satisfied that the all statutory criteria have been met. The determination of whether these criteria have been established is within the discretion of USCIS. It is also within the power, if not the discretionary authority, of USCIS to seek information about other aspects of the investment and the relationship of the investor to the enterprise.

The EB-5 Alien Entrepreneur law, regulations and EB-5 Program have been altered in the past, and may be altered in the future, by amendments to the law, regulations and practice guidelines from USCIS and by the announcement by USCIS of new policy, rules and procedures in RFEs, Notices of Intent to Deny (NOID) and Denials of petitions. In the event of such future changes, the investor will be required to comply with such future alterations, which are frequently applied retroactively by USCIS, making compliance by the Project or the investors difficult or impossible. If such future changes occur and they alter the current I-526 petition procedures, the investor will be expected to comply with any such alterations. *See Risk Factors, Risks Attendant To EB-5 Status).*

In the event that USCIS denies the I-526 petition, the investor may not proceed with the next step in the immigration process, consular processing or adjustment of status. Instead, the investor must decide whether to appeal the denial of the I-526 petition, revise and re-file the I-526 petition or abandon the prospect of obtaining Lawful Permanent Resident Status through investment in the Project.

## CONSULAR PROCESSING OR ADJUSTMENT OF STATUS

Approval of the I-526 petition means that the alien and the alien's spouse and children under the age of 21 years may apply for admission as Conditional Lawful Permanent Residents (CLPR). Approval of the I-526 petition does not mean that the investor has been granted admission to the United States as a lawful permanent resident. Approval of an I-526 means that the investment documented by the I-526 petition has, as of the date of the approval of the petition, qualified the investor as an alien entrepreneur. USCIS' propensity to review and revoke its prior approvals, attendant to the review of the investor's I-829, Petition to Remove Conditions or because USCIS discerns a new objection to a project while reviewing another investor's I-526 or I-829 petition, may disqualify the project or the investor from use of the EB-5 program despite reliance on the prior approval. *(See Risk Factors)*

The CLPR application for admission is a separate and subsequent process that concerns issues common to all aliens who wish to live in the United States permanently. Admission as a CLPR may be sought using one of two methods: consular processing or adjustment of status.

## CONSULAR PROCESSING

Consular processing is designed for aliens living outside of the United States, or for those who prefer to process at a consulate for strategic reasons or as a matter of convenience or are ineligible to adjust status. Typically, the consular post, which is designated at the time the I-526 petition is filed, is in the country of last residence, i.e., the last principal actual dwelling place.

In their sole discretion, consulates issue visas, a travel document, usually affixed to a passport, which authorizes the holder to seek admission to the United States at a port of entry. The visa is issued for an immigration status that a consul believes the visa applicant is qualified to hold. In an EB-5 case, the visa may be sought from a consulate only after the investor's I-526 petition is approved. An EB-5 investor and the investor's spouse and qualifying children are usually granted immigrant visas. Use of these visas to enter

BL-131

BL-0000131

Section 1. Jay Peak Biomedical Research Park L.P.

the U.S. results in a grant of Conditional Lawful Permanent Residence *(see discussion on Removal Of Conditions)*.

Before issuing an immigrant visa, the consular post must determine if each alien is admissible to the U.S. Approval of the I-526 petition does not by itself establish admissibility. An alien is admissible who proves that no grounds of inadmissibility exist and the alien has proper travel documents *(see the discussion on Immigration Risk Factors, below, for a non-exhaustive list of the grounds of inadmissibility)*. Waivers are available for certain of the many grounds of inadmissibility, but the grant of a waiver is in the discretion of the government and aliens seeking waivers experience lengthy delays in adjudication of waiver applications. Investors should consult with immigration counsel before investing to determine if any grounds of inadmissibility may affect the eligibility of the investor or the investor's spouse or otherwise qualifying children for admission to the United States and if a waiver is available for such grounds of inadmissibility.

If the consular post finds that the investor is admissible, it will issue an immigrant visa to the investor. The consular post will also determine if the spouse and the qualifying children of the investor are admissible. A determination of admissibility must be made as to each visa applicant. There is no guarantee that all members of the investor's family will be granted an immigrant visa. If the investor is denied an immigrant visa, applications for the spouse and children of the investor for such a visa will also be denied. Consular processing subjects both the visa applicant and the I-526 petition to the scrutiny of a second government agency whose decisions are not appealable. If the consular officer, based upon information not available to USCIS in its adjudications process, suspects fraud or misrepresentation in the I-526 petition process or if the consul doubts the eligibility for Lawful Permanent Resident Status, the consul may return the case to USCIS for re-adjudication of the I-526 petition.

Consular processing begins when USCIS transmits the approved alien's I-526 petition to the National Visa Center (NVC). In time, the applicants will be instructed to obtain fingerprints and medical examinations and to report to a consular interview. Immigrant visas usually are issued shortly after the interview unless the consul detects problems in the visa application, the underlying I-526 petition or during the interview process. The investor is advised to seek competent counsel for guidance on the processing experience and potential delays in the consular office handling investors' applications.

## NUMERICAL QUOTAS

Currently, the EB-5 Preference accords a total of 10,000 EB-5, Preference visa statuses allocated annually, of which 3,000 are available to alien investors and the spouses and qualifying children of investors who are making an investment in a Targeted Employment Area (TEA). The Project is currently situated within a TEA. EB-5 status is available on a first-come, first-served basis. Recently, USCIS has announced that it considers the 3,000 statuses for TEA cases as a guaranteed allocation, not a quota, so that all TEA cases are eligible to seek a visa, up to the annual quota of 10,000 visas.

Historically, the allocation of visas for the EB-5 Fifth Preference, including TEA's, has not been oversubscribed. Investors should note and consider the significantly increasing demand for visas in the Fifth Preference which has prompted the U.S. Department of State, in its December 2012 Visa Bulletin, to issue an advisory concerning the possible unavailability of EB-5 Fifth Preference visas for nationals of the People's Republic of China in the second half of Fiscal Year 2012 *(See Risk Factors)*.

## VISA ISSUANCE

Decisions by consuls are to be made in accordance with regulatory guidance on this process. Consuls have broad authority and discretion under such regulatory procedures and their decisions are

BL-132

BL-0000132

Section 1.  Jay Peak Biomedical Research Park L.P.

unreviewable. The investor should seek advice of competent legal counsel regarding visa issuance guidelines.

U.S. consuls advise that visa applicants should not change any living, employment, schooling or other lifestyle arrangements in their country of residence before they are issued an immigrant visa based upon an approved I-526 petition.

## ADMISSION TO U.S. AFTER VISA ISSUED

A visa authorizes the holder to seek admission to the United States at a port of entry. However, admission is subject to U.S. Customs and Border Protection (USCBP) inspection discussed below. After issuance, immigrant visas generally remain valid for six (6) months. During the validity period, the holder of the visa must use it to apply for admission to the United States at a designated port of entry. The port of entry is frequently in an international airport. When the alien arrives at the port of entry, he or she will present the immigrant visa and accompanying consular documents to a USCBP officer who has the authority to admit the investor or to deny the investor's admission to the United States as a CLPR. This process is known as inspection *(See Risk Factors)*.

## ADMISSION AFTER INVESTING, FILING THE I-526 OR DURING CONSULAR PROCESSING

Admission to the United States as a visitor or in most other non-immigrant statuses is predicated upon the intent to depart the country at the end of the period of admission.

Investors should consult with competent counsel to evaluate the risks associated with seeking temporary (non-immigrant) admission to the United States subsequent to making the investment or filing an I-526 petition or an applicant for an immigrant visa. Despite best efforts, an inspector may deny admission under these circumstances. Such a denial may also result in formal exclusion from the U.S. which might preclude admission with an immigrant visa for a period of years *(See Risk Factors)*.

## ADJUSTMENT OF STATUS

The Adjustment of Status (AOS) procedure is designed to permit aliens who have been admitted to the United States as non-immigrants or who have been paroled into the country to apply for admission as permanent residents without leaving the country. These non-immigrants must establish that they are admissible permanently, meeting the same standards as aliens who use consular processing to obtain a permanent resident visa.

Aliens seeking AOS must also comply with requirements peculiar to the AOS process. Aliens who do not meet these additional requirements will be required to use consular processing to obtain an immigrant visa, which will necessitate a departure from the United States. Aliens admitted in certain non-immigrant statuses may encounter more difficulties (and may not be successful) adjusting status than aliens admitted in other non-immigrant statuses. Investors should consult with immigration counsel regarding these issues before the I-526 petition is filed.

During AOS processing, the applicant will be required to submit a medical examination and will receive instructions from USCIS regarding biometric data collection and an interview. The interview may be waived in the discretion of USCIS. There is no formal process to request the waiver of an interview. If the investor is interviewed, the spouse and children of the investor will be required to attend the interview.

The USCIS California Service Center currently has jurisdiction of the AOS process for investors in the

BL-133

BL-0000133

Section 1. Jay Peak Biomedical Research Park L P

Project. The interview is conducted at a USCIS office near the investor's residence. USCIS uses the interview to update information about AOS applicants that may have changed subsequent to the filing of the AOS application and to explore any issue that USCIS believes is relevant to deciding the AOS case. Typically, but not always, CLPR is conferred on approved AOS applicants at the conclusion of the interview.

AOS is granted in the discretion of USCIS. An alien whose AOS application has been denied may request that the case be re-considered by the same office that denied AOS. If the request to re-open or re-consider the case is denied, or, if, after such a review, the alien fails to convince this office to reverse its original decision, the alien is without further recourse. AOS applicants should not make any permanent connections to the United States or change any permanent living, employment, schooling or other lifestyle arrangements in their country of residence before they are issued AOS based upon an approved I-526 petition.

## TRAVEL DURING ADJUSTMENT OF STATUS PROCESSING

Advance permission to depart the U.S. is issued routinely if the alien articulates a bona fide need to travel.

An alien investor who leaves the United States without advance permission while an AOS application is pending is deemed to have abandoned that application unless the applicant has been admitted in and continues to hold valid H or L non-immigrant status pending adjudication of the AOS application. Alien investors admitted to the United States in any non-immigrant status who have obtained advance parole during the AOS process should consult with immigration counsel before traveling.

If an alien is deemed to have abandoned an AOS application, the applicant must seek consular processing to obtain an immigrant visa permitting an application for admission to the U.S. during the period between the applicant's deemed abandonment of an AOS application and the time the applicant receives an immigrant visa from a U.S. consulate, typically about one year, the applicant is required to remain outside the U.S.

## EMPLOYMENT DURING THE ADJUSTMENT OF STATUS PROCESSING

Applicants for AOS who wish to work in the United States must obtain employment authorization unless they have been admitted to the U.S. in a non-immigrant status that confers employment authorization and does not end before AOS is granted. Self-employment requires employment authorization. Employment in the U.S. without authorization is a violation of immigration status and may jeopardize the right to adjust status.

## REMOVAL OF CONDITIONS

Approval of an AOS application or the grant of an immigrant visa followed by entry into the U.S. means that the investor and the spouse and qualified children of the investor have been granted Conditional Lawful Permanent Residence (CLPR) for two years. The "conditions" must be removed so that the aliens may reside in the U.S. indefinitely. Failure to remove the conditions results in the termination of CLPR status and will result in the commencement of removal proceedings.

Removal of conditions is sought by the filing of an I-829 petition in the 90 day period immediately preceding the second anniversary of the grant of CLPR status. In support of the petition, the alien investor must demonstrate full investment in the enterprise, sustainment of the investment continuously since becoming a CLPR and compliance with the requirement that ten (10) employment positions have been created as a result of the investment. It is the sole responsibility of the foreign investor to file and the sole risk of the investor who fails to file the I-829 petition in the ninety (90) day period immediately preceding the second

BL-134

BL-0000134

anniversary of the grant of CLPR status at the investor's sole expense. Failure to file the I-829 petition will result in the investor and the investor's accompanying family being place in removal (deportation) proceedings. There is no refund of the capital contribution or administration fee for delay or failure on the part of the investor for any reasons whatsoever to file their I-829 petition.

The California Service Center currently has jurisdiction to decide a Petition to Remove Conditions. It is authorized to approve a petition, seek additional written information before deciding the petition, refer the petition to a local office where information will be elicited in an interview, or, it may deny the petition. If the petition is referred for an interview, the local office of USCIS will decide the petition after the interview.

During the pendency of the petition, aliens admitted in CLPR status remain in valid status even if the petition is not decided before the expiry of the two year period of admission. Improper denials of and delays in obtaining documents evidencing extended CLPR status and advance parole are sometimes experienced. CLPR is extended in one year increments or until the Petition to Remove Conditions is adjudicated.

USCIS regulations control the process of removal of conditions. These regulations may change in the future. The investor will be expected to comply with and proceed with removal of conditions under the regulations in effect at the time the investor seeks removal of conditions.

There cannot be any assurance that USCIS will not change the requirements for removal of conditions after investors are granted CLPR status through investment in the Project. There cannot be any assurance that an investor will able to demonstrate to the satisfaction of USCIS that the Project is operating within its business plan, that it has created the requisite employment positions at the time required by USCIS or that any other requirements for the removal of conditions have been met. USCIS' propensity to review and revoke its prior approvals may disqualify the Project or the investor from use of the EB-5 program despite reliance on the prior approval. (See Risk Factors, Removal Of Conditions).

## IMMIGRATION RISK FACTORS

A prospective investor should consult with legal counsel familiar with United States immigration laws and practice before investing in this Project. Purchase of a Limited Partnership interest in an EB-5 project does not guarantee lawful permanent residence in the United States.

The Limited Partnership interests described in this Offering Memorandum involve a significant degree of risk. Among the immigration risk factors that a prospective investor should consider carefully are those identified in this Offering, however the discussion is not exhaustive:

### GENERAL

USCIS may modify its EB-5 Program practices by providing updated guidance to its examiners. Sometimes, but not consistently, USCIS publishes instructions for the use of EB-5 investors and their counsel. EB-5 investors and their counsel often first become aware of EB-5 practices and policies through the adjudication process for investor I-526 or I-829 petitions. If such modifications occur, investors may be required to provide new information or modified business plans or other modifications to an EB-5 project during the adjudication process to comply with USCIS requirements that were unknown to investors and their counsel at the time an I-526, immigrant petition by alien entrepreneur or an I-829, petition by entrepreneur to remove conditions was

BL-133

BL-0000135

Section 1. Jay Peak Biomedical Research Park L.P

filed. Amendments to the law and regulations of the EB-5 Program and changes in USCIS interpretations of statute and regulations or the imposition of new policy and procedures by USCIS without formal rule-making may also occur from time-to-time, which may have the effect of requiring EB-5 projects and EB-5 investors to provide new information or modify their previous EB-5 planning to satisfy new EB-5 Program requirements. There can be no assurance that such modifications will not be required in this Project on account of new policies, practices, interpretations, laws or regulations not effective or not known at this time. New requirements may be applied retroactively, making compliance by investors or the Project impossible. There can be no assurance that this Project will be able to modify its business plan or make other adaptations to comply with yet unknown EB-5 requirements. The investor should retain competent legal counsel for continuing advice on these matters.

While efforts have been made to structure this Offering to assist investors to meet EB-5, employment-based visa preference requirements under the Act and qualify as "alien entrepreneurs", a preliminary step to becoming eligible for admission to the United States of America with their spouse and unmarried minor children as lawful permanent residents, no representations can be made and no guarantees can be given that investment in this Project will assure an investor's petition as an "alien entrepreneur" will be granted by USCIS or, if it is, that investors with their spouse and such children will obtain conditional or unconditional lawful permanent resident status.

## APPROVAL OF INVESTMENTS IN THE PROJECT

There is no procedure in the Act or its enabling regulations to pre-qualify an investment for the EB-5, alien entrepreneur program. Individual investor applications on form I-526 must be filed with USCIS by the investor to determine the suitability of the investment offered herein for immigration purposes under 8 U.S.C.§ 1153 (b)(5)(a) - (d); INA § 203 (b)(5)(a) - d). USCIS may deny such an application.

USCIS has announced a tentative plan to permit developers to obtain a review of an EB-5 project, but only if USCIS is poised to deny an amendment to a regional center charter sought to permit the project to operate within the regional center. This review must be undertaken through applications to create or modify Regional Center authorizations where an EB-5 project is functioning under authorization from a Regional Center. There is no assurance that USCIS will implement this tentative plan. Notwithstanding the approval of a new or modified Regional Center application based upon a specific, exemplar EB-5 project, USCIS reserves the right to question and deny individual investor I-526 petitions resulting from investment in the exemplar project if USCIS detects any variations between the facts adjudicated in the exemplar case and the facts presented in the investor's petition. Pre-qualification of EB-5 projects, apart from Regional Center applications, continues to be unavailable notwithstanding this USCIS announcement.

## PROCESSING TIMES

USCIS and USDOS processing times for the I-526 and the adjustment of status or consular processing cases are not predictable, notwithstanding published processing times by these agencies. Delays in processing do occur and are growing longer in many instances despite the announcement by USCIS of its expanded resources for adjudicating EB-5 petitions and applications. USCIS and USDOS advise investors not to make changes in any living, employment, schooling or other lifestyle arrangements before receiving CLPR through the EB-5 Program.

## GOVERNMENT FILING FEES

35 of 46

BL-136

Section 1. Jay Peak Biomedical Research Park L.P.

Government filing fees may change. Such changes may increase the immigration filing costs to an investor who has made an investment in the Project and who is waiting to file an I-526 or a consular processing or AOS case (and collateral applications for employment authorization and advanced permission to travel).

## LIMITATIONS ON RETURN OF FUNDS IF I-526 PETITION IS DENIED

Upon subscribing to this Offering and becoming a Limited Partner, it is the sole responsibility and risk of the foreign investors to file their I-526 petitions. There is no refund for delay or failure to file the I-526 petition.

If the Regional Center Pilot Program lapses, for each investor whose I-526 is filed with USCIS but not adjudicated on or before the date of lapse, their $500,000 capital contribution shall remain invested in the Partnership until:

1. The Regional Center Pilot Program is reauthorized retroactively or is pending reauthorization within a twelve month period following sunset, and the investor's I-526 petition is in due course adjudicated;

   or,

2. Legislation is enacted or pending providing substantially similar immigration benefits to investors under the former EB-5 Regional Center Program within a twelve month period following sunset.

If none of the events described in 1 or 2 occur, or are not pending as stated, at the investor's election, the investor may (1) remain invested in the Project; or, (2) make a written request to the General Partner for a refund of the capital contribution of $500,000. Within ninety (90) days of the General Partner's receipt of a request for a refund, the capital contribution will be refunded by the Limited Partnership to the investor. The investor's rights are in this event limited solely to the return of the capital contribution of $500,000.

In the event an investor's I-526 petition receives notice of denial by USCIS, for reasons other than fraud or misrepresentation, the investor's rights are limited solely to the return of the investor's $500,000 capital contribution within ninety (90) days of written request therefore to the General Partner.

## TARGETED EMPLOYMENT AREAS AND THE MINIMUM INVESTMENT AMOUNT

As a general rule, the EB-5 program calls for a minimum investment of $1,000,000 USD. This sum may be reduced currently to $500,000 USD if the Project that receives the investment is situated in a Targeted Employment Area (TEA). TEA's must meet one of two criteria, the first, concerning population, and the second, concerning the rate of unemployment.

If an investment is made in a town or city whose population is less than 20,000, and the town or city is not within a Metropolitan Statistical Area (MSA) as designated by the U.S. Office of Management and Budget, the investment is deemed to have been made in a TEA. The eligibility of an EB-5 project to accept $500,000 USD investments is questioned if the project was situated in a TEA at the time the investment was made but is not in a TEA at the time the I-526 petition is filed. In the case of a TEA based upon the project's location in a rural area, this difference might occur, for example, because during this interim period new population data is published or because a new MSA is described to include the location of the project, albeit within a rural area.

In the event of a change between the date of the investment and the date of the filing of the I-526, USCIS

BL-0000137

Section 1. Jay Peak Biomedical Research Park L.P.

has said that it will consider the project to be within a TEA at the time of the investment if the invested funds were available to the project to undertake employment creation before the I-526 was filed. In this Project, USCIS should apply this standard in as much as the invested funds are irrevocably committed to the project before the I-526 is filed. There can be no assurance that USCIS will apply this rule appropriately.

USCIS has also said it will not permit every investor in a pooled investment project to invest only $500,000 merely because one or more investors were previously permitted to do so based upon the prior presence of a project in a TEA.

If the location of the Project is judged to no longer be within a TEA, investors filing I-526 petitions thereafter will be required to invest $1,000,000. No assurance can be provided that, for example, no new population data will be published rendering the location of a project outside a rural area or that new MSA boundaries depicting the location of the Project in the MSA will not be published.

Investors should consult with competent immigration counsel concerning TEA issues and investment counsel concerning the effects of investments of differing amounts on immigration and investment matters of significance to the investor.

### ATTAINING LAWFUL PERMANENT RESIDENCE

Despite the approval of an investor's form I-526, there cannot be any guarantee that the investor or the investor's spouse or any of the investor's minor, unmarried children will be granted lawful permanent residence. The grant of such immigration status is dependent upon the personal background of each applicant. Any one of several government agencies may determine in its discretion, usually without the possibility of appeal, that an applicant for lawful permanent residence is excludable from the United States.

### GROUNDS FOR EXCLUSION

Applicants for lawful permanent residence must demonstrate, affirmatively, that they are admissible to the United States.

There are many grounds of inadmissibility that the government may cite as the basis to deny admission for lawful permanent residence.

1.  Various statutes, including, for example, sections 212, 237 & 241 of the Immigration and Nationality Act, The Antiterrorism & Effective Death Penalty Act of 1996 (AEDPA) and the Illegal Immigration Reform & Immigrant Responsibility Act of 1996 (IIRAIRA) set forth grounds of inadmissibility, which may prevent an otherwise eligible applicant from receiving an immigrant visa, entering the United States or adjusting to lawful permanent residence.

2.  Examples of aliens precluded from entering the United States include:

    (A) persons who are determined to have a communicable disease of public health significance;

    (B) persons who are found to have, or have had, a physical or mental disorder, and behavior associated with the disorder which poses, or may pose, a threat to the property, safety, or welfare of the alien or of others, or have had a physical or mental

BL-0000138

disorder and a history of behavior associated with the disorder, which behavior has posed a threat to the property, safety, or welfare of the immigrant alien or others, and which behavior is likely to recur or to lead to other harmful behavior;

(C) persons who have been convicted of a crime involving moral turpitude (other than a purely political offense), or persons who admit having committed the essential elements of such a crime;

(D) persons who have been convicted of any law or regulation relating to a controlled substance, admitted to having committed or admits committing acts which constitute the essential elements of same;

(E) persons who are convicted of multiple crimes (other than purely political offenses) regardless of whether the conviction was in a single trial or whether the offenses arose from a single scheme of misconduct and regardless of whether such offenses involved moral turpitude;

(F) persons who are known, or for whom there is reason to believe, are, or have been, traffickers in controlled substances;

(G) persons engaged in prostitution or commercialized vice;

(H) persons who have committed in the United States certain serious criminal offenses, regardless of whether such offense was not prosecuted as a result of diplomatic immunity;

(I) persons excludable on grounds related to national security, related grounds, or terrorist activities;

(J) persons determined to be excludable by the secretary of state of the United States on grounds related to foreign policy;

(K) persons who are or have been a member of a totalitarian party, or persons who have participated in Nazi persecutions or genocide;

(L) persons who are likely to become a public charge at any time after entry;

(M) persons who were previously deported or excluded and deported from the United States;

(N) persons who by fraud or willfully misrepresenting a material fact, seek to procure (or have procured) a visa, other documentation or entry into the United States or other benefit under the immigration act;

(O) persons who have at any time assisted or aided any other alien to enter or try to enter the United States in violation of law;

(P) certain aliens who have departed the United States to avoid or evade U.S. Military service or training;

(Q) persons who are practicing polygamists; and

BL-139

BL-0000139

Section 1. Jay Peak Biomedical Research Park L.P.

(R) persons who were unlawfully present in the United States for continuous or cumulative periods in excess of 180 days.

## NO RETURN OF FUNDS IF VISA OR ADJUSTMENT OF STATUS IS DENIED

Following approval of an investor's I-526 petition, the investor and the spouse and qualifying children of the investor must apply for an immigrant visa or adjustment to permanent resident status. As part of this process, they undergo medical, police, security and immigration history checks to determine whether any of them are inadmissible to the United States for any of the reasons mentioned above or for any other reason. The visa or adjustment of status may be denied notwithstanding the eligibility for or approval of the I-526 petition. If, following subscription and payment of the investment funds and payment of the administration fee the investor or the spouse or any children of the investor are denied a visa for Conditional Lawful Permanent Residence or denied adjustment of status to Conditional Lawful Permanent Residence such action will not entitle the investor to the return of any funds paid to the Limited Partnership pursuant to this offering unless and until a substitute partner is found as set forth in section 10.01 of the Limited Partnership Agreement, and, in any event, there shall be no refund of the administration fees.

## CONDITIONAL LAWFUL PERMANENT RESIDENCE

Lawful permanent residence status granted initially to an investor and the spouse and qualifying children of the investor is "conditional." Each investor and the spouse and qualifying children of the investor must seek removal of conditions before the second anniversary of lawful permanent admission to the United States. There cannot be any assurance that the USCIS will consent to the removal of conditions as to the investor or as to the spouse or qualifying children of the investor, each of whom must make a separate application to remove conditions (albeit a single form is used to identify all applicants). If the investor fails to have conditions removed, the investor and the spouse and children of the investor will be required to leave the United States and will be placed in removal proceedings. Even if the investor succeeds in having conditions removed, the spouse and each qualifying child of the investor, separately, must have conditions removed. Failure to have conditions removed as to any of these members of the investor's family will require some members to depart from the United States and such family members will be placed in removal proceedings.

## NO REGULATIONS REGARDING REMOVAL OF CONDITIONS GENERALLY

USCIS regulations governing lawful permanent residence for investors do not state specifically the criteria which USCIS must apply to determine eligibility for the removal of conditions to lawful permanent resident status. Courts have determined some standards and USCIS have issued memoranda on some issues. The investor should seek competent immigration counsel to determine all of the issues that may arise in the I-829 process on account of the absence of regulations controlling the process or resulting from ambiguities in existing law and regulations.

## BUSINESS CHANGES AND BUSINESS FAILURES

The I-526 petition must be supported by evidence that the EB-5 project has received all investor capital, will dedicate the funds to furtherance of the EB-5 project and, thereby, will create all requisite employment. When an investor seeks removal of conditions, the I-829 petition must be supported by evidence that these requirements have been met, or, if they have not been met, there must be compelling explanations for delays or changes in the EB-5 project. If the Project is delayed in its implementation, if invested funds are expended differently or more slowly than anticipated or if employment is behind schedule, USCIS will expect documentation of changed circumstances to explain the delay and evidence that the Project is following its

BL-0000140

essential business plan.

It will be incumbent upon the investor to establish that despite such changes, the requirements of the EB-5 Program have been met: the required capital has been paid to the Project, the investment has been sustained and the required jobs have been created. There cannot be any assurance that USCIS will consider a change in the business plan to be immaterial, will be persuaded by the investor's explanation of the reason for the change, or will conclude that the investor's EB-5 Project is following its I-526 business plan and that the EB-5 requirements for all projects are being or will be met by the Project. Failure to persuade USCIS on each of these issues will result in the denial of an investor's I-829 petition. In this event, the investor and the investor's qualifying family members will be placed in removal proceedings and may be required to depart the United States.

There cannot be any assurance that all anticipated investors will have subscribed and have paid in all required capital on the anticipated schedule, that the Project will be developed as scheduled or that invested funds will be expended as scheduled or in a manner anticipated in the business plan. It is possible, and no assurance may be provided to the contrary, that the Project will not hire workers on the predicted schedule. Should one or more of these circumstances occur, no assurance may be given that USCIS will accept the explanation for the occurrence. If USCIS rejects the explanation, the I-829 petition will be denied and the investor and the investor's qualifying family members will be placed in removal proceedings which may require them to depart the United States.

USCIS expects that an EB-5 business will be continuously maintained through the period of conditional lawful residence to the time the I-829 Petition to Remove Conditions is filed and, possibly, until the I-829 is adjudicated. USCIS will examine the matter of whether the investment has been lost prior to or may be lost soon after conditions are removed. USCIS will also focus on whether an EB-5 project is likely to cease its operations shortly after conditions are removed, thereby shedding employment it has created.

If an EB-5 project fails (e.g., foreign investments are lost or are expected to be lost, or if jobs are not created in sufficient numbers or once created are lost or are expected to be lost) during the period of an investor's conditional residence or is deemed likely to fail shortly after conditions are removed, USCIS will not remove conditions.

Investors are not credited for having made investments in good faith or for having created all the required employment during a part of the period of conditional residence.

**JOB CREATION AND TENANT OCCUPANCY**

USCIS currently requires verifiable sources of reliable data that support the connection between the investment in an EB-5 project and the resulting creation of employment. If USCIS perceives that employment will be created by tenants occupying an EB-5-renovated or constructed building, it requires detailed, verifiable evidence to establish that there is "excess demand" for the specific types of space sought by tenants who are expected to occupy the structure according to the project's business plan. USCIS seeks verifiable proof that there is a lack of unique or specialized space which "constrains" the commencement or expansion of the prospective tenant's business. Absent such evidence, USCIS maintains that there is an insufficient "nexus" between the use of the EB-5 investment funds and the tenant's job creation to credit EB-5 investors with these jobs. If an investor is unable to provide such evidence and overcome USCIS' objections, the investor's petitions will fail for lack of establishment of requisite employment creation.There may be some business relationships between the investors' New Commercial Enterprise (NCE) and another business entity that do not involve a landlord-tenant relationship, and, therefore, should not result in USCIS' disqualification of jobs for the benefit of investors in a NCE involved in such a relationship. One such business relationship may be a joint venture collaboration, between the NCE and another business entity to

conduct a separate business enterprise by combining property, money, skill and knowledge. The NCE in this EB-5 project is engaging in a joint venture with the Joint Venturer. USCIS has not opined whether jobs created from the joint business activity of the NCE and another business entity, a joint venture, may be credited to EB-5 investors in the NCE. If USCIS rejects the right of the NCE to count such employment, the investor's petitions will fail for lack of establishment of requisite employment creation.

**Material Change In The EB-5 Project**

In the event of a material change to the business plan in the Project between the time the I-526 petition is filed and the time the investor applies for removal of conditions, the investor may be required by USCIS to file a new I-526 petition incorporating changes in the Project. In some cases, this will necessitate a new two-year period of conditional permanent residence after which the investor will be expected to file a new I-829 petition to remove conditions. If a new I-526 is filed, the children of the investor who become twenty-one (21) years old or who married before the new I-526 is filed will be deemed to have "aged out" and will not be eligible to immigrate based upon the parent-child relationship with the investor. If the spouse of the investor is divorced from the investor before the new I-526 is filed, the spouse will also be ineligible to immigrate based on the former marriage.

No assurances may be given that this EB-5 Project will not fail during the period of conditional permanent residence or at some time thereafter. No assurance may be provided that USCIS will forgive such failure or anticipated failure by granting an investor's I-829 petition. If the petition is denied, the investor and the investor's qualified family members will be placed in removal proceedings and may be required to depart the United States.

**REVIEW OF I-526 COMPLIANCE DURING THE I-829 PROCESS**

USCIS, at its election, uses the I-829 process to review the investor's compliance with previously resolved I-526 petition requirements. Such a review will be undertaken if the examiner believes that the prior favorable determination was "legally deficient" or if material facts have changed during the period of conditional residence. If USCIS believes the investor is not EB-5 eligible, the burden is on the investor to establish eligibility by reliance on "independent objective evidence."

The Limited Partnership will seek as much information as possible from USCIS, where good business practices permit, in an effort to assist investors to qualify for the removal of conditions. This notwithstanding, in the absence of regulations the Limited Partnership may make certain management decisions without knowing them to be objectionable to USCIS, thus resulting in an RFE and, possibly, the denial of an investor's I-829, petition to remove conditions. If the I-829 is denied, the investor and the investor's spouse and qualifying children will be expected to depart the U.S. and will be placed into removal proceedings.

Each investor should consult with competent immigration counsel and become educated about the standards that will determine eligibility of the investor and the spouse or children of the investor to achieve unconditional lawful permanent residence in the United States pursuant to this Program which currently is in a state of evolution.

**NUMERICAL QUOTAS**

Currently, the EB-5 Preference accords a total of 10,000 EB-5, Preference visa statuses allocated annually, of which 3,000 are available to alien investors and the spouses and qualifying children of investors who are making an investment in a Targeted Employment Area (TEA). The Project is currently

Section 1. Jay Peak Biomedical Research Park L.P.

situated within a TEA. EB-5 status is available on a first-come, first-served basis. Recently, USCIS has announced that it considers the 3,000 statuses for TEA cases as a guaranteed allocation, not a quota, so that all TEA cases are eligible to seek a visa, up to the annual quota of 10,000 visas.

Historically, the allocation of visas for the EB-5 Fifth Preference, including TEA's, has not been oversubscribed. Investors should note and consider the significantly increasing demand for visas in the Fifth Preference which has prompted the U.S. Department of State, in its December 2012 Visa Bulletin, to issue the following advisory concerning the possible unavailability of EB-5 Fifth Preference visas for nationals of the People's Republic of China:

> "Employment Fifth:  Current*
>
> *The following advisory is based strictly on the current demand situation.  Since demand patterns can (and sometimes do) change over time, this should be considered a worst case                   scenario                   at                   this                   point.
>
> It appears likely that a cut-off date will need to be established for the China Employment Fifth preference category at some point during second half of fiscal year 2013.  Such action would be delayed as long as possible, since while number use may be excessive over a 1 to 5 month period, it could average out to an acceptable level over a longer (e.g., 4 to 9 month) period.  This would be the first time a cut-off date has been established in this category, which is why readers are being provided with the maximum amount            of            advance            notice            regarding            the            possibility.
>
> The above projections for the Family and Employment categories are for what could happen during each of the next few months based on current applicant demand patterns.  The determination of the actual monthly cut-off dates is subject to fluctuations in applicant demand and a number of other variables which can change at any time.  Those categories with a "Current" projection will remain so for the foreseeable future, with the possible exception of the China Employment Fifth preference category mentioned above."

There is no reliable means to predict if delays due to unavailability of visas will occur, or, if it occurs, how long an investor or the spouse and qualifying children of the investor will wait before visa status for them becomes available.

Changes to current law on quotas or USCIS practices regarding the allocation of visas to the EB-5 Program could adversely impact the investor. Investors should seek the advice of competent immigration counsel concerning the law and USCIS practices regarding EB-5 visa availability.

## EXPIRATION OF THE REGIONAL CENTER PILOT PROGRAM

The Regional Center Pilot Program is significant to each investor until the investor receives unconditional lawful permanent residence. Each of the three immigration stages to be completed by the investor in a Regional Center EB-5 project is dependent upon the existence of the Regional Center as authorized by the Pilot Program. Some government agencies that confer immigration benefits upon EB-5 investors have announced that they are not authorized to confer such benefits (e.g., approve an I-526 petition by alien entrepreneur, approve an I-485, application to adjust status or grant an immigrant visa to an EB-5 investor or approve an I-829, petition by entrepreneur to remove conditions) once the Regional Center Pilot Program expires. The investor's qualifying relatives are subject to the same outcomes as the investor if the Regional Center Pilot Program expires.

BL-143

BL-0000143

Section 1. Jay Peak Biomedical Research Park L.P.

The Regional Center Pilot Program was first created in 1992. Since then it has been extended, most recently in 2012, until September 30, 2015 This Project seeks the benefit of the Regional Center Pilot Program that permits employment created indirectly by investments in the Project to be counted towards the minimum number of employment positions needed to qualify a foreign investor, the investor's spouse and the qualifying children of the investor to have conditions removed. There is no reliable means to know if the Regional Center program will be extended or made permanent.

If the Regional Center Pilot Program lapses, investors whose projects depend upon Regional Centers may not be able to file I-526 petitions or have filed petitions adjudicated and applications for lawful permanent residence or the removal of conditions may be rejected, delayed or denied, depriving the investor and the investor's qualifying family the right to enter, live or work in the U.S. Currently, there is no way to know or predict the positions that the relevant government agencies will take concerning the immigration rights of EB-5 investors in Regional Center Pilot Program projects should the Pilot Program lapse.

## ACTIVE PARTICIPATION IN LIMITED PARTNERSHIP BUSINESS

The EB-5 Program requires that each investor be actively involved in the business affairs of the Limited Partnership. Failure to be actively involved may jeopardize approval of the I-526 petition or result in the denial of Lawful Permanent Residence status for the investor and the spouse and the qualifying children of the investor. The Limited Partnership Agreement, in an effort to reflect the EB-5 regulations governing what level of participation is acceptable to meet the EB-5 criteria, mandates that each Limited Partner shall participate in the management of the business of the Partnership by making suggestions or recommendations to the General Partner on issues of policy important to the Partnership. The Limited Partnership Agreement also permits limited partners to participate in one or more of the activities (i) permitted of Limited Partners under the Vermont Revised Uniform Limited Partnership Act and (ii) otherwise set forth under the Limited Partnership Agreement. No Limited Partner shall control the Partnership's business or management or have any authority to act or bind the Partnership in any manner contrary to the provisions of the Limited Partnership Agreement. The Project cannot assure investors that these provisions are or will be satisfactory to USCIS.

## RISKS ATTENDANT TO EB-5 STATUS

USCIS frequently reinterprets the meaning of qualifying EB-5 criteria. The creation of new standards to be met, changes in the emphasis that USCIS places on EB-5 criteria, the reinterpretation of existing EB-5 criteria and the publication of new field instructions to examiners without prior notice all become binding upon previously filed but unadjudicated I-526 petitions and may affect whether they will be approved. These USCIS actions also are binding on EB-5 projects that have accepted some investors whose I-526 petitions are being prepared for filing and may determine if such projects and the I-526 and I-829 petitions based upon the projects will continue to be deemed compliant with EB-5 rules. There can be no certainty that compliance with known criteria as of the date an I-526 petition is filed will lead to the approval of the I-526 or I-829 petition.

USCIS has demonstrated an increasing propensity to review and revoke its prior approvals of petitions and applications based upon the retroactive application of new rules or new interpretation of standards, making compliance by investors or the Project impossible and disqualifying the project and the investor from use of the EB-5 program despite reliance on the prior approval. Despite the USCIS position that it will give deference to earlier decisions, USCIS cannot be relied upon to do so.

The EB-5 Program has many requirements that must be met to the satisfaction of USCIS. Investors should consult with competent immigration counsel to review all EB-5 Program requirements. The failure to meet

BL-14

even one of these requirements to the satisfaction of USCIS may result in the denial of the investor's I-526 petition or subsequent petitions.

## CONSULAR PROCESSING – VISA NOT GUARANTEED

In some instances, consulates place visa applicants in "administrative processing". Consuls are very reluctant to explain the specific reasons for this additional step taken before a visa will be issued. This procedure may be encountered (i) in consular posts that report high levels of visa fraud, (ii) in posts in some countries that are hyper-vigilant concerning security matters or (iii) because some information about a visa applicant, in the opinion of a consular officer, merits further background checks. Once administrative processing begins, consulates will not discuss the progress of a visa application. Applicants are relegated to indeterminate waiting for a decision on a visa application. Such a decision may take years to obtain.

Decisions by consuls are discretionary and unreviewable. USCIS and DOS report efforts to communicate more efficiently regarding their respective roles in determining the eligibility of EB-5 investors for immigrant visas. There cannot be any assurance that improved communications will occur generally or with respect to a particular investor or the investor's spouse or minor children. Neither may it be assured that improved communications will result in the issuance of a visa. Factors extraneous to the EB-5 project or the relationship of the investor to the project that a consul may, with unreviewable discretion, elect to consider could result in the denial of a visa. Investors are advised to seek competent immigration counsel on matters of consular processing.

## ADMISSION AFTER INVESTING, FILING THE I-526 OR DURING CONSULAR PROCESSING

Admission to the United States as a visitor or in most other non-immigrant statuses is predicated upon the intent to depart the country at the end of the period of admission. Experienced EB-5 legal practitioners caution that non-immigrant intent may be difficult to establish once an investor has paid funds into an EB-5 project or files an I-526, as the sole purpose of this investment and petition is to establish that the investor qualifies to become a lawful permanent residence. The difficulty of maintaining non-immigrant intent is made more difficult upon commencing consular processing, which is considered by USDOS to be a clear request for lawful permanent residence as soon as processing times permit. Investors should consult with competent counsel to evaluate the risks associated with seeking temporary (non-immigrant) admission to the United States subsequent to making the investment or filing an I-526 petition or an applicant for an immigrant visa. Despite best efforts, an inspector may deny admission under these circumstances. Such a denial may also result in formal exclusion from the U.S. which might preclude admission with an immigrant visa for a period of years.

## ADJUSTMENT OF STATUS

Further to this topic, please see *Immigration Matters, Adjustment Of Status*.

Making the investment, filing the I-526 or applying for AOS within the 60 day period before applying for AOS may be viewed by USCIS as evidence of immigrant intent and may result in the denial of AOS. In such an event, the investor will be required to depart the U.S. and will need to seek an immigrant visa through consular processing. In this process, experienced immigration counsel believe that USDOS (through its consulates) may require the investor to seek a waiver of exclusion (for which the applicant must establish eligibility) for having misrepresented the purpose of entry upon the admission as a non-immigrant. Waivers are granted in the unreviewable discretion of the USCIS and the processing time for waiver applications is frequently significant.

BL-145

Section 1. Jay Peak Biomedical Research Park L.P.

There may be additional reasons why an alien may not adjust status, which is a benefit granted in the discretion of USCIS. There is no appeal from a denial of AOS; the only relief available is a request to re-open or re-consider the AOS application. Investors should consult with immigration counsel to determine if they, their spouse and their children are eligible for AOS or if pursuit of AOS would be prudent.

Near the conclusion of an AOS case, USCIS may schedule an interview for the AOS applicant. The interview may be waived by USCIS, but the waiver should not be expected. Experienced immigration law practitioners believe that USCIS uses profiling information to determine who will be interviewed and it also interviews some AOS applicants to maintain the integrity of its screening process. There is no formal process to request the waiver of an interview. Investors should consult with experienced immigration counsel on all matters concerning adjustment of status.

## REMOVAL OF CONDITIONS

Further to this topic, please see *Immigration Matters, Removal Of Conditions*.

In the history of the EB-5 Program, INS (now USCIS) modified the requirements for removal of conditions after the time that some investors were granted CLPR. As a result of this action, some of those investors were unable to comply with the new requirements, creating the possibility that they would be removed from the United States. Some of these investors contested the change in rules after their investments were made. Their position was supported in litigation that resulted in INS being ordered to reconsider their applications to remove conditions by applying the original rules. (See Risks Attendant to EB-5 Status, above).

There is an increased interest by USCIS in examining all aspects of EB-5 project and investor petition compliance during the removal of conditions process. Investors should seek guidance from experienced EB-5 counsel concerning all aspects of the removal conditions process and the effect of possible USCIS actions on the investor and the investor's spouse and qualifying children.

One possible action is the denial of an investor's I-829 petition if USCIS determines not enough jobs are created, preserved or qualified to support the number of EB-5 investors in the Project. This determination would create the possibility that some or all of the EB-5 investors and their spouses and qualifying children would be removed from the United States. If USCIS determines that less than the required number of jobs have been created or preserved, the Offering mandates that jobs will be allocated to investors in the order of priority for those I-829 petitions that are approved, then to investors in the order of priority for those who have obtained lawful permanent admission to the United States (i.e. obtained a visa or adjustment of status). It is in each investor's best interests, therefore, to proceed expeditiously with their various petitions and applications, but again investors should seek guidance from experienced EB-5 counsel. In the event an investor's I-829 petition is denied for this or any other reason, the investor will not be entitled to the return of any funds paid to the Limited Partnership pursuant to this Offering unless and until a substitute partner is found as set forth in and pursuant to section 10.01 of the Limited Partnership Agreement, and, in any event, there shall be no refund of the administration fees to the investor.

## FAMILY RELATIONSHIPS

1.  Spouses of the investor may accompany or follow to join an investor who has been granted Conditional Lawful Permanent Residence provided that the investor and the spouse were married at the time of the investor's acquisition of CLPR. If the relationship is one in common law, the "spouse" of the investor may not acquire Lawful Permanent Resident Status on account of the relationship. Not all valid marriages will be recognized for purposes of U.S. Immigration. Investors should consult competent immigration counsel regarding the eligibility of their spouse for immigration benefits.

BL-146

BL-C000146

Section 1. Jay Peak Biomedical Research Park L.P.

2. Certain children or step-children of the investor may accompany or follow to join an investor who has been granted Conditional Lawful Permanent Residence provided that the investor can establish parentage or step-parentage at the time of the investor's first admission to the United States as a Conditional Lawful Permanent Resident or adjustment of status to lawful permanent residence. Failure to comply with all applicable requirements may result in the separation of a child from the investor or the investor's spouse for protracted periods, in some instances for years, while other immigration opportunities are attempted in an effort to reunite the family. U.S. law excludes some step-children and adopted children from eligibility for immigration benefits. Investors should consult competent immigration counsel regarding the eligibility of their children for immigration benefits.

3. A "child" is someone under the age of 21 years who is unmarried. If a child becomes age 21 or marries before being admitted to the U.S. as a lawful permanent resident or adjusting to Lawful Permanent Resident Status, the former child, now deemed a son or daughter, may not be eligible to accompany or follow to join the investor. In some circumstances, the Child Status Protection Act may assist a son or daughter to qualify as a child by reducing the deemed age of the son or daughter to less than 21 years. Failure to meet the requirements of the Child Status Protection Act may result in the separation of a son or daughter from the investor or the investor's spouse for protracted periods, in some instances for years, while other immigration opportunities are attempted in an effort to reunite the family.

4. Under some circumstances a child who becomes 21 years of age or marries while holding Conditional Lawful Permanent Resident Status, or the spouse of the investor who is divorced from the investor while holding Conditional Lawful Permanent Resident Status, may be eligible to remove conditions by being included in the investor's I-829 petition or filing a separate I-829 petition. Failure to meet qualifying conditions, which may not be within the child's or divorced spouse's control, and, about which the law and regulations do not provide clear guidance, will result in the child or divorced spouse being placed in removal proceedings and may require the child or divorced spouse to depart the United States.

5. Upon the death of an investor holding Conditional Lawful Permanent Resident Status, a spouse and qualifying children of the investor also holding such status are entitled to seek removal of conditions by submission of the same evidence demonstrating compliance with required criteria that USCIS requires of an investor seeking to remove conditions. Failure of each member of the family to establish these criteria will result in the denial of the application to remove conditions, placement of the family members in removal proceedings and their mandated departure from the United States.

It is unclear under USCIS procedures if a child who becomes a son or daughter before the death of the investor is entitled to seek removal of conditions. USCIS regulations are silent on this matter. If USCIS does not extend this benefit, such a son or daughter will be denied an application to remove conditions and will be placed in removal proceedings and may be mandated to depart the United States.

**End of section 1**

BL-147

BL-0000147

The Business Plan.

BL-0000147A





## Section 2

# The Business Plan

BL- K48

BL-000014C

{This Page was intentionally left blank}

BL-149

BL-0000149

# CONTENTS

**STRUCTURE OF OPERATIONS**

**IMPORTANT INFORMATION**.................................................................................................................1

**JAY PEAK BIOMEDICAL RESEARCH PARK L.P EXECUTIVE SUMMARY** ...............................................2

    TOTAL ANTICIPATED CAPITAL INVESTMENT.............................................................................4

    ANC BIO PROJECT SUMMARY...................................................................................................4

    THE STATE OF VERMONT- A USCIS DESIGNATED REGIONAL CENTER...................................4

    ANC BIO USA LLC- THE JOINT VENTURER..............................................................................5

    ANC BIO KEY MANAGEMENT...................................................................................................5

    THE PROJECT INVESTMENT AND FINANCIAL TRANSACTION.....................................................6

**CAPITALIZATION**....................................................................................................................8

    SOURCE AND USE OF FUNDS...................................................................................................8

    TIMELINE...............................................................................................................................10

**MARKET REVIEW**..................................................................................................................12

**JOB CREATION**.....................................................................................................................23

**POSSIBLE EXIT STRATEGIES**.................................................................................................23

BL-150

BL-0000150

{This Page was intentionally left blank}

BL _151

BL-0000151

## Jay Peak Biomedical Research Park LP- Structure of Operations

**Project:**

The LP Owns the Real Estate, and the Medical Research Facility Building where Clean Room Laboratories are Leased Out, and is a Joint Venturer in Businesses Operating within that facility that include Medical Device Manufacturing & Distribution And Medical Contract Management Operations.

**Job Creation:**

Required Jobs are Created by Funds Invested in the New Commercial Enterprise for:

- Equity Ownership in Real Estate and Facilities
- Manufacturing & Distribution of Medical Devices;
- Leasing & Operations of clean rooms & Laboratory Facilities



SECTION 2     JAY PEAK BIOMEDICAL RESEARCH PARK L.P.

## BUSINESS PLAN AND FINANCIAL DATA

### November 2012

Summary of Principal Objectives and Activities, including Financial Reports and Supporting Schedules.

Important Notice: See Offering Memorandum: Risk Factors.

### IMPORTANT NOTICE

FORWARD LOOKING STATEMENTS: ANY STATEMENTS THAT EXPRESS OR INVOLVE DISCUSSIONS WITH RESPECT TO PREDICTIONS, GOALS, EXPECTATIONS, BELIEFS, PLANS, PROJECTIONS, OBJECTIVES, ASSUMPTIONS OR FUTURE EVENTS OR PERFORMANCE ARE NOT STATEMENTS OF HISTORICAL FACT AND MAY BE "FORWARD LOOKING STATEMENTS". "FORWARD LOOKING STATEMENTS" ARE BASED ON EXPECTATIONS, ESTIMATES AND PROJECTIONS AT THE TIME THE STATEMENTS ARE MADE THAT INVOLVE A NUMBER OF RISKS AND UNCERTAINTIES WHICH COULD CAUSE ACTUAL RESULTS OR EVENTS TO DIFFER MATERIALLY FROM THOSE PRESENTLY ANTICIPATED.

THIS BUSINESS PLAN, FINANCIAL DATA AND THE JAY PEAK BIOMEDICAL RESEARCH PARK L.P. (THE "LIMITED PARTNERSHIP") OFFERING MEMORANDUM CONTAIN FORWARD LOOKING STATEMENTS AND PROJECTIONS FOR THE PROJECT (THE "ANC BIO PROJECT") THAT MAY ADDRESS, AMONG OTHER THINGS, PRODUCT DEVELOPMENT, EXPANSION STRATEGY, DEVELOPMENT OF SERVICES, USE OF PROCEEDS, PROJECTED REVENUE AND CAPITAL EXPENDITURES, OPERATING COSTS, LIQUIDITY, JOB CREATION, ECONOMIC MODELING, DEVELOPMENT OF ADDITIONAL REVENUE SOURCES, DEVELOPMENT AND MAINTENANCE OF PROFITABLE MARKETING, MANAGEMENT AND MAINTENANCE ALLIANCES, AND STATEMENTS OF EXPERIENCE AND EXPECTATIONS. NO ASSURANCE CAN BE MADE, NOR IS ANY ASSURANCE GIVEN IN ANY FORM IMPLIED OR OTHERWISE, THAT THESE FORECASTS WILL PROVE ACCURATE. NEITHER THE LIMITED PARTNERSHIP NOR ITS GENERAL PARTNER HAVE ANY OBLIGATION TO REVISE OR UPDATE ANY FORWARD LOOKING STATEMENTS OR PROJECTIONS FOR ANY REASON.

THESE FORWARD LOOKING STATEMENTS MAY BE ALSO FOUND IN THE SECTIONS OF THE JAY PEAK BIOMEDICAL RESEARCH PARK L.P. OFFERING MEMORANDUM ENTITLED "SUMMARY OF OFFERING," "RISK FACTORS," "IMMIGRATION RISK FACTORS", "USE OF PROCEEDS," AND IN THE OFFERING MEMORANDUM GENERALLY. ACTUAL RESULTS COULD DIFFER MATERIALLY FROM THOSE ANTICIPATED IN THESE FORWARD LOOKING STATEMENTS AND PROJECTIONS AS A RESULT OF VARIOUS FACTORS, INCLUDING ALL THE RISKS DISCUSSED IN "RISK FACTORS" WITHIN THE OFFERING MEMORANDUM. PROSPECTIVE INVESTORS SHOULD CONSIDER CAREFULLY ALL THESE RISKS, IN ADDITION TO OTHER INFORMATION CONTAINED WITHIN THE OFFERING MEMORANDUM BEFORE DECIDING WHETHER TO INVEST IN THE PARTNERSHIP.

BL - 153

BL-0000153

## EXECUTIVE SUMMARY

This Business Plan supplements the Offering Memorandum and, among its other purposes, sets forth the EB-5 project criteria for all prospective investors in the New Commercial Enterprise (NCE), to be known as Jay Peak Biomedical Research Park, L.P. that will purchase land, construct a new clean room facility and enter into a joint venture with AnC Bio USA, LLC (or similarly named entity, the "Joint Venturer"). These companies will create and own the joint venture entity, AnC Bio, LLC (or similar named entity, the "Joint Venture Entity")), which will operate the new facility within the Vermont Regional Center:

| | |
|---|---|
| Job Creating Enterprise: | AnC Bio LLC (the "Joint Venture Entity"). |
| Specific Industry Focus: | The specific industry category the EB-5 AnC Bio Project falls under is NAICS 54171 Research and Development in the Physical Sciences, Engineering and Life Sciences, which is currently a USCIS-approved activity for the State of Vermont Regional Center. |
| Geographical Focus: | The EB-5 AnC Bio Project is located in the State of Vermont within the geographic boundary of the USCIS' designated State of Vermont Regional Center. |

AnC Bio VT Project Contacts:

Principals –

Ariel Quiros/William Stenger
AnC Bio VT LLC
One AnC Bio Drive
Newport, VT 05855
Phone: (802) 327-2223
Email: bstenger@ancbiovt.com

Immigration Counsel –

Edward J. Carroll, Esq.
Carroll & Scribner, P.C.
P.O. Box 932
Burlington, VT 05402
Phone: 802-862-2855
Email: ecarroll@cslaw.us

Business Counsel -

Mark H. Scribner, Esq.
Carroll & Scribner, P.C.
P.O. Box 932
Burlington, VT 05402
Phone: 802-862-2855
Email: mscribner@cslaw.us

Economic/Jobs Impact Modeling -

Economic Development Research
Group, Inc.
2 Oliver Street, 9th Floor
Boston, MA 02109
Phone:617.338.6775

New Commercial Enterprise -

Jay Peak Biomedical Research Park L.P.
By: AnC Bio Vermont GP Services, LLC
(the "General Partner"), ATTN: William Stenger, Member

2

BL_154

BL-0000154

Parties to Joint Venture Agreement -     (1) Jay Peak Biomedical Research Park L.P.
(2) AnC Bio USA LLC (a wholly owned subsidiary of
AnC Bio VT LLC, the general developer)

**[REST OF PAGE INTENTIONALLY LEFT BLANK]**

3

BL-155

**Total Anticipated Capital Investment:** An amount of up to $110 million from up to 220 immigrant investors through the EB-5 Immigrant Investor Visa program (though the AnC Bio Project is also open to US investors).

**AnC Bio Project Summary:** The AnC Bio Project is intended to constitute a "commercial venture" for the purposes of the "employment creation" requirements under the EB-5 provisions of the Immigration & Nationality Act (the "Act") which provides that, <u>inter alia</u>, if an EB-5 investor invests specified amounts in the capital of a business carrying on a "commercial venture," the immigrant investor may apply for permanent resident status in the United States of America. The AnC Bio Project is further structured to qualify under provisions in the law that permit a reduced investment and permit a broader analysis of jobs created than would otherwise be permitted. The AnC Bio Project utilizes the provisions of the Act concerning the location of the principal place of business within a Targeted Employment Area so that the minimum investment required is $500,000. To meet employment creation requirements, the AnC Bio Project relies upon the fact that the principal place of business of the AnC Bio Project is situated in Newport, Vermont within the Vermont Regional Center authorized by Section 610 of the Appropriations Act of 1993.

From its base of operations in Orleans County, Vermont, the AnC Bio Project, operated by the Joint Venture Entity, is poised to add over 3,000 jobs over the two year period of development and first three years of operations, well more than the number of jobs required by the EB-5 provisions of the Act and supporting and providing EB-5 investors with an opportunity to obtain permanent residence for themselves, their spouses and their minor children, as more particularly set forth in this Offering Memorandum.

Investors in the NCE will be granted limited partnership interests in the New Commercial Enterprise known as Jay Peak Biomedical Research Park L.P. (also referred to herein as the "Limited Partnership"), a newly organized for profit commercial enterprise with its principal place of business in Newport, Orleans County, Vermont.

### THE STATE OF VERMONT – A USCIS DESIGNATED REGIONAL CENTER

Pursuant to Section 610 of the Appropriations Act of 1993, on June 26, 1997, the VACCD Regional Center, was approved and designated as a regional center to participate in the Immigrant Investor Pilot Program. On June 11th 2007, the designation was reaffirmed. In a written request dated August 17, 2009, VACCD Regional Center sought to amend its initial Regional Center designation, to expand the types of approved economic activities and industrial clusters as follows:

1. To add manufacturing, professional services, education, information and lending institutions to their current list of approved industries;
2. To add the economic activities of design, development and production of new products; expansion or renovation of existing facilities; establishing and expanding post secondary schools including building, development and operation of the schools; design, development & publishing of software, books and other information publishing activities; and
3. To provide direct equity investments in or to the industry clusters and/or to provide indirect investments to the industries through investment in an enterprise which in turn will lend the funds for specific industry related project(s).

Based on its review and analysis of the request to amend the previous VACCD Regional Center designation and prior amended proposals, business plan, and supplementary evidence, the U.S. Citizenship and Immigration Services (USCIS) by way of letter dated October 6, 2009 to VACCD amended the designation of the VACCD Regional Center to incorporate the above changes, and updated its records of the VACCD Regional Center approval, designation, and business plan to encompass these amendments.

4

BL-156

BL-0000156

The New Commercial Enterprise, established in 2012, and the construction and economic activity, to be located in Orleans County, Vermont, is also located within the State of Vermont Regional Center and this Project has been structured so that foreign investors may meet the requirements under 8 U.S.C.§ 1153 (b)(5)(A) – (D); INA § 203 (b)(5)(A) – (D) of the Act and qualify under this program (the "EB-5 Program") to become eligible for admission to the United States of America as lawful permanent residents.

### ANC BIO USA LLC – THE JOINT VENTURER

This Joint Venturer is a limited liability company organized in the State of Vermont, USA, and is a wholly owned subsidiary of AnC Bio VT LLC, also a limited liability company organized in Vermont. This Joint Venturer and AnC Bio VT LLC are affiliated companies of AnC Bio Inc. of South Korea ("Existing Asian AnC Entity"), a medical and biotechnology research and manufacturing company that develops medical products such as artificial organs and medical devices (heart-lung devices, LVAD's, dialysis machines, e-Liver devices, etc), vaccines and other biologics and stem cell products (collectively, the "AnC Bio Products"). This Joint Venturer will enter into a Joint Venture Agreement with the New Commercial Enterprise, the other joint venturer, to operate the new facility through a new joint venture entity, AnC Bio LLC, in an effort to enable the Existing Asian AnC Entity to expand its global reach within the United States and elsewhere in North America.

### ANC BIO LLC – THE JOINT VENTURE ENTITY

Pursuant to the Joint Venture Agreement, the two joint venturers, the New Commercial Enterprise and AnC Bio USA LLC, will set up a new entity, to be known as AnC Bio LLC (the "Joint Venture Entity"), to be organized in the State of Vermont with its principal place of business in Newport, Vermont. The Joint Venture Entity will run the operations at the new facility, including hiring employees to work in the research, development and production of AnC Bio Products, and to staff the clean rooms.

### ANC BIO KEY MANAGEMENT

The AnC Bio Project operations will be based at the AnC Bio Project location in Newport, Orleans County, Vermont. Key management personnel, and their experience, include:

1. William Stenger:

William Stenger is President of Jay Peak Resort and a member of AnC Bio VT LLC. He is a respected business leader in Vermont having served three governors for 20 years on their economic advisers councils. He has led Jay Peak resort for 27 years since 1985. Jay Peak is now the most dynamic four season resort in Vermont. Mr. Stenger also was instrumental in creating the Vermont EB- 5 Regional Center with Governor Howard Dean in 1997. Through his leadership in the EB-5 program Jay Peak projects have raised and invested in the Northeast region of Vermont over $275 million welcoming over 550 investors from 60 countries. Thousands of jobs have been created as a result of Mr. Stenger's work and leadership. He is respected throughout the country as a leader in the EB-5 community. Mr. Stenger was instrumental in getting the recent three-year extension to the EB-5 program. He has testified before the US Senate and House of Representatives on behalf of the program. Mr. Stenger is now directing his leadership to create the AnC Bio Project, expand the Existing Asian AnC Entity's global reach to North America, stimulate economic development within the United States and create many jobs for Vermonters and throughout the Northeastern United States and other areas in the country. Mr. Stenger is a graduate of Syracuse University, has been married to his wife Mary Jane for 41 years, has three grown children and four grandchildren. He has been recognized within Vermont as Citizen of the Year in 2011 and has also been awarded the highest educational service award the State of Vermont gives. Mr. Stenger lives in Newport, Vermont where the AnC Bio Project will be located.

5

BL-157

2. Ariel Quiros:

Ariel Quiros has been exercising the leadership skills that he developed at Trinity Pawling Preparatory School and in the U.S. Military for more than thirty years now. From managing complex strategies in hostile environments while serving with the U. S. Army to leading his own companies to success on six continents, Mr. Quiros has now certainly proven to be a true leader in the corporate environments worldwide with business relationships that have spanned decades.

In 1995, with fourteen operating Trading Importing and Exporting companies and offices in Seoul, London, Beijing, Sydney and Hong Kong, Ariel opened U.S. offices in Miami Florida and settled in on Biscayne Bay with his family. An avid sailor, this was a true reward for Ariel. Today Ariel enjoys life with his wife of 36 years, Okcha in their home on Key Biscayne, Florida. Ariel and his wife have 2 children with successful careers of their own and 2 grandchildren.

Mr. Quiros devotes much of his time and effort today to the Vermont companies he owns that he's most passionate about. These companies include Jay Peak Resort, Burke Mountain Resort, and AnC Bio VT LLC, all located in the beautiful Northeast Kingdom region of Vermont.

With the acquisition of Jay Peak Resort in 2008, and millions of dollars of resort improvements since, Mr. Quiros and his partner Bill Stenger have developed a strong and very successful EB-5 foreign investor program in Vermont. Ariel, along with Mr. Stenger and their management teams, have initiated six significant EB-5 projects at Jay Peak Resort in Vermont, five of which are well along to completion, bringing more than $275 million of U.S. dollars and thousands of new jobs to the region.

Ariel is also one of the founders and owners of the Existing Asian AnC Entity, a biomedical research and development company in Asia. He works tirelessly with this company which is on the cutting edge of R & D, and manufacturing of biomedical devices and therapies to improve lives everywhere. Mr. Quiros now plans to bring the technology and the intellectual property of this successful company to Vermont to be used by the AnC Bio Project.

## THE PROJECT INVESTMENT AND FINANCIAL TRANSACTION

The project is open to US investors and foreign investors. Each foreign investor is expected to seek classification as an "Alien Entrepreneur" and, as required by current law, to invest $500,000 USD to the project.

On a 7 acre parcel of land overlooking beautiful Lake Memphromegog in the City of Newport, Vermont, the New Commercial Enterprise will construct and equip (the "Project") a 67,500 square foot, world class certified GMP (Good Manufacturing Practice) and certified GLP (Good Laboratory Practice) biomedical research, manufacturing and distribution facility . The parcel of land is already home to a modern 90,000 square foot manufacturing facility and the campus parcel will be known as the Jay Peak Biomedical Research Park. The Joint Venture Entity will hire many employees at the AnC Bio Project site to work in the research, development, production and distribution operations and will staff and operate on behalf of third parties some of the clean rooms that will be part of the facility. The General Partner of the New Commercial Enterprise believes that the AnC Bio Project has positioned itself for substantial economic growth over the next few years even in today's challenging economic climate.

This new facility, with HEPA filtered, highly controlled air flow systems, and Environmental Management Systems, will be equipped with versatile scientific equipment assembled for the purpose of supporting research

6

BL-158

BL-0000158

in the fields of cellular based therapy medicine, human growth factors, vaccines, and bioengineering (including production of cutting edge medical devices). This caliber of research requires an extremely low density particle environment in a closely controlled facility. The Joint Venture Entity will also staff and operate clean room spaces in the building on behalf of third parties so that those third parties may conduct research into certain biomedical areas of concern and industries. These third parties will include universities and colleges looking to initiate and expand such research, but who have in the past been hampered by a lack of adequate, proximate clean room facilities. Renowned biotech research universities such as the University of Vermont, McGill University, University of Sherbrook and Dartmouth College, all situated within 90 miles of the AnC Bio Project, have already been apprised of this Project (see University of Vermont (UVM) letter in Exhibits to the Offering for an example of the expected business relationship the AnC Bio Project seeks to develop with UVM and other universities).

These clean rooms will provide sterile environments and high tech equipment that scientists need for their research efforts, but can rarely afford to build on their own. There is a shortage of these types of facilities worldwide and this component of the new research center will help meet the needs for eastern North America and are projected to provide substantive income for the investors. See letter from One Source Environmental LLC in the Exhibits attesting to lack of clean room space.

Client universities and corporations can use the clean room space and equipment for proprietary research. The clean room facilities can also be used as an extension of current operations of contract manufacturers for overflow and end of lifecycle products with expert support and over 200 sub-licensed Standard Operating Procedures from the Existing Asian AnC Entity.

The Joint Venture Entity will provide clean room facilities staffed by its own employees for start-up companies. This will enable start-ups to grow their business to the point where they are able to hire their own operatives while the AnC Bio Project facilities continue to provide them with the infrastructure to support their business model. None of the jobs on any third party payrolls, if any, however, will be counted in the job count analysis relied on to support foreign investor EB-5 petitions.

The AnC Bio Project facility will also provide clean room space to medical device manufacturing firms needing additional clean room research facilities or companies that need independent clean room access. Operations will be supported with dedicated warehouse, engineering and office space in the new facility allowing companies to operate as if they were in their own facility.

It is projected that infrastructure and preliminary construction of the facility will begin in November 2012. It is projected that the facility will open for operation in the spring of 2014. Discussions with potential clients for use of clean rooms are already under way. The Existing Asian AnC Entity will also contract with the Joint Venture Entity for the manufacture of devices at the new facility and will conduct stem cell and vaccine research, occupying a significant portion of the clean room facility space, all in reliance upon employees on the payroll of the Joint Venture Entity. It is projected that AnC Bio VT LLC or its designee will invest $8 million in cash into the Project, separate from EB-5 investments, to create and upgrade infrastructure at the campus as needed.

Approximately 30,000 square feet of this new tower facility will be dedicated to the clean rooms. Another 22,500 square feet of the building will be dedicated to support these clean rooms (including 7,500 square feet of Environmental Management and Safety Systems to insure that the building meets the standards necessary for bio-medical research, and an additional 15,000 square feet dedicated to office and conference room facilities for the researchers and their companies). Finally, 15,000 square feet will be designed for medical device manufacturing. There will be manufacturing space, warehousing, design, and prototyping areas. The new facility, at the option of the General Partner, will be made subject to a condominium regime comprised of two condominiums. In this scenario, it is projected that all but the 15,000 square feet dedicated to office and conference room space will comprise one condominium unit, to be owned by the New Commercial Enterprise. It

BL-159

BL-0000159

is projected that the 15,000 square feet for office and conference room space will be a second commercial condominium unit, to be deeded to AnC Bio VT LLC in partial consideration for its infusion of cash as outlined above and the negotiation of technology transfer agreements for the benefit of the Joint Venture Entity.

Investors will invest into the New Commercial Enterprise and receive limited partnership interests in return. The Limited Partnership into which the Investors will invest will be known as Jay Peak Biomedical Research Park L.P., a Vermont organized limited partnership with its principal place of business in Newport, Orleans County, Vermont.

With this in mind, and to provide the capital required to achieve these opportunities, the New Commercial Enterprise seeks a total amount of $110,000,000, to be raised from up to 220 investors ($500,000 each). With the money it raises, the New Commercial Enterprise will purchase land in Newport, Vermont owned by GSI of Dade County, Inc. (owned by Ariel Quiros, one of the owners of AnC Bio VT LLC), under a Purchase and Sale Agreement, and provide sufficient capital to construct the clean room facility on the property, as well as equip and furnish said building, for the ultimate benefit of the New Commercial Enterprise and its investors. The New Commercial Enterprise will also enter into a Joint Venture Agreement with the Joint Venturer for the purpose of creating and owning the Joint Venture Entity to run the operations of the new facility. With the invested funds, and pursuant to the Joint Venture Agreement, the New Commercial Enterprise forecasts that it will, primarily within the Vermont Regional Center and the Northeastern United States, generate in excess of 3,000 EB-5 eligible indirect jobs, exceeding the 2,200 jobs required for 220 EB-5 investors under EB-5 Alien Entrepreneur regulations (See the Exhibit to the Offering titled "Economic and Job Creation Impacts of the Prospective AnC Bio VT Facility in the Vermont Regional Center" prepared by Economic Development Research Group, Inc., and dated November, 2012, referred to herein as the "EDR Report").

The General Partner of the Limited Partnership will be AnC Bio Vermont GP Services LLC, a Vermont organized limited liability company based in Newport, Vermont. The General Partner, as set forth in the Limited Partnership Agreement, will have the primary discretion in operating the Limited Partnership on day to day matters, with input from the Limited Partners/investors on issues of policy and major decisions, as well as all of the rights and duties accorded limited partners under the terms of the Limited Partnership Agreement and under Vermont law. The General Partner will also negotiate business agreements, including without limitation the Joint Venture Agreement, and will have sole discretion to decide when, if and how to redeem the Limited Partners' interests, but in no event will any such buyout occur with funds invested into the AnC Bio Project prior to the time all Limited Partners who are investors in the Project under the EB-5 Program have applied for removal of conditions on their permanent residency, with any appeals of denials having been decided. **Without limiting the foregoing, there is no guaranty of repayment or mandatory redemption offered herein to any Limited Partners, and each Limited Partner, upon investing in the Project will reaffirm theunderstanding and acceptance of the fact that the entire investment is at risk.** The General Partner may engage others to assist in any activity in which the Limited Partnership engages in connection with the Project.

**CAPITALIZATION**

**Source and Use of Funds**

Investors are being offered the opportunity to purchase limited partnership interests in the Limited Partnership. The Capital Contribution of each investor to purchase an interest in the Limited Partnership shall be a minimum of $500,000 in cash paid in U.S. Dollars. The Investors shall not be obligated to make any additional Capital Contributions to the Limited Partnership. The maximum amount of funds to be received from Investors is USD $110,000,000.

The primary use of these invested proceeds, in addition to the consideration to be paid by the New Commercial Enterprise to the current land owner under the terms of a Purchase and Sale Agreement (a draft of which is included as an exhibit to the Offering), will be to construct and equip the new facility, including, e.g., the

BL-0000160