COMPLIANCE WITH THE FOREGOING. THE LIMITED PARTNERSHIP WILL REFUSE TO REGISTER A TRANSFER NOT MADE IN ACCORDANCE WITH REGULATION D OR REGULATION S AND ANY APPLICABLE STATE LAWS, UNLESS THE TRANSFER IS MADE AFTER REGISTRATION UNDER THE SECURITIES ACT OF 1933 AND ANY APPLICABLE STATE LAWS OR IS OTHERWISE EXEMPT FROM REGISTRATION. THESE RESTRICTIONS MAY RENDER IT DIFFICULT OR IMPOSSIBLE TO LOCATE A PROSPECTIVE PURCHASER IF AND WHEN AN OWNER WISHES TO SELL HIS LIMITED PARTNERSHIP INTEREST.

THERE IS NO PUBLIC MARKET FOR THE SALE AND PURCHASE OF THE LIMITED PARTNERSHIP INTERESTS. THESE INTERESTS ARE NOT READILY TRANSFERABLE. THERE ARE RESTRICTIONS ON THE SALE OF THE LIMITED PARTNERSHIP INTERESTS. THERE MAY BE NO MARKET FOR RESALE OF THESE LIMITED PARTNERSHIP INTERESTS. THERE CAN BE NO ASSURANCES THAT A PURCHASER CAN BE FOUND IF AND WHEN AN OWNER WISHES TO SELL HIS INTEREST. A PURCHASER MAY NEVER BE ABLE TO LIQUIDATE HIS INVESTMENT IN THE LIMITED PARTNERSHIP.

THE LIMITED PARTNERSHIP IS A LIMITED PARTNERSHIP CREATED PURSUANT TO VERMONT LAW. THE RIGHTS OF LIMITED PARTNERS IN A LIMITED PARTNERSHIP DIFFER MATERIALLY FROM THE RIGHTS OF PARTNERS IN A GENERAL PARTNERSHIP OR SHAREHOLDERS IN CORPORATIONS.

THE PARTNERSHIP'S INVESTMENT IN THE PROJECT WILL BE SUBJECT TO THE RISKS RELATED TO, AND FORMING A PART OF, THE OWNERSHIP OF REAL PROPERTY. THESE INCLUDE BUT ARE NOT LIMITED TO UNCERTAINTY OF CASH FLOW TO MEET FIXED OBLIGATIONS, ADVERSE CHANGES IN GENERAL OR LOCAL ECONOMIC CONDITIONS, CHANGES IN GOVERNMENTAL RULES AND OR FISCAL POLICIES, ADVERSE ECONOMIC CONDITIONS, ADVERSE CHANGES IN INTEREST RATES AND TAXES, EXCESSIVE BUILDING RESULTING IN AN OVERSUPPLY, REDUCTION IN THE COST OF OPERATING COMPETING PROPERTIES, RELATIVE APPEAL OF COMPETING PROPERTIES, COMPETING DEVELOPMENTS WITHIN THE VICINITY IN A SIMILAR INDUSTRY, REDUCED DEMAND FOR PROPERTIES IN THE AREA, AND OTHER FACTORS REFERENCED ELSEWHERE WITHIN THE RISK FACTORS, MANY IF NOT ALL OF WHICH ARE BEYOND THE CONTROL OF THE LIMITED PARTNERSHIP AND THE GENERAL PARTNER.

THE GENERAL PARTNER OF THE LIMITED PARTNERSHIP WILL HAVE CERTAIN POWERS AND RIGHTS NOT GRANTED TO THE OWNERS OF THE LIMITED PARTNERSHIP INTERESTS.

WHETHER THE LIMITED PARTNERSHIP CAN MAKE DISTRIBUTIONS TO THE LIMITED PARTNERS IS DEPENDENT ON MARKET CONDITIONS FOR RESORT VISITATIONS, RENTALS, OCCUPANCY, OPERATING COSTS, PARTNERSHIP EXPENSES, AND NUMEROUS OTHER FACTORS, WHICH AFFECT ITS ABILITY TO EARN A SUFFICIENT INCOME IN EACH YEAR, ALL OF WHICH IN TURN AFFECT THE GENERAL PARTNER'S DETERMINATION WHETHER OR TO WHAT EXTENT DISTRIBUTIONS, SHOULD BE MADE. THERE IS NO ASSURANCE THAT PARTNERSHIP INCOME DERIVED FROM RENTALS WILL BE AVAILABLE FOR DISTRIBUTION TO LIMITED PARTNERS.

JAY PEAK GP SERVICES LODGE, INC. OR ITS DESIGNEE WILL PROVIDE THE MANAGEMENT FOR THE PROJECT AND WILL OVERSEE THE LEASES TO THE APPROVED COMPANIES LEASING AND OPERATING THE PARTNERSHIP ASSETS AND FACILITIES. IF JAY PEAK GP SERVICES LODGE, INC. ELECTS TO CEASE BEING THE GENERAL PARTNER, IT MAY BE DIFFICULT TO FIND A REPLACEMENT.

INSURANCE: CERTAIN RISKS RELATED TO THE PROJECT MAY NOT BE INSURABLE SUCH AS, BUT NOT LIMITED TO, EXTREME WEATHER, TERRORISM AND ACTS OF GOD. IF AN UNINSURABLE LOSS OCCURS THE PARTNERSHIP COULD SUFFER LOSS OF CAPITAL AND PROFITS.

DEPENDENCE ON KEY PERSONNEL: THE LIMITED PARTNERSHIP WILL RELY ON THE ACTIVE PARTICIPATION OF WILLIAM STENGER, AN OFFICER OF THE GENERAL PARTNER. MR. STENGER HAS BEEN INVOLVED IN THE JAY PEAK EXPANSION PROJECT AND THE OPERATION OF THE RESORT FOR MANY YEARS. THE LOSS OF MR STENGER'S SERVICES COULD CREATE A SIGNIFICANT ADVERSE EFFECT ON THE PROJECT.

WHETHER THE LIMITED PARTNERSHIP'S ACTIVITIES CAN BE PROFITABLE WILL DEPEND, AT LEAST IN PART, ON THE INTEGRATION AND COORDINATION OF ITS BUSINESS WITH THE OTHER BUSINESSES OPERATED AT THE JAY PEAK RESORT, WHICH BUSINESSES MAY BE OWNED BY THE RESORT OWNER, AFFILIATES OF THE RESORT OWNER, OTHER LIMITED PARTNERSHIPS AND OTHER THIRD PARTIES, NONE OF WHICH THE LIMITED PARTNERSHIP WILL CONTROL. THE FINANCIAL FORECASTS ARE BASED, IN PART, ON ASSUMPTIONS CONCERNING FACTORS OVER WHICH THE LIMITED PARTNERSHIP WILL HAVE NO CONTROL, INCLUDING NUMBER OF VISITORS TO THE RESORT AND OCCUPANCY

RATES FOR THE TOWNHOUSES AND COTTAGES WHICH MAY BE ADVERSELY AFFECTED BY VARIOUS FACTORS SUCH AS ADVERSE WEATHER CONDITIONS AND THE US ECONOMY DURING THE RESORT'S PEAK SKI AND SUMMER SEASONS.

THE PROJECT INVOLVES SUBSTANTIAL CONSTRUCTION ACTIVITY. THERE MAY BE DELAYS IN CONSTRUCTION OR REVISIONS BEYOND THE CONTROL OF THE GENERAL PARTNER. ANY DELAYS MAY AFFECT THE ABILITY OF THE PROJECT TO GENERATE CASH FLOW, MEET THE PROJECT TIMELINE, AND OR MAY INCREASE COSTS AND REDUCE PROJECTED RATE OF RETURN.

SITE PLANS AND BUILDING CONCEPTUALS (INTERIOR AND EXTERIOR): THE SITE PLANS, BUILDING SKETCHES AND CONCEPTUAL PICTURES WITHIN THIS OFFERING MEMORANDUM ARE NOT INTENDED AS LEGAL DESCRIPTIONS OF THE PROPERTY OR TO CONSTITUTE AN UNDERTAKING TO DEVELOP THE SUBJECT PROPERTY EXACTLY AS SHOWN HEREIN. RATHER, IT IS FOR GENERAL REFERENCE ONLY AND THE ACTUAL DETAILS SHOWN HEREIN MAY VARY SUBSTANTIALLY DEPENDING UPON ACTUAL SITE CONDITIONS, ARCHITECTS PLANS, ZONING, PERMITTING AND NUMEROUS OTHER FACTORS. PLANS AND DESIGNS TO BUILD OUT THIS PROJECT AS PROPOSED ARE SUBJECT TO CHANGE WITHOUT NOTICE.

REAL ESTATE DEVELOPMENT ALWAYS INVOLVES VARIOUS ENVIRONMENTAL RISKS. THESE RISKS INCLUDE BUT ARE NOT LIMITED TO THE POSSIBLE PRESENCE OF HAZARDOUS AND TOXIC SUBSTANCES LOCATED ON, OR GENERATED BY CONSTRUCTION ACTIVITY OR OPERATIONS ON, THE SUBJECT PROPERTY, THE RESORT OR ADJACENT PROPERTY, WHICH COULD HAVE A DETRIMENTAL EFFECT ON THE PARTNERSHIP, AND COULD GIVE RISE TO LEGAL PROCEEDINGS BROUGHT BY CONTRACTORS, ADJACENT PROPERTY OWNERS AND OTHERS, ALL OF WHICH COULD CAUSE THE PARTNERSHIP TO SUFFER LOSS OF CAPITAL AND PROFITS, AND INCUR THE RESPONSIBILITY TO REMEDY THE ENVIRONMENTAL CONTAMINATION.

THE FINANCIAL FORECASTS CONTAIN ESTIMATES OF FUTURE RESULTS BASED ON INFORMATION AVAILABLE AS OF THE DATE OF THIS OFFERING MEMORANDUM THAT THE LIMITED PARTNERSHIP BELIEVES ARE REASONABLE. HOWEVER, NO REPRESENTATION IS OR CAN BE MADE AS TO FUTURE OPERATIONS OR OF THE AMOUNT OF ANY FUTURE INCOME OR LOSS FROM THE OPERATION OF THE COTTAGES, TOWNHOUSES, SERVICES CENTER, AUDITORIUM AND PARKING FACILITY OR OTHER PROJECT AMENITIES. IN ADDITION, THE FINANCIAL FORECASTS OF TENANTS IS PROVIDED ONLY AS A GUIDE FOR THE ECONOMIC ANALYSIS, AND NO RELIANCE OR REPRESENTATION IS OR CAN BE MADE AS TO THE ACTUAL RENTAL INCOME THAT MAY BE EARNED BY THE LIMITED PARTNERSHIP BY LEASING THE PROJECT AMENITIES.

FUTURE MARKET VALUE OF THE PROJECT: THE ECONOMY OF THE STATE OF VERMONT, OF THE UNITED STATES GENERALLY, DEMOGRAPHIC CHANGES, INTEREST RATES, TAX CHANGES, FUTURE CONSTRUCTION ACTIVITY, AND MANY OTHER FACTORS WILL DETERMINE THE FUTURE VALUE OF THE PROJECT. THERE IS NO ASSURANCE THAT THE PROJECT OR ANY SEGMENTS THEREOF WILL HOLD OR INCREASE IN VALUE.

THE SUCCESS OF THE LIMITED PARTNERSHIP WILL DEPEND ON ITS ABILITY TO ATTRACT VISITORS TO THE RESORT AND TO STAY IN THE TOWNHOUSES AND COTTAGES. NO ASSURANCE CAN BE GIVEN THAT THE LIMITED PARTNERSHIP WILL BE SUCCESSFUL IN ATTRACTING SUCH GUESTS OR CUSTOMERS.

THERE IS COMPETITION AMONG EXISTING ACCOMMODATIONS AT THE RESORT AND OPERATORS OF OTHER ALL SEASONS RESORT HOTELS TO ATTRACT AND ENCOURAGE VISITS FOR CUSTOMERS. THERE CAN BE NO ASSURANCE THAT THE LIMITED PARTNERSHIP WILL BE ABLE TO COMPETE.

THE RESORT OWNER, OR ITS SUCCESSORS OR ITS AFFILIATES, MAY IN THE FUTURE DETERMINE TO CONSTRUCT OTHER BUILDINGS AT THE RESORT, INCLUDING HOTELS AND OTHER AMENITIES WHICH MAY CONNECT WITH AND COMPETE WITH THE TOWNHOUSES AND COTTAGES, AND OTHER PROJECT AMENITIES FOR GUESTS AND CUSTOMERS.

WHILE THE GENERAL PARTNER BELIEVES THE FINANCIAL PROJECTIONS, SOURCES OF FUNDS, BUILD COSTS, TIME FRAMES AND OTHER INFORMATION WITHIN THE BUSINESS PLAN ARE BASED UPON REASONABLE ASSUMPTIONS CONCERNING CERTAIN FACTORS AFFECTING THE PROBABLE FUTURE DEVELOPMENT AND OPERATIONS OF THE PARTNERSHIP AND THE PROJECT WHICH MAY BE KNOWN AT THE TIME OF THIS OFFERING, PURCHASERS SHOULD RECOGNIZE THAT THE FINANCIAL FORECASTS MAKE ASSUMPTIONS ABOUT GROSS REVENUES FROM THE COTTAGES, TOWNHOUSES, SERVICES CENTER, AUDITORIUM AND PARKING FACILITY AND OTHER PROJECT AMENITIES INCLUDING BUT NOT LIMITED TO ANNUAL ROOM RATES, ADMISSION FEES, OCCUPANCY AND USAGE LEVELS, TENANTS'

OPERATIONS, WHICH ARE SUBJECT TO SUBSTANTIAL FLUCTUATION. ALTHOUGH THE LIMITED PARTNERSHIP DOES NOT BELIEVE SUCH CHARGES AND RATES TO BE UNREASONABLE, PROSPECTIVE PURCHASERS SHOULD BE AWARE THAT THERE IS NO ASSURANCE THAT SUCH RATES, TENANCY OPERATIONS AND OCCUPANCY RATES WILL BE ACHIEVED OR MAINTAINED. IF SUCH RATES, OCCUPANCY AND USAGE LEVELS ARE NOT ACHIEVED, THE OPERATING RESULTS MAY BE LESS FAVORABLE THAN THOSE PROJECTED. NO ASSURANCE CAN BE MADE THAT THESE FORECASTS WILL PROVE ACCURATE, AND PURCHASERS ARE WARNED AGAINST PLACING EXCESSIVE RELIANCE ON SUCH INFORMATION WHEN DECIDING WHETHER TO INVEST IN THE PARTNERSHIP.

POSSIBLE PURCHASE OF INTERESTS BY THE GENERAL PARTNER, RESORT OWNER, THEIR AFFILIATES, INVESTORS OR OFFICERS: IN THE EVENT THAT THE GENERAL PARTNER, RESORT OWNER, THEIR AFFILIATES, INVESTORS OR OFFICERS USES THEIR OR THEIR AFFILIATES' FUNDS OR FINANCIAL FACILITIES TO COMPLETE THE PROJECT, THE INVESTING PERSON(S) MAY ACQUIRE SOME CLASS B LIMITED PARTNERSHIP INTERESTS. IF THESE INTERESTS ARE SIGNIFICANT, AND ALBEIT THAT SUCH INTERESTS COULD BE NON-VOTING, THE ACQUIRING PERSON MAY STILL BE ABLE TO INFLUENCE OR CONTROL CERTAIN MATTERS UPON WHICH THE LIMITED PARTNERS ARE ENTITLED TO VOTE UNDER THE TERMS OF THE LIMITED PARTNERSHIP AGREEMENT.

AN INVESTOR MAY SUFFER ADVERSE TAX CONSEQUENCES IN THE EVENT OF A SALE OF HIS LIMITED PARTNERSHIP INTEREST.

THE LIMITED PARTNERSHIP IS A STARTUP BUSINESS THAT DOES NOT HAVE AN OPERATING HISTORY. THE LIMITED PARTNERSHIP'S BUSINESS IS DEPENDENT UPON THE LIMITED PARTNERSHIP OBTAINING SUFFICIENT CAPITAL TO PROPERLY DEVELOP ITS PROJECT, ITS SERVICES AND MARKETING OPERATIONS AND EFFECTIVELY EDUCATE THE PUBLIC, MORE SPECIFICALLY ITS TARGET MARKET, REGARDING ITS AVAILABILITY AND THE BENEFITS OF THE SITE.

EVEN IF THE LIMITED PARTNERSHIP OBTAINS ITS $45,000,000 EQUITY FINANCING AND USES IT AS DESCRIBED IN THE FINANCIAL DATA, THERE CAN BE NO ASSURANCE THAT ANY OPERATIONS WILL RESULT IN THE ANTICIPATED REVENUES OR NET INCOME TO THE LIMITED PARTNERSHIP.

RESTRICTED SECURITIES, LONG TERM NATURE OF INVESTMENT AND NO PUBLIC MARKET: INVESTORS WHO PURCHASE SECURITIES IN THIS OFFERING MUST BEAR THE ECONOMIC RISK OF THE INVESTMENT FOR AN INDEFINITE PERIOD BECAUSE THE SECURITIES HAVE NOT BEEN REGISTERED UNDER THE 1933 SECURITIES ACT OR ANY STATE LAWS, AND THEREFORE CANNOT BE SOLD IN THE PUBLIC MARKET UNLESS THEY ARE SUBSEQUENTLY REGISTERED UNDER THE 1933 SECURITIES ACT AND ANY APPLICABLE STATE LAWS OR AN EXEMPTION FROM SUCH REGISTRATION IS AVAILABLE.

THE LIMITED PARTNERSHIP HAS NOT PREPARED AUDITED FINANCIAL STATEMENTS (SEE FINANCIAL DATA – "RISK FACTORS"): NO INDEPENDENT COUNSEL HAS BEEN RETAINED TO REPRESENT THE INTEREST OF THE LIMITED PARTNERS. EACH PROSPECTIVE PURCHASER SHOULD CONSULT WITH HIS OWN COUNSEL AS TO THE TERMS OF THE PARTNERSHIP AGREEMENT AND EXHIBITS THERETO, AND THEIR FINANCIAL AND TAX ADVISERS AS TO THE BUSINESS PLAN AND EXHIBITS THERETO.

## U.S. IMMIGRATION FOR EB-5, ALIEN ENTREPRENEUR INVESTORS

THE IMMIGRATION INFORMATION PROVIDED IN THIS OFFERING MEMORANDUM IS NOT INTENDED TO BE, SHOULD NOT BE CONSIDERED AS AND IS NOT LEGAL ADVICE TO THE FOREIGN INVESTOR. EACH FOREIGN INVESTOR MUST CONSULT INDEPENDENT IMMIGRATION COUNSEL REGARDING U.S. IMMIGRATION LAW IMPLICATIONS, STRATEGIES, ADMONITIONS, BENEFITS, IF ANY, AND ALL OTHER IMMIGRATION-RELATED ISSUES REGARDING THE INVESTOR AND THE INVESTOR'S QUALIFYING FAMILY MEMBERS.

### OVERVIEW

THE EB-5, EMPLOYMENT-BASED VISA PREFERENCE, IS INTENDED TO ENCOURAGE THE FLOW OF CAPITAL INTO THE U.S. ECONOMY AND TO PROMOTE EMPLOYMENT OF U.S. WORKERS. TO ACCOMPLISH THESE GOALS AND SO THAT FOREIGN INVESTORS MAY OBTAIN IMMIGRATION BENEFITS FOR HAVING MADE AN INVESTMENT, THE PROGRAM MANDATES THE MINIMUM CAPITAL THAT FOREIGN INVESTORS MUST CONTRIBUTE AND IT MANDATES THAT 10 FULL-TIME EMPLOYMENT POSITIONS BE CREATED ON ACCOUNT OF EACH INVESTMENT. IN ADDITION TO THE RETURN THAT

INVESTORS HOPE TO ACHIEVE ON THEIR INVESTMENT, FOREIGN INVESTORS AND THEIR QUALIFYING FAMILY MEMBERS ARE OFFERED THE PROSPECT OF LAWFUL PERMANENT RESIDENCE IN THE UNITED STATES; PROVIDED THEY SATISFY THE REQUIREMENTS OF THE EB-5 PROGRAM.

THE JAY PEAK LODGE AND TOWNHOUSES PROJECT HAS BEEN STRUCTURED TO ASSIST INVESTORS TO MEET THE REQUIREMENTS OF THE EB-5 PROGRAM [8 U.S.C.§ 1153 (B)(5)(A) - (D); INA § 203 (B)(5)(A) - (D) OF THE IMMIGRATION &NATIONALITY ACT (THE "ACT")] AND QUALIFY VIA INVESTMENT IN THIS PROJECT (THE "PROJECT") TO BECOME ELIGIBLE FOR ADMISSION TO THE UNITED STATES OF AMERICA AS LAWFUL PERMANENT RESIDENTS WITH THE INVESTOR'S QUALIFYING FAMILY MEMBERS.

THE PROJECT STRUCTURE AND PROVISIONS ARE EXPECTED TO QUALIFY UNDER SEPARATE PROVISIONS IN THE LAW THAT PERMIT: (1) A REDUCED INVESTMENT, RELYING UPON THE PRESENCE OF THE PRINCIPAL PLACE OF BUSINESS OF THE EB-5 ENTERPRISE WITHIN A TARGETED EMPLOYMENT AREA (TEA); AND, (2) RELIANCE, IN WHOLE OR IN PART, UPON INDIRECT CREATION OF EMPLOYMENT POSITIONS, A PRIVILEGE GRANTED TO EB-5 PROJECTS THAT ARE WITHIN AND AFFILIATED WITH AN APPROVED REGIONAL CENTER, IN THIS INSTANCE, THE VERMONT REGIONAL CENTER AUTHORIZED BY THE ACT UNDER A PILOT PROGRAM. *(SEE IMMIGRATION RISK FACTORS, PAGE 28.)* QUALIFICATION OF THE PROJECT STRUCTURE AND COMPLIANCE WITH THE LAW IS DETERMINED BY THE USCIS, AS PART OF ITS REVIEW OF INVESTOR IMMIGRATION PETITIONS.

THE DISCUSSION OF IMMIGRATION MATTERS BELOW REFLECTS THE LIMITED PARTNERSHIP'S CURRENT UNDERSTANDING OF EB-5, ALIEN ENTREPRENEUR LAW, REGULATIONS AND EB-5 PROGRAM GUIDANCE FROM USCIS ON ITS PRACTICES AS OF THE DATE OF THIS OFFERING MEMORANDUM. THE EB-5 ALIEN ENTREPRENEUR LAW, REGULATIONS AND THE EB-5 PROGRAM MAY BE ALTERED IN THE FUTURE BY AMENDMENTS TO THE LAW, REGULATIONS AND PRACTICE GUIDELINES FROM USCIS. IN THE EVENT OF SUCH CHANGES, THE INVESTOR AND THE PROJECT WILL BE REQUIRED TO COMPLY WITH SUCH FUTURE ALTERATIONS. (SEE, RISK FACTORS, GENERAL, PAGE28 AND NO REGULATIONS REGARDING REMOVAL OF CONDITIONS, PAGE 33).

**FOR EB-5 INVESTORS**

FOREIGN INVESTORS ARE SPECIFICALLY DIRECTED TO REVIEW CERTAIN IMPORTANT MATTERS LISTED HEREUNDER AND IN THE IMMIGRATION RISK FACTORS PAGE 28.

LEGAL COUNSEL: THE INVESTOR WILL REQUIRE THE SERVICES OF INDEPENDENT LEGAL COUNSEL FOR U.S. IMMIGRATION LAW DUE DILIGENCE, ADVICE, PREPARATION AND FILING OF PETITIONS AND ALL OTHER U.S. IMMIGRATION MATTERS. THE INVESTOR IS RESPONSIBLE FOR PAYMENT OF ALL LEGAL FEES AND COSTS, INCLUDING USCIS APPLICATION FEES, INCURRED IN CONNECTION WITH THE RECEIPT OF SUCH LEGAL SERVICES.

FILING THE IMMIGRANT PETITIONS: JAY PEAK LODGE AND TOWNHOUSES L.P., THE GENERAL PARTNER AND JAY PEAK, INC. SHALL USE THEIR REASONABLE BEST EFFORTS TO ASSIST THE FOREIGN INVESTORS' LEGAL COUNSEL BY PROVIDING NECESSARY INFORMATION AND DOCUMENTATION TO SUPPORT AN I-526 PETITION AND AN I-829 PETITION TO REMOVE CONDITIONS. JAY PEAK LODGE AND TOWNHOUSES L.P., PROVIDES THIS INFORMATION SOLELY ON THE BASIS OF BEING WITHOUT LIABILITY OR OTHER OBLIGATION.

IN THE EVENT THE GENERAL PARTNER RECEIVES A USCIS NOTICE OF DENIAL OF AN INVESTOR'S I-526 PETITION, AND A COPY OF ALL RELEVANT MATERIALS PERTAINING TO SUCH DENIAL HAVE BEEN SUBMITTED TO THE LIMITED PARTNERSHIP, THE LIMITED PARTNERSHIP SHALL, WITHIN 90 DAYS OF A WRITTEN REQUEST BY THE INVESTOR, REFUND THE $500,000 CAPITAL CONTRIBUTION TOGETHER WITH THE RESORT OWNER REFUNDING $25,000 OF THE ADMINISTRATION FEE. UPON SUCH REPAYMENT, ANY INTEREST OF THE INVESTOR IN THE LIMITED PARTNERSHIP SHALL AUTOMATICALLY BE TERMINATED WITHOUT THE NECESSITY OF ANY FURTHER ACTION BY THE INVESTOR OR THE LIMITED PARTNERSHIP.

UPON SUBSCRIBING TO THIS OFFERING AND BECOMING A LIMITED PARTNER, IT IS AT THE SOLE RESPONSIBILITY AND RISK OF THE FOREIGN INVESTOR TO PROMPTLY FILE THE I-526 PETITION AT THE INVESTOR'S SOLE EXPENSE. THERE IS NO REFUND OF THE CAPITAL CONTRIBUTION OR ADMINISTRATION FEE FOR DELAY OR FAILURE FOR ANY REASON WHATSOEVER TO FILE AN I-526 PETITION.

THE EB-5 PROGRAM, BY VIRTUE OF RECENT AMENDMENTS TO THE REGIONAL CENTER PILOT PROGRAM ENABLING LEGISLATION, HAS BEEN EXTENDED THROUGH SEPTEMBER 30, 2012. THEREAFTER, IF THE REGIONAL CENTER PILOT PROGRAM LAPSES, FOR EACH INVESTOR WHOSE CASE IS FILED WITH USCIS BUT NOT ADJUDICATED ON OR BEFORE THE DATE OF LAPSE, THEIR $500,000 CAPITAL CONTRIBUTION SHALL REMAIN INVESTED IN THE PARTNERSHIP PROVIDED:

1.   THE REGIONAL CENTER PILOT PROGRAM IS REAUTHORIZED RETROACTIVELY OR IS PENDING REAUTHORIZATION WITHIN A TWELVE MONTH PERIOD FOLLOWING SUNSET, AND THE INVESTOR'S I-526 PETITION IS IN DUE COURSE ADJUDICATED;

     OR,

2.   LEGISLATION IS ENACTED OR PENDING PROVIDING SUBSTANTIALLY SIMILAR IMMIGRATION BENEFITS TO INVESTORS UNDER THE FORMER EB-5 REGIONAL CENTER PROGRAM WITHIN A TWELVE MONTH PERIOD FOLLOWING SUNSET.

IF NONE OF THE EVENTS DESCRIBED IN 1 OR 2 OCCUR, OR ARE NOT PENDING AS STATED, AT THE INVESTOR'S ELECTION, THE INVESTOR MAY (1) REMAIN INVESTED IN THE PROJECT; OR, (2) MAKE A WRITTEN REQUEST TO THE GENERAL PARTNER FOR A REFUND OF THE CAPITAL CONTRIBUTION OF $500,000. WITHIN NINETY (90) DAYS OF THE GENERAL PARTNER'S RECEIPT OF A REQUEST FOR A REFUND, THE CAPITAL CONTRIBUTION WILL BE REFUNDED BY THE LIMITED PARTNERSHIP TO THE INVESTOR. THE INVESTOR'S RIGHTS ARE IN THIS EVENT LIMITED SOLELY TO THE RETURN OF THE CAPITAL CONTRIBUTION OF $500,000.

## IMMIGRATION MATTERS

### OVERVIEW

THE JAY PEAK LODGE AND TOWNHOUSES PROJECT HAS BEEN STRUCTURED TO ASSIST INVESTORS TO MEET THE REQUIREMENTS OF THE EB-5 PROGRAM [8 U.S.C.§ 1153 (B)(5)(A) - (D); INA § 203 (B)(5)(A) - (D) OF THE IMMIGRATION &NATIONALITY ACT (THE "ACT")] AND QUALIFY VIA INVESTMENT IN THIS PROJECT (THE "PROJECT") TO BECOME ELIGIBLE FOR ADMISSION TO THE UNITED STATES OF AMERICA AS LAWFUL PERMANENT RESIDENTS WITH THE INVESTOR'S QUALIFYING FAMILY MEMBERS.

THE PROJECT STRUCTURE AND PROVISIONS ARE EXPECTED TO QUALIFY UNDER SEPARATE PROVISIONS IN THE LAW THAT PERMIT: (1) A REDUCED INVESTMENT, RELYING UPON THE PRESENCE OF THE PRINCIPAL PLACE OF BUSINESS OF THE EB-5 ENTERPRISE WITHIN A TARGETED EMPLOYMENT AREA (TEA); AND, (2) RELIANCE, IN WHOLE OR IN PART, UPON INDIRECT CREATION OF EMPLOYMENT POSITIONS, A PRIVILEGE GRANTED TO EB-5 PROJECTS THAT ARE WITHIN AND AFFILIATED WITH AN APPROVED REGIONAL CENTER, IN THIS INSTANCE, THE VERMONT REGIONAL CENTER AUTHORIZED BY THE ACT UNDER A PILOT PROGRAM.

QUALIFICATION OF THE PROJECT STRUCTURE AND COMPLIANCE WITH THE LAW IS DETERMINED BY THE USCIS, AS PART OF ITS REVIEW OF INVESTOR IMMIGRATION PETITIONS.

### AMOUNT OF INVESTMENT: AND TARGETED EMPLOYMENT AREA

THE EB-5 PROGRAM CALLS FOR A MINIMUM INVESTMENT OF $1,000,000 USD BY AN INVESTOR. HOWEVER, FOR THE PROJECT, THIS SUM MAY BE REDUCED TO $500,000 USD BECAUSE THE INVESTMENT IS SITUATED IN A TARGETED EMPLOYMENT AREA (TEA). TEA'S MUST MEET ONE OF TWO CRITERIA, THE FIRST, CONCERNING POPULATION, AND THE SECOND, CONCERNING HIGH RATES OF UNEMPLOYMENT IN TOWNS WHOSE POPULATION EQUALS OR EXCEEDS 20,000.

THE FIRST CRITERION, CONCERNING POPULATION, IS THE RELEVANT CRITERIA FOR THIS PROJECT, AS IT STATES THAT IF AN INVESTMENT IS MADE IN A TOWN OR CITY WHOSE POPULATION IS LESS THAN 20,000, AND THE TOWN OR CITY IS NOT WITHIN A METROPOLITAN STATISTICAL AREA (MSA) AS DESIGNATED BY THE U.S. OFFICE OF MANAGEMENT AND BUDGET, THE INVESTMENT IS DEEMED TO HAVE BEEN MADE IN A TEA. THE PROJECT BELIEVES IT COMPLIES WITH THIS CRITERIA BECAUSE IT RELIES ON THE FACT THAT IT IS SITUATED IN JAY, VERMONT; A TOWN

WHOSE POPULATION WAS 406 ACCORDING TO THE 2000 CENSUS AND ITS POPULATION IS STATED BY THE U.S. CENSUS BUREAU TO HAVE INCREASED TO 521 AS OF 2010, (SEE EXHIBIT H3 IN SECTION 5) BASED UPON THE MOST RECENTLY REPORTED DATA FROM THIS AGENCY BELIEVED TO BE PUBLISHED.

THE SECOND CRITERION IS NOT RELEVANT TO THE PROJECT BECAUSE THE TOWN OF JAY'S POPULATION DOES NOT EQUAL OR EXCEED 20,000 AND THE TOWN OF JAY IS NOT SITUATED IN A METROPOLITAN STATISTICAL AREA.

ADMINISTRATIVE AND OTHER COSTS BORNE BY THE INVESTOR CANNOT BE PAID FROM THIS SUM. IN THIS PROJECT, $50,000.00 ADMINISTRATIVE FEES ARE PAYABLE BY EACH INVESTOR IN ADDITION TO THE REQUIRED $500,000 MINIMUM INVESTMENT INTO THE PROJECT.

## COUNTING EMPLOYMENT POSITIONS CREATED

TO QUALIFY AS AN EB-5 INVESTOR, EACH INVESTOR MUST DEMONSTRATE THAT 10 FULL-TIME, YEAR-AROUND EMPLOYMENT POSITIONS WILL BE CREATED ON ACCOUNT OF THE INVESTMENT.

THESE EMPLOYMENT POSITIONS MUST BE FOR U.S. CITIZENS, LAWFUL PERMANENT RESIDENTS AND OTHER IMMIGRANTS LAWFULLY AUTHORIZED TO BE EMPLOYED IN THE UNITED STATES. NON-IMMIGRANT (TEMPORARY) WORKERS ARE NOT INCLUDED IN THE COUNT. ALSO EXCLUDED ARE THE INVESTOR, THE INVESTOR'S SPOUSE AND THE INVESTOR'S CHILDREN.

A FULL-TIME EMPLOYMENT POSITION (INCLUDING ONE POSITION SHARED BY MORE THAN ONE EMPLOYEE) MEANS ONE THAT REQUIRES AT LEAST 35 HOURS EACH WEEK TO FULFILL.

AN EMPLOYMENT POSITION IS DEEMED CREATED WHEN THE WORKER IS REMUNERATED ON THE PAYROLL OF THE NEW ENTERPRISE. INDEPENDENT CONTRACTORS ARE EXCLUDED FROM THE DIRECT EMPLOYMENT POSITION CREATION COUNT.

AN EXCEPTION TO THE REQUIREMENT OF PAYMENT OR OTHER REMUNERATION COMING DIRECTLY FROM THE NEW ENTERPRISE IS MADE IF THE ENTERPRISE IS LOCATED WITHIN AND AFFILIATED WITH A REGIONAL CENTER CREATED UNDER A PILOT PROGRAM FIRST ENACTED IN 1993. THE ENTIRE STATE OF VERMONT IS SUCH A REGIONAL CENTER. AN INVESTOR IN AN ENTERPRISE, SUCH AS THIS PROJECT, ESTABLISHED IN VERMONT, IS PERMITTED TO DEMONSTRATE THAT SOME, POSSIBLY ALL, OF THE EMPLOYMENT POSITIONS CREATED ON ACCOUNT OF THE INVESTMENT IN THE ENTERPRISE WILL BE INDIRECT EMPLOYMENT POSITIONS., I.E., NOT ON THE PAYROLL OF THE ENTERPRISE. IT IS INCUMBENT UPON THE INVESTOR TO SHOW HOW MANY EMPLOYMENT POSITIONS ARE EXPECTED TO BE CREATED INDIRECTLY BY RELIANCE UPON REASONABLE METHODOLOGIES SUCH AS MULTIPLIER TABLES, FEASIBILITY STUDIES, ANALYSES OF FOREIGN AND DOMESTIC MARKETS FOR THE GOODS OR SERVICES TO BE EXPORTED, AND OTHER ECONOMICALLY OR STATISTICALLY VALID FORECASTING DEVICES WHICH INDICATE THE LIKELIHOOD THAT THE BUSINESS WILL RESULT IN INCREASED EMPLOYMENT.

ALL SUCH FULL TIME EQUIVALENT EMPLOYMENT POSITIONS EXPECTED TO BE CREATED WILL BE APPLIED ONLY TO FOREIGN INVESTORS WHO SEEK TO UTILIZE THIS INVESTMENT FOR IMMIGRATION PURPOSES UNDER THE PROGRAM.

## THE STATE OF VERMONT - A REGIONAL CENTER

THE U.S. CONGRESS CREATED A PILOT PROGRAM, RESCHEDULED TO SUNSET ON SEPTEMBER 30, 2012, THAT PROVIDES FOR THE AUTHORIZATION OF REGIONAL CENTERS BY THE U.S. DEPARTMENT OF JUSTICE, IMMIGRATION AND NATURALIZATION SERVICE (N/K/A USCIS). ENTERPRISES LOCATED WITHIN AND AFFILIATED WITH A REGIONAL CENTER ARE NOT REQUIRED TO EMPLOY TEN (10) WORKERS FOR EACH EB-5 QUALIFYING INVESTMENT. IT SUFFICES IF THE INVESTOR DEMONSTRATES THAT AT LEAST TEN (10) QUALIFYING EMPLOYMENT POSITIONS WILL BE CREATED DIRECTLY OR INDIRECTLY ON ACCOUNT OF THE INVESTMENT.

IN JUNE 1997, THE STATE OF VERMONT, AGENCY OF COMMERCE AND COMMUNITY DEVELOPMENT (ACCD), WAS GRANTED A DESIGNATION AS AN APPROVED REGIONAL CENTER UNDER THIS PILOT PROGRAM. AN INVESTMENT IN A COMMERCIAL ENTERPRISE SITUATED WITHIN AND AFFILIATED WITH THE REGIONAL CENTER, THE STATE OF VERMONT, THAT FOSTERS ECONOMIC EXPANSION THROUGH INCREASED EXPORTS, GREATER REGIONAL

PRODUCTIVITY, EMPLOYMENT CREATION OR ADDITIONAL DOMESTIC CAPITAL INVESTMENT, QUALIFIES FOR THE BROADER VIEW OF EMPLOYMENT CREATION.

THE PROJECT HAS CONDUCTED AN ECONOMIC IMPACT ASSESSMENT TO DETERMINE THE NUMBER OF EMPLOYMENT POSITIONS EXPECTED TO BE CREATED AS A RESULT OF NINETY (90) FOREIGN INVESTORS EACH CONTRIBUTING $500,000 USD TO THE PROGRAM, AND THE RESORT OWNER CONTRIBUTING $15 MILLION. THIS ANALYSIS WAS CONDUCTED USING IMPLAN.

THE CURRENT ANALYSIS FOCUSED ON THE PROJECT AS A SOURCE OF EMPLOYMENT CREATION, SO THAT IT IS MORE SPECIFIC THAN THE ANALYSIS THAT SUPPORTED THE REGIONAL CENTER DESIGNATION FOR THE GREATER STATE OF VERMONT. THIS ANALYSIS DEMONSTRATES THAT THE COMBINED PROJECT DEVELOPMENT AND BUSINESS ACTIVITIES CARRIED ON BY THE LIMITED PARTNERSHIP IS EXPECTED TO CREATE GREATER THAN 2,000 PERMANENT FULL TIME EMPLOYMENT POSITIONS WITHIN THE STATE OF VERMONT, ACCD REGIONAL CENTER AND WITHIN THE UNITED STATES BY THE YEAR 2013. THESE PROJECTED EMPLOYMENT POSITIONS ARE IN EXCESS OF THE 900 EMPLOYMENT POSITIONS REQUIRED UNDER EB-5 LAW AND REGULATIONS. IF ALL LIMITED PARTNERSHIP INTERESTS ARE SOLD TO FOREIGN INVESTORS USING THE EB-5 PROGRAM. SEE THE COMMENT ON EXPIRATION OF REGIONAL CENTER PILOT PROGRAM AT PAGE 35. *(SEE RISK FACTORS, PAGE 17.)*


## THE I-526 PETITION PROCESS

FOR INVESTORS SEEKING LAWFUL PERMANENT RESIDENCE, THE FIRST STEP IN THE PROCESS IS TO FILE AN I-526 PETITION FOR ALIEN ENTREPRENEUR, TOGETHER WITH ACCOMPANYING EVIDENCE IN SUPPORT OF THE PROGRAM'S REQUIREMENTS. USCIS ADJUDICATES I-526 PETITIONS BY REVIEWING THESE CRITERIA, AMONG OTHERS:

<u>NEW COMMERCIAL ENTERPRISE:</u> THERE MUST BE EVIDENCE THAT SHOWS THAT ENTERPRISE IS NEW AND AUTHORIZED TO TRANSACT BUSINESS.

<u>INVESTMENT CAPITAL:</u> THE PETITION MUST BE SUPPORTED BY EVIDENCE THAT THE PETITIONER HAS INVESTED THE MINIMUM REQUIRED CAPITAL. USCIS EXPECTS THESE FUNDS TO BE "AT RISK", CONNOTING AN IRREVOCABLE COMMITMENT TO THE ENTERPRISE. THE FUNDS MUST BE USED BY THE ENTERPRISE EXCLUSIVELY TO CREATE EMPLOYMENT. FUNDS USED TO PAY ADMINISTRATIVE COSTS OR OTHER OBLIGATIONS UNDERTAKEN TO PROMOTE THE INVESTMENT; TO CREATE RESERVE ACCOUNTS OR FOR ANY PURPOSE THAT DOES NOT LEAD TO THE CREATION OF EMPLOYMENT BY THE ENTERPRISE ARE NOT DEEMED "AT RISK". ANY COMMITMENT BY THE EB-5 ENTERPRISE TO THE INVESTOR THAT IS DEEMED TO TRANSFORM THE RELATIONSHIP FROM AN INVESTMENT TO A DEBT ARRANGEMENT (FOR EXAMPLE, A PROMISE TO PAY A FIXED RATE OF RETURN OR TO REPAY SOME OR ALL OF THE INVESTMENT ON A DATE CERTAIN OR TO REPAY SOME OR ALL OF THE INVESTMENT IRRESPECTIVE OF THE FINANCIAL PERFORMANCE OF THE PROJECT) WILL DISQUALIFY THE INVESTED FUNDS FROM BEING DEEMED "AT RISK". FUNDS THAT ARE NOT DEEMED "AT RISK" WILL NOT BE COUNTED TOWARDS THE MINIMUM SUM REQUIRED TO BE INVESTED, POSSIBLY RESULTING IN THE DENIAL OF THE I-526 PETITION.

<u>SOURCE OF CAPITAL:</u> EVIDENCE MUST SUPPORT THE INVESTOR'S LEGAL ACQUISITION OF CAPITAL. IN SUPPORT OF THE I-526 PETITION, AN INVESTOR SHOULD EXPECT TO PROVIDE DETAILED RECORDS DEMONSTRATING THE PERSONAL AND BUSINESS FINANCIAL TRANSACTIONS THROUGH WHICH THE INVESTOR ACQUIRED THE INVESTED FUNDS, AND MANAGED, THOSE FUNDS. DURING THE ENTIRE PERIOD OF OWNERSHIP BY THE INVESTOR AND DEMONSTRATING THE TRANSACTIONS BY WHICH THE FUNDS WERE TRANSFERRED BY THE INVESTOR INTO THE EB-5 PROJECT. WHERE COUNTRIES REQUIRE BY LAW THE FILING OF ANNUAL INDIVIDUAL AND BUSINESS TAX RETURNS THE INVESTOR SHOULD ALSO EXPECT TO PROVIDE AT LEAST THE LAST FIVE YEARS TAX RETURNS IN CERTAIN INSTANCES, WHEN, FOR EXAMPLE, THE INVESTOR ACQUIRES INVESTMENT FUNDS AS GIFT, OR IN THE CASE OF THE INVESTOR MAKING LOANS FROM INDIVIDUALS OR SOME ENTITIES TO ACQUIRE THE INVESTMENT FUNDS, THE DONOR OR THE LENDER, AS THE CASE MAY BE, WILL BE EXPECTED TO PROVIDE FINANCIAL RECORDS OF COMPARABLE DETAIL ESTABLISHING THAT THE FUNDS WERE LAWFULLY ACQUIRED FUNDS EARNED OR OBTAINED IN THE UNITED STATES WHILE THE INVESTOR WAS IN UNLAWFUL IMMIGRATION STATUS ARE NOT DEEMED BY USCIS TO BE LAWFULLY ACQUIRED. IF USCIS IS NOT SATISFIED THAT THE INVESTED FUNDS WERE ACQUIRED BY THE INVESTOR LAWFULLY, SUCH FUNDS WILL NOT BE COUNTED TOWARDS THE MANDATORY INVESTMENT SUM, POTENTIALLY CAUSING THE I-526 PETITION TO FAIL. INVESTMENT IN AN EB-5 PROJECT IS NOT APPROPRIATE FOR THOSE WHO ARE UNABLE OR UNWILLING TO PROVIDE ALL FINANCIAL RECORDS THAT USCIS MAY REQUIRE TO DEMONSTRATE THAT INVESTED FUNDS HAVE BEEN LAWFULLY ACQUIRED BY THE INVESTOR.

**MANAGERIAL ROLE**: THE INVESTOR IS EXPECTED TO PARTICIPATE IN THE MANAGEMENT OF THE NEW ENTERPRISE BY ASSISTING IN THE FORMULATION OF THE ENTERPRISE'S BUSINESS POLICY, BY PARTICIPATING IN ONE OR MORE OF THE ACTIVITIES PERMITTED IN SECTION 3423(B) OF THE VERMONT REVISED UNIFORM LIMITED PARTNERSHIP ACT ("VRULPA"), AND AS OTHERWISE SET FORTH IN THE LIMITED PARTNERSHIP AGREEMENT. THE LIMITED PARTNERSHIP AGREEMENT PROVIDES THAT THIS MANAGEMENT ROLE CONSISTS, IN PART, OF THE RIGHT TO REPLACE THE GENERAL PARTNER UNDER CERTAIN CIRCUMSTANCES. LIMITED PARTNER INVESTORS IN AN EB-5 ENTERPRISE MUST HAVE ALL THE RIGHTS AND DUTIES USUALLY ACCORDED TO LIMITED PARTNERS BY THE UNIFORM LIMITED PARTNERSHIP ACT (ULPA), AS ADOPTED IN VERMONT AS VRULPA. THE PROJECT LIMITED PARTNERSHIP AGREEMENT PRESENTED BY THE PROJECT, IN ITS VIEW, PROVIDES SUCH RIGHTS AND DUTIES TO THE LIMITED PARTNERS. THE INVESTOR IS ADVISED TO SEEK COMPETENT COUNSEL TO REVIEW THE LIMITED PARTNERSHIP AGREEMENT COMPLIANCE WITH BOTH VRULPA AND IMMIGRATION LAW REQUIREMENTS. (SEE "RISK FACTORS, ACTIVE PARTICIPATION IN LIMITED PARTNERSHIP BUSINESS, PAGE 35 ...).

## THE I-526 PETITION APPROVAL

THE I-526 PETITION FOR ALIEN ENTREPRENEUR WILL BE APPROVED ONLY IF USCIS IS SATISFIED THAT THE ALL STATUTORY CRITERIA HAVE BEEN MET. THE DETERMINATION OF WHETHER THESE CRITERIA HAVE BEEN ESTABLISHED IS WITHIN THE DISCRETION OF USCIS. IT IS ALSO WITHIN THE POWER, IF NOT THE DISCRETIONARY AUTHORITY, OF USCIS TO SEEK INFORMATION ABOUT OTHER ASPECTS OF THE INVESTMENT AND THE RELATIONSHIP OF THE INVESTOR TO THE ENTERPRISE.

THE EB-5 ALIEN ENTREPRENEUR LAW, REGULATIONS AND EB-5 PROGRAM HAVE BEEN ALTERED IN THE PAST, AND MAY BE ALTERED IN THE FUTURE BY AMENDMENTS TO THE LAW, REGULATIONS AND PRACTICE GUIDELINES FROM USCIS. IN THE EVENT OF SUCH FUTURE CHANGES, THE INVESTOR WILL BE REQUIRED TO COMPLY WITH SUCH FUTURE ALTERATIONS. IF SUCH FUTURE CHANGES OCCUR AND THEY ALTER THE CURRENT I-526 PETITION PROCEDURES, THE INVESTOR WILL BE EXPECTED TO COMPLY WITH ANY SUCH ALTERATIONS. *SEE RISK FACTORS, RISKS ATTENDANT TO EB-5 STATUS, PAGE35).*

IN THE EVENT THAT USCIS DENIES THE I-526 PETITION, THE INVESTOR MAY NOT PROCEED WITH THE NEXT STEP IN THE IMMIGRATION PROCESS, CONSULAR PROCESSING OR ADJUSTMENT OF STATUS. INSTEAD, THE INVESTOR MUST DECIDE WHETHER TO APPEAL THE DENIAL OF THE I-526 PETITION, REVISE AND RE-FILE THE I526 PETITION OR ABANDON THE PROSPECT OF OBTAINING LAWFUL PERMANENT RESIDENT STATUS THROUGH INVESTMENT IN THE PROJECT.

## CONSULAR PROCESSING OR ADJUSTMENT OF STATUS

APPROVAL OF THE I-526 PETITION MEANS THAT THE ALIEN AND THE ALIEN'S SPOUSE AND CHILDREN UNDER THE AGE OF 21 YEARS MAY APPLY FOR ADMISSION AS CONDITIONAL LAWFUL PERMANENT RESIDENTS (CLPR). APPROVAL OF THE I-526 PETITION DOES NOT MEAN THAT THE INVESTOR HAS BEEN GRANTED ADMISSION TO THE UNITED STATES AS A LAWFUL PERMANENT RESIDENT. APPROVAL OF AN I-526 MEANS THAT THE INVESTMENT DOCUMENTED BY THE I-526 PETITION HAS QUALIFIED THE INVESTOR AS AN ALIEN ENTREPRENEUR. (SEE RISK FACTORS, PAGE 28 ...)

THE CLPR APPLICATION FOR ADMISSION IS A SEPARATE AND SUBSEQUENT PROCESS THAT CONCERNS ISSUES COMMON TO ALL ALIENS WHO WISH TO LIVE IN THE UNITED STATES PERMANENTLY. ADMISSION AS A CLPR MAY BE SOUGHT USING ONE OF TWO METHODS: CONSULAR PROCESSING OR ADJUSTMENT OF STATUS.

## CONSULAR PROCESSING

CONSULAR PROCESSING IS DESIGNED FOR ALIENS LIVING OUTSIDE OF THE UNITED STATES, OR FOR THOSE WHO PREFER TO PROCESS AT A CONSULATE FOR STRATEGIC REASONS OR AS A MATTER OF CONVENIENCE OR ARE INELIGIBLE TO ADJUST STATUS. TYPICALLY, THE CONSULAR POST, WHICH IS DESIGNATED AT THE TIME THE I-526 PETITION IS FILED, IS IN THE COUNTRY OF LAST RESIDENCE, I.E., THE LAST PRINCIPAL ACTUAL DWELLING PLACE.

IN THEIR SOLE DISCRETION, CONSULATES ISSUE VISAS, A TRAVEL DOCUMENT, USUALLY AFFIXED TO A PASSPORT THAT AUTHORIZES THE HOLDER TO SEEK ADMISSION TO THE UNITED STATES AT A PORT OF ENTRY. THE VISA IS

ISSUED FOR AN IMMIGRATION STATUS THAT A CONSUL BELIEVES THE VISA APPLICANT IS QUALIFIED TO HOLD. IN AN EB-5 CASE, THE VISA MAY BE SOUGHT FROM A CONSULATE ONLY AFTER THE INVESTOR'S I-526 PETITION IS APPROVED. AN EB-5 INVESTOR AND THE INVESTOR'S SPOUSE AND QUALIFYING CHILDREN ARE GRANTED IMMIGRANT VISAS. USE OF THESE VISAS TO ENTER THE U.S. RESULTS IN A GRANT OF CONDITIONAL LAWFUL PERMANENT RESIDENCE. *(SEE DISCUSSION ON REMOVAL OF CONDITIONS AT PAGE 37)*

BEFORE ISSUING AN IMMIGRANT VISA, THE CONSULAR POST MUST DETERMINE IF EACH ALIEN IS ADMISSIBLE TO THE U.S. APPROVAL OF THE I-526 PETITION DOES NOT BY ITSELF ESTABLISH ADMISSIBILITY. AN ALIEN IS ADMISSIBLE WHO PROVES THAT NO GROUNDS OF INADMISSIBILITY EXIST AND THE ALIEN HAS PROPER TRAVEL DOCUMENTS. *(SEE THE DISCUSSION ON IMMIGRATION RISK FACTORS, BELOW, FOR A NON-EXHAUSTIVE LIST OF THE GROUNDS OF INADMISSIBILITY.)* WAIVERS ARE AVAILABLE FOR CERTAIN OF THE MANY GROUNDS OF INADMISSIBILITY, BUT THE GRANT OF A WAIVER IS IN THE DISCRETION OF THE GOVERNMENT AND ALIENS SEEKING WAIVERS EXPERIENCE LENGTHY DELAYS IN ADJUDICATION OF WAIVER APPLICATIONS. INVESTORS SHOULD CONSULT WITH IMMIGRATION COUNSEL TO DETERMINE IF ANY GROUNDS OF INADMISSIBILITY MAY AFFECT THE ELIGIBILITY OF THE INVESTOR OR THE INVESTOR'S SPOUSE OR OTHERWISE QUALIFYING CHILDREN FOR ADMISSION TO THE UNITED STATES AND IF A WAIVER IS AVAILABLE FOR SUCH GROUNDS OF INADMISSIBILITY.

IF THE CONSULAR POST FINDS THAT THE INVESTOR IS ADMISSIBLE, IT WILL ISSUE AN IMMIGRANT VISA TO THE INVESTOR. THE CONSULAR POST WILL ALSO DETERMINE IF THE SPOUSE AND THE QUALIFYING CHILDREN OF THE INVESTOR ARE ADMISSIBLE. A DETERMINATION OF ADMISSIBILITY MUST BE MADE AS TO EACH VISA APPLICANT. THERE IS NO GUARANTEE THAT ALL MEMBERS OF THE INVESTOR'S FAMILY WILL BE GRANTED AN IMMIGRANT VISA. IF THE INVESTOR IS DENIED AN IMMIGRANT VISA, APPLICATIONS BY THE SPOUSE AND CHILDREN OF THE INVESTOR FOR SUCH A VISA WILL ALSO BE DENIED. CONSULAR PROCESSING SUBJECTS BOTH THE VISA APPLICANT AND THE I-526 PETITION TO THE SCRUTINY OF A SECOND GOVERNMENT AGENCY WHOSE DECISIONS ARE NOT APPEALABLE. IF THE CONSULAR OFFICER, BASED UPON INFORMATION NOT AVAILABLE TO USCIS IN ITS ADJUDICATIONS PROCESS, SUSPECTS FRAUD OR MISREPRESENTATION IN THE I-526 PETITION PROCESS, OR IF THE CONSUL DOUBTS THE ELIGIBILITY FOR LAWFUL PERMANENT RESIDENT STATUS, THE CONSUL MAY RETURN THE CASE TO USCIS FOR RE-ADJUDICATION OF THE I-526 PETITION.

CONSULAR PROCESSING BEGINS WHEN USCIS TRANSMITS THE APPROVED ALIEN'S I-526 PETITION TO THE NATIONAL VISA CENTER (NVC). IN TIME, THE APPLICANTS WILL BE INSTRUCTED TO OBTAIN FINGERPRINTS AND MEDICAL EXAMINATIONS AND TO REPORT TO A CONSULAR INTERVIEW. IMMIGRANT VISAS USUALLY ARE ISSUED SHORTLY AFTER THE INTERVIEW UNLESS THE CONSUL DETECTS PROBLEMS IN THE VISA APPLICATION, THE UNDERLYING I-526 PETITION OR DURING THE INTERVIEW PROCESS. THE INVESTOR IS ADVISED TO SEEK COMPETENT COUNSEL FOR GUIDANCE ON THE PROCESSING EXPERIENCE AND POTENTIAL DELAYS IN THE CONSUL OFFICE HANDLING INVESTORS' APPLICATION.


## VISA ISSUANCE

DECISIONS BY CONSULS ARE TO BE MADE IN ACCORDANCE WITH REGULATORY GUIDANCE ON THIS PROCESS, CONSULS HAVE BROAD AUTHORITY AND DISCRETION UNDER SUCH REGULATORY PROCEDURES AND THEIR DECISIONS ARE UNREVIEWABLE. THE INVESTOR SHOULD SEEK ADVICE OF COMPETENT LEGAL COUNSEL REGARDING VISA ISSUANCE GUIDELINES.

U.S. CONSULS ADVISE THAT VISA APPLICANTS SHOULD NOT CHANGE ANY LIVING, EMPLOYMENT, SCHOOLING OR OTHER LIFESTYLE ARRANGEMENTS IN THEIR COUNTRY OF RESIDENCE BEFORE THEY ARE ISSUED AN IMMIGRANT VISA BASED UPON AN APPROVED I-526 PETITION.

## ADMISSION TO U.S. AFTER VISA ISSUED

A VISA AUTHORIZES THE HOLDER TO SEEK ADMISSION TO THE UNITED STATES AT A PORT OF ENTRY. HOWEVER, ADMISSION IS SUBJECT TO U.S. CUSTOMS AND BORDER PROTECTION (USCBP) INSPECTION DISCUSSED BELOW. AFTER ISSUANCE, IMMIGRANT VISAS GENERALLY REMAIN VALID FOR SIX MONTHS. DURING THE VALIDITY PERIOD, THE HOLDER OF THE VISA MUST USE IT TO APPLY FOR ADMISSION TO THE UNITED STATES AT A DESIGNATED PORT OF ENTRY. THE PORT OF ENTRY IS FREQUENTLY IN AN INTERNATIONAL AIRPORT. WHEN THE ALIEN ARRIVES AT THE PORT OF ENTRY, HE OR SHE WILL PRESENT THE IMMIGRANT VISA AND ACCOMPANYING CONSULAR DOCUMENTS TO

A U.S. CUSTOMS AND BORDER PROTECTION (USCBP) OFFICER WHO HAS THE AUTHORITY TO ADMIT THE INVESTOR OR TO DENY THE INVESTOR'S ADMISSION TO THE UNITED STATES AS A CLPR. THIS PROCESS IS KNOWN AS INSPECTION. *(SEE RISK FACTORS, PAGE 17_).*

## ADMISSION AFTER INVESTING, FILING THE I-526 OR DURING CONSULAR PROCESSING

ADMISSION TO THE UNITED STATES AS A VISITOR OR IN MOST OTHER NON-IMMIGRANT STATUSES IS PREDICATED UPON THE INTENT TO DEPART THE COUNTRY AT THE END OF THE PERIOD OF ADMISSION.

INVESTORS SHOULD CONSULT WITH COMPETENT COUNSEL TO EVALUATE THE RISKS ASSOCIATED WITH SEEKING TEMPORARY (NON-IMMIGRANT) ADMISSION TO THE UNITED STATES SUBSEQUENT TO MAKING THE INVESTMENT OR FILING AN I-526 PETITION OR AN APPLICANT FOR AN IMMIGRANT VISA. DESPITE BEST EFFORTS, AN INSPECTOR MAY DENY ADMISSION UNDER THESE CIRCUMSTANCES. SUCH A DENIAL MAY ALSO RESULT IN FORMAL EXCLUSION FROM THE U.S. WHICH MIGHT PRECLUDE ADMISSION WITH AN IMMIGRANT VISA FOR A PERIOD OF YEARS. *(SEE RISK FACTORS, PAGE 28).*

## ADJUSTMENT OF STATUS

THE ADJUSTMENT OF STATUS (AOS) PROCEDURE IS DESIGNED TO PERMIT ALIENS WHO HAVE BEEN ADMITTED TO THE UNITED STATES AS NON-IMMIGRANTS OR WHO HAVE BEEN PAROLED INTO THE COUNTRY TO APPLY FOR ADMISSION AS PERMANENT RESIDENTS WITHOUT LEAVING THE COUNTRY. THESE NON-IMMIGRANTS MUST ESTABLISH THAT THEY ARE ADMISSIBLE PERMANENTLY, MEETING THE SAME STANDARDS AS ALIENS WHO USE CONSULAR PROCESSING TO OBTAIN A PERMANENT RESIDENT VISA.

ALIENS SEEKING AOS MUST ALSO COMPLY WITH REQUIREMENTS PECULIAR TO THE AOS PROCESS. ALIENS WHO DO NOT MEET THESE ADDITIONAL REQUIREMENTS WILL BE REQUIRED TO USE CONSULAR PROCESSING TO OBTAIN AN IMMIGRANT VISA, WHICH WILL NECESSITATE A DEPARTURE FROM THE UNITED STATES. ALIENS ADMITTED IN CERTAIN NON-IMMIGRANT STATUSES MAY ENCOUNTER MORE DIFFICULTIES (AND MAY NOT BE SUCCESSFUL) ADJUSTING STATUS THAN ALIENS ADMITTED IN OTHER NON-IMMIGRANT STATUSES. INVESTORS SHOULD CONSULT WITH IMMIGRATION COUNSEL REGARDING THESE ISSUES BEFORE THE I-526 PETITION IS FILED.

DURING AOS PROCESSING, THE APPLICANT WILL BE REQUIRED TO SUBMIT A MEDICAL EXAMINATION AND WILL RECEIVE INSTRUCTIONS FROM USCIS REGARDING BIOMETRIC DATA COLLECTION AND AN INTERVIEW. THE INTERVIEW MAY BE WAIVED BY USCIS, AT THE DISCRETION OF USCIS. THERE IS NO FORMAL PROCESS TO REQUEST THE WAIVER OF AN INTERVIEW. IF THE INVESTOR IS INTERVIEWED, THE SPOUSE AND CHILDREN OF THE INVESTOR WILL BE REQUIRED TO ATTEND THE INTERVIEW.

THE USCIS CALIFORNIA SERVIC ECENTER CURRENTLY HAS JURISDICTION OF THE AOS PROCESS FOR INVESTORS IN THE PROJECT. THE INTERVIEW IS CONDUCTED AT A USCIS OFFICE NEAR THE INVESTOR'S RESIDENCE. USCIS USES THE INTERVIEW TO UPDATE INFORMATION ABOUT AOS APPLICANTS THAT MAY HAVE CHANGED SUBSEQUENT TO THE FILING OF THE AOS APPLICATION AND TO EXPLORE ANY ISSUE THAT USCIS BELIEVES IS RELEVANT TO DECIDING THE AOS CASE. TYPICALLY, BUT NOT ALWAYS, CLPR IS CONFERRED ON APPROVED AOS APPLICANTS AT THE CONCLUSION OF THE INTERVIEW.

## TRAVEL DURING ADJUSTMENT OF STATUS PROCESSING

ADVANCE PERMISSION TO DEPART THE U.S. IS ISSUED ROUTINELY IF THE ALIEN ARTICULATES A BONA FIDE NEED TO TRAVEL.

AN ALIEN INVESTOR WHO LEAVES THE UNITED STATES WITHOUT ADVANCE PERMISSION WHILE AN AOS APPLICATION IS PENDING IS DEEMED TO HAVE ABANDONED THAT APPLICATION UNLESS THE APPLICANT HAS BEEN ADMITTED IN AND CONTINUES TO HOLD VALID H OR L NON-IMMIGRANT STATUS PENDING ADJUDICATION OF THE AOS APPLICATION. ALIEN INVESTORS ADMITTED TO THE UNITED STATES IN ANY NON-IMMIGRANT STATUS WHO HAVE OBTAINED ADVANCE PAROLE DURING THE AOS PROCESS SHOULD CONSULT WITH IMMIGRATION COUNSEL BEFORE TRAVELING.

IF AN ALIEN IS DEEMED TO HAVE ABANDONED AN AOS APPLICATION, THE APPLICANT MUST SEEK CONSULAR PROCESSING TO OBTAIN AN IMMIGRANT VISA PERMITTING AN APPLICATION FOR ADMISSION TO THE U.S. DURING

THE PERIOD BETWEEN THE APPLICANT'S DEEMED ABANDONMENT OF AN AOS APPLICATION AND THE TIME THE APPLICANT RECEIVES AN IMMIGRANT VISA FROM A U.S. CONSULATE, TYPICALLY ABOUT ONE YEAR, THE APPLICANT IS REQUIRED TO REMAIN OUTSIDE THE U.S.

## EMPLOYMENT DURING THE ADJUSTMENT OF STATUS PROCESSING

APPLICANTS FOR AOS WHO WISH TO WORK IN THE UNITED STATES MUST OBTAIN EMPLOYMENT AUTHORIZATION UNLESS THEY HAVE BEEN ADMITTED TO THE U.S. IN A NON-IMMIGRANT STATUS THAT CONFERS EMPLOYMENT AUTHORIZATION AND DOES NOT END BEFORE AOS IS GRANTED. SELF-EMPLOYMENT REQUIRES EMPLOYMENT AUTHORIZATION. EMPLOYMENT IN THE U.S. WITHOUT AUTHORIZATION IS A VIOLATION OF IMMIGRATION STATUS AND MAY JEOPARDIZE THE RIGHT TO ADJUST STATUS.

## ADJUSTMENT OF STATUS

AOS IS GRANTED IN THE DISCRETION OF USCIS. AN ALIEN WHOSE AOS APPLICATION HAS BEEN DENIED MAY REQUEST THAT THE CASE BE RE-CONSIDERED BY THE SAME OFFICE THAT DENIED AOS. IF THE REQUEST TO RE-OPEN OR RE-CONSIDER THE CASE IS DENIED, OR, IF, AFTER SUCH A REVIEW, THE ALIEN FAILS TO CONVINCE THIS OFFICE TO REVERSE ITS ORIGINAL DECISION, THE ALIEN IS WITHOUT FURTHER RECOURSE. AOS APPLICANTS SHOULD NOT MAKE ANY PERMANENT CONNECTIONS TO THE UNITED STATES OR CHANGE ANY PERMANENT LIVING, EMPLOYMENT, SCHOOLING OR OTHER LIFESTYLE ARRANGEMENTS IN THEIR COUNTRY OF RESIDENCE BEFORE THEY ARE ISSUED AOS BASED UPON AN APPROVED I-526 PETITION.

## REMOVAL OF CONDITIONS

APPROVAL OF AN AOS APPLICATION OR THE GRANT OF AN IMMIGRANT VISA FOLLOWED BY ENTRY AS ENTRY INTO THE U.S. MEANS THAT THE INVESTOR AND THE SPOUSE AND QUALIFIED CHILDREN OF THE INVESTOR HAVE BEEN GRANTED CONDITIONAL LAWFUL PERMANENT RESIDENCE (CLPR) FOR TWO YEARS. THE "CONDITIONS" MUST BE REMOVED SO THAT THE ALIENS MAY RESIDE IN THE U.S. INDEFINITELY. FAILURE TO REMOVE THE CONDITIONS RESULTS IN THE TERMINATION OF CLPR STATUS AND WILL RESULT IN THE COMMENCEMENT OF REMOVAL PROCEEDINGS.

REMOVAL OF CONDITIONS IS SOUGHT BY THE FILING OF AN I-829 PETITION IN THE 90 DAY PERIOD IMMEDIATELY PRECEDING THE SECOND ANNIVERSARY OF THE GRANT OF CLPR STATUS. IN SUPPORT OF THE PETITION, THE ALIEN INVESTOR MUST DEMONSTRATE FULL INVESTMENT IN THE ENTERPRISE, SUSTAINMENT OF THE INVESTMENT CONTINUOUSLY SINCE BECOMING A CLPR AND COMPLIANCE WITH THE REQUIREMENT THAT TEN (10) EMPLOYMENT POSITIONS HAVE BEEN CREATED AS A RESULT OF THE INVESTMENT. THE GENERAL PARTNER WILL WITHOUT LIABILITY PROVIDE DOCUMENTATION UPON REQUEST BY THE INVESTOR AS REASONABLY NECESSARY AND AVAILABLE IN SUPPORT OF THE INVESTOR'S APPLICATION FOR REMOVAL OF CONDITIONS. THE PARTNERSHIP IS RESPONSIBLE FOR ALL PROFESSIONAL FEES WHICH MAY BE INCURRED IN THE REVIEW AND PREPARATION OF SUCH DOCUMENTS IT IS AT THE SOLE RESPONSIBILITY AND RISK OF THE FOREIGN INVESTOR TO FILE THE I-829 PETITION IN THE 90 DAY PERIOD IMMEDIATELY PRECEDING THE SECOND ANNIVERSARY OF THE GRANT OF CLPR STATUS AT THE INVESTOR'S SOLE EXPENSE. THERE IS NO REFUND OF THE CAPITAL CONTRIBUTION OR ADMINISTRATION FEE FOR DELAY OR FAILURE FOR ANY REASON WHATSOEVER TO FILE AN I-829 PETITION

THE CALIFORNIA SERVICE CENTER CURRENTLY HAS JURISDICTION TO DECIDE A PETITION TO REMOVE CONDITIONS. IT IS AUTHORIZED TO APPROVE A PETITION, SEEK ADDITIONAL WRITTEN INFORMATION BEFORE DECIDING THE PETITION, REFER THE PETITION TO A LOCAL OFFICE WHERE INFORMATION WILL BE ELICITED IN AN INTERVIEW, OR, IT MAY DENY THE PETITION. IF THE PETITION IS REFERRED FOR AN INTERVIEW, THE LOCAL OFFICE OF USCIS WILL DECIDE THE PETITION AFTER THE INTERVIEW.

DURING THE PENDENCY OF THE PETITION, ALIENS ADMITTED IN CLPR STATUS REMAIN IN VALID STATUS EVEN IF THE PETITION IS NOT DECIDED BEFORE THE EXPIRY OF THE TWO YEAR PERIOD OF ADMISSION. IMPROPER DENIALS OF AND DELAYS IN OBTAINING DOCUMENTS EVIDENCING EXTENDED CLPR STATUS AND ADVANCE PAROLE ARE SOMETIMES EXPERIENCED. CLPR IS EXTENDED IN ONE YEAR INCREMENTS OR UNTIL THE PETITION TO REMOVE CONDITIONS IS ADJUDICATED.

USCIS REGULATIONS CONTROL THE PROCESS OF REMOVAL OF CONDITIONS. THESE REGULATIONS MAY CHANGE IN THE FUTURE. THE INVESTOR WILL BE EXPECTED TO COMPLY WITH AND PROCEED WITH REMOVAL OF CONDITION UNDER THE REGULATIONS IN EFFECT AT THE TIME THE INVESTOR SEEKS REMOVAL OF CONDITIONS.

THERE CANNOT BE ANY ASSURANCE THAT USCIS WILL NOT CHANGE THE REQUIREMENTS FOR REMOVAL OF CONDITIONS AFTER INVESTORS ARE GRANTED CLPR STATUS THROUGH INVESTMENT IN THE PROJECT. THERE CANNOT BE ANY ASSURANCE THAT AN INVESTOR WILL BE ABLE TO DEMONSTRATE TO THE SATISFACTION OF USCIS THAT THE PROJECT IS OPERATING WITHIN ITS BUSINESS PLAN, THAT IT HAS CREATED THE REQUISITE EMPLOYMENT POSITIONS AT THE TIME REQUIRED BY USCIS OR THAT ANY OTHER REQUIREMENTS FOR THE REMOVAL OF CONDITIONS HAVE BEEN MET. (SEE RISK FACTORS, REMOVAL OF CONDITIONS, PAGE 37).

## IMMIGRATION RISK FACTORS

A PROSPECTIVE INVESTOR SHOULD CONSULT WITH LEGAL COUNSEL FAMILIAR WITH UNITED STATES IMMIGRATION LAWS AND PRACTICE. PURCHASE OF A LIMITED PARTNERSHIP INTEREST IN AN EB-5 PROJECT DOES NOT GUARANTEE LAWFUL PERMANENT RESIDENCE IN THE UNITED STATES.

THE LIMITED PARTNERSHIP INTERESTS DESCRIBED IN THIS OFFERING MEMORANDUM INVOLVE A SIGNIFICANT DEGREE OF RISK. AMONG THE IMMIGRATION RISK FACTORS THAT A PROSPECTIVE INVESTOR SHOULD CONSIDER CAREFULLY ARE THOSE IDENTIFIED IN THIS OFFERING; HOWEVER THE DISCUSSION IS NOT EXHAUSTIVE:

### GENERAL

USCIS MAY MODIFY ITS EB-5 PROGRAM PRACTICES BY PROVIDING UPDATED GUIDANCE TO ITS EXAMINERS. SOMETIMES, BUT NOT CONSISTENTLY, USCIS PUBLISHES INSTRUCTIONS FOR THE USE OF EB-5 INVESTORS AND THEIR COUNSEL. EB-5 INVESTORS AND THEIR COUNSEL OFTEN FIRST BECOME AWARE OF EB-5 PRACTICES AND POLICIES THROUGH THE ADJUDICATION PROCESS FOR INVESTOR I-526 OR I-829 PETITIONS. IF SUCH MODIFICATIONS OCCUR, INVESTORS MAY BE REQUIRED TO PROVIDE NEW INFORMATION OR MODIFIED BUSINESS PLANS OR OTHER MODIFICATIONS TO AN EB-5 PROJECT DURING THE ADJUDICATION PROCESS TO COMPLY WITH USCIS REQUIREMENTS THAT WERE UNKNOWN TO INVESTORS AND THEIR COUNSEL AT THE TIME AN I-526, IMMIGRANT PETITION BY ALIEN ENTREPRENEUR OR AN I-829, PETITION BY ENTREPRENEUR TO REMOVE CONDITIONS WAS FILED. AMENDMENTS TO THE LAW AND REGULATIONS OF THE EB-5 PROGRAM MAY ALSO OCCUR FROM TIME-TO-TIME, WHICH MAY HAVE THE EFFECT OF REQUIRING EB-5 PROJECTS AND EB-5 INVESTORS TO PROVIDE NEW INFORMATION OR MODIFY THEIR PREVIOUS EB-5 PROGRAM PLANS TO SATISFY NEW EB-5 PROGRAM REQUIREMENTS. THERE CAN BE NO ASSURANCE THAT SUCH MODIFICATIONS WILL NOT BE REQUIRED IN THIS PROJECT ON ACCOUNT OF NEW POLICIES, PRACTICES, LAWS OR REGULATIONS NOT EFFECTIVE OR NOT KNOWN AT THIS TIME. THERE CAN BE NO ASSURANCE THAT THIS PROJECT WILL BE ABLE TO MODIFY ITS BUSINESS PLAN OR MAKE OTHER ADAPTATIONS TO COMPLY WITH YET UNKNOWN EB-5 REQUIREMENTS. THE INVESTOR SHOULD RETAIN COMPETENT LEGAL COUNSEL FOR CONTINUING ADVICE ON THESE MATTERS.

WHILE EFFORTS HAVE BEEN MADE TO STRUCTURE THIS OFFERING TO ASSIST INVESTORS TO MEET EB-5, EMPLOYMENT-BASED VISA PREFERENCE REQUIREMENTS UNDER 8 U.S.C.§ 1153 (B)(5)(A) - (D); INA § 203 (B)(5)(A) - (D) (THE "ACT") AND QUALIFY AS "ALIEN ENTREPRENEURS", A PRELIMINARY STEP TO BECOMING ELIGIBLE FOR ADMISSION TO THE UNITED STATES OF AMERICA WITH THEIR SPOUSE AND UNMARRIED MINOR CHILDREN AS LAWFUL PERMANENT RESIDENTS; NO REPRESENTATIONS CAN BE MADE AND NO GUARANTEES CAN BE GIVEN THAT INVESTMENT IN THIS PROJECT WILL GUARANTEE OR OTHERWISE ASSURE THAT AN INVESTOR'S PETITION AS AN "ALIEN ENTREPRENEUR" WILL BE GRANTED BY USCIS OR, IF IT IS, THAT INVESTORS WITH THEIR SPOUSE AND SUCH CHILDREN WILL OBTAIN CONDITIONAL OR UNCONDITIONAL LAWFUL PERMANENT RESIDENT STATUS.

### APPROVAL OF INVESTMENTS IN THE PROJECT

THERE IS NO PROCEDURE IN THE IMMIGRATION AND NATIONALITY ACT OR ITS ENABLING REGULATIONS TO PRE-QUALIFY AN INVESTMENT FOR THE EB-5, ALIEN ENTREPRENEUR PROGRAM. INDIVIDUAL INVESTOR APPLICATIONS ON FORM I-526 MUST FILED WITH USCIS BY THE INVESTOR TO DETERMINE THE SUITABILITY OF THE INVESTMENT OFFERED HEREIN FOR IMMIGRATION PURPOSES UNDER 8 U.S.C.§ 1153 (B)(5)(A) - (D); INA § 203 (B)(5)(A) - D). USCIS MAY DENY SUCH AN APPLICATION.

USCIS ANNOUNCED RECENTLY AN INFORMAL POLICY TO PERMIT DEVELOPERS TO OBTAIN A REVIEW OF AN EB-5 PROJECT BEFORE ANY INVESTORS FILE AN I-526 PETITION. THIS REVIEW MUST BE UNDERTAKEN THROUGH APPLICATIONS TO CREATE OR MODIFY REGIONAL CENTER AUTHORIZATIONS WHERE AN EB-5 PROJECT IS FUNCTIONING UNDER AUTHORIZATION FROM A REGIONAL CENTER. NOTWITHSTANDING THE APPROVAL OF A NEW OR MODIFIED REGIONAL CENTER APPLICATION BASED UPON A SPECIFIC, EXEMPLAR EB-5 PROJECT, USCIS RESERVES THE RIGHT TO QUESTION AND DENY INDIVIDUAL INVESTOR I-526 PETITIONS RESULTING FROM INVESTMENT IN THE EXEMPLAR PROJECT IF USCIS DETECTS VARIATIONS BETWEEN THE FACTS ADJUDICATED IN THE EXEMPLAR CASE AND THE FACTS PRESENTED IN THE INVESTOR'S PETITION. PRE-QUALIFICATION OF EB-5 PROJECTS, APART FROM REGIONAL CENTER APPLICATIONS, CONTINUES TO BE UNAVAILABLE NOTWITHSTANDING THIS USCIS ANNOUNCEMENT.

## PROCESSING TIMES

USCIS AND USDOS PROCESSING TIMES FOR THE I-526 AND THE ADJUSTMENT OF STATUS OR CONSULAR PROCESSING CASES ARE NOT PREDICTABLE, NOTWITHSTANDING PUBLISHED PROCESSING TIMES BY THESE AGENCIES. DELAYS IN PROCESSING MAY OCCUR. USCIS AND USDOS ADVISE INVESTORS NOT TO MAKE CHANGES IN ANY LIVING, EMPLOYMENT, SCHOOLING OR OTHER LIFESTYLE ARRANGEMENTS BEFORE RECEIVING CLPR THROUGH THE EB-5 PROGRAM.

## GOVERNMENT FILING FEES

GOVERNMENT FILING FEES MAY CHANGE. SUCH CHANGES MAY INCREASE THE IMMIGRATION FILING COSTS TO AN INVESTOR WHO HAS MADE AN INVESTMENT IN THE PROJECT AND WHO IS WAITING TO FILE AN I-526 OR A CONSULAR PROCESSING OR AOS CASE (AND COLLATERAL APPLICATIONS FOR EMPLOYMENT AUTHORIZATION AND ADVANCED PERMISSION TO TRAVEL).

## LIMITATIONS ON RETURN OF FUNDS IF I-526 PETITION IS DENIED

UPON SUBSCRIBING TO THIS OFFERING AND BECOMING A LIMITED PARTNER, IT IS THE SOLE RESPONSIBILITY AND RISK OF THE FOREIGN INVESTORS TO FILE THEIR I-526 PETITIONS. THERE IS NO REFUND FOR DELAY OR FAILURE TO FILE THE I-526 PETITION.

IF THE REGIONAL CENTER PILOT PROGRAM LAPSES, FOR EACH INVESTOR WHOSE CASE IS FILED WITH USCIS BUT NOT ADJUDICATED ON OR BEFORE THE DATE OF LAPSE, THEIR $500,000 CAPITAL CONTRIBUTION SHALL REMAIN INVESTED IN THE PARTNERSHIP UNTIL:

1. THE REGIONAL CENTER PILOT PROGRAM IS REAUTHORIZED RETROACTIVELY OR IS PENDING REAUTHORIZATION WITHIN A TWELVE MONTH PERIOD FOLLOWING SUNSET, AND THE INVESTOR'S I-526 PETITION IS IN DUE COURSE ADJUDICATED;

   OR,

2. LEGISLATION IS ENACTED OR PENDING PROVIDING SUBSTANTIALLY SIMILAR IMMIGRATION BENEFITS TO INVESTORS UNDER THE FORMER EB-5 REGIONAL CENTER PROGRAM WITHIN A TWELVE MONTH PERIOD FOLLOWING SUNSET.

IF NONE OF THE EVENTS DESCRIBED IN 1 OR 2 OCCUR, OR ARE NOT PENDING AS STATED, AT THE INVESTOR'S ELECTION, THE INVESTOR MAY (1) REMAIN INVESTED IN THE PROJECT; OR, (2) MAKE A WRITTEN REQUEST TO THE GENERAL PARTNER FOR A REFUND OF THE CAPITAL CONTRIBUTION OF $500,000. WITHIN NINETY (90) DAYS OF THE GENERAL PARTNER'S RECEIPT OF A REQUEST FOR A REFUND, THE CAPITAL CONTRIBUTION WILL BE REFUNDED BY THE LIMITED PARTNERSHIP TO THE INVESTOR. THE INVESTOR'S RIGHTS ARE IN THIS EVENT LIMITED SOLELY TO THE RETURN OF THE CAPITAL CONTRIBUTION OF $500,000.

IN THE EVENT AN INVESTOR'S I-526 PETITION RECEIVES NOTICE OF DENIAL BY USCIS, THE INVESTOR'S RIGHTS ARE LIMITED SOLELY TO THE RETURN OF THE INVESTOR'S $500,000 CAPITAL CONTRIBUTION (TOGETHER WITH $25,000 OF THE $50,000 ADMINISTRATION FEE FROM THE RESORT OWNER) WITHIN NINETY (90) DAYS OF WRITTEN REQUEST THEREFORE TO THE GENERAL PARTNER.

## TARGETED EMPLOYMENT AREAS AND THE MINIMUM INVESTMENT AMOUNT

AS A GENERAL RULE, THE EB-5 PROGRAM CALLS FOR A MINIMUM INVESTMENT OF $1,000,000 USD. THIS SUM MAY BE REDUCED CURRENTLY TO $500,000 USD IF THE PROJECT THAT RECEIVES THE INVESTMENT IS SITUATED IN A TARGETED EMPLOYMENT AREA (TEA). TEA'S MUST MEET ONE OF TWO CRITERIA, THE FIRST, CONCERNING POPULATION, AND THE SECOND, CONCERNING THE RATE OF UNEMPLOYMENT.

IF AN INVESTMENT IS MADE IN A TOWN OR CITY WHOSE POPULATION IS LESS THAN 20,000, AND THE TOWN OR CITY IS NOT WITHIN A METROPOLITAN STATISTICAL AREA (MSA) AS DESIGNATED BY THE U.S. OFFICE OF MANAGEMENT AND BUDGET, THE INVESTMENT IS DEEMED TO HAVE BEEN MADE IN A TEA. THE ELIGIBILITY OF AN EB-5 PROJECT TO ACCEPT $500,000 USD INVESTMENTS IS QUESTIONED IF THE PROJECT WAS SITUATED IN A TEA AT THE TIME THE INVESTMENT WAS MADE BUT IS NOT IN A TEA AT THE TIME THE I-526 PETITION IS FILED. IN THE CASE OF A TEA BASED UPON THE PROJECT'S LOCATION IN A RURAL AREA, THIS DIFFERENCE MIGHT OCCUR BECAUSE, DURING THIS INTERIM PERIOD NEW POPULATION DATA IS PUBLISHED OR BECAUSE A NEW MSA IS DESCRIBED TO INCLUDE THE LOCATION OF THE PROJECT, ALBEIT WITHIN A RURAL AREA.

IN THE EVENT OF A CHANGE BETWEEN THE DATE OF THE INVESTMENT AND THE DATE OF THE FILING OF THE I-526, USCIS HAS SAID THAT IT WILL CONSIDER THE PROJECT TO BE WITHIN A TEA AT THE TIME OF THE INVESTMENT IF THE INVESTED FUNDS WERE AVAILABLE TO THE PROJECT TO UNDERTAKE EMPLOYMENT CREATION BEFORE THE I-526 WAS FILED. IN THIS PROJECT, USCIS SHOULD APPLY THIS STANDARD INASMUCH AS THE INVESTED FUNDS ARE IRREVOCABLY COMMITTED TO THE PROJECT BEFORE THE I-526 IS FILED. THERE CAN BE NO ASSURANCE THAT USCIS WILL APPLY THIS RULE APPROPRIATELY.

USCIS HAS ALSO SAID IT WILL NOT PERMIT EVERY INVESTOR IN A POOLED INVESTMENT PROJECT TO INVEST ONLY $500,000 MERELY BECAUSE ONE OR MORE INVESTORS WERE PREVIOUSLY PERMITTED TO DO SO BASED UPON THE PRIOR PRESENCE OF A PROJECT IN A TEA.

IF THE LOCATION OF THE PROJECT IS JUDGED TO NO LONGER BE WITHIN A TEA, INVESTORS FILING I-526 PETITIONS THEREAFTER WILL BE REQUIRED TO INVEST $1,000,000. NO ASSURANCE CAN BE PROVIDED THAT NO NEW POPULATION DATA WILL BE PUBLISHED RENDERING THE LOCATION OF A PROJECT OUTSIDE A RURAL AREA OR THAT NEW MSA BOUNDARIES DEPICTING THE LOCATION OF THE PROJECT IN THE MSA WILL NOT BE PUBLISHED.

INVESTORS SHOULD CONSULT WITH COMPETENT IMMIGRATION COUNSEL CONCERNING TEA ISSUES AND INVESTMENT COUNSEL CONCERNING THE EFFECTS OF INVESTMENTS OF DIFFERING AMOUNTS ON IMMIGRATION AND INVESTMENT MATTERS OF SIGNIFICANCE TO THE INVESTOR.

## ATTAINING LAWFUL PERMANENT RESIDENCE

DESPITE THE APPROVAL OF AN INVESTOR'S FORM I-526, THERE CANNOT BE ANY GUARANTEE THAT THE INVESTOR OR THE INVESTOR'S SPOUSE OR ANY OF THE INVESTOR'S MINOR, UNMARRIED CHILDREN WILL BE GRANTED LAWFUL PERMANENT RESIDENCE. THE GRANT OF SUCH IMMIGRATION STATUS IS DEPENDENT UPON THE PERSONAL BACKGROUND OF EACH APPLICANT. ANY ONE OF SEVERAL GOVERNMENT AGENCIES MAY DETERMINE IN ITS DISCRETION, USUALLY WITHOUT THE POSSIBILITY OF APPEAL, THAT AN APPLICANT FOR LAWFUL PERMANENT RESIDENCE IS EXCLUDABLE FROM THE UNITED STATES.

## GROUNDS FOR EXCLUSION

APPLICANTS FOR LAWFUL PERMANENT RESIDENCE MUST DEMONSTRATE, AFFIRMATIVELY, THAT THEY ARE ADMISSIBLE TO THE UNITED STATES.

THERE ARE MANY GROUNDS OF INADMISSIBILITY THAT THE GOVERNMENT MAY CITE AS THE BASIS TO DENY ADMISSION FOR LAWFUL PERMANENT RESIDENCE.

1.  VARIOUS STATUTES, INCLUDING, FOR EXAMPLE, SECTIONS 212, 237 & 241 OF THE IMMIGRATION AND NATIONALITY ACT, THE ANTITERRORISM & EFFECTIVE DEATH PENALTY ACT OF 1996 (AEDPA) AND THE

ILLEGAL IMMIGRATION REFORM & IMMIGRANT RESPONSIBILITY ACT OF 1996 (IIRAIRA) SET FORTH GROUNDS OF INADMISSIBILITY, WHICH MAY PREVENT AN OTHERWISE ELIGIBLE APPLICANT FROM RECEIVING AN IMMIGRANT VISA, ENTERING THE UNITED STATES OR ADJUSTING TO LAWFUL PERMANENT RESIDENCE.

2. EXAMPLES OF ALIENS PRECLUDED FROM ENTERING THE UNITED STATES INCLUDE:

3. PERSONS WHO ARE DETERMINED TO HAVE A COMMUNICABLE DISEASE OF PUBLIC HEALTH SIGNIFICANCE;

4. PERSONS WHO ARE FOUND TO HAVE, OR HAVE HAD, A PHYSICAL OR MENTAL DISORDER, AND BEHAVIOR ASSOCIATED WITH THE DISORDER WHICH POSES, OR MAY POSE, A THREAT TO THE PROPERTY, SAFETY, OR WELFARE OF THE ALIEN OR OF OTHERS, OR HAVE HAD A PHYSICAL OR MENTAL DISORDER AND A HISTORY OF BEHAVIOR ASSOCIATED WITH THE DISORDER, WHICH BEHAVIOR HAS POSED A THREAT TO THE PROPERTY, SAFETY, OR WELFARE OF THE IMMIGRANT ALIEN OR OTHERS, AND WHICH BEHAVIOR IS LIKELY TO RECUR OR TO LEAD TO OTHER HARMFUL BEHAVIOR;

5. PERSONS WHO HAVE BEEN CONVICTED OF A CRIME INVOLVING MORAL TURPITUDE (OTHER THAN A PURELY POLITICAL OFFENSE), OR PERSONS WHO ADMIT HAVING COMMITTED THE ESSENTIAL ELEMENTS OF SUCH A CRIME;

6. PERSONS WHO HAVE BEEN CONVICTED OF ANY LAW OR REGULATION RELATING TO A CONTROLLED SUBSTANCE, ADMITTED TO HAVING COMMITTED OR ADMITS COMMITTING ACTS WHICH CONSTITUTE THE ESSENTIAL ELEMENTS OF SAME;

7. PERSONS WHO ARE CONVICTED OF MULTIPLE CRIMES (OTHER THAN PURELY POLITICAL OFFENSES) REGARDLESS OF WHETHER THE CONVICTION WAS IN A SINGLE TRIAL OR WHETHER THE OFFENSES AROSE FROM A SINGLE SCHEME OF MISCONDUCT AND REGARDLESS OF WHETHER SUCH OFFENSES INVOLVED MORAL TURPITUDE;

8. PERSONS WHO ARE KNOWN, OR FOR WHOM THERE IS REASON TO BELIEVE, ARE, OR HAVE BEEN, TRAFFICKERS IN CONTROLLED SUBSTANCES;

9. PERSONS ENGAGED IN PROSTITUTION OR COMMERCIALIZED VICE;

10. PERSONS WHO HAVE COMMITTED IN THE UNITED STATES CERTAIN SERIOUS CRIMINAL OFFENSES, REGARDLESS OF WHETHER SUCH OFFENSE WAS NOT PROSECUTED AS A RESULT OF DIPLOMATIC IMMUNITY;

11. PERSONS EXCLUDABLE ON GROUNDS RELATED TO NATIONAL SECURITY, RELATED GROUNDS, OR TERRORIST ACTIVITIES;

12. PERSONS DETERMINED TO BE EXCLUDABLE BY THE SECRETARY OF STATE OF THE UNITED STATES ON GROUNDS RELATED TO FOREIGN POLICY;

13. PERSONS WHO ARE OR HAVE BEEN A MEMBER OF A TOTALITARIAN PARTY, OR PERSONS WHO HAVE PARTICIPATED IN NAZI PERSECUTIONS OR GENOCIDE.

14. PERSONS WHO ARE LIKELY TO BECOME A PUBLIC CHARGE AT ANY TIME AFTER ENTRY;

15. PERSONS WHO WERE PREVIOUSLY DEPORTED OR EXCLUDED AND DEPORTED FROM THE UNITED STATES;

16. PERSONS WHO BY FRAUD OR WILLFULLY MISREPRESENTING A MATERIAL FACT, SEEK TO PROCURE (OR HAVE PROCURED) A VISA, OTHER DOCUMENTATION OR ENTRY INTO THE UNITED STATES OR OTHER BENEFIT UNDER THE IMMIGRATION ACT;

17. PERSONS WHO HAVE AT ANY TIME ASSISTED OR AIDED ANY OTHER ALIEN TO ENTER OR TRY TO ENTER THE UNITED STATES IN VIOLATION OF LAW;

18. CERTAIN ALIENS WHO HAVE DEPARTED THE UNITED STATES TO AVOID OR EVADE U.S. MILITARY SERVICE OR TRAINING;

19. PERSONS WHO ARE PRACTICING POLYGAMISTS; AND

20. PERSONS WHO WERE UNLAWFULLY PRESENT IN THE UNITED STATES FOR CONTINUOUS OR CUMULATIVE PERIODS IN EXCESS OF 180 DAYS.

## NO RETURN OF FUNDS IF VISA OR ADJUSTMENT OF STATUS IS DENIED

FOLLOWING APPROVAL OF AN INVESTOR'S I-526 PETITION, THE INVESTOR AND THE SPOUSE AND QUALIFYING CHILDREN OF THE INVESTOR MUST APPLY FOR AN IMMIGRANT VISA OR ADJUSTMENT TO PERMANENT RESIDENT STATUS. AS PART OF THIS PROCESS, THEY UNDERGO MEDICAL, POLICE, SECURITY AND IMMIGRATION HISTORY CHECKS TO DETERMINE WHETHER ANY OF THEM ARE INADMISSIBLE TO THE UNITED STATES FOR ANY OF THE REASONS MENTIONED ABOVE OR FOR ANY OTHER REASON. THE VISA OR ADJUSTMENT OF STATUS MAY BE DENIED NOTWITHSTANDING THE ELIGIBILITY FOR OR APPROVAL OF THE I-526 PETITION. IF, FOLLOWING SUBSCRIPTION AND PAYMENT OF THE INVESTMENT FUNDS AND PAYMENT OF THE ADMINISTRATION FEE THE INVESTOR OR THE SPOUSE OR ANY CHILDREN OF THE INVESTOR ARE DENIED A VISA FOR CONDITIONAL LAWFUL PERMANENT RESIDENCE OR DENIED ADJUSTMENT OF STATUS TO CONDITIONAL LAWFUL PERMANENT RESIDENCE SUCH ACTION WILL NOT ENTITLE THE INVESTOR TO THE RETURN OF ANY FUNDS PAID TO THE LIMITED PARTNERSHIP PURSUANT TO THIS OFFERING UNLESS AND UNTIL A SUBSTITUTE PARTNER IS FOUND AS SET FORTH IN SECTION 10.01 OF THE LIMITED PARTNERSHIP AGREEMENT, AND, IN ANY EVENT, THERE SHALL BE NO REFUND OF THE ADMINISTRATION FEES.

## CONDITIONAL LAWFUL PERMANENT RESIDENCE

LAWFUL PERMANENT RESIDENCE STATUS GRANTED INITIALLY TO AN INVESTOR AND THE SPOUSE AND QUALIFYING CHILDREN OF THE INVESTOR IS "CONDITIONAL." EACH INVESTOR AND THE SPOUSE AND QUALIFYING CHILDREN OF THE INVESTOR MUST SEEK REMOVAL OF CONDITIONS BEFORE THE SECOND ANNIVERSARY OF LAWFUL PERMANENT ADMISSION TO THE UNITED STATES. THERE CANNOT BE ANY ASSURANCE THAT THE USCIS WILL CONSENT TO THE REMOVAL OF CONDITIONS AS TO THE INVESTOR OR AS TO THE SPOUSE OR QUALIFYING CHILDREN OF THE INVESTOR, EACH OF WHOM MUST MAKE A SEPARATE APPLICATION TO REMOVE CONDITIONS (ALBEIT A SINGLE FORM IS USED TO IDENTIFY ALL APPLICANTS). IF THE INVESTOR FAILS TO HAVE CONDITIONS REMOVED, THE INVESTOR AND THE SPOUSE AND CHILDREN OF THE INVESTOR WILL BE REQUIRED TO LEAVE THE UNITED STATES AND WILL BE PLACED IN REMOVAL PROCEEDINGS, EVEN IF THE INVESTOR SUCCEEDS IN HAVING CONDITIONS REMOVED, THE SPOUSE AND EACH QUALIFYING CHILD OF THE INVESTOR, SEPARATELY, MUST HAVE CONDITIONS REMOVED. FAILURE TO HAVE CONDITIONS REMOVED AS TO ANY OF THESE MEMBERS OF THE INVESTOR'S FAMILY WILL REQUIRE SOME MEMBERS TO DEPART FROM THE UNITED STATES AND SUCH FAMILY MEMBERS WILL BE PLACED IN REMOVAL PROCEEDINGS.

## NO REGULATIONS REGARDING REMOVAL OF CONDITIONS
### GENERALLY

USCIS REGULATIONS GOVERNING LAWFUL PERMANENT RESIDENCE FOR INVESTORS DO NOT STATE SPECIFICALLY THE CRITERIA WHICH USCIS MUST APPLY TO DETERMINE ELIGIBILITY FOR THE REMOVAL OF CONDITIONS TO LAWFUL PERMANENT RESIDENT STATUS. COURTS HAVE DETERMINED SOME STANDARDS AND USCIS HAVE ISSUED MEMORANDA ON SOME ISSUES. THE INVESTOR SHOULD SEEK COMPETENT IMMIGRATION COUNSEL TO DETERMINE ALL OF THE ISSUES THAT MAY ARISE IN THE I-829 PROCESS ON ACCOUNT OF THE ABSENCE OF REGULATIONS CONTROLLING THE PROCESS OR RESULTING FROM AMBIGUITIES IN EXISTING LAW AND REGULATIONS.

## BUSINESS CHANGES AND BUSINESS FAILURES

THE I-526 PETITION MUST BE SUPPORTED BY EVIDENCE THAT THE EB-5 PROJECT HAS RECEIVED ALL INVESTOR CAPITAL, WILL DEDICATE THE FUNDS TO FURTHERANCE OF THE EB-5 PROJECT AND, THEREBY, WILL CREATE ALL REQUISITE EMPLOYMENT. WHEN AN INVESTOR SEEKS REMOVAL OF CONDITIONS, THE I-829 PETITION MUST BE SUPPORTED BY EVIDENCE THAT THESE REQUIREMENTS HAVE BEEN MET, OR, IF THEY HAVE NOT BEEN MET, THERE MUST BE COMPELLING EXPLANATIONS FOR DELAYS OR CHANGES IN THE EB-5 PROJECT. IF THE PROJECT IS DELAYED IN ITS

IMPLEMENTATION, IF INVESTED FUNDS ARE EXPEND DIFFERENTLY OR MORE SLOWLY THAN ANTICIPATED OR IF EMPLOYMENT IS BEHIND SCHEDULE, USCIS WILL EXPECT DOCUMENTATION OF CHANGED CIRCUMSTANCES TO EXPLAIN THE DELAY AND EVIDENCE THAT THE PROJECT IS FOLLOWING ITS ESSENTIAL BUSINESS PLAN.

IT WILL BE INCUMBENT UPON THE INVESTOR TO ESTABLISH THAT DESPITE SUCH CHANGES, THE REQUIREMENTS OF THE EB-5 PROGRAM HAVE BEEN MET: THE REQUIRED CAPITAL HAS BEEN PAID TO THE PROJECT, THE INVESTMENT HAS BEEN SUSTAINED AND THE REQUIRED JOBS HAVE BEEN CREATED. THERE CANNOT BE ANY ASSURANCE THAT USCIS WILL CONSIDER A CHANGE IN THE BUSINESS PLAN TO BE IMMATERIAL, WILL BE PERSUADED BY THE INVESTOR'S EXPLANATION OF THE REASON FOR THE CHANGE, OR WILL CONCLUDE THAT THE INVESTOR'S EB-5 PROJECT IS FOLLOWING ITS I-526 BUSINESS PLAN AND THAT THE EB-5 REQUIREMENTS FOR ALL PROJECTS ARE BEING OR WILL BE MET BY THE PROJECT. FAILURE TO PERSUADE USCIS ON EACH OF THESE ISSUES WILL RESULT IN THE DENIAL OF AN INVESTOR'S I-829 PETITION. IN THIS EVENT, THE INVESTOR AND THE INVESTOR'S QUALIFYING FAMILY MEMBERS WILL BE PLACED IN REMOVAL PROCEEDINGS AND MAY BE REQUIRED TO DEPART THE UNITED STATES.

THERE CANNOT BE ANY ASSURANCE THAT ALL ANTICIPATED INVESTORS WILL HAVE SUBSCRIBED AND HAVE PAID IN ALL REQUIRED CAPITAL ON THE ANTICIPATED SCHEDULE, THAT THE PROJECT WILL BE DEVELOPED AS SCHEDULED OR THAT INVESTED FUNDS WILL BE EXPENDED AS SCHEDULED OR IN A MANNER ANTICIPATED IN THE BUSINESS PLAN. IT IS POSSIBLE, AND NO ASSURANCE MAY BE PROVIDED TO THE CONTRARY, THAT THE PROJECT WILL NOT HIRE WORKERS ON THE PREDICTED SCHEDULE. SHOULD ONE OR MORE OF THESE CIRCUMSTANCES OCCUR, NO ASSURANCE MAY BE GIVEN THAT USCIS WILL ACCEPT THE EXPLANATION FOR THE OCCURRENCE. IF USCIS REJECTS THE EXPLANATION, THE I-829 PETITION WILL BE DENIED AND THE INVESTOR AND THE INVESTOR'S QUALIFYING FAMILY MEMBERS WILL BE PLACED IN REMOVAL PROCEEDINGS WHICH MAY REQUIRE THEM TO DEPART THE UNITED STATES.

IF THERE ARE VARIATIONS IN THE BUSINESS PLAN OF THE EB-5 PROJECT WHICH ARE DEEMED MATERIAL, USCIS MAY REQUIRE THE INVESTOR TO FILE NEW I-526 PETITIONS IF THE INVESTOR WISHES THE I-829 PETITION TO BE JUDGED AGAINST THE BUSINESS PLAN ACTUALLY IMPLEMENTED VERSUS JUDGING THE ORIGINAL BUSINESS PLAN THAT HAS NOT BEEN AND WILL NOT BE FULFILLED. FILING A NEW I-526 PETITION HAS POTENTIALLY SERIOUS RAMIFICATIONS FOR THE INVESTOR AND THE INVESTOR'S QUALIFIED FAMILY MEMBERS WHICH MAY LEAD TO THE INVESTOR AND SOME OR ALL OF THE INVESTOR'S QUALIFIED FAMILY HAVING TO DEPART THE UNITED STATES.

USCIS EXPECTS THAT AN EB-5 BUSINESS WILL BE CONTINUOUSLY MAINTAINED THROUGH THE PERIOD OF CONDITIONAL LAWFUL RESIDENCE TO THE TIME THE I-829 PETITION TO REMOVE CONDITIONS IS FILED. USCIS WILL EXAMINE THE MATTER OF WHETHER THE INVESTMENT HAS BEEN LOST PRIOR TO OR MAY BE LOST SOON AFTER CONDITIONS ARE REMOVED. USCIS WILL ALSO FOCUS WHETHER AN EB-5 PROJECT IS LIKELY TO CEASE ITS OPERATIONS SHORTLY AFTER CONDITIONS ARE REMOVED, THEREBY SHEDDING EMPLOYMENT IT HAS CREATED.

IF AN EB-5 PROJECT FAILS (MEANING FOREIGN INVESTMENTS ARE LOST OR ARE EXPECTED TO BE LOST, OR IF JOBS ARE NOT CREATED IN SUFFICIENT NUMBERS OR ONCE CREATED ARE LOST OR ARE EXPECTED TO BE LOST) DURING THE PERIOD OF AN INVESTOR'S CONDITIONAL RESIDENCE OR IS DEEMED LIKELY TO FAIL SHORTLY AFTER CONDITIONS ARE REMOVED, USCIS WILL NOT REMOVE CONDITIONS INVESTORS ARE NOT CREDITED FOR HAVING MADE INVESTMENTS IN GOOD FAITH OR FOR HAVING CREATED ALL THE REQUIRED EMPLOYMENT DURING A PART OF THE PERIOD OF CONDITIONAL RESIDENCE,

## MATERIAL CHANGE IN THE EB-5 PROJECT

IN THE EVENT OF A MATERIAL CHANGE TO THE BUSINESS PLAN IN THE PROJECT BETWEEN THE TIME THE I-526 PETITION IS FILED AND THE TIME THE INVESTOR APPLIES FOR REMOVAL OF CONDITIONS, THE INVESTOR MAY BE REQUIRED BY USCIS TO FILE A NEW I-526 PETITION INCORPORATING CHANGES IN THE PROJECT. IN SOME CASES, THIS WILL NECESSITATE A NEW TWO-YEAR PERIOD OF CONDITIONAL PERMANENT RESIDENCE AFTER WHICH THE INVESTOR WILL BE EXPECTED TO FILE A NEW I-829 PETITION TO REMOVE CONDITIONS. IF A NEW I-526 IS FILED, THE CHILDREN OF THE INVESTOR WHO BECOME TWENTY-ONE (21) YEARS OLD OR WHO MARRIED BEFORE THE NEW I-526 IS FILED WILL BE DEEMED TO HAVE "AGED OUT" AND WILL NOT BE ELIGIBLE TO IMMIGRATE BASED UPON THE PARENT-CHILD RELATIONSHIP WITH THE INVESTOR. THE SPOUSE OF THE INVESTOR, DIVORCED FROM THE INVESTOR BEFORE THE NEW I-526 IS FILED WILL ALSO BE INELIGIBLE TO IMMIGRATE BASED ON THE FORMER MARRIAGE.

NO ASSURANCES MAY BE GIVEN THAT THIS EB-5 PROJECT WILL NOT FAIL DURING THE PERIOD OF CONDITIONAL PERMANENT RESIDENCE OR AT SOME TIME THEREAFTER. NO ASSURANCE MAY BE PROVIDED THAT USCIS WILL FORGIVE SUCH FAILURE OR ANTICIPATED FAILURE BY GRANTING AN INVESTOR'S I-829 PETITION. IF THE PETITION IS DENIED, THE INVESTOR AND THE INVESTOR'S QUALIFIED FAMILY MEMBERS WILL BE PLACED IN REMOVAL PROCEEDINGS AND MAY BE REQUIRED TO DEPART THE UNITED STATES.

## REVIEW OF I-526 COMPLIANCE DURING THE I-829 PROCESS

USCIS, AT ITS ELECTION, USES THE I-829 PROCESS TO REVIEW THE INVESTOR'S COMPLIANCE WITH PREVIOUSLY RESOLVED I-526 PETITION REQUIREMENTS. SUCH A REVIEW WILL BE UNDERTAKEN IF THE EXAMINER BELIEVES THAT THE PRIOR FAVORABLE DETERMINATION WAS "LEGALLY DEFICIENT" OR IF MATERIAL FACTS HAVE CHANGED DURING THE PERIOD OF CONDITIONAL RESIDENCE. IF USCIS BELIEVES THE INVESTOR IS NOT EB-5 ELIGIBLE, THE BURDEN IS ON THE INVESTOR TO ESTABLISH ELIGIBILITY BY RELIANCE ON "INDEPENDENT OBJECTIVE EVIDENCE."

THE LIMITED PARTNERSHIP WILL SEEK AS MUCH INFORMATION AS POSSIBLE FROM USCIS, WHERE GOOD BUSINESS PRACTICES PERMIT, IN AN EFFORT TO ASSIST INVESTORS TO QUALIFY FOR THE REMOVAL OF CONDITIONS. THIS NOTWITHSTANDING, IN THE ABSENCE OF REGULATIONS THE LIMITED PARTNERSHIP MAY MAKE CERTAIN MANAGEMENT DECISIONS WITHOUT KNOWING THEM TO BE OBJECTIONABLE TO USCIS, THUS RESULTING IN AN RFE AND, POSSIBLY, THE DENIAL OF AN INVESTOR'S I-829, PETITION TO REMOVE CONDITIONS. IF THE I-829 IS DENIED THE INVESTOR AND THE INVESTOR'S SPOUSE AND QUALIFYING CHILDREN WILL BE EXPECTED TO DEPART THE U.S. AND WILL BE PLACED INTO REMOVAL PROCEEDINGS.

EACH INVESTOR SHOULD CONSULT WITH COMPETENT IMMIGRATION COUNSEL AND BECOME EDUCATED ABOUT THE STANDARDS THAT WILL DETERMINE ELIGIBILITY OF THE INVESTOR AND THE SPOUSE OR CHILDREN OF THE INVESTOR TO ACHIEVE UNCONDITIONAL LAWFUL PERMANENT RESIDENCE IN THE UNITED STATES PURSUANT TO THIS PROGRAM WHICH CURRENTLY IS IN A STATE OF EVOLUTION.

## NUMERICAL QUOTAS

CURRENTLY, 3,000 OF THE TOTAL 10,000 EB-5, PREFERENCE VISA STATUSES ALLOCATED ANNUALLY ARE AVAILABLE TO ALIEN INVESTORS AND THE SPOUSES AND QUALIFYING CHILDREN OF INVESTORS WHO ARE MAKING AN INVESTMENT IN A TARGETED EMPLOYMENT AREA (TEA). THE LODGE AND TOWNHOUSES PROJECT IS CURRENTLY SITUATED WITHIN A TEA. EB-5 STATUS IS AVAILABLE ON A FIRST-COME, FIRST-SERVED BASIS. RECENTLY, USCIS HAS ANNOUNCED THAT IT CONSIDERS THE 3,000 STATUSES FOR TEA CASES AS A GUARANTEED ALLOCATION, NOT A QUOTA, SO THAT ALL TEA CASES ARE ELIGIBLE TO SEEK A VISA, UP TO THE ANNUAL QUOTA OF 10,000 VISAS.

CURRENTLY, THE ALLOCATION OF VISAS FOR TEA'S IS NOT BEEN OVERSUBSCRIBED DESPITE INCREASING DEMAND FOR VISAS IN THE FIFTH PREFERENCE. THERE IS NO RELIABLE MEANS TO PREDICT IF DELAY DUE TO UNAVAILABILITY OF VISAS WILL OCCUR, OR, IF IT OCCURS, HOW LONG AN INVESTOR OR THE SPOUSE AND QUALIFYING CHILDREN OF THE INVESTOR WILL WAIT BEFORE VISA STATUS FOR THEM BECOMES AVAILABLE.

CHANGES TO CURRENT LAW ON QUOTAS OR USCIS PRACTICES REGARDING THE ALLOCATION OF VISAS TO THE EB-5 PROGRAM COULD ADVERSELY IMPACT THE INVESTOR. INVESTORS SHOULD SEEK THE ADVICE OF COMPETENT IMMIGRATION COUNSEL CONCERNING THE LAW AND USCIS PRACTICES REGARDING EB-5 VISA AVAILABILITY.

## EXPIRATION OF THE REGIONAL CENTER PILOT PROGRAM

THE REGIONAL CENTER PILOT PROGRAM IS SIGNIFICANT TO EACH INVESTOR UNTIL THE INVESTOR RECEIVES UNCONDITIONAL LAWFUL PERMANENT RESIDENCE. EACH OF THE THREE IMMIGRATION STAGES TO BE COMPLETED BY THE INVESTOR IN A REGIONAL CENTER EB-5 PROJECT IS DEPENDENT UPON THE EXISTENCE OF THE REGIONAL CENTER AS AUTHORIZED BY THE PILOT PROGRAM. SOME GOVERNMENT AGENCIES THAT CONFER IMMIGRATION BENEFITS UPON EB-5 INVESTORS HAVE ANNOUNCED THAT THEY ARE NOT AUTHORIZED TO CONFER SUCH BENEFITS (E.G., APPROVE AN I-526 PETITION BY ALIEN ENTREPRENEUR, APPROVE AN I-485, APPLICATION TO ADJUST STATUS OR GRANT AN IMMIGRANT VISA TO AN EB-5 INVESTOR OR APPROVE AN I-829, PETITION BY ENTREPRENEUR TO REMOVE CONDITIONS) ONCE THE REGIONAL CENTER PILOT PROGRAM EXPIRES. THE INVESTOR'S QUALIFYING RELATIVES ARE SUBJECT TO THE SAME OUTCOMES AS THE INVESTOR IF THE REGIONAL CENTER PILOT PROGRAM EXPIRES.

THE REGIONAL CENTER PILOT PROGRAM WAS FIRST CREATED IN 1992. SINCE THEN IT HAS BEEN EXTENDED, MOST RECENTLY IN 2009, UNTIL SEPTEMBER 30, 2012. THIS PROJECT SEEKS THE BENEFIT OF THE REGIONAL CENTER PILOT PROGRAM THAT PERMITS EMPLOYMENT CREATED INDIRECTLY BY INVESTMENTS IN THE PROJECT TO BE COUNTED TOWARDS THE MINIMUM NUMBER OF EMPLOYMENT POSITIONS NEEDED TO QUALIFY A FOREIGN INVESTOR, THE INVESTOR'S SPOUSE AND THE QUALIFYING CHILDREN OF THE INVESTOR TO HAVE CONDITIONS REMOVED. THERE IS NO RELIABLE MEANS TO KNOW IF THE REGIONAL CENTER PROGRAM WILL BE EXTENDED OR MADE PERMANENT.

IF THE REGIONAL CENTER PILOT PROGRAM LAPSES, INVESTORS WHOSE PROJECTS DEPEND UPON REGIONAL CENTERS MAY NOT BE ABLE TO FILE I-526 PETITIONS OR HAVE FILED PETITIONS ADJUDICATED; AND APPLICATIONS FOR LAWFUL PERMANENT RESIDENCE OR THE REMOVAL OF CONDITIONS MAY BE REJECTED, DELAYED OR DENIED, DEPRIVING THE INVESTOR AND THE INVESTOR'S QUALIFYING FAMILY UNABLE TO ENTER, LIVE OR WORK IN THE U.S. CURRENTLY, THERE IS NO WAY TO KNOW OR PREDICT THE POSITIONS THAT THE RELEVANT GOVERNMENT AGENCIES WILL TAKE CONCERNING THE IMMIGRATION RIGHTS OF EB-5 INVESTORS IN REGIONAL CENTER PILOT PROGRAM PROJECTS SHOULD THE PILOT PROGRAM LAPSE.

## ACTIVE PARTICIPATION IN LIMITED PARTNERSHIP BUSINESS

THE EB-5 PROGRAM REQUIRES THAT EACH INVESTOR BE ACTIVELY INVOLVED IN THE BUSINESS AFFAIRS OF THE LIMITED PARTNERSHIP. FAILURE TO BE ACTIVELY INVOLVED MAY JEOPARDIZE APPROVAL OF THE I-526 PETITION OR RESULT IN THE DENIAL OF LAWFUL PERMANENT RESIDENCE STATUS FOR THE INVESTOR AND THE SPOUSE AND THE QUALIFYING CHILDREN OF THE INVESTOR. THE LIMITED PARTNERSHIP AGREEMENT, IN AN EFFORT TO REFLECT THE EB-5 REGULATIONS GOVERNING WHAT LEVEL OF PARTICIPATION IS ACCEPTABLE TO MEET THE EB-5 CRITERIA, MANDATES THAT EACH LIMITED PARTNER SHALL PARTICIPATE IN THE MANAGEMENT OF THE BUSINESS OF THE PARTNERSHIP BY MAKING SUGGESTIONS OR RECOMMENDATIONS TO THE GENERAL PARTNER ON ISSUES OF POLICY IMPORTANT TO THE PARTNERSHIP. THE LIMITED PARTNERSHIP AGREEMENT ALSO PERMITS LIMITED PARTNERS TO PARTICIPATE IN ONE OR MORE OF THE ACTIVITIES (I) PERMITTED OF LIMITED PARTNERS UNDER THE VERMONT REVISED UNIFORM LIMITED PARTNERSHIP ACT AND (II) OTHERWISE SET FORTH UNDER THE LIMITED PARTNERSHIP AGREEMENT. NO LIMITED PARTNER SHALL CONTROL THE PARTNERSHIP'S BUSINESS OR MANAGEMENT OR HAVE ANY AUTHORITY TO ACT OR BIND THE PARTNERSHIP IN ANY MANNER CONTRARY TO THE PROVISIONS OF THE LIMITED PARTNERSHIP AGREEMENT. THE PROJECT CANNOT ASSURE INVESTORS THAT THESE PROVISIONS ARE OR WILL BE SATISFACTORY TO USCIS.

## RISKS ATTENDANT TO EB-5 STATUS

USCIS FREQUENTLY REINTERPRETS THE MEANING OF QUALIFYING EB-5 CRITERIA. THE CREATION OF NEW STANDARDS TO BE MET, CHANGES IN THE EMPHASIS THAT USCIS PLACES ON EB-5 CRITERIA, THE REINTERPRETATION OF EXISTING EB-5 CRITERIA AND THE PUBLICATION OF NEW FIELD INSTRUCTIONS TO EXAMINERS WITHOUT PRIOR NOTICE ALL BECOME BINDING UPON PREVIOUSLY FILED BUT UNADJUDICATED I-526 PETITIONS AND MAY AFFECT WHETHER THEY WILL BE APPROVED. THESE USCIS ACTIONS ALSO ARE BINDING ON EB-5 PROJECTS THAT HAVE ACCEPTED SOME INVESTORS WHOSE I-526 PETITIONS ARE BEING PREPARED FOR FILING AND MAY DETERMINE IF SUCH PROJECTS AND THE I-526 AND I-829 PETITIONS BASED UPON THE PROJECTS WILL CONTINUE TO BE DEEMED COMPLIANT WITH EB-5 RULES. THERE CAN BE NO CERTAINTY THAT COMPLIANCE WITH KNOWN CRITERIA AS OF THE DATE AN I-526 PETITION IS FILED WILL LEAD TO THE APPROVAL OF THE I-526 OR I-829 PETITION.

THE EB-5 PROGRAM HAS MANY REQUIREMENTS THAT MUST BE MET TO THE SATISFACTION OF USCIS. INVESTORS SHOULD CONSULT WITH COMPETENT IMMIGRATION COUNSEL TO REVIEW ALL EB-5 PROGRAM REQUIREMENTS. THE FAILURE TO MEET EVEN ONE OF THESE REQUIREMENTS TO THE SATISFACTION OF USCIS MAY RESULT IN THE DENIAL OF THE INVESTOR'S I-526 PETITION OR SUBSEQUENT PETITIONS.

## CONSULAR PROCESSING – VISA NOT GUARANTEED

IN SOME INSTANCES, CONSULATES PLACE VISA APPLICANTS IN "ADMINISTRATIVE PROCESSING". CONSULS ARE VERY RELUCTANT TO EXPLAIN THE SPECIFIC REASONS FOR THIS ADDITIONAL STEP TAKEN BEFORE A VISA WILL BE ISSUED. THIS PROCEDURE MAY BE ENCOUNTERED IN CONSULAR POSTS THAT REPORT HIGH LEVELS OF VISA FRAUD, POSTS IN SOME COUNTRIES THAT ARE HYPER-VIGILANT CONCERNING SECURITY MATTERS OR BECAUSE SOME INFORMATION ABOUT A VISA APPLICANT, IN THE OPINION OF A CONSULAR OFFICER, MERITS FURTHER BACKGROUND CHECKS. ONCE ADMINISTRATIVE PROCESSING BEGINS, CONSULATES WILL NOT DISCUSS THE PROGRESS OF A VISA APPLICATION. APPLICANTS ARE RELEGATED TO INDETERMINATE WAITING FOR A DECISION ON A VISA APPLICATION. SUCH A DECISION MAY TAKE YEARS TO OBTAIN.

DECISIONS BY CONSULS ARE DISCRETIONARY AND UNREVIEWABLE. USCIS AND DOS REPORT EFFORTS TO COMMUNICATE MORE EFFICIENTLY REGARDING THEIR RESPECTIVE ROLES IN DETERMINING THE ELIGIBILITY OF EB-5 INVESTORS FOR IMMIGRANT VISAS. THERE CANNOT BE ANY ASSURANCE THAT IMPROVED COMMUNICATIONS WILL OCCUR GENERALLY OR WITH RESPECT TO A PARTICULAR INVESTOR OR THE INVESTOR'S SPOUSE OR MINOR CHILDREN. NEITHER MAY IT BE ASSURED THAT IMPROVED COMMUNICATIONS WILL RESULT IN THE ISSUANCE OF A VISA. FACTORS EXTRANEOUS TO THE EB-5 PROJECT OR THE RELATIONSHIP OF THE INVESTOR TO THE PROJECT THAT A CONSUL MAY, WITH UNREVIEWABLE DISCRETION, ELECT TO CONSIDER COULD RESULT IN THE DENIAL OF A VISA. INVESTORS ARE ADVISED TO SEEK COMPETENT IMMIGRATION COUNSEL ON MATTERS OF CONSULAR PROCESSING.

## ADMISSION AFTER INVESTING, FILING THE I-526 OR DURING CONSULAR PROCESSING

ADMISSION TO THE UNITED STATES AS A VISITOR OR IN MOST OTHER NON-IMMIGRANT STATUSES IS PREDICATED UPON THE INTENT TO DEPART THE COUNTRY AT THE END OF THE PERIOD OF ADMISSION. EXPERIENCED EB-5 LEGAL PRACTITIONERS CAUTION THAT NON-IMMIGRANT INTENT MAY BE DIFFICULT TO ESTABLISH ONCE AN INVESTOR HAS PAID FUNDS INTO AN EB-5 PROJECT OR FILES AN I-526, AS THE SOLE PURPOSE OF THIS INVESTMENT AND PETITION IS TO ESTABLISH THAT THE INVESTOR QUALIFIES TO BECOME A LAWFUL PERMANENT RESIDENCE. THE DIFFICULTY OF MAINTAINING NON-IMMIGRANT INTENT IS MADE MORE DIFFICULT UPON COMMENCING CONSULAR PROCESSING, WHICH IS CONSIDERED BY USDOS TO BE A CLEAR REQUEST FOR LAWFUL PERMANENT RESIDENCE AS SOON AS PROCESSING TIMES PERMIT. INVESTORS SHOULD CONSULT WITH COMPETENT COUNSEL TO EVALUATE THE RISKS ASSOCIATED WITH SEEKING TEMPORARY (NON-IMMIGRANT) ADMISSION TO THE UNITED STATES SUBSEQUENT TO MAKING THE INVESTMENT OR FILING AN I-526 PETITION OR AN APPLICANT FOR AN IMMIGRANT VISA. DESPITE BEST EFFORTS, AN INSPECTOR MAY DENY ADMISSION UNDER THESE CIRCUMSTANCES. SUCH A DENIAL MAY ALSO RESULT IN FORMAL EXCLUSION FROM THE U.S. WHICH MIGHT PRECLUDE ADMISSION WITH AN IMMIGRANT VISA FOR A PERIOD OF YEARS.

## ADJUSTMENT OF STATUS

FURTHER TO THIS TOPIC, PLEASE SEE *IMMIGRATION MATTERS, ADJUSTMENT OF STATUS, PAGE 26.*

MAKING THE INVESTMENT, FILING THE I-526 OR APPLYING FOR AOS WITHIN THE 60 DAY PERIOD BEFORE APPLYING FOR AOS MAY BE VIEWED BY USCIS AS EVIDENCE OF IMMIGRANT INTENT AND MAY RESULT IN THE DENIAL OF AOS. IN SUCH AN EVENT, THE INVESTOR WILL BE REQUIRED TO DEPART THE U.S. AND WILL NEED TO SEEK AN IMMIGRANT VISA THROUGH CONSULAR PROCESSING. IN THIS PROCESS, EXPERIENCED IMMIGRATION COUNSEL BELIEVE THAT USDOS (THROUGH ITS CONSULATES) MAY REQUIRE THE INVESTOR TO SEEK A WAIVER OF EXCLUSION (FOR WHICH THE APPLICANT MUST ESTABLISH ELIGIBILITY) FOR HAVING MISREPRESENTED THE PURPOSE OF ENTRY UPON THE ADMISSION AS A NON-IMMIGRANT. WAIVERS ARE GRANTED IN THE UNREVIEWABLE DISCRETION OF THE USCIS AND THE PROCESSING TIME FOR WAIVER APPLICATIONS IS FREQUENTLY SIGNIFICANT.

THERE MAY BE ADDITIONAL REASONS WHY AN ALIEN MAY NOT ADJUST STATUS, WHICH IS A BENEFIT GRANTED IN THE DISCRETION OF USCIS. THERE IS NO APPEAL FROM A DENIAL OF AOS; THE ONLY RELIEF AVAILABLE IS A REQUEST TO RE-OPEN OR RE-CONSIDER THE AOS APPLICATION. INVESTORS SHOULD CONSULT WITH IMMIGRATION COUNSEL TO DETERMINE IF THEY, THEIR SPOUSE AND THEIR CHILDREN ARE ELIGIBLE FOR AOS OR IF PURSUIT OF AOS WOULD BE PRUDENT.

NEAR THE CONCLUSION OF AN AOS CASE, USCIS MAY SCHEDULE AN INTERVIEW FOR THE AOS APPLICANT. THE INTERVIEW MAY BE WAIVED BY USCIS, BUT THE WAIVER SHOULD NOT BE EXPECTED. EXPERIENCED IMMIGRATION LAW PRACTITIONERS BELIEVE THAT USCIS USES PROFILING INFORMATION TO DETERMINE WHO WILL BE INTERVIEWED AND IT ALSO INTERVIEWS SOME AOS APPLICANTS TO MAINTAIN THE INTEGRITY OF ITS SCREENING PROCESS. THERE IS NO FORMAL PROCESS TO REQUEST THE WAIVER OF AN INTERVIEW. INVESTORS SHOULD CONSULT WITH EXPERIENCED IMMIGRATION COUNSEL ON ALL MATTERS CONCERNING ADJUSTMENT OF STATUS.

## REMOVAL OF CONDITIONS

FURTHER TO THIS TOPIC, PLEASE SEE *IMMIGRATION MATTERS, REMOVAL OF CONDITIONS, PAGE 27*

IN THE HISTORY OF THE EB-5 PROGRAM, INS (NOW USCIS) MODIFIED THE REQUIREMENTS FOR REMOVAL OF CONDITIONS AFTER THE TIME THAT SOME INVESTORS WERE GRANTED CLPR. AS A RESULT OF THIS ACTION, SOME OF THOSE INVESTORS WERE UNABLE TO COMPLY WITH THE NEW REQUIREMENTS, CREATING THE POSSIBILITY THAT

THEY WOULD BE REMOVED FROM THE UNITED STATES. SOME OF THESE INVESTORS CONTESTED THE CHANGE IN RULES AFTER THEIR INVESTMENTS WERE MADE. THEIR POSITION WAS SUPPORTED IN LITIGATION THAT RESULTED IN INS BEING ORDERED TO RECONSIDER THEIR APPLICATIONS TO REMOVE CONDITIONS BY APPLYING THE ORIGINAL RULES.

THERE IS AN INCREASED INTEREST BY USCIS IN EXAMINING ALL ASPECTS OF EB-5 PROJECT AND INVESTOR PETITION COMPLIANCE DURING THE REMOVAL OF CONDITIONS PROCESS. INVESTORS SHOULD SEEK GUIDANCE FROM EXPERIENCED EB-5 COUNSEL CONCERNING ALL ASPECTS OF THE REMOVAL CONDITIONS PROCESS AND THE EFFECT OF POSSIBLE USCIS ACTIONS ON THE INVESTOR AND THE INVESTOR'S SPOUSE AND QUALIFYING CHILDREN.

## FAMILY RELATIONSHIPS

1. SPOUSES OF THE INVESTOR MAY ACCOMPANY OR FOLLOW TO JOIN AN INVESTOR WHO HAS BEEN GRANTED CONDITIONAL LAWFUL PERMANENT RESIDENCE PROVIDED THAT THE INVESTOR AND THE SPOUSE WERE MARRIED AT THE TIME OF THE INVESTOR'S ACQUISITION OF CLPR. IF THE RELATIONSHIP IS ONE IN COMMON LAW, THE "SPOUSE" OF THE INVESTOR MAY NOT ACQUIRE LAWFUL PERMANENT RESIDENT STATUS ON ACCOUNT OF THE RELATIONSHIP. NOT ALL VALID MARRIAGES WILL BE RECOGNIZED FOR PURPOSES OF U.S. IMMIGRATION. INVESTORS SHOULD CONSULT COMPETENT IMMIGRATION COUNSEL REGARDING THE ELIGIBILITY OF THEIR SPOUSE FOR IMMIGRATION BENEFITS.

2. CERTAIN CHILDREN OR STEP-CHILDREN OF THE INVESTOR MAY ACCOMPANY OR FOLLOW TO JOIN AN INVESTOR WHO HAS BEEN GRANTED CONDITIONAL LAWFUL PERMANENT RESIDENCE PROVIDED THAT THE INVESTOR CAN ESTABLISH PARENTAGE OR STEP-PARENTAGE AT THE TIME OF THE INVESTOR'S FIRST ADMISSION TO THE UNITED STATES AS A CONDITIONAL LAWFUL PERMANENT RESIDENT OR ADJUSTMENT OF STATUS TO LAWFUL PERMANENT RESIDENCE. FAILURE TO COMPLY WITH ALL APPLICABLE REQUIREMENTS MAY RESULT IN THE SEPARATION OF A CHILD FROM THE INVESTOR OR THE INVESTOR'S SPOUSE FOR PROTRACTED PERIODS, IN SOME INSTANCES FOR YEARS, WHILE OTHER IMMIGRATION OPPORTUNITIES ARE ATTEMPTED IN AN EFFORT TO REUNITE THE FAMILY. U.S. LAW EXCLUDES SOME STEP-CHILDREN AND ADOPTED CHILDREN FROM ELIGIBILITY FOR IMMIGRATION BENEFITS. INVESTORS SHOULD CONSULT COMPETENT IMMIGRATION COUNSEL REGARDING THE ELIGIBILITY OF THEIR CHILDREN FOR IMMIGRATION BENEFITS.

3. A "CHILD" IS SOMEONE UNDER THE AGE OF 21 YEARS WHO IS UNMARRIED. IF A CHILD BECOMES AGE 21 OR MARRIES BEFORE BEING ADMITTED TO THE U.S. AS A LAWFUL PERMANENT RESIDENT OR ADJUSTING TO LAWFUL PERMANENT RESIDENT STATUS, THE FORMER CHILD, NOW DEEMED A SON OR DAUGHTER, MAY NOT BE ELIGIBLE TO ACCOMPANY OR FOLLOW TO JOIN THE INVESTOR. IN SOME CIRCUMSTANCES, THE CHILD STATUS PROTECTION ACT MAY ASSIST A SON OR DAUGHTER TO QUALIFY AS A CHILD BY REDUCING THE DEEMED AGE OF THE SON OR DAUGHTER TO LESS THAN 21 YEARS. FAILURE TO MEET THE REQUIREMENTS OF THE CHILD STATUS PROTECTION ACT MAY RESULT IN THE SEPARATION OF A SON OR DAUGHTER FROM THE INVESTOR OR THE INVESTOR'S SPOUSE FOR PROTRACTED PERIODS; IN SOME INSTANCES FOR YEARS, WHILE OTHER IMMIGRATION OPPORTUNITIES ARE ATTEMPTED IN AN EFFORT TO REUNITE THE FAMILY.

4. UNDER SOME CIRCUMSTANCES A CHILD WHO BECOMES 21 YEARS OF AGE OR MARRIES WHILE HOLDING CONDITIONAL LAWFUL PERMANENT RESIDENT STATUS, OR THE SPOUSE OF THE INVESTOR WHO IS DIVORCED FROM THE INVESTOR WHILE HOLDING CONDITIONAL LAWFUL PERMANENT RESIDENT STATUS, MAY BE ELIGIBLE TO REMOVE CONDITIONS BY BEING INCLUDED IN THE INVESTOR'S I-829 PETITION OR FILING A SEPARATE I-829 PETITION. FAILURE TO MEET QUALIFYING CONDITIONS, WHICH MAY NOT BE WITHIN THE CHILD'S OR DIVORCED SPOUSE'S CONTROL, AND, ABOUT WHICH THE LAW AND REGULATIONS DO NOT PROVIDE CLEAR GUIDANCE, WILL RESULT IN THE CHILD OR DIVORCED SPOUSE BEING PLACED IN REMOVAL PROCEEDINGS AND MAY REQUIRE THE CHILD OR DIVORCED SPOUSE TO DEPART THE UNITED STATES.

5. UPON THE DEATH OF AN INVESTOR HOLDING CONDITIONAL LAWFUL PERMANENT RESIDENT STATUS, A SPOUSE AND QUALIFYING CHILDREN OF THE INVESTOR ALSO HOLDING SUCH STATUS ARE ENTITLED TO SEEK REMOVAL OF CONDITIONS BY SUBMISSION OF THE SAME EVIDENCE DEMONSTRATING COMPLIANCE WITH REQUIRED CRITERIA THAT USCIS REQUIRES OF AN INVESTOR SEEKING TO REMOVE CONDITIONS. FAILURE OF EACH MEMBER OF THE FAMILY TO ESTABLISH THESE CRITERIA WILL RESULT IN THE DENIAL OF THE APPLICATION TO REMOVE CONDITIONS, PLACEMENT OF THE FAMILY MEMBERS IN

REMOVAL PROCEEDINGS AND THEIR MANDATED DEPARTURE FROM THE UNITED STATES.

6.  IT IS UNCLEAR UNDER USCIS PROCEDURES IF A CHILD WHO BECOMES A SON OR DAUGHTER BEFORE THE DEATH OF THE INVESTOR IS ENTITLED TO SEEK REMOVAL OF CONDITIONS. USCIS REGULATIONS ARE SILENT ON THIS MATTER. IF USCIS DOES NOT EXTEND THIS BENEFIT, SUCH A SON OR DAUGHTER WILL BE DENIED AN APPLICATION TO REMOVE CONDITIONS AND WILL BE PLACED IN REMOVAL PROCEEDINGS AND MAY BE MANDATED TO DEPART THE UNITED STATES.

**END OF SECTION 1**



INTENTIONALLY LEFT BLANK

# Section 2
# Business Plan

JAY ✳ PEAK
VERMONT



INTENTIONALLY LEFT BLANK

Section 2 - Business Plan | Jay Peak Lodge and Townhouses L.P.

# CONTENTS

Note: (An appendix of financial tables is also annexed at the end of this Business Plan)

CONTENTS.................................................................................................................................1

IMPORTANT NOTICE ..............................................................................................................3

JAY PEAK LODGE AND TOWNHOUSES L.P. EXECUTIVE SUMMARY ...........................4

THE PARTNERSHIP AND ITS BUSINESS ............................................................................4

PROJECT SUMMARY..............................................................................................................5

INVESTMENT INTO PROJECT ..............................................................................................6

SOURCE AND APPLICATION OF FUNDS ............................................................................7

JAY PEAK RESORT ................................................................................................................9
    LOCATION..........................................................................................................................9
    MARKET REVIEW.............................................................................................................10

THE PROJECT: BUSINESS STRUCTURE ..........................................................................13

FLOWCHART: STRUCTURE OF BUSINESS OPERATIONS...............................................14

THE FINANCIAL TRANSACTION ........................................................................................15

TEN YEAR PROJECTIONS ..................................................................................................16
    SUMMARY OF PARTNERSHIP INCOME ........................................................................16
    SUMMARY OF PROJECTED TENANTS BUSINESS OPERATIONS FOR EACH ACTIVITY DETAILING INCOME
    GENERATED AND VISITOR SPENDING GENERATED BY THE PROJECT: .................17
    HIGHLIGHTS .....................................................................................................................19
    TOWNHOUSES AND COTTAGES INCOME STATEMENT.............................................20
    ADDITIONAL SPENDING BY OCCUPANTS OF TOWNHOUSES AND COTTAGES AND ANCILLARY FACILITIES:..21
    HIGHLIGHTS .....................................................................................................................22

TOWNHOUSES AND COTTAGES OPERATOR PROJECTIONS.........................................23
    TOWNHOUSES AND COTTAGES MANAGEMENT ........................................................24
    FACILITIES: ANALYSIS OF ACCOMMODATIONS..........................................................25

SKIER AND SUMMER SERVICES CENTER ........................................................................26
    TEN YEAR INCOME PROJECTIONS: SKIER AND SUMMER SERVICES CENTER......26
    HIGHLIGHTS .....................................................................................................................26

SKIER SERVICES CAFÉ WITHIN THE SKIER AND SUMMER SERVICES CENTER .........27
    TEN YEAR INCOME PROJECTIONS: SKIER SERVICES CAFÉ ...................................27
    HIGHLIGHTS .....................................................................................................................27

MULTI-STORY PARKING GARAGE WITH RECREATION DECK..........................................28
    TEN YEAR PROJECTIONS: MULTI-STORY PARKING GARAGE WITH RECREATION DECK.............28
    HIGHLIGHTS .....................................................................................................................28

STATESIDE AUDITORIUM ....................................................................................................29
    TEN YEAR INCOME PROJECTIONS: STATESIDE AUDITORIUM.................................29

PROJECT JOB CREATION CALCULATION:.........................................................................30
    IMPLAN SOFTWARE MODEL .........................................................................................30
    SUMMARY OF DATA APPLIED FOR IMPLAN SOFTWARE MODEL ANALYSIS .........32

1

© 2011 Rapid USA Visas, Inc. Naples, Florida USA. All Rights Reserved

DEVELOPMENT OF THE PROJECT ........................................................................................ 34

    DEVELOPMENT PHASES ................................................................................................ 34
    DEVELOPER AND CONSTRUCTION ................................................................................ 34
    DEVELOPMENT PERMITS .............................................................................................. 34

JAY PEAK RESORT CONCEPT MASTER PLAN .................................................................... 35

LODGE AND TOWNHOUSES PROJECT – CONCEPTUAL .................................................... 36

GENERAL PARTNER ........................................................................................................... 37

    FEES TO GENERAL PARTNER AND AFFILIATED ENTITIES ............................................ 37
    LIMITATION OF LIABILITY OF GENERAL PARTNER AND ACTIVE PARTICIPATION .......... 37
    PROPERTY MANAGEMENT AGREEMENT ....................................................................... 38
    DISTRIBUTIONS TO INVESTORS ................................................................................... 38
    EXIT STRATEGIES ....................................................................................................... 38
    JAY PEAK INC. RESORT MANAGEMENT TEAM .............................................................. 38
    SALES STRATEGY ....................................................................................................... 38

        JAY PEAK WINS NSAA MARKETING AWARD FOURTH YEAR IN A ROW ........................ 39
        JAY PEAK: A CASE STUDY IN SOCIAL MEDIA MARKETING FOR SKI RESORTS .............. 40

    LAND CONTRIBUTION .................................................................................................. 40

LOCATION MAP OF JAY PEAK RESORT, STATE OF VERMONT ........................................... 41

INTENTIONALLY LEFT BLANK

2

© 2011 Rapid USA Visas, Inc. Naples, Florida USA. All Rights Reserved

Section 2 - Business Plan | Jay Peak Lodge and Townhouses L.P.

# IMPORTANT NOTICE

**FORWARD LOOKING STATEMENTS:** ANY STATEMENTS THAT EXPRESS OR INVOLVE DISCUSSIONS WITH RESPECT TO PREDICTIONS, GOALS, EXPECTATIONS, BELIEFS, PLANS, PROJECTIONS, OBJECTIVES, ASSUMPTIONS OR FUTURE EVENTS OR PERFORMANCE ARE NOT STATEMENTS OF HISTORICAL FACT AND MAY BE "FORWARD LOOKING STATEMENTS. "FORWARD LOOKING STATEMENTS ARE BASED ON EXPECTATIONS, ESTIMATES AND PROJECTIONS AT THE TIME THE STATEMENTS ARE MADE THAT INVOLVE A NUMBER OF RISKS AND UNCERTAINTIES WHICH COULD CAUSE ACTUAL RESULTS OR EVENTS TO DIFFER MATERIALLY FROM THOSE PRESENTLY ANTICIPATED.

THIS BUSINESS PLAN CONTAINS FORWARD-LOOKING STATEMENTS AND PROJECTIONS THAT MAY ADDRESS, AMONG OTHER THINGS, THE VACATION RENTALS AND SKI RESORT AND ANCILLARY PROJECTS DEVELOPMENT AND STRATEGY, PROJECTED CONSTRUCTION TIMES, EXPANSION STRATEGY, DEVELOPMENT OF SERVICES, USE OF PROCEEDS, PROJECTED REVENUE AND CAPITAL EXPENDITURES, OPERATING COSTS, LIQUIDITY, JOB CREATION, ECONOMIC MODELING, DEVELOPMENT OF ADDITIONAL REVENUE SOURCES, DEVELOPMENT AND MAINTENANCE OF PROFITABLE MARKETING AND MANAGEMENT AND MAINTENANCE ALLIANCES, ABILITY TO DEVELOP "RESORT" IDENTIFICATION AND NATIONAL AND INTERNATIONAL EXPANSION, AND GENERAL PARTNER'S STATEMENTS OF EXPERIENCE AND EXPECTATIONS. NO ASSURANCE CAN BE MADE NOR IS ANY ASSURANCE GIVEN IN ANY FORM IMPLIED OR OTHERWISE THAT THESE FORECASTS WILL PROVE ACCURATE. NEITHER THE GENERAL PARTNER NOR THE LIMITED PARTNERSHIP HAS ANY OBLIGATION TO REVISE OR UPDATE ANY FORWARD LOOKING STATEMENT FOR ANY REASON.

THESE STATEMENTS MAY BE ALSO FOUND IN THE SECTIONS OF THE JAY PEAK LODGE AND TOWNHOUSES L.P OFFERING MEMORANDUM ENTITLED "SUMMARY OF OFFERING," "RISK FACTORS," "USE OF PROCEEDS," "THE PARTNERSHIP'S BUSINESS PLAN" AND IN THE OFFERING MEMORANDUM GENERALLY. ACTUAL RESULTS COULD DIFFER MATERIALLY FROM THOSE ANTICIPATED IN THESE FORWARD-LOOKING STATEMENTS AND PROJECTIONS AS A RESULT OF VARIOUS FACTORS, INCLUDING ALL THE RISKS DISCUSSED IN "RISK FACTORS" WITHIN THE OFFERING MEMORANDUM. PROSPECTIVE INVESTORS SHOULD CAREFULLY CONSIDER ALL THESE RISKS, IN ADDITION TO OTHER INFORMATION CONTAINED WITHIN THE OFFERING MEMORANDUM BEFORE DECIDING WHETHER TO INVEST IN THE PARTNERSHIP.

INTENTIONALLY LEFT BLANK

Business Consultants
Rapid USA Visas, Inc.
Naples, Florida 34110
Ph:USA 239.594.5400

Kenneth D Hulme FCCA
Chartered Certified Accountant
hulme@visausa.com

3

© 2011 Rapid USA Visas, Inc. Naples, Florida USA. All Rights Reserved

## IMPORTANT NOTICE

**FORWARD LOOKING STATEMENTS:** ANY STATEMENTS THAT EXPRESS OR INVOLVE DISCUSSIONS WITH RESPECT TO PREDICTIONS, GOALS, EXPECTATIONS, BELIEFS, PLANS, PROJECTIONS, OBJECTIVES, ASSUMPTIONS OR FUTURE EVENTS OR PERFORMANCE ARE NOT STATEMENTS OF HISTORICAL FACT AND MAY BE "FORWARD LOOKING STATEMENTS." FORWARD LOOKING STATEMENTS ARE BASED ON EXPECTATIONS, ESTIMATES AND PROJECTIONS AT THE TIME THE STATEMENTS ARE MADE THAT INVOLVE A NUMBER OF RISKS AND UNCERTAINTIES WHICH COULD CAUSE ACTUAL RESULTS OR EVENTS TO DIFFER MATERIALLY FROM THOSE PRESENTLY ANTICIPATED.

THIS BUSINESS PLAN CONTAINS FORWARD-LOOKING STATEMENTS AND PROJECTIONS THAT MAY ADDRESS, AMONG OTHER THINGS, THE VACATION RENTALS AND SKI RESORT AND ANCILLARY PROJECTS DEVELOPMENT AND STRATEGY, PROJECTED CONSTRUCTION TIMES, EXPANSION STRATEGY, DEVELOPMENT OF SERVICES, USE OF PROCEEDS, PROJECTED REVENUE AND CAPITAL EXPENDITURES, OPERATING COSTS, LIQUIDITY, JOB CREATION, ECONOMIC MODELING, DEVELOPMENT OF ADDITIONAL REVENUE SOURCES, DEVELOPMENT AND MAINTENANCE OF PROFITABLE MARKETING AND MANAGEMENT AND MAINTENANCE ALLIANCES, ABILITY TO DEVELOP "RESORT" IDENTIFICATION AND NATIONAL AND INTERNATIONAL EXPANSION, AND GENERAL PARTNER'S STATEMENTS OF EXPERIENCE AND EXPECTATIONS. NO ASSURANCE CAN BE MADE NOR IS ANY ASSURANCE GIVEN IN ANY FORM IMPLIED OR OTHERWISE THAT THESE FORECASTS WILL PROVE ACCURATE. NEITHER THE GENERAL PARTNER NOR THE LIMITED PARTNERSHIP HAS ANY OBLIGATION TO REVISE OR UPDATE ANY FORWARD LOOKING STATEMENT FOR ANY REASON.

THESE STATEMENTS MAY BE ALSO FOUND IN THE SECTIONS OF THE JAY PEAK LODGE AND TOWNHOUSES LP OFFERING MEMORANDUM ENTITLED "SUMMARY OF OFFERING," "RISK FACTORS," "USE OF PROCEEDS," "THE PARTNERSHIP'S BUSINESS PLAN" AND IN THE OFFERING MEMORANDUM GENERALLY. ACTUAL RESULTS COULD DIFFER MATERIALLY FROM THOSE ANTICIPATED IN THESE FORWARD-LOOKING STATEMENTS AND PROJECTIONS AS A RESULT OF VARIOUS FACTORS, INCLUDING ALL THE RISKS DISCUSSED IN "RISK FACTORS" WITHIN THE OFFERING MEMORANDUM. PROSPECTIVE INVESTORS SHOULD CAREFULLY CONSIDER ALL THESE RISKS, IN ADDITION TO OTHER INFORMATION CONTAINED WITHIN THE OFFERING MEMORANDUM BEFORE DECIDING WHETHER TO INVEST IN THE PARTNERSHIP.

INTENTIONALLY LEFT BLANK

Business Consultants
Rapid USA Visas, Inc.
Naples, Florida 34110
Ph:USA 239.594.5400

Kenneth D Hulme FCCA
Chartered Certified Accountant
hulme@visausa.com

3

© 2011 Rapid USA Visas, Inc. Naples, Florida USA. All Rights Reserved

# JAY PEAK LODGE AND TOWNHOUSES L.P. EXECUTIVE SUMMARY

## THE PARTNERSHIP AND ITS BUSINESS

JAY PEAK LODGE AND TOWNHOUSES L.P. IS A VERMONT LIMITED PARTNERSHIP WITH ITS PRINCIPAL PLACE OF BUSINESS IN JAY, VERMONT, AT THE SITE OF THE JAY PEAK RESORT (THE "RESORT", "JAY PEAK" OR "JAY PEAK RESORT") OWNED BY JAY PEAK, INC. (THE "RESORT OWNER"). THE FOLLOWING SUMMARY OF PRINCIPAL OBJECTIVES AND ACTIVITIES INCLUDING FINANCIAL REPORTS AND SUPPORTING SCHEDULES IS INCLUDED IN THE OFFERING FOR THE BENEFIT OF POTENTIAL INVESTORS AND SHOULD BE READ IN ITS ENTIRETY. IMPORTANT NOTICE: SEE OFFERING MEMORANDUM; RISK FACTORS "FORWARD LOOKING STATEMENTS".

## THE PROJECT: BRIEF OVERVIEW

CONSTRUCTING AND ERECTING: THREE (3) TOWNHOUSES WITH UP TO 10 UNITS IN EACH; EIGHTY (80) GOLF COTTAGE UNITS WITH ONE, TWO OR MORE BEDROOMS IN EACH; SKIER AND SUMMER SERVICES CENTER; MULTI-STORY PARKING GARAGE WITH RECREATION DECK AND AN AUDITORIUM; ALL LOCATED IN JAY PEAK RESORT, JAY, VERMONT; A TARGETED EMPLOYMENT AREA DESIGNATED AS RURAL WITH A CURRENT POPULATION OF LESS THAN 600 PEOPLE WITHIN THE STATE OF VERMONT, A USCIS DESIGNATED REGIONAL CENTER OVERSEEN BY THE STATE OF VERMONTS AGENCY OF COMMERCE AND COMMUNITY DEVELOPMENT ("VACCD").

## THE STATE OF VERMONT – A USCIS DESIGNATED REGIONAL CENTER

IN JUNE 1997, THE STATE OF VERMONT, AGENCY OF COMMERCE AND COMMUNITY DEVELOPMENT (ACCD), WAS GRANTED A DESIGNATION AS AN APPROVED REGIONAL CENTER, (SEC. 5 EXHIBIT B), BY THE THEN IMMIGRATION AND NATURALIZATION SERVICE. THE DESIGNATION WAS RENEWED AND THE ACTIVITIES EXTENDED IN MARCH 2007. A QUALIFYING INVESTMENT IN A COMMERCIAL ENTERPRISE SITUATED WITHIN THE REGIONAL CENTER, THE STATE OF VERMONT, MAY ASSIST INVESTORS IN AN APPROVED PROJECT THAT FOSTERS ECONOMIC EXPANSION THROUGH GREATER REGIONAL PRODUCTIVITY, JOB CREATION OR ADDITIONAL DOMESTIC CAPITAL INVESTMENT TO BECOME ELIGIBLE FOR ADMISSION TO THE UNITED STATES OF AMERICA AS LAWFUL PERMANENT RESIDENTS.

JAY PEAK RESORT A SKI AND GOLF RESORT COMPLEX ESTABLISHED FOR OVER 50 YEARS, AND LOCATED IN JAY VERMONT IS ALSO LOCATED WITHIN THE STATE OF VERMONT REGIONAL CENTER AND THIS PROJECT, NAMELY JAY PEAK LODGE AND TOWNHOUSES L.P. HAS BEEN STRUCTURED SO THAT FOREIGN INVESTORS MAY MEET THE REQUIREMENTS UNDER 8 U.S.C. § 1153 (B)(5)(A) – (D); INA § 203 (B)(5)(A) – (D) OF THE IMMIGRATION & NATIONALITY ACT (THE "ACT") AND QUALIFY UNDER THIS PROGRAM (THE "PROGRAM") TO BECOME ELIGIBLE FOR ADMISSION TO THE UNITED STATES OF AMERICA AS LAWFUL PERMANENT RESIDENTS WITH THE INVESTOR'S QUALIFYING FAMILY MEMBERS.

FURTHER TO THE UTILIZATION OF THE EB-5, ALIEN ENTREPRENEUR PROGRAM, ON OCTOBER 6, 2009, U.S. CITIZENSHIP AND IMMIGRATION SERVICE (USCIS) WROTE AS FOLLOWS TO THE STATE OF VERMONT, AGENCY OF COMMERCE AND COMMUNITY DEVELOPMENT (VACCD) TO AUTHORIZE EXPANDED ACTIVITIES WITHIN THE PREVIOUSLY APPROVED VERMONT REGIONAL CENTER:

THE DESIGNATION WAS REAFFIRMED. IN A WRITTEN REQUEST DATED AUGUST 17, 2009, VACCD REGIONAL CENTER SOUGHT TO AMEND ITS INITIAL REGIONAL CENTER DESIGNATION, TO EXPAND THE TYPES OF APPROVED ECONOMIC ACTIVITIES AND INDUSTRIAL CLUSTERS AS FOLLOWS

1. TO ADD MANUFACTURING, PROFESSIONAL SERVICES, EDUCATION, INFORMATION AND LENDING INSTITUTIONS TO THEIR CURRENT LIST OF APPROVED INDUSTRIES.

2. TO ADD THE ECONOMIC ACTIVITIES OF DESIGN, DEVELOPMENT AND PRODUCTION OF NEW PRODUCTS; EXPANSION OR RENOVATION OF EXISTING FACILITIES; ESTABLISHING AND EXPANDING POST SECONDARY SCHOOLS INCLUDING BUILDING, DEVELOPMENT AND OPERATION OF THE SCHOOLS; DESIGN, DEVELOPMENT & PUBLISHING OF SOFTWARE, BOOKS AND OTHER INFORMATION PUBLISHING ACTIVITIES.

3. TO PROVIDE DIRECT EQUITY INVESTMENTS IN OR TO THE INDUSTRY CLUSTERS AND/OR TO PROVIDE INDIRECT INVESTMENTS TO THE INDUSTRIES THROUGH INVESTMENT IN AN ENTERPRISE WHICH IN TURN WILL LEND THE FUNDS FOR SPECIFIC INDUSTRY RELATED PROJECT(S).

4

© 2011 Rapid USA Visas, Inc. Naples, Florida USA. All Rights Reserved

"BASED ON ITS REVIEW AND ANALYSIS OF THE REQUEST TO AMEND THE PREVIOUS VACCD REGIONAL CENTER DESIGNATION AND PRIOR AMENDED PROPOSALS, BUSINESS PLAN, AND SUPPLEMENTARY EVIDENCE, THE U.S. CITIZENSHIP AND IMMIGRATION SERVICES (USCIS), AMENDS THE DESIGNATION OF THE REGIONAL CENTER AS REQUESTED TO INCORPORATE THE ABOVE 2 CHANGES. [REFERRING TO THE EXPANSION OF "...THE TYPES OF APPROVED ECONOMIC ACTIVITIES AND INDUSTRIAL CLUSTERS...", ABOVE]. IN ACCEPTING THE AMENDMENT, USCIS HAS UPDATED ITS RECORDS OF YOUR REGIONAL CENTER APPROVAL, DESIGNATION, AND BUSINESS PLAN TO ENCOMPASS THESE AMENDMENTS RELATIVE TO THE INVESTMENT FOCUS OF THE REGIONAL CENTER ..."

IN NOVEMBER 2010 JAY PEAK LODGE AND TOWNHOUSES L.P. EXECUTED A MEMORANDUM OF UNDERSTANDING WITH VACCD, TO AUTHORIZE THIS PROJECT AS QUALIFYING INVESTMENT IN A NEW COMMERCIAL ENTERPRISE SITUATED WITHIN THE REGIONAL CENTER (SEE SECTION 5, EXHIBIT D). THE STATE OF VERMONT MAY ASSIST INVESTORS IN AN APPROVED PROJECT THAT FOSTERS ECONOMIC EXPANSION THROUGH GREATER REGIONAL PRODUCTIVITY, JOB CREATION OR ADDITIONAL DOMESTIC CAPITAL INVESTMENT TO BECOME ELIGIBLE FOR ADMISSION TO THE UNITED STATES OF AMERICA AS LAWFUL PERMANENT RESIDENTS.

## PROJECT SUMMARY

JAY PEAK LODGE AND TOWNHOUSES PHASE III-B EB-5 PROJECT IS A FURTHER PHASE OF THE JAY PEAK EB-5 EXPANSION PROJECT, PART OF THE STATE OF VERMONT APPROVED MASTER DEVELOPMENT PLAN FOR THE RESORT AND WILL COMPRISE:

- ACQUISITION OF TITLE TO THREE (3) OR MORE PARCELS OF REAL ESTATE AT THE RESORT FROM THE RESORT OWNER, AND CONSTRUCTING AND ERECTING THREE (3) TOWNHOUSE BUILDINGS WITH TEN LIVING UNITS IN EACH THAT WILL BE OWNED BY THE PARTNERSHIP AND LEASED TO AND OPERATED AS VACATION RENTAL UNITS BY A TENANT TO BE APPROVED BY THE PARTNERSHIP (THE "TOWNHOUSES"); AND

- ON LAND RETAINED BY THE RESORT OWNER THAT SITS ADJACENT TO THE CHAMPIONSHIP GOLF COURSE AT THE RESORT, AND LEASED TO THE PARTNERSHIP UNDER ONE OR MORE GROUND LEASES, CONSTRUCTING AND ERECTING EIGHTY (80) GOLF AND MOUNTAIN COTTAGES WITH ONE, TWO OR MORE BEDROOMS IN EACH THAT WILL BE OWNED BY THE PARTNERSHIP AND LEASED TO AND OPERATED AS VACATION RENTAL UNITS BY A TENANT TO BE APPROVED BY THE PARTNERSHIP (THE "COTTAGES"); AND

- ON LAND RETAINED BY THE RESORT OWNER AT THE RESORT, DEVELOPING A SKIER AND SUMMER SERVICES CENTER (THE "SERVICES CENTER"), TO BE LEASED BY THE LIMITED PARTNERSHIP FOR NOMINAL CONSIDERATION FROM THE RESORT OWNER AND SUBLEASING THE SERVICES CENTER AND ITS OPERATIONS FOR MARKET RENT TO A TENANT TO BE APPROVED BY THE PARTNERSHIP; AND

- ON LAND RETAINED BY THE RESORT OWNER AT THE RESORT, DEVELOPING A MULTI-STORY PARKING GARAGE WITH RECREATION ON THE TOP LEVEL, TO BE USED FOR LIMITED PARTNERSHIP AND PROJECT PARKING FACILITIES (THE "PARKING FACILITY"), TO BE LEASED BY THE LIMITED PARTNERSHIP FOR NOMINAL CONSIDERATION FROM THE RESORT OWNER AND SUBLEASED TO AN APPROVED TENANT; AND

- ON LAND RETAINED BY THE RESORT OWNER AT THE RESORT, DEVELOPING AN AUDITORIUM FOR CONCERTS AND EXHIBITIONS (THE "AUDITORIUM", AND TOGETHER WITH THE COTTAGES, TOWNHOUSES, PARKING FACILITY AND SERVICES CENTER, THE "PROJECT").

IT IS PROJECTED THAT THE RESORT OWNER WILL INVEST $15 MILLION IN CASH, LAND OR OTHER VALUE INTO THE PROJECT TO CREATE AND UPGRADE CERTAIN RESORT FACILITIES, INCLUDING ADDING AN ACCESS ROAD AND CONSTRUCTING ADDITIONAL SINGLE FAMILY TOWNHOUSES AND RESORT/PROJECT INFRASTRUCTURE.

THE JAY PEAK LODGE AND TOWNHOUSES L.P. PROJECT, AMOUNTING TO $45 MILLION OF DEVELOPMENT COSTS TO BE FINANCED PURSUANT TO THIS OFFERING MEMORANDUM, AND THE ADDITIONAL INVESTMENT IN CASH, LAND OR VALUE OF $15 MILLION PROJECTED TO BE PROVIDED BY THE RESORT OWNER, EQUATES TO THE ESTIMATED OVERALL DEVELOPMENT COSTS OF $60,000,000 (SEE SUMMARY OF OFFERING; PROJECT SUMMARY).

CREATING THE COTTAGES, TOWNHOUSES, SERVICES CENTER, AUDITORIUM AND PARKING FACILITY WILL AID THE FURTHER EXPANSION OF JAY PEAK AS AN "ALL SEASONS RESORT." JAY PEAK LODGE AND TOWNHOUSES L.P. WILL STIMULATE ECONOMIC DEVELOPMENT AND IS PROJECTED TO CREATE MANY NEW JOBS AT THE RESORT, IN THE

5

© 2011 Rapid USA Visas, Inc. Naples, Florida USA. All Rights Reserved

GREATER JAY PEAK REGION, WITHIN THE STATE OF VERMONT REGIONAL CENTER, AND IN THE REST OF THE UNITED STATES.

# INVESTMENT INTO PROJECT

THE LODGE AND TOWNHOUSES PHASE III-B PROJECT IS OPEN BOTH TO US INVESTORS, AND FOREIGN INVESTORS, WITH EACH FOREIGN INVESTOR SEEKING CLASSIFICATION AS AN "ALIEN ENTREPRENEUR" AS REQUIRED BY LAW TO CURRENTLY INVEST $500,000 USD TO THE PROJECT. THE PROJECT WILL REQUIRE INVESTMENT AMOUNTING TO $45 MILLION OF DEVELOPMENT COSTS TO BE FINANCED PURSUANT TO THIS OFFERING MEMORANDUM; WHICH WILL BE SUPPLEMENTED WITH THE ADDITIONAL INVESTMENT IN CASH, LAND OR VALUE OF $15 MILLION PROVIDED BY THE RESORT OWNER, RAISING THE ESTIMATED OVERALL DEVELOPMENT COSTS TO $60,000,000 (SEE SUMMARY OF OFFERING; PROJECT SUMMARY).

THE ARCHITECTURAL PLANS ARE IN THE COURSE OF PREPARATION AND SOME BUILDING PERMITS ARE BEING APPLIED FOR. UPON APPROVAL AND AFTER ISSUANCE OF ALL PERMITS, IT IS ANTICIPATED THAT BUILDING WORK WILL COMMENCE ON THE NEW TOWNHOUSES AND GOLF COTTAGES COMPLEX. THIS WILL CONSUME MOST OF THE CASH INVESTED INTO THE PARTNERSHIP OVER A 12 MONTH PERIOD. THE COMBINED TOWNHOUSES AND GOLF COTTAGES ALONG WITH THE ANCILLARY PROJECTS ARE PROJECTED TO OPEN IN WINTER SEASON OF 2013.

THE INVESTMENT PROJECT WILL AFTER COMPLETION OF THE DEVELOPMENT PHASE SHORTLY THEREAFTER START TO PROVIDE THE INVESTOR WITH A MONTHLY INCOME FROM LEASE RENTAL PAYMENTS.

BY CREATING THIS TOWNHOUSES, GOLF COTTAGES AND THE ANCILLARY PROJECTS, AND AIDING A FURTHER PORTION OF THE STATE OF VERMONT APPROVED JAY PEAK RESORT MASTER EXPANSION PLAN FOR THE TRANSITION OF JAY PEAK INTO AN "ALL SEASONS RESORT," JAY PEAK LODGE AND TOWNHOUSES L.P. WILL STIMULATE ECONOMIC DEVELOPMENT AND CREATE MANY NEW PERMANENT JOBS AT THE RESORT, IN THE GREATER JAY PEAK REGION, WITHIN THE STATE OF VERMONT REGIONAL CENTER AND OUTSIDE THE REGIONAL CENTER.

INTENTIONALLY LEFT BLANK

© 2011 Rapid USA Visas, Inc. Naples, Florida USA. All Rights Reserved

Section 2 - Business Plan | Jay Peak Lodge and Townhouses L.P.

# SOURCE AND APPLICATION OF FUNDS

THE TABLE BELOW DEPICTS THE TOTAL FUNDS INTO THE PROJECT AND THE SOURCE OF FUNDS. INVESTORS ARE BEING OFFERED THE OPPORTUNITY TO PURCHASE LIMITED PARTNERSHIP INTERESTS. THE CAPITAL CONTRIBUTION OF EACH LIMITED PARTNER TO THE PROJECT SHALL BE A MINIMUM OF $600,000 IN CASH, WHICH SHALL BE APPLIED TO THE PROJECT AS INVESTOR FUNDS. THE LIMITED PARTNER SHALL NOT BE OBLIGATED TO MAKE ANY ADDITIONAL CAPITAL CONTRIBUTIONS TO THE PARTNERSHIP. THE TOTAL OF INVESTMENT FUNDS TO BE RECEIVED FROM LIMITED PARTNERS IS $45,000,000. ADDITIONALLY JAY PEAK INC. WILL CONTRIBUTE IN CASH, ASSETS AND SERVICES A TOTAL VALUE OF $15,000,000 AND THE USE OF THESE FUNDS IS DETAILED IN THE TABLE AND RELATED NOTES DETAILED BELOW.

SEE NEXT PAGE

INTENTIONALLY LEFT BLANK

7

© 2011 Rapid USA Visas, Inc. Naples, Florida USA. All Rights Reserved

Section 2 - Business Plan | Jay Peak Lodge and Townhouses L.P.



## JAY PEAK LODGE & TOWNHOUSES L.P.
## 90 EB-5 INVESTORS $45,000,000

**Townhouses, Golf & Ski Cottages Complex, and Skier and Summer Services Lodge**

$60m Project Underwritten by $45m from EB-5 Investors, $15m from Jay Peak

| OWNED BY L.P. | | UNITS | | COST | TOTALS |
|---|---|---|---|---|---|
| VACATION RENTAL TOWNHOUSES: Approx. 1,200 sq ft each unit, built in blocks of ten units | | | Per Unit Block | Blocks | |
| ADJACENT TO SKI-SLOPES: ZONE I | | Cost Sq. ft | | 3 | |
| Block of three buildings: Total sq ft. each Bldg | 13,530 | $230 | $3,111,900 | $3,111,900 | |
| TOTAL SQ FT: | 40,590 | $230 | | | $9,335,700 |
| Fit Out/Furnishings | $30,000 per each res unit | $30,000 | $300,000 | $900,000 | $900,000 |
| Infrastructure | $200,000 each block (three blocks) | | $200,000 | $600,000 | $600,000 |
| | | | | TOTAL | $10,835,700 |
| Construction Supervision Costs | | Based upon: | $10,835,700 | | |
| Supervision | | | 15% | | $1,625,355 |
| Supevision Exepenses | | | 5% | | $541,785 |
| | | | | SUB-TOTAL | $13,002,840 |
| VACATION RENTAL COTTAGES: Approx. 1,100 sq ft average each unit | | | Total Living Units | 80 | |
| ADJACENT TO SKI-SLOPES AND GOLF COURSE: ZONE F | | Unit Cost | | | |
| | 1100 sq ft | $192,500 | | $7,700,000 | |
| | 1100 sq ft | $192,500 | | $7,700,000 | |
| Fit Out/Furnishings | $25,000 per each res unit | $25,000 | | $2,000,000 | $17,400,000 |
| Infrastructure | $15,000 Pad: | 80 | 15000 | $1,200,000 | $1,200,000 |
| | | | | TOTAL | $18,600,000 |
| Construction Supervision Costs | | Based upon: | $18,600,000 | | |
| Management Fee | | | 10% | | $1,860,000 |
| Supervision Expenses | | | 5% | | $930,000 |
| | | | | SUB-TOTAL | $21,390,000 |
| OWNED BY JAY PEAK: LEASED TO L.P. | | | | | |
| SKIER AND SUMMER SERVICES CENTER WITH SKIER CAFÉ | | | | | |
| 150 Persons Capacity | 12,000 sqft | $240 | | | $2,880,000 |
| Fit Out/Furnishings | | | | | $870,000 |
| PARKING GARAGE WITH TENNIS COURTS | | | | | $2,200,000 |
| Fixtures and Equipment | | | | | $480,000 |
| OWNED BY JAY PEAK: | | | | | |
| AUDITORIUM | | | | | $550,000 |
| Fit Out/Furnishings | | | | | $260,000 |
| TOTAL ANCILLARY FACILITIES | | | | | $7,180,000 |
| OTHER COSTS: | | | Credit re: Parking (50%) | -$1,340,000 | |
| LAND: Town Homes- per unit | 30 | $32,000 | $960,000 | $960,000 | |
| Golf Cottage pads | 80 | $35,000 | $1,800,000 | $2,800,000 | $2,417,160 |
| | | | | $3,760,000 | |
| PARKING, PATHWAYS etc. | | | | | $900,000 |
| Working Capital | | | | | $107,160 |
| TOTAL OTHER COSTS | | | | | $3,427,160 |
| TOTAL: EB-5 INVESTMENT FUNDS | | | | | $45,000,000 |
| | | | | | |
| JAY PEAK PROJECT CONTRIBUTIONS | | | | | |
| Access Rd: #2 | | $300,000 | | | $300,000 |
| Main Drainage and Storm Water Allocation | | $2,000,000 | | | $2,000,000 |
| RESORT SINGLE FAMILY TOWN HOMES: Upper Stateside Area | | $11,700,000 | | | $11,700,000 |
| General Infrastructure | | $1,000,000 | | | $1,000,000 |
| FUNDS FROM JAY PEAK INC. | | | | | $15,000,000 |
| TOTAL PROJECT INVESTMENT FUNDS | | | | | $60,000,000 |

Report prepared by Rapid USA Visas, Inc. Naples FL : K Douglas Hulme FCCA Chartered Certified Accountant Tel: 239.594.5400

5/9/2011

8

© 2011 Rapid USA Visas, Inc. Naples, Florida USA. All Rights Reserved

# JAY PEAK RESORT

ALTHOUGH JAY PEAK LODGE AND TOWNHOUSES L.P. IS A NEWLY FORMED ENTITY, JAY PEAK RESORT HAS BEEN A SUCCESSFUL, LARGELY WINTER RESORT FOR OVER 50 YEARS AND IS ONE OF THE LEADING SKI RESORTS IN NORTH AMERICA. JAY PEAK, (WWW.JAYPEAKRESORT.COM) WITH 344 INCHES OF AVERAGE ANNUAL SNOWFALL, THE HEAVIEST NATURAL SNOWFALL OF ANY SKI RESORT IN THE EAST, IS, WITH ITS NEW 18-HOLE CHAMPIONSHIP GOLF COURSE OPENED IN JUNE 2007, FAST BECOMING AN ESTABLISHED YEAR-ROUND FAMILY RESORT. THE COMPLETION AND OPENING OF THE PHASE I EB-5 PROJECT FOR A 57 UNIT ALL-SUITE HOTEL IN 2009; AND THE OPENING IN 2010 OF THE ICE HAUS ARENA AND GOLF CLUBHOUSE CENTER, BOTH FACILITIES BEING A PART OF THE ANCILLARY PROJECTS WITHIN THE PHASE II EB-5 PROJECT. WITH A FULL ONGOING CONSTRUCTION PROGRAM FOR PHASE II AND PENTHOUSE, THE PROJECTED OPENING ON THE PHASE II INDOOR WATER PARK IN NOVEMBER 2011, ALL-SUITE 120 UNIT HOTEL IN JANUARY/FEBRUARY 2012; AND THE PENTHOUSE SUITES SHORTLY THEREAFTER, THE JAY PEAK EB-5 VISA PROGRAM CONTINUES TO BE AN OUTSTANDING SUCCESS. ALL INVESTOR PETITIONS FOR PHASE I AND PHASE II FILED AND ADJUDICATED WITH USCIS HAVING BEEN APPROVED, A 100% SUCCESS RATE, THESE PROJECTS HAVE BEEN AN OUTSTANDING SUCCESS FOR THE CREATION OF NEW JOBS IN THE STATE OF VERMONT, FOR THE IMMIGRANT INVESTORS AND THEIR FAMILIES, MAKING A NEW LIFE IN THE USA, AND FOR JAY PEAK RESORT.



*Phase 1 EB-5 Project, February 2011*



*Jay Peak Championship Golf Course*

WITH AN ESTABLISHED ALPINE AND NORDIC SKI TRAIL SYSTEM AND CHAMPIONSHIP GOLF COURSE, WHICH WAS RECENTLY VOTED BEST IN VERMONT FOR 2011 BY BOTH GOLF WEEK MAGAZINE AND GOLF DIGEST, ALREADY AT THE RESORT, THE NEW LODGE AND TOWNHOUSES PROJECT WILL PROVIDE ADDITIONAL ACCOMMODATIONS AND ANCILLARY FACILITIES FOR SKIERS, GOLFERS AND OTHER VISITORS. TOWNHOUSES AND COTTAGES WILL BE LOCATED ADJACENT TO AND AROUND THE SKI TRAIL NETWORK AND CHAMPIONSHIP GOLF COURSE, SURROUNDED WITH PRISTINE VIEWS OF THE MOUNTAINS AND VALLEY, PROVIDING THE PERFECT SETTING FOR THOSE SKIERS, GOLFERS AND OTHER VISITORS SEEKING A VACATION PACKAGE EXPERIENCE BEYOND THE ORDINARY. IN WINTER, THE COTTAGES WILL BE FEATURED AS SKI CHALETS, AND THE GOLF COURSE AND NEWLY OPENED GOLF CLUB HOUSE WILL CONVERT TO A NORDIC SKIING CENTER WITH AN EXPANSIVE NETWORK OF PATHS AND TRAILS FOR CROSS COUNTRY SKIING AND SNOWSHOEING. THE TOWNHOUSES WILL HAVE SKI-IN/SKI-OUT ACCESS TO ALPINE SKI TRAIL SYSTEM. THE COTTAGES AND TOWNHOUSES WILL BE CENTRALLY LOCATED AT THE RESORT WITH EASY ACCESS TO ALL RESORT AMENITIES, AND PROVIDE WONDERFUL INDOOR AND OUTDOOR LIVING FOR THE ULTIMATE "APRÈS-GOLF" OR "APRÈS-SKI" EXPERIENCE AT ALL TIMES OF THE YEAR.

THE LODGE AND TOWNHOUSES PROJECT ALSO FEATURES A LODGE STYLE SKIER AND SUMMER SERVICES CENTER THAT INCORPORATES A CAFE WITH TERRACES FOR DINING AND RELAXATION TO BE LOCATED AT THE BASE SLOPES OF WHAT IS CALLED THE STATESIDE AREA OF THE RESORT. THE CONSTRUCTION OF A NEW MULTI-STOREY PARKING GARAGE WITH RECREATION LEVEL FOR TENNIS AND OTHER ACTIVITIES AND THE CONSTRUCTION OF A NEW AUDITORIUM WILL FURTHER ENHANCE THE RESORT ACTIVITIES FOR SUMMER VISITORS.

## LOCATION

JAY PEAK RESORT IS LOCATED IN THE CENTRAL PORTION OF NORTHERN VERMONT, APPROXIMATELY 65 MILES NORTHEAST OF BURLINGTON, VERMONT AND APPROXIMATELY 90 MILES SOUTHEAST OF MONTREAL, QUEBEC. THE RESORT IS LOCATED IN THE TOWN OF JAY, VERMONT IN ORLEANS COUNTY, TWO AIR MILES FROM THE CANADIAN BORDER. THE RESORT (FOUNDED IN 1955) HAS EVOLVED AS A WINTER ALPINE SKI RESORT OVER THE PAST 50 YEARS. IN RECENT YEARS, JAY PEAK HAS BEEN WORKING TOWARD THE CREATION OF A YEAR-ROUND RESORT SO THAT ECONOMIC VIABILITY IS STRENGTHENED, NEW PERMANENT JOBS ARE CREATED, AND THE REGION PROSPERS FROM THIS 4-SEASON ECONOMIC STRUCTURE. JAY PEAK HAS 75 SKI TRAILS, GLADES AND CHUTES COVERING APPROXIMATELY 450 ACRES, DIVIDED APPROXIMATELY 50% FOR INTERMEDIATE SKIERS (APPEALING TO THE MAJORITY OF SKIERS), 25% FOR EXPERT SKIERS AND 25% FOR BEGINNING SKIERS. THE TRAIL AND LIFT SYSTEM ALLOWS FOR A SUBSTANTIAL INCREASE IN SKIER VISITS AND PERMITS A COMFORTABLE LEVEL OF UTILIZATION, WITH LOWER THAN

© 2011 Rapid USA Visas, Inc. Naples, Florida USA. All Rights Reserved

Section 2 - Business Plan | Jay Peak Lodge and Townhouses L.P.

AVERAGE LIFT LINES COMPARED TO OTHER MAJOR SKI RESORTS IN VERMONT. JAY PEAK RESORT LAND AREA CONSISTS OF APPROXIMATELY 4,000 ACRES. ABUNDANT WATER IS AVAILABLE TO THE PROPERTY AND A MODERN $7 MILLION CENTRAL SEWAGE TREATMENT FACILITY HAS BEEN COMPLETED BY THE TOWNS OF JAY AND TROY. ACCESS TO THE RESORT IS CONVENIENT AND EASY FOR FAMILIES THROUGHOUT NEW ENGLAND, NEW YORK, BOSTON, AND THE PROVINCE OF QUEBEC IN CANADA, WITH MONTREAL AND ITS OVER 3 MILLION PEOPLE BEING ONLY AROUND 90 MINUTES DRIVE OR LESS TO JAY PEAK. IN FACT, JAY PEAK IS LOCATED WITHIN 6 HOURS DRIVE OF OVER 60 MILLION PEOPLE

## MARKET REVIEW



Jay Peak Golf Clubhouse opened June 2010

THE MOMENTUM THAT JAY PEAK IS CREATING IS IN LARGE PART DUE TO THE FACT THAT JAY PEAK HAS BEEN TRUE TO THEIR PLAN AND TRUE TO THEIR STRATEGY AND THE MARKET RECOGNIZING THAT DEPENDABILITY AND CONTINUITY. THE THEME BRAND DEVELOPMENT OF JAY PEAK IS BASED ON MAXIMIZING THE BRAND STRENGTHS OF VERMONT WHICH ARE ENVIRONMENTAL FRIENDLINESS, GREEN TECHNOLOGY, AUTHENTICITY OF PRODUCT BOTH IN DESIGN ARCHITECTURE AND OPERATIONS ALL LOCATED IN THE MIDDLE OF THE MOST AUTHENTIC AND GENUINE SETTING IN THE STATE WITH RURAL NATURAL LANDSCAPE BOTH AT JAY PEAK AND IN THE SURROUNDING COMMUNITIES.

THE RESORT MASTER DEVELOPMENT PLAN WAS APPROVED BY THE TOWN OF JAY AND STATE OF VERMONT IN 1997 AND INCLUDED A FEDERALLY FUNDED SEWAGE TREATMENT PLANT FACILITY TO ACCOMMODATE ALL OF JAY PEAK'S PROJECTED GROWTH NEEDS. THE TOWN OF JAY HAS ENDORSED JAY PEAK'S EXPANSION PLANS IN LINE WITH THEIR MASTER PLANS BOTH LOCALLY AND REGIONALLY. THE RESORT MASTER PLAN PROVIDES IDENTIFICATION OF CURRENT AND CONTEMPORARY BED BASE DEVELOPMENT PODS IN THE VARIOUS LOCATIONS THAT ARE CONSIDERED TO BE OF GREATEST DEMAND WHILE ADHERING TO ENVIRONMENTAL CONCERNS AND IN KEEPING WITH THE NATURAL SETTING AND BEAUTY OF THE RESORT. THE CONTINUED GROWTH AND EXPANSION AT THE RESORT IS CONSISTENT WITH THE APPROVED MASTER PLAN AND DEMONSTRATES CONTINUITY FROM INITIAL EXPANSION TO THE CURRENT IMPLEMENTATION.

JAY PEAK IS ONE OF THE FOUR LARGEST SKI MOUNTAINS AND SKI RESORT FACILITIES IN ALL OF NEW ENGLAND, YET CURRENTLY HAS THE SMALLEST BED BASE OF ANY MAJOR SKI RESORT, WITH LESS THAN 1,500 BEDS AT PRESENT. RESORTS THAT JAY PEAK COMPETES WITH HAVE NO LESS THAN 10,000 BEDS PER RESORT AND SOME AS HIGH AS 20,000 BEDS.



Vermont Governor Peter Shumlin visits Bill Stenger at the Indoor Water Park March 2011

MANY VISITORS TO THE RESORT PREVIOUSLY ONLY HAD THE OPPORTUNITY TO VISIT AS DAY TRIPPERS OR IN SOME INSTANCES SEEK ALTERNATE ACCOMMODATIONS. VISITORS OFTEN PASS ON JAY PEAK DUE TO INSUFFICIENT AVAILABLE ACCOMMODATIONS. THE CONTINUED EXPANSION OF RESORT AMENITIES, INCLUDING FACILITIES THAT NO OTHER SKI RESORT IN EASTERN NORTH AMERICA CURRENTLY HAVE AVAILABLE, AND IS EXPECTED TO CAUSE A RAPID ACCELERATION IN DEMAND FOR ACCOMMODATIONS AT JAY PEAK RESORT. ADVANCED MARKETING OF THE PHASE II FACILITIES HAS BEGAN AND IT IS PROJECTED THAT FOR ALL OF THE ACCOMMODATIONS JAY PEAK IS CURRENTLY BUILDING AND PLANNING TO BUILD, THERE WILL BE AN IMMEDIATE DEMAND.

FUTURE MARKET DEVELOPMENT WILL BE ENHANCED AS JAY'S POSITIONING AND PHYSICAL CHARACTERISTICS PROVIDE SUBSTANTIAL ADVANTAGES OVER OLDER, LESS ENVIRONMENTALLY SENSITIVE FACILITIES. WINTER BUSINESS WILL CONTINUE TO FOCUS ON BOTH ALPINE AND CROSS COUNTRY/NORDIC SKIING AND THE SKI VACATION PRODUCT. FAMILY SKI VACATIONS, SKI CLUB OUTINGS AND INDIVIDUAL AND COUPLES' BUSINESS WILL PROVIDE THE FRAMEWORK FOR WINTER BUSINESS DEVELOPMENT.

ACCENTUATING THE TWO AND THREE DAY WEEKEND STAY, AND THE THREE, FIVE, AND SEVEN-DAY SKI WEEK EXPERIENCE WILL BE THE PRIMARY FOCUS OF THE RESORT'S WINTER MARKETING EFFORTS. THE RESORT'S MARKETS FOR WINTER ACTIVITY AND HOTEL UTILIZATION WILL BE EASTERN CANADA, ALL OF NEW ENGLAND AND THE MID-ATLANTIC STATES OF THE UNITED STATES. FURTHER DESTINATION MARKETS SUCH AS THE MID-SOUTH AND FLORIDA

10

© 2011 Rapid USA Visas, Inc. Naples, Florida USA. All Rights Reserved