## **DECLARATION OF MICHAEL I. GOLDBERG, ESQ.**

Pursuant to 28 U.S.C. Section 1746, the undersigned states as follows:

1.  My name is Michael I. Goldberg. I am over twenty-one years of age and have personal knowledge of the matters set forth herein.

2.  On April 13, 2016, I was appointed as Receiver by the Hon. Darrin Gayles in the case of SEC v. Jay Peak, Inc., Case No. 16-CV-21301-GAYLES, in the Southern District of Florida. The receivership included the 15 corporate entities that are Defendants in this case, as well as the four Relief Defendants (collectively "the Receivership Entities").

3.  Since taking possession of the Receivership Entities and their bank and other financial accounts, I have learned that the Receivership Entities are in dire financial position and in danger of not having sufficient funds to continue operating beyond the very immediate future. In sum, the Receivership Entities have very little cash on hand, and numerous upcoming expenses that will quickly use up that cash. If I am not able to obtain additional sources of funding through a loan or line of credit, it is highly likely I will have to scale back or shut down operations at both the Jay Peak and Q Burke resorts.

4.  Information provided by three financial institutions where the Receivership Entities have accounts – People's United Bank, Merrill Lynch, and Citibank – show only about $4.7 million in frozen funds immediately available to the Receivership Entities to finance operations. As discussed below, that is far short of the cash the Receivership Entities need to continue operations.

5.  The majority of the revenue for the Jay Peak Resort is generated from October through April, when the mountain is open for skiing. From May through October, the off season, the Resort does not general sufficient revenue to cover its expenses. Accordingly, the

## EXHIBIT A

Resort operator has to generate sufficient cash during the ski season to carry it through the off season, or borrow money during the off season to meet expenses. By way of example, during last year's off season the Jay Peak Resort had arranged a $2 million line of credit with a bank to meet its operational needs.

6. Because of this year's extremely warm winter and lack of snow, the Jay Peak Resort did not generate as much cash as last year, and not nearly enough to meet its expenses for the upcoming off season. I believe that Mr. Quiros was aware of this – in fact he had been attempting to obtain a $4 million line of credit when the SEC filed its case and I was appointed Receiver. The line of credit was not executed, and because of the present circumstances, is not available to me now.

7. Our initial evaluation shows we will need at least $7 million and as much as $11.5 million to keep the Jay Peak resort open and operating through the off season. Moreover, I have been informed that the gondola system, which is needed to transport skiers to the top of the Jay Peak mountain, requires major and immediate repairs to meet the State of Vermont's safety standards. The system is 52 years old. The gondola's manufacturer, which is the only company in the world capable of properly repairing the gondola, has quoted the Jay Peak Resort a $4.15 million price to complete the repairs. This requires an immediate 30 percent down payment – approximately $1.3 million – and an additional $800,000 later in the summer, with the balance due early next year. If the gondola becomes non-operational, the Resort will not be able to transport skiers to the top of the mountain, and will not survive.

8. In addition, we are facing a daily barrage of demands for payment from numerous vendors. On April 20 alone, my management team had conversations with soft drink, internet service, gasoline and food services suppliers, all of whom in one fashion or another

threatened to cut off service or require cash payments. There are hundreds of vendors whom Jay Peak owes money, and if we do not come up with additional funds soon, the Resort will cease operating.

9. Because of the extensive publicity over the SEC's case and my appointment, we have been contacted by several groups and parties that had made reservations to hold events at the Resort, including a large meeting of a major car manufacturer scheduled for mid-June as well as several wedding parties. Jay Peak is required to complete $34,000 in improvements to meet the car manufacturer's requirements. My staff has spent countless hours trying to assure these future guests that the Resort will be open for business and will be able to accommodate their needs. Any loss of any of this business will further plunge the Resort into financial chaos.

10. The Q Burke Resort is in equally poor financial condition, as detailed in my recent motion seeking Court approval to have Jay Peak loan the Q Burke Resort money. More specifically, the hotel there has been recently completed and is ready to open, but cannot obtain a certificate of occupancy because of a dispute with the general contractor. The contractor claims the Resort owes it more than $3.9 million, and has apparently placed a lien on the hotel. The contractor is also holding the hotel's certificate of occupancy in escrow and refusing to deliver it until it receives payment. As detailed in my recent motion, the Q Burke Resort has almost no cash to fund operations or resolve this dispute.

11. Based on the foregoing, both Jay Peak and Q Burke resorts must immediately borrow millions of dollars to maintain their viability. If they "go dark," a great deal of their value will be lost. Accordingly, over the past week, I have engaged in preliminary discussions with several parties to attempt to arrange a loan. If the status of the receivership remains in limbo, and if there is even the slightest chance that Mr. Quiros will be put back in control, the

potential lenders I am speaking with will most likely refuse to lend any money to the Receivership Entities. Before the Court rules on the SEC's request for a preliminary injunction and to continue the asset freeze, I cannot give potential lenders any assurances that I will remain in control of the entities and be able to engage in a long-term plan to continue operations and improve the finances. Therefore, from the Receiver's perspective, it is imperative that the Court hold the preliminary injunction hearing and rule on the request for a preliminary injunction as soon as possible to enable me to arrange the necessary loans in time to keep both Resorts open and operating. I ask that the Court not postpone the Show Cause hearing on the SEC's request for a preliminary injunction now scheduled for 9:30 a.m. on April 25, 2016.

I declare under penalty of perjury that the foregoing is true, correct, and made in good faith.

_____
Michael I. Goldberg

Executed on this 21st day of April, 2016.