## **DECLARATION OF MICHAEL I. GOLDBERG, ESQ.**

Pursuant to 28 U.S.C. Section 1746, the undersigned states as follows:

1.      My name is Michael I. Goldberg. I am over twenty-one years of age and have personal knowledge of the matters set forth herein.

2.      I am a licensed attorney in Florida, and a partner in the firm of Akerman LLP. I also have an MBA in finance. I have served as a Court-appointed Receiver or as counsel to Court-appointed Receivers in federal equity receiverships for 25 years. I have been appointed as a Receiver in approximately 20 receiverships by judges in the Southern and Middle Districts of Florida. A portion of my CV is attached as Exhibit A to this declaration.

3.      On April 13, 2016, I was appointed as Receiver by the Hon. Darrin Gayles in the case of SEC v. Jay Peak, Inc., Case No. 16-CV-21301-GAYLES, in the Southern District of Florida. The receivership included the 15 corporate entities that are Defendants in this case, as well as the four Relief Defendants (collectively "the Receivership Entities").

4.      That same day, I worked with a team of approximately 15 lawyers, accountants, and hospitality management experts to carry out the terms of the Order appointing me ("Receiver Order"). I took possession of the premises and operations of the Receivership Entities at the Jay Peak and Q Burke Mountain Resorts in Vermont, as well as offices in Miami, Florida. *See* Receiver Order at ¶1. The Receiver Order also granted me authority over all bank and other financial institution accounts under the direct or indirect control of the Receivership Entities. *Id.* at ¶7.

5.      Since that time, I have, among other things, investigated to the best of my ability the manner in which the affairs of the Receivership Entities were conducted (*see* Receiver Order at ¶2); and attempted to understand the complicated and convoluted manner in which the

EXHIBIT A

Receivership Entities conducted financial transactions.

6. In coordination with the Securities and Exchange Commission, I and lawyers and accountants under my direction obtained information from several different financial institutions about amounts in accounts belonging to the Receivership Entities as well as Defendant Ariel Quiros (over whom the Court entered an asset freeze, *see* D.E. 11) and accounts in the names of entities under the control of Quiros. In addition, I and accountants and management personnel working under my direction obtained numerous financial statements from the CFO of Defendant Jay Peak, Inc. as of the date I was appointed.

7. The combination of the account and financial statements paint a very bleak financial picture. The Receivership entities have very little cash, and numerous upcoming expenses that will quickly use up available cash and, if additional money is not obtained, force the Receiver to shut down operations at Jay Peak and eliminate any possibility of Q Burke opening. This is a very different situation than the one claimed by Ariel Quiros in his sworn investigative testimony before the SEC.

8. For example, I note Quiros testified in September 2015 at the SEC under oath that Jay Peak's EBITDA (generally a measure of pre-tax profits) "this year" were approximately $12 million to $13 million. DE 4 at Ex. 13 (Quiros Testimony at 391 L.22-25). A short time later, Quiros stated EBITDA, or profits, were about $8 million. *Id.* at 394 L.11-20. It is unclear exactly what Quiros meant by "this year," but I have not seen any financial statement showing Jay Peak made EBITDA of anywhere near $8 million, much less $12 million to $13 million.

9. I have learned through my investigation that Jay Peak operates on a May 1 through April 30 fiscal year. Quiros' testimony was given in September 2015. I learned that the Jay Peak financial statements show that in FY 2015 (May 1, 2014 through April 30, 2015), Jay

Peak's profits EBITDA was approximately $3 million. For FY 2014, that figure was $2.6 million. Through February 2016, it appears Jay Peak is on track for EBITDA (profits) of $1.8 million for FY 2016.

10. My assessment of the ski resort operations after examining the financial records available to me and meeting with former CFO George Gulisano and the accountants and management company I retained to examine and manage Jay Peak, is that the ski resort operations are currently losing money and in danger of not having sufficient funds to continue operating beyond the very immediate future.

11. The majority of the revenue for the Jay Peak Resort is generated from October through April, when the mountain is open for skiing. From May through October, the off season, the Resort does not generate sufficient revenue to cover its expenses. For example, I have learned that Jay Peak had to secure a $2 million line of credit from a bank to have enough cash flow to finance operations through last off season. That line of credit was secured by the Jay Peak ski resort.

12. Furthermore, I learned that due to reduced revenues during the 2015-16 winter ski season because of warm weather and little snow, the Jay Peak Resort did not generate as much cash as last year, and not nearly enough to meet its expenses for the upcoming off season. I believe that Quiros was aware of this – in fact the Jay Peak Resort had been attempting to obtain a line of credit or bridge loan of at least $4 million with the same bank so Jay Peak would have sufficient cash flow to finance operations through the upcoming off season. Under the terms of that proposed agreement (which was not executed before the Court appointed me as Receiver), the assets of Jay Peak would secure it. I have been informed by the Resort managers that the Resort needs between $7 million and $11.5 million to finance its operations and be kept open

3

through the current off season.

13. Moreover, I have been informed that the gondola system, which is needed to transport skiers to the top of the Jay Peak mountain, requires major and immediate repairs to meet the State of Vermont's safety standards. The system is 52 years old. The gondola's manufacturer, which is the only company in the world capable of properly repairing the gondola, has quoted the Jay Peak Resort a $4.15 million price to complete the repairs. This requires an immediate 30 percent down payment – approximately $1.3 million – and an additional $800,000 later in the summer, with the balance due early next year. If the gondola becomes non-operational, the Resort will not be able to transport skiers to the top of the mountain, and will not survive.

14. In addition, we are facing a daily barrage of demands for payment from numerous vendors. On April 20 alone, my management team had conversations with soft drink, internet service, gasoline and food services suppliers, all of whom in one fashion or another threatened to cut off service or require cash payments. There are hundreds of vendors whom Jay Peak owes money, and if we do not come up with additional funds soon, the Resort will cease operating.

15. Because of the poor financial condition in which I found the Receivership entities under Quiros' management, there is insufficient cash in the Jay Peak and related accounts for me to meet Jay Peak's operational needs through the off season. Documents provided by People's United Bank, Citibank, and Merrill Lynch, show that about $4.7 million were either frozen or available in the account of each entity as of April 13, 2016:

- Jay Peak -- $1,149,198.65
- Jay Peak Hotel Suites Phase II LP (Phase II) -- $1,480,861.72
- Jay Peak Penthouse Suites (Phase III) -- $1,955.37
- Jay Peak Golf and Mountain Suites (Phase IV) -- $6,991.17
- Jay Peak Lodge and Townhouses (Phase V) -- $16,743.37

4

- Jay Peak Hotel Suites Stateside (Phase VI) -- $19,545.85[1]
- Q Resorts -- $1,283,690.22
- Jay Construction Management -- $484,116.70[2]
- GSI of Dade County -- $277,555.90

16.  There is an additional $1.35 million currently in a Canadian bank which is not subject to the Court's jurisdiction and will take some time to secure. Therefore, the total amount of money in those accounts available to me to finance Jay Peak operations is about $4.7 million.[3] This is insufficient to meet the operating needs of the Resort. As discussed above, I need $7 million to $11.5 million for operating expenses and an additional $4.15 million for the gondola repairs. On this basis alone, if I am unable to borrow money to cover the off season operating losses, the Jay Peak Resort will not make it to the ski season.

17.  Because we are entering the slow season, we expect very little in the way of cash from ongoing guests. By way of example, there were only seven rooms occupied at the Jay Peak Hotel when I was there on April 14, 2016.

18.  Furthermore, as part of an exit strategy for Phase I investors, Quiros and his companies re-purchased each of the 35 Phase I investors' $500,000 interest (a total of $17.5 million) and issued them promissory notes. Records show Phase I has paid each investor at most $75,000 of the $500,000. That means in total Phase I has only paid at most $2,625,000, and

---

[1] I detail the extreme shortfall in money needed to complete the Stateside project in Paragraphs 19 and 20 below.

[2] I discuss the amounts found in the JCM accounts in more detail in Paragraphs 20 and 22 below.

[3] This total does not include approximately $17.8 million held at People's United Bank in a restricted account in the name of Jay Peak Biomedical Research Park – the Phase VII limited partnership. Because that money was invested by investors for the specific purpose of constructing Phase VII, absent the Court's authorization, I cannot use that money to fund Jay Peak's operations under the terms outlined in the Phase VII offering documents and the limited partnership agreement. This total also does not include about $366,000 frozen in accounts in the name of Quiros or under his control. Finally, it does not include about $800,000 frozen in the name of various Q Burke accounts. As discussed in the Receiver's Emergency Motion For Authorization To Loan Funds (DE 43) and in Paragraph 21 below, Q Burke has its own significant financial problems.

owes the remaining $14,875,000 to the 35 investors. Clearly Phase I does not have the resources to make good on these payments, and neither do any of the other Jay Peak entities.

19. In its Complaint (DE 1) and Emergency Motion for Temporary Restraining Order, Asset Freeze, and Other Relief ("TRO Motion") (DE 4), the SEC detailed significant misuse of investor funds in Jay Peak Hotel Suites Stateside (Phase VI), and resulting shortfalls that have prevented construction from being completed. I found that to be true upon my investigation of Stateside's financial affairs. Stateside is fully subscribed, having raised $67 million from 134 investors, but apparently has spent all the money without coming anywhere close to completing construction. The Stateside Hotel is done, but construction on the 84 cottages is nowhere near finished, and construction on the recreation center and the medical center has not even begun. Only 36 of the 84 cottages are even close to being done.

20. I am informed that it will cost approximately $11 million to complete the cottages (not including the $2.1 million Stateside allegedly owes to the contractor for constructing the cottages). It is estimated to cost an additional $5.2 million to build the recreation center and $1.3 million to build the medical center. As set forth above, there was only $19,545.85 in Stateside's accounts. JCM, which was the project manager for Stateside, and where Quiros testified he sent investor funds, only has $484,116.70 in its accounts. Q Resorts has only about $1.2 million. This is nowhere near the amount needed to finish Stateside. In short, despite raising all the money the Stateside offering documents said was needed to build the project, the Receivership Defendants did something other than build the Stateside project with the money raised, because the Jay Peak entities no longer have it.

21. There are even more significant financial problems with Phase VII, the Jay Peak Biomedical Research Center. As set forth in the SEC's Complaint and TRO Motion, Phase VII

was attempting to raise $110 million from 220 investors to build a biomedical research center near the ski resort. At the time I was appointed, the SEC's evidence showed Phase VII had raised $83 million of that money from 166 investors. DE 4 at Ex. 30. Some $14[4] million of that $83 million remains in a restricted account at People's United Bank. However, prior to the SEC filing its case, the State of Vermont Regional Center had informed Phase VII management it could not use that money until it passed a comprehensive financial review. So that money is frozen at the current time.

22. That leaves approximately $69 million that should have been available for construction of the biomedical research center, but as the SEC's Complaint and TRO Motion detail, $30 million of that money was diverted for other purposes. DE 4 at 34-38. Furthermore, the vast majority of the remaining funds were sent from Phase VII to three of the Relief Defendants – JCM, GSI, and North East Contract Services ("Northeast") – according to my accountants' analysis of company records. There is little to show for this money – the only thing constructed on the Phase VII property is a warehouse estimated to be worth no more than $500,000. And other than the $17.8 million in a restricted account, the Phase VII accounts only have about $200,000 in them. The JCM accounts have $484,116.70, and we are unable to determine how much Northeast has. There is tens of millions of dollars of construction to be done, and no money to pay for it.

23. Finally, as set forth in my Emergency Motion for Authorization to Loan Funds, Q Burke has almost $700,00 of financial needs over the next three months that there may or may not be sufficient funds in the Q Burke accounts to pay for. DE 43 at ¶¶11-12. To preserve the hotel from "going dark" and losing significant value, I have been forced to ask the Court to let me borrow funds from Jay Peak in order to pay the absolute essential expenses such as

---

[4] The rest of the $17.8 million consists of administrative fees.

7

insurance, utilities and minimal payroll, which will only further exacerbate the financial problems the Jay Peak resort is facing.

24. I have reviewed Exhibits I and J to Quiros' Emergency Motion to Lift or Modify the Asset Freeze (DE 39). Exhibit I is a document entitled Ariel and Okcha Quiros Statement of Financial Condition as of September 30, 2014 ("Financial Statement"). I note that on Page 7 of the Financial Statement "Investments in Partnership Interests," Quiros' investment in Phase VII (listed as ANC Bio VT, LLC) is valued at $25 million. I do not know how this valuation was arrived at, but based on my review of the finances of Phase VII, I do not see evidence that it is worth $25 million at the present time.

25. Furthermore, I have had my management team review Exhibit J, an appraisal of the Jay Peak Resort, which appraises Jay Peak at an estimated value of $87 million. The appraisal is based on part on its conclusion that Jay Peak realized EBITDA of $5 million in 2014-15. However, the actual EBITDA was only approximately $3 million. I note the appraisal is further based in part on an estimate that Jay Peak will realize an EBITDA of $5 million in 2015-16. However, as stated earlier in this declaration, the actual EBITDA for 2015-16 is on track to be only approximately $1.8 million. Based on the information I have learned in the eight days since assuming control of Jay Peak and the inaccurate numbers for the 2014-15 and 2015-16 EBITDA, I cannot say whether the estimates for future years EBITDA in the appraisal (Page 87) are accurate. My management staff notes that the $87 million EBITDA is based on the projected EBITDA in future years.

I declare under penalty of perjury that the foregoing is true, correct, and made in good faith.

_____ ) Receiver
Michael I. Goldberg

Executed on this 22nd day of April, 2016

9