UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF FLORIDA

CASE NO.: 1:16-CV-21301-GAYLES

SECURITIES AND EXCHANGE
COMMISSION,

      Plaintiff,

vs.

ARIEL QUIROS,
WILLIAM STENGER,
JAY PEAK, INC.,
Q RESORTS, INC.,
JAY PEAK HOTEL SUITES L.P.,
JAY PEAK HOTEL SUITES PHASE II L.P.,
JAY PEAK MANAGEMENT, INC.,
JAY PEAK PENTHOUSE SUITES L.P.,
JAY PEAK GP SERVICES, INC.,
JAY PEAK GOLF AND MOUNTAIN SUITES L.P.,
JAY PEAK GP SERVICES GOLF, INC.,
JAY PEAK LODGE AND TOWNHOUSES L.P.,
JAY PEAK GP SERVICES LODGE, INC.,
JAY PEAK HOTEL SUITES STATESIDE L.P.,
JAY PEAK GP SERVICES STATESIDE, INC.,
JAY PEAK BIOMEDICAL RESEARCH PARK L.P.,
AnC BIO VERMONT GP SERVICES, LLC,

      Defendants, and

JAY CONSTRUCTION MANAGEMENT, INC.,
GSI OF DADE COUNTY, INC.,
NORTH EAST CONTRACT SERVICES, INC.,
Q BURKE MOUNTAIN RESORT, LLC,

      Relief Defendants

_____/

## NOTICE OF FILING

Michael I. Goldberg, in his capacity as receiver (the "Receiver") of Defendants Jay Peak,

Inc., Q Resorts, Inc., Jay Peak Hotel Suites L.P., Jay Peak Hotel Suites Phase II L.P., Jay Peak

Management, Inc., Jay Peak Penthouse Suites L.P., Jay Peak GP Services, Inc., Jay Peak Golf

and Mountain Suites, L.P., Jay Peak GP Services Golf, Inc., Jay Peak Lodge and Townhouse

CASE NO.: 1:16-CV-21301-GAYLES

L.P., Jay Peak GP Services Lodge, Inc., Jay Peak Hotel Suites Stateside L.P., Jay Peak Services

Stateside, Inc., Jay Peak Biomedical Research Park L.P., AnC Bio Vermont GP Services LLC,

and Relief Defendants Jay Construction Management, Inc., GSI of Dade County, Inc., North

East Contract Services, Inc. and Q Burke Mountain Resort LLC, by and through undersigned

counsel, hereby files the attached complaint filed on May 20, 2016.

Dated: May 27, 2016

**AKERMAN LLP**
*Co-Counsel for the Receiver*
350 East Las Olas Boulevard
Suite 1600
Fort Lauderdale, Florida 33301
Telephone: 954.463.2700
Facsimile: 954.463.2224

By: /s/ Jonathan S. Robbins, Esq.
Jonathan S. Robbins, Esq.
Florida Bar No. 989428
Email: jonathan.robbins@akerman.com

Respectfully submitted,

**LEVINE KELLOGG LEHMAN
SCHNEIDER + GROSSMAN LLP**
*Co-Counsel for the Receiver*
Miami Center, 22nd Floor
201 South Biscayne Blvd.
Miami, Florida 33131
Telephone: 305.403.8788
Facsimile: 305.403.8789

By: /s/ Jeffrey C. Schneider, P.A.
Jeffrey C. Schneider, P.A.
Florida Bar No. 933244
Email: jcs@lklsg.com
Secondary Email: lv@lklsg.com

## CERTIFICATE OF SERVICE

I hereby certify that on May 27, 2016, the foregoing document is being served this day on

all counsel of record identified on the attached Service List via electronic mail and to all *pro se*

parties identified on the attached Service List via U.S. Mail.

By:/s/ Jeffrey C. Schneider, P.A.
Jeffrey C. Schneider, P.A.

CASE NO.: 1:16-CV-21301-GAYLES

## SERVICE LIST

| | |
|---|---|
| **Jeffrey C. Schneider, P.A.**<br>*Co-Counsel for the Receiver*<br>LEVINE KELLOGG LEHMAN<br>SCHNEIDER + GROSSMAN LLP<br>201 South Biscayne Blvd.<br>22nd Floor, Miami Center<br>Miami, Florida 33131<br>Telephone: 305.403.8788<br>Facsimile: 305.403.8789<br>Email:  jcs@lklsg.com | **Robert K. Levenson, Esq.**<br>**Christopher E. Martin, Esq.**<br>Senior Trial Counsel<br>*Attorneys for Plaintiff*<br>SECURITIES & EXCHANGE COMMISSION<br>801 Brickell Avenue<br>Suite 1800<br>Miami, FL 33131<br>Telephone: 305.982.6386<br>Facsimile: 305.536.4154<br>Email:  martinc@sec.gov<br>Email:  levensonr@sec.gov |
| **Michael I. Goldberg, Esq.**<br>*Court-Appointed Receiver*<br>AKERMAN LLP<br>350 East Las Olas Boulevard<br>Suite 1600<br>Fort Lauderdale, Florida 33301<br>Telephone: 954.463.2700<br>Facsimile: 954.463.2224<br>Email: michael.goldberg@akerman.com | **Jonathan S. Robbins, Esq.**<br>*Co-Counsel for the Receiver*<br>AKERMAN LLP<br>350 East Las Olas Boulevard<br>Suite 1600<br>Fort Lauderdale, Florida 33301<br>Telephone: 954.463.2700<br>Facsimile: 954.463.2224<br>Email: jonathan.robbins@akerman.com |
| **Charles H. Lichtman, Esq.**<br>*Counsel for Defendant, Ariel Quiros*<br>BERGER SINGERMAN<br>Las Olas Centre II<br>350 E. Las Olas Boulevard, Suite 1000<br>Fort Lauderdale, FL 33301<br>Telephone: 954-525-9000<br>Facsimile: 954-532-2872<br>Email: clichtman@bergersingerman.com | **David Gordon, Esq.**<br>Jacklyn H. Grodin, Esq.<br>*Counsel for Defendant, Ariel Quiros*<br>MITCHELL SILBERBERG & KNUPP LLP<br>12 East 49th Street, 30th Floor<br>New York, New York 10017<br>Telephone: 212-509-3900<br>Email: dbg@msk.com<br>Email: jhg@msk.com |
| **Jean Pierre Nogues, Esq.**<br>**Mark T. Hiraide, Esq.**<br>*Counsel for Defendant, Ariel Quiros*<br>MITCHELL SILBERBERG & KNUPP LLP<br>11377 W. Olympic Blvd.<br>Los Angeles, CA 90064<br>Telephone: 310-312-2000<br>Email: jpn@msk.com<br>mth@msk.com | **Roberto Martinez, Esq.**<br>**Stephanie Anne Casey, Esq.**<br>*Counsel for Defendant, William Stenger*<br>COLSON HICKS EIDSON<br>255 Alhambra Circle, PH<br>Coral Gables, Florida 33134<br>Telephone: 305-476-7400<br>Facsimile: 305-476-7444<br>Email: bob@colson.com<br>Email: scasey@colson.com |

CASE NO.: 1:16-CV-21301-GAYLES

| | |
|---|---|
| **Haas A. Hatic, Esq.**<br>*Counsel for Defenant, North East*<br>*Contract Services, Inc.*<br>GREENSPOON MARDER, P.A.<br>200 East Broward Blvd., Suite 1500<br>Fort Lauderdale, Florida 33301<br>Telephone: 954-491-1120<br>Facsimile: 954-343-6956<br>Email: Hass.hatic@gmlaw.com | |

# UNITED STATES DISTRICT COURT
# SOUTHERN DISTRICT OF FLORIDA

### CASE NO. _____

MICHAEL I. GOLDBERG, as
Receiver for Jay Peak, Inc., Q
Resorts, Inc., Jay Peak Hotel Suites
L.P., Jay Peak Hotel Suites Phase II
L.P., Jay Peak Management, Inc.,
Jay Peak Penthouse Suites L.P., Jay
Peak GP Services, Inc., Jay Peak Golf
and Mountain Suites L.P., Jay Peak GP
Services Golf, Inc., Jay Peak Lodge and
Townhouses L.P., Jay Peak GP Services
Lodge, Inc., Jay Peak Hotel Suites
Stateside L.P., Jay Peak GP Services
Stateside, Inc., Jay Peak Biomedical
Research Park L.P., AnC Bio Vermont
GP Services, LLC, Q Burke Mountain
Resort, Hotel and Conference Center, L.P.,
Q Burke GP, LLC, Jay Construction
Management, Inc., GSI of Dade County,
Inc., North East Contract Services, Inc.,
and Q Burke Mountain Resort, LLC,

        Plaintiff,

v.                                                                                  **JURY DEMAND**

RAYMOND JAMES FINANCIAL, INC.
d/b/a RAYMOND JAMES, RAYMOND
JAMES & ASSOCIATES, INC., ARIEL
QUIROS, and JOEL BURSTEIN

        Defendants.

_____/

## RECEIVER'S COMPLAINT FOR RELIEF

    Plaintiff Michael I. Goldberg (the "Receiver"), as Receiver for Jay Peak, Inc. ("Jay

Peak"), Q Resorts, Inc. ("Q Resorts"), Jay Peak Hotel Suites L.P. ("Suites Phase I"), Jay Peak

Hotel Suites Phase II L.P. ("Hotel Phase II"), Jay Peak Management, Inc. ("Jay Peak

Management"), Jay Peak Penthouse Suites L.P. ("Penthouse Phase III"), Jay Peak GP Services, Inc. ("Jay Peak GP Services"), Jay Peak Golf and Mountain Suites L.P. ("Golf and Mountain Phase IV"), Jay Peak GP Services Golf, Inc. ("Jay Peak GP Services Golf"), Jay Peak Lodge and Townhouses L.P. ("Lodge and Townhouses Phase V"), Jay Peak GP Services Lodge, Inc. ("Jay Peak GP Services Lodge"), Jay Peak Hotel Suites Stateside L.P. ("Stateside Phase IV"), Jay Peak GP Services Stateside, Inc. ("Jay Peak GP Services Stateside"), Jay Peak Biomedical Research Park L.P. ("Biomedical Phase VII"), AnC Bio Vermont GP Services, LLC ("AnC Bio Vermont GP Services"), Q Burke Mountain Resort, Hotel and Conference Center, L.P. ("Q Burke Mountain Resort"), Q Burke Mountain Resort GP Services, LLC ("Q Burke GP Services"), and Jay Construction Management, Inc. ("JCM"), GSI of Dade County, Inc. ("GSI"), North East Contract Services, Inc. ("Northeast"), and Q Burke Mountain Resort, LLC ("Q Burke") (collectively, the "Receivership Entities"), sues Raymond James Financial, Inc. d/b/a Raymond James and Raymond James & Associates, Inc. (collectively, "Raymond James"), Ariel Quiros ("Quiros"), and Joel Burstein ("Burstein"), and states:

## INTRODUCTION

1.     The Receiver brings this action1 in his capacity as Receiver for the Receivership Entities to recover amounts stolen from the Receivership Entities and misused by Quiros, owner

---

1     Plaintiff is mindful that Raymond James and the Jay Peak Limited Partnerships entered into Client Agreements pursuant to which certain disputes were to be resolved through arbitration.  However, to the extent that provision applies to the Receiver's claims, Raymond James may desire to waive any attempt to enforce it, as Raymond James already is facing a lawsuit in this Court brought by the investors, *Daccache v. Raymond James et al.*, No. 1:16-cv-21575-FAM (S.D. Fla.), and it would be more efficient to consolidate discovery in this case with the investors' case than to defend two proceedings in two fora.  Moreover, Quiros is not a party to the Client Agreements, so the Receiver's claims against him cannot be compelled to arbitration.  Finally, any arbitration award is going to have to be confirmed in this Court regardless.  As a result, keeping this case before this Court affords obvious efficiencies to Raymond James.  If, however, Raymond James does not wish to waive arbitration, then the Receiver will file a motion to stay and file an arbitration.

of Q Resorts, and William Stenger ("Stenger"), president and CEO of Jay Peak, a Vermont ski resort owned by Q Resorts. Raymond James assisted Quiros and Stenger in stealing and misusing funds of various Receivership Entities by actively enabling Quiros and Stenger's intricate web of transfers and margin loans to defraud many of the Receivership Entities. Through their fraudulent scheme and with the aid of Raymond James, Quiros and Stenger have misused over $200 million and systematically looted over $50 million of the more than $350 million that has been raised from hundreds of investors through the U.S. Citizenship and Immigration Services' EB-5 Immigrant Investor Program.

2.     Quiros and Stenger, through Q Resorts and Jay Peak, attracted foreign investors hoping to earn permanent residence in the United States through investing in U.S. projects that create a certain number of jobs. Quiros and Stenger structured these ostensible investments as limited partnerships, whereby each limited partnership would use its investors' funds for specific purposes and under certain restrictions. The fraudulent scheme took the form of seven limited partnership securities offerings: Suites Phase I, Hotel Phase II, Penthouse Phase III, Golf and Mountain Phase IV, Lodge and Townhouses Phase V, Stateside Phase IV, Biomedical Phase VII, and Q Burke (collectively, the "Jay Peak Limited Partnerships"). These investments were not publicly traded.

3.     Investors who invested in these limited partnerships thought they were investing their funds in hotels, cottages, a biomedical research facility and other projects. In reality, while some of the funds were used for the projects, the majority of the funds were commingled, misused, and diverted to pay for other projects and to cover Quiros' personal expenses. The Jay Peak Limited Partnerships' money was also improperly converted into collateral for loans to Quiros by Raymond James. Raymond James enabled Quiros and Stenger's attempts to disguise

3

the fact that most of the seven projects were either over budget or experiencing shortfalls.   In doing so, Raymond James profited from the fraudulent scheme.

4.      Since 2008, Quiros has misappropriated more than $50 million in investor money to, among other things: (1) finance his purchase of the Jay Peak resort, (2) back a personal line of credit to pay his income taxes, (3) purchase a luxury condominium, (4) pay taxes of a company he owns, and (5) buy an unrelated resort.   Quiros also improperly used additional investor funds to pay down and pay off margin loans (including paying nearly $2.5 million in margin interest) that he set up in the name of the Jay Peak Limited Partnerships at Raymond James.

5.      The Jay Peak Limited Partnerships' funds were held in accounts at Raymond James, which were managed by Quiros' then son-in-law, Joel Burstein.   As the broker for the accounts holding Jay Peak Limited Partnership funds, Raymond James provided margin loans to Quiros which were collateralized with assets belonging to the Jay Peak Limited Partnerships.

6.      Raymond James and Burstein: (1) knew that the funds in the Raymond James accounts belonged to investors; (2) knew that the Jay Peak General Partners owed fiduciary duties to the investors in the Jay Peak Limited Partnerships; and (3) together with Quiros and Stenger, aided and abetted the breach of fiduciary duty by margining investors' assets, helping Quiros steal the investors' funds for his own use, and commingling investors' funds in breach of the partnership agreements. The Receiver seeks to recover the Jay Peak Limited Partnerships' losses through this action.

7.      On April 12, 2016, the SEC filed its Complaint for Injunctive and Other Relief against Quiros, Stenger, and the Receivership Entities, charging the defendants there with violations of numerous provisions of federal securities laws.   The case is currently pending in this District before the Honorable Darrin P. Gayles and styled *SEC v. Quiros, Stenger, Jay Peak,*

*Inc., et al.*, No. 16-21301-CV-DPG (S.D. Fla.) (the "SEC Case"). Also on April 12, 2016, the SEC filed, and Judge Gayles granted, an Emergency Motion for Temporary Restraining Order, Asset Freeze, and Other Relief.

8.   On April 13, 2016, Judge Gayles entered an order in the SEC Case appointing Michael I. Goldberg as Receiver over the Receivership Entities, their subsidiaries, successors and assigns (the "Receivership Order"). The Receivership Order authorizes the Receiver to: (i) take immediate possession of all property, assets and estates of every kind of the Receivership Entities, (ii) investigate the manner in which the affairs of the Receivership Entities were conducted; and (iii) institute legal actions for the benefit and on behalf of the Receivership Entities and their investors as deemed necessary by the Receiver to collect funds or assets that were wrongfully misappropriated or transferred from the Receivership Entities or otherwise traceable to the funds raised from investors in the Receivership Entities, including, but not limited to, seeking imposition of constructive trusts, disgorgement of profits, recovery, and/or avoidance of fraudulent transfer under Florida Statute 726.101 et seq.

9.   Further, investors harmed by the fraudulent scheme recently filed a class action complaint in this District before the Honorable Federico A. Moreno, *Daccache v. Raymond James et al.*, No. 1:16-cv-21575-FAM (S.D. Fla.).

**PARTIES AND RELEVANT NONPARTIES**

*A. Plaintiff*

10.   The Receiver is a natural person over the age of 21 and otherwise *sui juris*. The Receiver represents the interests of the Receivership Entities, who have been damaged as a result of the Defendants' conduct alleged herein.

*B. Defendants*

11.    Raymond James Financial, Inc. d/b/a Raymond James, is a corporation organized and existing under the laws of the state of Florida. Raymond James is a diversified financial services holding company with subsidiaries engaged primarily in investment and financial planning, in addition to investment banking and asset management. Its stock is traded on the New York Stock Exchange.

12.    Raymond James & Associates, Inc. (together with Raymond James Financial, Inc., "Raymond James") is a corporation organized and existing under the laws of the state of Florida.

13.    Quiros is a citizen and resident of the State of Florida. He is a natural person over the age of 21 and otherwise *sui juris*. In addition to being the sole owner, officer and director of Q Resorts, he is chairman of Jay Peak. Through those two companies, Quiros controlled each of the Jay Peak General Partners and Limited Partnerships. He is a principal of the general partner of the Jay Peak Biomedical limited partnership offering, which is the seventh and most recent project offering.

14.    Burstein is a citizen of the State of Florida. He is a natural person over the age of 21 and otherwise *sui juris*. Burstein is Quiros's former son-in law and the Miami Branch Manager and Vice President of Investments for the Raymond James South Florida Complex. He manages three Raymond James locations: Miami, Miami Beach and Dadeland.

### C. *Relevant Nonparties*

15.    Stenger is a resident of the state of Vermont. He is a natural person over the age of 21 and otherwise *sui juris*. Stenger is the Director, President, and CEO of Jay Peak. He is the president and director of the general partner of the first Jay Peak project offering, and is the sole officer or director of the general partner of the second through sixth offerings. All six offerings

were set up as limited partnerships. Stenger is, along with Quiros, a principal in the seventh offering's (Jay Peak Biomedical) general partner.

16.     Jay Peak is a Vermont corporation with its principal place of business in Jay, Vermont. Jay Peak operates the Jay Peak Resort in Jay, Vermont, which encompasses the first six projects for which Quiros and Stenger raised money. Jay Peak, in conjunction with others, has served as the manager or developer of the projects.

17.     Q Resorts is a Delaware corporation with its offices in Miami, Florida. Q Resorts is the 100% owner of Jay Peak, and Quiros is the sole owner, officer and director of Q Resorts. Q Resorts acquired Jay Peak from a Canadian firm in 2008, and Quiros has since overseen the various Jay Peak projects through Q Resorts.

18.     Suites Phase I is a Vermont limited partnership with its principal place of business in Jay, Vermont. Between December 2006 and May 2008, Suites Phase I raised $17.5 million from 35 investors through an EB-5 offering of limited partnership interests to build a hotel.

19.     Hotel Phase II is a Vermont limited partnership with its principal place of business in Jay, Vermont. Between March 2008 and January 2011, Hotel Phase II raised $75 million from 150 investors through an EB-5 offering of limited partnership interests to build a hotel, an indoor water park, an ice rink, and a golf club house.

20.     Jay Peak Management is a Vermont corporation which is the general partner of Suites Phase I and Hotel Phase II. It is also a wholly-owned subsidiary of Jay Peak. Stenger is the company's president.

21.     Penthouse Phase III is a Vermont limited partnership with its principal place of business in Jay, Vermont. Between July 2010 and October 2012, Penthouse Phase III raised $32.5 million from 65 investors through an EB-5 offering of limited partnership interests to build

a 55-unit "penthouse suites" hotel and an activities center.

22.     Jay Peak GP Services is a Vermont corporation and the general partner of Penthouse Phase III. Stenger, listed as the director, is its only principal.

23.     Golf and Mountain Phase IV is a Vermont limited partnership with its principal place of business in Jay, Vermont. Between December 2010 and November 2011, Golf and Mountain Phase IV raised $45 million from 90 investors through an EB-5 offering of limited partnership interests to build "golf cottage" duplexes, a wedding chapel, and other facilities.

24.     Jay Peak GP Services Golf is a Vermont corporation and the general partner of Golf and Mountain Phase IV. Stenger, listed as the director, is its only principal.

25.     Lodge and Townhouses Phase V is a Vermont limited partnership with its principal place of business in Jay, Vermont. Between May 2011 and November 2012, Lodge and Townhouses Phase V raised $45 million from 90 investors through an EB-5 offering of limited partnership interests to build 30 vacation rental townhouses, 90 vacation rental cottages, a café, and a parking garage.

26.     Jay Peak GP Services Lodge is a Vermont corporation and the general partner of Lodge and Townhouses Phase V. Stenger, listed as the director, is its only principal.

27.     Stateside Phase VI is a Vermont limited partnership with its principal place of business in Jay, Vermont. Between October 2011 and December 2012, Stateside Phase VI raised $67 million from 134 investors through an EB-5 offering of limited partnership interests to build an 84-unit hotel, 84 vacation rental cottages, a guest recreation center, and a medical center.

28.     Jay Peak GP Services Stateside is a Vermont corporation and the general partner of Stateside Phase IV.  Stenger, listed as the director, is its only principal.

29.     Biomedical Phase VII is a Vermont limited partnership with its principal place of

business in Newport, Vermont. Since November 2012, Biomedical Phase VII has raised approximately $83 million from 166 investors through an EB-5 offering of limited partnership interests to construct a biomedical research facility. Other than site preparation and groundbreaking, no work has been done on the facility.

30.     AnC Bio Vermont GP Services is a Vermont limited liability company and the general partner of Biomedical Phase VII. Its managing members are Quiros and Stenger.

31.     Q Burke Mountain Resort is a Vermont limited partnership with its principal place of business in East Burke, Vermont. As of September 2015, Q Burke Mountain Resort raised approximately $53.5 million from investors through an EB-5 offering of limited partnership interests to purchase land and develop a hotel and other facilities.

32.     Q Burke GP Services is a Vermont limited liability company and the general partner of Q Burke Mountain Resort. Its managing members are Quiros and Stenger.

33.     Jay Peak Management, Inc., Jay Peak GP Services, Inc., Jay Peak GP Services Golf, Inc., Jay Peak GP Services Lodge, Inc., Jay Peak GP Services Stateside, Inc., and AnC Bio Vermont GP Services, LLP are collectively referred to as the "Jay Peak General Partners".

34.     The Jay Peak Limited Partnerships and their corresponding Jay Peak General Partners are listed below:

| Jay Peak Limited Partnerships | Jay Peak General Partners |
|---|---|
| **"Suites Phase I"**<br>Jay Peak Hotel Suites L.P.<br>To build a hotel. Hotel is completed and operating. | Jay Peak Management, Inc.<br>Wholly-owned subsidiary of Jay Peak, Inc.<br>President: Stenger |
| **"Hotel Phase II"**<br>Jay Peak Hotel Suites Phase II L.P.<br>To build a hotel, an indoor water park, an ice rink, and a golf clubhouse. Construction is complete and the facilities are operating. | |
| **"Penthouse Phase III"**<br>Jay Peak Penthouse Suites L.P.<br>To build a 55-unit penthouse suites hotel and an activities | Jay Peak GP Services, Inc.<br>Director and only principal: Stenger |

| | |
|---|---|
| center, including a bar and restaurant.<br>Construction is complete and the facilities are operating. | |
| **"Golf and Mountain Phase IV"**<br>Jay Peak Golf and Mountain Suites L.P.<br>To build golf cottage duplexes, a wedding chapel, and other facilities.<br>Construction is complete and the facilities are operating. | Jay Peak GP Services Golf, Inc.<br>Director and only principal: Stenger |
| **"Lodge and Townhouse Phase V"**<br>Jay Peak Lodge and Townhouses L.P.<br>To build 30 vacation rental townhouses, 90 vacation rental cottages, a café, and a parking garage.<br>Construction is complete and the facilities are operating. | Jay Peak GP Services Lodge, Inc.<br>Director and only principal: Stenger |
| **"Stateside Phase VI"**<br>Jay Peak Hotel Suites Stateside L.P.<br>To build an 84-unit hotel, 84 vacation rental cottages, a guest recreation center, and a medical center.<br>Only hotel has been built. A small amount of work has been done on building the cottages and work has not yet begun on the recreation and medical centers. | Jay Peak GP Services Stateside, Inc.<br>Director and only principal: Stenger |
| **"Biomedical Phase VII"**<br>Jay Peak Biomedical Research Park, L.P.<br>To build a biomedical research facility. Other than site preparation and groundbreaking, no work has been done on the facility. | AnC Bio Vermont GP Services, LLP<br>Managing members: Quiros and Stenger |
| **"Q Burke Mountain Resort"**<br>Q Burke Mountain Resort, Hotel and Conference Center, L.P<br>To purchase land and develop hotel and facilities. | Q Burke Mountain Resort GP Services, LLC<br>Managing members: Quiros and Stenger |

35.     Though varying in certain details, the structures of the Jay Peak Limited Partnerships were materially the same, and all were used by the Quiros and Stenger in their fraudulent scheme.

### JURISDICTION AND VENUE

36.     This action is brought to accomplish the objectives of the Receivership Order. This Court has subject matter jurisdiction over this matter pursuant to 28 U.S.C. §§ 754, 1692, 1367, and 18 U.S.C. § 1962.

37.     This Court has personal jurisdiction over the Raymond James Defendants because they are Florida corporations, are doing business in Florida, and have registered with the Florida Secretary of State, or do sufficient business in Florida, have sufficient minimum contacts with

Florida, or otherwise intentionally avail themselves of the Florida consumer market through the promotion of their services.  This purposeful availment renders the exercise of jurisdiction by this Court over Defendants permissible under traditional notions of fair play and substantial justice.

38.    This Court has personal jurisdiction over Quiros and Burstein because they are Florida residents, do sufficient business in Florida, have sufficient minimum contacts with Florida, or otherwise intentionally avail themselves of the protections and benefits of Florida law.  Further, Quiros and Burstein committed tortious acts in Florida that form the basis of this action.

39.    Venue is proper in this forum pursuant to 28 U.S.C. § 1391 because Defendants transact business and may be found in this District.  Venue is also proper here because at all times relevant hereto, the practices complained of herein occurred in the Southern District of Florida and the SEC Case is pending in this District.

40.    All conditions precedent to this action have occurred, been performed, or have been waived.

## FACTUAL ALLEGATIONS

### The Fraudulent Scheme

41.    Jay Peak began offering and selling securities in the form of limited partnership interests in December 2006. Since that time it has raised over $350 million from hundreds of investors in at least 74 countries in seven separate offerings—the Jay Peak Limited Partnerships.

42.    Foreign applicants invest both to earn a return on their investment and to obtain their permanent green cards through the EB-5 Immigrant Investor Program created by Congress in 1990. The Program provides prospective immigrants with the opportunity to become

permanent residents by investing in the U.S. To qualify for an EB-5 visa, a foreign applicant must invest $500,000 or $1 million (depending on the type of investment) in a commercial enterprise approved by the U.S. Citizenship and Immigration Service. Once the applicant has invested, he or she may apply for a conditional green card, which is good for two years. If the investment creates or preserves at least ten jobs during those two years, the foreign applicant may apply to have the conditions removed from his or her green card. The applicant can then live and work in the U.S. permanently. An applicant only has to invest $500,000 if he or she invests through a Regional Center. As a Regional Center, the State of Vermont has approved Jay Peak as an EB-5 project.

43.     The proponents of Jay Peak and Stenger conveyed the idea that investors would purchase real estate and other projects such as hotels, suites, recreational facilities, and a biomedical research facility. They sought EB-5 investors and had a pool of people who would be willing to invest large amounts of money into their scheme. Stenger and Jay Peak gave marketing materials to the investors. Each project or group of projects was structured as a separate limited partnership, which had its corresponding general partners. *See* Partnership Chart ¶ 34. The Jay Peak General Partners owed fiduciary duties to their respective Jay Peak Limited Partnerships.

44.     Investors received offering materials from Jay Peak and Stenger stating that the monies invested would be used for legitimate purposes, when in reality, the monies were misused, commingled, and stolen.

45.     Stenger told investors that he anticipated the individual projects would each make a 2% to 6% annual return once they were complete and operating. The offering materials that Jay Peak provided to investors also touted their potential returns. For example, an individual

who purchased a limited partnership interest in Penthouse Phase III received information from Jay Peak stating that investors would realize a guaranteed 4% minimum return, with a projected 6% average return.

46.     Investors in each of the Jay Peak Limited Partnerships generally received from Jay Peak, and often from Stenger, offering materials consisting of a private placement memorandum, a business plan, and a limited partnership agreement.  Among the documents included in each business plan is one showing the cost of each project and the use of investor funds.  The "use of proceeds" document details exactly how Jay Peak and/or the specific Jay Peak Limited Partnership intended to spend all investor funds raised, including on land acquisition, site preparation, and construction. The document also lists the management contribution in each offering and how Jay Peak would spend that money.

47.     For example, the document outlining the use of proceeds for Penthouse Phase III, found under the term "Investor Funds Source and Application" in the business plan given to investors, stated Jay Peak would spend almost $28.1 million of the $32.5 million invested on construction of the Penthouse Suites hotel.  Included in this amount was approximately $900,000 for cost overruns and approximately $2.8 million for construction supervision fees.   The remaining $4.4 million was for the accompanying recreation and learning centers and a café and bar (Jay Peak was to contribute another $5 million).   At most Jay Peak could receive approximately $3.7 million of the $32.5 million for its own use.

48.     Stenger reviewed, was responsible for, and had authority over the contents of the offering documents in Phases I-VI, including the limited partnership agreements and the use of proceeds documents.  Quiros reviewed the contents of the Phase I-VI offering documents, was familiar with them, and understood he had to abide by them.  He also approved the use of

proceeds document in Phases III-VI. Both Stenger and Quiros, as principals of the general partner for Biomedical Phase VII, reviewed and approved the contents of that project's offering documents, including the limited partnership agreement and the use of proceeds document.

49.     Each limited partnership agreement, which all investors either signed or adopted, contains several restrictions on Jay Peak's and the general partners' use of investor money. Generally, each limited partnership agreement prevents the general partner from, without consent of the limited partners: (1) borrowing from or commingling investor funds; (2) acquiring any property with investor funds that does not belong to the limited partnership, other than as specifically authorized in the agreement; or (3) mortgaging, conveying or encumbering partnership property that was not real property.

50.     Investors made a $500,000 investment each in a particular Jay Peak Limited Partnership project. Investors also paid administrative fees, usually $50,000.

51.     Each Jay Peak Limited Partnership had an escrow account at People's United Bank in Vermont (formerly known as the Chittenden Trust Company). Stenger was a signatory on all of the People's Bank accounts and routinely authorized the transfer of funds into and out of those accounts.

52.     The initial $500,000 investment normally was deposited into the People's Bank account for the specific project in which the investor was participating. For example, a Penthouse Phase III investor's $500,000 investment was deposited into the People's Bank account for Penthouse Phase III.

53.     Once the Immigration Service approved the investor's initial or provisional green card, Stenger typically had the $500,000 transferred to a Raymond James account that was set up in the name of the particular project through Raymond James' Coral Gables office. Stenger had

no signatory or other authority over the Raymond James accounts.  Quiros opened all of the Raymond James accounts, and had sole authority over them.

54.     As described in detail below, Quiros and Stenger routinely violated the provisions stated above in paragraph 49 when they misused, misappropriated, embezzled, and commingled investors' funds from the Jay Peak Limited Partnership projects.  Instead of using the partnerships' funds as described in the use of proceeds documents, Quiros and Stenger frequently caused Jay Peak Limited Partnership funds to flow in a circular manner among various accounts and entities, which allowed them to misuse and misappropriate investor funds.

**Raymond James and Burstein Substantially Assisted Quiros and Stenger's Fraudulent Scheme.**

55.     The Raymond James broker listed on the accounts was Joel Burstein, Quiros' son-in-law at the time.  Burstein began his career at Raymond James in 1999, and obtained several broker licenses.  To qualify for these licenses, Burstein had to demonstrate that he possessed an adequate understanding of the securities industry.  In 2013, Burstein became the branch manager of the Miami, Dadeland and Miami Beach offices of Raymond James.  Burstein is now the Miami Branch Manager and Vice President of Investments for the Raymond James South Florida Complex.

56.     Once the Raymond James accounts received transfers from the People's Bank accounts, Quiros alone directed use of the funds.

57.     Quiros and Stenger, with Burstein and Raymond James' help, oversaw and directed use of all investor funds and the development and construction of any projects. Investors played no role in the development, construction, or operation of the facilities.

**Raymond James and Burstein Allowed Quiros to Use Limited Partnership Funds to Purchase Jay Peak.**

58.     Jay Peak was originally owned by a Canadian firm, Mont Saint-Sauveur International, Inc. ("MSSI"), which oversaw the Phase I securities offering.  Stenger worked for MSSI at the time and oversaw the offering as the principal of Jay Peak Management, the general partner of Suites Phase I and Hotel Phase II.  Suite Phase I raised $17.5 million from 35 investors from December 2008 through May 2008.

59.     From January through June 2008, Quiros negotiated and finalized a stock transfer agreement between MSSI and Q Resorts (Quiros' own company), in which MSSI agreed to transfer the real estate and other assets of Jay Peak to Q Resorts.  The agreement was signed on June 13, 2008, and the parties closed on the deal ten days later, June 23, 2008, for a final price of $25.7 million.

60.     In preparation for the closing, Quiros asked MSSI representatives to open brokerage accounts at Raymond James with Burstein, his son-in-law, in the names of the Suites Phase I and Hotel Phase II limited partnerships. MSSI representatives agreed, and Stenger opened a Suites Phase I account at Raymond James on May 20, 2008.  A month later, on June 20, 2008, he opened a Hotel Phase II account at Raymond James.

61.     Quiros testified under oath in front of the SEC that "Raymond James was a great supporter of mine.  They're the ones who developed my banking structure in 2008. . . . [Raymond James] put this structure together for me." Quiros also testified that Raymond James put together the margin loans for Quiros to acquire Jay Peak.

62.     As admitted by Burstein in his testimony before the SEC, Burstein and Quiros discussed financing the purchase of Jay Peak using a margin loan.  Frank Amigo (Burstein's supervisor and current Managing Director for Raymond James's South Florida Complex) also

16

participated in that conversation. Quiros, Burstein, and Amigo discussed how the margin loan would work—Raymond James would use the investors' funds in the Raymond James accounts, collateralize those investors' funds per Quiros' authorization, and give Quiros a loan based on the assets available. They also discussed holding investors' funds in the form of Treasury bills and the amount of collateral Quiros could utilize with Treasury bills. Raymond James allowed Quiros to collateralize 90% of the funds in the Jay Peak Limited Partnerships' accounts at Raymond James. Accordingly, Raymond James allowed Quiros to borrow 90% of the investors' funds in the Jay Peak Limited Partnership accounts. Raymond James was protected—if Quiros did not pay back the margin loan, Raymond James would take the investors' funds in the form of Treasury Bills and be made whole.

63.     On June 16 and 17, 2008, in preparation for closing, MSSI transferred $11 million in Suites Phase I investor funds from People's Bank to Raymond James. Three days later, on June 20, MSSI transferred $7 million in Hotel Phase II investor funds from People's Bank to Raymond James.

64.     In conjunction with those transfers, MSSI representatives on June 18, 2008, wrote a letter to Burstein, with copies to Quiros and Stenger, among others, stating that:

- The funds in the MSSI Raymond James Suites Phase I account were investor funds. "These funds were invested by immigrant investors in this limited partnership and must be held and/or used strictly in accordance with the limited partnership agreement, a copy of which I understand has already been provided to you. **You confirmed that these funds will not be used in any manner, including as collateral or a guarantee, to finance [Q Resorts, Inc.'s purchase of] the Jay Peak Resort.**" (emphasis added).

- Any money transferred to the Raymond James Hotel Phase II account similarly consisted of investor funds. "**Once again these funds may not be used in any manner, including as collateral or a guarantee, to fund the purchase of the Jay Peak Resort.**" (emphasis added).

65.     Raymond James knew that the monies in the Jay Peak Limited Partnership accounts were investors' funds and could not be used by Quiros for Quiros's purchase of Jay Peak.

66.     Despite the fact that MSSI clearly explained to Quiros and Stenger that they could not use investor money to purchase Jay Peak, Quiros—aided by transfers made by Stenger and by Burstein and Raymond James—did exactly that. Over the next two months Quiros, through Q Resorts, used $21.9 million of investor funds—$ 12.4 million from Suites Phase I and $9.5 million from Hotel Phase II—to fund the vast majority of his purchase of Jay Peak.

67.     Quiros began his fraudulent use of investor funds on June 17, the day before the MSSI letter, when he opened two accounts at Raymond James under his name and control, one each for Suites Phase I and Hotel Phase II. On the day of closing, June 23, MSSI transferred the $11 million in its Suites Phase I account at Raymond James to Quiros' new Suites Phase I account. The same day, MSSI transferred the $7 million in its Hotel Phase II account at Raymond James to Quiros' new Hotel Phase II account. MSSI closed the two Raymond James accounts within days, leaving Quiros in total control of investor money. Stenger, as the sole principal of the Suites Phase I and Hotel Phase II general partners, knew he was supposed to control investor funds. Yet he willingly allowed Quiros to take control of the funds, abdicating the responsibilities clearly laid out for him in the limited partnership agreements.

68.     Also on the day of closing, June 23, 2008, Quiros transferred $7.6 million of Suites Phase I investor funds from the Suites Phase I Raymond James account and $6 million of Hotel Phase II investor funds from the Hotel Phase II Raymond James account to another account (previously empty) that he had just opened at Raymond James in the name of Q Resorts. He completed his first fraudulent transfer the same day when he wired $ 13.544 million from the

Q Resorts account to the law firm representing MSSI as partial payment for the Jay Peak purchase.

69.     Over the next three months, Quiros made four additional payments totaling $5.5 million from the Q Resorts account to the same law firm as continued payment for the Jay Peak purchase. The specific payments were $1.5 million on July 1, 2008, $1 million on August 29, 2008, $500,000 on September 5, 2008, and $2.5 million on September 26, 2008.

70.     Quiros made three additional transfers from the Q Resorts account totaling $2.9 million—$2 million on June 25, 2008, $628,684 on June 26, 2008, and $263,000 on September 3, 2008—all to the law firm that had represented Q Resorts, Inc. in the purchase.

71.     Quiros and Q Resorts made all of these payments improperly using investor funds. For example, to fund the $2 million payment to Q Resorts' law firm on June 25, 2008, Quiros transferred $2 million derived from Suites Phase I investor funds from the Suites Phase I Raymond James account to the Q Resorts account, then immediately wired that $2 million to the Q Resorts' law firm. The next day he arranged the transfer of just under $300,000 each from the Suites Phase I and Hotel Phase II Raymond James accounts to the Q Resorts account, which he used to send $628,684 to the law firm.

72.     Stenger facilitated many of these payments by transferring additional money to the Raymond James accounts. For example, on July 1, 2008, Stenger authorized the transfer of $1 million of Suites Phase I investor funds from a Suites Phase I account at People's Bank to the Q Resorts account at Raymond James. The same day he authorized the transfer of $600,000 in Hotel Phase II investor funds from the Hotel Phase II account at People's Bank to the Q Resorts account. Quiros turned right around and wired $1.5 million of that money to the law firm representing MSSI.

73.     Subsequent transactions followed a similar pattern—Stenger transferring Suites Phase I or Hotel Phase II money from People's Bank either to the Suites Phase I and Hotel Phase II accounts or the Q Resorts account at Raymond James, and Quiros using that money to pay either Q Resorts or MSSI's law firm.  In addition, to facilitate some of these payments, Quiros transferred Phase I and II investor funds between the Suites Phase I and Hotel Phase II accounts at Raymond James.

74.     The limited partnership agreements and the use of proceeds documents for Phases I and II, all provided to investors before they invested, prohibited this use of investor funds.  For example, there was nothing in the use of proceeds document allowing Quiros or Suites Phase I to use $12.4 million of Phase I investor money to purchase Jay Peak.  Likewise, the Hotel Phase II use of proceeds document given to investors, entitled Estimated and Projected Cost of Development, showed a detailed breakdown of how Jay Peak would spend the $75 million it raised from investors.  There was nothing in this document that allowed Quiros or Hotel Phase II to use $9.5 million of Phase II investor funds to buy Jay Peak.

75.     The use of investor funds to purchase Jay Peak also contravened prohibitions in the Phase I and II limited partnership agreements.  Each agreement contained a Section 5.02, entitled "Limitations on the Authority of the General Partner."  That section in each agreement prevented the general partner from borrowing or commingling limited partnership funds and from making the type of purchase Quiros and Q Resorts made of Jay Peak without proper limited partnership consent.

**Raymond James and Burstein Used Limited Partnership Funds as Collateral to Loan Money to Quiros.**

76.     Burstein, Raymond James, and Quiros discussed using margin loans on the Jay Peak Limited Partnership accounts.  Raymond James collateralized the limited partnership funds

(in the form of Treasury bills) per Quiros's authorization, and gave Quiros a loan based on the assets available. Quiros could collateralize 90% of the Jay Peak Limited Partnerships' funds in Treasury bills—meaning, Quiros could borrow 90% of whatever funds were in the Jay Peak Limited Partnership accounts. Quiros, Stenger, and Raymond James knew that the funds in the Jay Peak Limited Partnership accounts were being used as collateral for the margin loans.

77.     Quiros and Raymond James' use of margin loans began in June 2008. When Quiros opened the Raymond James Suites Phase I and Hotel Phase II accounts, Quiros signed a credit agreement with Raymond James to allow both accounts to hold margin balances—meaning the accounts could borrow money (which would have to be paid back with interest) and hold negative cash balances. Put another way, the accounts went into debt to Raymond James when they incurred margin balances.

78.     The credit agreement Quiros signed pledged amounts in both Suites Phase I and Hotel Phase II accounts, as well as all of the assets of the Suites Phase I limited partnership, as collateral for any margin loans the accounts incurred. As Jay Peak began new offerings, Quiros opened new accounts at Raymond James in the name of each new Jay Peak Limited Partnership, to which Stenger transferred limited partnership funds from the corresponding account at People's Bank where the initial investors deposited their money.

79.     For example, investors in Penthouse Phase III sent their investments to an escrow account at People's Bank in the name of Penthouse Phase III. Stenger had signatory authority and control over that account. When the offering began, Quiros opened an account at Raymond James in the name of Penthouse Phase III, over which only he had signatory authority and control. Once Penthouse Phase III investors had their conditional green cards approved, Stenger approved the transfer of those investors' $500,000 deposits (*i.e.*, the limited partnership

contributions) to the Penthouse Phase III Raymond James account, thereby giving up control over that money to Quiros. Each time this happened, Stenger violated terms of the limited partnership agreements and caused the Jay Peak General Partners to breach their fiduciary duty to the Jay Peak Limited Partnerships. Stenger, as the principal of the general partner in Phases I-VI, had ultimate responsibility for the overall management and control of the business assets and the affairs of the six limited partnerships, and the obligation to place partnership funds in accounts in the names of the partnerships. Stenger abdicated these responsibilities by giving Quiros complete control of the partnerships' funds and by placing the funds in accounts to which he did not have access.

80.    The process in Phases II and IV-VII worked the same way. Furthermore, each time he opened a new Raymond James account, Quiros signed a new credit agreement pledging the assets of that account—in each case comprised of or derived from limited partnership funds—as collateral for the margin loans he continued to hold at Raymond James. Quiros signed a credit agreement on February 6, 2009, pledging limited partnership funds in the Suites Phase I and Hotel Phase II Raymond James accounts as collateral for the margin loans. He signed one on October 1, 2010, expanding the list of accounts to Penthouse Phase III and Q Resorts. Quiros signed a credit agreement on February 10, 2011, adding the account for Golf and Mountain Phase IV. He signed the next one on August 25, 2011, adding the account for Lodge and Townhouses Phase V. On February 28, 2012, he signed a credit agreement adding the account for Stateside Phase VI as collateral for the margin loans. And on August 5, 2013, Quiros signed a credit agreement adding the accounts for Biomedical Phase VII and another Quiros entity.

81.    Thus, in every offering, Quiros put limited partnership funds at risk by pledging them as collateral for the margin loans. Raymond James could have insisted on payment of the

margin loans, and Quiros would have had no choice but to pay them off with limited partnership funds slated for use to construct the various projects unless he could come up with a replacement source of funding. And, as described below, Quiros eventually paid off the margin loans using limited partnership funds.

82.     Quiros's establishment of the margin loans violated the terms of each of the Jay Peak Limited Partnership agreements (which Stenger and/or Jay Peak provided to all investors). Those agreements specifically prohibited the projects' general partners from encumbering or pledging partnership funds as collateral without the express approval of the investors. Furthermore, none of the offering documents the Defendants provided to investors said that any of the limited partnerships, general partners, Quiros, Stenger, Q Resorts, or Jay Peak could pledge investor funds as collateral for loans. In fact, the use of proceeds document in every offering, which set forth exactly how the investors' partnership funds would be spent, did not provide for use of such funds as collateral for or to pay off margin loans.

83.     Quiros began incurring margin loan debt in the Suites Phase I and Hotel Phase II accounts almost immediately after closing on the purchase of Jay Peak. Raymond James and Burstein actively helped Quiros hide the fact that investors' monies were missing from the Jay Peak Suites Phase I and Hotel Phase II accounts because Quiros had improperly used investor funds to purchase Jay Peak. On June 25, 2008, in an apparent attempt to give the appearance that partnership funds remained in the Suites Phase I account at Raymond James, Quiros directed the purchase of $11 million in Treasury Bills. That $11 million purchase matched the $11 million of Suites Phase I funds MSSI had transferred to Quiros' Suites Phase I account. But, by this time Quiros had transferred $7.6 million of the $11 million out of the account to pay for the purchase of Jay Peak, there were only $3.4 million in partnership funds left in the Suites Phase I

account. Therefore, Quiros's Suites Phase I account had to incur a margin loan balance of $7.6 million to buy Treasury Bills (the difference between the $3.4 million in the account and the full $11 million purchase). Under terms of the credit agreement Quiros had signed, that $7.6 million was actually a debt to Raymond James. Thus, Suites Phase I did not have a claim to the $11 million in Treasury Bills, and the $3.4 million in investor funds still in the Suites Phase I account was at risk of being forfeited to Raymond James if there was a margin call.

84.     Quiros undertook the same acts in the Hotel Phase II account at Raymond James on the same day. On June 25, 2008, he ordered the purchase of $7 million in Treasury Bills in that account. Again, this amount matched the $7 million of Hotel Phase II funds MSSI had transferred to Quiros's Hotel Phase II account. But again, Quiros had already transferred $6 million of that amount out of the account to pay for Q Resorts's purchase of Jay Peak. There was only $1 million in partnership funds left in the Hotel Phase II account. Therefore, Quiros' Hotel Phase II account had to incur a margin loan balance of $6 million to buy Treasury Bills (the difference between the $1 million in the account and the $7 million purchase). Under the terms of the credit agreement Quiros had signed, that $6 million was actually a debt to Raymond James. Hotel Phase II did not have a claim to the full $7 million in Treasury Bills, and the $1 million in partnership funds still in the Hotel Phase II account was at risk of being forfeited to Raymond James if there was a margin call.

85.     Quiros continued to make use of the margin loans in the Suites Phase I and Hotel Phase II accounts at Raymond James to pay the remainder of the purchase price for Jay Peak between June and September 2008.

86.     From October 2008 until February 2009, Quiros continued to maintain the margin loan balances in his Suites Phase I and Hotel Phase II accounts at Raymond James, with

partnership funds pledged as collateral in violation of the Phase I and II use of proceeds documents and the limited partnership agreements. By February 2009, the combined margin loan balances of the two accounts had reached $23.8 million. Stenger had continued to authorize transfers of investor funds from the People's Bank Phase I and II accounts to the Raymond James accounts, which then became collateral for the margin loans.

87.     That month, Quiros consolidated the two margin loans into one (Margin Loan III), and signed a new credit agreement that continued to pledge Phase I and II partnership funds to back the margin loan balance. Over the next three years, Quiros signed the aforementioned credit agreements pledging partnership funds from Phases III-VI as collateral. He also used more than $105 million of partnership funds from Phases I-V towards paying down Margin Loan III, broken down as follows: approximately $2.2 million from Suites Phase I, approximately $51.6 million from Hotel Phase II, approximately $32.5 million from Penthouse Phase III, approximately a net amount of $15.8 million from Golf and Mountain Phase IV, and approximately $5.6 million from Lodge and Townhouses Phase V.

88.     Margin Loan III continued to be backed by Suites Phase I and Hotel Phase II investor funds, putting them at risk, until February 2012. In addition, during this same time, Quiros and Stenger commingled Suites Phase I partnership funds with other projects. For example, on October 3, 2011, Stenger authorized a transfer of $49,000 from the Penthouse Phase III account at People's Bank to the People's Bank Suites Phase I account. And on February 23, 2012, Stenger authorized a transfer of almost $62,000 from the Suites Phase I account to the Hotel Phase II account, both at People's Bank.

89.     Because Quiros continued spending money from the margin loan account at Raymond James, the Margin Loan III balance remained at approximately $23 million in

February 2012.  On February 24, 2012, Quiros transferred approximately $22.4 million of investor funds from the Q Resorts account at Raymond James to pay off the $23.4 million balance.  The $22.4 million of investor funds is broken down as follows: approximately $5.8 million of this amount came from Stateside Phase VI, and approximately $16.6 million of this amount came from Lodge and Townhouses Phase V.

90.     However, just four days after paying off Margin Loan III, on February 28, 2012, Quiros opened yet another margin loan account in the name of Jay Peak at Raymond James (Margin Loan IV).  This time, he signed a credit agreement pledging investor partnership funds in accounts from Lodge and Townhouses Phase V and Stateside Phase VI as collateral for the margin loan balances.  In August 2013, he added the accounts of Jay Construction Management, Inc. (an entity controlled by Quiros) and Biomedical Phase VII, and reconfirmed the account of Q Resorts to a new credit agreement.

91.     From February 2012 through March 2014, Quiros used more than $6.5 million of partnership funds from Phases V-VI towards paying down the Raymond James Margin Loan IV. However, because Quiros spent approximately $25.5 million on the new margin loan account on various project-related and non-project expenses, the Margin Loan IV balance was approximately $19.4 million in February 2014.

92.     On April 12, 2013, Quiros transferred $3 million in Biomedical Phase VII partnership funds to his wholly owned company, GSI of Dade County, Inc. Six weeks later, on May 30, 2013, he used $2.2 million of that money to buy a luxury condominium at Trump Place in New York City.

93.     Raymond James then demanded that Quiros pay off Margin Loan IV.   In response, on March 5, 2014, Quiros transferred approximately $18.2 million of partnership funds

derived from a Biomedical Phase VII account at People's Bank, which he used as part of a $19 million pay off of this margin loan. Quiros took funds from the Biomedical Phase VII account at Raymond James and sent them to People's Bank, then People's Bank sent the funds to Quiros's Jay Construction account at Raymond James, and Quiros took the money out of the Jay Construction account at Raymond James to pay off the margin loan. All told, Quiros essentially used the money in the Biomedical Phase VII account that was collateral for the margin loan to pay off the margin loan. The $19 million that went to pay off the margin loan at Raymond James did not go to build the Biomedical Phase VII project, as intended. The pay down and pay off of this margin loan was a major contributor to the Biomedical Phase VII project's shortfalls.

94.    The margin loans at Raymond James operated from 2008 to 2014. These margin loans were always collateralized by partnership funds in violation of the Jay Peak Limited Partnership agreements.

95.    The funds of each Jay Peak Limited Partnership were commingled and misused for payments on obligations, or for the benefit of, Quiros, Jay Peak, Q Resorts, JCM, GSI, Q Burke, Northeast and/or other Jay Peak Limited Partnerships. Therefore, each Jay Peak Limited Partnership is a creditor of, and possesses a claim against, Quiros, Jay Peak, Q Resorts, JCM, GSI, Q Burke, Northeast and/or another Jay Peak Limited Partnership.

96.    In mid-2014, Raymond James proceeded to close the Jay Peak Limited Partnership accounts.

**Raymond James Knew the Quiros and Jay Peak Transactions Were Extraordinary.**

97.    The high number of transactions in the Jay Peak Limited Partnership accounts at Raymond James was out of the ordinary to Burstein and Raymond James.

98.    In fact, Burstein and Raymond James were concerned about the high volume of

wires in one of Quiros' accounts in 2011.   Raymond James's Anti-Money Laundering department evaluated the account and vetted it.

99.    The multiple Jay Peak Limited Partnership accounts being used as collateral for one loan was the only time Burstein had cross-margined multiple accounts to collateralize a single loan.

100.    Raymond James and Burstein knew or had reason to know the transfers and margin loans orchestrated by Quiros and Stenger violated the terms of the Jay Peak Limited Partnership agreements.  Raymond James and Burstein were aware or should have been aware of the use restrictions governing the partnership funds by virtue of their communications with MSSI, account opening documents pertaining to each Jay Peak Limited Partnership account, and minimal due diligence regarding the source of the funds transferred and collateralized that would have revealed Quiros and Stenger's fraudulent scheme.

101.    As early as 2012, Raymond James and Burstein were on notice of the emerging allegations in the press against Quiros and Stenger regarding misuse of investor funds.  For example, in Spring 2012, Douglas Hulme, a former business consultant who worked closely with Jay Peak warned immigration attorneys of the suspected misuse of funds and spoke with Peter Shumlin's—the Governor of Vermont—administration about his concerns.

**Raymond James and Burstein Were Rewarded for Aiding Quiros and Stenger's Fraud.**

102.    Throughout all relevant times, Raymond James received numerous transfers from Quiros, Stenger, and the Receivership Entities, including, but not limited to, interest and fee payments, granting of security interests, and deposits into Raymond James accounts and for the benefit of Raymond James.  These transfers perpetuated the fraud on the Jay Peak Limited Partnerships and their respective investors by diverting limited partnership funds and disguising

28

the amounts in their respective accounts and expenditures therefrom. When making these transfers, Quiros, both personally and on behalf of the Receivership Entities, intended to hinder, delay or defraud the Jay Peak Limited Partnerships.

103.    Raymond James' role in commingling funds it knew belonged to investors, and in helping Quiros and Stenger embezzle partnership funds, was neither passive nor ministerial. Raymond James played an active, instrumental role by (1) allowing Quiros to use funds that Raymond James knew Quiros was not supposed to use to buy Jay Peak from MSSI; (2) setting up margin loans for Quiros to commingle and steal partnership funds in the Jay Peak Limited Partnerships accounts; and (3) giving carte blanche to Quiros to do whatever he wanted with the Jay Peak Limited Partnerships' funds, including paying himself and paying off both a $23 million margin loan and a $19 million margin loan to Raymond James.

104.    In return, Raymond James and Burstein made substantial profits. Raymond James was paid interest of over $2 million on the margin loans on the Jay Peak Limited Partnership accounts. Because Raymond James and Burstein profited from the Jay Peak Limited Partnerships accounts, Raymond James and Burstein provided Quiros with substantial services and aided and abetted the Jay Peak General Partners' breaches of fiduciary duty to the Jay Peak Limited Partnerships.

## COUNT I
## AIDING AND ABETTING BREACH OF FIDUCIARY DUTY
### (All Defendants)

105.    The Receiver re-alleges and incorporates paragraphs 1-104 above as if fully set forth herein.

106.    The Jay Peak General Partners owed fiduciary duties to their corresponding Jay Peak Limited Partnerships.

29

107.    The Jay Peak General Partners breached their fiduciary duties by commingling the Jay Peak Limited Partnerships' monies, misappropriating them, and misusing them.

108.    Through Q Resorts, Inc. and Jay Peak, Inc., Quiros controlled each of the Jay Peak General Partners for Phases I to VI.  Quiros is also a managing member of the general partner of Phase VII.  Quiros, either with knowledge, general awareness, or recklessness substantially assisted in these breaches of fiduciary duty.

109.    Raymond James and Burstein, either with knowledge, general awareness, or recklessness substantially assisted in these breaches of fiduciary duty.

110.    As a result of the breaches of fiduciary duties, the Jay Peak Limited Partnerships suffered damages.

111.    By reason of the foregoing, the Receiver is entitled to a judgment awarding him compensatory damages in an amount to be determined at the trial of this action, together with interest at the maximum allowable rate.

**WHEREFORE**, Plaintiff, as Receiver for the Jay Peak Limited Partnerships, demands judgment against Quiros, Burstein, and Raymond James for compensatory damages in an amount to be determined at the trial of this action, together with interest at the maximum rate allowable, and such other relief this Court deems just and proper.

**COUNT II**
**CONSPIRACY TO BREACH FIDUCIARY DUTY**
**(All Defendants)**

112.    The Receiver re-alleges and incorporates paragraphs 1-104 above as if fully set forth herein.

113.    Defendants and Stenger are parties to a civil conspiracy.

114.    Defendants and Stenger conspired to have the Jay Peak General Partners breach

their fiduciary duties to the Jay Peak Limited Partnerships by commingling the Jay Peak Limited Partnerships' funds, misappropriating them, and misusing them.

115.   Defendants and Stenger committed overt acts in furtherance of their conspiracy, including: (a) Quiros misused investors' funds to purchase Jay Peak; (b) Quiros misused and misappropriated limited partnership funds by using them as collateral for loans, to pay off margin loans, and by misappropriating them for personal expenses; (c) Raymond James and Burstein allowed Quiros to use investor funds to purchase Jay Peak, and (d) Raymond James and Burstein provided Quiros with margin loans collateralized by Plaintiff's and investors' funds for Quiros to misappropriate and misuse.

116.   Defendants and Stenger's conspiracy and their respective overt acts caused the Jay Peak Limited Partnerships to suffer damages, including but not limited to the loss of limited partnership funds in Jay Peak Limited Partnerships.

**WHEREFORE**, Plaintiff, as Receiver for the Jay Peak Limited Partnerships, demands judgment against Quiros, Burstein, and Raymond James for compensatory damages in an amount to be determined at the trial of this action, together with interest at the maximum rate allowable, and such other relief this Court deems just and proper.

## COUNT III
## FRAUDULENT TRANSFERS PURSUANT TO FLA. STAT. § 726.105(1)(a)
### (Raymond James)

117.   The Receiver re-alleges and incorporates paragraphs 1-104 above as if fully set forth herein.

118.   Quiros made transfers in the form of interest fee and cost payments from the Receivership Entities to Raymond James in furtherance of the fraudulent scheme described above.

119.    Quiros, both personally and on behalf of the Receivership Entities, made the transfers with an intent to hinder, delay or defraud the Jay Peak Limited Partnerships.

120.    Given Raymond James' role in assisting Quiros and Stenger with the scheme to defraud the Jay Peak Limited Partnerships, Raymond James was not acting in good faith at the time that it received such transfers.  In fact, each transfer accepted by Raymond James served only to further the scheme against the Jay Peak Limited Partnerships and created more indebtedness for Quiros and the Receivership Entities.

**WHEREFORE**, Plaintiff, as Receiver for the Jay Peak Limited Partnerships, demands judgment against Raymond James declaring all transfers to Raymond James by the Receivership Entities and/or Quiros as fraudulent transfers under Florida Statute 726.105(1)(a), avoiding same to the extent permitted by law, and such other relief this Court deems just and proper.

**COUNT IV**
**FRAUDULENT TRANSFERS PURSUANT TO FLA. STAT. § 726.105(1)(b)**
**(Raymond James)**

121.    The Receiver re-alleges and incorporates paragraphs 1-104 above as if fully set forth herein.

122.    Quiros made transfers in the form of interest fee and cost payments from the Receivership Entities to Raymond James.

123.    Raymond James did not provide reasonably equivalent value to the Receivership Entities in exchange for such transfers.  Each transfer accepted by Raymond James served only to further the scheme against the Jay Peak Limited Partnerships and created more indebtedness for the Receivership Entities.

124.    When making such transfers, Quiros and the Receivership Entities, through the complex series of transfers whereby Quiros siphoned off partnership funds, were engaged or

32

about to engage in a business or transaction for which the remaining assets were unreasonably small in relation to the business or transaction and/or intended to incur, or reasonably should have believed that they would incur, debts beyond their ability to pay as they became due.

125.    Given Raymond James' role in assisting Quiros and Stenger with the scheme to defraud the Jay Peak Limited Partnerships, Raymond James was not acting good faith at the time that it received such transfers.  In fact, each transfer accepted by Raymond James served only to further the scheme against the Jay Peak Limited Partnerships and created more indebtedness for Quiros and the Receivership Entities.

**WHEREFORE**, Plaintiff, as Receiver for the Jay Peak Limited Partnerships, demands judgment against Raymond James declaring all transfers to Raymond James by the Receivership Entities as fraudulent transfers under Florida Statute 726.105(1)(b), avoiding same to the extent permitted by law, and such other relief this Court deems just and proper.

### COUNT V
### FRAUDULENT TRANSFERS PURSUANT TO FLA. STAT. § 726.106(1)
### (Raymond James)

126.    The Receiver re-alleges and incorporates paragraphs 1-104 above as if fully set forth herein.

127.    Quiros made transfers in the form of interest fee and cost payments from the Receivership Entities to Raymond James.

128.    Raymond James did not provide reasonably equivalent value to the Receivership Entities in exchange for such transfers.  Each transfer accepted by Raymond James served only to further the scheme against the Jay Peak Limited Partnerships and created more indebtedness for the Receivership Entities.

33

129.    The Receivership Entities were insolvent at the time of the transfers or became insolvent as a result of the transfers because of the underlying fraudulent scheme discussed above.

130.    Given Raymond James' role in assisting Quiros with the scheme to defraud the Jay Peak Limited Partnerships, Raymond James was not acting good faith at the time that it received such transfers.  In fact, each transfer accepted by Raymond James served only to further the scheme against the Jay Peak Limited Partnerships and created more indebtedness for the Receivership Entities.

**WHEREFORE**, Plaintiff, as Receiver for the Jay Peak Limited Partnerships, demands judgment against Raymond James declaring all transfers to Raymond James by the Receivership Entities as fraudulent transfers under Florida Statute 726.106(1), avoiding same to the extent permitted by law, and such other relief this Court deems just and proper.

### COUNT VI
### VIOLATION OF RACKETEER INFLUENCED AND
### CORRUPT ORGANIZATIONS ACT, 18 U.S.C. § 1962(c)
### (All Defendants)

131.    The Receiver re-alleges and incorporates paragraphs 1-104 above as if fully set forth herein.

132.    At all relevant times, Defendants and Stenger were employed by and associated with an illegal enterprise, and conducted and participated in that enterprise's affairs, through a pattern of racketeering activity consisting of numerous and repeated uses of the interstate mails and wire communications to execute a scheme to defraud, all in violation of RICO, 18 U.S.C. § 1962(c).

133.    The RICO enterprise, which engaged in, and the activities of which affected, interstate and foreign commerce, was comprised of an association in fact of entities and

individuals that included Defendants and Stenger.

134.    The members of the RICO enterprise had a common purpose: to increase and maximize their profits by illegally diverting funds that they knew belonged to partnerships for improper and unauthorized purposes.   Defendants shared the bounty of their enterprise by sharing the illegal profits generated by the joint scheme.

135.    Defendants conducted and participated in the affairs of this RICO enterprise through a pattern of racketeering activity that projects into the future, lasted more than one year, and that consisted of numerous and repeated violations of federal mail and wire fraud statutes, which prohibit the use of any interstate or foreign wire or mail facility for the purpose of executing a scheme to defraud, in violation of 18 U.S.C. §§ 1341 and 1343.   The RICO enterprise functioned over a period of years as a continuing unit and maintained an ascertainable structure separate and distinct from the pattern of racketeering activity alleged herein.

136.    Defendants each directed and controlled the enterprise's affairs as alleged in paragraphs, including, *inter alia*:

a.      Quiros devised the above-described scheme to defraud the Jay Peak Limited Partnerships and divert their funds for his own personal gain using the Raymond James accounts;

b.      Quiros and Stenger knowingly wired money out of accounts holding limited partnership funds for unauthorized purposes and for Quiros's own personal gain;

c.      Raymond James and Burstein assisted in the diversion and misuse of partnership funds, knowing that these funds belonged to the respective Jay Peak Limited Partnership and not to Quiros or Stenger;

d.      Stenger told the initial investors that their investments in the individual projects would yield 2% to 6% annually, knowing that the funds would be diverted for unauthorized uses

and for the benefit of Defendants;

e.    Raymond James provided margin loans to Quiros which were collateralized with assets belonging to the Jay Peak Limited Partnerships;

f.    Raymond James and Burstein facilitated an intricate web of transfers among various accounts at Raymond James to disguise the fact that the majority of the seven projects were either over budget or experiencing shortfalls;

g.    Quiros also improperly used additional investor funds to pay down and pay off margin loans (including paying nearly $2.5 million in margin interest) he set up in the name of the Jay Peak Limited Partnerships at Raymond James;

h.    Quiros reviewed the contents of the Phase I-VI offering documents, was familiar with them, and understood he had to abide by them.  He also approved the use of proceeds document in Phases III-VI;

i.    Raymond James was on notice of the use restrictions surrounding the Jay Peak Limited Partnership funds and willfully assisted Quiros' efforts to transfer, misuse, and commingle the funds in violation of the partnership agreements; and

j.    Raymond James, Quiros, and Burstein devised a plan to collateralize investors' funds for loans to Quiros.

137.    Defendants used the mails and wires in furtherance of the scheme.  Stenger provided materials to investors using the mails and the Defendants wired investor funds among various accounts, and for Quiros's personal expenses.

138.    As part of and in furtherance of the scheme to defraud, Defendants made material omissions and misrepresentations to the Jay Peak Limited Partnerships and the initial investors for each respective limited partnership with the intent to deceive them.

139.   Defendants had a duty to correct their misrepresentations and the mistaken impressions that arose from their omissions of material fact.   Their misrepresentations and omissions were material, as they helped advance their scheme and conceal their fraud, and were designed to lull the Jay Peak Limited Partnerships into believing that their investments were legitimate.   The Jay Peak Limited Partnerships and the investors would have sought to end the scheme, prevent the transfer of funds, and recover misused funds had Defendants Quiros, Stenger, Burstein, or Raymond James disclosed the true nature of their scheme, or the purposes for which the partnership funds would be or were in fact used.

140.   Because the scheme was not disclosed, and as a result of Defendants' conduct and participation in the racketeering activity alleged herein, the Jay Peak Limited Partnerships could take no action to avoid the misuse and embezzlement of their funds, causing the Jay Peak Limited Partnerships to suffer damages in the form of the loss of their respective funds.

**WHEREFORE**, Plaintiff, as Receiver for the Jay Peak Limited Partnerships, demands judgment against Defendants for compensatory and treble damages, attorneys fees and costs under 18 U.S.C. § 1964, and such other relief this Court deems just and proper.

### COUNT VII
### CONSPIRACY IN VIOLATION OF RACKETEER INFLUENCED AND CORRUPT ORGANIZATIONS ACT, 18 U.S.C. § 1962(d)
### (All Defendants)

141.   The Receiver re-alleges and incorporates paragraphs 1-104 and 131-140 above as if fully set forth herein.

142.   At all relevant times, Defendants and Stenger were associated with the enterprise and agreed and conspired to violate 18 U.S.C. § 1962(c).   Defendants agreed to conduct and participate, directly and indirectly, in the conduct and affairs of the enterprise through a pattern of racketeering activity, in violation of 18 U.S.C. § 1962(d).

143.    Defendants committed and caused to be committed a series of overt acts in furtherance of the conspiracy and to affect the objects thereof, including but not limited to the acts set forth above.

144.    As a result of Defendants' violations of 18 U.S.C. § 1962(d), the Jay Peak Limited Partnerships suffered damages in the form of loss of their respective funds.

**WHEREFORE**, Plaintiff, as Receiver for the Jay Peak Limited Partnerships, demands judgment against Defendants for compensatory and treble damages, attorneys fees and costs under 18 U.S.C. § 1964, and such other relief this Court deems just and proper.

## DEMAND FOR JURY TRIAL

Plaintiff requests a jury trial for any and all Counts for which a trial by jury is permitted by law.

Dated: May 20, 2016

Respectfully submitted,

LEVINE KELLOGG LEHMAN
SCHNEIDER + GROSSMAN LLP
*Counsel for the Receiver*
201 South Biscayne Boulevard
Miami Center, 22nd Floor
Miami, FL 33131
Telephone:  (305) 403-8788
Facsimile:  (305) 403-8789

By: */s/ Jeffrey C. Schneider*
JEFFREY C. SCHNEIDER, P.A.
Florida Bar No. 933244
Primary: jcs@lklsg.com
Secondary: lv@lklsg.com
JASON KELLOGG, ESQ.
Florida Bar No. 0578401
Primary: jk@lklsg.com
Secondary: kh@lklsg.com
MARCELO DIAZ-CORTES, ESQ.
Florida Bar No. 118166
Primary: md@lklsg.com
Secondary: cod@lklsg.com

38