UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF FLORIDA

CASE NO.:  16-cv-21301-GAYLES

SECURITIES AND EXCHANGE COMMISSION,

      Plaintiff,

v.

ARIEL QUIROS,
WILLIAM STENGER,
JAY PEAK, INC.,
Q RESORTS, INC.,
JAY PEAK HOTEL SUITES L.P.,
JAY PEAK HOTEL SUITES PHASE II. L.P.,
JAY PEAK MANAGEMENT, INC.,
JAY PEAK PENTHOUSE SUITES, L.P.,
JAY PEAK GP SERVICES, INC.,
JAY PEAK GOLF AND MOUNTAIN SUITES L.P.,
JAY PEAK GP SERVICES GOLF, INC.,
JAY PEAK LODGE AND TOWNHOUSES L.P.,
JAY PEAK GP SERVICES LODGE, INC.,
JAY PEAK HOTEL SUITES STATESIDE L.P.,
JAY PEAK GP SERVICES STATESIDE, INC.,
JAY PEAK BIOMEDICAL RESEARCH PARK L.P.,
AnC BIO VERMONT GP SERVICES, LLC,

      Defendants, and

JAY CONSTRUCTION MANAGEMENT, INC.,
GSI OF DADE COUNTY, INC.,
NORTH EAST CONTRACT SERVICES, INC.,
Q BURKE MOUNTAIN RESORT, LLC,

      Relief Defendants.

Q BURKE MOUNTAIN RESORT, HOTEL
AND CONFERENCE CENTER, L.P.
Q BURKE MOUNTAIN RESORT GP SERVICES, LLC,

      Additional Receivership Defendants[1]

_____ /

## NOTICE OF FILING

---

[1] *See* Order Granting Receiver's Motion to Expand Receivership dated April 22, 2016 [ECF No.:

Michael I. Goldberg (the "Receiver"), through undersigned counsel, hereby gives notice of the filing of *Receiver's First Interim Report* on August 12, 2016.

Respectfully submitted,

  /s/ Michael I. Goldberg
Michael I. Goldberg, Esq.
Florida Bar Number:  886602
Email:  michael.goldberg@akerman.com
AKERMAN LLP
Las Olas Centre II, Suite 1600
350 East Las Olas Boulevard
Fort Lauderdale, FL  33301-2999
Telephone (954) 463-2700
Facsimile: (954) 463-2224
*Court Appointed Receiver*

## CERTIFICATE OF SERVICE

I HEREBY CERTIFY that a true and correct copy of the foregoing was served on this August 12, 2016 via the Court's notice of electronic filing on all CM/ECF registered users entitled to notice in this case as indicated on the attached Service List.

By: /s/ Michael I. Goldberg
     Michael I. Goldberg, Esq.

# SERVICE LIST

**1:16-cv-21301-DPG Notice will be electronically mailed via CM/ECF to the following:**

Robert K. Levenson, Esq.
Senior Trial Counsel
Florida Bar No. 0089771
Direct Dial: (305) 982-6341
Email: levensonr@sec.gov
almontei@sec.gov, gonzalezlm@sec.gov,
jacqmeinv@sec.gov

Christopher E. Martin, Esq.
Senior Trial Counsel
SD Florida Bar No.: A5500747
Direct Dial: (305) 982-6386
Email: martinc@sec.gov
almontei@sec.gov, benitez-perelladaj@sec.gov

SECURITIES AND EXCHANGE
COMMISSION
801 Brickell Avenue, Suite 1800
Miami, Florida 33131
Telephone: (305) 982-6300
Facsimile:   (305) 536-4154
*Attorneys for Plaintiff*

Roberto Martinez, Esq.
Email: bob@colson.com
Stephanie A. Casey, Esq.
Email: scasey@colson.com
COLSON HICKS EIDSON, P.A.
255 Alhambra Circle, Penthouse
Coral Gables, Florida 33134
Telephone: (305) 476-7400
Facsimile: (305) 476-7444
*Attorneys for William Stenger*

Jeffrey C. Schneider, Esq.
Email: jcs@lklsg.com
LEVINE KELLOGG LEHMAN
SCHNEIDER + GROSSMAN
Miami Center, 22nd Floor
201 South Biscayne Blvd.
Miami, Florida 33131
Telephone: (305) 403-8788
*Co-Counsel for Receiver*

Jonathan S. Robbins, Esq.
jonathan.robbins@akerman.com
AKERMAN LLP
350 E. Las Olas Blvd., Suite 1600
Ft. Lauderdale, Florida 33301
Telephone:  (954) 463-2700
Facsimile:  (954) 463-2224

Naim Surgeon, Esq.
naim.surgeon@akerman.com
AKERMAN LLP
Three Brickell City Centre
98 Southeast Seventh Street, Suite 1100
Miami, Florida  33131
Telephone: (305) 374-5600
Facsimile: (305) 349-4654
*Attorney for Court-Appointed Receiver*

Scott B. Cosgrove, Esq.
Email: scosgrove@leoncosgrove.com
James R. Bryan, Esq.
Email: jbryan@leoncosgrove.com
Leon Cosgrove, LLC
255 Alhambra Circle
Suite 800
Coral Gables, Florida 33133
Telephone: (305) 740-1975
Facsimile: (305) 437-8158
*Attorney for Ariel Quiros*

David B. Gordon, Esq.
Email: dbg@msk.com
MITCHELL SILBERBERG & KNOPP, LLP
12 East 49th Street – 30th Floor
New York, New York 10017
Telephone: (212) 509-3900
*Co-Counsel for Ariel Quiros*

Jean Pierre Nogues, Esq.
Email: jpn@msk.com
Mark T. Hiraide, Esq.
Email: mth@msk.com
MITCHELL SILBERBERG & KNOPP, LLP
11377 West Olympic Blvd.
Los Angeles, CA 90064-1683
Telephone (310) 312-2000
*Co-Counsel for Ariel Quiros*

Mark P. Schnapp, Esq.
Email: schnapp@gtlaw.com
Mark D. Bloom, Esq.
Email: bloomm@gtlaw.com
Danielle N. Garno
E-Mail: garnod@gtlaw.com
GREENBERG TRAURIG, P.A.
333 SE 2nd Avenue, Suite 4400
Miami, Florida 33131
Telephone: (305) 579-0500
*Attorney for Intervenor, Citibank N.A.*

J. Ben Vitale
Email: bvitale@gurleyvitale.com
David E. Gurley
Email: dgurley@gurleyvitale.com
GURLEY VITALE
601 S. Osprey Avenue
Sarasota, Florida 32436
Telephone: (941) 365-4501
*Attorney for Blanc & Bailey Construction, Inc.*

**Stanley Howard Wakshlag**
email: swakshlag@knpa.com
KENNY NACHWALTER, P.A.
Four Seasons Tower
1441 Brickell Avenue
Suite 1100
Miami, FL 33131-4327
Telephone: (305) 373-1000
*Attorneys for Raymond James & Associates Inc.*

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF FLORIDA

CASE NO.:  16-cv-21301-GAYLES

SECURITIES AND EXCHANGE COMMISSION,

      Plaintiff,

v.

ARIEL QUIROS,
WILLIAM STENGER,
JAY PEAK, INC.,
Q RESORTS, INC.,
JAY PEAK HOTEL SUITES L.P.,
JAY PEAK HOTEL SUITES PHASE II. L.P.,
JAY PEAK MANAGEMENT, INC.,
JAY PEAK PENTHOUSE SUITES, L.P.,
JAY PEAK GP SERVICES, INC.,
JAY PEAK GOLF AND MOUNTAIN SUITES L.P.,
JAY PEAK GP SERVICES GOLF, INC.,
JAY PEAK LODGE AND TOWNHOUSES L.P.,
JAY PEAK GP SERVICES LODGE, INC.,
JAY PEAK HOTEL SUITES STATESIDE L.P.,
JAY PEAK GP SERVICES STATESIDE, INC.,
JAY PEAK BIOMEDICAL RESEARCH PARK L.P.,
AnC BIO VERMONT GP SERVICES, LLC,

      Defendants, and

JAY CONSTRUCTION MANAGEMENT, INC.,
GSI OF DADE COUNTY, INC.,
NORTH EAST CONTRACT SERVICES, INC.,
Q BURKE MOUNTAIN RESORT, LLC,

      Relief Defendants.

Q BURKE MOUNTAIN RESORT, HOTEL
AND CONFERENCE CENTER, L.P.
Q BURKE MOUNTAIN RESORT GP SERVICES, LLC,

      Additional Receivership Defendants[1]

_____/

## RECEIVER'S FIRST INTERIM REPORT

---

[1] *See* Order Granting Receiver's Motion to Expand Receivership dated April 22, 2016 [ECF No.: 60].

Michael I. Goldberg, in his capacity as receiver (the "Receiver") of Jay Peak, Inc., Q Resorts, Inc., Jay Peak Hotel Suites L.P., Jay Peak Hotel Suites Phase II L.P., Jay Peak Management, Inc., Jay Peak Penthouse Suites L.P., Jay Peak GP Services, Inc., Jay Peak Golf and Mountain Suites L.P., Jay Peak GP Services Golf, Inc., Jay Peak Lodge and Townhouse L.P., Jay Peak GP Services Lodge, Inc., Jay Peak Hotel Suites Stateside L.P., Jay Peak Services Stateside, Inc., Jay Peak Biomedical Research Park L.P., AnC Bio Vermont GP Services, LLC (collectively, the "Receivership Defendants") and Jay Construction Management, Inc., GSI of Dade County, Inc., North East Contract Services, Inc., and Q Burke Mountain Resort, LLC (collectively, the "Relief Defendants") and Q Burke Mountain Resort, Hotel and Conference Center, L.P. and Q Burke Mountain Resort GP Services, LLC (together, "Additional Receivership Defendants") (the Receivership Defendants, Relief Defendants, and Additional Receivership Defendants shall collectively be referred to as the "Receivership Entities"), by and through undersigned counsel, and pursuant to the Order Granting Plaintiff Securities and Exchange Commission's Motion for Appointing Receiver, dated April 13, 2016 (the "Order") [ECF No. 13], respectfully files his First Interim Report.

# TABLE OF CONTENTS

Page

I.    BACKGROUND .................................................................................................... - 3 -
      A.    Procedural Background ................................................................................ - 3 -
      B.    The EB-5 Program ...................................................................................... - 4 -

II.   RECEIVERSHIP ENTITIES .............................................................................. - 5 -
      A.    Receivership Defendants ............................................................................ - 5 -
      B.    Relief Defendants ..................................................................................... - 11 -
      C.    Additional Receivership Entities ............................................................. - 11 -

III.  ACTIONS TAKEN BY THE RECEIVER DURING THE REPORTING PERIOD ....... - 12 -
      A.    Securing the Assets .................................................................................. - 12 -
            1.   Management of Vermont Properties ............................................... - 12 -
            2.   GSI's Miami Office ........................................................................ - 14 -
            3.   North East Contract Services, LLC's Miami Office ...................... - 15 -
            4.   Opa-Locka Warehouse .................................................................... - 15 -
      B.    Notice of the Receivership ....................................................................... - 15 -
      C.    Website/Ongoing Communications .......................................................... - 15 -
      D.    Immigration Issues ................................................................................... - 16 -
            1.   USCIS ............................................................................................. - 16 -
            2.   Supplying Economic Data to Investors to Satisfy Their Individual
                 Immigration Petitions .................................................................... - 18 -
      E.    Expansion of Receivership ....................................................................... - 18 -
      F.    Litigation and Third Party Claims ........................................................... - 20 -
            1.   Raymond James & Associates, Inc. and Raymond James Financial, Inc. ........... - 20 -
                 a.   Goldberg v. Raymond James Financial, Inc., et al. ............... - 21 -
                 b.   State of Vermont v. Raymond James Financial, Inc. .............. - 22 -
                 c.   Temporary Loan from Raymond James & Associates, Inc. ..... - 23 -
            2.   Citibank, N.A. ................................................................................ - 24 -
            3.   Additional Discovery ...................................................................... - 25 -
      G.    Preservation of Contractor and Subcontractor Lien Rights ..................... - 25 -
      H.    Repairing the Aerial Tram ........................................................................ - 26 -
      I.    Deferred Maintenance .............................................................................. - 27 -
      J.    Water System ........................................................................................... - 27 -
      K.    Newport .................................................................................................... - 28 -
      L.    Airport ...................................................................................................... - 29 -
      M.    Jay Peak's Management of Homeowner Associations .............................. - 29 -

IV.   FINANCIAL AFFAIRS ..................................................................................... - 30 -
      A.    Bank Accounts ......................................................................................... - 30 -
      B.    Jay Peak ................................................................................................... - 30 -
      C.    Q Burke .................................................................................................... - 31 -
      D.    Operating Expenses .................................................................................. - 32 -
            1.   Resort Personnel ............................................................................. - 33 -
            2.   Modification of Operating Supplies ................................................ - 35 -

-AKERMAN LLP, LAS OLAS CENTRE II, SUITE 1600, 350 EAST LAS OLAS BOULEVARD, FORT LAUDERDALE, FL 33301-2999

      3. Restructuring of Financial Reporting and Culture Change.................................- 35 -
    E.  Monetization of cell tower income stream...............................................................- 35 -
    F.  Receivership Expenses.............................................................................................- 35 -
V.  ADMINISTRATION OF THE RECEIVERSHIP ESTATES .........................................- 36 -
    A.  The Receiver and his Professionals.........................................................................- 36 -
    B.  Claims.......................................................................................................................- 37 -
    C.  Recommendations ....................................................................................................- 38 -

AKERMAN LLP, LAS OLAS CENTRE II, SUITE 1600, 350 EAST LAS OLAS BOULEVARD, FORT LAUDERDALE, FL 33301-2999

# I.     BACKGROUND

## A.     Procedural Background

On April 12, 2016, the Securities and Exchange Commission ("SEC") filed a complaint [ECF No. 1] ("Complaint") in the United States District Court for the Southern District of Florida (the "Court") against the Receivership Defendants, the Relief Defendants, William Stenger ("Stenger") and Ariel Quiros ("Quiros" and with the Receivership Defendants, Relief Defendants and Stenger, the "Defendants"), the principal of the Receivership Defendants, alleging that the Defendants violated the Securities Act of 1933 and the Securities Exchange Act of 1934 by making false or materially misleading representations to investors. The SEC also sought emergency relief including the entry of a temporary restraining order freezing the Defendants' assets and the appointment of a receiver.   The case was assigned to the Honorable Darrin P. Gayles.

According to the Complaint, the scheme orchestrated by Quiros and managed by Stenger involved securities offerings made on behalf of seven limited partnerships connected to Defendant Jay Peak, Inc. The first six offerings were associated with construction and renovation at the Jay Peak ski resort and its accompanying facilities. Specifically, the SEC accused the Defendants of making material misrepresentations to investors in connection with the sale of limited partnership interests, the commingling of individual partnership funds among all partnership, and the diversion of partnership assets for personal use.

On April 13, 2016, the Court entered an Order [ECF No. 11] granting the SEC's Emergency *Ex Parte* Motion for Temporary Restraining Order, Asset Freeze and Other Relief [ECF No. 4] and an Order granting the SEC's Motion for Appointment of Receiver [ECF No. 13] (the "Receivership Order"). Among other things, the Receivership Order appointed Michael Goldberg as the receiver over the Receivership Defendants and the Relief Defendants.

-Akerman LLP, Las Olas Centre II, Suite 1600, 350 East Las Olas Boulevard, Fort Lauderdale, FL 33301-2999

On April 19, 2016, the Receiver filed a motion to expand the receivership to include the Additional Receivership Defendants [ECF No. 44]. On April 22, 2016, the Court entered the Order Granting Motion to Expand Receivership [ECF No. 60]. In that order, the Court explicitly stated that the "[t]he Receivership Order [D.E. 13] shall apply to Q Burke, L.P. and Q Burke GP, LLC as if the Additional Receivership Entities were originally included in the Receivership Order."

The SEC also sought the entry of a preliminary injunction and other relief. The Receivership Entities and Stenger consented to the entry of the preliminary injunction. Quiros opposes the entry of the preliminary injunction. In April, the Court held an evidentiary hearing on the SEC's request for entry of a preliminary injunction. On May 27, 2016, the SEC and Quiros filed memorandums in support of their respective positions. The Court has not yet determined whether or not to enter a preliminary injunction. In the meantime, the Receiver has been administering the receivership.

**B.     The EB-5 Program**

The Receivership Defendants, as more fully described below, are comprised of eight separate partnerships each of which raised money from foreign investors pursuant to the federal EB-5 immigration program and other related entities created by Quiros. In short, all but one of the partnerships operates ski centric hotels in northeastern Vermont, also known as the Northeast Kingdom. Congress created the EB-5 Immigrant Investor Program ("EB-5") in 1990 to provide prospective immigrants with the opportunity to become a permanent resident by investing in the United States economy. To qualify for an EB-5 visa, a foreign applicant must invest $500,000 or $1 million (depending on the type of investment) in a commercial enterprise approved by the U.S. Citizenship and Immigration Service ("USCIS"). Once he or she has invested, the foreign

AKERMAN LLP, LAS OLAS CENTRE II, SUITE 1600, 350 EAST LAS OLAS BOULEVARD, FORT LAUDERDALE, FL 33301-2999

applicant may apply (an "I-526 Petition") for a conditional green card, which is valid for two years. If the investment creates or preserves at least ten jobs during those two years, the foreign applicant may apply (an "I-829 Petition") to have the conditions removed from his or her green card and live and work in the U.S. permanently.

A certain number of EB-5 visas are set aside for prospective immigrants who invest through what is known as a Regional Center. An applicant only has to invest $500,000 through a Regional Center. The investors in this case made their investments through the State of Vermont's EB-5 Regional Center, which is one of the few state operated regional centers in the country.

## II.   RECEIVERSHIP ENTITIES

### A.   Receivership Defendants

**Jay Peak, Inc.** ("Jay Peak") is a Vermont corporation with its principal place of business in Jay, Vermont. Jay Peak owns and operates the Jay Peak Resort in Jay, Vermont, which encompasses the first six projects for which the Defendants raised money from foreign investors through the EB-5 Immigrant Investor Program.

**Q Resorts. Inc.** ("Q Resorts") is a Delaware corporation with its offices in Miami, Florida. Q Resorts is the 100 percent owner of Jay Peak, and Quiros is the sole owner, officer and director of Q Resorts. In 2008, Q Resorts acquired Jay Peak from Mont Saint-Saveur International, Inc. ("MSSI"), a Canadian company. Quiros has since overseen the various Jay Peak projects through Q Resorts. The initial EB-5 offering was made by MSSI. Stenger worked for MSSI at the time, and oversaw the offering as the principal of Jay Peak Management, Inc.

**Jay Peak Hotel Suites L.P.** ("Suites Phase I") is a Vermont limited partnership with its principal place of business in Jay, Vermont.  Suites Phase I consists of a 57 suite hotel with an

occupancy capacity of 228 guests located at the base of the Jay Peak Mountain. Between December 2006 and May 2008, Suites Phase I raised $17.5 million from 35 investors through an EB-5 offering of limited partnership interests to build the hotel. All 35 investors have had their I-526 petitions approved and 34 of the 35 investors have had their I-829 petitions approved.   In 2014, the investors in this project were converted from equity holders to debt holders. This conversion was the subject of significant dispute and will be reviewed in due time by the Court. The hotel is operating and it is expected that the hotel will continue to operate until the best course of disposition is determined.

**Jay Peak Hotel Suites Phase II L.P.** ("Hotel Phase II") is a Vermont limited partnership with its principal place of business in Jay, Vermont. Between March 2008 and January 2011, Hotel Phase II raised $75 million from 150 investors through an EB-5 offering of limited partnership interests to build a hotel, an indoor water park, an ice rink, and a golf club house. This project consists of a 120 suite hotel with the capacity of 480 guests located at the base of the Jay Peak Mountain. This project includes an Ice Arena, a Golf Clubhouse which contains three suites, a restaurant, a locker room area and a retail shop, a 50,000 square foot waterpark, a 10,000 square foot conference center, multiple restaurants and a 3,000 square foot arcade.

The I-526 petitions have been approved for 145 of the 150 investors in Hotel Phase II and 139 investors have had their I-829 petitions approved. Seven investors abandoned their immigration petition, one is not yet eligible to file his I-829, two had their I-526 petitions denied and one has a pending I-829 petition. The hotel is operating and it is expected that this hotel will continue to operate until the best course of disposition is determined with the goal of maximizing return on investment and each investor achieving their unconditional green card.

AKERMAN LLP, LAS OLAS CENTRE II, SUITE 1600, 350 EAST LAS OLAS BOULEVARD, FORT LAUDERDALE, FL 33301-2999

**Jay Peak Management, Inc.** ("JPM") is a Vermont corporation which is the general partner of Suites Phase I and Hotel Phase II. It is also a wholly-owned subsidiary of Jay Peak.

**Jay Peak Penthouse Suites L.P.** ("Penthouse Phase III") is a Vermont limited partnership with its principal place of business in Jay, Vermont. Between July 2010 and October 2012, Penthouse Phase III raised $32.5 million from 65 investors through an EB-5 offering of limited partnership interests to build a 56 unit suite hotel with the capacity of 224 guests located at the base of the Jay Peak Mountain. This project also consists of The Mountain Learning Center located near Stateside—a facility where children learn to ski and snowboard. All 65 investors have had their I-526 petitions approved and 58 of the 65 investors have had their I-829 petitions approved. One investor abandoned his immigration petition, two investors are not yet eligible to file their I-829 and 4 investors have a pending I-829 petitions. The hotel is operating and it is expected that this hotel will continue to operate until the best course of disposition is determined with the goal of maximizing return on investment and each investor achieving their unconditional green card.

**Jay Peak GP Services, Inc.** is a Vermont corporation and the general partner of Penthouse Phase III.

**Jay Peak Golf and Mountain Suites L.P.** ("Golf and Mountain Phase IV") is a Vermont limited partnership with its principal place of business in Jay, Vermont.  Between December 2010 and November 2011, Golf and Mountain Phase IV raised $45 million from 90 investors through an EB-5 offering of limited partnership interests to build "golf cottage" duplexes, a wedding chapel, and other facilities. This project consists of a 100 suite hotel able to accommodate 500 guests located at the base of the Jay Peak Mountain. This project also includes the Mountain Top Restaurant and the Provisions General Store. Each of the investors has had

their I-526 petitions approved and 69 of the 90 investors have had their I-829 petitions approved. Three investors are not yet eligible to file their I-829 and 18 investors have a pending I-829 petition. The hotel is operating and it is expected that this hotel will continue to operate until the best course of disposition is determined with the goal of maximizing return on investment and each investor achieving their unconditional green card.

**Jay Peak GP Services Golf, Inc.** is a Vermont corporation and the general partner of Golf and Mountain Phase IV.

**Jay Peak Lodge and Townhouses L.P.** ("Lodge and Townhouses Phase V") is a Vermont limited partnership with its principal place of business in Jay, Vermont. Between May 2011 and November 2012, Lodge and Townhouses Phase V raised $45 million from 90 investors through an EB-5 offering of limited partnership interests to build a 110 suites hotel which can accommodate 550 guests located at the base of the Jay Peak Mountain. This project includes the Stateside Day Lodge, which includes a cafeteria, bar, retail shops and ski rental facilities. Additionally, this project includes an amphitheater that can accommodate up to 3,500 guests and a 480 car parking garage.

Eighty-eight of the 90 investors have had their I-526 petitions approved and one investor had his I-526 petition denied. Thirty-one investors have had their I-829 petitions approved. Three investors abandoned their immigration petitions, two investors are not yet eligible to file their I-829 and 50 investors have a pending I-829 petition. The hotel is operating and it is expected that this hotel will continue to operate until the best course of disposition is determined with the goal of maximizing return on investment and each investor achieving their unconditional green card.

**Jay Peak GP Services Lodge, Inc.** is a Vermont corporation and the general partner of Lodge and Townhouses Phase V.

AKERMAN LLP, LAS OLAS CENTRE II, SUITE 1600, 350 EAST LAS OLAS BOULEVARD, FORT LAUDERDALE, FL 33301-2999

**Jay Peak Hotel Suites Stateside L.P.** ("Stateside Phase VI") is a Vermont limited partnership with its principal place of business in Jay, Vermont. Between October 2011 and December 2012, Stateside Phase VI raised $67 million from 134 investors through an EB-5 offering of limited partnership interests to build an 84-unit hotel, 84 vacation rental cottages, a guest recreation center, and a medical center. Although the Stateside Phase VI offering was fully subscribed, the Defendants have only completed construction of the hotel.

To date, 35 of the 86 cottages are in some form of completion. Additionally, 24 of the cottages were being bought from a modular home builder and based on preliminary information a large part of the purchase price of these 24 modular homes has been paid. Construction on the recreational center and the medical center has not yet been commenced. Preliminary analysis indicates that it will cost an additional $11 to $12 million to complete the cottages, $4.1 million to complete the recreational center and $1.4 million to complete the medical center. However, this partnership only appears to have $55,000 in cash left from the money raised from investors. I-526 petitions have been approved for 132 of the 134 investors and two have had their I-526 petitions denied. One investor abandoned his immigration petition, 10 investors are not yet eligible to file their I-829 and 121 investors have a pending I-829 petition. The Receiver is hopeful that he will be able to recover enough funds from claims against Quiros, third parties or elsewhere in order to complete this project so that all investors in the project will be eligible to have their I-829 petition approved. Of course, this outcome is not guaranteed.

**Jay Peak GP Services Stateside, Inc.** is a Vermont corporation and the general partner of Stateside.

**Jay Peak Biomedical Research Park L.P.** ("Biomedical Phase VII") is a Vermont limited partnership with its principal place of business in Newport, Vermont. Since November

2012, Biomedical Phase VII has raised approximately $84.53 million from 169 investors through an EB-5 offering of limited partnership interests to construct a biomedical research facility. In 2014 $6 million was sent to GSI for the land on which the project was intended to be built. Other than site preparation and groundbreaking, no significant work has been done on the facility. The costs of the construction to date is estimated to be approximately $2.8 million. The Receiver has been informed that some of Biomedical Phase VII's money was used to purchase patents from entities located in South Korea. As of yet, the Receiver has not verified the amount of funds allegedly used to purchase these patents and what, if any, patents were purchased. Additionally, the partnership currently has approximately $17.8 million in a restricted account that is designated to pay construction costs. The documents governing these funds are ambiguous and it is unclear whether these funds belong to the specific investors who funded the account or to all of the 169 investors in the partnership. The funds shall remain in trust until such time as the fate of the Phase VII Biomedical Partnership I becomes clearer and the Court determines the proper disposition of the funds.

Biomedical Phase VII is not fully subscribed as it was permitted to have 220 investors and to raise $110 million. As of the date of the receivership, the project has 169 investors and raised $84.5 million. To date, 83 of the 169 investors have had their I-526 petitions approved. A large amount of the Biomedical Phase VII's funds were diverted to uses that were neither disclosed nor permitted under the partnership agreement. The accountants are currently performing forensic accounting work to determine exactly where these funds went. The Receiver will file a report detailing the conclusions of his forensic accountants when they finish their analysis. The Receiver is pursuing claims against Quiros and third parties in an attempt to

recover funds wrongfully diverted from this project. Of course, there are no guaranties as to the success of any recovery.

**AnC Bio Vermont GP Services, LLC** ("AnC Bio") is a Vermont limited liability company and the general partner of Biomedical Phase VII. Its managing members are Quiros and Stenger.

### B.    Relief Defendants

**Jay Construction Management, Inc.** ("JCM") is a Vermont corporation with its offices in Miami, Florida, at the same address as Q Resorts. As of March 16, 2016, its status is listed as terminated. Quiros is the sole officer and director of JCM .

**GSI of Dade County, Inc.** ("GSI") is a Florida corporation with its offices in Miami at the same address as Q Resorts. Quiros is the owner and sole officer and director of GSI.

**North East Contract Services, LLC** ("Northeast") is a Florida limited liability company formed in February 2013 and headquartered in Weston, Florida. Northeast acts as project manager for Biomedical Phase VII. William Kelly, who is Jay Peak's COO and a longtime business associate of Quiros, is the managing principal of Northeast.

**Q Burke Mountain Resort, LLC** ("Q Burke") is a Florida limited liability company formed in April 2012 and headquartered in Miami at the same address as Q Resorts. Quiros is the managing principal of Q Burke. Q Burke is also the owner of the Burke Mountain Resort located in East Burke, Vermont, which is the site of another EB-5 offering that Quiros promoted called Q Burke Mountain Resort.

### C.    Additional Receivership Entities

**Q Burke Mountain Resort, Hotel and Conference Center L.P.** ("Q Burke LP"), is a Vermont Limited Partnership with its principal place of business in Burke, Vermont, and owns

AKERMAN LLP, LAS OLAS CENTRE II, SUITE 1600, 350 EAST LAS OLAS BOULEVARD, FORT LAUDERDALE, FL 33301-2999

the Burke Mountain Resort.   The Burke Mountain Resort, as further detailed below, is a brand new hotel located at the base of the Burke Mountain consisting of 112 guest suites, conference rooms and ski related facilities.  The Burke Mountain Resort is set to open in early September.

**Q Burke Mountain Resort GP Services, LLC** ("Q Burke GP") is a Vermont limited liability company with its principal place of business in Burke, Vermont and is the general partner of Q Burke LP.  Quiros and Stenger are the owners and sole members of Q Burke GP.

## III.   ACTIONS TAKEN BY THE RECEIVER DURING THE REPORTING PERIOD

### A.   Securing the Assets

Upon his appointment, the Receiver and his professionals immediately traveled to Vermont to secure and take  possession of the assets of the Receivership Entities as authorized by the Receivership Order.  See Receivership Order at ¶ 1. The Receiver toured the properties and the operations of the Receivership Entities, met with the staff and analyzed the management structure of the Receivership Entities. The Receiver conferred with his team of attorneys and accountants to determine the best course of action to maximize the value of assets of the Receivership Entities. In order to formulate a plan for maintaining the operations of the Receivership Entities, the Receiver examined the structure and interrelationship of the Receivership Entities regarding cash flow issues between the Receivership Entities and related non-receivership entities.

### 1.   Management of Vermont Properties

Immediately upon his appointment, the Receiver sought to employ a management company to maintain and operate the Jay Peak and Burke Mountain Resort resorts and related facilities owned or controlled by the Receivership Entities. As described in the Receivership Order, the retention of a management company is critical to operation and preservation of the

AKERMAN LLP, LAS OLAS CENTRE II, SUITE 1600, 350 EAST LAS OLAS BOULEVARD, FORT LAUDERDALE, FL 33301-2999

Receivership Entities' assets. *See* Receivership Order at ¶ 4. The Receiver selected Leisure Hotels , LLC ("Leisure"), one of the preeminent resort management companies in the country. The Receiver negotiated a detailed management agreement (the "Management Agreement") with Leisure, which was drafted and negotiated to provide protection of the Receivership Entities' assets. The Management Agreement was approved by Order of the Court dated July 11, 2016 [ECF No. 186].

Pursuant to the Management Agreement, Leisure is responsible for, among other things, maintaining and repairing the subject properties; obtaining and maintaining in full force and effect required licenses and permits; procuring and arranging for goods and services; making or installing repairs, decorations, renewals, alterations, etc.; making recommendations with respect to all major policy matters affecting the subject property; arranging for and complying with all terms of all insurance policies; collecting and accounting for and remitting to governmental authorities applicable taxes; and participating in and cooperating with the Receiver in connection with any investigation related to the subject properties. Leisure have assigned six of their leading professionals to work full time or part time, both on-site and remotely to manage the operating Receivership Entities. The Receiver confers with the management team on a daily basis and reviews weekly and monthly reports prepared by the management team.

Upon commencement of the Receivership, Leisure assisted in securing cash in the vaults and cash drawers; toured the properties to obtain an understanding of the scope of operations; participated in identifying the organizational structure of the properties; began assessing whether all properties were properly insured; and began assessing the capabilities and staffing levels and competency of personnel at both resorts. As more fully described herein, with the Receiver's

approval, Leisure has made changes to the operations, which have resulted in cost savings for the Receivership Entities.

### 2. GSI's Miami Office

On the day of his appointment, the Receiver, with the help of his professionals and staff, took control of GSI's office located in downtown Miami, Florida, where a number of the Receivership Entities also do business and/or receive mail, such as JCM, Q Burke, and AnC Bio. That office occupies the entire fourth floor of the building located at 111 NE 1st Street. The Receiver secured the premises and changed the locks, and the key required for elevator access. The Receiver seized all computers located on the premises and took images of each of them. The Receiver's professionals are reviewing and cataloging that information. The GSI office is where Quiros maintained most, if not all, of his documentation for the Jay Peak project and his banking records. The Receiver's professionals have been reviewing and cataloging these records.

While the Receiver's representatives were in the process of seizing control of the GSI office, Quiros arrived at the office. Quiros turned over his corporate credit cards and his office keys to the Receiver. Quiros was allowed to remove personal items such as medications, items of clothing, and the like from the office. He was also allowed to take copies of documents that were maintained in the GSI office. The Receiver also collected the keys and corporate credit cards of GSI employees. The Receiver's representatives interviewed the employees about the location of any additional assets and the operations in the GSI office.

The Receiver has suspended GSI's operations. The Receiver collects the mail that is delivered to the GSI property and has made the personal mail for Quiros and his family members available to Quiros. On a number of occasions, Quiros has requested access to the GSI office to

take copies of various documents or to obtain additional personal items, and the Receiver, through his representatives, have provided supervised access for that purpose.

### 3.      North East Contract Services, LLC's Miami Office

Upon his appointment, the Receiver determined that Receivership Defendant, Northeast, was operating out of the home of its principal, William Kelly. The Receiver secured copies of all of the documents maintained by Northeast with regard to all of the Receivership Entities and took images of the computers utilized by Mr. Kelly for Northeast's business. The Receiver's representative also interviewed Mr. Kelly about the work Northeast performed with regard to contracting and supervision related to the Q Burke project. Mr. Kelly provided the passwords for his computer and relinquished his corporate credit card. The Receiver is further investigating Northeast's role with respect to the Receivership Entities.

### 4.      Opa-Locka Warehouse

Through the review of GSI documents, the Receiver learned that GSI leased a warehouse located in Opa-Locka, Florida. The Receiver assumed control of that warehouse and changed the locks. The warehouse serves as storage for furniture and automotive parts, one dirt bike, an off-road vehicle, and two vintage United States Army Jeeps from World War II.

### B.      Notice of the Receivership

As required by 28 U.S.C. § 754, the Receiver filed Notices of Receivership in all jurisdictions in which the Receivership Entities were believed to have interests and/or assets. The Receiver commenced such actions in sixteen separate jurisdictions.

### C.      Website/Ongoing Communications

During his initial visit to Vermont, the Receiver met with Vermont government officials, creditors of the Receivership Entities and employees of the Receivership Entities. Within the first week of the receivership, the Receiver drafted a letter to all known investors and potential

AKERMAN LLP, LAS OLAS CENTRE II, SUITE 1600, 350 EAST LAS OLAS BOULEVARD, FORT LAUDERDALE, FL 33301-2999

creditors, joined Governor Shumlin in a press conference and conducted targeted meetings with creditors, contractors and interested parties. The Receiver continues to personally respond to inquiries, usually through e-mail and telephone calls.

Since the Receiver cannot respond to every inquiry, the Receiver has established a toll-free investor "Hotline" at (800) 223-2234 and an email address for general inquiries: jaypeak@akerman.com. The Receiver also established a website www.JayPeakReceivership.com to provide up to date information for investors and interested parties. Because the investors hail from multiple countries, the website is available in seven languages. The Receiver has posted copies of court filings, correspondence with investors and other pertinent information on the website. To provide public access to court documents, the Receiver posts copies of key filings in this case on the website.

The Receiver has posted numerous updates on his website, including a letter to investors and potential creditors dated April 21, 2016; a joint letter from the Receiver and the Vermont Regional Center in the USCIS Investor Program, dated May 24, 2016; a memorandum to investors dated June 2, 2016; a joint letter from the Receiver and the Vermont Regional Center to the U.S. Department of Homeland Security, dated June 30, 2016. The website also includes a Registration Form for investors and creditors to provide the Receiver with their contact information. The Receiver will continue to utilize the website as the primary method of communicating with investors, creditors and other interested parties throughout the receivership.

**D.     Immigration Issues**

      **1.     USCIS**

The Receiver is fully aware that most investors are equally concerned about their immigration status as they are about their investment. Although some earlier investors who have

been lucky enough to have their I-829 petitions approved have expressed their sole concern is the return of their investment, the Receiver notes that these investors may not be aware of the fact that USCIS may have the ability to revoke I-829 approval for up to five years from the date it was originally approved in the event it is determined that the original approval was based upon inaccurate information. Some correspondence from USCIS indicates that they are focusing on whether or not the requisite "link" exists between investors' investments and job creation and are questioning the existence based upon the improper transfer of money among the various partnership as alleged in the SEC's complaint. Thus, all investors need to be aware of this issue whether or not they have already received approval of their I-829 petitions.

The Receiver is equally focused on immigration issues. To that end, the Receiver, along with the Vermont Regional Center, has attempted to communicate directly with USCIS in an effort to start a dialogue concerning the immigration issues investors may face as a result of this receivership. The Receiver and the Vermont Regional Center sent a letter in May, 2016 to USCIS requesting a meeting, however, USCIS replied with a non-responsive letter. Thereafter, the Receiver and the Vermont Regional Center sent another letter to USCIS, the United States Attorney General and the Department of Homeland Security requesting a meeting to discuss the situation. Once again, USCIS was non-responsive and to date the Receiver has not heard from either the Attorney General or the Department of Homeland Security.

Based on USCIS' unresponsiveness, the Receiver is now attempting to resolve the issues in another way. Fortuitously, the federal EB-5 program is set to expire later this year and, upon information and belief, Congress is considering rewriting the EB-5 statutes to deal with instances of fraud among other issues. Based on this, the Receiver, subject to court approval, is in the process of retaining an attorney in Washington who specializes in immigration issues to help the

AKERMAN LLP, LAS OLAS CENTRE II, SUITE 1600, 350 EAST LAS OLAS BOULEVARD, FORT LAUDERDALE, FL 33301-2999

Receiver propose certain changes to the EB-5 statute that provide relief to victims of fraud. The Receiver intends to do everything possible to help the investors receive and maintain their I-829 approval, including instituting litigation, if necessary. The Receiver, subject to court approval,  is also in the process of retaining an immigration attorney experienced in litigation to assist him.

2.      <b>Supplying Economic Data to Investors to Satisfy Their Individual Immigration Petitions</b>

The Receivership Entities continue to regularly assist investors in fulfilling their reporting requirements to USCIS in order to obtain I-526 and I-829 approvals. To that end, the Receivership Entities continue to employ administrative personnel, accountants and an economist to supply investors with the information necessary for them to meet their USCIS reporting requirements.

**E.      Expansion of Receivership**

Less than one week after the Receiver's appointment, it became apparent that the receivership estate should be expanded to include Q Burke L.P., and Q Burke GP Services (along with Q Burke, the "Q Burke Entities").  The Receiver's accountant conducted a preliminary forensic investigation to examine the use of investor funds. During this investigation, the Receiver learned that monies received by Quiros and Stenger for the sole use of the Receivership Entities had been unlawfully pledged, transferred and comingled with the Q Burke Entities.  The Receiver also learned that the Burke Mountain Resort is owned by Q Burke L.P..

And, as it turns out, the general partner of Q Burke LP is Q Burke GP, which is owned by Quiros and Stenger. Quiros and Stenger are also the only members of the general partnership. In addition to their common ownership of the Receivership Entities and the Q Burke Entities, the Burke Mountain Resort was built on land purchased by investor funds that were pledged to the Receivership Entities only. Specifically, Quiros used $7 million from a loan collateralized by

funds pledged to the Receivership Entities to finance the land purchase for the Burke Mountain Resort, effectively comingling funds from the original Jay Peak projects. Notably, while some construction had begun including the completion of the Burke Mountain Resort, the hotel did not have the available funds to open nor could certain amenities on the property be completed because of funding shortfalls similar to those that befell the Receivership Entities.

The Receivership Order expressly authorizes the Receiver to take immediate possession of property, assets and estates of every kind that either belonged to or were in the possession of the Receivership Entities. *See* ECF No. 13 at ¶ 1. The Receiver discovered how funds pledged by investors in the Receivership Entities were transferred to the Q Burke Entities and how more than $4.6 million from Q Burke LP was improperly transferred to Relief Defendants, North East and JCM to pay expenses that were not associated with Q Burke LP.  The Receiver realized that the Q Burke Entities would be rendered inoperable if they were not made a part of the receivership estate. On April 22, 2016, upon emergency motion of the Receiver, the Court entered an Order Granting Receiver's Motion to Expand Receivership [ECF No. 60]. The Receiver was appointed as the Receiver over Q Burke LP and Q Burke GP with all of the powers granted to him under the original appointment.

In conjunction with expanding the receivership, on April 22, 2016, the Court entered an Order [ECF No. 61] granting the Receiver's  Emergency Motion for Authorization to Loan Funds from Receivership and/or Relief Defendants to Q Burke L.P. [ECF No. 43]. The Court authorized the Receiver to loan up to $750,000 from the Receivership and/or Relief Defendants to Q Burke LP from funds the Receiver holds in trust so that the Receiver can preserve the Q Burke Project for the benefit of the creditors and investors.

AKERMAN LLP, LAS OLAS CENTRE II, SUITE 1600, 350 EAST LAS OLAS BOULEVARD, FORT LAUDERDALE, FL 33301-2999

F.      **Litigation and Third Party Claims**

1.      **Raymond James & Associates, Inc. and Raymond James Financial, Inc.**

It became apparent to the Receiver that Raymond James & Associates, Inc. and Raymond James Financial, Inc. (collectively, "Raymond James") were involved in the scheme perpetrated by Quiros. Indeed, an examination of documents produced by Raymond James in response to the Receiver's subpoena revealed extensive involvement by Raymond James in the Ponzi scheme from mid-2008 until mid-2014. Quiros' former son-in-law, Joel Burstein ("Burstein"), was a branch manager at Raymond James, and was the employee responsible for servicing Quiros' financial needs. Burstein and Raymond James maintain that they were merely a financial advisor – executing transactions directed by Quiros – and that they took no meaningful part in Quiros' business endeavors, but the documents reveal that both Burstein and Raymond James were on notice of the nature of the EB-5 program and investor funds derived therefrom, the limited partnership structure underlying the EB-5 investments, and Quiros' obligation to manage the investor funds.

Raymond James' participation in Quiros' scheme can be classified into three categories: (i) facilitating Quiros' personal acquisition of Jay Peak, Inc. using EB-5 investor funds; (ii) collateralizing EB-5 investor funds for margin loans provided to third-party accounts exclusively controlled by Quiros; and (iii) facilitating without hesitation Quiros' complex web of transfers that served to disguise the nature, amount and disposition of investor funds mismanaged and misused by Quiros.

Raymond James was involved with Quiros' scheme since its inception, when Quiros executed the purchase of Jay Peak, Inc. from MSSI. Pursuant to Quiros' request, and as part of the purchase of the resort, MSSI transferred the EB-5 investor funds it had collected to Quiros-

controlled accounts held at Raymond James, specifically advising Quiros, Raymond James, and Burstein, *in writing*, that the EB-5 funds could not be used to purchase or finance the acquisition of Jay Peak, Inc. Despite the cautions from MSSI, Quiros directed Raymond James to use the EB-5 funds for the acquisition of Jay Peak, and Raymond James blindly followed Quiros' directions.

Thereafter, Raymond James, at Quiros' request, continued and extended the cross-collateralization of EB-5 funds for margin loans issued under the exclusive control of Quiros. During that same time, Raymond James directed a frenzy of intricate and confusing transfers authorized by Quiros from and between accounts held for the Receivership Entities. Many of the transactions executed resulted in misuse and misappropriation of EB-5 investor funds by Quiros. In mid-2014, Raymond James finally terminated relations with Quiros, but only after receiving scrutiny from the SEC and FINRA.

a.     **Goldberg v. Raymond James Financial, Inc., et al.**

Given Burstein and Raymond James' participation in and facilitation of Quiros' scheme to defraud EB-5 investors and the limited partnerships embodying the investors' rights and interests, the Receiver, commenced an action against Raymond James and Burstein in the Southern District of Florida, Case No. 1:16-cv-21831-JAL (the "Raymond James Action"). In the Raymond James Action, the Receiver sought relief against Raymond James, Burstein, and Quiros for (i) aiding and abetting breach of fiduciary duty; (ii) conspiracy to breach fiduciary duty; (iii) fraudulent transfers under Sections 726.105(1)(a), (b), and 726.106(1) of the Florida Statutes; (iv) violation of the Racketeer Influenced and Corrupt Organizations Act; and (v) conspiracy in violation the Racketeer Influenced and Corrupt Organizations Act. The action is currently pending before the Honorable Judge Lenard. Counsel for the parties have held a

AKERMAN LLP, LAS OLAS CENTRE II, SUITE 1600, 350 EAST LAS OLAS BOULEVARD, FORT LAUDERDALE, FL 33301-2999

conference to discuss a plan for exchanging discoverable information, but formal discovery has not yet begun. To date, there have been several class actions and multiple arbitrations filed by investors against Raymond James. It is the Receiver's understanding that each investor is included in the class action(s).

### b.    State of Vermont v. Raymond James Financial, Inc.

Shortly after the commencement of the receivership, the Securities Division of the Vermont Department of Financial Regulation started investigating Raymond James' role, including the use of Raymond James accounts, the failure by Raymond James to follow written supervisory procedures, and the failure of Raymond James to maintain reasonable supervisory procedures regarding the cross collateralization of margin accounts in connection with its relationship with the Receivership Entities. Raymond James cooperated with the State of Vermont in its investigation by responding to inquiries and providing documentary evidence and other materials. The State of Vermont alleged that Raymond James failed to obtain adequate documentation establishing Quiros' authority to act on behalf of the limited partnerships and was otherwise negligent in there oversight of the Receivership Entities' accounts at Raymond James.

As a result of the investigation, the State of Vermont and Raymond James entered into a settlement agreement whereby Raymond James agreed to cease-and-desist from violating Vermont's securities laws and to comply with all of their provisions in the future. Moreover, Raymond James agreed to pay $1.45 million to Vermont as an administrative penalty and to reimburse it for its costs incurred in conducting its investigation. In connection with the settlement, Raymond James also agreed to pay the Receiver $4.5 million ("RJ Funds") to be held for the purpose of reimbursing claims to EB-5 investors in this case. The Receiver currently

holds the RJ Funds in trust pending future order of the Court directing how these funds should be distributed.

### c. Temporary Loan from Raymond James & Associates, Inc.

Given the Receivership Entities' dire monetary situation, Raymond James and the Receiver reached an interim agreement to help the Jay Peak resort remain operational and to maximize its value to investors and creditors. Pursuant to the agreement, the Receiver is permitted to use up to $1.5 million of the RJ Funds to pay expenses associated with the Receivership Estate's operations (the "Borrowed Amount"). The Borrowed Amount may only be used for payroll expenses incurred in the ordinary course for day-to-day operations. In other words, the Receiver cannot use the Borrowed Amount for any other purpose associated with the administration of the Receivership Estate including, but not limited to professionals' fees. The State of Vermont also insisted that the Borrowed Amount not be used to pay Stenger's salary. The Receiver is required to repay the Borrowed Amount by April 1, 2017 with the first available funds generated in the Receivership Estate (but not with the proceeds of any line of credit).  If the Receiver is unable to repay the Borrowed Amount, it will be afforded priority over all claims of investors and pre-receivership trade creditors and will be superior to all administrative claims. The Borrowed Amount will not, however, be superior to the claims of any secured creditors. On August 8, 2016, the Receiver, through conflicts counsel, filed an Unopposed Motion to Approve Temporary and Partial Use of Funds from Settlement Between Raymond James & Associates, Inc. and the State of Vermont for Operation of Receivership Estate [ECF No. 197]. The Court granted the motion on August 11, 2016 [ECF No. 198].

AKERMAN LLP, LAS OLAS CENTRE II, SUITE 1600, 350 EAST LAS OLAS BOULEVARD, FORT LAUDERDALE, FL 33301-2999

### 2.   Citibank, N.A.

Beginning in 2015, Quiros opened a number of accounts at Citibank, N.A. ("Citibank"). Quiros also *personally* obtained a $15 million line of credit from Citibank (the "Line of Credit"), which was collateralized with $17 million posted, in cash, by Q Resorts and Jay Construction Management.[2] As of the commencement of this action by the SEC, Quiros had drawn down approximately $14.5 million on the Line of Credit.

The payments from the Line of Credit were used for a variety of matters ranging from the payment of Quiros' personal taxes, returns to earlier investors, and construction-related expenses. Given the financial information currently available, the Receiver is reasonably certain that most, if not all, of the funds that Citibank is holding are traceable to EB-5 investor funds. The Receiver's professionals are conducting a comprehensive forensic analysis of Quiros' transfers to confirm these suspicions.

After learning of the "excess collateral" that Citibank was holding in accounts titled in the name of the Receivership Entities (*i.e.*, Q Burke and JCM), the Receiver immediately negotiated an agreement with Citibank pursuant to which Citibank released $1.8 million to the Receiver's bank accounts. This agreement was approved by the Order Authorizing Release and Disbursement of Funds in Citibank Pledged Account to Receiver, Without Prejudice. *See* ECF No. 156. Since that time, Citibank and the Receiver have been negotiating the consensual return of the remaining funds held by Citibank . The Receiver and Citibank have reached an agreement in principle which will generate much needed capital for the receivership.  The parties are finalizing the settlement agreement and related papers and will seek Court approval of the

---

[2] Citibank is also holding funds of Receivership Defendants in accounts frozen pursuant to the Temporary Restraining Order issued by this Court.

settlement. The details of this settlement will be disclosed shortly in the motion seeking its approval.

### 3. Additional Discovery

In an attempt to secure additional information about the scope and nature of Quiros' scheme, the Receiver has subpoenaed a number of banks at which Quiros and/or the Receivership Entities have or had accounts. In addition to Raymond James and Citibank, these banks include Merrill Lynch; HSBC Bank USA, N.A.; JP Morgan Chase Bank, N.A.; and People's United Bank. To the extent the documents and information obtained from these institutions are material, the Receiver will share his findings with the Court after he and his professionals complete their analysis.

### G. Preservation of Contractor and Subcontractor Lien Rights

Prior to the appointment of the Receiver, certain of the Receivership Defendants had entered in agreements retaining contractors to supply design services, labor and materials for construction of the Burke Mountain Resort, the Stateside Phase VI hotel and vacation rental cottages and Biomedical Phase VII. The contractors engaged subcontractors and suppliers. These projects are in various phases of development. The contractors have made demands for payment, but the Receivership Entities currently lack sufficient funds to pay the contractors. In order to preserve their lien rights under Vermont statutes, the Receiver worked with the contractors and prepared motions to modify the preliminary injunction and/or receivership order to authorize the contractors to file Stipulated Writs of Attachment. *See* ECF Nos. 133 and 160. Thus far, the Court has entered Orders authorizing the Clerk of the Court to execute Writs of Attachment for Stateside Phase VI and Burke Mountain Resort contractors. The Orders and the Writs of Attachment allow for perfection of lien rights, but do not allow the contractors or subcontractors

AKERMAN LLP, LAS OLAS CENTRE II, SUITE 1600, 350 EAST LAS OLAS BOULEVARD, FORT LAUDERDALE, FL 33301-2999

to enforce or otherwise act upon their liens absent further order of the Court. The Orders also preserve all rights of the Receiver to object to the claims, including, but not limited to the amounts, validity, timeliness, priority of the claims. *See* ECF Nos. 161 and 162.

### H.    Repairing the Aerial Tram

Jay Peak Resort utilizes a 52 year old aerial tram, *i.e.*, a gondola system (the "Tram") to transport skiers and others to the top of the Jay Peak mountain. In some respects the Tram is the centerpiece of the Jay Peak Resort and is its single must visible asset.  During his investigation, the Receiver learned that the Tram required major and immediate repairs to meet the State of Vermont's safety standards. On May 31, 2016, the State of Vermont, Department of Labor, issued Finding an Order for Corrective Action (the "Vermont Tram Order") directing repairs and upgrades to the Tram. The Vermont Tram Order temporarily shut down operation of the Tram pending satisfactory progress on repairs, upgrades, and an inspection.  Doppelmayr USA, the manufacturer of the Tram is the only company capable of properly repairing the Tram.

Prior to the Receiver's appointment, Jay Peak had been negotiating an agreement for repairs, modifications, and an upgrade with Doppelmayr USA ("Doppelmayr Contract"). After his appointment, the Receiver and his professionals completed those negotiations.  The upgrades include replacing of the electrical control, drive components, carriages, and track rope saddles on towers and reinforcement of tower components where feasible. The price of the upgrades to the Tram total $4,900,000.

On June 3, 2016, the Court issued the Endorsed Order Granting Receiver's Motion [ECF No. 155] for Authorization to Enter and for Approval of Passenger Tramway Modification Agreement. [ECF No. 158]. Immediately thereafter, the Doppelmayr Contract was executed and the repairs and upgrades commenced. In June 2016, inspectors from the State of Vermont,

AKERMAN LLP, LAS OLAS CENTRE II, SUITE 1600, 350 EAST LAS OLAS BOULEVARD, FORT LAUDERDALE, FL 33301-2999

Department of Labor, inspected the Tram and supporting equipment and based on the inspection results, the State of Vermont, Department of Labor, issued Findings and Amended Order Permitting Operation of the Jay Peak Tram, which recognized the "extensive activity" taken by the Receiver, his professionals, and others towards addressing the immediate repairs needed for the Tram. Based on that "extensive activity," "the prohibition against operation [was] lifted" provided the conditions set forth in the Amended Order "are complied with." To that end, further repairs and upgrades continue and the Receiver and his professionals are monitoring the progress.[3]

### I.      Deferred Maintenance

In addition to the Tram, several other deferred maintenance issues were discovered which can adversely impact operations. Moreover, due to the expansive size of the resorts, new issues continue to surface such as critical failure of HVAC units, etc. Capital improvements and replacements for both properties have been budgeted for the current fiscal year with the priority based on (1) life safety issues for customers and employees, and (2) items that impact customer satisfaction that would either increase business or prevent loss of business. Contingency reserves have been built into the budget but there is no guarantee that such reserves will be sufficient.

### J.      Water System

For several decades, Jay Peak Resort has provided and maintained a water system for a neighboring village, Jay Peak Subdivision II, also known as Wilderness Village. Those services were provided without any apparent obligation on the part of Jay Peak Resort and without any compensation from any residents or local landowners. In April 2016, the Vermont Department of Environmental Conservation, Drinking Water and Groundwater Protection Division, sent a letter to Jay Peak regarding the Jay Peak Subdivision II water system, stating "the Jay Peak

---

[3] The Receiver was also forced to repair a small hairline crack in one of the Tram's carriages for $22,000.

Subdivision II water system exceeded the newly-established Health Advisory of 0.3 mg/l for manganese." Upon notification of the April 2016 letter, the Receiver immediately notified residents and homeowners in Jay Peak Subdivision II.

Research did not reveal any contractual, regulatory, or statutory requirement for Jay Peak, Inc. or any of the Receivership Entities to maintain on a going-forward basis a water system to any surrounding communities. According to the Declaration of Covenants, Conditions and Restrictions Applicable to Jay Peak Division II, there is an obligation to "install" a water system, but there is not any obligation to maintain such a system going forward. The State of Vermont has communicated to the Receiver its position that such an obligation does exist, though the Receiver and his professionals respectfully disagree.

The Receiver has investigated alternatives, communicated extensively with state officials, Jay peak resort staff and employees, as well as resident's and homeowners. Based on information available, the Receiver determined it will cost approximately $150,000 to correct the manganese levels. However, Jay Peak is not in a position to bear those costs or future costs of maintenance (nor in the Receiver's opinion is it responsible.) The Receiver and his professionals are actively working with local officials in order to develop a plan to rectify the situation and to develop a plan for establishment of a local utility that will address the manganese levels and maintain the water supply going forward. The permit in place is non-transferrable and part of the plan will be dealing with any government requirements for a new permit for the new utility.

### K.   Newport

Another asset within the receivership is an entire block of real property in downtown Newport, Vermont. This property consists of a torn down building and the property is basically an excavation site widely referred to as the "hole in the ground." Prior to the receivership, this

property was purchased and demolished at an approximate cost of $2.8 million. It was intended that this property would be redeveloped as a mixed use retail and residential complex using additional EB-5 funds raised from future investors. The Receiver has met several times with the City of Newport and other potentially interested purchasers concerning the sale of this property. The Receiver is in the process of obtaining an appraisal for the property. As of yet, however, the Receiver has not entered into a contract for the sale of the property.  Any sale will be subject to the Court's approval.

**L.     Airport**

Jay Peak previously entered into contractual arrangements with the State of Vermont and third parties to effectively act as a fixed based operator (FBO) for a local airport approximately 35 minutes from Jay Peak. On this property is a hangar built to house several experimental aircraft purchased by Quiros and his son. Jay Peak incurred hundreds of thousands of dollars to expand the runway and deal with water runoff. This contract was a money losing proposition for the receivership, and accordingly, the Receiver terminated the contract in July. The Receiver is also in discussions with the State of Vermont about possibly purchasing the hangar.

**M.     Jay Peak's Management of Homeowner Associations**

Jay Peak currently acts as manager for six homeowner associations encompassing hundreds of residential units. Over half of these units participate in the rental management program by Jay Peak whereby Jay Peak will rent out the individual homeowner's unit to third parties. Leisure performed a detailed review of the management of homeowner associations and made significant changes to procedures that immediately enhanced cash flow and streamlined operations for both the resort and respective homeowner associations. Additionally, at the Receiver's direction, Leisure attended the annual homeowners' association meetings and

witnessed an extremely hostile attitude towards the resort.  The Receiver also attended  the general meeting of the associations and answered questions.  Leisure then met individually with various board of directors from the associations and proposed a complete revamp of management operations for the associations. During Leisure's analysis of current practices, it also discovered that the resort was not charging for all services provided to the associations. Additionally, some services provided to the associations were not cost effective for the resort nor was the resort the best source to provide such services. Accordingly, Leisure had the resort solicit third party bids to provide certain services to the associations which will increase satisfaction by the homeowners while allowing resort personnel to focus more on core business.

## IV.    FINANCIAL AFFAIRS[4]

### A.    Bank Accounts

The Receivership Entities' financial accounts were frozen pursuant to the Receivership Order. The Receivership Order also provides the Receiver with control and signatory authority for all financial accounts. *See* Receivership Order, ¶ 7. The Receiver has taken control of the existing financial accounts and opened new accounts. A list of the financial accounts is attached hereto as **Exhibit A**.

### B.    Jay Peak

The timing of this receivership could not have been worse from a cash flow perspective. More specifically, this receivership commenced on April 13, 2016—right at the end of ski season when the resort makes most of its money. From May through December, the "off season," the resort loses money. Cash flow projections indicate that the Jay Peak resort will lose

---

[4]  Due to the fact that this receivership involves operating entities, the confidentiality of the specific details on the Receivership Entities' operations are important.  Accordingly, the Receiver has not attached detailed financial statements to this report, but has instead provided a general summary.  Should the Court want to review such detailed financial data, the Receiver shall provide the information through an in-camera inspection.  The Receiver has conferred with the SEC, who supports this approach to the financial statements.

AKERMAN LLP, LAS OLAS CENTRE II, SUITE 1600, 350 EAST LAS OLAS BOULEVARD, FORT LAUDERDALE, FL 33301-2999

approximately $6.5 million this off season. Typically, a prudent operator will build up cash during season to be able to get through the off season. However, such was not the case with the Jay Peak and the Receivership Entities accounts did not contain sufficient cash upon the commencement of the receivership to fund this short fall. This cash flow shortfall was further compounded by the cost of repairing and maintaining the Tram (as further discussed above). Although Quiros was aware of the necessary Tram repairs, he failed to set aside money to pay for them. Instead, Quiros intended to obtain a line of credit secured by the assets of Jay Peak in order to fund the Tram repair. However, the line of credit was not obtained as of the commencement of the receivership.

In addition to the cash short fall caused by operations and the Tram repair, at the commencement of the receivership the Jay Peak and the Burke Resort owed trade vendors $5.1 million for past due bills. The Receiver has been working with these vendors and has paid each one timely for all goods or services provided subsequent to the commencement of the receivership. The Receiver is planning on starting to pay past due amounts owed to vendors in season when cash flow improves.

**C.    Q Burke**

The Q Burke Hotel, now known simply as the "Burke" Hotel, presents a whole other set of challenges caused by Quiros' fraud and gross mismanagement. More specifically, Quiros formed the Q Burke L.P. in or around June, 2013 to raise $98 million from 196 investors. The goal of the partnership was to build (i) a hotel consisting of 112 guest suites, conference rooms and meeting areas; (ii) an indoor and outdoor tennis complex; (iii) an indoor aquatic center consisting of a water park; and (iv) enhance mountain biking facilities. As of the commencement

of the receivership, the Q Burke partnership raised $60.5 million from 121 investors. Only the hotel and conference room facilities have been built at an approximate cost of $66 million.

After it became evident that Quiros was wrongfully diverting money from the partnerships, in or around the spring of 2015, the State of Vermont Department of Financial Regulation instituted a set of controls designed to prevent Quiros from transferring money from one partnership to pay the expenses of another partnership. It is believed that the institution of these controls prevented Quiros from illegally diverting money from AnC Bio and other partnerships into the Q Burke partnership. Thus, Quiros was no longer able to steal the funds necessary to pay all of the contractors who built the Q Burke Hotel. Currently, there appears to be approximately $3.6 million owed to contractors who built the Q Burke. As described more fully herein, the Receiver has permitted these contractors to place liens on the Q Burke hotel to secure the sums owed to them. The Receiver is hopeful that he will be able to start paying these contractors some money if and when he has sufficient liquidity, but at the very latest from the proceeds of the sale of the Q Burke.

The Q Burke is set to open Labor Day weekend.  The Receiver is hopeful that the hotel will be able to operate profitably through the upcoming season.

**D.     Operating Expenses**

Once the bank accounts were unfrozen by the Court, this provided the properties with $2 million of cash to keep operating. Significant changes were made within the properties' accounting and cash management departments to enhance controls and provide better cash forecasting. Additionally, Leisure management personnel now approves all purchase orders in excess of $5,000 and actively participates in meetings and budgeting for all departments. Leisure contacted hundreds of vendors and continues to work with these vendors each week on past due

accounts payable. Due to the new relationships and trust established, almost all of these vendors have continued to provide goods and services to the Properties without payment of these past due amounts.

Due to the fact that the Jay Properties are essentially operated as a single resort and that the properties are in a dire cash position, the properties have utilized cash from whatever sources available amongst the respective entities including the other Receivership Entities. Intercompany payables and receivables have been recorded on the respective companies' books and records for such cash transfers. Personnel and insurance related costs are given the highest priority of payment.  All transfers among the various entities are being tracked and will be "trued up" upon the sale of the properties.

### 1.    Resort Personnel

Off-season bi-weekly payroll costs were in excess of $700,000 which has now been reduced to approximately $500,000. Several positions have been eliminated resulting in hundreds of thousands of dollars in savings but will not have a material impact on operations. Additionally, the real estate department at Jay Peak was eliminated for additional cost savings in excess of $100,000. Minimum levels of employment must be maintained during the off-season to retain key employees needed during in-season and also for sales and marketing and repair and maintenance of the facilities. The majority of repairs and maintenance plus capital improvements occur during off-season. Employment levels for the resorts are approximately as follows:

|  | Jay Peak | Burke |
|---|---|---|
| In-season | 1,200 | 160 |
| Off-season | 500 | 40 |

AKERMAN LLP, LAS OLAS CENTRE II, SUITE 1600, 350 EAST LAS OLAS BOULEVARD, FORT LAUDERDALE, FL  33301-2999

Burke employee levels above exclude the Burke Mountain Lodge which has not yet commenced operations. Such employment levels are anticipated to run approximately 50 in-season and 20 off-season.

A new General Manager was hired for Jay Peak. Leisure Hotels & Resorts then brought in its team of certified public accountants to assess systems and internal controls at both resorts. Material weaknesses were noted primarily in the payroll department at Jay Peak and several areas at Burke. New processes and reporting structures have been implemented to prevent loss of assets or material disruption of operations. Overall, Jay Peak has competent personnel and good controls. Burke's level of competency and controls were severely lacking with the exception of a few individuals. Almost all senior management at Burke was terminated and Burke's operations were completely reorganized and several back office functions between Jay Peak and Burke (accounting, human resources, information technology, and some marketing) have been consolidated in a manner that can be easily unwound should one resort eventually be sold without the other. An allocation of joint costs between the resorts has been performed and costs will be recorded on the respective books and records for each resort. This will result in significant cost savings to both resorts, enhance training, efficiency and customer service at Burke and provide significant positive synergies for the properties while allowing both resorts to retain their own identity.

A review of both resorts' human resource policies and compliance noted some weaknesses and deficiencies at Jay Peak and several material weaknesses at Burke. Jay Peak's weaknesses and non-compliance have been corrected and procedures modified for regulatory compliance. Due to multiple employment related issues at Burke, its employees have been consolidated into Jay Peak's payroll filings and benefit plans effective July 31, 2016 which

eliminates many of these issues prospectively at Burke. All direct and indirect costs of payroll related to Burke will be charged back to Burke by Jay Peak. This structure can be easily unwound should one resort be sold without the other.

### 2.     Modification of Operating Supplies

Several changes in operations have been implemented that have reduced operating expenses by tens of thousands of dollars annually. Additional changes will continue to be incorporated after further study.

### 3.     Restructuring of Financial Reporting and Culture Change

Due to the complex contractual arrangements with the EB-5 limited partnerships, there is no comprehensive management financial reporting for individual profit centers within the Jay Peak physical assets. Changes in financial reporting and a change of culture is being introduced within the resort to focus more on operations from a profitability standpoint rather than on growth of assets and contractual compliance. Accounting will still respect the contractual nature of the separate legal entities.

### E.     Monetization of cell tower income stream

The Receiver and Leisure have been negotiating with several companies to monetize the income stream of Jay Peak's cell tower income. Although this has not yet been finalized, it is anticipated that approximately $2 million of cash receipts will be generated from such monetization.

### F.     Receivership Expenses

As more fully described herein, the Court has authorized the Receiver to enter into a Management Agreement with Leisure to operate, manage and maintain the facilities. Leisure is paid a management fee of two and one-half percent (2.5%) of all gross receipts (as that term is

defined in the Management Agreement). There is a minimum fee of forty-five thousand dollars ($45,000) for each month (or prorated for partial months) and a nine thousand dollar ($9,000) accounting fee to be paid for each month (or prorated for partial months). The Receiver has confirmed that the fees identified in the Management Agreement are consistent with those regularly charged in the industry.

The Receiver's other professionals have not yet received payment for their services. The Receivership Entities are in an extremely tight cash situation and need every dollar of available cash to fund their operations. The Receiver and his professionals recognize the importance that all available cash be directed to fund the Receivership Entities' operations in order for them to survive, and accordingly, have agreed to defer their request for fees until such time as the estate has sufficient cash to pay them. Accordingly, on July 22, 2016, the Receiver filed a Motion to Extend the Deadline to File Quarterly Applications for Professional Compensation [ECF No. 189], which was approved by an endorsed Order of the Court [ECF No. 195], dated July 29, 2016.

## V.     ADMINISTRATION OF THE RECEIVERSHIP ESTATES

The Receiver has assembled a team of professionals with experience and skills working on receivership matters.

### A.     The Receiver and his Professionals

The Receiver is a partner at the law firm of Akerman LLP ("Akerman") and co-chair of Akerman's Fraud & Recovery Practice Group. The Receiver has practiced law for twenty-six years and specializes in receivership and bankruptcy cases. The Receiver has been appointed receiver in more than twenty-five state and federal receivership cases and has represented receivers and trustees in many other cases. The Receiver is working with a team of attorneys and

AKERMAN LLP, LAS OLAS CENTRE II, SUITE 1600, 350 EAST LAS OLAS BOULEVARD, FORT LAUDERDALE, FL 33301-2999

paralegals at Akerman to administer this case. Since Akerman employs 50 attorneys and consultants, the Receiver has ready access to professionals who specialize in litigation, real estate, immigration, corporate and other pertinent matters.

Jeffrey Schneider, a partner at the law firm Levine Kellogg Lehman Schneider and Grossman LLP provides special litigation and conflicts litigation services for the Receiver. Mr. Schneider is a trial lawyer whose practice focuses on complex commercial litigation and receiverships. Mr. Schneider has served as a receiver himself in several cases.

Soneet Kapila, CPA, and the accounting firm Kapila Mukamal provide accounting and forensic work for the Receiver. Mr. Kapila's practice is focused on restructuring, creditors' rights, bankruptcy, fiduciary matters and financial transactions litigation. He has conducted numerous forensic and fraud investigations, and has worked in conjunction with the Securities and Exchange Commission, the Federal Bureau of Investigation and the United States Attorney's Office. Mr. Kapila is also a panel trustee for the United States Bankruptcy Court for the Southern District of Florida.

Malcolm Ruby, a partner in the Toronto office of the law firm Gowling WLK, has assisted the Receiver secure bank accounts in Canada. Mr. Ruby has acted on behalf of the SEC and the Ontario Securities Commission in a number of cases raising trans-border enforcement issues. Mr. Ruby was successful in assisting the Receiver in obtaining the funds held in the Canadian Bank.

### B.    Claims

The unique nature of this receivership case may present the need for multiple classifications of claims. Investors may have claims for monetary damages due to a loss of all or part of their investment as well as other damages incurred as a result of the loss of their

anticipated immigration status. Contractors and subcontractors, who have asserted mechanics' liens, seek payment for the services provided and labor performed prior to the receivership. General trade creditors also hold claims for their pre-receivership services. The Receiver foresees developing a multi-layered claims process to address and verify the various claims. This claims process will be developed over time and submitted to the Court for approval when finalized.

### C.      Recommendations

The Receiver's initial focus has been on securing and maintaining the assets of the Receivership Entities, tracing the use of the individual partnership funds and responding to inquiries from the investors, creditors and other interested parties. The Receiver anticipates taking the following actions: (i) continue to operate and maintain the facilities until the best course of disposition is determined with the goal of each investor obtaining the highest possible return on their investment and achieving their unconditional green card; (ii) develop a claims process; (iii) investigating and commencing litigation against third parties who may be liable for the perpetration of the Defendants' fraud; (iv) continue to review transfers of the individual partnership funds and seek to recover funds which were fraudulently transferred; (v) respond to inquiries from investors, creditors, government officials and interested parties; and (vi) provide updates through the receivership website.

Dated:  August 12, 2016.

AKERMAN LLP, LAS OLAS CENTRE II, SUITE 1600, 350 EAST LAS OLAS BOULEVARD, FORT LAUDERDALE, FL 33301-2999

Respectfully submitted,


 /s/ Michael I. Goldberg
Michael I. Goldberg, Esq.
Florida Bar Number:  886602
Email:  michael.goldberg@akerman.com
AKERMAN LLP
Las Olas Centre II, Suite 1600
350 East Las Olas Boulevard
Fort Lauderdale, FL  33301-2999
Telephone (954) 463-2700
Facsimile: (954) 463-2224
*Court Appointed Receiver*