**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF FLORIDA**

**CASE NO.:  16-cv-21301-GAYLES**

**SECURITIES AND EXCHANGE COMMISSION,**

      **Plaintiff,**

**v.**

**ARIEL QUIROS,**
**WILLIAM STENGER,**
**JAY PEAK, INC.,**
**Q RESORTS, INC.,**
**JAY PEAK HOTEL SUITES L.P.,**
**JAY PEAK HOTEL SUITES PHASE II. L.P.,**
**JAY PEAK MANAGEMENT, INC.,**
**JAY PEAK PENTHOUSE SUITES, L.P.,**
**JAY PEAK GP SERVICES, INC.,**
**JAY PEAK GOLF AND MOUNTAIN SUITES L.P.,**
**JAY PEAK GP SERVICES GOLF, INC.,**
**JAY PEAK LODGE AND TOWNHOUSES L.P.,**
**JAY PEAK GP SERVICES LODGE, INC.,**
**JAY PEAK HOTEL SUITES STATESIDE L.P.,**
**JAY PEAK GP SERVICES STATESIDE, INC.,**
**JAY PEAK BIOMEDICAL RESEARCH PARK L.P.,**
**AnC BIO VERMONT GP SERVICES, LLC,**

      **Defendants, and**

**JAY CONSTRUCTION MANAGEMENT, INC.,**
**GSI OF DADE COUNTY, INC.,**
**NORTH EAST CONTRACT SERVICES, INC.,**
**Q BURKE MOUNTAIN RESORT, LLC,**

      **Relief Defendants.**

**Q BURKE MOUNTAIN RESORT, HOTEL**
**AND CONFERENCE CENTER, L.P.**
**Q BURKE MOUNTAIN RESORT GP SERVICES, LLC,**

      **Additional Receivership Defendants[1]**

_____/

<u>**NOTICE OF FILING RECEIVER'S SECOND INTERIM REPORT**</u>

---

[1] _See_ Order Granting Receiver's Motion to Expand Receivership dated April 22, 2016 [ECF No.: 60].

Michael I. Goldberg ("Receiver"), through undersigned counsel, hereby gives notice of the filing of *Receiver's Second Interim Report* dated November 22, 2016.

Respectfully submitted,

  /s/ Michael I. Goldberg
Michael I. Goldberg, Esq.
Florida Bar Number:  886602
Email:  michael.goldberg@akerman.com
AKERMAN LLP
Las Olas Centre II, Suite 1600
350 East Las Olas Boulevard
Fort Lauderdale, FL  33301-2999
Telephone (954) 463-2700
Facsimile: (954) 463-2224
*Court Appointed Receiver*

## CERTIFICATE OF SERVICE

I HEREBY CERTIFY that a true and correct copy of the foregoing was served on this November 22, 2016 via the Court's notice of electronic filing on all CM/ECF registered users entitled to notice in this case as indicated on the attached Service List.

By: */s/* Michael I. Goldberg
        Michael I. Goldberg, Esq.

{38950350;1}

## SERVICE LIST

**1:16-cv-21301-DPG Notice will be electronically mailed via CM/ECF to the following:**

Robert K. Levenson, Esq.
Senior Trial Counsel
Florida Bar No. 0089771
Direct Dial: (305) 982-6341
Email: levensonr@sec.gov
almontei@sec.gov, gonzalezlm@sec.gov,
jacqmeinv@sec.gov

Christopher E. Martin, Esq.
Senior Trial Counsel
SD Florida Bar No.: A5500747
Direct Dial: (305) 982-6386
Email: martinc@sec.gov
almontei@sec.gov, benitez-
perelladaj@sec.gov

**SECURITIES AND EXCHANGE**
**COMMISSION**
801 Brickell Avenue, Suite 1800
Miami, Florida 33131
Telephone: (305) 982-6300
Facsimile:   (305) 536-4154
*Attorneys for Plaintiff*

Roberto Martinez, Esq.
Email: bob@colson.com
Stephanie A. Casey, Esq.
Email: scasey@colson.com
**COLSON HICKS EIDSON, P.A.**
255 Alhambra Circle, Penthouse
Coral Gables, Florida 33134
Telephone: (305) 476-7400
Facsimile:  (305) 476-7444
*Attorneys for William Stenger*

Jeffrey C.  Schneider, Esq.
Email: jcs@lklsg.com
**LEVINE KELLOGG LEHMAN**
**SCHNEIDER & GROSSMAN**
Miami Center, 22nd Floor
201 South Biscayne Blvd.
Miami, Florida 33131
Telephone: (305) 403-8788
*Co-Counsel for Receiver*

Jonathan S. Robbins, Esq.
jonathan.robbins@akerman.com
**AKERMAN LLP**
350 E. Las Olas Blvd., Suite 1600
Ft. Lauderdale, Florida 33301
Telephone:  (954) 463-2700
Facsimile:  (954) 463-2224

Naim Surgeon, Esq.
naim.surgeon@akerman.com
**AKERMAN LLP**
Three Brickell City Centre
98 Southeast Seventh Street, Suite 1100
Miami, Florida  33131
Telephone: (305) 374-5600
Facsimile:  (305) 349-4654
*Attorney for Court-Appointed Receiver*

Scott B. Cosgrove, Esq.
Email: scosgrove@leoncosgrove.com
James R. Bryan, Esq.
Email: jbryan@leoncosgrove.com
**LEON COSGROVE, LLC**
255 Alhambra Circle
Suite 800
Coral Gables, Florida 33133
Telephone: (305) 740-1975
Facsimile:  (305) 437-8158
*Attorney for Ariel Quiros*

David B. Gordon, Esq.
Email: dbg@msk.com
**MITCHELL SILBERBERG &**
**KNOPP, LLP**
12 East 49th Street – 30th Floor
New York, New York 10017
Telephone: (212) 509-3900
*Co-Counsel for Ariel Quiros*

Jean Pierre Nogues, Esq.
Email:  jpn@msk.com
Mark T. Hiraide, Esq.
Email: mth@msk.com
**MITCHELL SILBERBERG &**
**KNOPP, LLP**
11377 West Olympic Blvd.
Los Angeles, CA 90064-1683
Telephone (310) 312-2000
*Co-Counsel for Ariel Quiros*

Mark P. Schnapp, Esq.
Email: schnapp@gtlaw.com
Mark D. Bloom, Esq.
Email: bloomm@gtlaw.com
Danielle N. Garno
E-Mail: garnod@gtlaw.com
**GREENBERG TRAURIG, P.A.**
333 SE 2nd Avenue, Suite 4400
Miami, Florida 33131
Telephone: (305) 579-0500
*Attorney for Intervenor, Citibank N.A.*

J. Ben Vitale
Email: bvitale@gurleyvitale.com
David E. Gurley
Email: dgurley@gurleyvitale.com
**GURLEY VITALE**
601 S. Osprey Avenue
Sarasota, Florida 32436
Telephone: (941) 365-4501
*Attorney for Blanc & Bailey Construction,*
*Inc.*

**Stanley Howard Wakshlag**
email: swakshlag@knpa.com
**KENNY NACHWALTER, P.A**.
Four Seasons Tower
1441 Brickell Avenue
Suite 1100
Miami, FL 33131-4327
Telephone: (305) 373-1000
*Attorneys for Raymond James &*
*Associates Inc.*

{38950350;1}

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF FLORIDA

CASE NO.:  16-cv-21301-GAYLES

SECURITIES AND EXCHANGE COMMISSION,

     Plaintiff,

v.

ARIEL QUIROS,
WILLIAM STENGER,
JAY PEAK, INC.,
Q RESORTS, INC.,
JAY PEAK HOTEL SUITES L.P.,
JAY PEAK HOTEL SUITES PHASE II. L.P.,
JAY PEAK MANAGEMENT, INC.,
JAY PEAK PENTHOUSE SUITES, L.P.,
JAY PEAK GP SERVICES, INC.,
JAY PEAK GOLF AND MOUNTAIN SUITES L.P.,
JAY PEAK GP SERVICES GOLF, INC.,
JAY PEAK LODGE AND TOWNHOUSES L.P.,
JAY PEAK GP SERVICES LODGE, INC.,
JAY PEAK HOTEL SUITES STATESIDE L.P.,
JAY PEAK GP SERVICES STATESIDE, INC.,
JAY PEAK BIOMEDICAL RESEARCH PARK L.P.,
AnC BIO VERMONT GP SERVICES, LLC,

     Defendants, and

JAY CONSTRUCTION MANAGEMENT, INC.,
GSI OF DADE COUNTY, INC.,
NORTH EAST CONTRACT SERVICES, INC.,
Q BURKE MOUNTAIN RESORT, LLC,

     Relief Defendants.

Q BURKE MOUNTAIN RESORT, HOTEL
AND CONFERENCE CENTER, L.P.
Q BURKE MOUNTAIN RESORT GP SERVICES, LLC,

     Additional Receivership Defendants[1]
_____/

## RECEIVER'S SECOND INTERIM REPORT

---

[1]*See* Order Granting Receiver's Motion to Expand Receivership dated April 22, 2016 [ECF No.: 60].

<u>IMPORTANT—PLEASE READ CAREFULLY</u>

THE STATEMENTS CONTAINED IN THIS REPORT ARE BASED ON THE RECEIVER'S PRELIMINARY INVESTIGATION CONDUCTED IN THE SHORT TIME ELAPSING FROM THE ESTABLISHMENT OF THIS RECEIVERSHIP. THE RECEIVER COMPILED THIS REPORT BASED ON BOTH THE RECEIVER AND HIS PROFESSIONALS': *I)* REVIEW OF THOUSANDS OF PAGES OF DOCUMENTS; AND *II)* INTERVIEWS OF THE DEFENDANTS' EMPLOYEES, AFFILIATES, INVESTORS AND OTHER RELATED PERSONS. THE FACTS AND CONCLUSIONS STATED HEREIN MAY BE SUBJECT TO CHANGE AS THE RECEIVER'S INVESTIGATION PROGRESSES. OTHER THAN AMOUNTS CONTAINED IN BANK AND/OR BROKERAGE ACCOUNTS, THE VALUE OF ANY OTHER ASSET HAS NOT YET BEEN DETERMINED. THE RECEIVER INTENDS TO FILE ADDITIONAL REPORTS, FROM TIME TO TIME, AS ADDITIONAL INFORMATION IS OBTAINED.

Michael I. Goldberg, in his capacity as receiver (the "Receiver") of Jay Peak, Inc., Q Resorts, Inc., Jay Peak Hotel Suites L.P., Jay Peak Hotel Suites Phase II L.P., Jay Peak Management, Inc., Jay Peak Penthouse Suites L.P., Jay Peak GP Services, Inc., Jay Peak Golf and Mountain Suites L.P., Jay Peak GP Services Golf, Inc., Jay Peak Lodge and Townhouse L.P., Jay Peak GP Services Lodge, Inc., Jay Peak Hotel Suites Stateside L.P., Jay Peak Services Stateside, Inc., Jay Peak Biomedical Research Park L.P., AnC Bio Vermont GP Services, LLC (collectively, the "Receivership Defendants") and Jay Construction Management, Inc., GSI of Dade County, Inc., North East Contract Services, Inc., and Q Burke Mountain Resort, LLC (collectively, the "Relief Defendants") and Q Burke Mountain Resort, Hotel and Conference Center, L.P. and Q Burke Mountain Resort GP Services, LLC (together, "Additional Receivership Defendants") (the Receivership Defendants, Relief Defendants, and Additional Receivership Defendants shall collectively be referred to as the "Receivership Entities"), by and through undersigned counsel, and pursuant to the Order Granting Plaintiff Securities and Exchange Commission's Motion for Appointing Receiver, dated April 13, 2016 (the "Order") [ECF No. 13], respectfully files his Second Interim Report.

AKERMAN LLP, LAS OLAS CENTRE II, SUITE 1600, 350 EAST LAS OLAS BOULEVARD, FORT LAUDERDALE, FL  33301-2999

## I.     BACKGROUND

The Receiver filed his First Interim Report [DE No. 201] on August 12, 2016.  The First Interim Report provides background information on the events that led up to the appointment of the Receiver and a detailed explanation of the Receivership Defendants.[2]  For the purpose of brevity, the Receiver will not repeat all of this information contained in the First Interim Report, but refers all interested parties to the First Interim Report for additional background information.

On April 12, 2016, the Securities and Exchange Commission ("SEC") filed a complaint [ECF No. 1] ("Complaint") in the United States District Court for the Southern District of Florida (the "Court") against the Receivership Defendants, the Relief Defendants, William Stenger ("Stenger") and Ariel Quiros ("Quiros" and with the Receivership Defendants, Relief Defendants and Stenger, the "Defendants"), the principal of the Receivership Defendants, alleging that the Defendants violated the Securities Act of 1933 and the Securities Exchange Act of 1934 by making false or materially misleading representations to investors.  Along with the Complaint, the SEC requested the Court to enter a temporary restraining order and a preliminary injunction preventing the Receivership Defendants from, among other things, transferring or otherwise utilizing their assets.

On April 13, 2016, the Court entered an Order [ECF No. 11] granting the SEC's Emergency *Ex Parte* Motion for Temporary Restraining Order, Asset Freeze and Other Relief [ECF No. 4] and an Order granting the SEC's Motion for Appointment of Receiver [ECF No. 13] (the "Receivership Order"). Among other things, the Receivership Order appointed Michael Goldberg as the receiver over the Receivership Defendants and the Relief Defendants.  Quiros opposed the SEC's request for a preliminary injunction and the Court held multiple hearings on the SEC's motion in April and May.

---

[2] All capitalized terms will have the same meaning as defined in the First Interim Report.

AKERMAN LLP, LAS OLAS CENTRE II, SUITE 1600, 350 EAST LAS OLAS BOULEVARD, FORT LAUDERDALE, FL  33301-2999

On September 21, 2016, upon motion [ECF No. 206] of the SEC and consent by Stenger, the Court entered an Order granting a Judgment of Permanent Injunction and Other Relief against Stenger [ECF No. 215].[3]  Quiros opposes the entry of an injunction and has filed a Motion to Dismiss the Complaint [ECF No. 171]. On November 21, 2016, the Court entered a Preliminary Injunction [ECF No. 238] preliminarily enjoining Quiros from continuing to violate the Federal Securities laws, maintaining the asset freeze set forth in the TRO, and continuing the receivership, among other relief. Moreover, the Court denied Quiros' Motion to Dismiss [ECF No. 239].

## II.   ACTIONS TAKEN BY THE RECEIVER DURING THE REPORTING PERIOD

### A.   Preserving the Assets

The Receiver, with the assistance of the court-approved management company, Leisure Hotels, LLC ("Leisure"), and his attorneys and accountants continue to operate the assets of the Receivership Entities.

#### 1.   Management of Vermont Properties

The Receiver confers with the Leisure management team on a daily basis and reviews weekly and monthly reports prepared by the management team.  Please see the Financial Affairs section of this report below for more detailed information on the financial condition of the Jay Peak Resort and the Burke Hotel.

#### 2.   GSI's Miami Office

On the day of his appointment, the Receiver, with the help of his professionals and staff, took control of GSI's office located in downtown Miami, Florida, where a number of the Receivership Entities also do business and/or receive mail, such as JCM, Q Burke, and AnC Bio.

---

[3]   Stenger was employed by the Receiver from April through September.  In September, the Receiver terminated Stenger as an employee, however, he continues to assist the Receiver and Leisure Resorts on an independent contractor basis, as needed.

AKERMAN LLP, LAS OLAS CENTRE II, SUITE 1600, 350 EAST LAS OLAS BOULEVARD, FORT LAUDERDALE, FL 33301-2999

That office occupies the entire fourth floor of the building located at 111 NE 1st Street. The Receiver seized all computers located on the premises and took images of each of them. The Receiver's professionals are reviewing and cataloging that information. The GSI office is where Quiros maintained most, if not all, of his documentation for the Jay Peak project and his banking records.  The Receiver's professionals have been reviewing and cataloging these records.

While at GSI's offices, the Receiver's representatives also took possession of a laptop found in Quiros' office.  The Receiver imaged all the information stored on the laptop.  Shortly after the imaging process was completed, Quiros requested that the laptop be returned to him, claiming that it was his personal laptop.  Based on that representation, and after confirming that an image had been taken of the laptop, the Receiver authorized the return of the laptop to Quiros.

Counsel for Quiros later represented to the Receiver that the laptop was Quiros' personal property, purchased with Quiros' personal funds, and used to communicate with his personal attorneys from personal email addresses.  In other words, the representation was that Quiros did not use a "Jay Peak" email address from the laptop or any other email address associated with the Receivership Entities.

By virtue of his review of documentation produced by other parties, the Receiver has determined that Quiros sent many emails regarding Jay Peak matters, particularly as they relate to transfers between and among bank accounts, from his personal "███████att.net" email account, and other than his laptop that was found in his office, there were no other laptops, desktops or computers in that office.  As a result, the Receiver sought authority to retain a third-party vendor to conduct a review of the imaged materials from the laptop and to divide the images into two categories: privileged emails and/or documents and all other emails and/or documents. [ECF No. 230].  On October 20, 2016, this Court granted that motion. [ECF No.

233].  The Receiver is working with a third party vender to isolate any potentially privileged information.

### 3.    Opa-Locka Warehouse

The Receiver assumed control of the Opa-Locka warehouse leased by GSI.  The warehouse serves as storage for furniture and automotive parts, one dirt bike, a small boat, an off-road vehicle, and two vintage United States Army Jeeps from World War II.  The landlord for the warehouse has contacted the Receiver in an attempt to collect the amounts owed by GSI for monthly rent.  The Receiver's representatives were also contacted by the owner of the trailer upon which the small boat was kept.  Documentation demonstrating that the trailer is not owned by Quiros or any Receivership Entity has been provided and reviewed by the Receiver's professionals, so that trailer will soon be returned to its owner.

### B.    Website/Ongoing Communications

The Receiver returned to Vermont on multiple occasions for meetings with Vermont government officials, creditors of the Receivership Entities and employees of the Receivership Entities. The Receiver continues to respond to inquiries, usually through e-mail and telephone calls.  Since the Receiver cannot respond to every inquiry, the Receiver maintains a toll-free investor "Hotline" at (800) 223-2234 and an email address for general inquiries: jaypeak@akerman.com. The Receiver also updates the website www.JayPeakReceivership.com to provide up to date information for investors and interested parties.  Because the investors come from foreign countries, the website is available in seven languages. The Receiver has posted copies of court filings, correspondence with investors and other pertinent information on the website. To provide public access to court documents, the Receiver posts copies of key filings in this case on the website.  The Receiver has posted numerous updates on his website.

AKERMAN LLP, LAS OLAS CENTRE II, SUITE 1600, 350 EAST LAS OLAS BOULEVARD, FORT LAUDERDALE, FL 33301-2999

The website also includes a Registration Form for investors and creditors to provide the Receiver with their contact information. The Receiver will continue to utilize the website as the primary method of communicating with investors, creditors and other interested parties throughout the receivership.

### C.    Immigration Issues

#### 1.    USCIS and EB-5 Legislation

The Receiver is fully aware that most investors are concerned about their immigration status as well as their investment. Although some earlier investors who have been lucky enough to have their I-829 petitions approved have expressed their sole concern is the return of their investment, the Receiver notes that these investors may not be aware of the fact that USCIS may have the ability to revoke I-829 approval for up to five years from the date it was originally approved in the event it is determined that the original approval was based upon inaccurate information or in the event USCIS determines that an investor's money was not actually invested as stated.  Some correspondence from USCIS indicates that they are focusing on whether or not the requisite "link" exists between investors' investments and job creation and are questioning the existence based upon the improper transfer of money among the various partnerships as alleged in the SEC's complaint. Thus, all investors need to be aware of this issue whether or not they have already received approval of their I-829 petitions and be careful of the positions they take in legal proceedings which could directly affect their immigration status.

As set forth in the Receiver's first report, the Receiver, along with the Vermont Regional Center, has attempted to communicate directly with USCIS in an effort to start a dialogue concerning the immigration issues investors may face as a result of this receivership. The Receiver and the Vermont Regional Center sent a letter in May, 2016 to USCIS requesting a

meeting, however, USCIS replied with a non-responsive letter. Thereafter, the Receiver and the Vermont Regional Center sent another letter to USCIS, the United States Attorney General and the Department of Homeland Security requesting a meeting to discuss the situation. Once again, USCIS was non-responsive and to date the Receiver has not heard from either the Attorney General or the Department of Homeland Security.

Based on USCIS' unresponsiveness, the Receiver is now attempting to resolve the issues in another way. More specifically, throughout the summer, the Receiver worked on encouraging Congress to re-write existing EB-5 laws to provide relief to EB-5 investors that are victims of fraud.  In early September, Congressman Goodlatte, the Chair of the House Judiciary Committee, proposed new EB-5 legislation that contained relief for victims of fraud such as the investors in this case.  Although the legislation was not passed prior to Congress going on recess (nor was it expected to), the Receiver is hopeful that Congress will revisit the issue after the new year and the Receiver is optimistic that new legislation which contains relief for victims of EB-5 fraud may pass next year.  The Receiver intends to do everything possible to help the investors receive and maintain their I-829 approval, including instituting litigation, if necessary.

## 2.    Supplying Economic Data to Investors to Satisfy Their Individual Immigration Petitions

The Receivership Entities continue to regularly assist investors in fulfilling their reporting requirements to USCIS in order to obtain I-526 and I-829 approvals. To that end, the Receivership Entities continue to employ administrative personnel, accountants and an economist to supply investors with the information necessary for them to meet their USCIS reporting requirements.  Moreover, the Receiver has hired H. Ronald Klasko, a highly regarded EB-5 attorney, to assist the Receiver in preparing the necessary papers in order for investors to

properly respond to USCIS's request for information and evidence supporting their various I-526 and I-829 petitions.

### a.      AnC Biomedical Project

The Receiver's immigration counsel has worked with the Receiver's accountants to identify and document expenditures that are appropriate inputs under EB-5 law for job creation projections. The attorneys are also working with the economists to maximize job creation projections using various recognized economic methodologies. The Receiver is hopeful that potential new legislation may enable subsequent investors to complete the immigration process. In the absence of legislation, the Receiver will be preparing a condition removal template presenting legal arguments advocating why subsequent investors' conditions on residence should be removed even in the absence of sufficient jobs.

### b.      Stateside Project

Since the inception of the receivership, 8 Stateside investors received Requests for Evidence ("RFE") on their pending I-829 petitions. The RFEs requested extensive evidence, most of which was not available. The Receiver's attorneys have been working with the Receiver's office and the Jay Peak accountant, as well as the forensic accountants, to gather the necessary documentation requested by USCIS.

Because the documentation was not available by the due date of the RFEs, a request was made to USCIS to rescind and reissue the RFEs with a new due date. USCIS has thus far refused to do so. In the meantime, it is expected that all of the necessary documents will be made available within the next few weeks, which will enable the Receiver's attorneys to complete a template RFE response.   It is strongly suggested that the investors' attorneys who received RFEs

AKERMAN LLP, LAS OLAS CENTRE II, SUITE 1600, 350 EAST LAS OLAS BOULEVARD, FORT LAUDERDALE, FL 33301-2999

use the receivership estate's template to file a late response. If, in the interim, USCIS issues a Notice of Intent to Deny ("NOID"), the template will be available for a response to the NOID.

The Receiver's attorneys are also working with the economist to prepare 4 different economic reports, which hopefully will enable Stateside to maximize job creation projection with the goal of proving sufficient jobs to cover all investors' condition removals. Two of the reports will use the IMPLAN model, and two will use the RIMS II model. Separate reports will be based on expenditures that have occurred to date and expenditures that are anticipated to occur in 2017 as additional funds may become available to complete the project. The Receiver's attorneys have been keeping in contact with the investors' attorneys regarding the status of our efforts.

### c.      Lodge and Townhouse Project

One investor has received a Request for Evidence. The Receiver's attorneys have been working with the Jay Peak accountant, and the forensic accountants, and were able to obtain all of the necessary information to prepare a template response to the RFE, which the investor's attorney filed on a timely basis.   The Receiver's attorneys will also be working with the economist to prepare an updated economic report that will likely be necessary once USCIS adjudicates pending I-829 petitions.

### d.      Burke Hotel f/k/a QBurke Hotel Project

The Burke Hotel is open and operating.   The Receiver's attorneys, along with the accountant and economist, are starting to assemble the information necessary for the QBurke investors to file their I-829 petitions and respond to any RFEs issued by USCIS.

D.      **Litigation and Third Party Claims**

1.      **Raymond James & Associates, Inc. and Raymond James Financial, Inc.**

It became apparent to the Receiver that Raymond James & Associates, Inc. and/or Raymond James Financial, Inc. (collectively, "Raymond James") were involved in the scheme perpetrated by Quiros. Indeed, an examination of documents produced by Raymond James in response to the Receiver's subpoena revealed extensive involvement by Raymond James in the Ponzi scheme from mid-2008 until mid-2014. Quiros' former son-in-law, Joel Burstein ("Burstein"), was a branch manager at Raymond James, and was the employee responsible for servicing Quiros' financial needs. Burstein and Raymond James maintain that they were merely a financial advisor – executing transactions directed by Quiros – and that they took no meaningful part in Quiros' business endeavors, but the documents reveal that both Burstein and Raymond James were on notice of the nature of the EB-5 program and investor funds derived therefrom, the limited partnership structure underlying the EB-5 investments, and Quiros' obligation to manage the investor funds.

Raymond James' participation in Quiros' scheme can be classified into three categories: (i) facilitating Quiros' personal acquisition of Jay Peak, Inc. using EB-5 investor funds; (ii) collateralizing Receivership Entity funds for margin loans provided to third-party accounts exclusively controlled by Quiros; and (iii) facilitating without hesitation Quiros' complex web of transfers that served to disguise the nature, amount and disposition of Receivership Entity funds mismanaged and misused by Quiros.

Raymond James was involved with Quiros' scheme since its inception, when Quiros executed the purchase of Jay Peak, Inc. from MSSI.  Pursuant to Quiros' request, and as part of the purchase of the resort, MSSI transferred the EB-5 investor funds it had collected to Quiros-

controlled accounts held at Raymond James, specifically advising Quiros, Raymond James, and Burstein, *in writing*, that the funds could not be used to purchase or finance the acquisition of Jay Peak, Inc.  Despite the cautions from MSSI, Quiros directed Raymond James to use the funds for the acquisition of Jay Peak, and Raymond James blindly followed Quiros' directions.

Thereafter, Raymond James, at Quiros' request, continued and extended the cross-collateralization of funds that should have been held in escrow for the Receivership Entities for margin loans issued under the exclusive control of Quiros.  During that same time, Raymond James directed a frenzy of intricate and confusing transfers authorized by Quiros from and among accounts held for the Receivership Entities. Many of the transactions executed resulted in misuse and misappropriation of such funds by Quiros.  In mid-2014, Raymond James finally terminated relations with Quiros, but only after receiving scrutiny from the SEC and FINRA.

### a.      Goldberg v. Raymond James Financial, Inc., *et al.*

Given Burstein and Raymond James' participation in and facilitation of Quiros' scheme to defraud the limited partnerships, the Receiver commenced an action against Raymond James and Burstein in the Southern District of Florida, Case No. 1:16-cv-21831-JAL (the "Raymond James Action").  In the Raymond James Action, the Receiver seeks relief against Raymond James, Burstein, and Quiros for (i) aiding and abetting breach of fiduciary duty; (ii) conspiracy to breach fiduciary duty; (iii) fraudulent transfers under Sections 726.105(1) (a), (b), and 726.106(1) of the Florida Statutes; (iv) violation of the Racketeer Influenced and Corrupt Organizations Act; and (v) conspiracy in violation the Racketeer Influenced and Corrupt Organizations Act. The action is currently pending before the Honorable Judge Lenard.  The defendants in the Raymond James Action each filed motions to dismiss, which have been fully

briefed by all parties.  No hearing has been held and no ruling has yet been issued on those motions.

Counsel for the parties have held a conference to discuss a plan for exchanging discoverable information, because formal discovery has now begun.  Counsel for the parties to this action have been coordinating their discovery efforts with counsel in the other matters discussed below, so as to minimize duplication of effort and streamline the discovery process and, of course, to minimize the expense on the receivership.  To date, there have been several class actions and multiple arbitrations filed by investors against Raymond James.  The Receiver's counsel has, therefore, been attending discovery hearings and case management conferences in the other cases so that orders can be issued confirming the coordination of efforts among the various cases.  Thus far, Magistrate Judge O'Sullivan has issued one such order, allowing for depositions to be used among the various cases, which will help to minimize the expense to, and burden on, the receivership estate.

### b. State of Vermont v. Raymond James Financial, Inc.

Shortly after the commencement of the receivership, the Securities Division of the Vermont Department of Financial Regulation started investigating Raymond James' role, including the use of Raymond James accounts, the failure by Raymond James to follow written supervisory procedures, and the failure of Raymond James to maintain reasonable supervisory procedures regarding the cross collateralization of margin accounts in connection with its relationship with the Receivership Entities. Raymond James cooperated with the State of Vermont in its investigation by responding to inquiries and providing documentary evidence and other materials. The State of Vermont alleged that Raymond James failed to obtain adequate

documentation establishing Quiros' authority to act on behalf of the limited partnerships and was otherwise negligent in there oversight of the Receivership Entities' accounts at Raymond James.

As a result of the investigation, the State of Vermont and Raymond James entered into a settlement agreement whereby Raymond James agreed to cease-and-desist from violating Vermont's securities laws and to comply with all of their provisions in the future. Moreover, Raymond James agreed to pay $1.45 million to Vermont as an administrative penalty and to reimburse it for its costs incurred in conducting its investigation. In connection with the settlement, Raymond James also agreed to pay the Receiver $4.5 million ("RJ Funds") to be held for the purpose of reimbursing claims to EB-5 investors in this case. The Receiver currently holds the RJ Funds in trust pending future order of the Court directing how these funds should be distributed.

### c.     Temporary Loan from Raymond James & Associates, Inc.

Given the Receivership Entities' dire monetary situation, Raymond James and the Receiver reached an interim agreement to help the Jay Peak resort remain operational and to maximize its value to investors and creditors. Pursuant to the agreement, the Receiver is permitted to use up to $1.5 million of the RJ Funds to pay expenses associated with the Receivership Estate's operations (the "Borrowed Amount"). The Borrowed Amount may only be used for payroll expenses incurred in the ordinary course for day-to-day operations. In other words, the Receiver cannot use the Borrowed Amount for any other purpose associated with the administration of the Receivership Estate including, but not limited to any professionals' fees.

The Receiver is required to repay the Borrowed Amount by April 1, 2017 with the first available funds generated in the Receivership Estate (but not with the proceeds of any line of credit).  If the Receiver is unable to repay the Borrowed Amount, it will be afforded priority over

AKERMAN LLP, LAS OLAS CENTRE II, SUITE 1600, 350 EAST LAS OLAS BOULEVARD, FORT LAUDERDALE, FL 33301-2999

all claims of investors and pre-receivership trade creditors and will be superior to all administrative claims.  The Borrowed Amount will not, however, be superior to the claims of any secured creditors.

On August 8, 2016, the Receiver, through conflicts counsel, filed an Unopposed Motion to Approve Temporary and Partial Use of Funds from Settlement Between Raymond James & Associates, Inc. and the State of Vermont for Operation of Receivership Estate [ECF No. 197]. The Court granted the motion on August 11, 2016 [ECF No. 198].  On October 4, 2016, the Receiver indicated that he would be wiring $745,675.01 from the Borrowed Amount on October 5, 2016.  The Receiver intends to immediately repay these funds from the proceeds of the Citibank Settlement (as defined below).

### 2. Citibank, N.A.

Beginning in 2015, Quiros opened a number of accounts at Citibank, N.A. ("Citibank"). Quiros also *personally* obtained a $15 million line of credit from Citibank (the "Line of Credit"), which was collateralized with $17 million posted, in cash, by Q Resorts and Jay Construction Management.[4] As of the commencement of this action by the SEC, Quiros had drawn down approximately $14.5 million on the Line of Credit.

After learning of the "excess collateral" that Citibank was holding in accounts titled in the name of the Receivership Entities (*i.e.*, Q Burke and JCM), the Receiver immediately negotiated an agreement with Citibank pursuant to which Citibank released $1.8 million to the Receiver's bank accounts. Citibank was very cooperative and agreed to voluntarily release the $1.8 million.  This agreement was approved by the Court through an Order Authorizing Release

---

[4] Citibank is also holding funds of Receivership Defendants in accounts frozen pursuant to the Temporary Restraining Order issued by this Court.

AKERMAN LLP, LAS OLAS CENTRE II, SUITE 1600, 350 EAST LAS OLAS BOULEVARD, FORT LAUDERDALE, FL 33301-2999

and Disbursement of Funds in Citibank Pledged Account to Receiver, Without Prejudice. *See* ECF No. 156.

The Receiver and Citibank negotiated resolution of the remainder of the funds in the collateral accounts, and reached a final agreement (the "Citibank Settlement") on August 25, 2016. Pursuant to the Citibank Settlement, Citibank is to pay the Receiver $13,300,000.00 in exchange for settlement and compromise of all claims relating to this action and the Receivership Entities' claims against Citibank. Of this sum, Citibank already paid the Receiver $1.8 million referenced above and an additional $700,000 that was paid on or about August 25, 2016. The balance of $10.8 million was received on November 21, 2016. The $13,300,000.00 total payment represents a return of approximately 78% return of the funds held by Citibank, which is considered an excellent settlement.

On August 30, 2016, the Receiver filed his Motion for (I) Approval of Settlement Between Receiver and Citibank, N.A.; (II) Entry of a Bar Order; (III) Modification of Freeze Order; and (IV) Approval of Form, Content and Manner of Notice of Settlement and Bar Order; Incorporated Memorandum of Law [ECF 205]. On September 2, 2016, the Court entered the Order (I) Preliminarily Approving the Settlement Between Receiver and Citibank, N.A.; (II) Approving Form and Content of Notice, and Manner and Method of Service and Publication; (III) Setting Deadline to Object to Approval of Settlement and Entry of Bar Order; and (IV) Scheduling a Hearing (ECF 207]. On October 18, 2016, the Court entered the Order (I) Approving Settlement Between Receiver and Citibank, N.A.; (II) Barring, Restraining, and Enjoining Claims Against Citibank, N.A.; and (III) Modifying Asset Freeze Accordingly. [ECF 231]. With entry of the bar order in favor of Citibank, all persons and entities (except for the United States of America, its agencies and departments and any state or local government) are

AKERMAN LLP, LAS OLAS CENTRE II, SUITE 1600, 350 EAST LAS OLAS BOULEVARD, FORT LAUDERDALE, FL 33301-2999

permanently barred and enjoined from instituting or continuing claims against Citibank in connection with its involvement in facts giving rise to this action.

Subject to the Court's authorization, the Receiver anticipates that the proceeds of the Citibank Settlement will be used to: (i) subsidize the Jay Peak Resort and Burke Hotel operations (ie… trade payables, property taxes, payroll, etc…); (ii) reduce the amount owed to contractors for work done in connection with the Burke Hotel, Stateside and AnC Biomedical projects; (iii) satisfy the Receiver's obligations to the professionals who have assisted him since the commencement of the receivership; (iv) restore the $750,000 borrowed from the Raymond James escrow account; and (v) retain a contingency fund to allow the Receiver to meet unexpected obligations. With this capital infusion, the Receiver is confident that the Jay Peak Resort and Burke Hotel can remain operational until they are eventually sold for the investors' benefit.   Finally, in accordance with the Court's order approving the Citibank Settlement, the Receiver shall file a report with the Court prior to any distribution to investors setting forth the uses of the Citibank Settlement proceeds so that the Court can determine an equitable "true up" among the various groups of investors.

### E.    Water System

For several decades, Jay Peak Resort has provided and maintained a water system for a neighboring village, Jay Peak Subdivision II, also known as Wilderness Village. Those services were provided without any apparent obligation on the part of Jay Peak Resort and without any compensation from any residents or local landowners. In April 2016, the Vermont Department of Environmental Conservation, Drinking Water and Groundwater Protection Division, sent a letter to Jay Peak regarding the Jay Peak Subdivision II water system, stating "the Jay Peak Subdivision II water system exceeded the newly-established Health Advisory of 0.3 mg/l for

manganese." Upon notification of the April 2016 letter, the Receiver immediately notified residents and homeowners in Jay Peak Subdivision II.

Research did not reveal any contractual, regulatory, or statutory requirement for Jay Peak, Inc. or any of the Receivership Entities to maintain on a going-forward basis a water system to any surrounding communities. According to the Declaration of Covenants, Conditions and Restrictions Applicable to Jay Peak Division II, there is an obligation to "install" a water system, but there is not any obligation to maintain such a system going forward. The State of Vermont has communicated to the Receiver its position that such an obligation does exist, though the Receiver and his professionals respectfully disagree.

The Receiver has investigated alternatives, communicated extensively with state officials, Jay Peak resort staff and employees, as well as residents and homeowners and determined the excessive manganese could be mitigated by installing an ion exchange treatment system.  On November 10, 2016, the State of Vermont sent Jay Peak a letter stating that it agrees that an ion exchange treatment system is an acceptable alternative to treat the excessive manganese.  The Receiver will take the necessary steps to obtain the necessary permits to complete this modification which is expected to cost approximately $150,000.00.  Jay Peak is not in a position to bear those costs or future costs of maintenance (nor in the Receiver's opinion it responsible.) The Receiver and his professionals are actively working with local officials in order to develop a plan to rectify the situation and to develop a plan for establishment of a local utility that will address the manganese levels and maintain the water supply going forward. The permit in place is non-transferrable and part of the plan will be dealing with any government requirements for a new permit for the new utility.

AKERMAN LLP, LAS OLAS CENTRE II, SUITE 1600, 350 EAST LAS OLAS BOULEVARD, FORT LAUDERDALE, FL 33301-2999

F.      **Newport**

Another asset within the receivership is an entire block of real property in downtown Newport, Vermont. This property consists of a torn down building and the property is basically an excavation site widely referred to as the "hole in the ground." Prior to the receivership, this property was purchased and demolished at an approximate cost of $2.8 million. It was intended that this property would be redeveloped as a mixed use retail and residential complex using additional EB-5 funds raised from future investors. The Receiver has met several times with the City of Newport and other potentially interested purchasers concerning the sale of this property. Any future sale will be subject to the Court's approval.

G.      **Airport**

Jay Peak previously entered into contractual arrangements with the State of Vermont and third parties to effectively act as a fixed based operator (FBO) for a local airport approximately 35 minutes from Jay Peak. On this property is a hangar built to house several experimental aircraft purchased by Quiros and his son. Jay Peak incurred hundreds of thousands of dollars to expand the runway and deal with water runoff. This contract was a money losing proposition for the receivership, and accordingly, the Receiver terminated the contract in July. The Receiver is also in discussions with third parties about possibly purchasing the hangar.

H.      **Jay Peak's Management of Homeowner Associations**

Jay Peak currently acts as manager for six homeowner associations encompassing hundreds of residential units. Over half of these units participate in the rental management program by Jay Peak whereby Jay Peak will rent out the individual homeowner's unit to third parties. Leisure performed a detailed review of the management of homeowner associations and made significant changes to procedures that immediately enhanced cash flow and streamlined

operations for both the resort and respective homeowner associations. Additionally, at the Receiver's direction, Leisure attended the annual homeowners' association meetings and witnessed an extremely hostile attitude towards the resort.  The Receiver also attended the general meeting of the associations and answered questions.  Leisure then met individually with various board of directors from the associations and proposed a complete revamp of management operations for the associations. During Leisure's analysis of current practices, it also discovered that the resort was not charging for all services provided to the associations. Additionally, some services provided to the associations were not cost effective for the resort nor was the resort the best source to provide such services. Accordingly, Leisure had the resort solicit third party bids to provide certain services to the associations which will increase satisfaction by the homeowners while allowing resort personnel to focus more on core business.

### I.    Water Park

The water park at Jay Peak – known as the Pump House – needs repairs to the duct sock system, specifically, the hanging system that suspends the large fabric air ducts from the ceiling of the water park. This system is the water park's main ventilation system.  Jay Peak has engaged Hardy Structural Engineering to design a new hanging system and VHV Company, Inc. to remove the old hanging system and install the new system.  It is anticipated that the installation will be conducted in two phases, with the first phase in November 2016 and the second phase in the Spring of 2017.  Scheduling of this work will be done in a way designed to minimize the interruption of business.  The cost of these repairs is estimated to be $350,000.  The Receiver believes  that he may have claims against  the architects, engineers and contractors who originally designed and built the water park duct sock system, and accordingly, the Receiver has put these persons on notice of these claims which the Receiver intends to pursue in due time.

AKERMAN LLP, LAS OLAS CENTRE II, SUITE 1600, 350 EAST LAS OLAS BOULEVARD, FORT LAUDERDALE, FL  33301-2999

### III.    FINANCIAL AFFAIRS[5]

#### A.    Bank Accounts

The Receivership Entities' financial accounts were frozen pursuant to the Receivership Order. The Receivership Order also provides the Receiver with control and signatory authority for all financial accounts. *See* Receivership Order, ¶ 7. The Receiver has taken control of the existing financial accounts and opened new accounts. Due to the lack of liquidity during the off season, the Receiver has been forced to infuse cash into the Jay Peak to subsidize its operations. Attached to this Report as **Exhibit "A"** is a Standard Accounting Report ("SAR") detailing the Receivership Entities business operations and the sums the Receiver has provided to the Jay Peak Resort and the Burke Hotel to subsidize their operations.

#### B.    Jay Peak

Due to Quiros' wrongful diversion of funds, the timing of this receivership could not have been worse from a cash flow perspective. More specifically, this receivership commenced on April 13, 2016—right at the end of ski season when the resort makes most of its money. From May through December, the "off season," the resort loses money. Cash flow projections indicate that the Jay Peak resort will lose approximately $6.5 million this off season. Typically, a prudent operator will build up cash during season to be able to get through the off season. However, such was not the case with the Jay Peak and the Receivership Entities accounts did not contain sufficient cash upon the commencement of the receivership to fund this short fall because Quiros wrongfully diverted millions of dollars. This cash flow shortfall was further compounded by the

---

[5]  Due to the fact that this receivership involves operating entities, the confidentiality of the Receivership Entities' financial data is important.  Accordingly, the Receiver has not attached detailed financial statements to this report, but has instead provided a general summary.  Should the Court want to review such detailed financial data, the Receiver shall provide the information to the Court in-camera.

cost of repairing and maintaining the Tram.  Although Quiros was aware of the necessary Tram repairs, he failed to set aside money to pay for them.

In addition to the cash short fall caused by operations and the Tram repair, at the commencement of the receivership the Jay Peak and the Burke Resort owed trade vendors $5.1 million for past due bills. The Receiver has been working with these vendors and has paid each one timely for all goods or services provided subsequent to the commencement of the receivership. The Receiver is planning on starting to pay past due amounts owed to vendors in season when cash flow improves.

### C.     Q Burke

The Q Burke Hotel, now known simply as the "Burke" Hotel, presents a whole other set of challenges caused by Quiros' fraud and gross mismanagement. More specifically, Quiros formed the Q Burke L.P. in or around June, 2013 to raise $98 million from 196 investors. The goal of the partnership was to build (i) a hotel consisting of 112 guest suites, conference rooms and meeting areas; (ii) an indoor and outdoor tennis complex; (iii) an indoor aquatic center consisting of a water park; and (iv) enhance mountain biking facilities. As of the commencement of the receivership, the Q Burke partnership raised $60.5 million from 121 investors. Only the hotel and conference room facilities have been built at an approximate cost of $66 million.

 After it became evident that Quiros was wrongfully diverting money from the partnerships, in or around the spring of 2015, the State of Vermont Department of Financial Regulation instituted a set of controls designed to prevent Quiros from transferring money from one partnership to pay the expenses of another partnership. It is believed that the institution of these controls prevented Quiros from illegally diverting money from AnC Bio and other partnerships into the Q Burke partnership. Thus, Quiros was no longer able to steal the funds

necessary to pay all of the contractors who built the Q Burke Hotel. Currently, there appears to be approximately $3.6 million owed to contractors who built the Q Burke. As described more fully herein, the Receiver has permitted these contractors to place liens on the Q Burke hotel to secure the sums owed to them. The Receiver is hopeful that he will be able to start paying these contractors some money from the Citibank settlement proceeds and the balance from the proceeds of the sale of the Q Burke.

The Q Burke opened in early September.  The Q Burke has been sold out on several weekends, although weekday occupancy is low as anticipated this time of year.  However, overall, the Q Burke is operating ahead of budget and the Receiver is optimistic that it will continue to operate ahead of budget throughout the ski season if favorable ski conditions exist. The Receiver has also been working closely with the Burke Mountain Academy ("BMA") in an effort to insure that the Burke Mountain can offer the best possible skiing product.  To that end, the Receiver and BMA hope to shortly announce some significant changes to Burke Mountain which will positively impact the Burke Hotel.

### D.  Operating Expenses

Significant changes were made within the properties' accounting and cash management departments to enhance controls and provide better cash forecasting. Additionally, Leisure management personnel now approve all purchase orders in excess of $5,000 and actively participate in meetings and budgeting for all departments. Leisure contacted hundreds of vendors and continues to work with these vendors each week on past due accounts payable. Due to the new relationships and trust established, almost all of these vendors have continued to provide goods and services without payment of these past due amounts.

Due to the fact that the various Jay Peak properties are essentially operated as a single resort and that the properties are in a dire cash position, the properties have utilized cash from whatever sources available amongst the respective entities including the other Receivership Entities. Intercompany payables and receivables have been recorded on the respective companies' books and records for such cash transfers. Personnel and insurance related costs are given the highest priority of payment. All transfers among the various entities are being tracked and will be "trued up" upon the sale of the properties.

### 1.    Resort Personnel for Jay Peak Resort and Burke Hotel

Off-season bi-weekly payroll costs were in excess of $700,000 which has now been reduced to approximately $500,000. Several positions have been eliminated resulting in hundreds of thousands of dollars in savings but will not have a material impact on operations. Additionally, the real estate department at Jay Peak was eliminated for additional cost savings in excess of $100,000. Minimum levels of employment must be maintained during the off-season to retain key employees needed during in-season and also for sales and marketing and repair and maintenance of the facilities. The majority of repairs and maintenance plus capital improvements occur during off-season. Employment levels for the resorts are approximately as follows:

|  | Jay Peak | Burke |
|---|---|---|
| In-season | 1,200 | 160 |
| Off-season | 500 | 40 |

A new General Manager was hired for Jay Peak. Leisure Hotels & Resorts then brought in its team of certified public accountants to assess systems and internal controls at both resorts. Material weaknesses were noted primarily in the payroll department at Jay Peak and several areas at Burke. New processes and reporting structures have been implemented to prevent loss of

assets or material disruption of operations. Overall, Jay Peak has competent personnel and good controls. Burke's level of competency and controls were severely lacking with the exception of a few individuals. Almost all senior management at the Burke were terminated and the Burke's operations were completely reorganized and several back office functions between Jay Peak and Burke (accounting, human resources, information technology, and some marketing) have been consolidated in a manner that can be easily unwound should one resort eventually be sold without the other. An allocation of joint costs between the resorts has been performed and costs will be recorded on the respective books and records for each resort. This will result in significant cost savings to both resorts, enhance training, efficiency and customer service at Burke and provide significant positive synergies for the properties while allowing both resorts to retain their own identity.

A review of both resorts' human resource policies and compliance noted some weaknesses and deficiencies at Jay Peak and several material weaknesses at Burke. Jay Peak's weaknesses and non-compliance have been corrected and procedures modified for regulatory compliance. Due to multiple employment related issues at Burke, its employees have been consolidated into Jay Peak's payroll filings and benefit plans effective July 31, 2016 which eliminates many of these issues prospectively at Burke. All direct and indirect costs of payroll related to Burke will be charged back to Burke by Jay Peak. This structure can be easily unwound should one resort be sold without the other.

### E.     Receivership Expenses

As more fully described herein, the Court has authorized the Receiver to enter into a Management Agreement with Leisure to operate, manage and maintain the facilities. Leisure is paid a management fee of two and one-half percent (2.5%) of all gross receipts (as that term is

defined in the Management Agreement). There is a minimum fee of forty-five thousand dollars ($45,000) for each month (or prorated for partial months) and a nine thousand dollar ($9,000) accounting fee to be paid for each month (or prorated for partial months). The Receiver has confirmed that the fees identified in the Management Agreement are consistent with those regularly charged in the industry.

As explained in prior reports and numerous other Court filings, the Receivership Estate has experienced a severe liquidity shortfall.  This is due to the fact that the Receivership Entities failed to set aside sufficient cash to fund off-season losses as well as the necessary $5 million tram repair.   Accordingly, the Receiver has needed all available cash to fund operations and has been unable to pay his professionals who have graciously agreed to wait for payment.[6]

For the first seven months of this receivership, the Receiver's professionals have incurred approximately $1.4 million in fees and expenses.  The Receiver notes that this sum, although optically large, is relatively small based on the amount of work undertaken and the size of fee requests in similar receiverships.   In light of his recent receipt of the Citibank settlement proceeds, the Receiver and his professionals have filed fee applications simultaneous herewith.

## IV.     ADMINISTRATION OF THE RECEIVERSHIP ESTATES

The Receiver has assembled a team of professionals with experience and skills working on receivership matters.

### A.      The Receiver and his Professionals

The Receiver is a partner at the law firm of Akerman LLP ("Akerman") and co-chair of Akerman's Fraud & Recovery Practice Group. The Receiver has practiced law for twenty-six years and specializes in receivership and bankruptcy cases. The Receiver has been appointed

---

[6]  The Receiver's professionals were required to file fee applications in July.  However, at the Receiver's request and with the Court's authorization, the professional's agreed to delay their request until the Receivership Estate had sufficient liquidity.

AKERMAN LLP, LAS OLAS CENTRE II, SUITE 1600, 350 EAST LAS OLAS BOULEVARD, FORT LAUDERDALE, FL  33301-2999

receiver in more than twenty-five state and federal receivership cases and has represented receivers and trustees in many other cases. The Receiver is working with a team of attorneys and paralegals at Akerman to administer this case. Since Akerman employs over 650 attorneys and consultants, the Receiver has ready access to professionals who specialize in litigation, real estate, immigration, corporate and other pertinent matters.

Jeffrey Schneider, a partner at the law firm Levine Kellogg Lehman Schneider & Grossman LLP, provides special litigation and conflicts litigation services for the Receiver. Mr. Schneider is a trial lawyer whose practice focuses on complex commercial litigation and receiverships. Mr. Schneider has served as a receiver himself in several cases.

Soneet Kapila, CPA, and the accounting firm Kapila Mukamal provide accounting and forensic work for the Receiver. Mr. Kapila's practice is focused on restructuring, creditors' rights, bankruptcy, fiduciary matters and financial transactions litigation. He has conducted numerous forensic and fraud investigations, and has worked in conjunction with the Securities and Exchange Commission, the Federal Bureau of Investigation and the United States Attorney's Office. Mr. Kapila is also a panel trustee for the United States Bankruptcy Court for the Southern District of Florida.

Malcolm Ruby, a partner in the Toronto office of the law firm Gowling WLK, has assisted the Receiver secure bank accounts in Canada. Mr. Ruby has acted on behalf of the SEC and the Ontario Securities Commission in a number of cases raising trans-border enforcement issues.  Mr. Ruby was successful in assisting the Receiver in obtaining the funds held in the Canadian Bank.

H. Ron Klasko, the founding member of Klasko Immigration Law Partners, is widely regarded as one of the nation's leading EB-5 experts.  He and his staff are assisting the Receiver

AKERMAN LLP, LAS OLAS CENTRE II, SUITE 1600, 350 EAST LAS OLAS BOULEVARD, FORT LAUDERDALE, FL  33301-2999

in all aspects of immigration law and are working directly with investors' attorneys to help them deal with USCIS.

**B.     Claims**

The unique nature of this receivership case may present the need for multiple classifications of claims. Investors may have claims for monetary damages due to a loss of all or part of their investment as well as other damages incurred as a result of the loss of their anticipated immigration status. Contractors and subcontractors, who have asserted mechanics' liens, seek payment for the services provided and labor performed prior to the receivership. General trade creditors also hold claims for their pre-receivership services. The Receiver foresees developing a multi-layered claims process to address and verify the various claims. This claims process will be developed over time and submitted to the Court for approval when finalized.

**C.     Recommendations**

The Receiver's initial focus has been on securing and maintaining the assets of the Receivership Entities, tracing the use of the individual partnership funds and responding to inquiries from the investors, creditors and other interested parties. The Receiver anticipates taking the following actions: (i) continue to operate and maintain the facilities until the best course of disposition is determined with the goal of each investor obtaining the highest possible return on their investment and achieving their unconditional green card; (ii) develop a claims process; (iii) investigating and commencing litigation against third parties who may be liable for the perpetration of the Receivership Defendants' fraud; (iv) continue to review transfers of the individual partnership funds and seek to recover funds which were fraudulently transferred; (v)

respond to inquiries from investors, creditors, government officials and interested parties; and (vi) provide updates through the receivership website.

Dated:  November 22, 2016.

Respectfully submitted,

  /s/ Michael I. Goldberg
Michael I. Goldberg, Esq.
Florida Bar Number:  886602
Email:  michael.goldberg@akerman.com
AKERMAN LLP
Las Olas Centre II, Suite 1600
350 East Las Olas Boulevard
Fort Lauderdale, FL  33301-2999
Telephone (954) 463-2700
Facsimile: (954) 463-2224
*Court Appointed Receiver*

## CERTIFICATE OF SERVICE

I HEREBY CERTIFY that a true and correct copy of the foregoing was served on this November 22, 2016 via the Court's notice of electronic filing on all CM/ECF registered users entitled to notice in this case as indicated on the attached Service List.

By: */s/* Michael I. Goldberg
        Michael I. Goldberg, Esq.

## SERVICE LIST

**1:16-cv-21301-DPG Notice will be electronically mailed via CM/ECF to the following:**

Robert K. Levenson, Esq.
Senior Trial Counsel
Florida Bar No. 0089771
Direct Dial: (305) 982-6341
Email: levensonr@sec.gov
almontei@sec.gov, gonzalezlm@sec.gov,
jacqmeinv@sec.gov

Christopher E. Martin, Esq.
Senior Trial Counsel
SD Florida Bar No.: A5500747
Direct Dial: (305) 982-6386
Email: martinc@sec.gov
almontei@sec.gov, benitez-
perelladaj@sec.gov

**SECURITIES AND EXCHANGE
COMMISSION**
801 Brickell Avenue, Suite 1800
Miami, Florida 33131
Telephone: (305) 982-6300
Facsimile:  (305) 536-4154
*Attorneys for Plaintiff*

Roberto Martinez, Esq.
Email: bob@colson.com
Stephanie A. Casey, Esq.
Email: scasey@colson.com
**COLSON HICKS EIDSON, P.A.**
255 Alhambra Circle, Penthouse
Coral Gables, Florida 33134
Telephone: (305) 476-7400
Facsimile:  (305) 476-7444
*Attorneys for William Stenger*

Jeffrey C.  Schneider, Esq.
Email: jcs@lklsg.com
**LEVINE KELLOGG LEHMAN
SCHNEIDER & GROSSMAN**
Miami Center, 22nd Floor
201 South Biscayne Blvd.
Miami, Florida 33131
Telephone: (305) 403-8788
*Co-Counsel for Receiver*

Jonathan S. Robbins, Esq.
jonathan.robbins@akerman.com
**AKERMAN LLP**
350 E. Las Olas Blvd., Suite 1600
Ft. Lauderdale, Florida 33301
Telephone:  (954) 463-2700
Facsimile:   (954) 463-2224

Naim Surgeon, Esq.
naim.surgeon@akerman.com
**AKERMAN LLP**
Three Brickell City Centre
98 Southeast Seventh Street, Suite 1100
Miami, Florida  33131
Telephone: (305) 374-5600
Facsimile:  (305) 349-4654
*Attorney for Court-Appointed Receiver*

Scott B. Cosgrove, Esq.
Email: scosgrove@leoncosgrove.com
James R. Bryan, Esq.
Email: jbryan@leoncosgrove.com
**LEON COSGROVE, LLC**
255 Alhambra Circle, Suite 800
Coral Gables, Florida 33133
Telephone: (305) 740-1975
Facsimile:  (305) 437-8158
*Attorney for Ariel Quiros*

David B. Gordon, Esq.
Email:  dbg@msk.com
**MITCHELL SILBERBERG &
KNOPP, LLP**
12 East 49th Street – 30th Floor
New York, New York 10017
Telephone: (212) 509-3900
*Co-Counsel for Ariel Quiros*

Jean Pierre Nogues, Esq.
Email:  jpn@msk.com
Mark T. Hiraide, Esq.
Email: mth@msk.com
**MITCHELL SILBERBERG &**
**KNOPP, LLP**
11377 West Olympic Blvd.
Los Angeles, CA 90064-1683
Telephone (310) 312-2000
*Co-Counsel for Ariel Quiros*

Mark P. Schnapp, Esq.
Email: schnapp@gtlaw.com
Mark D. Bloom, Esq.
Email: bloomm@gtlaw.com
Danielle N. Garno
E-Mail: garnod@gtlaw.com
**GREENBERG TRAURIG, P.A.**
333 SE 2nd Avenue, Suite 4400
Miami, Florida 33131
Telephone: (305) 579-0500
*Attorney for Intervenor, Citibank N.A.*

J. Ben Vitale
Email: bvitale@gurleyvitale.com
David E. Gurley
Email: dgurley@gurleyvitale.com
**GURLEY VITALE**
601 S. Osprey Avenue
Sarasota, Florida 32436
Telephone: (941) 365-4501
*Attorney for Blanc & Bailey Construction,*
*Inc.*

**Stanley Howard Wakshlag**
email: swakshlag@knpa.com
**KENNY NACHWALTER, P.A.**
Four Seasons Tower
1441 Brickell Avenue, Suite 1100
Miami, Florida 33131-4327
Telephone: (305) 373-1000
*Attorneys for Raymond James &*
*Associates Inc.*

EXHIBIT "A"

**Jay Peak Resort/Burke Mountain**
**Cash Flow Statement**
4/14/16 through 10/31/16

| | | | | USD | |
|---|---|---|---|---:|---|
| **Beginning Cash Balance** | | | | | |
| People's United Bank # | -1736 | | $ | 1,157,570 | |
| People's United Bank # | -1752 | | $ | (2,230) | |
| People's United Bank # | -7175 | | $ | - | |
| People's United Bank # | -0659 | | $ | 1,627,901 | |
| People's United Bank # | -0667 | | $ | 1,431 | |
| People's United Bank # | 6722 | | $ | 53,503 | |
| People's United Bank # | 1175 | | $ | - | |
| People's United Bank # | 6726 | | $ | 18,644 | |
| People's United Bank # | 6724 | | $ | 2,761 | |
| Desjardins # | 2955 | | $ | 195,498 | |
| Desjardins # | 3548 | | $ | 919,076 | |
| | | | $ | 3,974,153 | |
| | | | | | |
| **Add Incoming:** | | | | | |
| Receiver Funding | | | | | |
| Direct - Merrill Lynch Bank Accounts | | | $ | 2,400,456 | |
| Indirect - CitiBank Accounts | | | $ | 2,949,598 | |
| Deposits from Operations | | | $ | 17,989,753 | A |
| | | | $ | 23,339,807 | |
| | | | | | |
| **Less Outgoing:** | | | | | |
| Payroll & Benefits | | | | | |
| Jay Peak Resort | | | $ | (8,083,750) | |
| Burke Mountain | | | $ | (841,264) | |
| Vendor Payments | | | | | |
| Jay Peak Resort | | | $ | (10,678,388) | B |
| Burke Mountain | | | $ | (1,112,453) | B |
| Tax Payments | | | | | |
| Vermont Department of Taxes | | | $ | (1,657,603) | |
| Internal Revenue Service | | | $ | (8,663) | |
| Merchant and Bank Fees | | | $ | (502,873) | |
| | | | $ | (22,884,993) | |
| | | | | | |
| **Ending Cash Balance** | | | | | |
| People's United Bank # | -1736 | | $ | 2,768,504 | |
| People's United Bank # | -1752 | | $ | - | |
| People's United Bank # | -7175 | | $ | 21,003 | |
| People's United Bank # | -0659 | | $ | 1,239,440 | |
| People's United Bank # | -0667 | | $ | - | |
| People's United Bank # | 6722 | | $ | 197,465 | |
| People's United Bank # | 1175 | | $ | 2,574 | |
| People's United Bank # | 6726 | | $ | 30,028 | |
| People's United Bank # | 6724 | | $ | 455 | |
| Desjardins # | 2955 | | $ | 141,574 | |
| Desjardins # | 3548 | | $ | 27,924 | |
| | | | $ | 4,428,967 | |

**Note A:**
Canadian transactions have been converted to US Dollars based upon the following methodology:

The Canadian portion of total resort deposits was calculated to be 7% for the report period.  This percentage was applied to all resort deposits at the average CDN to USD currency exchange rate of .77 for the report period.

**Note B:**
Vendor payments pertain primarily to goods and services received after April 13, 2016.

Jay Peak Resort/Burke Mountain
Beginning Cash Balance

* Rate: 0.79

| Company | Bank | Account Name | Account Number | 04/21/2016 USD/CDN End of Day Cash Balance | 04/21/2016 USD End of Day Cash Balance | |
|---|---|---|---|---|---|---|
| 08 - JPI | People's | General Account | -1736 | 1,157,569.64 | 1,157,569.64 | |
| 08 - JPI | People's | Payroll Account | -1752 | (2,230.47) | (2,230.47) | |
| 08 - JPI | People's | Money Market Acct | -7175 | - | - | |
| 20 - JPHSP2 | People's | General Account | -0659 | 1,627,900.70 | 1,627,900.70 | |
| 20 - JPHSP2 | People's | Money Market Acct | -0667 | 1,431.11 | 1,431.11 | |
| 380 - BMOC | People's | General Account | 6722 | 53,503.21 | 53,503.21 | |
| 380 - BMOC | People's | Savings Account | 1175 | - | - | |
| 381 - BMRM | People's | General Account | 6726 | 18,644.11 | 18,644.11 | |
| 382 - BMWC | People's | General Account | 6724 | 2,760.62 | 2,760.62 | |
| 08 - JPI | Desjardins | CDN Operating Acct | 2955 | 247,465.63 | 195,497.85 | * |
| 20 - JPHSP2 | Desjardins | CDN Operating Acct | 3548 | 1,163,387.05 | 919,075.77 | * |
| | | | | $ 4,270,431.60 | $ 3,974,152.54 | |

Jay Peak Resort/Burke Mountain
Detailed Report on Receiver Funding
4/14/14 through 04/21/14

Direct - Merrill Lynch Bank Accounts
Indirect - CitiBank Accounts

| TRC Number | Account Number | Account Type | Account Name | Post Date | Reference | Amount | Description | Type | Text |
|---|---|---|---|---|---|---|---|---|---|
| 221171186 | 21796 | Checking | JPI Operating - 1796 | 05/02/2016 | 1.0005E+12 | $ 909,669.43 | INCOMING WIRE TRANSFER | Wire | For Alemoni; obtained from various CitiBank accounts |
| 221171196 | 21796 | Checking | JPI Operating - 1796 | 05/03/2016 | 1.0006E+12 | $ 243,000.63 | INCOMING WIRE TRANSFER | Wire | For Alemoni; obtained from various CitiBank accounts |
| 221171186 | 21796 | Checking | JPI Operating - 1796 | 06/07/2016 | 9.39003E+14 | $ 1,000,000.00 | BOOK TRANSFER CREDIT | | REF 1591115L   FUNDS TRANSFER FRM DEP 419104788   FROM       FUNDSTER FROM JAY CONST TO JPI |
| 221171186 | 21796 | Checking | JPI Operating - 1796 | 06/08/2016 | 9.97603E+14 | $ 800,000.00 | BOOK TRANSFER CREDIT | | REF 1860443L   FUNDS TRANSFER FRM DEP 419104788   FROM       TRSFFRM JPI CONSTRUCTION TO OPS |
| 221171186 | 21796 | Checking | JPI Operating - 1796 | 07/18/2016 | 1.00E+12 | $ 1,700,000.00 | INCOMING WIRE TRANSFER | Wire | For most account statement; Funds obtained from various Merrill Lynch Bank accounts. |
| 221171186 | 21796 | Checking | JPI Operating - 1796 | 07/18/2016 | 9.970+14 | $ (310.00) | BOOK TRANSFER DEBIT | | REF 2013533L   FUNDS TRANSFER TO DEP 419104788   FROM       TRSFFRM JPI OPS TO JAY CONSTRUCT |
| | | | | | | $ (269,595.59) | Note A | | |
| | | | | | | $ (841,279.43) | Note B | | |

Note A
The receiver withdrew 269,140 CDN from Jay Peak Inc's Desjardins bank account on June 1, 2016 (the converted amount is 202,929.99 USD)
These funds were returned to the Company via the wires noted above.

Note B
The receiver withdrew 1,113,600.63 CDN from Jay Peak Hotel Suites Phase II LP's Desjardins bank account on June 1, 2016 (the converted amount is 841,279.48 USD)
These funds were returned to the Company via the wires noted above.

| 221172190 | 21796 | Checking | JPI Operating - 1796 | 10/28/2016 | 1.00500E+12 | $ 1,000,000.00 | INCOMING WIRE TRANSFER | Wire |
| 221171186 | 1796 | Checking | JPI Operating - 1796 | 10/05/2016 | 1.00601E+13 | $ 745,675.61 | INCOMING WIRE TRANSFER | Wire |

Jay Peak Resort/Burke Mountain
**Detailed Report on Resort Deposits**
4/14/16 through 10/31/16

Average Currency Exchange Rate:     0.77

**Summary of Departmental Deposits into Major Line of Business Categories**

| Dept Category | | USD |
|---|---|---:|
| Short-term Assets | $ | 1,816,189 |
| Capital Expenditures (incl. tram upgrade) | $ | 1,961 |
| Short-term Liabilities | $ | 3,218,608 |
| Equity | $ | - |
| S, G & A | $ | 153,815 |
| General Operations | $ | 457,014 |
| Food & Beverage | $ | 4,360,143 |
| Hotel & Lodging | $ | 4,085,193 |
| Other Mountain Activities | $ | 2,394,740 |
| Condo Associations | $ | 490,902 |
| Skiing Operations | $ | 172,443 |
| Summer Operations | $ | 696,150 |
| Ski School | $ | 11,569 |
| Retail | $ | 122,785 |
| Ski Rental/Repair | $ | 8,243 |
| | $ | 17,989,753 |

Jay Peak Resort/Burke Mountain
**Detailed Report on Vendor Payments**
4/14/16 through 10/31/16

Average Currency Exchange Rate:         0.77

**Summary of Departmental Vendor Payments into Major Line of Business Categories**

| Dept Category | USD |
|---|---|
| Short-term Assets | $ 1,669,608 |
| Capital Expenditures (incl. tram upgrade) | $ 2,621,237 |
| Short-term Liabilities | $ 452,387 |
| Equity | $ 1,307 |
| S, G & A | $ 2,327,247 |
| General Operations | $ 1,194,935 |
| Food & Beverage | $ 1,705,429 |
| Hotel & Lodging | $ 607,913 |
| Other Mountain Activities | $ 443,388 |
| Condo Associations | $ 64,071 |
| Skiing Operations | $ 524,011 |
| Summer Operations | $ 146,725 |
| Ski School | $ 1,679 |
| Retail | $ 30,905 |
| Ski Rental/Repair | $ - |
| | $ 11,790,841 |

Jay Peak Resort/Burke Mountain
Ending Cash Balance

| Company | Bank | Account Name | Account Number | 10/31/2016 USD/CDN End of Day Cash Balance | 10/31/2016 USD End of Day Cash Balance | |
|---|---|---|---|---|---|---|
| 08 - JPI | People's | General Account | -1736 | 2,768,503.54 | 2,768,503.54 | |
| 08 - JPI | People's | Payroll Account | -1752 | - | - | |
| 08 - JPI | People's | Money Market Acct | -7175 | 21,002.68 | 21,002.68 | |
| 20 - JPHSP2 | People's | General Account | -0659 | 1,239,440.48 | 1,239,440.48 | |
| 20 - JPHSP2 | People's | Money Market Acct | -0667 | - | - | |
| 380 - BMOC | People's | General Account | 6722 | 197,464.57 | 197,464.57 | |
| 380 - BMOC | People's | Savings Account | 1175 | 2,574.46 | 2,574.46 | |
| 381 - BMRM | People's | General Account | 6726 | 30,028.48 | 30,028.48 | |
| 382 - BMWC | People's | General Account | 6724 | 454.50 | 454.50 | |
| 08 - JPI | Desjardins | CDN Operating Acct | 2955 | 188,765.48 | 141,574.11 | * |
| 20 - JPHSP2 | Desjardins | CDN Operating Acct | 3548 | 37,232.07 | 27,924.05 | * |
| | | | | $ 4,485,466.26 | $ 4,428,966.87 | |

* Rate:  0.75