UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF FLORIDA

CASE NO.: 16-cv-21301-GAYLES

SECURITIES AND EXCHANGE COMMISSION,

       Plaintiff,

v.

ARIEL QUIROS,
WILLIAM STENGER,
JAY PEAK, INC.,
Q RESORTS, INC.,
JAY PEAK HOTEL SUITES L.P.,
JAY PEAK HOTEL SUITES PHASE II. L.P.,
JAY PEAK MANAGEMENT, INC.,
JAY PEAK PENTHOUSE SUITES, L.P.,
JAY PEAK GP SERVICES, INC.,
JAY PEAK GOLF AND MOUNTAIN SUITES L.P.,
JAY PEAK GP SERVICES GOLF, INC.,
JAY PEAK LODGE AND TOWNHOUSES L.P.,
JAY PEAK GP SERVICES LODGE, INC.,
JAY PEAK HOTEL SUITES STATESIDE L.P.,
JAY PEAK GP SERVICES STATESIDE, INC.,
JAY PEAK BIOMEDICAL RESEARCH PARK L.P.,
AnC BIO VERMONT GP SERVICES, LLC,

       Defendants, and

JAY CONSTRUCTION MANAGEMENT, INC.,
GSI OF DADE COUNTY, INC.,
NORTH EAST CONTRACT SERVICES, INC.,
Q BURKE MOUNTAIN RESORT, LLC,

       Relief Defendants.

Q BURKE MOUNTAIN RESORT, HOTEL
AND CONFERENCE CENTER, L.P.,
Q BURKE MOUNTAIN RESORT GP SERVICES, LLC[1],
AnC BIO VT, LLC,[2]

       Additional Receivership Defendants.

_____/

---

[1] *See* Order Granting Receiver's Motion to Expand Receivership dated April 22, 2016 [ECF No. 60].
[2] *See* Order Granting Receiver's Motion for Entry of an Order Clarifying that AnC Bio VT, LLC is included in the Receivership or in the Alternative to Expand the Receivership to include AnC Bio VT, LLC, *Nunc Pro Tunc* dated September 7, 2018 [ECF No. 493].

**RECEIVER'S SIXTH INTERIM REPORT**

Michael I. Goldberg, in his capacity as receiver (the "Receiver"), pursuant to the Order Granting Plaintiff Securities and Exchange Commission's Motion for Appointment of Receiver (the "Receivership Order") [ECF No. 13], dated April 13, 2016, respectfully files his Sixth Interim Report covering the period from July 1, 2018 up to and including April 30, 2019.[3]

**PRELIMINARY STATEMENT**

During the period covered by this report, the Receiver reached a significant settlement with Ariel Quiros ("Quiros"), where Quiros relinquished any interest he may have in the Receivership Entities. This settlement cleared the way for the Receiver to market and sell the Jay Peak Resort and other assets with Quiros having no remaining right, title, claims or interest whatsoever in the Receivership Entities, the Jay Peak Resort, the Burke Mountain Hotel, Jay Peak Mountain, and Burke Mountain, including but not limited to, any real or personal property related to or utilized by the Jay Peak Resort and Burke Mountain Hotel. The Court approved the retention of a financial advisor, Houlihan Lokey ("HL"), to assist the Receiver with the sale of the Jay Peak Resort.

For the past two months, HL has been actively marketing the Jay Peak Resort to potential strategic and financial advisors throughout the United States, Europe and Asia. The Receiver is hopeful that a buyer can be located and a sales process can be concluded in 2019. The Receiver is not sure of what price the Jay Peak Resort will ultimately sell for, but it is highly doubtful that it will sell for a price sufficient to pay the Jay Peak investors in full. The Receiver and his professionals will do their best to obtain the highest possible price for the resort by conducting a

---

[3] For the purpose of brevity, the Receiver has endeavored not to restate information contained in the prior Status Reports, but refers all interested parties to those Status Reports for additional information including a detailed description of the Receivership Defendants and the events that led up to the appointment of the Receiver.

AKERMAN LLP, LAS OLAS CENTRE II, SUITE 1600, 350 EAST LAS OLAS BOULEVARD, FORT LAUDERDALE, FL 33301-2999

vigorous and fully transparent sales process.  The proceeds of the sale of the Jay Peak Resort

shall be, subject to the Court's approval, distributed on a pro-rata basis to all investors in the Jay

Peak Resort Phase II – Phase VI.[4]  In the interim, the Receiver continues to sell smaller parcels

of land that have no impact on the operation or sale of the other receivership properties.  The

proceeds of the sale of the smaller parcels have been deposited into the Receiver's operating

accounts and used to cover receivership expenses.

## I.    BACKGROUND

On April 12, 2016, the Securities and Exchange Commission ("SEC") filed a complaint

("Complaint") [ECF No. 1] in the United States District Court for the Southern District of

Florida (the "Court") against the Receivership Defendants,[5] the Relief Defendants,[6] William

Stenger and Ariel Quiros (collectively, the "Defendants").  The Complaint alleged that Mr.

Quiros and Mr. Stenger, in violation of federal securities laws, controlled and utilized the various

Receivership Entities in furtherance of a fraud on the investors who participated in limited

partnerships offered under the federally created EB-5 visa program.  The first six limited

partnerships (Phase I – Phase VI) raised funds to develop and expand the Jay Peak ski resort and

its accompanying facilities located in Jay, Vermont (the "Jay Peak Resort").  The seventh limited

---

[4] Phase I investors have already been paid from the proceeds of the settlement with Raymond James & Associates, Inc. *See*, ECF No. 353. Phase VII are the investors in the AnC Bio Project. Certain of the Phase VII investors have already received a refund on their principal investment.  The Phase VII investors who have been approved as conditional residents were provided with the opportunity to receive a refund or redeploy their investment. As more fully described herein, as of the date of this report, the Receiver has either delivered a refund of their principal investment to the Phase VII investors or facilitated their redeployed into the One Wall Street Project.

[5] The "Receivership Defendants" are Jay Peak, Inc., Q Resorts, Inc., Jay Peak Hotel Suites L.P., Jay Peak Hotel Suites Phase II L.P., Jay Peak Management, Inc., Jay Peak Penthouse Suites L.P., Jay Peak GP Services, Inc., Jay Peak Golf and Mountain Suites L.P., Jay Peak GP Services Golf, Inc., Jay Peak Lodge and Townhouse L.P., Jay Peak GP Services Lodge, Inc., Jay Peak Hotel Suites Stateside L.P., Jay Peak Services Stateside, Inc., Jay Peak Biomedical Research Park L.P., and AnC Bio Vermont GP Services, LLC.

[6] The "Relief Defendants" are Jay Construction Management, Inc., GSI of Dade County, Inc., North East Contract Services, Inc., and Q Burke Mountain Resort, LLC. Later, Q Burke Mountain Resort, Hotel and Conference Center, L.P. and Q Burke Mountain Resort GP Services, LLC were added as "Additional Receivership Defendants". The Receivership Defendants, Relief Defendants, and Additional Receivership Defendants are collectively referred to as the "Receivership Entities".

partnership, Phase VII, raised funds to purchase land and develop a biomedical research facility in Newport, Vermont (the "AnC Bio Project"). An eighth limited partnership, Phase VIII, which was not originally part of the receivership,[7] funds to develop and expand the Burke Mountain Hotel and ski area located in East Burke, Vermont (the "Burke Mountain Resort").

Along with the Complaint, the SEC requested the Court enter a temporary restraining order and a preliminary injunction preventing the Receivership Defendants from, among other things, transferring or otherwise utilizing their assets. On April 13, 2016, the Court entered the Receivership Order and granted the SEC's Emergency *Ex Parte* Motion for Temporary Restraining Order, Asset Freeze and Other Relief [ECF No. 4]. Among other things, the Receivership Order appointed Michael Goldberg as the receiver over the Receivership Defendants and the Relief Defendants. On April 22, 2016, the Court entered an Order expanding the receivership to include Q Burke Mountain Resort, Hotel and Conference Center, L.P. and Q Burke Mountain Resort GP Services, LLC as Additional Receivership Defendants [ECF No. 60]. On September 7, 2018, the Court entered an Order granting Receiver's motion to clarify that AnC Bio VT, LLC is included in the receivership or to expand the receivership to include AnC Bio VT, LLC, *nunc pro tunc* to the inception of the case. [ECF No. 493]

The SEC resolved its disputes with Mr. Quiros and Mr. Stenger. On February 5, 2018, the Court entered an Order [ECF No. 449] establishing a Fair Fund pursuant to Section 308(a) of the Sarbanes-Oxley Act of 2002 to allow the distribution of the civil penalties paid by Quiros and Stenger, along with the disgorgement and prejudgment interest paid by Quiros, to defrauded Jay Peak investors. On the same date, the Court entered Final Judgments against Mr. Quiros and Mr. Stenger setting forth the amount of disgorgement, prejudgment interest on disgorgement and

---

[7] *See* fn. 1.

civil penalty. The Final Judgment against Mr. Quiros [ECF No. 450, as amended by ECF No. 474] holds him liable for $81,344,166 of disgorgement, representing profits gained as a result of the conduct alleged in the Amended Complaint, prejudgment interest on disgorgement of $2,515,798, and a civil penalty of $1,000,000, for a total of $84,859,964. The Final Judgment against Mr. Quiros also provides that Mr. Quiros shall satisfy his obligations by disgorging certain real property, including the rights to the Jay Peak and Burke Mountain resorts, and other assets to the Receiver.[8]  Mr. Quiros has executed deeds transferring ownership of properties to the Receiver.[9]  The Final Judgment against Mr. Stenger [ECF No. 451] ordered him to pay a $75,000 civil penalty (the SEC did not seek disgorgement from Mr. Stenger) in three installments. Mr. Stenger has completed payment of his civil penalty.

## II.    ACTIONS TAKEN BY THE RECEIVER DURING THE REPORTING PERIOD

### A.    Claims

As more fully described in previous reports, on June 30, 2017 [ECF No. 353], the Court approved a settlement that the Receiver and other parties reached with Raymond James & Associates, Inc. ("Raymond James"), whereby Raymond James agreed to pay $150 million (in two tranches) in exchange for an order barring all claims against Raymond James (the "RJ Settlement").[10] The vast majority of the proceeds of the RJ Settlement were earmarked to pay the claims of the creditors of the Receivership Entities, reimburse investors who will be unable to obtain their citizenship, and provide benefit to other investors by funding improvements to the

---

[8] The Receiver is uncertain as to the value of these properties.

[9] On March 2, 2018, the Court entered an Order [ECF No. 458] modifying the asset freeze against Quiros [ECF No. 11 and 238] solely to allow the transfer of certain bank accounts and real property to the Receiver in satisfaction of Quiros' disgorgement obligations. The asset freeze has recently been fully terminated upon Quiros satisfying all of his obligations under his settlement agreement with the SEC.

[10] The Receiver, through special counsel, filed a lawsuit against Raymond James and Quiros' former son-in-law, Joel Burstein, who was a branch manager at Raymond James, and the employee responsible for servicing Quiros' financial needs (Case No. 1:16-cv-21831-JAL) (the "Raymond James Action") for among other causes of action, aiding and abetting breach of fiduciary duty.

Jay Peak Resort and Burke Mountain Resort which increase their value and create the requisite jobs needed for investors to meet their EB-5 job creation requirements.  The Receiver has received all of the funds due under the RJ Settlement and has implemented the terms of the RJ Settlement.  Importantly, in October 2018, the Receiver completed all construction relating to the Stateside Project (defined below) and, based on the reports of his economists, believes that enough jobs have now been created for every Jay Peak investor to meet their immigration requirements.

### 1.    Phase 1 – Phase V Investors

The principal investment claims of the investors in Jay Peak Hotel Suites L.P. ("Phase I") have been fully satisfied.  Phases II through Phase V consist of those individuals who invested in the partnerships[11] that built the remaining phases of the Jay Peak Resort (excluding the Stateside Hotel).  These partnerships funded the construction of the Jay Hotel, waterpark, golf course, hockey rink and Golf and Mountain Villas, among other assets. The Phase II – Phase V investors will receive a pro rata distribution of their equity interest from the proceeds of the sale of the Jay Peak Resort, along with Phase VI investors as referenced below. The Receiver is actively marketing the Jay Peak Resort for sale and is hopeful to complete a sale of the Jay Peak Resort this year.  Due to the fact that Phase I investors have already been paid off, Phase II through Phase VI investors will benefit by receiving the proceeds of the sale of the Tram Haus which was funded by Phase I investors.  The Receiver is not sure of what price the Jay Peak Resort will ultimately sell for, but it is highly doubtful that it will sell for a price sufficient to pay Phase II – Phase VI investors in full.  The Receiver and his professionals will do their best to obtain the highest possible price for the resort by conducting a vigorous and fully transparent sales process.

---

[11] The partnerships are Receivership Defendants Jay Peak Hotel Suites Phase II L.P., Jay Peak Penthouse Suites L.P., Jay Peak Golf and Mountain Suites L.P., and Jay Peak Lodge and Townhouses L.P.

Over the past few years, the Receiver has focused on changing the Jay Peak Resort from mainly a ski resort to a year round resort in an effort to improve profitability. More specifically, the Jay Peak Resort is a well-known ski resort that attracts hundreds of thousands of people in the winter months generating millions of dollars in profit. However, in the summer months, the Resort's occupancy rate is much lower and the Jay Peak Resort loses money essentially eating into the profit it generates during the winter ski season. Although the Receiver considered the possibility of closing the Jay Peak Resort in the slow summer months, it was determined that such was not feasible because it would severely hamper the Resort's ability to attract and maintain the employee base necessary in the winter months as well as create additional problems. Therefore, the Receiver has focused on making changes to increase the Resort's off-season occupancy rate.

To that end, with the Court's authorization, the Receiver completed the Recreational Center, eliminated the planned medical center and decreased the planned amount of cottages in Phase VI from 80 to 64 cottages.[12] The savings from this allowed the Receiver to build athletic fields to attract soccer and lacrosse tournaments to the Jay Peak Resort in the off-season. The positive results of this decision are already paying off, as multiple tournaments have already been booked for the upcoming off-season. The Receiver and his management team believe that the addition of the athletic fields has been highly beneficial, as it will make the Jay Peak Resort more profitable.

Although the Jay Peak Resort was built in phases, in reality, it is a single resort. It has common accounting, marketing, management and operations. It is impossible to separate the financial performance of one phase from another as, in many cases, the assets are physically

---

[12] The decision to reduce the amount of cottages from 80 to 64 will not affect the Jay Peak Resort because the Resort is only at full occupancy a few days of the year. Any loss of revenue by the reduction of these cottages is more than offset by the increased revenue generated by the athletic fields.

combined.  Moreover, no single phase owns the mountain and its improvements (i.e.... ski lifts, tram, etc...), without which, they are essentially worthless.  Therefore, it is the Receiver's opinion that the most equitable way to distribute the proceeds of the sale is on a pro-rata basis whereby each investor will receive an equal percentage of the sales proceeds.  This decision, as all other major decisions, will be subject to review with the SEC and ultimately the Court's approval.  Once the Jay Peak Resort is sold and the transaction is funded, the Receiver will file a motion with the Court to distribute the net sales proceeds to the investors.  The Receiver is hopeful that this process can be completed this year.

### 2.    Phase VI Investors

Phase VI consists of the investors who invested in Jay Peak Hotel Suites Stateside L.P., which raised money to build the Stateside Hotel, 84 cottages, a recreational center and a medical center (collectively, the "Stateside Project"). As of the commencement of the receivership, only the Stateside Hotel was completed and 35 cottages were partially constructed.  Upon the Receiver's motion, the Court entered an Order approving a modified plan for completion of the construction [ECF No. 330], which reduced the number of cottages to be completed from 84 to 60 and eliminated the plans to build a medical center. Instead, the Receiver used those savings to build a more comprehensive recreational center and athletic fields, which will enhance revenue during the off-season.  Construction of the cottages, recreation center and athletic fields have been completed.[13]  The revised project has created sufficient jobs for all of the Phase VI investors to pursue their citizenship.  The Phase VI investors will also receive a *pro rata* return of their equity from the sale of the Jay Peak Resort as set forth in the previous section.

---

### 3.     Phase VII Investors

Receivership Defendant, Jay Peak Biomedical Research Park, L.P. solicited funds from the Phase VII Investors for the AnC Bio Project – what was purported to be a biomedical research facility to be built in Newport, Vermont.  As of the commencement of the Receivership, only approximately $5.5 million in construction had taken place on the biomedical research facility and most of the money raised from the Phase VII Investors had been wrongfully diverted. The Receiver was able to recover approximately $17.8 million remaining in escrow in one of the bank accounts frozen by the Court. With the Court's approval, the Receiver returned the escrow funds to all but one of the Phase VII Investors whose funds were traced to the escrow account.[14] Those investors fully assigned to the Receiver any claims they may have against the Receivership Entities and third parties.

The Receiver provided the remaining Phase VII investors with the opportunity to receive a refund or redeploy their investment, depending on their status.  For the 67 Phase VII investors who have already been approved as conditional residents, the Receiver provided them with the opportunity to redeploy to another qualifying project (the "One Wall Street Project") for the remainder of the sustainment period.   Although not a guarantee, the Receiver and his professionals believe that redeployment offers these investors the best opportunity to meet the EB-5 requirements.  All Phase VII investors have either been refunded their principal investment or redeployed to the One Wall Street Project.[15] The receivership estate owes the Phase VII investors their administrative fee of $50,000 each.  If the receivership estate generates sufficient

---

[14] On June 22, 2017, the sole investor who has yet to claim his funds from escrow filed a letter with the court [ECF No. 351] citing, among other things, that he has not submitted the documentation required by the Receiver for a refund. As of the date of this filing, the investor has still not submitted the requisite documentation for a refund and his funds remain in escrow.
[15] The Receiver has obtained a release from each Phase VII investor in exchange for tendering them their refund. The Receiver currently holds $2 million in escrow for four of these investors who asked the Receiver to temporarily retain their funds pending USCIS's determination of their immigration status.

extra funds from litigation or the sale of the ANC Bio building and other non-Jay Peak Resort or Burke Mountain assets, the Receiver plans to establish a claims process to attempt to satisfy these claims.

4.      **Phase VIII Investors**

Phase VIII consists of 121 investors who invested through Additional Receivership Defendant, Burke Mountain Resort, Hotel and Conference Center, L.P. to build the hotel and conference center on Burke Mountain.   Initially, Phase VIII was not included in the SEC Complaint.  However, after the Receiver's appointment, he and his professionals determined that money from Phase VIII was wrongfully diverted to and commingled with, funds raised in other phases.  Therefore, the Receiver requested the Court add Phase VIII to the receivership.  The Court approved this request by Order dated April 22, 2016 [ECF No. 60].

Originally, this project was to consist of a hotel and conference center, an aquatic center, a tennis center and a mountain bike facility.   However, as of the commencement of the receivership, only the hotel and conference center were completed. The Receiver's economist has estimated that Phase VIII is currently short of the job creation requirement.  The Receiver is considering additional construction to increase job creation and is optimistic that sufficient jobs can be created for all Phase VIII investors to satisfy their EB-5 requirements.

Phase VIII is the most challenging project of the receivership from a financial and immigration perspective for a several reasons.  First, the construction of the hotel has failed to create enough jobs for all investors.  Most recent estimates indicate that the project is short 60 to 100 jobs (6 to 10 investors) and currently there is not enough jobs for up to 10 investors. Second, USCIS has terminated the Vermont Regional Center.  The termination of the Regional Center arguably constitutes a "material change" under the immigration laws and may be a

significant problem for those investors who have not yet received approval of their I-526 petitions. The State of Vermont, which owns the Regional Center, is challenging USCIS's decision. Finally, the Burke Mountain Hotel has been operating at a loss[16] and the Receiver has been forced to supplement its operations from other funds. The Receiver is using funds generated from litigation, settlements and the sale of other assets to subsidize the Burke Mountain Hotel's operations.[17]

With respect to the first two issues, the Receiver is faced with a chicken-egg problem. The Receiver could invest more money into the Burke Mountain Hotel to create enough jobs for each investor, however, in the event the State of Vermont's appeal fails and the Regional Center is fully and finally terminated, such investment could be a waste of money in the event the additional investment does not create an concomitant increase in the sales price of the Burke Mountain Hotel. Investing additional funds only makes sense in the event the State of Vermont is successful in its challenge to the termination of the Regional Center or the increased investment will increase the eventual sales price of the hotel by the amount invested. Therefore, the Receiver is analyzing potential investments and pursuing a strategy of actively supporting the State of Vermont's appeal of the termination of the Regional Center and is also considering other action on his own to assist the Phase VIII investors.[18] If successful, the Receiver will invest as much money as necessary, subject to the Court's approval, to create enough jobs as needed for each investor to meet their immigration requirements. Only after the Receiver is certain that he has done his best to protect the investors from an immigration perspective will he seek to sell the

---

[16]   The fact that the Burke Hotel is operating at a loss will have a concomitant effect on its value. Although an appraisal has not been undertaken, the Receiver currently believes that the Burke Hotel would sell for substantially less than is owed to Phase VIII investors.
[17] The Court has previously authorized the use of a portion of the proceeds of the settlements with Citibank N.A. [ECF No. 231] and Raymond James & Associates, Inc. [ECF No. 315] to cover operating expenses.
[18] The Receiver is not detailing such potential action in this report for confidentiality reasons.

Burke Mountain Hotel, as it is the Receiver's belief that all investors were motivated to make this investment in order to obtain their green card.

### B.     Management of Vermont Properties

The Receiver, with the assistance of the court-approved management company, Leisure Hotels, LLC ("Leisure") continue to operate the Jay Peak Resort and the Burke Mountain Hotel. Jay Peak Resort's General Manager, Steven Wright and Burke Mountain Hotel's General Manager, Kevin Mack also play an important role in the management of the resorts. The Receiver confers with the Leisure management team, Steven Wright and Kevin Mack on a regular basis to monitor the hotels' operations. Please see the Financial Affairs section of this report for more detailed information on the financial condition of the Jay Peak Resort and the Burke Mountain Hotel.

### C.     Future Plans to Sell the Jay Peak Resort and the Burke Mountain Hotel

#### 1.     Jay Peak Resort

The Receiver has reached the point in time where the Jay Peak is operating smoothly, construction is complete, and most importantly, all jobs necessary for every investor in Phases I through VI to qualify for I-829 approval have been created. Moreover, due to the SEC's efforts, the Receiver has taken possession of the mountain and now control all assets related to the Jay Peak Resort. Therefore, the Receiver is now actively marketing the Jay Peak Resort for sale. To that end, the Receiver has negotiated an agreement with Houlihan Lokey, a prominent investment banker who specializes in sales transactions involving ski resorts, to represent the Receiver in connection with marketing the Jay Peak Resort. On January 7, 2019, the Court entered an Order granting the Receiver's Motion for Authorization to Retain Houlihan Lokey to Assist the Receiver in Connection with the Sale of the Jay Peak Resort [ECF No. 520].

To that end, HL has been actively marketing the Jay Peak Resort to potential strategic and financial buyers throughout the United States, Europe and Asia. As of the date of this report, HL has contacted 125 potential buyers as of May 3, 2019 and 26 of them have executed Non-Disclosure Agreements and are actively reviewing financial material and other documents related to the Jay Peak Resort maintained in a data room set up for the sales process.

### 2. Burke Mountain Resort

Since construction of the Burke Mountain Hotel has not yet generated sufficient jobs for all of the investors in the project, the Receiver has decided not to sell the hotel property at this junction. However, other portions of the land owned by Burke 2000 LLC are not necessary for the operation of the hotel and ski area. The Receiver can sell those tracts of land and bring additional revenue in to the receivership estate. The Receiver has identified a 71-acre tract of undeveloped land owned by Burke 2000 LLC, which can be divided into four lots and sold as separate parcels. On February 3, 2019, the Court granted the Receiver the authority to sell the 71-acre tract of land [ECF No. 525] as well as a separate 3-acre parcel located near the entrance to the Burke Mountain Hotel [ECF No. 534]. The Receiver may continue to market stand-alone parcels prior to the sale of the Burke Mountain Hotel.

### E.   Litigation and Third Party Claims

### 1.   Ariel Quiros

On December 19, 2018, after notice to all investors and other interested parties and hearing before the Court, the Court approved the settlement between the Receiver and Mr. Quiros (the "Quiros Settlement") and the entry of a bar order (the "Bar Order") enjoining claims against Mr. Quiros.[19]   Pursuant to the settlement, Mr. Quiros, on behalf of himself and anyone

---

[19] A Corrected Final Order was entered on January 10, 2019. See ECF No. 527.

that claims through him (including his wife and children) fully and forever waive any rights, title, claims or interest in or against any and all Receivership Entities and any and all real or personal property or other rights owned, used or possessed by the Receivership Entities in the operation of the Jay Peak Resort or the Burke Mountain Hotel and their related assets. The Quiros Settlement further provides that Mr. Quiros shall have no remaining right, title, claims or interest whatsoever in the Receivership Entities, the Jay Peak Resort, the Burke Mountain Hotel, Jay Peak Mountain, Burke Mountain, including but not limited to, any real or personal property related to or utilized by the Jay Peak Resort and Burke Mountain Hotel. The Quiros Settlement resolves Mr. Quiros' claims to any of the Receivership Entities, their property or proceeds of their sale so the Receiver may undertake a sales process of the Jay Peak Resort and Burke Mountain Hotel and their related assets and distribute the proceeds of those sales, subject to Court approval, to the Investors who may be entitled to share in such distribution, as to be determined by the Court.

The Bar Order enjoins all persons (excluding the limitations set forth below) from commencing or continuing litigation or pursuit of other claims against Mr. Quiros that relate in any manner to the events, transactions and circumstances alleged in this case.  As negotiated among the Receiver, Mr. Quiros and certain interested parties, the Bar Order does shall not apply (i) to the United States of America, its agencies or departments, or to any state or local government and its agencies or departments; (ii) Citibank, N.A.; (iii) People's United Financial, Inc. and People's United Bank, N.A.; (iv) the Ad Hoc Group of Investors; (v) to the settling parties' respective obligations under the Settlement Agreement; or to (vi) any request by anyone for discovery from Mr. Quiros or any entity which he controls or has an ownership interest, including but not limited to the service or enforcement of legally authorized subpoenas for

documents, deposition or information, in actions or proceedings not barred by the Order.   This settlement has no effect on potential criminal charges against Mr. Quiros.

### 2.      Quiros v. Ironshore Indemnity, Inc.

From 2011, and until August 2016, Receivership Defendant Q Resorts, Inc., and its subsidiaries, officers and directors were insured under a $10 million Directors, Officers and Private Company Liability Insurance Policy issued by Ironshore Indemnity, Inc. ("Ironshore"). On April 15, 2016, after the commencement of this case and the appointment of the Receiver, Mr. Quiros and Mr. Stenger requested coverage from Ironshore. Thereafter, the Receiver requested coverage on behalf of the Receivership Entities, as additional insureds under the policies. Ironshore denied coverage, claiming that this case related back to the SEC's prior investigation, and that the investigation was a covered "claim" under the Policies that should have been reported.

After Ironshore denied coverage to Mr. Quiros, he filed an action seeking a declaration that he is entitled to insurance coverage from Ironshore.   This action is captioned *Quiros v. Ironshore Indemnity, Inc.*, No. 16-cv-25073 (S.D. Fla.) and pending before the Honorable Marcia G. Cooke (the "Ironshore Action").   In mid-2017, the Receiver intervened in the Ironshore Action to protect the interests of the Receivership Entities in insurance policies. After multiple settlement discussions and two failed mediations, in December 2018, the Receiver, Mr. Quiros, Mr. Stenger and Ironshore reached a settlement.   In exchange for a settlement payment in the amount of $1,900,000 from Ironshore, the Receiver, on behalf of the Receivership Entities, Mr. Stenger and Mr. Quiros and have agreed (i) to settle and compromise all claims for coverage under the Ironshore insurance policies ("Policies") and all claims related to Ironshore's payment of funds to any person or entity arising out of or related to the claims made against any Insured

(as defined in the Policies) in this case or in any other action, and (ii) to obtain entry of a bar order enjoining any person from bringing any claims which directly or indirectly arise from or relate to the Policies or to any other contract or agreement with Ironshore (the "Ironshore Settlement"). Of the $1,900,000 payable by Ironshore pursuant to the Settlement Agreement, the Receiver anticipates receiving $837,500, Mr. Quiros anticipates receiving $837,500, and Mr. Stenger anticipates receiving $225,000. These amounts may change in the event any of the proceeds must be used to resolve challenges to entry of the Bar Order.

The Receiver filed a Motion to approve the Ironshore Settlement, for entry of a bar order and to approve the form of notice to all interested parties [ECF No. 523]. Saint-Sanveur Valley Resorts, Inc. ("SSVR"), the defendant in *Goldberg v. Saint-Sauveur Valley Resorts, Inc.*, pending in the United States District Court for the District of Vermont (the "Vermont Action") filed an objection to the Ironshore Settlement, asserting that the proposed bar order could adversely affect its defense of the Vermont Action and bar its counterclaims against the Receiver and third-party claims against Mr. Stenger, Mr. Quiros, the Receivership Entities and third parties. Mr. Quiros' former attorneys, Leon Cosgrove, LLC and Mitchell, Silberberg & Knupp (the latter firm was also formerly counsel to the Receivership Entities) also filed an objection claiming they are owed money. On April 4, 2019, the Court entered an Order approving the settlement [ECF No. 554] and an Order barring, restraining and enjoining claims against Ironshore (the "Ironshore Bar Order") [ECF No. 555]. The former attorneys have filed a Notice of Appeal of the Ironshore Bar Order.

### 3.    Goldberg v. Kelly

The Receiver filed a Complaint against William Kelly, the former owner of Relief Defendant North East Contract Services, Inc. ("NECS"), *Goldberg v. Kelly*, Case No. 17-cv-

62157 (S.D. Fla.).   The claims against Kelly arise from allegedly improper payments NECS and/or Kelly received from Receivership Defendant AnC Bio Vermont GP Services LLC in connection with the now defunct AnC Bio Project.   The Receiver asserts that Kelly wrongfully assumed control of the improperly paid funds and subsequently diverted the funds to other recipients instead of returning the funds.   The case is still in the discovery phase.

### 4.   Claims Against Other Third Parties

The Receiver and his professionals continue to investigate and evaluate potential claims against other persons and companies involved with the Receivership Entities.   The Receiver's litigation attorneys have prepared subpoenas *duces tecum* to professionals who previously performed work with the Receivership Entities as part of their investigation of possible claims that may be asserted by the Receiver and in order to identify concealed or fraudulently transferred receivership assets and causes of action.   The Receiver intends to pursue recovery of fraudulently transferred assets or the proceeds thereof from third parties. The Receiver has negotiated tolling agreements with a number of other third parties.

### 5.   Document Recovery

The Receiver continues to maintain and update an electronic database to store documents produced by financial institutions and all pre-receivership servers and other data recovered from the files of the Defendants. An e-discovery vendor hosts such electronic files and permits the Receiver's professionals searchable access.   This system also allows the Receiver's professionals to share information and efficiently respond to discovery requests in related litigation.

III.    **FINANCIAL AFFAIRS**[20]

A.    **Bank Accounts**

The Receivership Entities' financial accounts were frozen pursuant to the Receivership Order. The Receivership Order also provides the Receiver with control and signatory authority for all financial accounts. *See* Receivership Order, ¶ 7.   The Receiver and his staff maintain receivership bank accounts and pay administrative expenses. The Receiver's staff has opened new bank accounts for the purpose of segregating the proceeds of the RJ Settlement and distributing payment to investors, contractors and other creditors.

Attached to this Report as **Exhibit "A"** is a Standard Fund Accounting Report ("SFAR") for the period of July 1, 2018 – December 31, 2018, and cash flow statements for the operating Receivership Entities detailing the Receivership Entities' business operations.

B.    **Jay Peak Resort**

1.    **Ski Season**

Jay Peak continued its daily ski operations through Sunday, April 28, 2019, representing one of the longest continuous operating seasons in Jay Peak's history.[21]  Jay Peak closed for the midweek period of April 29, 2019 – May 3, 2019 and reopened for the first full weekend of May 4, 2019.   With just a few days remaining in fiscal year 2019, management is forecasting an approximate increase of 4% to top-line operational revenue.   Moreover, the number of skier visits was 3.5% better than fiscal year 2018.   (This is in spite of more weather-impacted ski days.)  Likewise, the total rented rooms for fiscal year 2019 are forecasted to increase about 11%

---

[20] Because this receivership involves operating entities, the confidentiality of the Receivership Entities' financial data is important.  Accordingly, the Receiver has not attached detailed financial statements to this report, but has instead provided a general summary.  Should the Court want to review such detailed financial data, the Receiver shall provide the information to the Court in-camera.
[21] Snowfall was above average at 423 inches (but below the 491 inches experienced in fiscal year 2017).

over fiscal year 2018.  Lift ticket sales revenue is forecasted at approximately 5% over fiscal year 2018.

Waterpark visits are forecasted to increase about 7% over fiscal year 2018.  Higher visitation rates and an increase in waterpark based lodging packages helped drive this increase. Resort food and beverage is forecasted at a record amount of 5% over fiscal year 2018.  This has been driven by the increase in skier visits, waterpark visits and overall lodging nights at the hotels and condominiums.

### 2.      Outlook

For fiscal year 2020, management is budgeting for top-line revenue increase of 2% over fiscal year 2019.  This is predicated on a modest increase to skier and waterpark visits, overall lodging nights and modest ticket yield increases across all categories with the exception of season pass revenue, which is forecasted to remain flat, due to competitive rates and the use of multi-resort pass products.  Management also forecast a new source of revenue because of completion of the athletic fields, and bookings.

### C.      Burke Mountain Resort

### 1.      Ski Season

The Burke Mountain Resort opened its winter operations on November 23, 2018, which was the earliest the slopes were open at Burke since the 1990's.  Above average snowfall[22] and early season cold temperatures (which allowed for efficient snowmaking, helped shape the winter season). The resort ceased winter operations on April 14, 2019, the first year in the resort's known history in which operations exceeded 130 days for a season.  At the end of March (the mid-point in its fiscal year), the resort registered a 26% increase in sales.  Other gains

---

[22] Snowfall averages 170 inches at Burke, but this season measured over 275 inches.

include: the number of skier visits increased 20%; season pass revenue was up 13%; hotel room nights increased 47%, pushing lodging revenue up 29%; and food and beverage sales gained 26%.  Although the Burke Mountain Resort is trending in the right direction, it is still losing money and the Receiver is supplementing its operations from the proceeds of litigation recoveries and the sale of Burke Mountain related properties.

### 2. Sales Outlook

The Bike Park opens on May 25, 2019.  Last season saw triple digit growth in Bike Park visits.  Management expects continued, but more measured growth this season.  Current ski season pass sales for fiscal year 2020 are already up 17%.  The resort has been nominated by Ski Are Management (the professional trade organization for mountain resorts) for a best marketing campaign aware for the winter season.  The Burke Mountain Resort will maintain with a strong brand marketing campaign to continue to grow sales.

## IV. ADMINISTRATION OF THE RECEIVERSHIP ESTATES

The Receiver continues to utilize the skills of his professionals, including his general counsel Akerman LLP; special litigation and conflicts counsel Jeffrey Schneider and Levine Kellogg Lehman Schneider & Grossman LLP; and immigration counsel H. Ron Klasko and Klasko Immigration Law Partners. Soneet Kapila, CPA, and the accounting firm Kapila Mukamal provide accounting and forensic work for the Receiver.

### A. Website/Ongoing Communications

The Receiver continues to communicate with government officials, creditors, contractors and interested parties. The Receiver continues to respond to inquiries, usually through e-mail and telephone calls.  The Receiver returned to Vermont in January for meetings.  The Receiver and his staff continue to respond to inquiries from investors, creditors and other interested parties.

The Receiver continues to maintain a toll-free investor hotline at (800) 223-2234, an email address for general inquiries jaypeak@akerman.com, and a website www.JayPeakReceivership.com to provide up to date information for investors and interested parties. The Receiver has posted copies of court filings, correspondence with investors and other pertinent information on the website. The Receiver has also prepared and posted numerous updates on his website, including letters to investors. The Receiver will continue to utilize the website as the primary method of communicating with investors, creditors and other interested parties throughout the receivership.

B.    Recommendations

The Receiver continues to secure and maintain the assets of the Receivership Entities, analyze the use of the individual partnership funds and respond to inquiries from the investors, creditors and other interested parties. The Receiver anticipates taking the following actions: *(i)* continue to operate and maintain the facilities until the best course of disposition is determined with the goal of each investor obtaining the highest possible return on their investment and achieving their unconditional green card; *(ii)* provide information to investors to satisfy their EB-5 job creation requirements; *(iii)* continue to pay the allowed claims of creditors and investors; *(iv)* investigate and commence litigation against third parties who may be liable for the perpetration of the Receivership Defendants' fraud; *(v)* continue to review transfers of the individual partnership funds and seek to recover funds which were fraudulently transferred; *(vi)* respond to inquiries from investors, creditors, government officials and interested parties; and *(vii)* provide updates through the receivership website.

Dated:  May 20, 2019.

Respectfully submitted,

By: */s/ Michael I. Goldberg*
Michael I. Goldberg, Esq.
Florida Bar No. 886602
Email: michael.goldberg@akerman.com
**AKERMAN LLP**
Las Olas Centre II, Suite 1600
350 East Las Olas Blvd.
Fort Lauderdale, FL 33301-2229
Telephone: (954) 463-2700
Facsimile: (954) 463-2224
*Court Appointed Receiver*

## CERTIFICATE OF SERVICE

I HEREBY CERTIFY that a true and correct copy of the foregoing was served on this May 20, 2019 via the Court's notice of electronic filing on all CM/ECF registered users entitled to notice in this case as indicated on the attached Service List.

By: */s/* Michael I. Goldberg
Michael I. Goldberg, Esq.

## SERVICE LIST

### 1:16-cv-21301-DPG Notice will be electronically mailed via CM/ECF to the following:

**Robert K. Levenson, Esq.**
Senior Trial Counsel
Email: levensonr@sec.gov
almontei@sec.gov, gonzalezlm@sec.gov,
jacqmeinv@sec.gov
**SECURITIES AND EXCHANGE
COMMISSION**
801 Brickell Avenue, Suite 1800
Miami, Florida 33131
Telephone: (305) 982-6300
Facsimile:   (305) 536-4154
*Attorneys for Plaintiff*

**Christopher E. Martin, Esq.**
Senior Trial Counsel
Email: martinc@sec.gov
almontei@sec.gov, benitez-perelladaj@sec.gov
**SECURITIES AND EXCHANGE
COMMISSION**
801 Brickell Avenue, Suite 1800
Miami, Florida 33131
Telephone: (305) 982-6300
Facsimile:   (305) 536-4154
*Attorneys for Plaintiff*

**Roberto Martinez, Esq.**
Email: bob@colson.com
**Stephanie A. Casey, Esq.**
Email: scasey@colson.com
**COLSON HICKS EIDSON, P.A.**
255 Alhambra Circle, Penthouse
Coral Gables, Florida 33134
Telephone: (305) 476-7400
Facsimile:  (305) 476-7444
*Attorneys for William Stenger*

**Jeffrey C.  Schneider, Esq.**
Email: jcs@lklsg.com
**LEVINE KELLOGG LEHMAN
SCHNEIDER + GROSSMAN**
Miami Center, 22nd Floor
201 South Biscayne Blvd.
Miami, Florida 33131
Telephone: (305) 403-8788
*Co-Counsel for Receiver*

**Jonathan S. Robbins, Esq.**
jonathan.robbins@akerman.com
**AKERMAN LLP**
350 E. Las Olas Blvd., Suite 1600
Ft. Lauderdale, Florida 33301
Telephone: (954) 463-2700
Facsimile:   (954) 463-2224
*Attorney for Receiver*

**Naim Surgeon, Esq.**
naim.surgeon@akerman.com
**AKERMAN LLP**
Three Brickell City Centre
98 Southeast Seventh Street, Suite 1100
Miami, Florida  33131
Telephone: (305) 374-5600
Facsimile:  (305) 349-4654
*Attorney for Receiver*

**David B. Gordon, Esq.**
Email: dbg@msk.com
**MITCHELL SILBERBERG & KNOPP, LLP**
12 East 49th Street – 30th Floor
New York, New York 10017
Telephone: (212) 509-3900
*Co-Counsel for Ariel Quiros*

**Jean Pierre Nogues, Esq.**
Email:  jpn@msk.com
**Mark T. Hiraide, Esq.**
Email: mth@msk.com
**MITCHELL SILBERBERG & KNOPP, LLP**
11377 West Olympic Blvd.
Los Angeles, CA 90064-1683
Telephone (310) 312-2000
*Co-Counsel for Ariel Quiros*

47500296;2
48871712;2

- 23 -

**Mark P. Schnapp, Esq.**
Email: schnapp@gtlaw.com
**Mark D. Bloom, Esq.**
Email: bloomm@gtlaw.com
**Danielle N. Garno, Esq.**
E-Mail: garnod@gtlaw.com
**GREENBERG TRAURIG, P.A.**
333 SE 2nd Avenue, Suite 4400
Miami, Florida 33131
Telephone: (305) 579-0500
*Attorneys for Citibank*

**Stanley Howard Wakshlag, Esq.**
Email: swakshlag@knpa.com
**KENNY NACHWALTER, P.A.**
Four Seasons Tower
1441 Brickell Avenue
Suite 1100
Miami, FL 33131-4327
Telephone: (305) 373-1000
*Attorneys for Raymond James & Associates Inc.*

**Stephen James Binhak, Esquire**
**THE LAW OFFICE OF STEPHEN JAMES BINAK, P.L.L.C.**
1221 Brickell Avenue, Suite 2010
Miami, Florida 33131
Telephone: (305) 361-5500
Facsimile: (305) 428-9532
*Counsel for Attorney for Saint-Sauveur Valley Resorts*

**J. Ben Vitale, Esq.**
Email: bvitale@gurleyvitale.com
**David E. Gurley, Esq.**
Email: dgurley@gurleyvitale.com
**GURLEY VITALE**
601 S. Osprey Avenue
Sarasota, Florida 32436
Telephone: (941) 365-4501
*Attorneys for Blanc & Bailey Construction, Inc.*

**Melissa Damian Visconti, Esquire**
Email: mdamian@dvllp.com
**DAMIAN & VALORI LLP**
1000 Brickell Avenue, Suite 1020
Miami, Florida 33131
Telephone: 305-371-3960
Facsimile: 305-371-3965
*Attorneys for Ariel Quiros*

**Laurence May, Esquire**
**EISEMAN, LEVIN, LEHRHAUPT & KAKOYIANNIS, P.C.**
805 Third Avenue
New York, New York 10002
Telephone: (212) 752-1000
*Co-Counsel for Attorney for Saint-Sauveur Valley Resorts*

# **<u>EXHIBIT A</u>**

Michael I. Goldberg, Receiver
Las Olas Centre II – Suite 1600
350 E. Las Olas Boulevard
Ft. Lauderdale, Florida  33301
(954) 463-2700 (Main)
(800) 223-2234 (Toll Free)

# STANDARDIZED FUND ACCOUNTING REPORT

Civil – Receivership Fund

## SECURITIES & EXCHANGE COMMISSION

vs.

## ARIEL QUIROS, et al.

Case No.: 16-cv-21301-GAYLES

Reporting Period: 07/01/2018 – 12/31/2018

**STANDARDIZED FUND ACCOUNTING REPORT - Cash Basis (Receivership)**
SEC v. Quiros, et al.
Case No.: 16-cv-21301-GAYLES
Reporting Period 07/01/2018 to 12/31/2018

| FUND ACCOUNTING (See Instructions): | | Detail | Subtotal | Grand Total |
|---|---|---|---|---|
| Line 1 | Beginning Balance (As of 06/30/2018): | $ - | $ - | $ 24,712,207.95 |
| | *Increases in Fund Balance:* | | | |
| Line 2 | Business Income | $ - | | |
| Line 3 | Cash and Securities (UNrestricted) | $ 3,077,223.40 | | |
| Line 3 | Cash and Securities (RESTRICTED) | $ - | | |
| Line 4 | Interest/Dividend Income | $ 47,401.61 | | |
| Line 5 | Business Asset Liquidation | $ - | | |
| Line 6 | Personal Asset Liquidation | $ - | | |
| Line 7 | Third-Party Litigation Income | $ - | | |
| Line 8 | Miscellaneous - Other | $ - | | |
| | Total Funds Available (Lines 1 – 8): | | | $ 27,836,832.96 |
| | *Decreases in Fund Balance:* | | | |
| Line 9 | Disbursements to Investors | | | $ - |
| Line 10 | **Disbursements for Receivership Operations** | | | $ - |
| Line 10a | *Disbursements to Receiver or Other Professionals* | $ 715,063.33 | | |
| Line 10b | *Business Asset Expenses* | $ 5,416,050.14 | | |
| Line 10c | *Personal Asset Expenses* | $ - | | |
| Line 10d | *Investment Expenses* | $ - | | |
| Line 10e | *Third-Party Litigation Expenses* | $ - | | |
| | 1. Attorney Fees | $ 492,480.18 | | |
| | 2. Litigation Expenses | $ - | | |
| | *Total Third-Party Litigation Expenses* | $ - | | |
| Line 10f | *Tax Administrator Fees and Bonds* | $ - | | |
| Line 10g | *Federal and State Tax Payments* | $ (38,275.62) | | |
| | Total Disbursements for Receivership Operations | | | $ 6,585,318.03 |
| Line 11 | **Disbursements for Distribution Expenses Paid by the Fund:** | | | |
| Line 11a | *Distribution Plan Development Expenses:* | | | |
| | 1. Fees: | | | |
| | Fund Administrator........................ | $ - | | |
| | Independent Distribution Consultant (IDC)........... | $ - | | |
| | Distribution Agent........................ | $ - | | |
| | Consultants........................ | $ - | | |
| | Legal Advisers........................ | $ - | | |
| | Tax Advisers........................ | $ - | | |
| | 2. Administrative Expenses | $ - | | |
| | 3. Miscellaneous | $ - | | |
| | *Total Plan Development Expenses* | | | $ - |
| Line 11b | *Distribution Plan Implementation Expenses:* | | | |
| | 1. Fees: | | | |
| | Fund Administrator........................ | $ - | | |
| | IDC........................ | $ - | | |
| | Distribution Agent........................ | $ - | | |
| | Consultants........................ | $ - | | |
| | Legal Advisers........................ | $ - | | |
| | Tax Advisers........................ | $ - | | |
| | 2. Administrative Expenses | $ - | | |
| | 3. Investor Identification: | | | |
| | Notice/Publishing Approved Plan........... | $ - | | |
| | Claimant Identification........... | $ - | | |
| | Claims Processing........... | $ - | | |
| | Web Site Maintenance/Call Center........... | $ - | | |
| | 4. Fund Administrator Bond | $ - | | |
| | 5. Miscellaneous | $ - | | |
| | 6. Federal Account for Investor Restitution (FAIR) Reporting Expenses | | | |
| | *Total Plan Implementation Expenses* | | | $ - |
| | Total Disbursements for Distribution Expenses Paid by the Fund | | | $ - |
| Line 12 | **Disbursements to Court/Other:** | | | |
| Line 12a | *Investment Expenses/Court Registry Investment System (CRIS) Fees* | $ - | | |
| Line 12b | *Federal Tax Payments* | $ - | | |
| | Total Disbursements to Court/Other: | | | $ - |
| | Total Funds Disbursed (Lines 9 – 11): | | | $ 6,585,318.03 |
| Line 13 | Ending Balance (As of 12/31/2018): | | | $ 21,251,514.93 |

1

STANDARDIZED FUND ACCOUNTING REPORT - Cash Basis (Receivership)
SEC v. Quiros, et al.
Case No.: 16-cv-21301-GAYLES
Reporting Period 07/01/2018 to 12/31/2018

| | | | | | | |
|---|---|---|---|---|---|---|
| Line 14 | | Ending Balance of Fund – Net Assets: | | | $ | |
| | Line 14a | *Cash & Cash Equivalents* | | $ | - | |
| | Line 14b | *Investments* | | $ | | |
| | Line 14c | *Other Assets or Uncleared Funds* | | $ | - | |
| | | **Total Ending Balance of Fund – Net Assets** | | | $ | - |

| | | | Detail | Subtotal | Grand Total |
|---|---|---|---|---|---|
| **OTHER SUPPLEMENTAL INFORMATION:** | | | | | |
| | | *Report of Items NOT To Be Paid by the Fund:* | | | |
| Line 15 | | **Disbursements for Plan Administration Expenses Not Paid by the Fund:** | | | |
| | Line 15a | *Plan Development Expenses Not Paid by the Fund:* | | | |
| | | 1. Fees: | | | |
| | | Fund Administrator.............................. | $ - | | |
| | | IDC................................................... | $ - | | |
| | | Distribution Agent.............................. | $ - | | |
| | | Consultants........................................ | $ - | | |
| | | Legal Advisers................................... | $ - | | |
| | | Tax Advisers...................................... | $ - | | |
| | | 2. Administrative Expenses | $ - | | |
| | | 3. Miscellaneous | $ - | | |
| | | *Total Plan Development Expenses Not Paid by the Fund* | | $ - | |
| | Line 15b | *Plan Implementation Expenses Not Paid by the Fund:* | | | |
| | | 1. Fees: | | | |
| | | Fund Administrator.............................. | $ - | | |
| | | IDC................................................... | $ - | | |
| | | Distribution Agent.............................. | $ - | | |
| | | Consultants........................................ | $ - | | |
| | | Legal Advisers................................... | $ - | | |
| | | Tax Advisers...................................... | $ - | | |
| | | 2. Administrative Expenses | $ - | | |
| | | 3. Investor Identification: | | | |
| | | Notice/Publishing Approved Plan.......... | $ - | | |
| | | Claimant Identification........................ | $ - | | |
| | | Claims Processing............................... | $ - | | |
| | | Web Site Maintenance/Call Center....... | $ - | | |
| | | 4. Fund Administrator Bond | $ - | | |
| | | 5. Miscellaneous | $ - | | |
| | | 6. FAIR Reporting Expenses | $ - | | |
| | | *Total Plan Implementation Expenses Not Paid by the Fund* | | $ - | |
| | Line 15c | *Tax Administrator Fees & Bonds Not Paid by the Fund* | | $ - | |
| | | **Total Disbursements for Plan Administration Expenses Not Paid by the Fund** | | $ - | |
| Line 16 | | **Disbursements to Court/Other Not Paid by the Fund:** | | | |
| | Line 16a | *Investment Expenses/CRIS Fees* | $ - | | |
| | Line 16b | *Federal Tax Payments* | $ - | | |
| | | **Total Disbursements to Court/Other Not Paid by the Fund:** | | $ - | |
| Line 17 | | **DC & State Tax Payments** | | $ - | |
| Line 18 | | **No. of Claims:** | | | |
| | Line 18a | *# of Claims Received This Reporting Period................* | | | 0 |
| | Line 18b | *# of Claims Received Since Inception of Fund........* | | | 0 |
| Line 19 | | **No. of Claimants/Investors:** | | | |
| | Line 19a | *# of Claimants/Investors Paid This Reporting Period........* | | | 0 |
| | Line 19b | *# of Claimants/Investors Paid Since Inception of Fund.............* | | | 0 |

Receiver:

By: /s/ Michael I. Goldberg
(signature)

Michael I. Goldberg
(printed name)

Court Appointed Receiver
(title)

Date: 3/19/19

**Jay Peak Resort/Burke Mountain**
**Cash Flow Statement**
7/01/18 through 7/31/18

|  |  | USD |  |
|---|---|---:|---|
| **Beginning Cash Balance** |  |  |  |
| People's United Bank # ▓▓-1736 | $ | 3,937,244 |  |
| People's United Bank # ▓▓-1752 | $ | - |  |
| People's United Bank # ▓▓-7175 | $ | 21,058 |  |
| People's United Bank # ▓▓-0659 | $ | 937,856 |  |
| People's United Bank # ▓▓-0667 | $ | - |  |
| People's United Bank # ▓▓6722 | $ | 1,564,127 |  |
| People's United Bank # ▓▓1175 | $ | - |  |
| People's United Bank # ▓▓6726 | $ | 60,733 |  |
| People's United Bank # ▓▓6724 | $ | 10,043 |  |
| Desjardins #102955 | $ | 397,870 |  |
| Desjardins #103548 | $ | - |  |
|  | $ | **6,928,931** |  |
|  |  |  |  |
| **Add Incoming:** |  |  |  |
| Receiver Funding |  |  |  |
| Direct - Merrill Lynch Bank Accounts | $ | - |  |
| Indirect - CitiBank Accounts | $ | 1,265,240 |  |
| Deposits from Operations | $ | 2,824,277 | A |
|  | $ | **4,089,517** |  |
|  |  |  |  |
| **Less Outgoing:** |  |  |  |
| Payroll & Benefits |  |  |  |
| Jay Peak Resort | $ | (1,417,835) |  |
| Burke Mountain | $ | (296,503) |  |
| Vendor Payments |  |  |  |
| Jay Peak Resort | $ | (2,061,936) |  |
| Burke Mountain | $ | (403,031) | ▓ |
| Tax Payments |  |  |  |
| Vermont Department of Taxes | $ | (140,274) |  |
| Internal Revenue Service | $ | (401) |  |
| Merchant and Bank Fees | $ | (41,262) |  |
|  | $ | **(4,361,242)** |  |
|  |  |  |  |
| **Ending Cash Balance** |  |  |  |
| People's United Bank # ▓▓-1736 | $ | 3,651,174 |  |
| People's United Bank # ▓▓-1752 | $ | - |  |
| People's United Bank # ▓▓-7175 | $ | 21,061 |  |
| People's United Bank # ▓▓-0659 | $ | 947,445 |  |
| People's United Bank # ▓▓-0667 | $ | - |  |
| People's United Bank # ▓▓6722 | $ | 1,610,966 |  |
| People's United Bank # ▓▓1175 | $ | - |  |
| People's United Bank # ▓▓6726 | $ | 41,523 |  |
| People's United Bank # ▓▓6724 | $ | 4,797 |  |
| Desjardins #▓▓955 | $ | 380,240 |  |
| Desjardins #▓▓548 | $ | - |  |
|  | $ | **6,657,206** |  |

**Note A:**
Canadian transactions have been converted to US Dollars based upon the following methodology:

The Canadian portion of total resort deposits was calculated to be 7% for the report period. This percentage was applied to all resort deposits at the average CDN to USD currency exchange rate of .77 for the report period.

**Jay Peak Resort/ Burke Mountain**
**Cash Flow Statement**
8/01/18 through **8/31/18**

|  |  | USD |
|---|---|---|
| **Beginning Cash Balance** |  |  |
| People's United Bank # █ 1736 | $ | 3,651,174 |
| People's United Bank # █ 1752 | $ | - |
| People's United Bank # █ 7175 | $ | 21,061 |
| People's United Bank # █ 0659 | $ | 947,445 |
| People's United Bank # █ 0667 | $ | - |
| People's United Bank █ 6722 | $ | 1,610,966 |
| People's United Bank # █ 1175 | $ | - |
| People's United Bank # █ 6726 | $ | 41,523 |
| People's United Bank # █ 6724 | $ | 4,797 |
| Desjardins # █ 955 | $ | 380,240 |
| Desjardins # █ 548 | $ | - |
|  | $ | **6,657,206** |
|  |  |  |
| **Add Incoming:** |  |  |
| Receiver Funding |  |  |
| Direct - Merrill Lynch Bank Accounts | $ | - |
| Indirect - CitiBank Accounts | $ | 576,331 |
| Deposits from Operations | $ | 3,852,173 A |
|  | $ | **4,428,504** |
|  |  |  |
| **Less Outgoing:** |  |  |
| Payroll & Benefits |  |  |
| Jay Peak Resort | $ | (1,359,749) |
| Burke Mountain | $ | (261,434) |
| Vendor Payments |  |  |
| Jay Peak Resort | $ | (1,459,660) █ |
| Burke Mountain | $ | (343,297) █ |
| Tax Payments |  |  |
| Vermont Department of Taxes | $ | (264,369) |
| Internal Revenue Service | $ | (179) |
| Merchant and Bank Fees | $ | (53,760) |
|  | $ | **(3,742,448)** |
|  |  |  |
| **Ending Cash Balance** |  |  |
| People's United Bank # █ 1736 | $ | 3,953,176 |
| People's United Bank # █ 1752 | $ | - |
| People's United Bank # █ 7175 | $ | 21,065 |
| People's United Bank # █ 0659 | $ | 959,892 |
| People's United Bank # █ 0667 | $ | - |
| People's United Bank # █ 6722 | $ | 1,857,535 |
| People's United Bank # █ 1175 | $ | - |
| People's United Bank # █ 6726 | $ | 57,303 |
| People's United Bank # █ 6724 | $ | 9,292 |
| Desjardins # █ 955 | $ | 484,999 |
| Desjardins # █ 548 | $ | - |
|  | $ | **7,343,262** |

**Note A:**

Canadian transactions have been converted to US Dollars based upon the following methodology:

The Canadian portion of total resort deposits was calculated to be 9% for the report period. This percentage was applied to all resort deposits at the average CDN to USD currency exchange rate of .77 for the report period.

█
█
█

**Jay Peak Resort/Burke Mountain**
**Cash Flow Statement**
9/01/18 through 9/30/18

|  | USD |
|---|---|
| **Beginning Cash Balance** | |
| People's United Bank # ▮▮1736 | $ 3,953,176 |
| People's United Bank # ▮▮1752 | $ - |
| People's United Bank # ▮▮7175 | $ 21,065 |
| People's United Bank # ▮▮0659 | $ 959,892 |
| People's United Bank # ▮▮0667 | $ - |
| People's United Bank # ▮▮6722 | $ 1,857,535 |
| People's United Bank # ▮▮1175 | $ - |
| People's United Bank # ▮▮6726 | $ 57,303 |
| People's United Bank # ▮▮6724 | $ 9,292 |
| Desjardins # ▮▮955 | $ 484,999 |
| Desjardins # ▮▮548 | $ - |
|  | $ 7,343,262 |
| | |
| **Add Incoming:** | |
| Receiver Funding | |
| Direct - Merrill Lynch Bank Accounts | $ - |
| Indirect - CitiBank Accounts | $ 748,660 |
| Deposits from Operations | $ 3,102,551  A |
|  | $ 3,851,211 |
| | |
| **Less Outgoing:** | |
| Payroll & Benefits | |
| Jay Peak Resort | $ (1,162,128) |
| Burke Mountain | $ (248,032) |
| Vendor Payments | |
| Jay Peak Resort | $ (1,924,429) ▮ |
| Burke Mountain | $ (299,811) ▮ |
| Tax Payments | |
| Vermont Department of Taxes | $ (207,843) |
| Internal Revenue Service | $ (287) |
| Merchant and Bank Fees | $ (72,254) |
|  | $ (3,914,784) |
| | |
| **Ending Cash Balance** | |
| People's United Bank # ▮▮1736 | $ 3,721,029 |
| People's United Bank # ▮▮1752 | $ - |
| People's United Bank # ▮▮7175 | $ 21,068 |
| People's United Bank # ▮▮0659 | $ 958,522 |
| People's United Bank # ▮▮0667 | $ - |
| People's United Bank # ▮▮6722 | $ 2,008,184 |
| People's United Bank # ▮▮1175 | $ - |
| People's United Bank # ▮▮6726 | $ 63,224 |
| People's United Bank # ▮▮6724 | $ 11,685 |
| Desjardins # ▮▮955 | $ 495,977 |
| Desjardins # ▮▮548 | $ - |
|  | $ 7,279,689 |

**Note A:**
Canadian transactions have been converted to US Dollars based upon the following methodology:

The Canadian portion of total resort deposits was calculated to be 6% for the report period. This percentage was applied to all resort deposits at the average CDN to USD currency exchange rate of .77 for the report period.

**Jay Peak Resort/Burke Mountain**
**Cash Flow Statement**
10/01/18 through 10/31/18

|  | | USD |
|---|---|---:|
| **Beginning Cash Balance** | | |
| People's United Bank # ████ 1736 | $ | 3,721,029 |
| People's United Bank # ████ 1752 | $ | - |
| People's United Bank # ████ 7175 | $ | 21,068 |
| People's United Bank # ████ 0659 | $ | 958,522 |
| People's United Bank # ████ 0667 | $ | - |
| People's United Bank # ████ 6722 | $ | 2,008,184 |
| People's United Bank # ████ 1175 | $ | - |
| People's United Bank # ████ 6726 | $ | 63,224 |
| People's United Bank # ████ 6724 | $ | 11,685 |
| Desjardins # ██ 955 | $ | 495,977 |
| Desjardins # ██ 548 | $ | - |
| | $ | 7,279,689 |
| | | |
| **Add Incoming:** | | |
| Receiver Funding | | |
| Direct - Merrill Lynch Bank Accounts | $ | - |
| Indirect - CitiBank Accounts | $ | 796,156 |
| Deposits from Operations | $ | 4,071,855   A |
| | $ | 4,868,011 |
| | | |
| **Less Outgoing:** | | |
| Payroll & Benefits | | |
| Jay Peak Resort | $ | (1,636,542) |
| Burke Mountain | $ | (357,129) |
| Vendor Payments | | |
| Jay Peak Resort | $ | (4,636,259) ██ |
| Burke Mountain | $ | (731,579) ██ |
| Tax Payments | | |
| Vermont Department of Taxes | $ | (145,432) |
| Internal Revenue Service | $ | (193) |
| Merchant and Bank Fees | $ | (61,045) |
| | $ | (7,568,179) |
| | | |
| **Ending Cash Balance** | | |
| People's United Bank # ████ 1736 | $ | 2,620,967 |
| People's United Bank # ████ 1752 | $ | - |
| People's United Bank # ████ 7175 | $ | 21,072 |
| People's United Bank # ████ 0659 | $ | 492,325 |
| People's United Bank # ████ 0667 | $ | - |
| People's United Bank # ████ 6722 | $ | 896,260 |
| People's United Bank # ████ 1175 | $ | - |
| People's United Bank # ████ 6726 | $ | 47,495 |
| People's United Bank # ████ 6724 | $ | 3,315 |
| Desjardins # ██ 955 | $ | 498,087 |
| Desjardins # ██ 548 | $ | - |
| | $ | 4,579,521 |

**Note A:**
Canadian transactions have been converted to US Dollars based upon the following methodology:

The Canadian portion of total resort deposits was calculated to be 5% for the report period. This percentage was applied to all resort deposits at the average CDN to USD currency exchange rate of .77 for the report period.

**Jay Peak Resort/Burke Mountain**
**Cash Flow Statement**
11/01/18 through **11/30/18**

|  |  | USD |
|---|---|---:|
| **Beginning Cash Balance** |  |  |
| People's United Bank # ▮ 1736 | $ | 2,620,967 |
| People's United Bank # ▮ 1752 | $ | - |
| People's United Bank # ▮ 7175 | $ | 21,072 |
| People's United Bank # ▮ 0659 | $ | 492,325 |
| People's United Bank # ▮ 0667 | $ | - |
| People's United Bank # ▮ 6722 | $ | 896,260 |
| People's United Bank # ▮ 1175 | $ | - |
| People's United Bank # ▮ 6726 | $ | 47,495 |
| People's United Bank # ▮ 6724 | $ | 3,315 |
| Desjardins # ▮ 955 | $ | 498,087 |
| Desjardins # ▮ 548 | $ | - |
|  | $ | 4,579,521 |
|  |  |  |
| **Add Incoming:** |  |  |
| Receiver Funding |  |  |
| Direct - Merrill Lynch Bank Accounts | $ | - |
| Indirect - CitiBank Accounts | $ | 208,229 |
| Deposits from Operations | $ | 3,776,062 A |
|  | $ | 3,984,291 |
|  |  |  |
| **Less Outgoing:** |  |  |
| Payroll & Benefits |  |  |
| Jay Peak Resort | $ | (1,315,672) |
| Burke Mountain | $ | (279,975) |
| Vendor Payments |  |  |
| Jay Peak Resort | $ | (2,423,174) ▮ |
| Burke Mountain | $ | (388,465) ▮ |
| Tax Payments |  |  |
| Vermont Department of Taxes | $ | (228,033) |
| Internal Revenue Service | $ | (479) |
| Merchant and Bank Fees | $ | (85,082) |
|  | $ | (4,720,880) |
|  |  |  |
| **Ending Cash Balance** |  |  |
| People's United Bank # ▮ 1736 | $ | 1,849,078 |
| People's United Bank # ▮ 1752 | $ | - |
| People's United Bank # ▮ 7175 | $ | 21,075 |
| People's United Bank # ▮ 0659 | $ | 569,846 |
| People's United Bank # ▮ 0667 | $ | - |
| People's United Bank # ▮ 6722 | $ | 832,333 |
| People's United Bank # ▮ 1175 | $ | - |
| People's United Bank # ▮ 6726 | $ | 54,820 |
| People's United Bank # ▮ 6724 | $ | 7,599 |
| Desjardins # ▮ 955 | $ | 508,181 |
| Desjardins # ▮ 548 | $ | - |
|  | $ | 3,842,932 |

**Note A:**
Canadian transactions have been converted to US Dollars based upon the following methodology:

The Canadian portion of total resort deposits was calculated to be 12% for the report period. This percentage was applied to all resort deposits at the average CDN to USD currency exchange rate of .76 for the report period.

**Jay Peak Resort / Burke Mountain**
**Cash Flow Statement**
12/01/18 through **12/31/18**

|  | USD |
|---|---|
| **Beginning Cash Balance** | |
| People's United Bank # ████1736 | $ 1,849,078 |
| People's United Bank # ████1752 | $ - |
| People's United Bank # ████7175 | $ 21,075 |
| People's United Bank # ████0659 | $ 569,846 |
| People's United Bank # ████0667 | $ - |
| People's United Bank # ████6722 | $ 832,333 |
| People's United Bank # ████1175 | $ - |
| People's United Bank # ████6726 | $ 54,820 |
| People's United Bank # ████6724 | $ 7,599 |
| Desjardins # ██955 | $ 508,181 |
| Desjardins # ██548 | $ - |
| | $ 3,842,932 |
| **Add Incoming:** | |
| Receiver Funding | |
| Direct - Merrill Lynch Bank Accounts | $ - |
| Indirect - CitiBank Accounts | $ 855,950 |
| Deposits from Operations | $ 7,807,587   A |
| | $ 8,663,537 |
| **Less Outgoing:** | |
| Payroll & Benefits | |
| Jay Peak Resort | $ (1,894,787) |
| Burke Mountain | $ (391,849) |
| Vendor Payments | |
| Jay Peak Resort | $ (2,899,541) ██ |
| Burke Mountain | $ (444,722) ██ |
| Tax Payments | |
| Vermont Department of Taxes | $ (308,716) |
| Internal Revenue Service | $ (116) |
| Merchant and Bank Fees | $ (79,284) |
| | $ (6,019,015) |
| **Ending Cash Balance** | |
| People's United Bank # ████1736 | $ 4,843,720 |
| People's United Bank # ████1752 | $ - |
| People's United Bank # ████7175 | $ 21,079 |
| People's United Bank # ████0659 | $ 613,903 |
| People's United Bank # ████0667 | $ - |
| People's United Bank # ████6722 | $ 461,032 |
| People's United Bank # ████1175 | $ - |
| People's United Bank # ████6726 | $ 50,335 |
| People's United Bank # ████6724 | $ 13,708 |
| Desjardins # ██955 | $ 483,677 |
| Desjardins # ██548 | $ - |
| | $ 6,487,454 |

**Note A:**

Canadian transactions have been converted to US Dollars based upon the following methodology:

The Canadian portion of total resort deposits was calculated to be 7% for the report period. This percentage was applied to all resort deposits at the average CDN to USD currency exchange rate of .74 for the report period.

**Jay Peak Resort/Burke Mountain**
**Cash Flow Statement**
1/01/19 through 1/31/19

|  | USD |
|---|---|
| **Beginning Cash Balance** | |
| People's United Bank # ▮1736 | $ 4,843,720 |
| People's United Bank # ▮1752 | $ - |
| People's United Bank # ▮7175 | $ 21,079 |
| People's United Bank # ▮0659 | $ 613,903 |
| People's United Bank # ▮0667 | $ - |
| People's United Bank # ▮6722 | $ 461,032 |
| People's United Bank # ▮1175 | $ - |
| People's United Bank # ▮6726 | $ 50,335 |
| People's United Bank # ▮6724 | $ 13,708 |
| Desjardins # ▮955 | $ 483,677 |
| Desjardins # ▮548 | $ - |
| | $ 6,487,454 |
| **Add Incoming:** | |
| Receiver Funding | |
| Direct - Merrill Lynch Bank Accounts | $ - |
| Indirect - CitiBank Accounts | $ 145,850 |
| Deposits from Operations | $ 10,328,279  A |
| | $ 10,474,129 |
| **Less Outgoing:** | |
| Payroll & Benefits | |
| Jay Peak Resort | $ (2,454,190) |
| Burke Mountain | $ (467,369) |
| Vendor Payments | |
| Jay Peak Resort | $ (4,197,931) ▮ |
| Burke Mountain | $ (681,356) ▮ |
| Tax Payments | |
| Vermont Department of Taxes | $ (534,575) |
| Internal Revenue Service | $ (3,233) |
| Merchant and Bank Fees | $ (173,408) |
| | $ (8,512,062) |
| **Ending Cash Balance** | |
| People's United Bank # ▮1736 | $ 6,081,326 |
| People's United Bank # ▮1752 | $ - |
| People's United Bank # ▮7175 | $ 21,083 |
| People's United Bank # ▮0659 | $ 814,927 |
| People's United Bank # ▮0667 | $ - |
| People's United Bank # ▮6722 | $ 940,317 |
| People's United Bank # ▮1175 | $ - |
| People's United Bank # ▮6726 | $ 43,854 |
| People's United Bank # ▮6724 | $ 28,011 |
| Desjardins # ▮955 | $ 520,003 |
| Desjardins # ▮548 | $ - |
| | $ 8,449,521 |

**Note A:**
Canadian transactions have been converted to US Dollars based upon the following methodology:

The Canadian portion of total resort deposits was calculated to be 12% for the report period.  This percentage was applied to all resort deposits at the average CDN to USD currency exchange rate of .75 for the report period.